1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   MARY E. HACKENBRACHT
    Senior Assistant Attorney General
3   ELLEN M. PETER
    Supervising Deputy Attorney General
4   JAN ZABRISKIE
    Deputy Attorney General
5    1300 I Street, Suite 125
     P.O. Box 944255
6    Sacramento, CA 94244-2550
     Telephone: (916) 322-5181
7    Fax: (916) 327-2319
     Email: jan.zabriskie@doj.ca.gov
8

9   Attorneys for Plaintiff

10              IN THE UNITED STATES DISTRICT COURT

11                FOR THE DISTRICT OF COLUMBIA

12

13   **STATE OF CALIFORNIA by and through**          Case No: _____
     **ARNOLD SCHWARZENEGGER, GOVERNOR**
14   **OF THE STATE OF CALIFORNIA, and the**
     **CALIFORNIA AIR RESOURCES BOARD,**
15                                                    **COMPLAINT FOR**
                                        Plaintiff,    **DECLARATORY AND**
16                                                    **INJUNCTIVE RELIEF**
17           v.

18   **UNITED STATES ENVIRONMENTAL**
     **PROTECTION AGENCY and STEPHEN L.**
19   **JOHNSON, ADMINISTRATOR,**

20                                       Defendants.

21

22                      **INTRODUCTION**

23       1.      The State of California, by and through Arnold Schwarzenegger,

24   Governor of the State of California, and the California Air Resources Board,

25   brings this action to compel the United States Environmental Protection Agency

26   and Stephen L. Johnson, Administrator for the United States Environmental

27   Protection Agency (USEPA), to either grant or deny California's request for a

28   waiver of preemption of its Regulation to Control Greenhouse Gas Emissions

from Motor Vehicles (GHG Regulation), under section 209(b) of the Clean Air Act (42 U.S.C. § 7543(b)).  The California Air Resources Board (CARB) requested the waiver from USEPA on December 21, 2005.  The administrative docket is EPA-HQ-OAR-2006-0173.

2.    California  adopted the GHG Regulation to reduce the future harm to California's public health, welfare, safety, and economy resulting from increased global warming.  The GHG Regulation requires a reduction in the emissions of greenhouse gases from most light-duty motor vehicles sold in California, on a fleet-wide basis, beginning with the 2009 model-year.

3.    USEPA must act on the GHG Regulation without further delay because manufacturers cannot market their 2009 model-year vehicles in California without first certifying them.  Marketing of the 2009 models can begin as early as January 2008.  Also, at least 14 other states have adopted or are considering the adoption of the same emission standards for new vehicles sold in their states. Implementation of their regulations depends on the USEPA first granting California's waiver application.

4.    USEPA has unreasonably delayed action on the requested waiver. The agency has had nearly two years since CARB applied for the waiver to review the application and supporting materials and to make a decision.

5.    The comments submitted to the USEPA overwhelmingly support the GHG Regulation.  Of the approximately 98,000 comments referenced in the USEPA's docket, more than 99.9% support the GHG Regulation.  Only one automaker subject to the GHG regulation submitted any opposition to the USEPA. Two automaker trade groups submitted opposing comments.

6.    The effect of global warming on California's population, economy and environment has been extensively demonstrated both during CARB's and USEPA's administrative proceedings on the GHG Regulation and in other public forums and scientific proceedings.

7.    The accelerating  rate at which GHG emissions are increasing in the absence of regulation also makes the USEPA's delay unreasonable.  The measured rate of change is exceeding earlier projections.  Recent studies, of which the USEPA is aware, indicate the Earth may be perilously close to an irreversible melting of ice sheets within this century.

8.    Motor vehicles are a major source of greenhouse gases, particularly in California.  Automotive emissions of greenhouse gases are increasing more rapidly than any other source.  The longer the delay in reducing these emissions, the more costly and harmful will be the impact on California.

## JURISDICTION, VENUE AND NOTICE

9.    Jurisdiction of this court is invoked pursuant to the citizen's suit provision of the Clean Air Act, 42 U.S.C. § 7604(a).

10.    Venue in this court is proper as the GHG Regulation is "nationally applicable" by reason of the multiple states that have adopted the same regulation under 42 U.S.C. § 7507 and because the regulation applies to automobile manufacturers residing outside the jurisdiction of the Court of Appeals for the Ninth Circuit.

11.    California notified the USEPA of its intent to file this action pursuant to 42 U.S.C. § 7604(a) on April 25 and 26, 2007.

## REGULATORY HISTORY

12.    In 2002, the California Legislature adopted Assembly Bill 1493 (Pavley), which amended California Health and Safety Code section 42823 and added section 43018.5.  The legislation required CARB to develop and adopt a regulation for the control of greenhouse gas emissions by light-duty motor vehicles.

13.    In 2002, CARB began holding public workshops and soliciting public comments on the development of a draft regulation.

///

14.    After a series of workshops, comment analysis, and public hearings, the CARB Board approved its GHG Regulation on September 23, 2004. Final language and adoption occurred on August 4, 2005. The regulation amended Title 13 of the California Code of Regulations, sections 1900 and 1961, and added section 1961.1.

15.    On December 21, 2005, CARB applied to the USEPA for waiver of federal preemption of the GHG Regulation under the Clean Air Act pursuant to 42 U.S.C. § 7543(b).

16.    USEPA did not notice a hearing or solicit additional comments on California's waiver application until April 30, 2007, sixteen months after CARB applied for the waiver. USEPA held hearings on May 22 and 30, 2007. The noticed comment period expired on June 15, 2007.

17.    To date, USEPA has not granted or denied California's request for the waiver.

**GLOBAL WARMING IS MAKING CALIFORNIA'S CLIMATE WORSE**

18.    The climate of California is predominantly arid to semi-arid. Summers are hot and winters mild. Precipitation largely arrives in the form of winter storms carried south-eastward across the state from the Pacific Ocean. Except for mountain snowfall, precipitation arrives as rain.

19.    Increasing emissions of greenhouse gases into the atmosphere are causing global warming. The resultant climatic change in California includes increasing temperatures, reduced snowfall in the mountains, a northward shift in the prevailing winter storm track, deteriorating air quality, and more extreme weather events.

20.    California's statewide, annual mean temperature increased by 0.57 degrees Celsius (1.03 degrees Fahrenheit) between 1949 to 1999. Greenhouse gas emissions are expected to further increase the rate of warming. Average California temperatures in the summer are expected to increase between 4.1°C

(7.3°F) and 8.3°C (14.9°F) by the end of 2100. Winter temperatures are expected to rise between 3.0°C (5.4°F) and 4.0°C (7.2°F).

21.    Rising temperatures are causing less precipitation to fall as snow in California's northern mountains and relatively more as rain.

22.    Global warming increases extreme heat waves and storm intensities. In the 2006-2007 season, Southern California experienced its driest year since record-keeping began 130 years ago. Two years earlier, Los Angeles had its wettest year in the last 121 years, including the fifteen wettest days since record-keeping began. A heat wave in July of 2006 set a record of six consecutive 110-plus-degree days in Fresno and 11 consecutive triple-digit days in Sacramento. Further global warming will increase weather variability in the future, resulting in longer droughts, more extreme heat waves, and more severe storms.

**GLOBAL WARMING ENDANGERS CALIFORNIA'S HUMAN HEALTH, WELFARE, SAFETY, ECONOMY AND ENVIRONMENT**

23.    California is the most populous state in the United States, home to one in seven Americans. Its population is approaching 37 million and is projected to reach 44 million by 2020 and nearly 60 million by 2050.

24.    California depends on one of the largest network of reservoirs and aqueducts in the world for its water supply. This network stores the winter and early spring snowmelt from the Sierra Nevada and other northern mountains for delivery when water demand is highest, in the late spring and summer. The system irrigates crops in California's central valleys and delivers domestic water to a population centered in the southern and coastal parts of the state. Runoff from the Sierra Nevada snow pack accounts for about 35% of California's water supply.

25.    California has been the leading state in agricultural production for the past 50 years. For example, in 1997, 10.8 million acres of the state were devoted to harvested crops with another 14.4 million acres devoted to pasture and

1    rangeland.   It produces more than 350 crops.  Half of the fruits, nuts and

2    vegetables in the country come from California.  It is the only state producing

3    commercial quantities of almonds, artichokes, clingstone peaches, figs, raisins,

4    walnuts, pistachios, nectarines, olives, dates, and prunes. California also leads the

5    nation in dairy production.

6        26.    Agriculture is critical to California's economy.  Cash farm receipts

7    to agricultural producers were valued at $31.8 billion in 2004. California's

8    agriculture is also vital for the nation, as 80% of the production is sold for

9    domestic consumption.

10        27.    California agriculture usually consumes about 40 percent of the

11    state's total annual developed water supply.  A reduced water supply will decrease

12    the amount and increase the cost of California's crop production.  Increased

13    temperatures will decrease dairy production.

14        28.    The Colorado River provides more than one-half of Southern

15    California's average annual net water use.  It supplies water for agricultural use in

16    the Imperial and Coachella valleys of Southern California and for domestic

17    consumption elsewhere in the southern portion of the state.  The Colorado River

18    watershed has been subject to a drought since 1999.  This poleward shifting of the

19    Pacific Ocean storm tracks and higher temperatures in the Colorado Basin are

20    expected to increase drought conditions through most of this century.

21        29.    Increasing temperatures are reducing the duration, as well as the

22    size, of the mountain snowpack in California.  Snow accumulation, measured on

23    the first of April each year, has declined ten percent since 1950. The peak run-off

24    occurs ten to thirty days earlier in the spring than it has in the past.

25        30.    Projected increases in temperature will drastically reduce the

26    snowpack needed to sustain California's water supply.  By 2070–2099, virtually

27    no snow will be left below the elevation of 1000 m (3280 feet).   The volume of

28    snow will be 60% to 93% less at the middle elevations, up to 6560 feet (2000 m),

and losses of 25% to 79% will occur above the middle elevations up to 9840 feet
(3000 m).

31.    California's flood protection system includes dams and levees that
were designed based on historical conditions.  These conditions are changing and
flood risks are increasing as intense storms are becoming larger and a greater
proportion of precipitation falls as rain.  Draining reservoirs before winter storms
to reduce flood risks increases the separate risk of water becoming unavailable for
California's agricultural and domestic needs.

32.    California's ocean coastline is more than 1000 miles long.  The coast
includes wide beaches and broad plains in Southern California.  Major inland bays
and estuaries, including the San Francisco Bay and the Sacramento-San Joaquin
Deltas, are in the northern part of the State.  Seventy percent of California's
population lives within 60 miles of the coast.

33.    Sea level rise has affected much of the coast in Southern California,
Central California, and the San Francisco Bay and estuary.  These historical trends
have approached 2 mm/year (0.08 inches/year).  These rates are consistent with
the global sea level rise.  Average sea level around the globe is projected to rise an
additional 0.18 to 5.9 meters (0.6 to19.4 feet) by 2100.

34.    The projected sea level rise will further erode California's beaches
and bluffs, inundate low-lying coastal lands and marshes, spread through the bays,
exacerbate flooding at the mouths of rivers and streams, increase saltwater
intrusion into estuaries and coastal aquifers, increase the risk of levee failures, and
threaten California's system for controlling water flow in the Sacramento-San
Joaquin Delta.

35.    Ozone is a component of smog that damages the respiratory tract
and increases the symptoms of asthma, a debilitating breathing affliction that has
become increasingly common. California's South Coast and San Joaquin air
basins experience the highest ozone concentrations in the United States; they have

1   the only severe and serious health area designations for the national 8-hour ozone

2   standard.  Global warming increases the formation of ozone.  These effects will

3   increase the already dangerously high levels of  ozone in the South Coast and San

4   Joaquin air basins.

5       36.    Heat-related deaths are a major health risk in California.  A heat-

6   wave in July of 2006 was responsible for 140 deaths in California.  Global

7   warming is projected to increase heat-related deaths.  For example,  in Los

8   Angeles in the 2090's, the risk is expected to be two to three times higher than in

9   the corresponding decade a century before.  Other projections are greater, with

10  estimates of a five to seven fold increase in heat-related deaths.

11      37.    California has extensive forests and other wild lands.  The 85 million

12  acres of wild lands includes 17 million acres of commercial forests.  Global

13  warming has already increased the number of large wild land fires by causing fire

14  seasons to be drier and hotter, start earlier, and last longer.   Fires larger than 1000

15  acres in the western United States occurred four time more often between 1987

16  and 2003 than they did between 1970 and 1986. The resulting property damage

17  and fire suppression costs have increased as well.  Further acceleration of snow

18  melt and higher temperatures will increase the frequency of large fires by making

19  wild land vegetation drier and fire seasons last longer.  The area historically

20  burned by fires is expected to expand by nine to fifteen percent by the end of the

21  century.

22      38.    Global warming will also alter the natural biota.  Alpine and

23  subalpine forests will decline and coniferous forests will be partly replaced by

24  mixed conifer and evergreen hardwoods.  Grasslands will expand, largely at the

25  expense of woodlands and chaparral.  Increases in woody growth due to longer

26  growing seasons and, under some climatic scenarios, more precipitation, will be

27  cut short by the increased wildfires.  Warming temperatures will allow the

28  expansion of agricultural weeds, pests and microbial diseases.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    8

39.    Additional risks for California, more difficult to predict, but of far greater magnitude, include the potential acceleration of ice-sheet melting from the Antarctic and Greenland.  Computer modeling of future climates indicates that a global increase of up to 3°C could cause these ice sheets to melt in the next century.  More recent measurements and studies indicate that ice melting is happening more rapidly and may cause catastrophic sea level rise within this century.  Loss of the Greenland Ice Sheet would cause the sea level to rise twenty-one feet and loss of the West Antarctic Ice Sheet would cause a rise of twenty-six feet.

40.    Because of the feedback effects of global warming, a rise in global temperatures of less than 3°C could cause ice sheet melting to reach a "tipping point," which would preclude future emission reductions from reversing the loss of polar ice and resultant sea rise.  Such a tipping point could occur with a global increase in temperatures of between 1°C and 3°C.

### AUTOMOTIVE EMISSIONS ARE A MAJOR SOURCE OF GREENHOUSE GASES

41.    California has at least 32.5 million registered vehicles, more than twice the number of any other state.

42.    Light-duty motor vehicles account for about 30% of the greenhouse gases emitted in California.

43.    Vehicle emissions are the most rapidly growing source of greenhouse gas emissions in California.

44.    USEPA approval of the GHG regulation would reduce greenhouse gas emissions by about 30 million metric tons in 2020.  Because USEPA approval will allow regulations based on California's standards to take effect in at least 12 other states, the total 2020 reductions would be about 74 million metric tons.

///

///

1    45.    A reduction in greenhouse gas emissions will reduce the rate of

2    global warming and the associated risks and magnitude of the adverse impacts of

3    global warming on California.

4    **THE GHG REGULATION REQUIRES REDUCTIONS IN VEHICULAR
EMISSIONS OF GREENHOUSE GASES**

5

6    46.    The GHG Regulation requires that the major manufacturers of light-

7    duty vehicles sold in California begin to reduce the vehicular emissions of

8    greenhouse gases on a fleet-wide basis beginning with the 2009 model-year.

9    47.    The regulation divides the light-duty vehicles of each affected

10   manufacturer into two fleets.  One fleet (PC/LDT1) comprises passenger cars,

11   pick-up trucks and small sports utility vehicles.  The other fleet (LDT2/MDPV)

12   comprises larger light-duty trucks, up to 8500 pounds (gross vehicle weight), large

13   sports utility vehicles, and medium-duty passenger vehicles of less than 10,000

14   pounds.

15   48.    Greenhouse gas emissions, measured in terms of CO2-equivalents,

16   are limited to a fleet-average 323 grams per mile for PC/LDT1s in the 2009

17   model-year and decline over the years to 205 grams per mile in the 2016 model-

18   year.  Emission limits for LTD2/MDPVs are 439 grams per mile in the 2009

19   model-year and decline to 332 grams per mile in the 2016 model-year.

20   49.    Automakers can achieve compliance with the GHG Regulation

21   through a combination of  improved technologies and other actions.  Compliance

22   can be achieved by reductions in tailpipe emissions of  greenhouse gases, the use

23   of alternative fuels, credits for air conditioner improvements, credits carried over

24   from another year or fleet, and credit-trading among manufacturers.

25   **CONGRESS INTENDED PROMPT USEPA ACTION ON WAIVER
APPLICATIONS FOR CALIFORNIA AUTOMOBILE EMISSIONS
REGULATIONS.**

26

27   50.    Congress intended that California (1) serve as a laboratory for the

28   nation in the control of automotive emissions, (2) be able to adopt more stringent

1    regulations for automotive emissions than the federal government,  and (3) be able

2    to act more quickly than USEPA in adopting air pollution control measures.

3        51.    California has traditionally led the USEPA in establishing emission

4    standards for light-duty vehicles.

5        52.    42 U.S.C. § 7543(a) requires, subject to specified exceptions, that

6    USEPA's Administrator grant a waiver of federal preemption under the Clean Air

7    Act if California has determined that its "standards will be, in the aggregate, at

8    least as protective of public health and welfare as applicable Federal standards."

9        53.    The specified exceptions are set out in 42 U.S.C. § 7543 (b)(1).  The

10    USEPA Administrator must make at least one of the following three findings in

11    order to deny the waiver application:

12        (a) California's determination of protectiveness is arbitrary and capricious,

13        (b) California does not need the standards to meet compelling and

14        extraordinary conditions, or

15        (c) the standards and accompanying enforcement procedures are not

16        consistent with 42 U.S.C. § 7521(a).

17        54.    Under 42 U.S.C. § 7543, the USEPA does not go through the

18    process of independent rule-making.  Instead USEPA provides notice and

19    opportunity for public participation during its review of the California emission

20    regulation.

21        55.    Congress generally intended that the USEPA make determinations

22    of this type in a matter of weeks or months, not years.

23    **REASONABLE TIME FOR THE USEPA TO ACT HAS EXPIRED**

24        56.    CARB submitted a comprehensive analysis of the GHG regulation

25    when it applied for the waiver in December 2005.  The USEPA requested no

26    additional information.

27        57.    When the USEPA took no action on California's waiver application,

28    California Governor Arnold Schwarzenegger wrote the President of the United

1 States on April 10, 2006 and requested urgent action on California's waiver

2 application.  A copy was sent to the USEPA Administrator.

3   58. The USEPA did not respond.  It did not indicate what action, if any,

4 it was taking on CARB's application.  Nevertheless, the USEPA had been

5 studying the GHG regulation since at least September of 2004.

6   59. California's Governor again wrote the President and copied the

7 USEPA on October 24, 2006.  The Governor repeated his request for urgent

8 action.

9   60. On February 21, 2007, the USEPA informed CARB that USEPA did

10 not intend to act on California's waiver application, other than opening an

11 electronic docket, until the United States Supreme Court decided whether USEPA

12 was obligated to address greenhouse gases as air pollutants under the Clean Air

13 Act.   The Supreme Court ruled on April 2, 2007, that the greenhouse gases are

14 subject to regulation under the Clean Air Act.

15   61. USEPA requires no additional time to review California's

16 determination that its  standards are "at least as protective of public health and

17 welfare as applicable Federal standards" under 42 U.S.C. § 7543(b)(1) and (2).

18 California explicitly documented its determination in its December 2005

19 submission to the USEPA.

20   62. The protectiveness comparison of state and federal standards also

21 requires no additional time, since USEPA has no federal standards.

22   63. USEPA requires no additional time to determine whether

23 California's rule making was arbitrary and capricious under 42 U.S.C. §

24 7543(b)(1)(A).  USEPA was provided with a comprehensive exposition of

25 CARB's two-year rule-making when CARB first requested the waiver in

26 December 2005.  CARB's December 2005 submission to USEPA included an

27 outline of its rule-making process, a detailed 251-page Initial Statement of

28 Reasons for the rule, as well as a 446-page Final Statement of Reasons containing

CARB's further analysis and response to additional comments and statements presented on the rule.   The public policy objective of reducing atmospheric greenhouse gases is directly achieved by the GHG regulation since it set standards for reducing emissions of these very gases.

64.     USEPA requires no additional time to determine whether California needs the GHG regulation to meet compelling and extraordinary conditions under 42 U.S.C. § 7543(b)(1)(B).  The  USEPA is already aware, through its administration of other provisions of the Clean Air Act, that criteria air pollutants in California's South Coast and San Joaquin air basins continue to exceed national air quality standards.  The USEPA is also aware of the perils of  global warming, as it has been separately studying global warming effects since at least 1984.

65.     In addition, the policy and practice of the USEPA is to evaluate California's need to meet compelling and extraordinary conditions in terms of California's motor vehicle emissions program as a whole.  In this respect, the USEPA was already aware of California's continuing need for this program.

66.     USEPA requires no additional time to determine whether California standards are consistent with 42 U.S.C. § 7521(a), as the substantive comments based on lead time and technological feasibility were limited, and CARB submitted comprehensive documentation in its original December 2005 submission.

67.     USEPA requires no additional time to consider comments submitted in the course of its review of the GHG regulation. The deadline for comment submission expired on June 15, 2007.  Of the approximately 98,000 comments referenced by the USEPA's docket, more than 99.9% support the GHG Regulation.  General Motors Corporation is the only automaker subject to the regulation that submitted any comments.  Opposition is largely restricted to two automaker advocacy groups, the Alliance of Automobile Manufacturers and the Association of International Automobile Manufacturers. Only 15 entities who

opposed the regulation included any analysis in their comments, so the review time cannot be lengthy.

68.    The automakers' ability to timely and reasonably comply with the GHG Regulation was independently confirmed in a civil action, tried over the course of five weeks, before the United States District Court for the State of Vermont.  The action for federal preemption was brought by General Motors Corporation, DaimlerChrysler Corporation, and domestic and foreign automaker trade associations, as well as car dealers, in an attempt to invalidate Vermont's identical version of California's GHG Regulation.  The same adverse claims contained in the comments submitted in this USEPA proceeding were litigated in that civil action. The District Court rejected those claims in a 240-page opinion issued on September 12, 2007.

**MULTIPLE AND SUBSTANTIAL INTERESTS ARE
PREJUDICED BY DELAY**

69.    Since the GHG Regulation's graduated emission standards begin to apply with the 2009 model-year, further delay by the USEPA will interfere with implementation of the certification procedure required under the GHG Regulation. An order of the United States District Court for the Eastern District of California prohibits implementation of the GHG regulation until the USEPA grants the waiver.

70.    Automakers that will be subject to the GHG regulation have alleged in court pleadings, either directly or through their trade associations, that "it is essential for manufacturers subject to the rules like the AB 1493 regulations to obtain approval of their vehicle models well before the relevant model-year begins."  As the automakers correctly observe, the 2009 model-year can begin as early as January 2008.

71.    At least the following 14 states have adopted the GHG Regulation under Section 177 of the Clean Air Act or are in the process of adopting it:

1    Arizona, Connecticut, Florida, Maine, Maryland, Massachusetts, New Jersey, New

2    Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont and

3    Washington.  In at least ten of these states, the regulations apply beginning with

4    the 2009 model-year.  They account for more than 40% of the nation's population.

5    USEPA's delay prejudices these states as it does California, since implementation

6    of their regulations requires that USEPA first waive federal preemption for the

7    GHG regulation.

8        72.    Further delay also means that the postponed restoration of a

9    relatively stable and more equable climate would be less likely.  Such a delay

10   would also require more drastic and rapid greenhouse gas reductions in the future

11   at a greater cost.

12       73.    Longer delay also increases the risk of an abrupt climate change

13   within this century that would include a larger and more rapid rise of sea level

14   along California's coasts, inland bays and deltas.  Disintegration of the Greenland

15   Ice Sheet would raise sea level by twenty-one feet and disintegration of the West

16   Antarctic Ice Sheet would raise sea level by twenty-six feet.  A later loss of the

17   East Antarctic Ice Sheet would add more than 210 additional feet to the sea level.

18       74.    The USEPA is obligated to either grant or deny California's request

19   for a waiver of federal preemption of its GHG Regulation under 42 U.S.C. §

20   7543(b)(1).

21       75.    The USEPA's current failure to make a determination under 42

22   U.S.C. § 7543(b)(1) constitutes an unreasonable delay under 42 U.S.C. § 7604(a).

23       76.    The USEPA's failure to make a determination under 42 U.S.C. §

24   7543(b)(1) constitutes an unreasonable delay under 5 U.S.C. § 706(1).

25       77.    The USEPA's failure to make a determination under 42 U.S.C. §

26   7543(b)(1) constitutes agency action unlawfully withheld under 5 U.S.C. § 706(1).

27

28   / / /

1  WHEREFORE, plaintiff demands:

2    1.    That this court issue an order declaring that defendants United States

3  Environmental Protection Agency and Stephen L. Johnson, Administrator,

4  have unreasonably delayed in deciding California's application for waiver of

5  federal preemption of California's GHG Regulation under 42 U.S.C. § 7543(b)

6  and that their failure constitutes agency action unlawfully withheld.

7    2.    That this court issue an order compelling defendants United States

8  Environmental Protection Agency and Stephen L. Johnson, Administrator, to

9  decide California's application for waiver of federal preemption of

10  California's GHG Regulation under 42 U.S.C. § 7543(b) forthwith.

11    3.    That this court retain jurisdiction over this action at least until the

12  United States Environmental Protection Agency and Administrator decide

13  California's application.

14    4.    That the court grant such other and further relief as may be proper.

15

16  Dated: November 5, 2007          EDMUND G. BROWN Jr., Attorney
                                     General of the State of California
17                                   MARY E. HACKENBRACHT,
                                     Senior Assistant Attorney General
18                                   ELLEN M. PETER,
                                     Supervising Deputy Attorney General
19

20

21                                   JAN ZABRISKIE, Deputy Attorney General

22                                   Attorneys for Plaintiff State of California
                                     by and through Arnold Schwarzenegger,
23                                   Governor of the State of California, and the
                                     California Air Resources Board
24

25

26

27

28

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| State of California, by and through Arnold Schwarzenegger, Governor of the State of California and the California Air Resources Board | United States Environmental Protection Agency and Stephen L. Johnson, Administrator |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

EDMUND G. BROWN, Jr., Attorney  General of the State of California
MARY E. HACKENBRACHT, Senior
Assistant Attorney General
ELLEN M. PETER,
JAN ZABRISKIE
Deputy Attorneys General
1300 I Street, 15th Floor
P. O. Box 944255
Sacramento, California 94244
Telephone: (916) 322-5181

ATTORNEYS (IF KNOWN)

Case: 1:07-cv-02024
Assigned To : Lamberth, Royce C.
Assign. Date : 11/8/2007
Description: Admn. Agency Review

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
◉ 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**
☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**◉ C. Administrative Agency Review**
☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☒ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

*Not USA*
*Not USAG*

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Court from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

EPA unreasonably delayed on request for waiver of preemption under 42 U.S.C. § 7543(b)(1) in violation of 42 U.S.C. § 7604(a) and 5 U.S.C. § 706(1).

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** [_____]<br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>YES ☐  NO ☒ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY** (See instruction)  YES ☒  NO ☐  If yes, please complete related case form.

DATE  November 5, 2007    SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.