IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF CALIFORNIA, by and through                1-07-CV-2024
ARNOLD SCHWARZENEGGER, Governor of
the State of California, and CALIFORNIA AIR
RESOURCES BOARD

                Plaintiffs,

and

WASHINGTON ENVIRONMENTAL COUNCIL
615 Second Ave., Suite 380
Seattle, WA 98104

CLIMATE SOLUTIONS
219 Legion Way SW, Ste 201
Olympia, WA 98501

ENVIRONMENT WASHINGTON
3240 Eastlake Ave E., Ste 102Seattle, WA 98102

OREGON WILD
5825 N. Greeley Ave
Portland, Oregon 97217

3E STRATEGIES
16 NW Kansas Ave.
Bend, OR 97702

ENVIRONMENT OREGON
1536 SE 11th Avenue, Suite B
Portland, OR 97214

ANGUS DUNCAN
11334 S.W. Aventine Circus
Portland, OR 97219

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252

FRIENDS OF THE EARTH
311 California Street, Suite 510
San Francisco, CA 94104

Applicants-in-Intervention/
Plaintiffs

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and STEPHEN L.
JOHNSON, Administrator of the Environmental
Protection Agency Interior,

Defendants.

_____

**AMENDED, CORRECTED, UNOPPOSED MOTION TO INTERVENE
IN SUPPORT OF PLAINTIFFS**

Pursuant to Federal Rule of Civil Procedure 24 and Local Civil Rule 7(j), the Washington Environmental Council, Climate Solutions, Environment Washington, Oregon Wild, Environment Oregon, 3EStrategies, Angus Duncan, the Center for Biological Diversity, and Friends of the Earth hereby move this Court to intervene as of right as a Plaintiffs in this case, or, in the alternative, for permissive intervention. The motion to intervene is unopposed by Plaintiffs and Defendants have been contacted and take no position on it.

This motion is based on the attached exhibits, Memorandum in Support, and Declarations of Joan Crooks, Arthur (R.D.) Grunbaum, Doug Heiken, Angus Duncan, Kassia R. Siegel, Jessica Coven, William P. (Bill) LaBorde, Cylvia Hayes and Dr. Phillip Dustan, as well as any other materials that may be submitted to the Court during oral argument.

**MEMORANDUM IN SUPPORT**

**TABLE OF CONTENTS**

INTRODUCTION........................................................................................................1

FACTUAL AND LEGAL BACKGROUND............................................................2

THE APPLICANTS SHOULD BE PERMITTED TO INTERVENE........................................7

    I.      The Applicants are Entitled to Intervene as a Matter of Right............................8

           A.     The Applicants' Motion to Intervene is Timely........................................8

           B.     The Applicants Have a Significantly Protectable Interest
                in the Subject of the Action........................................................8

           C.     Absent Intervention, the Applicants Interest in Arresting Climate
                Change Will Be Significantly Impaired..................................................12

           D.     The Existing Parties Do Not Adequately Represent the Interests of
                the Applicants........................................................................13

    II.     In the Alternative, the Applicants Should be Allowed Permissive
           Intervention............................................................................15

CONCLUSION........................................................................................................16

**INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure (FRCP) 24(a), the Washington Environmental Council, Climate Solutions, Environment Washington, Oregon Wild, Environment Oregon, 3EStrategies, Angus Duncan, the Center for Biological Diversity, and Friends of the Earth, hereafter "Applicants" move to intervene on the side of plaintiff California in this action challenging the Environmental Protection Agency's unreasonable delay in issuing a waiver to California under Section 209(b) of the Clean Air Act, 42 U.S.C. § 7543. That waiver is needed to enable California's greenhouse gas (GHG) emissions limit program for passenger cars and light trucks to go into effect. Further, unless the waiver is granted, states that have adopted California's GHG tailpipe emissions program will not be able to enforce their programs. Those states include Oregon and Washington. Plaintiff California has stated that it does not oppose this motion for intervention and Defendant takes no position with respect to it. A proposed complaint is filed herewith.

Applicants satisfy all four requirements of FRCP 24(a) and are therefore entitled to intervene in this action as a matter of right. First, this motion to intervene is timely; defendants have not yet filed their response to California's complaint. Second, Applicants' interest in ensuring no further delay by defendant in issuing its decision is legally cognizable and related to the subject matter of this action. Third, a decision in defendant's favor rejecting California's remedy to require the Administrator to issue its waiver decision without further delay would impair Applicants' interest in ensuring effective state regulation that is needed, in the absence of equally effective federal regulation, to mitigate dangerous climate change. Finally, while Applicants' interests in this litigation are similar to that of plaintiff, they are sufficiently different that, absent their intervention, Applicants will not be adequately represented in this matter. In

1

the alternative, Applicants seek the Court's permission to intervene under FRCP 24(b).

**FACTUAL AND LEGAL BACKGROUND**

The Clean Air Act (CAA) requires the Environmental Protection Agency (EPA) to regulate pollutants from vehicle emissions, CAA § 202(a)(1), 42 U.S.C. § 7521(a)(1) and generally bars states from issuing and enforcing their own tailpipe emissions standards. CAA § 209(a), 42 U.S.C. § 7543(a). An exception is available for California, where that state "determines [its] standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards." CAA § 209(b), 42 U.S.C. § 7543(b). The EPA is required to grant to California, upon that state's request, a waiver of § 209(a) preemption where the state makes the § 209(b) determination, unless the EPA finds one of the following: (1) California's determination was arbitrary and capricious; (2) the state's standards are not needed to meet compelling and extraordinary conditions; or (3) California's standards and enforcement procedures are not consistent with the EPA's own authority to regulate vehicle emissions. CAA § 209(b), 42 U.S.C. § 7543(b). Other states, in turn, are entitled either to adopt the federal standards or the California emissions program. CAA § 177, 42 U.S.C. § 7507.

Pursuant to Chapter 200, Statutes of 2002 (A.B. 1493: Pavley Act), the California Air Resources Board undertook a rule-making process and, in 2004, adopted a regulation requiring phased reductions in tailpipe greenhouse gas (GHG) emissions commencing with 2009 model year passenger vehicles and light-duty trucks. Cal. Code Regs. tit. 13, § 1961.1 (2007). By 2016, the California program would reduce fleet average GHG emissions from new passenger cars and light trucks by more than a third. California submitted its request for a waiver of preemption to the EPA on Dec. 21, 2005. See 70 FR 21260 (April 30, 2007).

In 2005, Washington adopted the California GHG tailpipe emissions program by statute, contingent on Oregon adopting the same program. Wash. Rev. Code. § 70.120A.010 (2007); Wash. Adm. Code 173-423 (2007). By rule, in 2005, Oregon adopted the California program. Or. Adm. R. 340-257-0040 and 340-257-0100 (2007).[1]

In February, 2007, the Intergovernmental Panel on Climate Change released a report detailing the physical science basis for climate change.[2] Exhibit 1. It found that warming of the climate system is "unequivocal," noting that "eleven of the last twelve years... rank among the 12 warmest years in the instrumental record of global surface temperature" and that "the linear warming trend over the last 50 years... is nearly twice that for the last 100 years." The report stated, with "high confidence," that the rate of observed sea level rise increased from the 19th to the 20th century.[3] *Id*. at 4-5. The report found, as well, that atmospheric concentrations of carbon dioxide, methane and nitrous oxide have "increased markedly as a result of human

---

[1] We note, for completeness, that thirteen states, in addition to California, Oregon and Washington, have either adopted California's program or are on the verge of doing so. They include Arizona, Colorado, Connecticut, Florida, Massachusetts, Maryland, Maine, New Jersey, New Mexico, New York, Pennsylvania, Rhode Island and Vermont. Pew Center on Global Climate Change at www.pewclimate.org/what_s_being_done/in_the_states/vehicle_ghg_standard.cfm (visited Nov. 7, 2007).

[2] The February report provided results of the work of IPCC Working Group 1 which, in turn, is part of IPCC's Fourth Assessment Report. A report synthesizing the work of all IPCC working groups is due November 17. See http://www.ipcc.ch/ (visited Nov. 5).

[3] According to IPCC scientists, global sea level did not change significantly for 2-3,000 years, until late in the 19th century. During the 20th century, the IPCC estimates sea level to have risen at an average rate of about 1.7 mm/year (~7 inches during the century), including a 1.8 mm/year rate from 1961-2003. The scientists predict, moreover, a 21st century sea-level rise in the range of 1.8 to 5.9 mm/year (~7 to 23-inches for the century), depending on emission scenarios and other factors. *Id*. and IPCC WG1 AR4 Report, Chapter 5 at http://ipcc-wg1.ucar.edu/wg1/wg1-report.html (visited Nov. 7, 2007). Cf. prediction of James Hansen, Exhibit 5 at 2299 (unabated emissions could lead to an "ice sheet response [that] would likely occur within centuries, and ice melt this century could yield sea level rise of 1 meter or more and a dynamically changing ice sheet that is out of our control.").

3

activities since 1750," with the concentration of carbon dioxide exceeding "by far the natural range over the last 650,000 years." *Id*. at 2. The IPCC expressed "very high confidence"[4] that the net effect of human activities since 1750 has been one of warming, *id*. at 3,[5] and noted that "[m]ost of the observed increase in globally averaged temperatures since the mid-20th century is *very likely* due to the observed increase in anthropogenic greenhouse gas concentrations."[6] *Id*. at 8 (emphasis in original). The report projected that "[c]ontinued [GHG] emissions at or above current rates would cause further warming and induce many changes in the global climate system during the 21st century that would *very likely* be larger than those observed during the 20th century." *Id*. at 10 (emphasis in original).

On April 2, 2007, in <u>Massachusetts v. EPA</u>, 127 S. Ct. 1438 – a case challenging the EPA's failure under the CAA to regulate vehicle GHG emissions – the Supreme Court held that GHG emissions clearly qualify as pollutants under the CAA, *id.* at 1462, and found, *inter alia*, that harms associated with climate change are "serious and well recognized,"[7] *id.* at 1442, that

---

[4] The IPCC uses the term "very high confidence" to indicate that the expert judgment has at least a 90% chance of being correct, while an assessment given with "high confidence" is deemed to have about an 80% chance.

[5] The report found that "[t]he carbon dioxide radiative forcing increased by 20% from 1995 to 2005, the largest change for any decade in at least the last 200 years." *Id.* at 3. "Radiative forcing" is "a measure of the influence that a factor has in altering the balance of incoming and outgoing energy in the Earth-atmosphere system and is an index of the importance of the factor as a potential climate change mechanism." *Id.* at 2, note 2.

[6] The term "very likely" is used by the IPCC to indicate, using expert judgment, that an outcome or result has a greater than 90% probability of occurrence, while "likely" means greater than 66% probability. *Id*. at 3, note 6.

[7] The Court credited evidence both of already-occurred climate change harms (retreat of mountain glaciers, reduction in snow-cover, earlier spring melts, accelerated rise of sea levels), as well as evidence of harms that are presently threatened ("precipitate" rise in sea levels, severe and irreversible changes to natural ecosystems, reduced water storage in mountain snowpack, rapid spread of disease, and increased ferocity of hurricanes). *Id.* at 1455-56.

human-caused emissions of GHGs are a principal cause of climate change with the U.S. transportation sector contributing a significant share, *id.* at 1457, and that lowering vehicle GHG emissions that otherwise would accumulate is an important step toward arresting climate change, even if it is only one step. *Id.* To date, however, the EPA has neither adopted nor promulgated any standard to reduce or limit GHG emissions from vehicles.

On June 15, 2007, several of the present Applicants from Oregon and Washington provided comments to the EPA in support of California's waiver request, based on their recognition that reductions in GHG emissions from vehicles in California, Oregon, Washington, as well from other locales are essential to mitigating impacts of climate change in Oregon and Washington (as in California and elsewhere). *See* Exhibit 2. The comments cited a 2004 consensus statement by fifty Oregon and Washington scientists. *See* Exhibit 3. That statement reported that significant climate change impacts in the Pacific Northwest have already occurred, including that average regional temperatures have increased 1-3 °F over the last century, with the 1975 to present warming attributed to human-causes. The scientists stated that hydrologically important consequences of regional warming have already occurred, including a 35% decline in spring snowpack, a shift in peak streamflow by 1-3 weeks, and an increase in winter and decrease in summer flows. They predicted that, in the absence of significant changes, regional annual average temperatures are likely to increase approximately 2.7 °F by 2030, and 5.4 °F by the 2050s, resulting in shifting isotherms and changes in vegetation zones, higher elevation treelines, earlier animal and plant breeding, a longer and more intense allergy season, rising sea levels, further snowpack declines, longer fire seasons, and drier summers with a likely "increase in drought stress and vulnerability of forests to insects, disease and fire." *Id*.

5

The June 15 comments noted that, as in California, vehicle emissions are responsible for a substantial portion of GHG pollution emitted in Oregon and Washington, and that enforcement of the California standards will assist in limiting the most severe forms of climate change. *Id.* at 6-7.[8] The balance of the June 15 comments explained that California correctly determined that (1) its vehicle emissions standards are at least as protective as applicable federal standards, (2) that the waiver is needed to meet compelling and extraordinary conditions in California (notwithstanding that the California program, particularly if widely adopted, will also benefit Oregon and Washington) and, (3) that the California GHG vehicle emission program is consistent with § 202(a) of the CAA. *Id.* at 5-8.

Over the 22-month period during which the EPA has failed to act on California's request to implement its program it has become increasingly clear that atmospheric GHG concentrations have neared a "tipping point" beyond which irreparable and exceptionally severe climate change will be unavoidable. Exhibit 5. This means that little time remains to reverse present emission trends.[9] Moreover, according to James Hansen, director of NASA's Goddard Institute for Space Studies,[10] the continuation of "business as usual" GHG emissions makes it "practically certain" that there will be abrupt climate changes this century. Exhibit 6 at 31, par. 84. Hansen based his

---

[8] The comments noted, as well, that initiatives to limit GHG emissions from vehicles constitute one of several key mitigation measures identified by the Intergovernmental Panel on Climate Change (IPCC) to arrest the projected growth of global GHG emissions. *See* Exhibit 4 at 14.

[9] Recent observations that the Arctic ice cap has shrunk far faster than predictions derived from most prior simulations of global warming only add to this concern. Andrew Revkin, *Arctic Melt Unnerves the Experts*, New York Times (October 2, 2007).

[10] Hansen's statements are found in his declaration provided to the federal district court in a case challenging Vermont's adoption of California's GHG tailpipe emissions limits program. The court found Hansen's testimony credible and admissible. *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F.Supp.2d 295, 320 (2007).

6

opinion on "the magnitude and speed of human-induced changes of atmospheric composition (which dwarf natural changes) and the rate of global warming that will result." *Id*. Further delay in capping and reducing GHG emissions will require exceptionally deep and far less realistic later reductions, if dangerous climate change is to be avoided. See Exhibit 7 at 14. On the other hand, as summarized by the Vermont court, Hansen and others deem the type of emissions reductions required under the California program to be "consistent with the rates of change necessary to avoid the most drastic consequences of global warming." Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie, 508 F.Supp.2d 295, 304 (2007).

The EPA's delay in issuing the requested waiver accordingly thwarts the efforts of citizens, acting through their state governments, to take effective action to mitigate climate change. The delay, moreover, risks a calamity by pressing atmospheric GHG concentrations toward a tipping point that could effect an essentially irreversible alteration of the climate system upon which nature in its present form and human civilization depend.[11]

**APPLICANTS SHOULD BE PERMITTED TO INTERVENE**

Federal Rule of Civil Procedure 24(a)(2) provides that intervention of right is proper where: (1) the motion is timely; (2) the petitioner has asserted an interest relating to the property or transaction which is the subject of the action; (3) without intervention the disposition of the action may as a practical matter impair or impede the petitioner's ability to protect that interest; and (4) the petitioner's interest is inadequately represented by the existing parties. See Fund for Animals, Inc. v. Norton, 322 F.3d 728, 731 (D.C. Cir. 2003); Environmental Defense v. Leavitt, 329 F.Supp.2d 55, 65-67 (D.D.C. 2004). "[T]he D.C. Circuit has taken a liberal approach to

---

[11] In the event that EPA rejects California's waiver request once it renders its decision, EPA's present delay only works to forestall the time in which California or other parties can seek judicial review of that decision.

intervention." Wilderness Society v. Babbitt, 104 F. Supp.2d 10, 18 (D. D.C. 2000), citing

NRDC v. Costle, 561 F.2d 904, 910-11 (D.C. Cir. 1977).

**I.    The Applicants Are Entitled to Intervene as a Matter of Right**

**A.    Applicants' Motion to Intervene is Timely**

The timeliness of a motion to intervene depends on "all the circumstances" surrounding

the case, NAACP v. N.Y., 413 U.S. 345, 366 (1973), but primarily on the "improbability of

prejudice to those already parties in the case." Nat'l Wildlife Fed. v. Burford, 878 F.2d 422, 433

(D.C. Cir. 1989) (quoting Hodgson v. United Mine Workers of America, 473 F.2d 118, 129

(D.C. Cir. 1972)), rev'd on other grounds, 497 U.S. 871 (1990).

Applicants have not been tardy in seeking intervention, as this motion is provided even

prior to defendant's answer.  Moreover, there is no prejudice to any party in this case.  There has

been no significant filing in the case other than plaintiff's complaint.  For this reason, this

motion to intervene is timely.

**B.    Applicants Have a Significantly Protectable Interest in the Subject of the Action**

Satisfaction of constitutional standing requirements "demonstrates the existence of a

legally protected interest" under FRCP 24 (a) Jones v. Prince George's County, Md., 348 F.3d

1014, 1019 (D.C. Cir. 2003); Envtl. Def., 329 F.Supp.2d at 66, n. 7.  Here, Applicants have

constitutional standing: members of the organizations and one individual that comprise the

present group of Applicants have demonstrated injury in-fact, causation, and redressability.

Fund for Animals, Inc. v Norton, 322 F.3d 728, 732-33 (D.C.Cir. 2003).  See also

Massachusetts, 127 S.Ct. at 1453-54 ("[o]nly one of the petitioners needs to have standing ... to

consider the petition for review"); Clinton v. City of New York, 524 U.S. 417, 431 n.19 (1998),

<u>citing</u> <u>Bowsher v. Synar</u>, 478 U.S. 714, 721 (1986) (same).

Applicants include environmental organizations dedicated to protection of natural resources and restoration of sustainable ecosystems.  In light of the presently damaging and foreseeably devastating impacts on natural systems, mitigation of climate change is central to Applicants' mission and goals.  Crooks Decl. ¶ 2 (Council is "dedicated to the protection, preservation, and enhancement of the natural resources, ecological values, and environment of Washington");  Heiken Decl. ¶ 5 ("Avoiding and/or mitigating climate change is critical to the realization of Oregon Wild's mission to protect and restore Oregon's wildlands, wildlife and water as an enduring legacy"); Siegel Decl. ¶ 4 (Center for Biological Diversity's goal is to "protect biological diversity, public health, and the environment from global warming"); Coven Decl. ¶ 1 (Climate Solutions' mission is to "promote practical solutions to global warming that are also economically profitable); LaBorde Decl. ¶¶ 2, 6 (Environment Washington objectives include environmental quality of state's air, water, and open spaces); Hayes ¶¶ 1, 4 (3EStrategies goals include sustainable economic practices and $CO_2$ emission reductions); Dustan ¶ 26 (Friends of the Earth invested institutional energy to ensure active implementation of tailpipe GHG reduction law).

Applicants and their members have worked hard to educate the public and inform policymakers about existing impacts, worsening impacts on the natural environment if GHG concentrations continue to increase, and viable options to mitigate climate change.  Heiken Decl. ¶ 9 (citing Oregon Wild report on impact to ecosystems and forests); Brunbaum Decl. ¶ 11 (describing work to increase awareness of climate change impacts on Grays Harbor, Washington); Duncan Decl. ¶¶ 8-11(service on Governor's global warming advisory group that created state strategy including adoption of tailpipe GHG emissions program; guidance to state

9

Environmental Quality Commission; President of foundation dedicated to displacing fossil fuel generation with energy efficiency and renewable energy technologies); Siegel Decl. ¶ 6; Coven ¶ Decl. 2; Hayes Decl. ¶ 1, Laborde Decl. ¶¶ 3-5. Unchecked climate change therefore undermines the organizations' goals and injures members in their professional capacity. Siegel Decl. ¶ 10 (professional goal of promoting reductions in GHG pollution to slow global warming); Laborde Decl. ¶ 6 (EPA's failure to issue a decision results in more severe climate change and undermines declarant's "work with and the objectives of Environment Washington"); Dustan Decl. ¶¶ 13-20 (climate change a "significant factor" in the loss of corals, contributing to "diminished opportunities for fundamental biological research and my ability to pursue my profession") and ¶ 27 (demonstrated organizational interest in ensuring EPA acts on waiver request, as group crafted law, found authors for bill, was instrumental in passing bill, and assisted in crafting implementing regulations).

Applicants, moreover, advocated within their respective legislative and administrative bodies for the adoption of state tailpipe GHG emissions programs, deeming them important and readily achievable steps toward mitigating climate change. Crooks Decl. ¶ 2 (Washington Environmental Council was instrumental in Washington state's adoption of the Clean Cars legislation); Dustan Decl ¶¶ 26, 27 (Friends of the Earth craft the law and was instrumental in passage of California's tailpipe GHG emissions reduction law); Grunbaum Decl. ¶ 11; Siegel Decl. ¶¶ 6-7; Coven Decl. ¶ 3; LaBorde Decl. ¶ 4; Hayes Decl. ¶ 1.

Further, members of the Applicant organizations are actually and imminently affected in concrete and particularized ways by the acceleration and exacerbation of climate change caused by defendant's failure to decide on California's waiver request. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, note 1 (1992) ("By particularized, we mean that the injury must

10

affect the plaintiff in a personal and individual way."); <u>Massachusetts</u>, 127 S.Ct. at 1456 (that climate-change risks are widely shared does not minimize a party's interest in the outcome of litigation).  Injuries from climate change unmitigated by effective controls on GHG emissions stem from sea-level rise, increased precipitation and flooding, increased wildfire, habitat impoverishment, and species loss.  Grunman Decl. ¶¶ 9, 10, 14 (concern for survivability of home and shoreline property due to increasing rainfall and precipitation variability, more significant storm surges, rising sea level, increased wave action and erosion); Duncan Decl. ¶¶ 5-6 (wildfire threat to home at Black Butte Ranch, Oregon; water supply uncertainty due to declines in Cascade snowpack) and ¶ 7 (recreational activity limitation due to increased summer fire danger and reduced winter snowpack) ; Siegel Decl.  ¶ 12 (2006 wildfire threat to home near Joshua Tree, California) and ¶¶ 13-16 (impairment to Arctic ecosystem from climate change induced sea-ice loss jeopardizes polar bears, a species of particular concern to member of Applicant group who observed such bears in Manitoba, Canada, at the time of her declaration, and who plans to observe their condition next year in the same location);  Heiken Decl. ¶¶ 11-12 (family recreation destination Neptune Beach, at the mouth of Cummins Creek, to be underwater unless climate change is checked); Coven Decl. ¶ 8 (earlier runoff from snow pack and resulting water shortages) and ¶ 9 (increase in Seattle rainfall will require replacement of house roof); LaBorde (fewer opportunities to ski in the Cascade mountains); Hayes Decl. ¶ 6 (climate change undermines to plans to run, hike and ski in forest and wilderness areas surrounding Bend); Dustan Decl. ¶¶ 16-18 (Diminished enjoyment of coral reefs and ability to share with family) and ¶¶ 19-20 (increased construction and insurance costs to build home so as to withstand climate change-induced increase is storm severity).

These injuries are traceable to defendant's dual failure to regulate GHG emissions and refusal to permit California and other states to regulate vehicle GHG emissions themselves. A decision in favor of defendant would encourage the EPA to further delay issuing the § 209 (b) waiver, resulting in further harm to Applicants and their members. Heiken Decl. ¶ 13 (if EPA "continues to sit on its hands," then declarant and his organization will harmed by impacts on forests, water, and wildlife); Grunbaum Decl. ¶ 13 (continued inaction ignores "the lessons we have learned about global warming"). Plaintiff's success in the instant litigation, however, could be an important step toward enabling the states to enforce their tailpipe GHG emissions limits. The timing imposed by the sought-after remedy is critical, and it is for that reason that Applicants intend to argue in this litigation that the EPA be compelled to render its decision without further delay. Doing so would enable states that have adopted the vehicle GHG emissions limits to enforce their programs starting with 2009 model year vehicles. That, in turn, will do more to slow or reduce the impacts of climate change than delayed implementation of the state programs. In the context of the present absence of federal GHG emissions limits, enabling the states to promptly enforce their tailpipe GHG emissions limits will, in fact, reduce the risk and injuries imposed by climate change to members and their organizations, even if that risk and those injuries would not thereby be eliminated, thereby satisfying the causation and redressability elements of the requisite constitutional standing analysis. Massachussetts, 127 S. Ct. at 1458.

C.      **Absent Intervention, Applicants' Interest in the Subject Matter of the Litigation Will Be Significantly Impaired**

The impairment requirement of Rule 24(a) concerns whether, as a practical matter, a denial of intervention would impede a prospective intervenor's ability to protect its interests in

the subject of the action. As the Advisory Committee Notes for the 1966 amendments to Rule 24(a) explain, "[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." FRCP 24 Advisory Committee Note to 1966 Amendments.

Applicants and their members, as discussed above, would be impaired in the event of an adverse decision in this litigation. Applicants seek to intervene in order to protect their own interests and those of their members, in particular by attempting to ensure that climate change is slowed and its risks reduced by seeking judicial relief that requires the EPA to issue its waiver decision without further delay. Further, an adverse decision by the Court that would allow the EPA to continue to delay its decision would effectively, for the period of continuing delay, nullify Applicants' advocacy efforts that led to the adoption by California, Oregon and Washington of their respective vehicle GHG emission limits programs.

### D.    The Existing Parties Do Not Adequately Represent the Interests of the Applicants

The Supreme Court has explained that the "inadequate representation" requirement of Fed R. Civ. P. Rule 24(a) "is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." Trbovich v. United Mine Workers of America, 404 U.S. 528, 538 & n. 10 (1972) (citation omitted). The D.C. Circuit court has recognized that Trbovich establishes a low standard for measuring inadequacy of representation. Fund for Animals, 322 F. 3d at 275, 276 n. 7. Indeed, "the [D.C. Circuit] Court of Appeals has stated that 'the burden is on those opposing intervention to show that representation for the absentee will be adequate.'" Alexander v. FBI, 186 F.R.D. 21, 31 (D.D.C. 1998) (quoting American Tel. & Tel. Co., 642 F.2d 1285, 1293 (D.C. Cir. 1980)).

This standard is met here.

Applicants' interest in a judicial resolution of the present controversy, and the arguments Applicants will advance in the present litigation, are similar but different from that of plaintiff California.  The D.C. Circuit has frequently recognized that governmental representation of private intervenors may be inadequate, particularly where the private intervenors can be expected to make different arguments from their governmental counterparts. Dimond v. District of Columbia, 792 F.2d 179, 193 (D.C. Cir. 1986); see also Forest Conservation Council v. United States Forest Service, 66 F.3d 1489, 1498-99 (9th Cir. 1985) (Defendant U.S. Forest Service could not be expected to make all the arguments of proposed intervenors).

Further, the actual relief that the Court may grant or approve may be different if Applicants are not permitted intervention.  A settlement offer by the EPA, for instance, might be acceptable to plaintiff California but not to Applicants.  These parties may evaluate such an offer differently in part because, as a government entity, California represents the interests of many constituencies whereas Applicants are focused on the narrower goal of protecting the environment without respect to the wider demands of the public as a whole that include other interests. Trbovich, 404 U.S. at 538-39 (finding intervention appropriate because the broad public interests that government represents are "related, but not identical" to proposed intervenor's narrower interests).  American Horse Protection Ass'n, Inc. v. Veneman, 200 F.R.D. 153 (D.D.C. 2001)(government agency had general interest that in preserving plan supported by applicants for intervention, but its obligations to other interests rendered its representation of applicants inadequate).  Without intervention, for example, Applicants would not be in a position to object to any proposed resolution of this matter that fails to ensure that 2009 model-year vehicles will, in fact, be regulated – an outcome that likely requires the various state vehicle

14

GHG emission programs to be fully enforceable in January 2008.

Moreover, the urgency and severity of the present threat of dangerous climate change that, as explained above, directly, concretely and severely affects Applicants, helps to establish their especially strong interest.  See U.S. v. Hooker Chemicals & Plastics Corp., 749 F. 2d 968, 983 (2d Cir. 1984) ("[a] showing that a very strong interest exists may warrant intervention upon a lesser showing of impairment or inadequacy of representation").  Particularly in this context, the Court should credit the fact that the state of California may not adequately represent Applicants' interest in this litigation, and so accept their motion to intervene by right.

## II.    In the Alternative, Applicants Should be Allowed Permissive Intervention

Rule 24(b) sets the basic parameters for permissive intervention:  "Upon timely application anyone may be permitted to intervene in an action:  (1) when a statute of the United States confers a conditional right to intervene;  or (2) when an applicant's claim or defense and the main action have a question of law or fact in common."  FRCP 24(b).   When "exercising its discretion," the district court "shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."  Id. EEOC v. Nat'l Children's Center, Inc., 146 F.3d 1042, 1045 (D.C. Cir. 1998).

The Applicants satisfy the standard of FRCP 24(b)(2), in that they seek to compel the EPA to comply with its nondiscretionary duties under the CAA and promptly issue the requested waiver of federal preemption to California.  Applicants therefore will address questions of law and fact in common with those raised in the complaint.  Further, no existing party would be prejudiced at this early stage of litigation, making permissive intervention appropriate.

15

**CONCLUSION**

For the foregoing reasons, Applicants have a right to intervene under FRCP 24(a).  In the alternative, the Court should permit Applicants to intervene pursuant to Rule 24(b).


Dated: December 3, 2007                    Respectfully Submitted,


_____
Daniel Galpern, OR Bar #06195
Western Environmental Law Center
1216 Lincoln St.
Eugene, OR  97401
(541) 485-2471
galpern@westernlaw.org

Applicant *Pro Hac Vice*


_____
Matt Kenna, Bar #CO0028
Western Environmental Law Center
679 E. 2nd Ave., Suite 11B
Durango, CO  81301
(970) 385-6941
mattkenna@gmail.com

Attorneys for Applicants-in-Intervention

16

Certificate of Service.

I hereby certify that on this 3rd day of December, 2007, I served a true and correct copy

of Motion to Intervene, Memorandum in Support, Declarations of Joan Crooks, Arthur (R.D.)

Grunbaum, Doug Heiken, Angus Duncan, Kassia R. Siegel, Jessica Coven, William P. (Bill)

LaBorde, Cylvia Hayes, and Dr. Philip Dustan and Proposed Order upon the following parties

via U.S. Mail, postage-paid, addressed as follows:

Norman Louis Rave
U.S. Department of Justice
P.O. Box 23986
Washington, DC 20026

Jan Zabriskie
Deputy Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550

Yueh-ru Chu
Office Of the Attorney General, NY
120 Broadway, 26th Floor
New York, NY 10127

Valerie S. Csizmadia
Delaware Attorney General's Office
102 West Water Street, 3rd Floor
Dover, DE 19904

_____

Marisela Taylor
Western Environmental Law Center

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF CALIFORNIA, by and through                    1-07-CV-2024
ARNOLD SCHWARZENEGGER, Governor of
the State of California, and CALIFORNIA AIR
RESOURCES BOARD

                 Plaintiffs,

and

WASHINGTON ENVIRONMENTAL COUNCIL
615 Second Ave., Suite 380
Seattle, WA 98104

CLIMATE SOLUTIONS
219 Legion Way SW, Ste 201
Olympia, WA 98501

ENVIRONMENT WASHINGTON
3240 Eastlake Ave E., Ste 102
Seattle, WA 98102

OREGON WILD
5825 N. Greeley Ave
Portland, Oregon 97217

3E STRATEGIES
16 NW Kansas Ave.
Bend, OR 97702

ENVIRONMENT OREGON
1536 SE 11th Avenue, Suite B
Portland, OR 97214

ANGUS DUNCAN
11334 S.W. Aventine Circus
Portland, OR 97219

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252

FRIENDS OF THE EARTH
311 California Street, Suite 510
San Francisco, CA 94104

Applicants-in-Intervention/
Plaintiffs

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and STEPHEN L.
JOHNSON, Administrator of the Environmental
Protection Agency Interior,

Defendants.

_____

**EXHIBITS IN SUPPORT OF MOTION TO INTERVENE**

EXHIBIT 1:    Excepts from Intergovernmental Panel on Climate Change, Working Group I

Contribution to the Fourth Assessment Report, *Climate Change 2007: The Physical Basis:*

*Summary for Policy Makers* (February 2007) (www.ipcc.ch, last visited Nov. 2, 2007).

EXHIBIT 2:    Western Environmental Law Center, Comments on Behalf of Eighteen

Washington and Oregon Organizations to EPA in Support of California's Request for a Waiver

of Federal Preemption Pursuant to §209(b) of the Clean Air Act (June 15, 2007).

EXHIBIT 3:    Excerpts from *Scientific Consensus Statement on the Likely Impacts of Climate*

*Change on the Pacific Northwest* (Dec. 2004)

(http://inr.oregonstate.edu/reports_atmosphere.html, visited Nov. 2, 2007).

EXHIBIT 4:    Excerpts from Intergovernmental Panel on Climate Change, Working Group III

Contribution to the Fourth Assessment Report, *Climate Change 2007: Mitigation of Climate*

*Change: Summary for Policy Makers* (May 2007) (www.ipcc.ch, last visited Nov. 2, 2007).

EXHIBIT 5:    Excerpts from Hansen et. al., Dangerous human-made interference with climate,

Journal of Atmospheric Chemistry and Physics (May 7, 2007) (www.atmos-chem-

phys.org/7/2287/2007/acp-7-2287-2007.pdf, last visited Nov. 1, 2007).

EXHIBIT 6:    Excerpts from Declaration of James E. Hansen in Green Mountain Chrysler-Plymouth Dodge-Jeep v. Torti, Consolidated Cases 2:05-CV-302 and 304 (Aug. 14, 2006).

EXHIBIT 7:    Excerpts from Union of Concerned Scientists, *How to Avoid Dangerous Climate Change: A Target for U.S. Emissions Reductions* (September 2007), Fig. 5 at 14, at www.ucsusa.org/assets/documents/global_warming/emissions-target-report.pdf (last visited Nov. 1, 2007).

## A report of Working Group I of the Intergovernmental Panel on Climate Change

# Summary for Policymakers

**Drafting Authors:**

Richard B. Alley, Terje Berntsen, Nathaniel L. Bindoff, Zhenlin Chen, Amnat Chidthaisong, Pierre Friedlingstein, Jonathan M. Gregory, Gabriele C. Hegerl, Martin Heimann, Bruce Hewitson, Brian J. Hoskins, Fortunat Joos, Jean Jouzel, Vladimir Kattsov, Ulrike Lohmann, Martin Manning, Taroh Matsuno, Mario Molina, Neville Nicholls, Jonathan Overpeck, Dahe Qin, Graciela Raga, Venkatachalam Ramaswamy, Jiawen Ren, Matilde Rusticucci, Susan Solomon, Richard Somerville, Thomas F. Stocker, Peter A. Stott, Ronald J. Stouffer, Penny Whetton, Richard A. Wood, David Wratt

**Draft Contributing Authors:**

J. Arblaster, G. Brasseur, J.H. Christensen, K.L. Denman, D.W. Fahey, P. Forster, E. Jansen, P.D. Jones, R. Knutti, H. Le Treut, P. Lemke, G. Meehl, P. Mote, D.A. Randall, D.A. Stone, K.E. Trenberth, J. Willebrand, F. Zwiers

**This Summary for Policymakers should be cited as:**

IPCC, 2007: Summary for Policymakers. In: *Climate Change 2007: The Physical Science Basis. Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change* [Solomon, S., D. Qin, M. Manning, Z. Chen, M. Marquis, K.B. Averyt, M.Tignor and H.L. Miller (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA.

**Exhibit 1**

# Introduction

The Working Group I contribution to the IPCC Fourth Assessment Report describes progress in understanding of the human and natural drivers of climate change,[1] observed climate change, climate processes and attribution, and estimates of projected future climate change. It builds upon past IPCC assessments and incorporates new findings from the past six years of research. Scientific progress since the Third Assessment Report (TAR) is based upon large amounts of new and more comprehensive data, more sophisticated analyses of data, improvements in understanding of processes and their simulation in models and more extensive exploration of uncertainty ranges.

The basis for substantive paragraphs in this Summary for Policymakers can be found in the chapter sections specified in curly brackets.

# Human and Natural Drivers of Climate Change

*Changes in the atmospheric abundance of greenhouse gases and aerosols, in solar radiation and in land surface properties alter the energy balance of the climate system. These changes are expressed in terms of radiative forcing,[2] which is used to compare how a range of human and natural factors drive warming or cooling influences on global climate. Since the TAR, new observations and related modelling of greenhouse gases, solar activity, land surface properties and some aspects of aerosols have led to improvements in the quantitative estimates of radiative forcing.*

**Global atmospheric concentrations of carbon dioxide, methane and nitrous oxide have increased markedly as a result of human activities since 1750 and now far exceed pre-industrial values determined from ice cores spanning many thousands of years (see Figure SPM.1). The global increases in carbon dioxide concentration are due primarily to fossil fuel use and land use change, while those of methane and nitrous oxide are primarily due to agriculture. {2.3, 6.4, 7.3}**

- Carbon dioxide is the most important anthropogenic greenhouse gas (see Figure SPM.2). The global atmospheric concentration of carbon dioxide has increased from a pre-industrial value of about 280 ppm to 379 ppm[3] in 2005. The atmospheric concentration of carbon dioxide in 2005 exceeds by far the natural range over the last 650,000 years (180 to 300 ppm) as determined from ice cores. The annual carbon dioxide concentration growth rate was larger during the last 10 years (1995–2005 average: 1.9 ppm per year), than it has been since the beginning of continuous direct atmospheric measurements (1960–2005 average: 1.4 ppm per year) although there is year-to-year variability in growth rates. {2.3, 7.3}

- The primary source of the increased atmospheric concentration of carbon dioxide since the pre-industrial period results from fossil fuel use, with land-use change providing another significant but smaller contribution. Annual fossil carbon dioxide emissions[5] increased from an average of 6.4 [6.0 to 6.8][5] GtC (23.5 [22.0 to 25.0] GtCO$_2$) per year in the 1990s to 7.2 [6.9 to 7.5] GtC (26.4 [25.3 to 27.5] GtCO$_2$) per year in 2000–2005 (2004 and 2005 data are interim estimates). Carbon dioxide emissions associated with land-use change

---

[1] *Climate change* in IPCC usage refers to any change in climate over time, whether due to natural variability or as a result of human activity. This usage differs from that in the United Nations Framework Convention on Climate Change, where climate change refers to a change of climate that is attributed directly or indirectly to human activity that alters the composition of the global atmosphere and that is in addition to natural climate variability observed over comparable time periods.

[2] *Radiative forcing* is a measure of the influence that a factor has in altering the balance of incoming and outgoing energy in the Earth-atmosphere system and is an index of the importance of the factor as a potential climate change mechanism. Positive forcing tends to warm the surface while negative forcing tends to cool it. In this report, radiative forcing values are for 2005 relative to pre-industrial conditions defined at 1750 and are expressed in watts per square metre (W m$^{-2}$). See Glossary and Section 2.2 for further details.

[3] ppm (parts per million) or ppb (parts per billion, 1 billion = 1,000 million) is the ratio of the number of greenhouse gas molecules to the total number of molecules of dry air. For example, 300 ppm means 300 molecules of a greenhouse gas per million molecules of dry air.

[4] Fossil carbon dioxide emissions include those from the production, distribution and consumption of fossil fuels and as a by-product from cement production. An emission of 1 GtC corresponds to 3.67 GtCO$_2$.

[5] In general, uncertainty ranges for results given in this Summary for Policymakers are 90% uncertainty intervals unless stated otherwise, that is, there is an estimated 5% likelihood that the value could be above the range given in square brackets and 5% likelihood that the value could be below that range. Best estimates are given where available. Assessed uncertainty intervals are not always symmetric about the corresponding best estimate. Note that a number of uncertainty ranges in the Working Group I TAR corresponded to 2 standard deviations (95%), often using expert judgement.

**Exhibit 1**

## CHANGES IN GREENHOUSE GASES FROM ICE CORE AND MODERN DATA



are estimated to be 1.6 [0.5 to 2.7] GtC (5.9 [1.8 to 9.9] $GtCO_2$) per year over the 1990s, although these estimates have a large uncertainty. {7.3}

• The global atmospheric concentration of methane has increased from a pre-industrial value of about 715 ppb to 1732 ppb in the early 1990s, and was 1774 ppb in 2005. The atmospheric concentration of methane in 2005 exceeds by far the natural range of the last 650,000 years (320 to 790 ppb) as determined from ice cores. Growth rates have declined since the early 1990s, consistent with total emissions (sum of anthropogenic and natural sources) being nearly constant during this period. It is *very likely*[6] that the observed increase in methane concentration is due to anthropogenic activities, predominantly agriculture and fossil fuel use, but relative contributions from different source types are not well determined. {2.3, 7.4}

• The global atmospheric nitrous oxide concentration increased from a pre-industrial value of about 270 ppb to 319 ppb in 2005. The growth rate has been approximately constant since 1980. More than a third of all nitrous oxide emissions are anthropogenic and are primarily due to agriculture. {2.3, 7.4}

> The understanding of anthropogenic warming and cooling influences on climate has improved since the TAR, leading to *very high confidence*[7] that the global average net effect of human activities since 1750 has been one of warming, with a radiative forcing of +1.6 [+0.6 to +2.4] W m$^{-2}$ (see Figure SPM.2). {2.3., 6.5, 2.9}

• The combined radiative forcing due to increases in carbon dioxide, methane, and nitrous oxide is +2.30 [+2.07 to +2.53] W m$^{-2}$, and its rate of increase during the industrial era is *very likely* to have been unprecedented in more than 10,000 years (see Figures

**Figure SPM.1.** *Atmospheric concentrations of carbon dioxide, methane and nitrous oxide over the last 10,000 years (large panels) and since 1750 (inset panels). Measurements are shown from ice cores (symbols with different colours for different studies) and atmospheric samples (red lines). The corresponding radiative forcings are shown on the right hand axes of the large panels. {Figure 6.4}*

[6] In this Summary for Policymakers, the following terms have been used to indicate the assessed likelihood, using expert judgement, of an outcome or a result: *Virtually certain* > 99% probability of occurrence, *Extremely likely* > 95%, *Very likely* > 90%, *Likely* > 66%, *More likely than not* > 50%, *Unlikely* < 33%, *Very unlikely* < 10%, *Extremely unlikely* < 5% (see Box TS.1 for more details).

[7] In this Summary for Policymakers the following levels of confidence have been used to express expert judgements on the correctness of the underlying science: *very high confidence* represents at least a 9 out of 10 chance of being correct; *high confidence* represents about an 8 out of 10 chance of being correct (see Box TS.1)

**Exhibit 1**

SPM.1 and SPM.2). The carbon dioxide radiative forcing increased by 20% from 1995 to 2005, the largest change for any decade in at least the last 200 years. {2.3, 6.4}

• Anthropogenic contributions to aerosols (primarily sulphate, organic carbon, black carbon, nitrate and dust) together produce a cooling effect, with a total direct radiative forcing of –0.5 [–0.9 to –0.1] W m⁻² and an indirect cloud albedo forcing of –0.7 [–1.8 to –0.3] W m⁻². These forcings are now better understood than at the time of the TAR due to improved *in situ*, satellite and ground-based measurements and more

comprehensive modelling, but remain the dominant uncertainty in radiative forcing. Aerosols also influence cloud lifetime and precipitation. {2.4, 2.9, 7.5}

• Significant anthropogenic contributions to radiative forcing come from several other sources. Tropospheric ozone changes due to emissions of ozone-forming chemicals (nitrogen oxides, carbon monoxide, and hydrocarbons) contribute +0.35 [+0.25 to +0.65] W m⁻². The direct radiative forcing due to changes in halocarbons[8] is +0.34 [+0.31 to +0.37] W m⁻². Changes in surface albedo, due to land cover changes and deposition of black carbon aerosols on snow, exert



**Figure SPM.2.** *Global average radiative forcing (RF) estimates and ranges in 2005 for anthropogenic carbon dioxide (CO₂), methane (CH₄), nitrous oxide (N₂O) and other important agents and mechanisms, together with the typical geographical extent (spatial scale) of the forcing and the assessed level of scientific understanding (LOSU). The net anthropogenic radiative forcing and its range are also shown. These require summing asymmetric uncertainty estimates from the component terms, and cannot be obtained by simple addition. Additional forcing factors not included here are considered to have a very low LOSU. Volcanic aerosols contribute an additional natural forcing but are not included in this figure due to their episodic nature. The range for linear contrails does not include other possible effects of aviation on cloudiness.* {2.9, Figure 2.20}

---

[8] Halocarbon radiative forcing has been recently assessed in detail in *IPCC's Special Report on Safeguarding the Ozone Layer and the Global Climate System* (2005).

Exhibit 1

respective forcings of –0.2 [–0.4 to 0.0] and +0.1 [0.0 to +0.2] W m$^{-2}$. Additional terms smaller than ±0.1 W m$^{-2}$ are shown in Figure SPM.2. {2.3, 2.5, 7.2}

- Changes in solar irradiance since 1750 are estimated to cause a radiative forcing of +0.12 [+0.06 to +0.30] W m$^{-2}$, which is less than half the estimate given in the TAR. {2.7}

## Direct Observations of Recent Climate Change

*Since the TAR, progress in understanding how climate is changing in space and in time has been gained through improvements and extensions of numerous datasets and data analyses, broader geographical coverage, better understanding of uncertainties, and a wider variety of measurements. Increasingly comprehensive observations are available for glaciers and snow cover since the 1960s, and for sea level and ice sheets since about the past decade. However, data coverage remains limited in some regions.*

**Warming of the climate system is unequivocal, as is now evident from observations of increases in global average air and ocean temperatures, widespread melting of snow and ice, and rising global average sea level (see Figure SPM.3). {3.2, 4.2, 5.5}**

- Eleven of the last twelve years (1995–2006) rank among the 12 warmest years in the instrumental record of global surface temperature[9] (since 1850). The updated 100-year linear trend (1906 to 2005) of 0.74°C [0.56°C to 0.92°C] is therefore larger than the corresponding trend for 1901 to 2000 given in the TAR of 0.6°C [0.4°C to 0.8°C]. The linear warming trend over the last 50 years (0.13°C [0.10°C to 0.16°C] per decade) is nearly twice that for the last 100 years. The total temperature increase from 1850–1899 to 2001–2005 is 0.76°C [0.57°C to 0.95°C]. Urban heat island effects are real but local, and have a negligible influence (less than 0.006°C per decade over land and zero over the oceans) on these values. {3.2}

- New analyses of balloon-borne and satellite measurements of lower- and mid-tropospheric temperature show warming rates that are similar to those of the surface temperature record and are consistent within their respective uncertainties, largely reconciling a discrepancy noted in the TAR. {3.2, 3.4}

- The average atmospheric water vapour content has increased since at least the 1980s over land and ocean as well as in the upper troposphere. The increase is broadly consistent with the extra water vapour that warmer air can hold. {3.4}

- Observations since 1961 show that the average temperature of the global ocean has increased to depths of at least 3000 m and that the ocean has been absorbing more than 80% of the heat added to the climate system. Such warming causes seawater to expand, contributing to sea level rise (see Table SPM.1). {5.2, 5.5}

- Mountain glaciers and snow cover have declined on average in both hemispheres. Widespread decreases in glaciers and ice caps have contributed to sea level rise (ice caps do not include contributions from the Greenland and Antarctic Ice Sheets). (See Table SPM.1.) {4.6, 4.7, 4.8, 5.5}

- New data since the TAR now show that losses from the ice sheets of Greenland and Antarctica have *very likely* contributed to sea level rise over 1993 to 2003 (see Table SPM.1). Flow speed has increased for some Greenland and Antarctic outlet glaciers, which drain ice from the interior of the ice sheets. The corresponding increased ice sheet mass loss has often followed thinning, reduction or loss of ice shelves or loss of floating glacier tongues. Such dynamical ice loss is sufficient to explain most of the Antarctic net mass loss and approximately half of the Greenland net mass loss. The remainder of the ice loss from Greenland has occurred because losses due to melting have exceeded accumulation due to snowfall. {4.6, 4.8, 5.5}

- Global average sea level rose at an average rate of 1.8 [1.3 to 2.3] mm per year over 1961 to 2003. The rate was faster over 1993 to 2003: about 3.1 [2.4 to 3.8] mm per year. Whether the faster rate for 1993 to 2003 reflects decadal variability or an increase in the longer-term trend is unclear. There is *high confidence* that

---

[9] The average of near-surface air temperature over land and sea surface temperature.

**Exhibit 1**

- Mid-latitude westerly winds have strengthened in both hemispheres since the 1960s. {3.5}

- More intense and longer droughts have been observed over wider areas since the 1970s, particularly in the tropics and subtropics. Increased drying linked with higher temperatures and decreased precipitation has contributed to changes in drought. Changes in sea surface temperatures, wind patterns and decreased snowpack and snow cover have also been linked to droughts. {3.3}

- The frequency of heavy precipitation events has increased over most land areas, consistent with warming and observed increases of atmospheric water vapour. {3.8, 3.9}

- Widespread changes in extreme temperatures have been observed over the last 50 years. Cold days, cold nights and frost have become less frequent, while hot days, hot nights and heat waves have become more frequent (see Table SPM.2). {3.8}

**Table SPM.2.** *Recent trends, assessment of human influence on the trend and projections for extreme weather events for which there is an observed late-20th century trend. {Tables 3.7, 3.8, 9.4; Sections 3.8, 5.5, 9.7, 11.2–11.9}*

| Phenomenon[a] and direction of trend | Likelihood that trend occurred in late 20th century (typically post 1960) | Likelihood of a human contribution to observed trend[b] | Likelihood of future trends based on projections for 21st century using SRES scenarios |
|---|---|---|---|
| Warmer and fewer cold days and nights over most land areas | *Very likely[c]* | *Likely[d]* | *Virtually certain[d]* |
| Warmer and more frequent hot days and nights over most land areas | *Very likely[e]* | *Likely (nights)[d]* | *Virtually certain[d]* |
| Warm spells/heat waves. Frequency increases over most land areas | *Likely* | *More likely than not[f]* | *Very likely* |
| Heavy precipitation events. Frequency (or proportion of total rainfall from heavy falls) increases over most areas | *Likely* | *More likely than not[f]* | *Very likely* |
| Area affected by droughts increases | *Likely* in many regions since 1970s | *More likely than not* | *Likely* |
| Intense tropical cyclone activity increases | *Likely* in some regions since 1970 | *More likely than not[f]* | *Likely* |
| Increased incidence of extreme high sea level (excludes tsunamis)[g] | *Likely* | *More likely than not[f,h]* | *Likely[i]* |

Table notes:
[a]  See Table 3.7 for further details regarding definitions.
[b]  See Table TS.4, Box TS.5 and Table 9.4.
[c]  Decreased frequency of cold days and nights (coldest 10%).
[d]  Warming of the most extreme days and nights each year.
[e]  Increased frequency of hot days and nights (hottest 10%).
[f]  Magnitude of anthropogenic contributions not assessed. Attribution for these phenomena based on expert judgement rather than formal attribution studies.
[g]  Extreme high sea level depends on average sea level and on regional weather systems. It is defined here as the highest 1% of hourly values of observed sea level at a station for a given reference period.
[h]  Changes in observed extreme high sea level closely follow the changes in average sea level. {5.5} It is *very likely* that anthropogenic activity contributed to a rise in average sea level. {9.5}
[i]  In all scenarios, the projected global average sea level at 2100 is higher than in the reference period. {10.6} The effect of changes in regional weather systems on sea level extremes has not been assessed.

**Exhibit 1**

## Understanding and Attributing Climate Change

*This assessment considers longer and improved records, an expanded range of observations and improvements in the simulation of many aspects of climate and its variability based on studies since the TAR. It also considers the results of new attribution studies that have evaluated whether observed changes are quantitatively consistent with the expected response to external forcings and inconsistent with alternative physically plausible explanations.*

**Most of the observed increase in global average temperatures since the mid-20th century is *very likely* due to the observed increase in anthropogenic greenhouse gas concentrations.[12] This is an advance since the TAR's conclusion that "most of the observed warming over the last 50 years is *likely* to have been due to the increase in greenhouse gas concentrations". Discernible human influences now extend to other aspects of climate, including ocean warming, continental-average temperatures, temperature extremes and wind patterns (see Figure SPM.4 and Table SPM.2). {9.4, 9.5}**

- It is *likely* that increases in greenhouse gas concentrations alone would have caused more warming than observed because volcanic and anthropogenic aerosols have offset some warming that would otherwise have taken place. {2.9, 7.5, 9.4}

- The observed widespread warming of the atmosphere and ocean, together with ice mass loss, support the conclusion that it is *extremely unlikely* that global climate change of the past 50 years can be explained without external forcing, and *very likely* that it is not due to known natural causes alone. {4.8, 5.2, 9.4, 9.5, 9.7}

- Warming of the climate system has been detected in changes of surface and atmospheric temperatures in the upper several hundred metres of the ocean, and in contributions to sea level rise. Attribution studies have established anthropogenic contributions to all of these changes. The observed pattern of tropospheric warming and stratospheric cooling is *very likely* due to the combined influences of greenhouse gas increases and stratospheric ozone depletion. {3.2, 3.4, 9.4, 9.5}

- It is *likely* that there has been significant anthropogenic warming over the past 50 years averaged over each continent except Antarctica (see Figure SPM.4). The observed patterns of warming, including greater warming over land than over the ocean, and their changes over time, are only simulated by models that include anthropogenic forcing. The ability of coupled climate models to simulate the observed temperature evolution on each of six continents provides stronger evidence of human influence on climate than was available in the TAR. {3.2, 9.4}

- Difficulties remain in reliably simulating and attributing observed temperature changes at smaller scales. On these scales, natural climate variability is relatively larger, making it harder to distinguish changes expected due to external forcings. Uncertainties in local forcings and feedbacks also make it difficult to estimate the contribution of greenhouse gas increases to observed small-scale temperature changes. {8.3, 9.4}

- Anthropogenic forcing is *likely* to have contributed to changes in wind patterns,[13] affecting extra-tropical storm tracks and temperature patterns in both hemispheres. However, the observed changes in the Northern Hemisphere circulation are larger than simulated in response to 20th-century forcing change. {3.5, 3.6, 9.5, 10.3}

- Temperatures of the most extreme hot nights, cold nights and cold days are *likely* to have increased due to anthropogenic forcing. It is *more likely than not* that anthropogenic forcing has increased the risk of heat waves (see Table SPM.2). {9.4}

---

[12] Consideration of remaining uncertainty is based on current methodologies.

[13] In particular, the Southern and Northern Annular Modes and related changes in the North Atlantic Oscillation. {3.6, 9.5, Box TS.2}

**Exhibit 1**



Northwest
1216 Lincoln Street
Eugene, Oregon 97401
541 485-2471
fax  485-2457
eugene@westernlaw.org

Southwest
P.O. Box 1507
Taos, New Mexico 87571
505 751-0351
fax  751-1775
taos@westernlaw.org

Rocky Mountains
679 E. 2nd Avenue, Suite 11B
Durango, Colorado 81301
970 385-6941
fax  385-6804
durango@westernlaw.org

www.westernlaw.org

# Western Environmental Law Center

**Defending the West**  Wildlands, Water, and Western Communities

June 15, 2007

The Honorable Stephen L. Johnson, Administrator
United States Environmental Protection Agency
EPA West (Air Docket); Mail Code 6102T
1200 Pennsylvania Ave., NW, Room B108
Washington, D.C. 20460

RE:    California State Motor Vehicles Pollution Control Standards
           Request for Waiver of Preemption under Clean Air Act Section 209(b)

Attention: Docket ID No. EPA-HQ-OAR-2006-0173

Dear Mr. Administrator:

        We write on behalf of the undersigned Oregon and Washington organizations in

strong support of California's request for a waiver of federal preemption under the Clean

Air Act[1] to allow its vehicle greenhouse gas (GHG) emissions limit program to go into

effect.

        The environment, public health, and economy of Oregon and Washington are

presently threatened by climate change and the certainty of worse to come absent

decisive changes that reduce GHG atmospheric concentrations.  Reductions of GHG

emissions in California, no less than reductions of such emissions in Oregon and

Washington, are essential to mitigating the impacts of climate change in Oregon and

---

[1] Clean Air Act §209(b), 42 U.S.C. §7543(b) (1990).

Western Environmental Law Center
Comments on California's §209(b) Federal Preemption Waiver Request
Page 1 of 10.

**Exhibit 2**

Washington.  The inverse is also true: reductions in GHG emissions in Oregon and

Washington will reduce the effects of climate change in California, and elsewhere.

According to a recently published statement of 50 scientists with expertise on

climate change, impacts in the Pacific Northwest have already occurred and will become

far worse unless meaningful action is quickly taken.  Average regional temperatures have

increased 1-3°F over the last century, with the most recent warming trend (1975 to

present) attributed to human-caused atmospheric GHG concentration increases.[2]

Hydrologically important consequences of regional warming have already occurred,

including a 35 percent decline in spring snowpack, a shift in peak streamflow by 1-3

weeks, and an increase in winter and decrease in summer flows."[3]

Regional annual average temperature is likely to increase approximately 2.7°F by

2030, and 5.4°F by the 2050s, resulting in shifting isotherms and changes in vegetation

zones, higher elevation treelines, earlier animal and plant breeding, a longer and more

intense allergy season, rising sea levels, declining snowpacks, longer fire seasons, and

drier summers with a likely "increase in drought stress and vulnerability of forests to

insects, disease and fire."[4]  Warmer stream and river temperatures will threaten the

population of native fish, including salmon.[5]  Native plant and animal species will be

stressed and rendered more vulnerable to displacement by invasive species emboldened

---

[2] *Scientific Consensus Statement on the Likely Impacts of Climate Change on the Pacific Northwest* (Dec. 2004) at
http://inr.oregonstate.edu/download/climate_change_consensus_statement_final.pdf. at 4.
[3] Philip Mote, Eric Salathé, and Cynthia Peacock, *Energy-Relevant Impacts of Climate Change in the Pacific Northwest*, Climate Impacts Group, University of Washington (July 2006) at 3.
[4] *Scientific Consensus Statement*, op cit. note 2, at 8.
[5] Washington State Department of Ecology, *Climate Change: Disrupting out Climate, Environment and Communities*, at http://www.ecy.wa.gov/climatechange/warming/htm.

**Exhibit 2**

to expand northward into new territory.[6]  Scientists and public health officials predict, as well, an increase in unhealthy air days, a related escalation of heat-related illnesses and deaths, and an expanded prevalence of insect-carried diseases – including malaria and Lyme disease.[7]  Flooded homes likely also will trigger the growth of indoor molds and fungus.[8]  Increased health care costs combined with a projected decrease in profits in the agricultural, forestry, hydroelectricity, and tourism industries pose serious challenges to the regional economy.[9]

In sum, climate change is already happening -- and Oregon and Washington already feel the impact.  Moreover, the stress that global and regional warming will place on the environment, economy, and social fabric of Pacific Northwest states, among others, will mount over the next few decades "as a result of the continuing long-term effects of greenhouse gases and the energy systems now in use."[10]  Unless a fundamental change in direction begins this decade, it may be impossible to avoid "far-ranging undesirable consequences," including mass species extinctions.[11]  Fortunately, a number of impacts can be avoided, reduced, or delayed by serious mitigation actions that can be

---

[6] *Id.*

[7] Governor Kulongoski's Vehicle Emission Workgroup, Governor's Vehicle Emissions Workgroup Report 36-37 (2005), *available at* http://www.deq.state.or.us/aq/orlev/docs/05Nov02WorkgroupRpt.pdf (hereinafter, *Governor's Workgroup*).

[8] *Climate Change: Disrupting out Climate, Environment and Communities*, Washington State Department of Ecology, *available at* http://www.ecy.wa.gov/climatechange/warming/htm.

[9] *Governor's Workgroup, supra* note 7 at 37.

[10] James Hansen, *The Threat to the Planet*, The New York Review (July 13, 2006) available at www.nybooks.com/articles/19131.

[11] *Id.*  Similarly, "[e]ven the most stringent mitigation efforts cannot avoid further impacts of climate change in the next few decades."  IPCC Working Group II Contribution to the Fourth Assessment Report, *Climate Change 2007: Impacts, Adaptation and Vulnerability: Summary for Policy Makers* (April 2007).

Western Environmental Law Center
Comments on California's §209(b) Federal Preemption Waiver Request
Page 3 of 10.

**Exhibit 2**

undertaken now.[12]  The determination of several states to reduce their GHG contributions is therefore rationally predicated on the need to undertake serious change at all levels.[13]

Vehicles contribute a large share to total GHG emissions from fossil fuels in Oregon and Washington.[14]  Accordingly, pursuant to section 177 of the Clean Air Act, Washington and Oregon have adopted California's vehicle GHG emission limits.[15] Implementation of the programs in both states is contingent upon EPA granting California a waiver of federal preemption pursuant to section 209(b) of the Clean Air Act.[16]  EPA's continuing refusal to grant California's waiver request, in spite of the merits of the California program, renders hollow section 177's promise that states can take effective action to protect the environment when California standards provide greater protection than applicable federal standards. [17]

The Register notice invites comment on whether California's determination that its standards are at least as protective of public health and welfare as are the applicable

---

[12] *Id*.

[13] Were Oregon, Washington, and California a single nation, that entity would be the world's seventh-largest carbon dioxide emitter. Governor's Advisory Group on Global Warming, *Oregon Strategy for Greenhouse Gas Reductions* (hereinafter *Strategy*), State of Oregon (Dec. 2004) at 25.

[14] GHG emissions from vehicles constitute approximately 31, 27, and 33 percent of total emissions in Oregon, Washington, and California, respectively.  Western Environmental Law Center calculations based on data in WashPIRG Foundation, *The Carbon Boom: State and National Trends in Carbon Dioxide Emissions Since 1990* (April 2007) at 35-40.  *See also Strategy* at 77; State of Washington, Department of Community, Trade and Economic Development, *Washington State's Greenhouse Gas Emissions: Sources and Trends* (June 2004) at 6.

[15] Wash. Rev. Code §70.120A.010 (2005); Or. Admin. R. 340-257-0010 (2005).

[16] Washington's program is also contingent on Oregon's program being in effect.  Wash. Rev. Code §70.120A.010.

[17] In addition to the three West Coast states, nine other states -- Maine, Vermont, New York, Pennsylvania, Massachusetts, Rhode Island, Maryland, Connecticut, and New Jersey -- have adopted California's limits.  *See Maryland Governor Signs Clean Car Bill Adopting California Emissions Standards*, Green Car Congress (Apr. 25, 2007) at www.greencarcongress.com/2007/04/maryland_govern.html.

**Exhibit 2**

federal standards is arbitrary and capricious, whether California needs such standards to meet a compelling and extraordinary condition, and whether California's standards are consistent with section 202(a) of the Clean Air Act.[18]  The notice, as well, asks about the relevance to these criteria of the fact that California's program relates to global climate change and the Supreme Court's recent decision in *Massachusetts v. EPA*.

First, California's determination that, in the aggregate, its vehicle emissions standards are at least as protective as applicable federal standards is well-founded, not arbitrary or capricious.  EPA previously approved California's vehicle emissions limits for other pollutants, including its standards for non-methane organic gas, oxides of nitrogen, carbon monoxide, particulates, and formaldehyde – so-called LEV I and LEV II standards.[19]  That approval settles that California's existing vehicle emission limits program is at least as protective as applicable federal standards.  The only remaining substantive question in assessing the protective nature of California's present petition is whether the state's vehicle GHG emission limits are at least as protective as applicable federal standards for limiting just such emissions.  Because EPA has failed, to date, to enact any specific limitations on vehicle GHG emissions, California's standards must be found to be more protective if: (1) GHG emissions constitute pollutants under the Clean Air Act, (2) California's program will lead to reductions in vehicle GHG emissions, and (3) those reductions render California's program more protective of public health and welfare than no reductions.

The Supreme Court decision in *Massachusetts v. EPA* noted that "[t]he harms

---

[18] 72 Fed. Reg. 21260, 21261 (Apr. 30, 2007).
[19] 68 Fed. Reg. 19811 (Apr. 22, 2003).

**Exhibit 2**

associated with climate change are serious and well recognized," [20] that human-caused emissions of greenhouse gases are a principal cause of climate change, and that the transportation sector contributes a significant share of global carbon dioxide emissions.[21] In addition, the court held that GHG emissions clearly qualify as pollutants under the Clean Air Act's "capacious" definition of the term.[22]

Lowering vehicle GHG emissions that otherwise would accumulate is an important step toward climate change mitigation, even if it is only one step,[23] particularly when GHG emissions reductions to be realized in California are combined with those to be realized in opt-in states, including Oregon and Washington. We note, in this regard, that initiatives to limit GHG emissions from vehicles constitute one of several key mitigation measures identified by the Intergovernmental Panel on Climate Change (IPCC) to arrest the projected growth of global GHG emissions.[24] By 2016, California's program, if allowed to go into effect, will reduce fleet average GHG emissions from new passenger cars and light trucks by more than a third.[25] In Oregon alone, implementation of California's GHG vehicle emission limit is expected to result in 16,000 fewer tons of carbon dioxide released per day by the year 2030.[26] Clearly, then, EPA's waiver will

---

[20] *Massachusetts v. EPA*, 127 S.Ct. 1438, 1442 (2007).

[21] *Id*. at 1457.

[22] *Id.* at 1462.

[23] *See id*. at 1457 (rejecting EPA's argument that the agency's failure to regulate vehicle GHG emissions has too attenuated a relation to climate change for it to be a justiciable matter).

[24] IPCC, Working Group III Contribution to the Fourth Assessment Report, *Climate Change 2007: Mitigation of Climate Change: Summary for Policy Makers* 14 (May 2007).

[25] For heavier light-duty trucks and medium-duty passenger vehicles, California's program will lead to a 24 percent reduction in vehicle GHG emissions by 2016. California EPA Air Resources Board, Request for a Clean Air Act Section 209(b) Waiver of Preemption: Support Document (hereinafter CARB) (Dec. 21, 2005) at 7. Calculations are by the Western Environmental Law Center.

[26] Governor, *supra* note 7, at 24.

**Exhibit 2**

substantially limit GHG emissions that would otherwise be generated. Accordingly, California's determination that its program is at least as protective of public health and welfare as applicable federal standards is neither arbitrary nor capricious.

Second, California needs to limit GHG vehicle emissions to meet compelling and extraordinary conditions. We summarized, *supra*, some of the evidence illustrating that Oregon and Washington will need to confront grave challenges presented by climate change, but none of that undermines the fact that climate change presents a compelling and extraordinary condition for California.[27] California's need for its requested section 209(b) waiver is grounded in the fact that climate change imposes an environmental threat extreme in California's modern history, one moreover that the state is forced to confront absent any present federal effort to contain vehicle GHG emissions. Moreover, as California has noted, the state "is particularly vulnerable" to climate change impacts, including, in its Bay-Delta area, "to saltwater intrusion from sea-level rise, levee collapse, and flooding, any of which would severely tax California's increasingly fragile water-supply system."[28]

Third, as California has fully explained,[29] its vehicle GHG emissions standard and accompanying enforcement procedures are consistent with section 202(a) of the Clean

---

[27] To claim otherwise – namely that California could not receive a section 209(b) waiver if the "compelling and extraordinary conditions" it cites were less significant than those faced by other states – would be to turn section 209(b) and section 177 on their heads and consign both California and those other states to federal protections that may be less protective or, as in the present case, non-existent. In this regard, see 49 Fed. Reg. 18887 (May 3, 1984).

[28] CARB, *supra* note 17, at 17-18. The state notes, as well, that "[t]he predicted decrease in winter snow pack would exacerbate these impacts by reducing spring and summer snowmelt runoff critical for municipal and agricultural uses, a situation further strained by fish and wildlife considerations. Also, of course, California's high ozone levels – clearly a condition Congress considered – will be exacerbated by higher temperatures from global warming." *Id.*

[29] CARB, *supra* note 17, at 19-43.

Western Environmental Law Center
Comments on California's §209(b) Federal Preemption Waiver Request
Page 7 of 10.

**Exhibit 2**

Air Act because the requisite technology to meet its standard either presently exists or else industry is likely to be able to develop and deploy the requisite technology by the standard's compliance deadlines.

Finally, we note that the Energy Policy and Conservation Act[30] (EPCA) fuel economy provisions for new vehicles are simply not relevant to EPA's consideration of this petition or to the California Air Resources Board's authority to implement its vehicle GHG regulations.  Auto manufacturers have challenged the California standard on the ground that it is an attempt to impose fuel economy standards for new vehicles and so is preempted by EPCA.  But the Supreme Court has settled this issue in *Massachusetts*, holding that even though the Department of Transportation's responsibility to set mileage standards might overlap with EPA's environmental duties – because compliance with reduced vehicle GHG emission limits may be obtained by increasing fleet mileage capacity – that "in no way licenses EPA to shirk its environmental responsibilities" to directly limit vehicle GHG emissions.[31]  It follows that EPA is similarly bound to uphold its statutory obligation to permit California – and states opting-in to California's program – to enact and enforce vehicle GHG emission limits that are at least as protective of public health and welfare, particularly here, in the context of federal abdication of responsibility for restricting vehicle GHG emissions.

Please include these comments in Docket ID No. EPA HQ-OAR-2006-0173.

---

[30] Energy Policy and Conservation Act of 1975, 49 U.S.C. §§32902-32919.
[31] *Massachusetts*, 127 S.Ct. at 1461-62.

**Exhibit 2**

Sincerely yours,

Dan Galpern, Attorney
Western Environmental Law Center
For

Cylvia Hayes
3EStrategies
16 N.W. Kansas Ave.
Bend, OR 97702

Norman E. Ritchie, Executive Director
Association of Northwest Steelheaders
P.O. Box 22065
Milwaukie, OR 97269

Mike O'Brien, Chapter Chair
Cascade Chapter of the Sierra Club
180 Nickerson St., Suite 202
Seattle, WA 98109

K.C. Golden, Policy Director
Climate Solutions/Northwest Climate Connections
1601 Second Ave., Suite 615
Seattle, WA 98101

Angus Duncan
E2 Oregon
11334 S.W. Aventine Circus
Portland, OR 97219

David Leslie, Executive Director
Ecumenical Ministries of Oregon
0245 S.W. Bancroft, Suite B
Portland, OR 97239

Jeremiah Baumann, Environmental Advocate
Environment Oregon
1536 S.E. 11th Ave., Suite B
Portland, OR 97214

Bill LaBorde, State Director
Environment Washington
3240 Eastlake Ave. E., Suite 102
Seattle, WA 98102

**Exhibit 2**

Aaron Ostrom, Executive Director
Futurewise
814 Second Ave., Suite 500
Seattle, WA  98104

James Schroeder, Sr. Environmental Policy Specialist
National Wildlife Federation Western Natural Resource Center
6 Nickerson St., Suite 200
Seattle, WA 98109

Sara Patton, Director
NW Energy Coalition
219 First Ave. South, Suite 100
Seattle, WA 98104

Andrea Durbin, Executive Director
Oregon Environmental Council
222 N.W. Davis St., Suite 309
Portland, OR 97209-3900

Steve Pedery, Conservation Director
Oregon Wild
5825 N. Greeley Ave.
Portland, OR 97217

Alexia C. Kelly, Policy Analyst
The Climate Trust
65 S.W. Yamhill St., Suite 400
Portland, OR 97204

Kurt Fritts, Executive Director
Washington Conservation Voters
2021 Third Ave.
Seattle, WA 98121

Joan Crooks, Executive Director
Washington Environmental Council
615 Second Ave., Suite 380
Seattle, WA 98104

Amy Peterson, Interim Director
WashPIRG
3240 Eastlake Ave. E., Suite 101
Seattle, WA 98102

John McGlenn, President
Washington Wildlife Federation
P.O. Box 1966
Olympia, WA 98507-1966

**Exhibit 2**

**Scientific Consensus Statement on the
Likely Impacts of Climate Change on the Pacific Northwest**

**Executive Summary**

The signatories of this statement seek to describe the state of scientific knowledge regarding likely impacts of climate change to the Pacific Northwest region.  The intent is to assist Governor Kulongoski's Advisory Group on Global Warming in its task of developing a greenhouse gas emission reduction strategy for Oregon.  The signatories agree that climate change is underway and that it is having global effects as well as impacts in the Pacific Northwest region.  Climate-related changes to date, likely future changes, key questions to answer and research priorities are listed below.

**Regional Climate Change Impacts in Recent Decades.**
**Temperature.**  Scientists are very certain that the Pacific Northwest is warming and that since 1975 the warming is best explained by human-caused changes in greenhouse gases.
**Precipitation.**  Since the beginning of the 20th century, average annual precipitation has increased across the region by 10% with increases of 30–40% in eastern Washington and northern Idaho.
**Sea Level.**  Land on the central and northern Oregon coast (from Florence to Astoria) is being submerged by rising sea level at an average rate of 0.06 – 0.08 inches (1.5–2 mm) annually, as inferred from data for the period 1930–1995.
**Snowpack.**  Between 1950 and 2000, the April 1 snowpack declined.  In the Cascades, the cumulative downward trend in snow-water equivalent is approximately 35% for the period 1950–1995.  Timing of the peak snowpack has moved earlier in the year, increasing March streamflows and reducing June streamflows.  Snowpack at low-to-mid elevations is the most sensitive to warming temperatures.

**Regional Climate Change Projections over the Next 10-50 Years.**
**Temperature.**  Scientists have intermediate certainty that average temperatures in the Pacific Northwest will continue to increase in response to global climate change.  Assessments suggest that the average warming will be approximately 2.7° F by 2030 and 5.4° F. by 2050.  These projected increases are highly likely to result in a higher elevation treeline, longer growing seasons, longer fire seasons, earlier animal and plant breeding, longer and more intense allergy season and changes in vegetation zones.
**Precipitation.**  Precipitation changes are very uncertain.  The challenge will be to resolve scientific uncertainties about the interactions among atmosphere, land and ocean before significant climate change impacts occur.  Oregon is expected to remain a wintertime-dominant precipitation regime (i.e., most precipitation will continue to occur in the winter).  In addition, most precipitation will continue to occur in the mountains.  Impacts on water resources due to low summer precipitation and earlier peak streamflow will likely include decreased summer water availability, changes in our ability to manage flood damage, shifts in hydropower

**Exhibit 3**

production from summer to winter, and decreased water quality due to higher temperatures, increased salinity and pollutant concentration.

**Sea Level.**  Sea level is very certain to continue to rise although the impact will vary depending upon how fast the land is rising. In addition to increases in sea level, maximum wave heights will likely also increase, resulting in increasing erosion in coastal areas.

**Snowpack.**  The April 1 snowpack will continue to decline corresponding to an earlier peak streamflow.

**Marine Ecosystems.**  It is very certain that ocean circulation will continue to change in response to ocean-atmospheric processes.  These changes suggest a likely increase in the magnitude and duration of upwelling, which will affect marine ecosystems.  It is uncertain whether these changes will have adverse impacts such as more frequent occurrences of the low-oxygen ("dead zone") events seen in 2002 and 2004.

**Terrestrial Ecosystems.**  The impact of changes in temperature and precipitation on terrestrial ecosystems is poorly known.  Due to current biomass densities, the anticipated drier summers will likely increase drought stress and vulnerability of forests to insects, disease and fire.

**Important Questions that could be Answered by Research**.
What will be the trend and pattern of precipitation in the region?
What will be the patterns of coastal ocean winds?
What are the dynamics of large, decadal-scale patterns of ocean/atmosphere interactions?
Do thresholds exist for abrupt climate change and system shifts?
How will these patterns affect ecosystem patterns and resilience?
How will changes impact human health?
How will changes affect regional economic and social conditions?

**Research Priorities**
1.  Improved and sustained observation of critical processes that can resolve interannual/decadal-scale variability.
2.  Focused process experiments and studies of critical processes, such as impacts of increased $CO_2$ on forest dynamics.
3.   Improved numerical and statistical models focused on coupled atmosphere/ocean/land processes that include ecological as well as geophysical dynamics.
4.  Modeling and analysis of the effects of economics and management policies interannual/decadal-scale processes in the region.

**Exhibt 3**

**Scientific Consensus Statement on the**
**Likely Impacts of Climate Change on the Pacific Northwest**

**History and Objective**
This Consensus Statement was drafted by a subcommittee of participants in the scientific meeting "Impacts of Climate Change on the Pacific Northwest" convened at OSU on June 15, 2004. The statement has been reviewed and signed by 50 meeting participants. The objective of the statement is to assist Governor Kulongoski's Advisory Group on Global Warming (GAGGW) by describing the state of scientific knowledge and uncertainty regarding climate change impacts in the Pacific Northwest. The GAGGW is charged with recommending strategies for reduction of greenhouse gas emission for the State of Oregon. For more information about the consensus process and participants, see Appendix A.

**Global Effects of Climate Change**
The signatories of this consensus statement agree with the scientific findings about climate change as reported in the Third Assessment Report of Working Group I of the Intergovernmental Panel on Climate Change (IPCC), published in 2001. The IPCC finds that
- over the last century, the global average surface temperature increased about 1° F, and
- sea level rose between 4 and 8 inches.

The IPCC predicts that if current trends continue, by 2100
- the global average temperature will increase 2.5–10.4° F and
- sea level will rise 4–35".

The IPCC report concludes that
> "There is new and stronger evidence that most of the warming observed over the last 50 years is attributable to human activities."

An overview of these and other findings from the IPCC Third Assessment Report is attached in Appendix B.

**Regional Impacts of Climate Change**
Climate change is also affecting important parameters and processes on a regional scale. This Consensus Statement addresses the following key questions related to the impacts of climate change on the Pacific Northwest:
- What are the areas of consensus on the impacts of climate change on the Pacific Northwest based on scientific findings and observed changes?
- What are the projections for impacts of climate change on the Pacific Northwest over the next 10–50 years?
- What are the areas of uncertainty affecting our ability to understand and predict likely climate change?
- What are the most important questions to be answered in the next 5–10 years?
- What are the priorities for future research?

**Exhibt 3**

**What are the areas of consensus on the impacts of climate change on the Pacific Northwest, based on scientific findings and observed changes?**

Some major parameters and processes in the Pacific Northwest affected by climate change are described below.  Areas of consensus on these topics, based on scientific findings and observed changes, were gathered and synthesized from a variety of sources, including the U.S. Global Change Research Program Report (USGCRP 2001), papers in peer-reviewed scientific publications, and scientific presentations and breakout group summaries from the June 2004 Impacts of Climate Change in the Pacific Northwest meeting at OSU.

*Temperature*

Scientists are very certain that the Pacific Northwest is warming.  The USGCRP Report indicates that the annual average temperature has increased 1–3° F (0.6–1.7° C) over most of the region in the last century.  Temperature change during this time is characterized by a steep rise from 1900 to 1940, a decline from 1940 to 1975, and a rise thereafter.  Model simulations suggest that the earlier warming was largely due to natural causes, whereas the most recent warming is best explained by human-caused changes in greenhouse gases (Water Resources Breakout Group 2004).  Since 1920, nearly every temperature monitoring station in the Pacific Northwest—both urban and rural—shows a warming trend (Mote 2003).

*Precipitation*

While there is little evidence of a consistent global warming signal for precipitation in the West since 1915, precipitation has increased modestly from 1916 to 1997 (Water Resources Breakout Group 2004).  Since the beginning of the 20th century, the USGCRP Report indicates that annual precipitation has increased across the region by 10% on average, and the level of increase has reached 30–40% in eastern Washington and Northern Idaho.

*Sea Level*

During the period 1930–1995, land on the southern Oregon coast between Florence and Coos Bay has generally risen faster than worldwide changes in sea level by about 1 mm per year (Abbott 2004).  However, the same data, which are based on geodetic leveling and tide-gauge records, indicate that land on the central and northern coast of Oregon (from Florence to Astoria) is being submerged by rising sea level at a rate of 1.5–2 mm per year.

*Snowpack*

From 1950 to 2000, warming temperatures across the West have diminished snowpacks.  During this period, most monitoring stations in the Pacific Northwest show a decline in April 1 snowpack (or "snow water equivalent") (Miles 2004).  In the Cascades, the cumulative downward trend in snow water equivalent is approximately 35%.  Model simulations for the period 1950–1995 show that roughly half the reductions in the Cascades are due to warming trends, and half are due to downward trends in precipitation.  Trends for the period 1916–1995 show smaller trends due to warming (a 20% decrease in 82 years) and little effect from precipitation (Water Resources Breakout Group 2004).

Simulations of snow-water equivalent from 1916–1997 show that the timing of peak snow accumulation and 90% snowmelt have both moved toward earlier calendar dates across the West (Water Resources Breakout Group 2004; Miles 2004).  In sensitive areas like the Cascades, for

**Exhibt 3**

example, the date of peak snowpack has shifted by as much as 40 days earlier in the year. These simulations are supported by studies of observed snowpack, along with observations of stream flow from 1950–2003 which show systematic reductions in April 1 snowpack and June flow, and increases in March flow, over much of the West (Water Resources Breakout Group 2004; Stewart et al. in review).

Snowpack at low-to-mid elevations is the most sensitive to warming temperatures. Watersheds in the Cascades have shown significant losses of summer water availability due to warming over the last 55 years. The fraction of annual streamflow from May to September in the Cedar River watershed, for example, has declined by 30% in 55 years (Miles 2004). These observed changes in streamflow are not explained by trends in precipitation.

### Climate Variability at the Scale of Years to Decades

The USGCRP Report indicates that the climate of the Pacific Northwest shows significant recurrent patterns of year-to-year variability. Warm years tend to be relatively dry with low streamflow and light snowpack, which lead to summer water shortages, less abundant salmon, and increased probability of forest fires. Conversely, cool years tend to be relatively wet with high streamflow and heavy snowpack. Scientists conclude with high certainty that variations in Pacific Northwest climate show clear correlations with the large-scale ocean-atmosphere patterns associated with the El Nino/Southern Oscillation (ENSO) on scales of a few years (interannual) (Abbott 2004). Because of uncertainty about underlying dynamics and lack of predictability about other large-scale ocean-atmosphere patterns, such as the Pacific Decadal Oscillation (PDO), understanding the effects of such patterns on climate variability in the Pacific Northwest is problematic at present.

### What are the projections for climate change and its impacts in the Pacific Northwest over the next 10-50 years?

### Temperature

There is intermediate certainty that average temperatures in the Pacific Northwest will continue to increase in response to global climate change. The slope of the trend over the last 20 years should continue in the next few decades. The USGCRP Pacific Northwest assessment predicts that there will be average warming over the region of approximately 2.7° F (1.5° C) by 2030 and 5.4° F (3° C) by the 2050s. This change translates into a 0.18 to 0.9° F (0.1–0.5° C) increase per decade. However, the rate of increase may be even higher in the eastern portion of the region. The exact magnitude and rate of increase are difficult to predict, particularly beyond 50 years.

These projected temperature increases are highly likely to result in:
- An increase in elevation of the upper tree line,
- Longer growing seasons,
- Increased length of fire season,
- Earlier breeding by animals and plants,
- Longer and more intense allergy season, and
- Possible changes in vegetation zones.

**Exhibt 3**

Other changes, such as prevalence of insect infestations and expansion of woody vegetation, are less certain (Terrestrial Ecosystems Breakout Group 2004), in part because they are affected by additional factors such as precipitation and land use.

### Precipitation

Changes in precipitation regimes are generally acknowledged to be very uncertain in comparison with the temperature changes described above. Existing models are unable to make consistent projections of precipitation on regional scales. Recent IPCC global climate model scenarios have suggested the likelihood of modest increases in winter precipitation and decreases in summer precipitation for the Pacific Northwest. These effects are broadly consistent with the expected consequences of an intensified hydrologic cycle at the global level.

Some current research, however, suggests that these scenarios could be wrong for the Pacific Northwest because other factors may influence the outcome. For example, systematic changes in global sea surface temperature patterns, or in other fundamental drivers of global atmospheric circulation, could create systematic changes in storm-track behavior (Water Resources Breakout Group 2004). Based on this hypothesis, the Pacific Northwest could conceivably become drier, despite an intensification of the hydrologic cycle on a global level. These alternate hypotheses underscore the current uncertainty even about the direction of trends (i.e., increasing or decreasing) in precipitation. Better understanding of the interactions among atmosphere, land, and ocean are critical to predicting changes to and patterns of precipitation. The challenge will be to resolve these scientific uncertainties before significant climate change impacts occur.

Regarding specific projections, Oregon now experiences most of its precipitation during winter, with the greatest precipitation occurring in the mountains. The expectation is that this pattern will continue, and that the greatest precipitation (in the form of snow) will remain at high elevations. Changes in cool-season (i.e., October–March) climate are, therefore, likely to have the greatest effect on river flow and water resources.

Due to relatively little precipitation in summer and an earlier summer streamflow recession associated with earlier snowmelt, intensified impacts on water resources likely will include:

- Increased summer water demand (because of population growth) coupled with decreased water availability due to warmer temperatures, systematic reductions in summer streamflow, and limited reservoir storage.

- Changed ability to mitigate flood damage (which could result from increased unpredictability associated with extreme weather events and streamflow forecasting) that may warrant reconsideration of current management schemes for storage reservoirs and flood protection to account for this altered flow regime.

- Increased winter flows (if precipitation remains the same or increases in winter) that enhancement hydropower production in winter months and reductions in summer streamflow that diminish hydropower production in summer months may challenge the current approach to hydropower production in the Columbia River (Water Resources Breakout Group 2004).

**Exhibt 3**

- Decreased summer water availability and late-summer flows that may further decrease the overall ability water of water regulators and users to meet instream flow targets using storage reservoirs, and intensify the conflict between winter hydropower production and summer water supply.

- Exacerbated water-quality issues, including increased water temperatures in lakes and rivers, increased salinity and pollutant concentration (because water withdrawals decrease water quantity and concentrate pollutants in remaining water), lower dissolved oxygen content with increasing temperature, increases in certain pathogens that thrive at higher temperatures, and changes in the ecosystem and food web—all of which would stress fish including salmon.

### Sea Level

Sea level is very certain to continue to rise. The impacts of sea-level rise, however, will vary because of differences in tectonic processes throughout the Pacific Northwest. In some areas where tectonic processes exceed sea-level rise, land will rise faster than increased sea level. Where tectonic processes do not exceed sea-level rise, the region's shoreline will move landward. Maximum wave heights also will likely increase. This increase in wave height, in association with sea-level rise, has the potential to increase erosion in coastal areas.

### Snowpack

It is highly certain that the April 1 snowpack will continue to decline in response to increasing global greenhouse-gas emissions. This decline in snowpack will correspond with an earlier peak runoff of snowmelt, and increased streamflows earlier in the year (see above).

Other effects of warmer temperatures on snowmelt hydrology have been well understood for decades, and the effects of global warming on Pacific Northwest rivers has been quantified in a number of published studies. In basins with significant snow accumulation in winter, warmer temperatures systematically reduce peak snow accumulation, producing more runoff in winter, earlier peak flows in spring, and reduced water availability in summer. Snowpack at high elevations is generally less sensitive to temperature changes and more sensitive to precipitation changes. Thus, at high elevations, snowpack could increase if winter precipitation increases over time. However, even if there is an increase in snowfall at high elevations, the area covered by high elevations is small relative to the area of an entire river basin and consequently the total snow pack in a river basin typically declines if temperatures rise (even if precipitation increases by a modest amount).

### Marine Ecosystems

It is very certain that ocean circulation will continue to change in response to ocean-atmospheric processes occurring at the scale of years to decades (see discussion of ENSO and PDO above). These changes in ocean circulation include the intensity and character of upwelling winds, as well as changes in freshwater input (Water Resources Breakout Group 2004). While the patterns of these variations and their impacts on marine ecosystems (e.g., persistent changes in ecosystem structure, directional changes in productivity, etc.) are unknown, paleological records and quantified physical dynamics help to shed light on potential projections. Paleo-records suggest

**Exhibt 3**

that over long time scales, warm regimes are associated with strong upwelling. It also is known that a warmer continent results in stronger equator-ward winds that fuel upwelling. In combination, these two trends suggest a likely increase in the magnitude and duration of upwelling along the Pacific Northwest coast (Water Resources Breakout Group 2004).

The emergence of a mass of hypoxic (low oxygen) water (a so-called "dead zone") appearing off the central coast of Oregon in 2002 and 2004 may signal an unanticipated consequence of climate change mediated through changes in ocean circulation.

Projections about climate change in the region also indicate the potential for:
- Influx of seawater into estuaries and lower reaches of rivers due to sea-level rise,
- An earlier influx of freshwater into estuarine and coastal areas,
- Greater seasonal variation, and
- Increased stress on estuarine and nearshore species that are physiologically adapted to particular patterns in physical characteristics of their habitats (e.g., salinity).

### Terrestrial Ecosystems
Changes in temperature and precipitation patterns are likely, but the manner in which these changes will affect the terrestrial ecosystems of the Pacific Northwest is poorly known. Likely impacts include shifts in species composition and timing of the growing season, but the details are unpredictable. For example, temperature changes and loss of snowpack are expected to affect forests, particularly those in southwest, central, and eastern Oregon that rely on snowpack for water. Given current biomass densities, the anticipated drier summers will increase drought stress and vulnerability of forests to insects and diseases, and may ultimately lead to widespread fires that may systematically alter the hydrologic response in river basins over time.

**What are the greatest areas of uncertainty affecting our ability to understand and predict likely climate change in the Pacific Northwest?**
Shifts in regional-scale climate forcing, such as precipitation and winds, are the fundamental processes that affect ecosystems. We have little certainty in the projections about these key processes for the Pacific Northwest, and their effects on outcomes such as extreme events (e.g., flooding and large fires). The next level of uncertainty is the response of marine and terrestrial ecosystems to changes in the patterns of variability as well as long-term trends. Lastly, shifts in management practices, urban development, and other human activities will be convolved with changes in the natural environment and will impact ecosystems.

**What are the most important questions to be answered in the next 5-10 years?**
- What will be the trend and pattern of precipitation in the Pacific Northwest?
- What will be the patterns of coastal ocean winds and associated upwelling events?
- What are the dynamics of large, decadal-scale patterns of ocean/atmosphere interactions?
- Do thresholds exist for abrupt climate change and system shifts?
- How will the aforementioned patterns affect ecosystem patterns and resilience (including the maintenance of processes and patterns in the face of variability)?

**Exhibt 3**

**What are the priorities for future research?**

The priorities should be based on answering the four questions listed above. To accomplish this, we need to invest in four areas of research.

1. Improved and sustained observations of critical processes that can resolve interannual/decadal-scale variability. These observing systems should be focused on both physical and biological variables, and should be of sufficient quality to resolve local, small-scale processes relative to climate signals.

2. Focused process experiments and studies of critical processes, such as the impacts of increased $CO_2$ on forest dynamics and the impact of changes in the upwelling regime on coastal marine ecosystems and fisheries.

3. Improved numerical and statistical models focused on coupled atmosphere/ocean/land processes that include ecological as well as geophysical dynamics. Particular emphasis should be on developing regional-scale projections. Close interaction between modeling and analysis and the observing programs should be ensured.

4. Modeling and analysis of the effects of economic and management policies interannual/decadal-scale processes in the Pacific Northwest. This could include forest management, land use changes, fishery management, coastal zone management and water policy.

**Exhibt 3**

**Contribution of Working Group III to the**
**Fourth Assessment Report of the**
**Intergovernmental Panel on Climate Change**

# Summary for Policymakers

**This Summary for Policymakers was formally approved  at the 9th Session of Working Group III of the IPCC, Bangkok, Thailand. 30 April - 4 May 2007**

**Drafting authors:**

Terry Barker, Igor Bashmakov, Lenny Bernstein, Jean Bogner, Peter Bosch, Rutu Dave, Ogunlade Davidson, Brian Fisher, Michael Grubb, Sujata Gupta, Kirsten Halsnaes, BertJan Heij, Suzana Kahn Ribeiro, Shigeki Kobayashi, Mark Levine, Daniel Martino, Omar Masera Cerutti, Bert Metz, Leo Meyer, Gert-Jan Nabuurs, Adil Najam, Nebojsa Nakicenovic, Hans Holger Rogner, Joyashree Roy, Jayant Sathaye, Robert Schock, Priyaradshi Shukla, Ralph Sims, Pete Smith, Rob Swart, Dennis Tirpak, Diana Urge-Vorsatz, Zhou Dadi

**This Summary for Policymakers should be cited as:**

IPCC, 2007: Summary for Policymakers. In: *Climate Change 2007: Mitigation. Contribution of Working Group III to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change* [B. Metz, O.R. Davidson, P.R. Bosch, R. Dave, L.A. Meyer (eds)], Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA.

**Exhibit 4**

- Energy efficient buildings, while limiting the growth of $CO_2$ emissions, can also improve indoor and outdoor air quality, improve social welfare and enhance energy security [6.6, 6.7].
- Opportunities for realising GHG reductions in the building sector exist worldwide. However, multiple barriers make it difficult to realise this potential. These barriers include availability of technology, financing, poverty, higher costs of reliable information, limitations inherent in building designs and an appropriate portfolio of policies and programs [6.7, 6.8].
- The magnitude of the above barriers is higher in the developing countries and this makes it more difficult for them to achieve the GHG reduction potential of the building sector [6.7].

13. **The economic potential in the industrial sector[19] is predominantly located in energy intensive industries. Full use of available mitigation options is not being made in either industrialized or developing nations** (*high agreement, much evidence*)

- Many industrial facilities in developing countries are new and include the latest technology with the lowest specific emissions. However, many older, inefficient facilities remain in both industrialized and developing countries. Upgrading these facilities can deliver significant emission reductions [7.1, 7.3, 7.4].
- The slow rate of capital stock turnover, lack of financial and technical resources, and limitations in the ability of firms, particularly small and medium-sized enterprises, to access and absorb technological information are key barriers to full use of available mitigation options [7.6].

14. **Agricultural practices collectively can make a significant contribution at low cost[19] to increasing soil carbon sinks, to GHG emission reductions, and by contributing biomass feedstocks for energy use** (*medium agreement, medium evidence*)**.**

- A large proportion of the mitigation potential of agriculture (excluding bioenergy) arises from soil carbon sequestration, which has strong synergies with sustainable agriculture and generally reduces vulnerability to climate change [8.4, 8.5, 8.8].
- Stored soil carbon may be vulnerable to loss through both land management change and climate change [8.10].
- Considerable mitigation potential is also available from reductions in methane and nitrous oxide emissions in some agricultural systems [8.4, 8.5].

- There is no universally applicable list of mitigation practices; practices need to be evaluated for individual agricultural systems and settings [8.4].
- Biomass from agricultural residues and dedicated energy crops can be an important bioenergy feedstock, but its contribution to mitigation depends on demand for bioenergy from transport and energy supply, on water availability, and on requirements of land for food and fibre production. Widespread use of agricultural land for biomass production for energy may compete with other land uses and can have positive and negative environmental impacts and implications for food security [8.4, 8.8].

15. **Forest-related mitigation activities can considerably reduce emissions from sources and increase $CO_2$ removals by sinks at low costs[19], and can be designed to create synergies with adaptation and sustainable development** (*high agreement, much evidence*)[23].

- About 65% of the total mitigation potential (up to 100 US$/tCO$_2$-eq) is located in the tropics and about 50% of the total could be achieved by reducing emissions from deforestation [9.4].
- Climate change can affect the mitigation potential of the forest sector (i.e., native and planted forests) and is expected to be different for different regions and sub-regions, both in magnitude and direction [9.5].
- Forest-related mitigation options can be designed and implemented to be compatible with adaptation, and can have substantial co-benefits in terms of employment, income generation, biodiversity and watershed conservation, renewable energy supply and poverty alleviation [9.5, 9.6, 9.7].

16. **Post-consumer waste[24] is a small contributor to global GHG emissions[25] (<5%), but the waste sector can positively contribute to GHG mitigation at low cost[19] and promote sustainable development** (*high agreement, much evidence*).

- Existing waste management practices can provide effective mitigation of GHG emissions from this sector: a wide range of mature, environmentally effective technologies are commercially available to mitigate emissions and provide co-benefits for improved public health and safety, soil protection and pollution prevention, and local energy supply [10.3, 10.4, 10.5].
- Waste minimization and recycling provide important indirect mitigation benefits through the conservation of energy and materials [10.4].

---

23 Tuvalu noted difficulties with the reference to "low costs" as Chapter 9, page 15 of the WG III report states that: "the cost of forest mitigation projects rise significantly when opportunity costs of land are taken into account".

24 Industrial waste is covered in the industry sector.

25 GHGs from waste include landfill and wastewater methane, wastewater $N_2O$, and $CO_2$ from incineration of fossil carbon.

**Exhibit 4**

Atmos. Chem. Phys., 7, 2287–2312, 2007
www.atmos-chem-phys.net/7/2287/2007/
© Author(s) 2007. This work is licensed
under a Creative Commons License.



Atmospheric
Chemistry
and Physics

# Dangerous human-made interference with climate: a GISS modelE study

J. Hansen[1,2], M. Sato[2], R. Ruedy[3], P. Kharecha[2], A. Lacis[1,4], R. Miller[1,5], L. Nazarenko[2], K. Lo[3], G. A. Schmidt[1,4], G. Russell[1], I. Aleinov[2], S. Bauer[2], E. Baum[6], B. Cairns[5], V. Canuto[1], M. Chandler[2], Y. Cheng[3], A. Cohen[6], A. Del Genio[1,4], G. Faluvegi[2], E. Fleming[7], A. Friend[8], T. Hall[1,5], C. Jackman[7], J. Jonas[2], M. Kelley[8], N. Y. Kiang[1], D. Koch[2,9], G. Labow[7], J. Lerner[2], S. Menon[10], T. Novakov[10], V. Oinas[3], Ja. Perlwitz[5], Ju. Perlwitz[5], D. Rind[1,4], A. Romanou[1,4], R. Schmunk[3], D. Shindell[1,4], P. Stone[11], S. Sun[1,11], D. Streets[12], N. Tausnev[3], D. Thresher[4], N. Unger[2], M. Yao[3], and S. Zhang[2]

[1]NASA Goddard Institute for Space Studies, New York, NY, USA
[2]Columbia University Earth Institute, New York, NY, USA
[3]Sigma Space Partners LLC, New York, NY, USA
[4]Department of Earth and Environmental Sciences, Columbia University, New York, NY, USA
[5]Department of Applied Physics and Applied Mathematics, Columbia University, New York, NY, USA
[6]Clean Air Task Force, Boston, MA, USA
[7]NASA Goddard Space Flight Center, Greenbelt, MD, USA
[8]Laboratoire des Sciences du Climat et de l'Environnement, Orme des Merisiers, Gif-sur-Yvette Cedex, France
[9]Department of Geology, Yale University, New Haven, CT, USA
[10]Lawrence Berkeley National Laboratory, Berkeley, CA, USA
[11]Massachusetts Institute of Technology, Cambridge, MA, USA
[12]Argonne National Laboratory, Argonne, IL, USA

Received: 23 October 2006 – Published in Atmos. Chem. Phys. Discuss.: 5 December 2006
Revised: 29 March 2007 – Accepted: 15 April 2007 – Published: 7 May 2007

**Abstract.** We investigate the issue of "dangerous human-made interference with climate" using simulations with GISS modelE driven by measured or estimated forcings for 1880–2003 and extended to 2100 for IPCC greenhouse gas scenarios as well as the "alternative" scenario of Hansen and Sato (2004). Identification of "dangerous" effects is partly subjective, but we find evidence that added global warming of more than 1°C above the level in 2000 has effects that may be highly disruptive. The alternative scenario, with peak added forcing ~1.5 W/m² in 2100, keeps further global warming under 1°C if climate sensitivity is ~3°C or less for doubled $CO_2$. The alternative scenario keeps mean regional seasonal warming within $2\sigma$ (standard deviations) of 20th century variability, but other scenarios yield regional changes of 5–10$\sigma$, i.e. mean conditions outside the range of local experience. We conclude that a $CO_2$ level exceeding about 450 ppm is "dangerous", but reduction of non-$CO_2$ forcings can provide modest relief on the $CO_2$ constraint. We discuss three specific sub-global topics: Arctic climate change,

tropical storm intensification, and ice sheet stability. We suggest that Arctic climate change has been driven as much by pollutants ($O_3$, its precursor $CH_4$, and soot) as by $CO_2$, offering hope that dual efforts to reduce pollutants and slow $CO_2$ growth could minimize Arctic change. Simulated recent ocean warming in the region of Atlantic hurricane formation is comparable to observations, suggesting that greenhouse gases (GHGs) may have contributed to a trend toward greater hurricane intensities. Increasing GHGs cause significant warming in our model in submarine regions of ice shelves and shallow methane hydrates, raising concern about the potential for accelerating sea level rise and future positive feedback from methane release. Growth of non-$CO_2$ forcings has slowed in recent years, but $CO_2$ emissions are now surging well above the alternative scenario. Prompt actions to slow $CO_2$ emissions and decrease non-$CO_2$ forcings are required to achieve the low forcing of the alternative scenario.

*Correspondence to:* J. Hansen
(jhansen@giss.nasa.gov)

Published by Copernicus Publications on behalf of the European Geosciences Union.

**Exhibit 5**

# 1   Introduction

The Earth's atmospheric composition and surface properties are being altered by human activities. Some of the alterations are as large or larger than natural atmosphere and surface changes, even compared with natural changes that have occurred over hundreds of thousands of years. There is concern that these human-made alterations could substantially alter the Earth's climate, which has led to the United Nations Framework Convention on Climate Change (United Nations, 1992) with the agreed objective "to achieve stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system."

The Earth's climate system has great thermal inertia, requiring at least several decades to adjust to a change of climate forcing (Hansen et al., 1984). Anthropogenic physical infrastructure giving rise to changes of atmospheric composition, such as power plants and transportation systems, also has a time constant for change of several decades. Thus there is a need to anticipate the nature of anthropogenic climate change and define the level of change constituting dangerous interference with nature. Simulations with global climate models on the century time scale provide a tool for addressing that need. Climate models used for simulations of future climate must be tested by means of simulations of past climate change.

We carry out climate simulations using GISS atmospheric modelE documented by Schmidt et al. (2006), hereafter modelE (2006). Specifically, we attach the model III version of atmospheric modelE to the computationally efficient ocean model of Russell et al. (1995). This coupled model and its climate sensitivity have been documented by a large set of simulations carried out to investigate the "efficacy" of various climate forcings (Hansen et al., 2005a), hereafter Efficacy (2005). We use the same model III here for transient climate simulations for 1880–2100, with a few simulations extended to 2300.

We made calculations for each of ten individual climate forcings for the period 1880–2003, as well as for all forcings acting together. The simulations using all ten forcings were extended into the future using scenarios of atmospheric composition defined by the Intergovernmental Panel on Climate Change (IPCC, 2001) and two scenarios defined by Hansen and Sato (2004). The simulations for 1880–2003 with individual forcings are described by Hansen et al. (2007a). Extensive diagnostics and convenient graphics for all of the runs are available at http://data.giss.nasa.gov/modelE/climsim/. Diagnostics for extended runs with all forcings acting at once are also available from the official IPCC repository (http://www-pcmdi.llnl.gov/ipcc/about_ipcc.php).

Section 2 defines the climate model and summarizes principal known deficiencies. Section 3 defines time-dependent climate forcings that we employ. Section 4 examines simulated global temperature change and specific regional climate change issues. Section 5 compares trends of actual climate forcings and those in the scenarios. Section 6 summarizes the relevance of our results to the basic question: is there still time to avoid dangerous human interference with climate? This final section goes one step beyond the usual scientific paper, as it aims to interpret results in terms of policy options and stimulate discussion of the role of scientists in the climate debate.

# 2   Climate model

## 2.1   Atmospheric model

The atmospheric model employed here is the 20-layer version of GISS modelE (2006) with $4° \times 5°$ horizontal resolution. This resolution is coarse, but use of second-order moments for numerical differencing improves the effective resolution for the transport of tracers. The model top is at 0.1 hPa. Minimal drag is applied in the stratosphere, as needed for numerical stability, without gravity wave modeling. Stratospheric zonal winds and temperature are generally realistic (Fig. 17 in Efficacy, 2005), but the polar lower stratosphere is as much as 5–10°C too cold in the winter and the model produces sudden stratospheric warmings at only a quarter of the observed frequency. Model capabilities and limitations are described in Efficacy (2005) and modelE (2006). Deficiencies are summarized below (Sect. 2.4).

## 2.2   Ocean representation

In this paper we use the dynamic ocean model of Russell et al. (1995). One merit of this ocean model is its efficiency, as it adds negligible computation time to that for the atmosphere when the ocean horizontal resolution is the same as that for the atmosphere, as is the case here. There are 13 ocean layers of geometrically increasing thickness, four of these in the top 100 m. The ocean model employs the KPP parameterization for vertical mixing (Large et al., 1994) and the Gent-McWilliams parameterization for eddy-induced tracer transports (Gent et al., 1995; Griffies, 1998). The resulting Russell et al. (1995) ocean model produces a realistic thermohaline circulation (Sun and Bleck, 2006), but yields unrealistically weak El Nino-like variability as a result of its coarse resolution.

Interpretation of climate simulations and observed climate change is aided by simulations with the identical atmospheric model attached to alternative ocean representations. We make calculations with the same time-dependent 1880–2003 climate forcings of this paper and same atmospheric model attached to: (1) ocean A, which uses observed sea surface temperature (SST) and sea ice (SI) histories of Rayner et al. (2003); (2) ocean B, the Q-flux ocean (Hansen et al., 1984; Russell et al., 1985), with specified horizontal ocean heat transports inferred from the ocean A control run and diffusive uptake of heat anomalies by the deep ocean; (3) ocean C, the

**Exhibit 5**

# 6   Summary: can we avoid dangerous climate change?

## 6.1   Global warming: how much is dangerous?

IPCC (2001) provides an invaluable service by assessing knowledge of climate change and addressing the goal of the United Nations Framework Convention on Climate Change (Article 2 of United Nations, 1992), which is to stabilize atmospheric composition at a level avoiding "dangerous anthropogenic interference" with climate. IPCC (2001) discusses dangerous interference with the aid of a "burning embers" diagram, in which several "reasons for concern" are assigned colors that become increasingly red as global temperature increases, the color assignments being based on expert opinions. The diagram is sometimes taken as suggesting that global warming of 2–3°C, relative to recent temperatures, is likely to be dangerous (IPCC, 2001; Smith and Hitz, 2003; Yohe et al., 2004). Schneider and Mastrandrea (2005) use the burning embers for a probabilistic assessment of dangerous, with 2.85°C as the 50th percentile threshold.

Hansen (2004, 2005a, b) asserts that the dangerous level of global warming is closer to 1°C or less, his principal rationale being evidence from the Earth's history that greater warmings are likely to cause large sea level change, which, he argues, will occur on a time scale of centuries. We discuss the sea level issue in Sect. 6.1.1 and regional climate effects in 6.1.2, describing additional evidence in support of the contention that a level of global warming as low as 1°C can have dangerous effects.

### 6.1.1   Global temperature and sea level

Simulated 21st century climate change can be used to drive ice sheet models that calculate the expected contribution of ice sheets to sea level change. Wild et al. (2003) include ice sheet calculations within their high-resolution (T-106) global climate model with a BAU scenario that has $CO_2$ reaching 715 ppm in 2100, finding that both the Greenland and Antarctic ice sheets grow, contributing a 12 cm/century fall to sea level change. Huybrechts et al. (2004) use a 3-D thermomechanical ice sheet/ice shelf model driven by climate change produced by general circulation models (ECHAM4 and HadAM3H), finding mass loss from Greenland, larger mass gain by Antarctica, with little net sea level change by 2100.

We question whether such ice sheet models adequately represent all physics that is important during the wet process of ice sheet disintegration in a warming climate. Explicit modeling of ice streams that channel flow of ice to the ocean may be needed, including effects of rainfall and melt percolation through crevasses and moulins, as well as the removal of ice shelves by the warming ocean and dynamical propagation inland of effects due to thinning and retreat of coastal ice. Increased snowfall in ice sheet interiors provides one negative feedback, but with BAU warming of several degrees Celsius over the ice sheets most of Greenland and West Antarctica would be bathed in summer melt. As the area of melt increases, as ice shelves are lost, and as coastal ice thins, positive feedbacks due to decreasing albedo and lowering ice surface may feed a rapid nonlinear dynamical response.

Given the difficulty of modeling ice sheet response to warming, it is useful to examine the Earth's history for evidence of ice sheet response to prior warmings. Global temperature should be a meaningful parameter for such empirical study. It is shown in Efficacy (2005) that there is a congruence in the spatial distribution of climate response to most global forcing mechanisms normalized by the effective (or fixed SST) forcing, with exceptions for highly localized forcings such as land-use change or biomass burning aerosols, and with limitation to comparisons for a fixed distribution of continents. This approximate equivalence of effective forcings increases the likelihood of a meaningful relationship between global temperature and climate impacts such as sea level change.

The highest sea level in the past half million years was at most ~+5 m relative to today. A case has been made for higher sea level ~400 Kybp (Hearty et al., 1999), but there are dating uncertainties and it is likely that this higher stand occurred at a much earlier time (Droxler et al., 2002). It is necessary to go back to the Pliocene, about 3 million years ago, to find sea levels clearly much greater than today. Sea level then is estimated to have been 25±10 m higher than today (Barrett et al., 1992; Dowsett et al., 1994; Dwyer et al., 1995). Maximum global temperatures during interglacial periods of the past half million years were probably about +1°C relative to today; Antarctic temperatures in some interglacial periods reached about +2°C (Petit et al., 1999), but tropical maxima were <+1°C (Medina-Elizade and Lea, 2005; Hansen et al., 2006). The middle Pliocene was about +3°C relative to today (Crowley, 1996; Dowsett et al., 1996).

Long-term global ice volume changes tend to lag global temperature change by a few thousand years (Mudelsee, 2001), but these changes are in response to weak forcings varying on millennial time scales (Hays et al., 1976). Nevertheless, at some ice age terminations ice volume change is rapid, e.g. the largest sea level rise following the last ice age, Meltwater Pulse 1A, when sea level rose about 20 m in 400 years, was practically synchronous with the Bolling warming (Kienast et al., 2003). Other studies provide evidence of large (~10 m or more) changes of sea level on "sub-orbital" time scales (Siddall et al., 2003; Potter et al., 2004; Thompson and Goldstein, 2005), i.e. sea level change occurring much more rapidly than changes of the Earth's orbital elements.

GHG climate forcings in the IPCC BAU scenarios, such as A1FI, A2 and A1B, are far outside the range that has existed on Earth in millions of years. The rate of change of this sustained forcing exceeds that of known forcings in at least millions of years. Global warming in the BAU scenarios, with canonical climate sensitivity ~3°C for doubled $CO_2$, is ~3°C by 2100 and still rising rapidly. By 2100 the

**Exhibit 5**

melt area on Greenland and West Antarctica and the melt rate of ice shelves, if any ice shelves remain, would be much greater than today. Thus it is unlikely that the response time for significant ice sheet change could exceed centuries, because such response times (with sea level change of meters per century) have occurred during the Pleistocene with much smaller forcings.

If equilibrium sea level rise is many meters, a response time of centuries provides little consolation to coastal dwellers. They would be faced with intermittent floods associated with storms and continually rebuilding above a transient sea level. Thus we suggest that sea level change may define a low level for global warming that constitutes dangerous change, due to the large concentration of people and infrastructure along global coastlines.

Present understanding of ice sheet response to global warming does not allow sharp definition of a "dangerous" level, but BAU scenarios are surely well into the dangerous regime. Even global warming of 1°C conceivably could produce a long-term sea level rise of several meters (Otto-Bleisner et al., 2006; Overpeck et al., 2006). However, climate forcing on the ice sheets is far smaller with global warming <1°C than with global warming 2–3°C, and the resulting slower changes of the ice sheets would allow a better chance to develop climate mitigation strategies or adapt to sea level change.

### 6.1.2    Regional climate effects

Regional climate change also yields a clear distinction between BAU scenarios with global warming $\sim$3°C and an alternative scenario that keeps global warming $<\sim$1°C. In the specific alternative scenario we have defined, global warming is 0.80°C in the 21st century for a model with climate sensitivity 2.9°C for doubled $CO_2$. The resulting change of local seasonal mean temperature this century is typically 1–2$\sigma$, where $\sigma$ is the standard deviation of seasonal temperature in the 20th century. In IPCC BAU scenarios, the average change of seasonal mean temperature is 5–10$\sigma$.

Ecosystems, wildlife, and humans thus would be subjected in the BAU scenarios to conditions far outside their local range of experience. Perhaps humans, aided by modern technology, may adapt readily to such regional climate change. Wildlife and ecosystems, however, will not have that advantage, and their abilities to migrate may be limited by anthropogenic and geographic constraints on their locations. We suggest that 5–10$\sigma$ changes of regional seasonal temperature are prima facie evidence that the BAU scenarios extend well into the range of "dangerous anthropogenic interference".

We have focused on temperature change, but hydrologic changes that accompany global warming may have large effects on ecosystems, wildlife, and humans. An expansion and intensification of subtropical dry conditions occurs consistently with global warming in our climate simulations (Hansen et al., 2005a, 2007a). Held and Soden (2006) and

Lu et al. (2007) find agreement among a large number of models in intensification of the pattern of precipitation minus evaporation and its temporal variance, with poleward expansion of subtropical conditions accompanying global warming. Practical impacts may include increased drought and fires in regions such as the Western United States, Mediterranean, Australia and parts of Africa. Paleoclimate data (Cook et al., 2004) provide evidence of strong drought in the western United States accompanying global warming, and the GISS model is able to reproduce this tendency for subtropical drying in past warm climates as well as in modern ones (Shindell et al, 2006). We cannot specify a threshold for these effects, and there is already evidence of such tendencies in the past decade. However, the simulated effects are proportional to global warming (Held and Soden, 2006; Lu et al., 2007), so end-of-century effects under BAU warming are about three times greater than in the alternative scenario.

Arctic climate change provides another possible criterion for DAI. The strong positive feedback between sea ice area and surface albedo makes the Arctic one of the most sensitive regions on Earth to global warming. In the middle Pliocene, with global temperature 2–3°C warmer than today, the Arctic was ice-free in the warm season. Such drastic climate change would have deleterious effects on wildlife and indigenous people (ACIA, 2004), constituting what many people would agree is dangerous anthropogenic interference with nature.

Thus, from the perspective of the Arctic, IPCC BAU scenarios again yield dangerous climate change. We reiterate that these BAU scenarios did not include variations in short-lived species, which could further enhance the warming as substantial reductions in reflective aerosols are assumed under SRES scenarios for the late 21st century. However, warming and positive feedbacks that feed further warming can be minimized by keeping the net forcing small. We suggest that, if additional $CO_2$ growth is kept small, as in the alternative scenario, and if some of the positive non-$CO_2$ climate forcings that are most effective in the Arctic are reduced, it may be possible to limit or even eliminate further Arctic warming. This would require large reductions of $CH_4$, tropospheric $O_3$, and other pollutants, but such reductions would have ancillary benefits (West et al., 2006; Air Pollution Workshop, http://www.giss.nasa.gov/meetings/pollution2005/).

### 6.1.3    Climate feedbacks

The climate sensitivity of $^3/_4$°C per W/m$^2$ (about 3°C for doubled $CO_2$) is inferred for the case in which GHGs and ice sheet area are treated as forcings (Hansen, 2005b). If climate change is small enough, say in the range of the interglacial periods of the past million years, the areas of the Greenland and Antarctica ice sheets should not change significantly, and the positive feedback of increasing GHGs with increasing global temperature is small (+18 ppm $CO_2$ per °C, +49 ppb $CH_4$ per °C, +15 ppb $N_2O$ per °C, Hansen and Sato,

**Exhibit 5**

2004). However, with BAU scenarios the expected global warming extends far outside the range of recent interglacial periods, raising the possibility of much larger feedbacks such as destabilization of methane hydrates (Sect. 4.2.3).

Although we lack sufficient information for quantitative analysis, the existence of climate feedbacks appears to present the possibility of a dichotomy between climate futures such as the alternative scenario, which keeps global warming less than 1°C, and BAU scenarios. If the warming is less than 1°C, it appears that strong positive feedbacks are not unleashed, judging from recent Earth history. On the other hand, if global warming gets well out of this range, there is a possibility that positive feedbacks could set in motion climate changes far outside the range of recent experience. The ability of the ocean to absorb human-made $CO_2$ decreases as the emissions increase (Archer, 2005), there is a possibility that the terrestrial biosphere could even become a source of $CO_2$ (Cox et al., 2000; Jones et al., 2006), and even a potential that large amounts of methane could be released from undersea methane hydrates, or from thawing permafrost, as discussed in Sect. 4.2.3.

## 6.2 Can we avoid dangerous climate change?

The objective of the Framework Convention on Climate Change (United Nations, 1992) is stabilization of greenhouse gas concentrations at a level avoiding dangerous human-made interference with climate. The obvious question, what is the "dangerous" greenhouse gas level, has received little research attention, perhaps because of inherent arbitrariness in any criteria for "dangerous".

Actions to address climate change are the prerogative of the public and their representatives. Science, however, should provide as much relevant quantitative information as practical, and unavoidably there is some overlap of the science and policy areas. For the sake of clarity of communication, we include here opinions relating to policy options, based on quantitative climate science, but these must be recognized as personal opinions not institutional positions.

We examine potential criteria for dangerous climate change assuming that humanity wants to preserve planetary conditions similar to those in the period of civilization, thus near the range of climate in the present interglacial period, the Holocene, which has existed almost 12 000 years. Even with such an assumption, various uncertainties make definition of the dangerous level imprecise and imply that estimates must be continually refined as knowledge improves.

Nevertheless, we can conclude that the world is already close to the dangerous level. The sharpest criterion is probably maintenance of long-term sea level close to the present level, as about one billion people live within 25 m elevation of today's sea level. Uncertainty exists about the time for ice sheets to respond to climate change (IPCC, 2001; Hansen, 2005a), but analyses in this paper and comparison with atmospheric composition in prior warm periods (Hansen et al.,

2007b) suggest that a $CO_2$ level exceeding ~450 ppm is almost surely dangerous, and the ceiling may be even lower. Reduction of non-$CO_2$ forcings provides some flexibility in the $CO_2$ ceiling.

### 6.2.1 The imprecise "dangerous" level

Global warming in "business-as-usual" (BAU) climate forcing scenarios, for climate sensitivity consistent with paleoclimate data, is at least 2–3°C by 2100 (relative to 2000) and still increasing rapidly. Implications include an ice-free Arctic in the warm season, other regional climate changes outside the range of historical experience, and initiation of ice sheet changes that presage future sea level change out of humanity's control. The Earth, in a broad sense, would be a different planet than the one that existed for the past 10 millennia.

Have we already passed a "tipping point" such that it is now impossible to avoid "dangerous" climate change (Lovelock, 2006)? In our estimation, we must be close to such a point, but we may not have passed it yet. It is still feasible to achieve a scenario that keeps additional global warming under 1°C, yielding a degree of climate change that is quantitatively and qualitatively different than under BAU scenarios.

The "alternative" scenario, designed to keep warming less than 1°C, has a significantly smaller forcing than any of the IPCC scenarios. In recent years net growth of all real world greenhouse gases has run just slightly ahead of the alternative scenario, with the excess due to continued growth of $CO_2$ emissions at about 2%/year. $CO_2$ emissions would need to level out soon and decline before mid-century to approximate the alternative scenario. Moderate changes of emissions growth rate have a marked effect after decades, as shown by comparison to BAU scenarios. Early decreases in emissions growth are the most effective.

The alternative scenario target, keeping added $CO_2$ to ~80 ppm between 2000 and 2050, may already be impractical due to the 2%/year growth of $CO_2$ emissions in the past decade. However, the net greenhouse forcing could still meet the alternative scenario target via the combination of a still feasible slowdown and reduction of $CO_2$ emissions together with aggressive absolute reductions of $CH_4$ and $O_3$ and a slowdown in the growth of $N_2O$. Reduction of non-$CO_2$ forcings has benefits for human health and agriculture (West et al., 2005; Air Pollution Workshop, http://www.giss.nasa.gov/meetings/pollution2005/), as well as for climate. Reduction of non-$CO_2$ forcings is especially effective in limiting Arctic climate change (Sect. 6.2.1 above; Shindell et al., 2006).

Continued rapid growth of $CO_2$ emissions and infrastructure for another decade may make attainment of the alternative scenario impractical if not impossible. Because widescale use of power plants with $CO_2$ sequestration is at least a decade away, near-term emphasis on energy efficiency and renewable energy is needed to minimize construction of previous-generation pulverized-coal power plants. Such

**Exhibit 5**



**Fig. 10.** Fossil fuel emissions: **(a)** annual by fuel type, and **(b)**cumulative by fuel type, **(c)** cumulative by source country or region, excluding ship and air emissions, **(d)** 2005 emissions by source region, **(e)**cumulative 1750–2005 emissions, **(f)** relative contribution of fossil fuels to global warming in 2005, and **(g)** per capita emissions of the 15 largest sources in 2003. Data sources: Carbon Dioxide Information Analysis Center, Oak Ridge National Laboratory for 1751-2003 and British Petroleum (2006) for 2004–2005. Data for Russia are 60% of USSR for 1850–1991 and Russian Federation thereafter.

power plants are a primary cause of increasing $CO_2$ emissions, and their construction commits the world to high $CO_2$ emissions or high costs of power plant replacement. Potential energy savings from improved efficiency, even in developed countries, are sufficient to cover increased energy demand for the 1-2 decades needed to develop improved energy technologies (Romm et al., 1998; Pacala and Socolow, 2004; NCEP, 2004).

Human-made aerosols cause a net negative climate forcing that we estimate (Fig. 1) as about half the magnitude of positive greenhouse gas forcing. Thus aerosols have diminished global warming in what Hansen and Lacis (1990) call a "Faustian bargain". As humanity reduces particulate air pollution in the future, a payment in increased global warming will come due (Andreae et al., 2005). With appropriate understanding of the aerosol forcing, however, it may be possible to minimize warming effects of air pollution reduction. The direct aerosol forcing can be reduced via emphasis on

reduction of black carbon (soot) aerosols that cause warming (Hansen et al., 2000; Jacobson, 2001). The aerosol indirect effect is non-linear, with the first aerosols added having greatest effect (Menon et al., 2002). Thus retention of a small amount of aerosols, perhaps in remote areas, may minimize warming. Better knowledge of aerosol properties and their effects is needed for analysis.

A scenario that avoids "dangerous" climate change appears to be still technically feasible. The fact that the recent trend of global GHG climate forcing remains close to the "alternative scenario" that we estimate as necessary to avoid "dangerous" climate change provides some basis for optimism. In addition, we are entering an era in which the reality of climate change is becoming increasingly apparent, and it is clear that the effects of climate change, especially sea level rise and changes in the hydrological cycle, will be widespread, affecting both developed and developing countries.

**Exhibit 5**

Reduction of climate forcing is a global problem, as quantified in Fig. 9, and thus it presents an unusual challenge to attain needed international cooperation. For this reason it is particularly important that the scientific understanding of climate change and its implications be transmitted to the public and policy makers, and the message must be understandable and believable if it is to help produce the actions needed to avoid dangerous climate change.

Our conclusion that global temperature is nearing the level of dangerous climate effects implies that little time remains to achieve the international cooperation needed to avoid widespread undesirable consequences. $CO_2$ emissions are the critical issue, because a substantial fraction of these emissions remain in the atmosphere "forever", for practical purposes (Fig. 9a). The principal implication is that avoidance of dangerous climate change requires the bulk of coal and unconventional fossil fuel resources to be exploited only under condition that $CO_2$ emissions are captured and sequestered. A second inference is that remaining gas and oil resources must be husbanded, so that their role in critical functions such as mobile fuels can be stretched until acceptable alternatives are available, thus avoiding a need to squeeze such fuels from unconventional and environmentally damaging sources. The task is to achieve a transition to clean carbon-free energy sources, which are essential on the long run, without pushing the climate system beyond a level where disastrous irreversible effects become inevitable.

### 6.2.2 Role of scientists in the climate debate

These stark conclusions about the threat posed by global climate change and implications for fossil fuel use are not yet appreciated by essential governing bodies, as evidenced by ongoing plans to build coal-fired power plants without $CO_2$ capture and sequestration. In our view, there is an acute need for science to inform society about the costs of failure to address global warming, because of a fundamental difference between the threat posed by climate change and most prior global threats.

In the nuclear standoff between the Soviet Union and United States, a crisis could be precipitated only by action of one of the parties. In contrast, the present threat to the planet and civilization, with the United States and China now the principal players (though, as Fig. 10 shows, Europe also has a large responsibility), requires only inaction in the face of clear scientific evidence of the danger.

Thus scientists are faced with difficult choices between communication of scientific information to the public and focus on basic research, as there are inherent compromises in any specific balance. Former American Vice President Al Gore, at a plenary session of the December 2006 meeting of the American Geophysical Union, challenged earth scientists to become involved in informing the public about global climate change. The overwhelmingly positive audience reaction to his remarks provides hope that the large gap between scientific understanding and public knowledge about climate change may yet be closed.

*Acknowledgements.* Data that we use for recent greenhouse gas amounts are from the NOAA Earth System Research Laboratory, Global Monitoring Division where we are particularly indebted to E. Dlugokencky, S. Montzka, and J. Elkins for up-to-date data. We thank E. Baum, T. Boden, C. Covey, O. Dubovik, H. Gilgen, D. Harvey, B. Holben, P. Jones, J. Lanzante, J. Lean, F. Mims, B. Randel, E. Rignot for data and helpful correspondence, and D. Cain for technical assistance. Research support from H. Harvey of the Hewlett Foundation, G. Lenfest, and NASA Earth Science Research Division managers J. Kaye, D. Anderson, W. Abdalati, P. DeCola, T. Lee, and E. Lindstrom is gratefully acknowledged.

Edited by: M. Heimann

### References

Abdalati, W., Krabill, W. B., Frederick, E., Manizade, S., Martin, C., Sonntag, J., Swift, R., Thomas, R., Wright, W., and Yungel, J.: Near-coastal thinning of the Greenland ice sheet, J. Geophys. Res., 106, 33 729–33 742, 2001.

Andreae, M. O., Jones, C. D., and Cox, P. M.: Strong present-day aerosol cooling implies a hot future, Nature, 435, 1187–1190, 2005.

Annan, J. D. and Hargreaves, J. C.: Using multiple observationally-based constraints to estimate climate sensitivity, Geophys. Res. Lett., 33, L06704, doi:10.1029/2005GL025259, 2006.

Aoki, S., Yoritaka, M., and Masuyama, A.: Multidecadal warming of subsurface temperature in the Indian sector of the Southern Ocean, J. Geophys. Res., 108(C4), 8081, doi:10.1029/2000JC000307, 2003.

Archer, D.: Fate of fossil-fuel $CO_2$ in geologic time, J. Geophys. Res., 110, C09S05, doi:10.1029/2004JC002625, 2005.

Archer, D.: Methane hydrate stability and anthropogenic climate change, Biogeosciences. Discuss., 4, 993–1057, 2007.

Arctic Climate Impact Assessment (ACIA): Impacts of a Warming Arctic, Cambridge Univ. Press, Cambridge, UK, 2004.

Ausubel, J.: Can technology spare the Earth?, Amer. Scientist, 84, 166–178, 1996.

Ausubel, J.: Where is energy going?, Industrial Physicist, 6(1), 16–19, 2000.

Barrett, P. J., Adams, C. J., McIntosh, W. C., Swisher, C. C., and Wilson, G. S.: Geochronological evidence supporting Antarctic deglaciation three million years ago, Nature, 359, 816–818, 1992.

Bell, G. D., Goldenberg, S., Landsea, C., Blake, E., Pasch, R., Chelliah, M., and Mo, K.: Tropical storms, Bull. Amer. Meteorol. Soc., 86, S26–S29, 2005.

Bleck, R.: An oceanic general circulation model framed in hybrid isopycnic-Cartesian Coordinates, Ocean Modelling, 4, 55–88, 2002.

Bowen, G. J., Bralower, T. J., Delaney, M. L., Dickens, G. R., Kelly, D. C., Koch, P. L., Kump, L. R., Meng, J., Sloan, L. C., Thomas, E., Wing, S. L., and Zachos, J. C.: Eocene hyperthermal event offers insight into greenhouse warming, Eos Trans. Amer. Geophys. Union, 87, 165–169, 2006.

**Exhibit 5**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| GREEN MOUNTAIN CHRYSLER-PLYMOUTH-DODGE-JEEP, et al., <br>                 Plaintiffs, <br><br> ASSOCIATION OF INTERNATIONAL AUTOMOBILE MANUFACTURERS, <br>                 Plaintiff, <br>         v. <br> THOMAS W. TORTI, Secretary of the Vermont Agency of Natural Resources, et al., <br>                 Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )   Case Nos.   2:05-CV-302, and <br> )                   2:05-CV-304 <br> )                 (Consolidated) <br> ) <br> ) <br> )   **DECLARATION OF** <br> )   **JAMES E. HANSEN** <br> ) |

I James E. Hansen, state and declare as follows:

1.    I am over 18 years of age and am competent to testify regarding the following.

2.    I submit this report as my personal opinion as a private citizen.  For the sake of identification, I am a senior scientist at the Columbia University Earth Institute, Adjunct Professor of Earth and Environmental Sciences at Columbia University, and Director of the NASA Goddard Institute for Space Studies.  I have degrees in Physics, Astronomy and Mathematics from the University of Iowa, where I was trained in Dr. James Van Allen's Department of Physics and Astronomy, receiving my Ph. D. in 1967.  I have also studied at the University of Kyoto and University of Tokyo, and as a post-doctoral scientist at Leiden Observatory, Netherlands.  I have been an active researcher in planetary atmospheres and climate science for almost 40 years, with the last 30 years focused on climate research, publishing more than 100 scholarly articles on the latter topic.  I was elected to the National Academy of Sciences in 1995 and am the recipient of the American Geophysical Union's Roger Revelle Medal and the Heinz Environment Award.  I have testified numerous times to committees of the United States Senate and House of Representatives, and have twice made presentations to the George W. Bush Administration's cabinet level Climate and Energy Task Force chaired by Vice President Richard Cheney.

**Exhibit 6**

83. The climate system is capable of abrupt changes and surprises, as demonstrated by a variety of rapid changes in the Earth's history. These abrupt climate changes are surprises not so much in the sense of being unexpected from a scientific perspective, but rather by the fact that their occurrences are infrequent and their exact timing is unpredictable. Abrupt climate change occurs when gradual change pushes the earth system across a threshold, suddenly switching the climate into a new system. Abrupt climate change is closely related to "tipping points" discussed above, because once an abrupt climate change occurs it can be difficult or impossible to reverse the climate change on a time scale relevant to civilization.

84. The occurrence of abrupt climate changes this century is practically certain, if we continue with Business-as-Usual greenhouse gas emissions. This assertion is based on the magnitude and speed of the human-induced changes of atmospheric composition (which dwarf natural changes) and the rate of global warming that will result from such atmospheric changes (which exceeds any documented natural global warming event). The magnitude of the expected total climate change under Business-as-Usual is so large that it almost surely passes a number of thresholds. Although, it is impossible to say when these thresholds will be passed, we give examples here of abrupt changes that seem highly likely under Business-as-Usual and we discuss additional more speculative possibilities.

85. An example of an abrupt regional climate change relevant to the United States is a switch to a long-term mega-drought encompassing most of the Western United States and portions of the Midwest. Such mega-droughts have occurred in the Earth's history, generally in conjunction with warmer climate. Global warming causes a relaxation of the tropospheric overturning circulation (Soden and Held, J. Clim. 19, 3354, 2006) with resulting intensification of hot, dry conditions in subtropical regions such as the Southwest United

31

**Exhibit 6**

# HOW TO AVOID DANGEROUS CLIMATE CHANGE

## A Target for U.S. Emissions Reductions

Amy L. Luers
*Union of Concerned Scientists*

Michael D. Mastrandrea
*Woods Institute for the Environment, Stanford University*

Katharine Hayhoe
*Department of Geosciences, Texas Tech University*

Peter C. Frumhoff
*Union of Concerned Scientists*

*September 2007*

**Exhibit 7**

# Contents

Figures & Tables ................................................................ *iv*

Acknowledgments ............................................................. *v*

Executive Summary ........................................................... 1

I.    Introduction .......................................................... 3

II.   Setting a Global Limit on Heat-trapping Emissions ..................... 5

III.  Different Pathways to the Stabilization Target ........................ 8

IV.   Complementary Targets for Industrialized and
      Developing Nations .................................................... 9

V.    The U.S. Share of the Global Emissions Budget ........................ 13

VI.   What We Need to Do .................................................. 14

VII.  Would Any Existing Proposals Get the Job Done? ....................... 16

VIII. The Way Forward ..................................................... 18

Notes ....................................................................... 20

References .................................................................. 21

Appendix: Emissions Reduction Targets in Federal Multi-Sector
          Climate Bills ..................................................... 25

**Text Boxes**

1.    What Happens If Temperatures Increase More Than 2°C? ................. 6

2.    Other Ways to Hit the Target ........................................ 15

3.    Lessons Learned in California ....................................... 19

**Exhibit 7**

# VI. What We Need to Do

What then is a reasonable emissions pathway that would stay within the given U.S. emissions budget? It is clear that a continued increase in emissions in the near term would require dramatically greater reductions over a shorter time frame later. Furthermore, these rapid later reductions would likely be more difficult and expensive to achieve than gradual changes over a longer period of time.

For example, to achieve the minimum 80 percent reductions below 2000 levels by 2050, the United States must reduce its emissions an average of 4 percent per year starting in 2010. However, if U.S. emissions continue to increase up until 2020 as projected by the EIA Low Projection (EIA 2007), the annual average rate of reduction would have to be raised to approximately 8 percent per year from 2020 to 2050. This amounts to about double the annual reductions required by an "early start" plan (Figure 5). Furthermore, if the United States follows the EIA Low Projection path, it will exceed the 160 GtCO$_2$ budget by 2020, and nearly exceed the 265 GtCO$_2$ budget by 2030.

In other words, an "early start" plan that requires reductions to begin in 2010 could reduce average reduction rates to less than half what would be required with a 2020 start. This does not imply, however, that there is only one possible pathway to meet the U.S. reduction target. Several examples are discussed in Box 2.



**Figure 5. Implications of Delay**



Reductions in U.S. annual emissions that would be required based on a start date of 2010 (blue line) or 2020 (red line). This analysis assumes that U.S. emissions would follow the EIA Low Projection (EIA 2007) until emissions reductions begin. Initiating reductions in 2010 would require a 4 percent reduction rate through 2050 to stay within a cumulative emissions budget of 265 GtCO$_2$eq (consistent with a 450 ppm CO$_2$eq stabilization target). Delaying reductions until 2020, however, would not only require a faster reduction rate (at least 8 percent) to stay within the same budget, but deeper reductions as well. (The areas under each curve have been constrained so that cumulative emissions do not exceed 265 GtCO$_2$eq.) Note that to stay within a 160 GtCO$_2$eq emissions budget would require even steeper reduction rates.

**Exhibit 7**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF CALIFORNIA, by and through                1-07-CV-2024
ARNOLD SCHWARZENEGGER, Governor of
the State of California, and CALIFORNIA AIR
RESOURCES BOARD

                    Plaintiffs,

and

WASHINGTON ENVIRONMENTAL COUNCIL
615 Second Ave., Suite 380
Seattle, WA 98104

CLIMATE SOLUTIONS
219 Legion Way SW, Ste 201
Olympia, WA 98501

ENVIRONMENT WASHINGTON
3240 Eastlake Ave E., Ste 102
Seattle, WA 98102

OREGON WILD
5825 N. Greeley Ave
Portland, Oregon 97217

3E STRATEGIES
16 NW Kansas Ave.
Bend, OR 97702

ENVIRONMENT OREGON
1536 SE 11th Avenue, Suite B
Portland, OR 97214

ANGUS DUNCAN
11334 S.W. Aventine Circus
Portland, OR 97219

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252

FRIENDS OF THE EARTH
311 California Street, Suite 510
San Francisco, CA 94104

Applicants-in-Intervention/
Plaintiffs

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and STEPHEN L.
JOHNSON, Administrator of the Environmental
Protection Agency Interior,

Defendants.

_____

**COMPLAINT IN INTERVENTION FOR DECLARATORY
AND INJUNCTIVE RELIEF**

Conservation organizations seeking to intervene in this action on the side of plaintiff

California–the Washington Environmental Council, Climate Solutions, Environment

Washington, Oregon Wild, Environment Oregon, 3EStrategies, Angus Duncan, the Center for

Biological Diversity, and Friends of the Earth, hereafter, "Applicants"–allege as follows for their

complaint in intervention:

1.       The State of California, by and through Arnold Schwarzenegger, Governor of the State of

California, and the California Air Resources Board, brought an action to compel the United

States Environmental Protection Agency and Stephen L. Johnson, Administrator for the United

States Environmental Protection Agency (USEPA), to either grant or deny California's request

for a waiver of preemption of its Regulation to Control Greenhouse Gas Emissions from Motor

Vehicles (GHG Regulation), under section 209(b) of the Clean Air Act (42 U.S.C. § 7543(b)).

The California Air Resources Board (CARB) requested the waiver from USEPA on December

21, 2005. The administrative docket is EPA-HQ-OAR-2006-0173.

1

2.     California adopted the GHG Regulation to reduce the future harm to California's public health, welfare, safety, and economy resulting from increased global warming. The GHG Regulation requires a reduction in the emissions of greenhouse gases from most light-duty motor vehicles sold in California, on a fleet-wide basis, beginning with the 2009 model-year.

3.     Applicants, recognizing that motor vehicles are one of the most significant sources of GHGs that cause global warming, advocated for development of the vehicle GHG standards by California and for the adoption of those standards in Oregon and Washington.

4.     USEPA must act on the GHG Regulation without further delay because manufacturers cannot market their 2009 model-year vehicles in California without first certifying them. Marketing of the 2009 models can begin as early as January 2008. Also, at least 14 states other than California have adopted or are considering the adoption of the same emission standards for new vehicles sold in their states. Implementation of their regulations depends on the USEPA first granting California's waiver application.

5.     USEPA has unreasonably delayed action on the requested waiver. The agency has had nearly two years since CARB applied for the waiver to review the application and supporting materials and to make a decision.

6.     Comments submitted to the USEPA–which include comments by Applicants – overwhelmingly support the GHG Regulation. Of the approximately 98,000 comments referenced in the USEPA's docket, more than 99.9% support the GHG Regulation. Only one automaker subject to the GHG regulation submitted any opposition to the USEPA.  Two automaker trade groups submitted opposing comments.

7.     The effect of global warming on the environment and society has been extensively demonstrated both during CARB's and USEPA's administrative proceedings on the GHG

2

Regulation and in other public forums and scientific proceedings. The accelerating rate at which GHG emissions are increasing in the absence of regulation also makes the USEPA's delay unreasonable. The measured rate of change is exceeding earlier projections. Recent studies, of which the USEPA is aware, indicate the Earth may be perilously close to an irreversible melting of ice sheets within this century.

8.    Motor vehicles are a major source of greenhouse gases. Automotive emissions of greenhouse gases are increasing more rapidly than any other source. The longer the delay in reducing these emissions, the more harmful will be the impact on the environment and on society, including especially persons with limited financial resources.

**JURISDICTION, VENUE AND NOTICE**

9.    Jurisdiction of this court is invoked pursuant to the citizen's suit provision of the Clean Air Act, 42 U.S.C. § 7604(a).

10.    Venue in this court is proper as the GHG Regulation is "nationally applicable" by reason of the multiple states that have adopted the same regulation under 42 U.S.C. § 7507 and because the regulation applies to automobile manufacturers residing outside the jurisdiction of the Court of Appeals for the Ninth Circuit.

11.    California notified the USEPA of its intent to file this action pursuant to 42 U.S.C. § 7604(a) on April 25 and 26, 2007.

**REGULATORY HISTORY**

12.    In 2002, the California Legislature adopted Assembly Bill 1493 (Pavley), which amended California Health and Safety Code section 42823 and added section 43018.5. The legislation required CARB to develop and adopt a regulation for the control of greenhouse gas emissions by light-duty motor vehicles.

3

13.     In 2002, CARB began holding public workshops and soliciting public comments on the development of a draft regulation.

14.     After a series of workshops, comment analysis, and public hearings, the CARB Board approved its GHG Regulation on September 23, 2004. Final language and adoption occurred on August 4, 2005. The regulation amended Title 13 of the California Code of Regulations, sections 1900 and 1961, and added section 1961.1.

15.     On December 21, 2005, CARB applied to the USEPA for waiver of federal preemption of the GHG Regulation under the Clean Air Act pursuant to 42 U.S.C. § 7543(b).

16.     USEPA did not notice a hearing or solicit additional comments on California's waiver application until April 30, 2007, sixteen months after CARB applied for the waiver. USEPA held hearings on May 22 and 30, 2007. The noticed comment period expired on June 15, 2007.  To date, USEPA has not granted or denied California's request for the waiver.

17.     Pursuant to their authority under CAA §177, 42 U.S.C. §7507, the following states have adopted, or are in the process of adopting the California vehicle GHG standard: Arizona, Connecticut, Maine, Maryland, Massachusetts, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington.

**GLOBAL WARMING ENDANGERS HUMAN HEALTH, WELFARE, SAFETY, ECONOMY AND THE ENVIRONMENT**

18.     Increasing emissions of greenhouse gases into the atmosphere are causing global warming.  The resultant climatic change in western states, including in California, Washington, and Oregon in which states Applicant organizations have members and maintain offices, include increasing temperatures, reduced snowfall in the mountains, a northward shift in the prevailing winter storm track, deteriorating air quality, and more extreme weather events.

19.    Warming of the climate system is unequivocal, according to the international consensus of scientists, evidenced by the fact that eleven of the last twelve years rank among the 12 warmest years for which instrumental record of global average surface temperature exist, and that the warming trend over the last five decades is nearly twice that for the last 100 years.  The net effect of human activities since 1750 has been one of warming and most of the observed increase in globally averaged temperatures since the mid-20th century is very likely due to the observed increase in anthropogenic greenhouse gas concentrations.

20.    Sea levels have risen from the 19th to the 20th century and continued GHG emissions at or above current rates will cause further warming, inducing many changes in the global climate system during the 21st century that will be larger than those observed during the 20th century.

21.    Significant climate change impacts in the Pacific Northwest have already occurred, including an average regional temperature increased of 1-3 °F over the last century, with the 1975 to present warming attributed to human-causes.  Hydrologically important consequences of regional warming have already occurred, including a 35% decline in spring snowpack, a shift in peak streamflow by 1-3 weeks, and an increase in winter and decrease in summer flows.

22.    Oregon and Washington scientists predict that, absent significant reductions in global GHG emissions, regional annual average temperatures are likely to increase approximately 2.7 °F by 2030, and 5.4 °F by the 2050s, resulting in shifting isotherms and changes in vegetation zones, higher elevation treelines, earlier animal and plant breeding, a longer and more intense allergy season, rising sea levels, further snowpack declines, longer fire seasons, and drier summers with a likely "increase in drought stress and vulnerability of forests to insects, disease and fire."

5

23.     The western states have extensive forests and other wild lands.  Global warming has already increased the number of large wild land fires by causing fire seasons to be drier and hotter, start earlier, and last longer. Fires larger than 1000 acres in the western United States occurred four time more often between 1987 and 2003 than they did between 1970 and 1986. The resulting property damage and fire suppression costs have increased as well. Further acceleration of snow melt and higher temperatures will increase the frequency of large fires by making wild land vegetation drier and fire seasons last longer. The area historically burned by fires is expected to expand by nine to fifteen percent by the end of the century.

24.     Global warming will also alter the natural biota. Alpine and subalpine forests will decline and coniferous forests will be partly replaced by mixed conifer and evergreen hardwoods. Grasslands will expand, largely at the expense of woodlands and chaparral. Increases in woody growth due to longer growing seasons and, under some climatic scenarios, more precipitation, will be cut short by the increased wildfires. Warming temperatures will allow the expansion of agricultural weeds, pests and microbial diseases.

25.     Atmospheric GHG concentrations have neared a tipping point beyond which irreparable and exceptionally severe climate change will be unavoidable.  Once global temperatures climb more than 1˚C above present, widespread sea-ice melting may trigger climate feedback loops that ensure further warming.  Thus, continued GHG emissions at present or greater levels make it practically certain that there will be abrupt climate changes this century.

26.     If the potential full effects of melting or disintegrating ice sheets in Greenland and Antarctica are accounted for, unabated GHG emissions could lead to a sea level rise of 1 meter or more this century, a dynamically changing ice sheet that is out of human control, and eventual sea-level rise of twenty-six feet.  Many cities and communities in their present configuration,

6

including most major cities along the U.S. east coast, will not successfully adapt to such a sea-level rise.

27.    To avoid dangerous interference with the global climate system, there must be no further delay in capping and reducing GHG emissions.

**AUTOMOTIVE EMISSIONS ARE A MAJOR SOURCE OF GREENHOUSE GASES**

28.    Vehicle emissions are responsible for a substantial portion of GHG pollution emitted in California, Oregon, Washington and other states.  Light-duty motor vehicles account for nearly a third of the greenhouse gases emitted in the U.S.

29.    Enforcement by states of the California standards will assist in limiting the most severe impacts of climate change, including mass species extinctions.

30.    The California standards are consistent with the mitigation measures identified by the Intergovernmental Panel on Climate Change (IPCC) as needed to arrest the projected growth of global GHG emissions.

31.     USEPA approval of the GHG regulation would reduce greenhouse gas emissions by about 74 million metric tons by 2020.

**THE GHG REGULATION REQUIRES REDUCTIONS IN VEHICULAR EMISSIONS OF GREENHOUSE GASES**

32.    The GHG Regulation requires that the major manufacturers of light duty vehicles begin to reduce the vehicular emissions of greenhouse gases on a fleet-wide basis beginning with the 2009 model-year.

33.    The regulation divides the light-duty vehicles of each affected manufacturer into two fleets. One fleet (PC/LDT1) comprises passenger cars, pick-up trucks and small sports utility vehicles. The other fleet (LDT2/MDPV) comprises larger light-duty trucks, up to 8500 pounds

(gross vehicle weight), large sports utility vehicles, and medium-duty passenger vehicles of less than 10,000 pounds.

34.    Greenhouse gas emissions, measured in terms of $CO_2$-equivalents, are limited to a fleet-average 323 grams per mile for PC/LDT1s in the 2009 model-year and decline over the years to 205 grams per mile in the 2016 model year.  Emission limits for LTD2/MDPVs are 439 grams per mile in the 2009 model-year and decline to 332 grams per mile in the 2016 model-year.

35.    Automakers can achieve compliance with the GHG Regulation through a combination of improved technologies and other actions. Compliance can be achieved by reductions in tailpipe emissions of greenhouse gases, the use of alternative fuels, credits for air conditioner improvements, credits carried over from another year or fleet, and credit-trading among manufacturers.

**CONGRESS INTENDED PROMPT USEPA ACTION ON WAIVER APPLICATIONS FOR CALIFORNIA AUTOMOBILE EMISSIONS REGULATIONS.**

36.    Congress intended that California and other states (1) serve as a laboratories for the nation in the control of automotive emissions, (2) be able to adopt more stringent regulations for automotive emissions than the federal government, and (3) be able to act more quickly than USEPA in adopting air pollution control measures.

37.    California has traditionally led the USEPA in establishing emission standards for light-duty vehicles.

38.     42 U.S.C. § 7543(a) requires, subject to specified exceptions, that USEPA's Administrator grant a waiver of federal preemption under the Clean Air Act if California has determined that its "standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards."

8

39.    The specified exceptions are set out in 42 U.S.C. § 7543 (b)(1). The USEPA

Administrator must make at least one of the following three findings in order to deny the waiver

application: (a) California's determination of protectiveness is arbitrary and capricious, (b)

California does not need the standards to meet compelling and extraordinary conditions, or (c)

the standards and accompanying enforcement procedures are not consistent with 42 U.S.C. §

7521(a).

40.    Under 42 U.S.C. § 7543, the USEPA does not go through the process of independent

rule-making. Instead USEPA provides notice and opportunity for public participation during its

review of the California emission regulation.

41.    Congress generally intended that the USEPA make determinations of this type in a matter

of weeks or months, not years.

**REASONABLE TIME FOR THE USEPA TO ACT HAS EXPIRED**

42.    CARB submitted a comprehensive analysis of the GHG regulation when it applied for

the waiver in December 2005. The USEPA requested no additional information.

43.    When the USEPA took no action on California's waiver application, California Governor

Arnold Schwarzenegger wrote the President of the United States on April 10, 2006 and

requested urgent action on California's waiver application. A copy was sent to the USEPA

Administrator.

44.    The USEPA did not respond. It did not indicate what action, if any, it was taking on

CARB's application. Nevertheless, the USEPA had been studying the GHG regulation since at

least September of 2004.

45.    California's Governor again wrote the President and copied the USEPA on October 24,

2006. The Governor repeated his request for urgent action.

9

46.    On February 21, 2007, the USEPA informed CARB that USEPA did not intend to act on California's waiver application, other than opening an electronic docket, until the United States Supreme Court decided whether USEPA was obligated to address greenhouse gases as air pollutants under the Clean Air Act. The Supreme Court ruled on April 2, 2007, that the greenhouse gases are subject to regulation under the Clean Air Act.

47.    USEPA requires no additional time to review California's determination that its standards are "at least as protective of public health and welfare as applicable Federal standards" under 42 U.S.C. § 7543(b)(1) and (2).  California explicitly documented its determination in its December 2005 submission to the USEPA.

48.    The protectiveness comparison of state and federal standards also requires no additional time, since USEPA has no federal standards.

49.    USEPA requires no additional time to determine whether California's rule making was arbitrary and capricious under 42 U.S.C. § 7543(b)(1)(A). USEPA was provided with a comprehensive exposition of CARB's two-year rule-making when CARB first requested the waiver in December 2005. CARB's December 2005 submission to USEPA included an outline of its rule-making process, a detailed 251-page Initial Statement of Reasons for the rule, as well as a 446-page Final Statement of Reasons containing CARB's further analysis and response to additional comments and statements presented on the rule. The public policy objective of reducing atmospheric greenhouse gases is directly achieved by the GHG regulation since it set standards for reducing emissions of these very gases.

50.    USEPA requires no additional time to determine whether California needs the GHG regulation to meet compelling and extraordinary conditions under 42 U.S.C. § 7543(b)(1)(B). The USEPA is already aware, through its administration of other provisions of the Clean Air

Act, that criteria air pollutants in California's South Coast and San Joaquin air basins continue to exceed national air quality standards. The USEPA is also aware of the perils of global warming, as it has been separately studying global warming effects since at least 1984.

51.    In addition, the policy and practice of the USEPA is to evaluate California's need to meet compelling and extraordinary conditions in terms of California's motor vehicle emissions program as a whole. In this respect, the USEPA was already aware of California's continuing need for this program.

52.    USEPA needs no additional time to determine whether California standards are consistent with 42 U.S.C. § 7521(a), as the substantive comments based on lead time and technological feasibility were limited, and CARB submitted comprehensive documentation in its original December 2005 submission.

53.    USEPA requires no additional time to consider comments submitted in the course of its review of the GHG regulation. The deadline for comment submission expired on June 15, 2007. Of the approximately 98,000 comments referenced by the USEPA's docket, more than 99.9% support the GHG Regulation. General Motors Corporation is the only automaker subject to the regulation that submitted any comments. Opposition is largely restricted to two automaker advocacy groups, the Alliance of Automobile Manufacturers and the Association of International Automobile Manufacturers. Only 15 entities who opposed the regulation included any analysis in their comments, so the review time cannot be lengthy.

54.    The automakers' ability to timely and reasonably comply with the GHG Regulation was independently confirmed in a civil action, tried over the course of five weeks, before the United States District Court for the State of Vermont. The action for federal preemption was brought by General Motors Corporation, DaimlerChrysler Corporation, and domestic and foreign automaker

11

trade associations, as well as car dealers, in an attempt to invalidate Vermont's identical version

of California's GHG Regulation. The same adverse claims contained in the comments submitted

in this USEPA proceeding were litigated in that civil action. The District Court rejected those

claims in a 240-page opinion issued on September 12, 2007.

**MULTIPLE AND SUBSTANTIAL INTERESTS ARE PREJUDICED BY DELAY**

55.    Since the GHG Regulation's graduated emission standards begin to apply with the 2009

model-year, further delay by the USEPA will interfere with implementation of the certification

procedure required under the GHG Regulation. An order of the United States District Court for

the Eastern District of California prohibits implementation of the GHG regulation until the

USEPA grants the waiver.

56.    Automakers that will be subject to the GHG regulation have alleged in court pleadings,

either directly or through their trade associations, that "it is essential for manufacturers subject to

the rules like the AB 1493 regulations to obtain approval of their vehicle models well before the

relevant model-year begins." As the automakers correctly observe, the 2009 model-year can

begin as early as January 2008.

57.    At least the following 14 states have adopted the GHG Regulation under Section 177 of

the Clean Air Act or are in the process of adopting it: Arizona, Connecticut, Florida, Maine,

Maryland, Massachusetts, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode

Island, Vermont and Washington. In at least ten of these states, the regulations apply beginning

with the 2009 model-year. They account for more than 40% of the nation's population. USEPA's

delay prejudices these states as it does California, since implementation of their regulations

requires that USEPA first waive federal preemption for the GHG regulation.

58.     Further delay also means that the postponed restoration of a relatively stable and more equable climate would be less likely. Such a delay would also require more drastic and rapid greenhouse gas reductions in the future at a greater cost.

59.     Longer delay also increases the risk of an abrupt climate change within this century that would include a larger and more rapid rise of sea level along California's coasts, inland bays and deltas. Disintegration of the Greenland Ice Sheet would raise sea level by twenty-one feet and disintegration of the West Antarctic Ice Sheet would raise sea level by twenty-six feet. A later loss of the East Antarctic Ice Sheet would add more than 210 additional feet to the sea level.

60.     The USEPA is obligated to either grant or deny California's request for a waiver of federal preemption of its GHG Regulation under 42 U.S.C. § 7543(b)(1).

61.     The USEPA's current failure to make a determination under 42 U.S.C. § 7543(b)(1) constitutes an unreasonable delay under 42 U.S.C. § 7604(a).

62.     The USEPA's failure to make a determination under 42 U.S.C. § 7543(b)(1) constitutes an unreasonable delay under 5 U.S.C. § 706(1).

63.     The USEPA's failure to make a determination under 42 U.S.C. § 7543(b)(1) constitutes agency action unlawfully withheld under 5 U.S.C. § 706(1).

**WHEREFORE, Applicants demand:**

1.     That this court issue an order declaring that defendants United States Environmental Protection Agency and Stephen L. Johnson, Administrator, have unreasonably delayed in deciding California's application for waiver of federal preemption of California's GHG Regulation under 42 U.S.C. § 7543(b) and that their failure constitutes agency action unlawfully withheld.

2.     That this court issue an order compelling defendants United States Environmental

Protection Agency and Stephen L. Johnson, Administrator, to decide California's application for

waiver of federal preemption of California's GHG Regulation under 42 U.S.C. § 7543(b)

forthwith.

3.     That this court retain jurisdiction over this action until the United States

Environmental Protection Agency and Administrator decide California's application.

4.     That the court grant such other and further relief as may be proper.


Dated: December 3, 2007                    Respectfully Submitted,


                                           _____
                                           Daniel Galpern, OR Bar #06195
                                           Western Environmental Law Center
                                           1216 Lincoln St.
                                           Eugene, OR  97401
                                           (541) 485-2471
                                           galpern@westernlaw.org
                                           Applicant *Pro Hac Vice*


                                           _____
                                           Matt Kenna, Bar #CO0028
                                           Western Environmental Law Center
                                           679 E. 2nd Ave., Suite 11B
                                           Durango, CO  81301
                                           (970) 385-6941
                                           mattkenna@gmail.com

                                           Attorneys for Applicants-in-Intervention

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF CALIFORNIA, by and through          1-07-CV-2024
ARNOLD SCHWARZENEGGER, Governor of
the State of California, and CALIFORNIA AIR
RESOURCES BOARD

                Plaintiffs,

and

WASHINGTON ENVIRONMENTAL COUNCIL
615 Second Ave., Suite 380
Seattle, WA 98104

CLIMATE SOLUTIONS
219 Legion Way SW, Ste 201
Olympia, WA 98501

ENVIRONMENT WASHINGTON
3240 Eastlake Ave E., Ste 102
Seattle, WA 98102

OREGON WILD
5825 N. Greeley Ave
Portland, Oregon 97217

3E STRATEGIES
16 NW Kansas Ave.
Bend, OR 97702

ENVIRONMENT OREGON
1536 SE 11th Avenue, Suite B
Portland, OR 97214

ANGUS DUNCAN
11334 S.W. Aventine Circus
Portland, OR 97219

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252

FRIENDS OF THE EARTH
311 California Street, Suite 510
San Francisco, CA 94104

Applicants-in-Intervention/
Plaintiffs

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and STEPHEN L.
JOHNSON, Administrator of the Environmental
Protection Agency Interior,

Defendants.

_____

**<u>DECLARATION OF JESSICA COVEN IN SUPPORT OF AMENDED, CORRECTED,
UNOPPOSED MOTION TO INTERVENE IN SUPPORT OF PLAINTIFFS</u>**

I, Jessica Coven, declare as follows:

1.   I am the Policy Associate for Climate Solutions, a 501(c)3 nonpartisan, non-
     profit advocacy organization based in Olympia, Washington, with offices in
     both Olympia and Seattle. I am very familiar with the mission of the
     organization and past policies that it has advocated for.

2.   Climate Solutions was formed nine years ago and works throughout the
     northwest in Washington, Oregon and Idaho to promote practical solutions to
     global warming that are also economically profitable. We work with a diverse
     group of stakeholders toward this aim, including rural farm communities,
     venture capitalists and organized labor. Climate Solutions has been active in
     promoting many policies passed in Washington to protect our air, water and
     lands, including the state's Clean Car standards, renewable fuels standard and
     an emissions performance standard that sets limits for global warming pollution
     from new electric power plants. Climate Solutions consistently works to ensure
     the success of past policies it has promoted and as such has a strong interest in
     making sure the Clean Car standards are fully implemented.

3.   Climate Solutions coordinates a program called "Northwest Climate
     Connections" that allows environmental organizations, businesses and
     municipalities to come together in advocating strong policies that will protect
     the climate. We currently have approximately 40 organizational Connections
     members in Washington who have joined the program because of the unique
     ways in which their individual organization will be affected by the impacts of

climate change. These Connections members include the City of Seattle, whose entire population faces a projected water shortage due to the earlier runoff of snow pack, which would threaten the safety of the city population and place an extreme strain on the local economy. Another member is the architectural firm Mithun, who fear they will face declining profits because of the impact climate change will have on the U.S. and Washington economy. In addition to Connections members, Climate Solutions sends regular email updates and alerts to over 7500 Washington residents to empower them to support strong policies on climate change such as the Clean Car legislation passed in 2005.

4.    Climate Solutions has a long history of promoting sound energy and transportation policy. In 2005, we helped to lead the state effort to pass vehicle emissions standards like those adopted by California. Climate Solutions engaged our Connections members and 7500 e-activists by keeping them informed about the bill, while at the same time worked with Legislators, lobbyists and other stakeholders to ensure the bill was passed. We have continued to publicly support the standards since their passage.

5.    In 2006, we advocated for a state Renewable Fuel Standard to increase the amount of biofuels used in the state. We supported this bill in order to reduce the greenhouse gas emissions coming from the state's transportation sector.

6.    In 2007, Climate Solutions successfully advocated for broad global warming legislation that limits the state's global warming pollution and establishes pollution limits for electric generating facilities. I personally sit on the rulemaking stakeholder committee for the electric facility pollution law, as a

2

way to ensure Climate Solutions' continual support of implementing the policies we promote.

7.  Before coming to Climate Solutions I worked for over five years on energy and climate policy in Washington DC for two other nonpartisan, non-profit organizations. At the 2004 United Nations Kyoto Protocol summit, I spoke at the first international press conference concerning the California clean car standards and the automobile manufacturers lawsuit against the standards. I have actively promoted these standards at the state, national and international levels since their passage.

In addition, I have a master's degree in economics and energy policy from the Johns Hopkins University where I specialized in public policies to protect the climate.

8.  I am an avid cyclist who bikes Seattle's Burke-Gilman trail daily as I commute to work. I am very aware of the potential negative impacts that climate change could have on my ability to continue biking this trail as it lies along the water at sea-level. Rising sea-level could make this trail un-rideable within my lifetime. Climate change is already affecting my ability to engage in the outdoor activities I have enjoyed all my life. This past March I went on a hiking excursion to Mt. Rainier, long known to have some of Washington's best hiking trails. Unfortunately, because of the catastrophic floods experienced on the mountain earlier this year, almost all hiking trails were closed and my trip had to be cut short. I am planning another trip for the spring of 2008 and fear the mountain could experience another winter of extreme weather, which would

again make me unable to hike its trails.

9.   As a Seattle resident, I also face the impacts of earlier runoff from our snow

pack, which will result in water shortage and potentially impact the

hydroelectric dams from which we receive the majority of our electricity.

10.  Seattle's already wet winters are projected to see much more precipitation over

the next several decades. This will threaten my Ballard-area house, which is

almost 100 years old and likely unable to survive an acute increase in annual

rainfall without major renovation. Though my house does not lie in a historic

flood area, the increase in rainfall Seattle is projected to experience will almost

certainly require me to replace the existing roof of my house.

11.  Climate Solutions currently serves on Governor Gregoire's Climate Advisory

Team, which has been tasked with determining policies that will reduce the

state's global warming pollution to the target levels approved by the 2007

Legislature. In Washington, transportation accounts for about half of the state's

total greenhouse gas emissions, showing that without taking action to lower

emissions from this sector, the Climate Advisory Team will be unable to fulfill

its task.

12.  If the Clean Cars legislation is unable to be implemented, Washington's efforts

to avoid the most devastating impacts of global warming will be seriously

hindered. This will leave the state open to hotter and drier summers, wetter

winters, rising sea-level and an increase in wildfires that will severely damage

our state's forests, and thus the entire state economy. Climate Solutions is

seeking to protect the businesses and organizations that are a part of our

Connections program as well as all the individual activists who engage on our

campaigns via our email alerts by ensuring that the Clean Car legislation is

fully implemented.

I declare under penalty of perjury that the foregoing is true and correct to the best of my
knowledge, information, and belief.

November 15, 2007

Jessica Coven
7022 22nd Ave NW
Seattle, WA 98117
206-443-9570

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF CALIFORNIA, by and through                    1-07-CV-2024
ARNOLD SCHWARZENEGGER, Governor of
the State of California, and CALIFORNIA AIR
RESOURCES BOARD

                        Plaintiffs,

and

WASHINGTON ENVIRONMENTAL COUNCIL
615 Second Ave., Suite 380
Seattle, WA 98104

CLIMATE SOLUTIONS
219 Legion Way SW, Ste 201
Olympia, WA 98501

ENVIRONMENT WASHINGTON
3240 Eastlake Ave E., Ste 102
Seattle, WA 98102

OREGON WILD
5825 N. Greeley Ave
Portland, Oregon 97217

3E STRATEGIES
16 NW Kansas Ave.
Bend, OR 97702

ENVIRONMENT OREGON
1536 SE 11th Avenue, Suite B
Portland, OR 97214

ANGUS DUNCAN
11334 S.W. Aventine Circus
Portland, OR 97219

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252

FRIENDS OF THE EARTH
311 California Street, Suite 510
San Francisco, CA 94104

Applicants-in-Intervention/
Plaintiffs

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and STEPHEN L.
JOHNSON, Administrator of the Environmental
Protection Agency Interior,

Defendants.

_____

**DECLARATION OF JOAN CROOKS
IN SUPPORT OF MOTION TO INTERVENE**

I, Joan Crooks, declare as follows:

1.   I am the Executive Director of Washington Environmental Council (WEC).   I have held this position since 1995, and I have been employed by WEC since 1992.   I am very familiar with the history and mission of the organization.   I am a member of WEC as well.

2.   WEC is a non-profit corporation registered in the state of Washington. Formed in 1967, WEC is a statewide, nonpartisan organization dedicated to the protection, preservation, and enhancement of the natural resources, ecological values, and environment of Washington through public education, policy development, legislative advocacy, and support for citizens and citizen groups working toward the same ends. WEC has been instrumental in the adoption of many of the state's major environmental laws, including the State Environmental Policy Act, the Shoreline Management Act, the Growth Management Act, and most importantly for this matter, the recent Clean Cars legislation.   These laws help to set the standards that protect the quality of life for citizens of Washington State.   WEC has consistently supported and defended such laws and has a strong interest in ensuring that the Clean Cars legislation is fully implemented.

3.   WEC has over 3,500 individual members and over 50 affiliated organizations. WEC maintains a website at www.wecprotects.org and communicates with our membership through a quarterly newsletter and "E-news" bulletin.   We also maintain a grassroots activist network through our "Greentree" alert system.   WEC is one of the primary organizers of the environmental "Lobby Day" that brings hundreds of citizens to the state capitol to communicate directly to legislators.

4.   WEC has a long history of involvement in energy and transportation issues.

1

In 2005, WEC helped lead the effort to pass Clean Cars, the legislation that adopted the vehicle emissions standards that had been set by California. WEC coordinated media outreach, committed lobbying resources, and kept our membership informed and engaged as the bill moved through the legislature. That same legislative session WEC also took the lead in promoting passage of Green Building legislation. Together, those laws are intended to help reduce Washington's carbon footprint from its transportation sector and from new public buildings.

5. In 2006 and 2007, we had similar success with new biofuels laws, intended to increase the state's energy security as well as reduce greenhouse gas emissions. WEC supported the passage of Initiative 937 in 2006, requiring major utilities to have 15% renewable resources in their electricity portfolio by 2020. In 2006, WEC also participated as an amicus before the state Supreme Court in support of Seattle City Light's efforts to mitigate for its greenhouse gas contributions. When the Supreme Court issued an adverse decision, we supported successful legislation to grant City Light and other municipalities the authority they needed to mitigate greenhouse gas emissions by purchasing emissions offsets. In 2007, we advocated for the passage of groundbreaking climate legislation that established greenhouse gas reduction goals for the state and set an emissions performance standard for new power plants.

6. WEC currently participates on Governor Gregoire's Climate Action Team that will propose policies to meet the overarching goals set by the 2007 climate legislation. As an outgrowth of these efforts, WEC recently adopted a Climate Change Campaign to push state decision-makers to take the critical next steps in fighting climate change.

7. If the intent of the Clean Cars legislation is frustrated, it will seriously hinder

2

the ability of Washington to meet greenhouse gas reduction goals.  Our transportation sector contributes heavily to Washington's greenhouse gas emissions, and the state is particularly vulnerable to the effects of climate change.  As our legislature has recognized, Washington faces diminishing mountain snow pack necessary to feed rivers, aquifers, and reservoirs; hotter and drier summers; rising sea levels that will impact our coastal communities; increased risk of fires and insects devastating the state's forests; and higher water temperatures and lower river flows further stressing already endangered fish populations.  WEC's organizational members, including the NW Energy Coalition, Washington Native Plant Society, Washington Ski Touring Club, and many others have institutional and economic interests in the natural resources of Washington State that will be injured by such emissions.  WEC seeks to protect its members' interests by ensuring that the Clean Cars legislation is fully implemented.

8.  I routinely come into contact with WEC's individual members and members of WEC affiliate organizations.  Generally, our membership is an active group that engages in activities such as hiking, rafting, sea kayaking, fishing, and nature study in and around Washington's coasts, rivers, mountains, and forests.  Our individual members' ability to use and enjoy the coasts, rivers, mountains, and forests of Washington State are adversely affected by the release of carbon dioxide and other greenhouse gases, and WEC members have frequently noted to me their concerns about the impacts of climate change on the state.

I declare under penalty of perjury under the laws of the State of Washington that the

foregoing is true and correct.

_____

Joan Crooks

6551 17th Ave. NE
Seattle, WA 98115
206 527-1006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF CALIFORNIA, by and through                    1-07-CV-2024
ARNOLD SCHWARZENEGGER, Governor of
the State of California, and CALIFORNIA AIR
RESOURCES BOARD

               Plaintiffs,

and

WASHINGTON ENVIRONMENTAL COUNCIL
615 Second Ave., Suite 380
Seattle, WA 98104

CLIMATE SOLUTIONS
219 Legion Way SW, Ste 201
Olympia, WA 98501

ENVIRONMENT WASHINGTON
3240 Eastlake Ave E., Ste 102
Seattle, WA 98102

OREGON WILD
5825 N. Greeley Ave
Portland, Oregon 97217

3E STRATEGIES
16 NW Kansas Ave.
Bend, OR 97702

ENVIRONMENT OREGON
1536 SE 11th Avenue, Suite B
Portland, OR 97214

ANGUS DUNCAN
11334 S.W. Aventine Circus
Portland, OR 97219

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252

FRIENDS OF THE EARTH
311 California Street, Suite 510
San Francisco, CA 94104

Applicants-in-Intervention/
Plaintiffs

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and STEPHEN L.
JOHNSON, Administrator of the Environmental
Protection Agency Interior,

Defendants.

_____

**DECLARATION OF ANGUS DUNCAN
IN SUPPORT OF MOTION TO INTERVENE**

Declaration of Angus Duncan

I, Angus Duncan, do declare as follows:

1.  I live in Sisters, Oregon, and Portland, Oregon.  I submit this declaration to summarize my involvement in the climate change issue in Oregon, to explain how climate change has impacted me personally and individually, and to state why I regard it likely that these impacts  will grow more severe if greenhouse gas emissions are not soon brought under control.  EPA's failure to issue the required Clear Air Act waiver prevents both California and Oregon from reducing such emissions from automobiles.  Accordingly, I join this intervention in the hope that the court will compel issuance of that waiver.

2.  I am President and Chief Executive Officer for the Bonneville Environmental Foundation (BEF), a charitable non-profit business and foundation working in the areas of renewable energy project development, carbon market development, and watershed restoration.  Our offices are at 240 SW First Avenue, Portland, Oregon 97204.  I also serve on, or have served on, citizen task forces appointed by Governor Ted Kulongoski to chart Oregon's actions and responses to tracking, reporting and reducing the State's greenhouse gas emissions footprint, and to coping with the physical and economic effects on the State's human and biological communities of global warming.  I am filing this Declaration as a private citizen, and not in any official role.

3.  My wife and I own a house at Black Butte Ranch near Sisters in Central Oregon.  Black Butte Ranch is an historic working ranch since the 1880's, redeveloped for a residential use in the 1970's.  The property was not a prosperous ranch due to the swampy meadows resulting from groundwater seeps and springs that in turn relied on annual snowmelt from the adjacent east slope of the Cascade Mountains.  The accessible water supply is an important factor in supporting the residential property use, however.  The Ranch is also at what is now called the wildland/urban interface; that is, it is surrounded (as is Sisters, eight miles southeast) by National Forest lands dominated by late successional Ponderosa Pine stands.

4.  Forest fire is a natural feature of forests, and particularly of Oregon's east side forests, which are in the rain shadow of the Cascades and therefore significantly drier than the west side.  Vegetation, including species such as Ponderosa Pine, is adapted to frequent low intensity forest fires, and in fact relies upon them for forest ecosystem health. Particularly in the last decade, those drier forests on Oregon's Eastside (and in its Southwest corner) have been severely stressed by increasingly larger and more intense forest fires than have been historically known to occur.  These appear to be the combined consequence of government forest fire suppression policies over many decades that allowed fuels buildup, together with longer fire seasons, hotter, drier weather patterns, and more dead or weakened standing timber due to more frequent outbreaks of disease and insect predation, all conditions described by the Intergovernmental Panel on Climate Change (IPCC) and Oregon State University scientists as consistent with impacts of global warming from increasing greenhouse gas concentrations in the earth's atmosphere.

1

5.  In August of this year the "GW" fire (lightning-strike caused) burned some 7300 acres southwest of Black Butte Ranch, coming within one-quarter mile of the Ranch before it was contained.  I and family members were evacuated due to an official determination of imminent danger.  No homes were lost this year, although on at least one occasion in the last decade two homes at the western edge of the ranch were destroyed by another such fire.  These fires have become frequent occurrences now, in contrast to more measured outbreaks during most of the life of the ranch.  Last year (2006) the Black Crater Fire burned over 9000 acres directly south of the Ranch and to within seven miles of Sisters.  In 2003 the B&B Complex Fire burned over 90,000 acres west and north of the Ranch, closing US Highway 20 and forcing evacuations of nearby Camp Sherman.

6.  I and other homeowners at the Ranch have additional longer-range concerns regarding water supplies as Cascade Mountain snowpack declines occur.  Such declines have been measured and confirmed by scientists at the University of Washington and Oregon State University at upwards of 30% since 1950 (mountain glacier retreats are additional, confirming indicators).  The water supplies at the Ranch are springs from groundwater replenished annually by snowfall in the adjacent Cascades.  The potential effects are speculative but the groundwater linkages between snowpack and springs are well established.

7.  Additional concerns we have as Central Oregon homeowners include:  limitations on recreational activities due to heightened forest fire danger in the summer, and declining snowpack at nearby ski areas in winter; potential impacts to mobility due to fire-related road closures, and on local tax burden due to increased remediation on roads and other public works; and impacts on already stressed watersheds and their biological ecosystems – and particularly stressed and endangered salmonid species, including populations listed under the Federal Endangered Species Act – from forest health declines and forest fires.

8.  My work with the State of Oregon on greenhouse gas emissions includes serving through 2004 on the Governor's Advisory Group on Global Warming, chairing its Drafting subcommittee.  The Advisory Group was charged with drafting a recommended strategy and set of measures the State could undertake to reduce greenhouse gas emissions associated with the activities of Oregonians.  The Advisory Group, a broadly representative body of Oregon citizens, unanimously recommended State emissions reduction goals and some sixty measures to achieve these.  Six high priority actions were identified by the Advisory Group, including adoption by Oregon of the auto tailpipe greenhouse gas emissions regulations previously developed and adopted by California under its Clean Air Act waiver authority.  Governor Kulongoski accepted the Advisory Group's strategy and recommendations without amendment.  He directed Oregon's Environmental Quality Commission (EQC) to act on the tailpipe emissions recommendation (I provided guidance to the EQC in this process).  In 2005, the EQC adopted these regulations by rule (in the process making operational the same rules in the State of Washington, which had conditioned its adoption on Oregon so acting).

9.  I continue to be invested as an Oregon citizen in the success of the Oregon strategy and achievement of its goals (now adopted also by legislative approval in 2007), serving in

various volunteer capacities including on the EQC Advisory Committee for development of mandatory greenhouse gas emissions reporting standards and procedures for all sources (including autos that would be regulated under the tailpipe standards) in 2007.

10. My professional involvement begins much earlier, representing the City of Portland during the drafting and adoption of the Northwest Power Act of 1980, which stipulated that new power generating resources in the Pacific Northwest should be selected for lowest cost, including all identifiable environmental costs and benefits; and which established the Northwest Power Planning Council to conduct the analysis that would recommend selected technologies and resources. I later served as a Member and Chairman of the Council, which at my instance and beginning in 1991 identified global warming as an environmental concern and cost risk factor, and included in its power planning process a "reduced greenhouse gas" scenario.

11. I have served since 1998 as (founding) President of the Bonneville Environmental Foundation. I and my Board, chaired by (also founding) Chairman and former Oregon Senator Mark Hatfield set the Foundation's goal of acting to displace greenhouse gas-emitting fossil fuel generation serving the Pacific Northwest (estimated at $\geq$ 40% coal and gas combined) with energy efficiency and new renewable energy technologies. BEF also supports the restoration of physical and biological function in Northwest watersheds. BEF's success in achieving its institutional goals is directly linked to reductions in greenhouse gas emissions. The linkage to watersheds is discussed above. The greenhouse gas reductions that BEF's solar, wind and other renewable energy projects achieve, and the environmental gains that will result, will be directly offset by the continuation and growth of greenhouse gas emissions from the auto tailpipe emissions that Oregon's action in adopting California regulations is intended to curtail.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Angus Duncan
13760 Vine Maple
Black Butte Ranch
Sisters, OR

November 5, 2007

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF CALIFORNIA, by and through          1-07-CV-2024
ARNOLD SCHWARZENEGGER, Governor of
the State of California, and CALIFORNIA AIR
RESOURCES BOARD

                    Plaintiffs,

and

WASHINGTON ENVIRONMENTAL COUNCIL
615 Second Ave., Suite 380
Seattle, WA 98104

CLIMATE SOLUTIONS
219 Legion Way SW, Ste 201
Olympia, WA 98501

ENVIRONMENT WASHINGTON
3240 Eastlake Ave E., Ste 102
Seattle, WA 98102

OREGON WILD
5825 N. Greeley Ave
Portland, Oregon 97217

3E STRATEGIES
16 NW Kansas Ave.
Bend, OR 97702

ENVIRONMENT OREGON
1536 SE 11th Avenue, Suite B
Portland, OR 97214

ANGUS DUNCAN
11334 S.W. Aventine Circus
Portland, OR 97219

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252

FRIENDS OF THE EARTH
311 California Street, Suite 510
San Francisco, CA 94104

Applicants-in-Intervention/
Plaintiffs

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and STEPHEN L.
JOHNSON, Administrator of the Environmental
Protection Agency Interior,

Defendants.

_____

**DECLARATION OF DR. PHILIP DUSTAN IN SUPPORT OF AMENDED,
CORRECTED, UNOPPOSED MOTION TO INTERVENE IN SUPPORT OF
PLAINTIFFS**

DECLARATION OF DR. PHILIP DUSTAN

I, DR. PHILIP DUSTAN, declare as follows:

1.     My name is Dr. Phillip Dustan. I am a full professor in the Biology Department of

the College of Charleston in Charleston, South Carolina.  I am a member of Friends of the Earth.

2.     I have personal knowledge of the matters set forth herein, and if called to testify I

could and would competently testify thereto, except for those items stated to be based upon

information and belief.  For those items based upon information and belief, I have relied upon

information reasonably relied on by professionals in my field to inform our professional

judgment and opinion, and as to those matters I am informed and believe them to be true as

expressly stated herein.

3.     I teach ecology, marine ecology, and coral reef ecology.  I also research and study

the ecology and physiology of corals and coral reef communities.

4.     I was the Cousteau Society's Science Advisor from 1997-2003.  I worked as

principal scientist on the Calypso on and off between 1974 through 1983.  The Cousteau Society

funded my work on the Calypso.  My research has also been funded by the National Science

Foundation, Smithsonian Institution and Harbor Branch Foundation, National Aeronautics and

Space Administration, National Oceanic and Atmospheric Administration, and the US

Environmental Protection Agency.

5.     I started SCUBA diving and began my study of coral reefs in 1969.  Much of my

work has focused on coral reefs off of the Florida Keys.  In 1974, with support from the

Smithsonian Institution and Harbor Branch Foundation, I established long-term reef monitoring

sites at xCarysfort Reef in the present-day Key Largo National Marine Sanctuary.  This site is

the oldest permanently marked coral reef study site in the Western Atlantic/Caribbean area.  I still monitor that site and have published papers detailing my findings.

6.    In 1995, I was asked to be a principal investigator on the U.S. Environmental Protection Agency Florida Keys Coral Monitoring Project (CRMP).  Between 1996 and 2000, our research group documented an overall 38% loss of living coral cover in the Florida Keys National Marine Sanctuary between Key Largo and Key West and the Carysfort Reef in the northern Florida Keys.  In 2004, coral cover was approximately half of what it had been in 1996. Combined with earlier studies dating from 1974, Carysfort Reef has lost over 90% of its living coral cover.  The degradation is far beyond ecological collapse, resembling a graveyard composed of the skeletons of a once pristine coral garden.

7.    Other reef studies in which I have participated in the Bahamas and Central Pacific Ocean have revealed similar degradation of reefs that are far removed from sources of land-based pollution.  In the Bahamas, a reef named Rainbow Gardens off Iguana Cay near the Caribbean Marine Research Center at Lee Stocking Island, Exumas, Bahamas lost 79% of its living coral cover between 1991 and 2004.  The majority of the coral mortality occurred during and after mass bleaching in 1998 and 1999 caused by elevated seawater temperatures. Subsequently, sponge boring weakened the dead coral skeletons which were then shattered by hurricanes.

8.    In the Pacific Ocean in November 2004, the crew of the research vessel Heraclitus, operated by the Planetary Coral Reef Foundation (501c3 non-profit) and conducting studies under my direction, came upon a completely dead coral community in the Kanton Atoll lagoon, a remote island in the Phoenix Island group in the Central Pacific Ocean Phoenix Islands.  The fish community was still present, but virtually every coral and other benthic

invertebrate was dead or missing from the reef community.  The scientific crew, who had been conducting studies on other islands, had voyaged north to the equatorial zone to escape the typhoon season.  They had chosen Kanton because National Geographic Magazine (February 2004) had described the atoll as an exceptionally beautiful, pristine coral reef.  The article, based on a 2002 scientific expedition led by Drs. David Obura and Gregory Stone of the New England Aquarium, described the reef ecosystem as: "*[o]ne of Earth's last pockets of primal ocean...those underwater havens that have remained unspoiled as long as the ocean can remember*" and further noted that "*[o]ur most  valuable discovery was that the Phoenix Islands as an intact coral ecosystem have survived largely intact making them one of the last havens of ocean wilderness.*" (National Geographic, February 2004, http://magma.nationalgeographic.com/ngm/0402/feature3).

9.    My colleagues on the survey team were shocked that such a reef system could have perished in so short a time and immediately carried out underwater documentation surveys. Later investigations, using the internet, revealed that the pool of elevated temperature seawater (termed an oceanic hot spot) of unprecedented magnitude had formed over the island group from August 2002 to March 2003.  The elevated temperatures exceeded the upper thermal limits of reef corals for almost five months and resulted in the completed mortality of this pristine lagoon coral community.  The survey team estimated that losses ranging from 45 to 60 percent of the coral cover had also occurred on the reefs on the outer atoll slopes.

10.    It is striking that an entire reef community had been killed by elevated seawater temperatures in less time that it had taken to publish an article in National Geographic Magazine. Furthermore, even though the warming had been detected by NOAA, the damage to the reef

caused by the sharply elevated temperatures went unnoticed until the survey team happened

upon the damage, nine months after the National Geographic article had been published.

- July 2002    New England Aquarium Expedition
- Aug 2002-Mar03  NOAA Coral Bleaching  Hot Spot detection
- Feb 2004    National Geographic Article published
- Nov 2004    PCRF Phoenix Islands coral survey
- July 2006    Manuscript accepted for publication by Atoll Research Bulletin published by Smithsonian Institution, Washington, D.C.

   11.  At the 10th International Coral Reef Symposium (28 June to 2 July, 2004,

Okinawa, Japan), the participants, consisting of scientists, resource managers, and NGO and

governmental officials, declared that the degradation of coral reefs worldwide has reached a

critical stage.[1]  Furthermore, they recognized that the increase in sea surface temperatures, the

decrease in carbonate levels, and sea-level rise (caused by increasing anthropogenic CO2 in the

atmosphere) all act synergistically to stress coral reefs, which leads to severe bleaching and

extensive coral mortality.  The Okinawa Declaration reinforced the findings of numerous

scientific reports and major summaries including Reefs at Risk in the Caribbean and the Pew

Ocean Commission.

   12.  I am a member of the International Society for the Study of Coral Reefs, the

society that convened the conference.  The declaration was posted on the world wide web and

thoroughly discussed on the NOAA maintained Coral List serve (a web-based list serve of over

3,000 coral reef scientists, managers, and policy makers).  While I did not attend the conference

in person, I participated in the web-based process and read much of the scientific literature on the

subject.

---

[1]  *See http://www.icriforum.org/secretariat/oki_declaration.html*

13.     Based on my review of the scientific literature, the concentration of atmospheric

carbon dioxide today has increased from a pre-industrial (pre-1600 AD) level of 278-280 ppm to

over 360 ppm and continues to show every sign of increasing.  This global change has affected

the ecology of all shallow seas through increases in temperature and dissolved carbon dioxide.

The mass bleaching of reef corals, and other reef organisms containing zooxanthellae[2], which

first appeared in the early 80's, has been increasing in frequency and magnitude.

14.     While corals may bleach in response to many different kinds of stress, it is now

widely accepted by the scientific research community that increases in water temperature are the

principal stress factor in mass bleaching.  The link between bleaching and sea surface

temperature (SST) has become so well demonstrated that the National Oceanic and Atmospheric

Administration has established a satellite-based program to predict where and when bleaching

might occur.  These reports are regularly disseminated to, and verified by, the global coral reef

science community using the NOAA sponsored coral-list serve email discussion group.

15.     As documented in the report "Climate Change Impacts on the United States: The

Potential Consequences of Climate Variability and Change Overview, Coastal Areas and Marine

Resources," by the National Assessment Synthesis Team, U.S. Global Change Research Program

published in 2000, the effects of increased atmospheric carbon dioxide have moved to the

forefront of coral reef research as large scale bleaching and outbreaks of coral diseases continue

---

[2]      *Zooxanthellae* are microscopic single-celled yellow brown algae that live inside the coral animal tissues
where they form a tight symbiotic relationship with the coral, making coral functionally both animal and plant.  It is
this evolutionary adaptation that enables corals to construct the framework of modern coral reefs.

Ὡ       As animals, most corals are voracious predators.  They expand their tentacles to feed on zooplankton and
sweep their surroundings with mesenterial filaments to absorb dissolved nutrients.  As plants, their photosynthetic
zooxanthellae produce oxygen that supports animal tissue respiration and synthesize a variety of carbon compounds
for the host animal cells.  By utilizing the waste products of animal metabolism as raw materials of primary
production, the algae also create an internal recycling system that prevents the loss of rare and important nutrients as
well as enhancing the rate of skeletal growth.  These adaptations have enabled corals to become the dominant reef-
building organisms of the planet.  Curiously, this intricate metabolic dance is restricted to the warm, clear tropical
oceans, which, up until recently have been some of the most benign, predictable, and undisturbed habitats in the
shallow seas.

to increase.  In addition to the stress caused by elevated temperature, recent scientific research has shown that increased carbon dioxide lowers the pH of the ocean surface waters.  This chemical change lowers calcium carbonate saturation levels which reduces the growth rate and strength of coral skeletons.  Lowered saturation levels may also limit the uptake of inorganic carbon from the seawater by other reef organisms with algal symbionts.  The seriousness of the problem can be summarized by noting that coral reefs provide over $375 billion annually (1997 dollars) in goods and services to humanity in the way of food, shelter from storms, and other significant economic benefits.  I believe that it threatens our very own environmental security, as stressed reefs can no longer support the populations of tropical nations.

16.     My personal observations, research, and scholarship have led me to the conclusion that climate change is a significant factor responsible for the increasing loss of corals. Climate change is currently harming and will continue to harm me because its effects contribute to diminished opportunities for fundamental biological research and my ability to pursue my profession.  The impacts on coral reefs are tantamount to visiting the Sequoia National Forest and finding over 90% of the trees (90 out of 100) dead or on the ground.

17.     My recreational interests are also harmed by climate change.  I am a scuba diver. I have and will continue to scuba dive in reefs affected by climate change, including reefs off of the Florida Keys.  These reefs are no longer healthy.  They are very small with only a few individual colonies.  There are far fewer fish.  My enjoyment of the reefs, and my ability to share the reefs with family and friends has been diminished.

18.     In 2004, I revisited Carysfort Reef and other study sites in the northern part of the Florida Keys National Marine Sanctuary with my eleven year old son.  The sight of so much dead coral and devastated reef upset him to the point where he did not want to continue

snorkeling in the water.  I was deeply saddened because, while my own feelings of loss are based on my long term intimate knowledge of these once beautiful reefs, my son's apprehensions were brought on by their present day graveyard-like appearance.   I was struck by the realization again that our stewardship of the only reefs along our continental coastline has failed the American people.

19.     My family and I also own land and have built a home on John's Island, approximately 10 miles southwest of Charleston, South Carolina.  Our home is built on the shore of an estuary known as the Stono River, approximately 5.5 miles from the ocean and on land eight feet above sea level.

20.     I believe that climate change is causing rising sea levels and increasing storm surge frequency and heights.  An increase in the severity of hurricanes is also predicted.  Because of this, I have expended a significant amount of money to build my home higher and stronger than required by current code, even though the home is over five miles from the ocean.  Additionally, my insurance rates for the new home will increase over time.  I believe that the higher insurance costs are attributable to the effects of climate change.

21.     I understand that the Environmental Protection Agency has failed, for over two years, to make a decision on the State of California's request for a waiver allowing California to enforce its Clean Cars law, which sets greenhouse gas limitations for new cars sold into California.

22.     I further understand that EPA's failure to make a decision on California's waiver request effectively prohibits other states that have adopted California's tailpipe greenhouse gas law from enforcing their law.

23.     It is my further understanding and knowledge that emissions from vehicles are a significant share of total greenhouse gas emissions.

24.     Unless emissions from all major sources, including especially vehicle emissions, are quickly capped and reduced, climate change will become even more severe.  As climate change becomes more severe, I will continue to experience personal injury of the type that I have outlined above and those injuries will in face become more severe.

25.     Action by EPA either to quickly grant California's waiver request -- or else to actually reject it and thus enable intervenors to challenge that rejection in court – is essential to enabling states to limit these emissions and help reduce climate change.

26.     Finally, as a member of Friends of the Earth, I am aware that the Bluewater Team of Friends of the Earth has invested, and continues to invest, a significant amount of its institutional energy to ensure the active implementation of California's tailpipe greenhouse gas reduction law.

27.     I am aware that Friends of the Earth ("Friends") crafted the law, found authors for the bill, was instrumental in passing the bill, and assisted in crafting the implementing regulations, especially with regard to alternative fuel pathways.  Friends has continued to invest resources in defending the law against the automakers' legal challenge and in ensuring that EPA acts on California's waiver.  Because of its unique and impassioned support of this law, I understand that Friends of the Earth has a compelling interest in ensuring that EPA acts on California's waiver application and that EPA's continued failure to grant the waiver undermines Friends' work in this area.

I swear under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

December 3, 2007.

_____
Dr. Philip Dustan

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF CALIFORNIA, by and through          1-07-CV-2024
ARNOLD SCHWARZENEGGER, Governor of
the State of California, and CALIFORNIA AIR
RESOURCES BOARD

                  Plaintiffs,

and

WASHINGTON ENVIRONMENTAL COUNCIL
615 Second Ave., Suite 380
Seattle, WA 98104

CLIMATE SOLUTIONS
219 Legion Way SW, Ste 201
Olympia, WA 98501

ENVIRONMENT WASHINGTON
3240 Eastlake Ave E., Ste 102
Seattle, WA 98102

OREGON WILD
5825 N. Greeley Ave
Portland, Oregon 97217

3E STRATEGIES
16 NW Kansas Ave.
Bend, OR 97702

ENVIRONMENT OREGON
1536 SE 11th Avenue, Suite B
Portland, OR 97214

ANGUS DUNCAN
11334 S.W. Aventine Circus
Portland, OR 97219

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252

FRIENDS OF THE EARTH
311 California Street, Suite 510
San Francisco, CA 94104

Applicants-in-Intervention/
Plaintiffs

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and STEPHEN L.
JOHNSON, Administrator of the Environmental
Protection Agency Interior,

Defendants.

_____

**DECLARATION OF ARTHUR (R.D.) GRUNBAUM
IN SUPPORT OF MOTION TO INTERVENE**

I, Arthur (R.D.) Grunbaum, do declare as follows:

1.      I am a life-long resident of Washington State and live in rural Gray's Harbor, Washington on the south shore of Grays Harbor Bay at the mouth of O'Leary Creek.  I have lived in the area full-time with my partner, Linda Orgel for about the last four years, but we have owned the place much longer, since 1991, and we spent time there each weekend and during vacations.

2.      My partner and I are current members of Washington Environmental Council and I served as a Board Member of that organization for six years.  Environmental issues have long been a concern of mine.  Both Linda and I are founders of Friends of Grays Harbor (FOGH), a broad-based 100% volunteer tax-exempt 501(c)(3) citizens group made up of crabbers, fishers, oyster growers and caring citizens whose mission is to foster and promote the economic, biological, and social uniqueness of Washington's estuaries and ocean coastal environments.  The goal of FOGH is to protect the natural environment, human health and safety in Grays Harbor and vicinity through science, advocacy, law, activism and empowerment.  I am currently the Vice President of FOGH.

3.      We are a charter member of the Grays Harbor Audubon Society and I am the editor of its newsletter, The Sandpiper.  We are also founding members of the Grays Harbor Institute, an organization which brings speakers and presents events that will investigate, analyze, synthesize and promote democratic ideals consistent with ending poverty and racism and advancing human, civil, environmental, educational and health rights.

4.      We are founding members and Linda is co-chair of the Grays Harbor Community Alliance which is an organization that brings together local labor and environmental

1

groups to work for common goals. This organization is based on the "Blue-Green" organizations that have developed in Washington State and nationwide. Finally, I was a Charter member of Surfrider Foundation, Westport Chapter.

5.    Climate and weather has been a long-time fascination of mine and that interest was accentuated when we moved to Grays Harbor which has an average rainfall 2 times the amount of the Seattle area, where I grew up most of my life. Prior to purchasing our place on the south shore, Linda and I looked at property near Washaway Beach. This was probably our first direct experience with the power of ocean and its erosion forces. Then, in 1994 a huge breach occurred at Westhaven State Park on Half Moon Bay in Westport Washington. We observed the breach personally and began to think about similar issues and how they might affect our own piece of property.

6.    In 1998, then-Governor Gary Locke directed the Department of Community Development and Trade (CTED) to create a Coastal Erosion Task Force. I was appointed to the Steering Committee for that task force and represented both FOGH and WEC. We spent many months being educated by the Department of Ecology, US Geological Services and academic resources about coastal erosion, sand management, and climate effects on our coastal shorelines

7.    Unfortunately, a minority group from the City of Westport, private consultants and other coastal communities derailed the conclusions and recommendations of the Task Force. As a result, the City of Westport declared erosion hazard emergencies on 9 separate occasions in less than 10 years and directed the Army Corps of Engineers (Corps) to place materials on the beach. In 2002, I personally, along with Wildlife Forever of Grays Harbor, brought a lawsuit to prevent the Corps from dumping 27,000

cubic yards of cobble on the shoreline of Half Moon Bay in Westport.  We were successful in changing the materials to sand and initiating a study of the Corps activities in the Grays Harbor area.

8.      FOGH's association with fishers, crabbers, and oystergrowers further highlighted the dependence on climate and weather for the safety and livelihood of those who rely on the water.  One of the issues that became obvious to us is that the weather and climate prediction capabilities at the coast were lacking compared to those inland.  Linda and I became aware of the need for improved weather prediction when we were blindsided by unexpected storms or relieved when they mysteriously passed us by.  As a result we became involved with Professor Clifford Mass of the University of Washington Department of Atmospheric Sciences in attempting to get a Doppler radar station located on the Washington Coast.  We have been working with Professor Mass on this project for many years now, and hope that funding for it will come to fruition in the coming congressional budget cycle.  As a result of our association, The Grays Harbor Institute brought Professor Mass to Grays Harbor in May of 2007 to speak on global warming, the regional implications for the Pacific Northwest, and later that evening, why the Northwest needs a coastal weather radar.

9.      Both Linda and I are concerned by the prospect of global warming from a universal aspect and also a very personal aspect – the survivability of our home and shoreline property.  Our specific property is located on the south edge of Grays Harbor with O'Leary Creek bifurcating the lowland areas.  The creek and bay are tidally influenced and rise at certain times of the year 12 – 13 feet.  Storm surges and excessive rainfall increase this influence and over the past 17 years, we have seen the waters come

closer to the house than they have previously.  The front part of our house was built in 1912 and the property itself is historical in that William O'Leary who was the first non-native settler in Grays Harbor first homesteaded it in 1848. We have been aware since our purchase that major hazard events like earthquakes and tsunamis would have a profound effect on our property, but the possibility of rising sea levels and increased storm ferocity are now additional concerns.

10.    We are in the process of updating our home and have noticed that certain areas that have survived for almost 100 years are now becoming compromised by excessive moisture and greater wind velocities.  Last year for example, we logged 102 inches of rain on our home weather station.  This is almost 2 feet above what we would consider a normal year.  We fear that climate change will mean greater variability in precipitation from year to year.  Increased rainfall impacts the creek on our property, leading to additional erosion.  And even if precipitation patterns only shift within the year, higher flows in the fall – for example -- can have severe consequences for the integrity of the stream channel.

11.    I have worked very hard to increase the awareness of global warming and its potential effects to Grays Harbor.    Both Linda and I were very active in the support of Clean Car bill passed by the Washington legislature and worked with our Grays Harbor Community Alliance, Audubon, other local environmental groups and local political party to inform and educate our fellow Harborites to the wisdom of decreased greenhouse emissions.  We were delighted when the Legislature and Governor became champions of lowering emissions in Washington State and saw that as an important step toward addressing a global issue.

12.    We are gravely concerned however, that the US EPA has not followed through with the necessary enablement allowing Washington and other states to take a proactive action to make a difference in the amounts of emissions pouring into our atmosphere. Emissions from vehicles have been proven to cause and have effect on the climate that affects us in Grays Harbor and in the world.

13.    As a member of FOGH, Grays Harbor Audubon, Washington Environmental Council, The Grays Harbor Community Alliance, The Grays Harbor Institute and as a citizen of my coastal community, I am concerned that inaction and/or ignoring the lessons we have learned about global warming and the human-made emissions of our technology will ultimately deprive me, my family and associates of the right to clean air, clean water, and a healthy estuary.

14.    In a very personal sense, I am also concerned about climate change impacts on the property where I now live with my partner.  I am concerned that increased erosion from sea level rise and wave action will jeopardize our home.  I am concerned that changing precipitation patterns will have detrimental impacts on the stream that crosses my property.  I am concerned that climate change will result in efforts, such as riprapping and armoring the shoreline with rocks and other barriers, that will degrade the natural environment.  Because of where we live, the impacts of climate change will have profound impacts over the coming years.  I believe that we must begin to address the issue as soon as possible if we are to avert what could be calamitous results that will degrade the natural ecosystem and environment.

I declare under penalty of perjury of the laws of the United States of America and the State of Washington that the foregoing is true and correct.


Date 11/02/07

Arthur (R.D.) Grunbaum
1128 State Route 105
Aberdeen, Washington 98520-9516
(360) 648-2476

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF CALIFORNIA, by and through          1-07-CV-2024
ARNOLD SCHWARZENEGGER, Governor of
the State of California, and CALIFORNIA AIR
RESOURCES BOARD

                  Plaintiffs,

and

WASHINGTON ENVIRONMENTAL COUNCIL
615 Second Ave., Suite 380
Seattle, WA 98104

CLIMATE SOLUTIONS
219 Legion Way SW, Ste 201
Olympia, WA 98501

ENVIRONMENT WASHINGTON
3240 Eastlake Ave E., Ste 102
Seattle, WA 98102

OREGON WILD
5825 N. Greeley Ave
Portland, Oregon 97217

3E STRATEGIES
16 NW Kansas Ave.
Bend, OR 97702

ENVIRONMENT OREGON
1536 SE 11th Avenue, Suite B
Portland, OR 97214

ANGUS DUNCAN
11334 S.W. Aventine Circus
Portland, OR 97219

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252

FRIENDS OF THE EARTH
311 California Street, Suite 510
San Francisco, CA 94104

Applicants-in-Intervention/
Plaintiffs

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and STEPHEN L.
JOHNSON, Administrator of the Environmental
Protection Agency Interior,

Defendants.

_____

**<u>DECLARATION OF CYLVIA HAYES IN SUPPORT OF AMENDED, CORRECTED,
UNOPPOSED MOTION TO INTERVENE IN SUPPORT OF PLAINTIFFS</u>**

I, Cylvia Hayes, do declare as follows:

I.  My perspective on this issue is shaped by 19 years of professional experience in the sustainable development field.  In 1999, I founded 3EStrategies, a public service and consulting firm with a mission of accelerating the transition to sustainable building, energy and economic practices.  I am currently executive director of the organization, as well as a member of it.  Our goals include:

1) To make green building the norm in Central Oregon and beyond.
2) To accelerate the development of sustainable energy practices and industries.
3) To promote and support development of sustainable economic practices and systems.
4) To develop and promote opportunities to reduce Carbon Dioxide emissions.
5) To create sustainable develop programs and models that are replicable.

One of 3EStrategies' key projects is the Business Alliance of Sustainable Energy, a coalition of clean energy companies and stakeholders.

In addition, I sit on Governor Kulongoski's Renewable Energy Working Group and was integrally involved with crafting the energy and climate change bills that were introduced in the 2007 Oregon Legislature.  I have also been involved in educating the public and galvanizing support for Oregon's decision to adopt strong tailpipe emissions limits.  Finally, I was one of the people personally trained by former Vice President Al Gore, in the science and history behind the *Inconvenient Truth* documentary.

II.  The Northwestern United States are already experiencing environmental and economic damages as a result of climate change.  Wildfires in the west have increased in frequency 400% over the past 20 years, due in part to a prolonged drought and drier soil and forest conditions.  The Oregon snowpack has decreased by over 30% in the past two decades and the spring melt is coming sooner, which impacts water storage.  Oregon's rivers are in large part driven by snowpack.  Changes in the snowpack are already having severe consequences. For example, the southern Oregon salmon fishery has been declared a national disaster for the second year because there has not been enough water in the Klamath Basin for both farm irrigation and healthy river levels.  As a result millions of fingerling salmon have been killed, crippling the salmon fishery. Beginning in 2002, a dead zone appeared off the coast of Oregon, impacting crab and fish populations.  Scientists suggest it may be the result of shifting current and temperature conditions.

III.  The California greenhouse gas tailpipe emissions limits program is important because the federal government has failed to take appropriate steps to address our national contribution to global greenhouse gas emissions.  With 4% of the

world's population, the United States produces approximately 25% of global human-related greenhouse gasses and yet, we have failed to implement significant domestic programs or work effectively with the international community to address the greenhouse gas emissions issue.   Given this absence in federal leadership, states are stepping forward to address this crucial issue. The California effort is important because the state alone is the sixth largest economy in the world and has enormous economic influence.  The focus on vehicle tailpipe emissions is extraordinarily important given that in the Energy Act of 2005 Congress did not include transportation related energy issues.  Finally, let us not forget that major U.S. auto makers are crumbling economically while Honda and Toyota, leaders in efficient, low emissions vehicles, are quite strong and growing.  At this time, you cannot sell a U.S. made automobile in China without adding additional fuel efficiency and emissions reductions equipment.  It may well prove that the California greenhouse gas tailpipe emissions limits program reduces global warming pollution, while simultaneously encouraging the U.S. auto industry to produce vehicles that can compete in the global marketplace.

IV.  Greenhouse gas tailpipe emissions limits programs are important to 3EStrategies because they assist us in meeting our goals of accelerating the transition to sustainable economic practices and reducing carbon dioxide emissions.  Reducing the degree and impacts of climate change and making a proactive transition away from fossil fuels are among the greatest challenges facing humanity at this time.  Tailpipe emissions limits programs are essential to effectively meeting these challenges.

V.  It is also important that Oregon and Washington States are stepping up in support of the California Greenhouse Gas tailpipe emissions limits program and pursuing implementation of similar policies in those states.  The Western Governors Global Warming Initiative has had a significant impact in catalyzing action across the country and beyond.  In fact, in the spring of 2003, when the concept of the Governors Global Warming Initiative was beginning to take shape, I was in Rome at a United Nations event addressing energy and climate issues. Though the international community was in general frustrated with and critical of the United States' lack of action, there was much praise and excitement about the Western Governors Global Warming Initiative.  It is likely that a unified western tailpipe emissions limits program will catalyze significant action across the country.

VI.  In addition to my professional interests, I am concerned about climate change from the perspective of a homeowner and outdoors person.   My home and organization office is located in Bend Oregon, a region highly susceptible to wild fire.  I am concerned that unchecked GHG emissions will lead to severe climate change in the near future that will threaten my community and my home. In addition, I am a runner and hiker and in the past few years have experienced numerous times when the air quality was so unhealthy due to smoke that I had to

2

avoid heavy exertion outdoors.  I plan to run and hike this Spring and Summer in National Forest and Wilderness areas that surround Bend.  However, I am concerned that my plans will be nullified if wildfires and their resulting smoke that are derived, at least in part, from continuing and worsening climate change, render my engaging in such activities exceptionally dangerous.  I am also a nordic skier.  In recent years, the ski season has been shorter than normal (and in fact, the Mt. Bachelor ski area has had to purchase a snow making machine!).  Again, I plan to engage in Nordic skiing this winter in the mountains surrounding Bend, but I am concerned that conditions will continue to worsen by climate change-induced lack of snowfall, and that I will be prevented even more than in past years from engaging in this activity.

And, at least as important to me as these issues is the fact that I value nature for its own intrinsic and aesthetic value.  I do not want to see an increase in habitat degradation and species loss due to unchecked climate change.

VI.  I declare under penalty of perjury that foregoing is true and correct to the best of my knowledge, information and belief.

Executed at 10:10am on November 15, 2007.

Signature:

Printed Name:  Cylvia Hayes

Address:  760 NW York DR., Ste. 300,  Bend, OR  97701

Phone:  (541) 617-9013

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF CALIFORNIA, by and through          1-07-CV-2024
ARNOLD SCHWARZENEGGER, Governor of
the State of California, and CALIFORNIA AIR
RESOURCES BOARD

                    Plaintiffs,

and

WASHINGTON ENVIRONMENTAL COUNCIL
615 Second Ave., Suite 380
Seattle, WA 98104

CLIMATE SOLUTIONS
219 Legion Way SW, Ste 201
Olympia, WA 98501

ENVIRONMENT WASHINGTON
3240 Eastlake Ave E., Ste 102
Seattle, WA 98102

OREGON WILD
5825 N. Greeley Ave
Portland, Oregon 97217

3E STRATEGIES
16 NW Kansas Ave.
Bend, OR 97702

ENVIRONMENT OREGON
1536 SE 11th Avenue, Suite B
Portland, OR 97214

ANGUS DUNCAN
11334 S.W. Aventine Circus
Portland, OR 97219

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252

FRIENDS OF THE EARTH
311 California Street, Suite 510
San Francisco, CA 94104

Applicants-in-Intervention/
Plaintiffs

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and STEPHEN L.
JOHNSON, Administrator of the Environmental
Protection Agency Interior,

              Defendants.

_____

**DECLARATION OF DOUG HEIKEN
IN SUPPORT OF MOTION TO INTERVENE**

I, DOUG HEIKEN, declare as follows:

1. My name is Doug Heiken. I am a resident of Lane County, Oregon.

2. I am a member in good standing of Oregon Wild (formerly Oregon Natural Resources Council). I have been a volunteer or employee of Oregon Wild since 1990. My current job title is "Conservation and Restoration Coordinator." My work primarily involves forest and wildlife conservation through education and advocacy. My work focuses more and more on the need to restore ecosystems and prepare them for the effects of climate change.

3. I am familiar with the June 15, 2007 letter from Western Environmental Law Center sent on behalf of Oregon Wild and others requesting that EPA grant California's request for waiver of preemption under Clean Air Act Section 209(b). Granting this waiver will allow California (as well as states like Oregon) to regulate $CO_2$ emissions and help prevent and mitigate global climate change that threatens the interests of Oregon Wild members.

4. I personally use and enjoy the forests, waterways, and wildlife of Oregon as do the thousands of Oregon Wild members. I particularly enjoy hiking and observing wildlife in old-growth forests and along rivers and streams. My interests are consistent with the interest of Oregon Wild described below.

5. Avoiding and/or mitigating climate change is critical to the realization of Oregon Wild's mission to protect and restore Oregon's wildlands, wildlife and water as an enduring legacy. Oregon's forests, waterways, and wildlife are critically dependent on maintaining a stable climate that varies within the historical range, but does not deviate too far from that range. Global warming is most importantly

expected to increase evaporative demand which will reduce water supply regardless of whether precipitation increases or decreases. This will deprive both streams and soil of water and increase drought stress for forests and fish. Water shortages will increase tree mortality from drought, fire, and insects. Since these disturbance processes are one of the fundamental determinants of vegetation pattern and structure, climate change will fundamentally alter the character and quality of the habitat that many species of wildlife depend on. The very nature and character of Oregon is at risk.

6. Unchecked climate change will interfere with the realization of Oregon Wild's mission to protect wildlands by among other things increasing the risk of uncharacteristic forest fires. While fire is a natural part of our forests, uncharacteristic fires will deprive Oregon Wild members of forest enjoyment.

7. Unchecked climate change will interfere with the realization of Oregon Wild's mission to protect wildlife by increasing the risk of major ecological shifts. In order to remain within the climatic zone each species evolved with, climate change will force wildlife to move northward or toward higher elevations, yet there is no guarantee that favorable precipitation patterns will follow. Many species are not very mobile and the rate of climate change may exceed the ability of some species to migrate and stay within suitable climate zones. Experts predict that ecological communities will not move as intact units, but will instead disassemble and reassemble in novel ways, leaving some species excluded from the future biotic community. Opportunistic generalist species are expected to be

favored over specialist species. Scientists also expect decoupling of species relations such as predator/prey, plant/pollinator, plant/herbivore, etc.

8.  Unchecked climate change will interfere with the realization of Oregon Wild's mission to protect water by accelerating the global hydrologic cycle. Predicted increases in winter precipitation will cause higher peak flows along with extra erosion and turbidity. Increased evaporative water demand will decrease summer flows which will raise water temperatures, reduce dissolved oxygen, reduce the availability of water for diluting pollution, and reduce opportunities for water recreation like swimming, boating and fishing.

9.  I recently authored a report for Oregon Wild which explained several significant ecological threats posed by climate change, including the following passage:

### How will climate change affect ecosystems, forests, and trees?

Some biological effects of climate change can already be seen. There is evidence that some trees are leafing out earlier and forbs are flowering earlier. Also, some birds are migrating earlier, and seasonal peaks in some insect populations are occurring earlier.[1] "[C]limate change is not something that will happen in the future but is already in progress."[2]

We should expect shifting "isoclimes" (zones of similar climate). Forest communities will shift toward the poles and toward higher elevations, but the climate may change faster than species' natural capacity to migrate. Species are not expected to shift together as intact communities because of differing capacities for dispersal, migration, establishment, and tolerance of climate change. As a result, forest community composition will likely change. Climate change will disrupt co-evolved relationships between predators and their prey, plants and their pollinators, migration timing and flowering, etc. [3] During the tumultuous

---

[1] Walther, G.R., Post, E., Convey, P., Menzel, A., Parmesan, C., Beebee, T.J.C., Fromentin, J.R., Hoegh-Guldberg, O., Bairlein, O., 2002. Ecological responses to recent climate change. Nature 416, 389–395.
[2] An Interview with Dr. Gian-Reto Walther. ESI Special Topics: October 2006. http://esi-topics.com/gwarm2006/interviews/Gian-RetoWalther.html
[3] Sherry, A., X. Zhou, S. Gu, J. A. Amone III, D. S. Schimel, P. S. Verburg, L. L. Wallace, and Y. Luo. 2007. Divergence of reproductive phenology under climate warming. PNAS, 104: 198-202. http://bomi.ou.edu/luo/pdf/Sherry%20et%20al.%202007%20PNAS.pdf

period of shifting biomes, opportunistic "weedy" species will readily replace native species that are displaced by climate change.4

Expected decreases in streamflow and increases in stream temperatures will place additional stress on cold-water fish such as salmon and trout. Forests may consequently be deprived of large quantities of marine-derived nutrients that for millennia have been conveyed by salmon from the ocean to continental ecosystems.5

The following trends in forest ecosystems should be expected as a result of climate change. Forest disturbances such as fire and defoliating insects will likely increase, causing a reduction in the average age of trees (although old-growth forests will persist because of natural refugia, ecological inertia, and stochastic variation). Forests will likely become simplified due to the ascendancy of weedy species. The movement of existing forest types northward and toward higher elevations will likely cause extirpation of species where natural or human-induced habitat bottlenecks are encountered.6

There are significant feedbacks between climate and forests. Increasing temperatures can lead to longer growing seasons and more plant growth which can store more carbon or become fuel for fires. Longer fire seasons will likely occur due to earlier drying of fuels.7 Milder winters (more frost-free days) and warmer summers will allow insect populations to increase.8 Warmer temperatures will also increase rates of

---

4 Hansen, Neilson, Dale, Flather, Iverson, Currie, Shafer, Cook, and Bartlein. 2001. Global Change in Forests: Responses of Species, Communities, and Biomes. BioScience vol 51, no. 9, pp 765-779. http://www.usgcrp.gov/usgcrp/Library/nationalassessment/forests/bioone5.pdf

5 Naiman, R.J., R.E. Bilby, D.E. Schindler, and J.M. Helfield. 2002. Pacific salmon, nutrients, and the dynamics of freshwater and riparian ecosystems. Ecosystems. 5:399–417. http://www.fish.washington.edu/people/naiman/CV/reprints/naiman_ecosys_salmon_2002.pdf. Helfield, J.M., and R.J. Naiman. 2001. Effects of salmon-derived nitrogen on riparian forest growth and implications for stream productivity. Ecology 82(9) : 2403-2409. http://www.fish.washington.edu/people/naiman/CV/reprints/helfield_naiman_2001.pdf

6 Nigel Dudley. 1998. Forests And Climate Change. Forest Innovations – a joint project of IUCN, GTZ and WWF. http://www.equilibriumconsultants.com/publications/docs/climatechangeandforests.pdf

7 A. L. Westerling, H. G. Hidalgo, D. R. Cayan, T. W. Swetnam. 2006. Warming and Earlier Spring Increase Western U.S. Forest Wildfire Activity. Science 18 August 2006: Vol. 313. no. 5789, pp. 940 – 943. http://www.srs.fs.usda.gov/pubs/ja/ja_westerling001.pdf

8 Insects' "short life cycles, mobility, reproductive potential, and physiological sensitivity to temperature" lead to a conclusion that small changes in climate can lead to large changes in the distribution and abundance of insects. Ayers & Lombardero. 2000. Assessing the Consequences for Global Change for Forest Disturbance from Herbivores and Pathogens. The Science of the Total Environment 262 (2000) 263-286. http://www.usgcrp.gov/usgcrp/Library/nationalassessment/forests/forests7.pdf

"Shortened winters, increasing summer temperatures, and fewer late-spring frosts correlate to increased insect feeding, faster growth rates, and rapid reproduction. … Drought creates many conditions that are favorable to increased insect reproduction. … Attempts at intervention [to control insects] are proving mostly negligible. " Dunn, David, Crutchfield, James. 2006. Insects, Trees, and Climate: The Bioacoustic Ecology of Deforestation and Entomogenic Climate Change. Santa Fe Institute Working Paper. Arxiv.org. However, reduced snow cover might lead to increased winter mortality for some insects that rely on a blanket of snow for winter cover.

respiration and decomposition which release CO2 to the atmosphere, yet this effect might be partially countered by drying of soil surface layers which limits respiration.9

Changes in forest disturbance regimes will likely be tightly coupled with the changes described above and may overshadow the direct physiological effects of climate change on plants and trees.10 It is reasonable to anticipate increased disturbances from wildfire, flooding, wind and storm damage, insect damage, and invasive species. Disturbance typically disrupts photosynthesis and favors respiration/decomposition processes thereby liberating CO2.

Plants will likely face increased seasonal drought stress. Higher temperatures will increase evaporative losses from soils and increase transpiration from plants. "Forests at upper (cold) and lower (dry and/or hot) timberlines are most likely to show strong direct effects of climatic variation on tree growth, since they are closer to their physiological limits and, therefore, more prone to stress at these locations."[11]

See "The Straight Facts on Forests, Carbon, and Global Warming," available

here: http://www.oregonwild.org/oregon_forests/global-warming-and-forests

10. The bull trout is an example of a species likely to be affected by climate change. I and Oregon Wild have long advocated for the conservation of bull trout and their habitat. It is now listed a s Threatened species under the Endangered Species Act. We have advocated for protection of specific areas such as the McKenzie River and tributaries of the Deschutes River that provide habitat for bull trout. I enjoy hiking near bull trout streams and observing them in nature. Bull trout are particularly vulnerable to climate change because they depend on very cold water for survival. Some bull trout populations, particularly those in southern and

[9] Hanson & Weltzin. 2000. Drought Disturbance from Climate Change: Response of United States Forests. The Science of the Total Environment 262 (2000) 205-220. http://www.usgcrp.gov/usgcrp/Library/nationalassessment/forests/forests2.pdf
[10] Flannigan, Stocks & Wotton. 2000. Climate Change and Forest Fires. The Science of the Total Environment 262 (2000) 221-229. http://www.usgcrp.gov/usgcrp/Library/nationalassessment/forests/forests5.pdf
[11] Climate Impacts Group. Climate Impacts on Pacific Northwest Forests. University of Washington. http://www.cses.washington.edu/cig/pnwc/pnwforests.shtml.

eastern Oregon, could be extirpated due to warming water temperatures unless carbon emissions are controlled as soon as possible. This will foreclose my ability to enjoy bull trout in those areas.

11. Another example — I particularly enjoy hiking in the Cummins Creek watershed and the Cummins Creek Wilderness in the Siuslaw National Forest. Oregon Wild helped to protect this area through passage of the Oregon Wilderness Act of 1984 - Public Law 98-328. I have hiked in the Cummins Creek watershed many times with friends and family. Cummins Creek offers unparalleled groves of old-growth Sitka Spruce trees that blanket a small watershed that drains directly to the Pacific Ocean. Unchecked climate change will likely increase storm damage, drought stress, and cause longer fire seasons increasing the risk that the beautiful forests of the Cummins Creek watershed will be lost to a premature and avoidable wind, fire, or insect event, thus degrading my enjoyment of affected areas. If climate change remains unchecked and sea levels rise as much as predicted, significant parts of the Cummins Creek watershed will be underwater. Beautiful Neptune Beach at the mouth of Cummins Creek is a favorite recreation destination for my family and it will certainly be underwater unless climate change is checked.

12. I plan to enjoy Cummins Creek and bull trout in the future. And I hope to continue the tradition by sharing the natural world with my family and friends.

13. If the requested waiver is not granted and EPA continues to sit on its hands and fail to regulate greenhouse gasses from cars and light trucks, then Oregon Wild and I will be directly harmed by climate change and its attendant impacts on forests, water, and wildlife.

14. If the requested waiver is granted and California and other states are allowed to regulate $CO_2$ from cars and light trucks then my interests and the interests of Oregon Wild will be advanced because state regulation of $CO_2$ is at least a step toward avoiding and mitigating climate change.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed this  2nd  day of November, 2007, in Eugene, Oregon.

*Doug Heiken*

_____
Doug Heiken

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF CALIFORNIA, by and through                    1-07-CV-2024
ARNOLD SCHWARZENEGGER, Governor of
the State of California, and CALIFORNIA AIR
RESOURCES BOARD

                    Plaintiffs,

and

WASHINGTON ENVIRONMENTAL COUNCIL
615 Second Ave., Suite 380
Seattle, WA 98104

CLIMATE SOLUTIONS
219 Legion Way SW, Ste 201
Olympia, WA 98501

ENVIRONMENT WASHINGTON
3240 Eastlake Ave E., Ste 102
Seattle, WA 98102

OREGON WILD
5825 N. Greeley Ave
Portland, Oregon 97217

3E STRATEGIES
16 NW Kansas Ave.
Bend, OR 97702

ENVIRONMENT OREGON
1536 SE 11th Avenue, Suite B
Portland, OR 97214

ANGUS DUNCAN
11334 S.W. Aventine Circus
Portland, OR 97219

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252

FRIENDS OF THE EARTH
311 California Street, Suite 510
San Francisco, CA 94104

Applicants-in-Intervention/
Plaintiffs

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and STEPHEN L.
JOHNSON, Administrator of the Environmental
Protection Agency Interior,

Defendants.

_____

**DECLARATION OF WILLIAM P. (BILL) LABORDE IN SUPPORT OF AMENDED,
CORRECTED, UNOPPOSED MOTION TO INTERVENE IN SUPPORT OF
PLAINTIFFS**

I, William P. (Bill) LaBorde, do declare as follows:

1.  I am the state director of Environment Washington and a member of the organization.

2.  Environment Washington is a statewide environmental organization that advocates for our nearly 25,000 members across the state who have an interest in protecting the state's environmental quality – its air, water and open spaces.

3.  I am a homeowner in Seattle, Washington.  I am also a skier and I plan to ski this winter and in subsequent winters in the Cascade mountains near Seattle.  I have a direct interest in our state avoiding greater impacts from severe climate change.

4.  Impacts from climate change that will likely impact my property and personal interests include higher electricity and water rates due to reduced winter snowpack; damage to my property from more severe wind and rainstorms; flooding of my property from increased precipitation; damage from rising sea levels on Puget Sound ports impacting our local economy and therefore our livelihood; and fewer opportunities to ski in the Cascade mountains.  These are all likely impacts on Washington that have been identified by the University of Washington Climate Impacts Group and by reports from the state's Department of Ecology and Department of Community, Trade and Economic Development.  I have review a number of these reports in my professional work.

3.  I am involved with our state Climate Advisory Team (CAT) stakeholder process which is working to develop a plan to reduce our state greenhouse gas emissions to 1990 levels by 2020, 25% below 1990 levels by 2035, and 50% below 1990 levels by 2050.  Department of Ecology staff working with the CAT process have already determined that our ability to reduce emissions in the transportation sector (responsible for nearly half of the state's emissions) is dependent on meeting the California GHG tailpipe standards.

4.  In my former role as a senior policy analyst for the NW Energy Coalition, I helped pass the Washington Clean Cars bill.   I testified in state House and Senate committees to the importance of adopting the California standard to reduce our state's emissions from the transportation sector.

5.  I also served on the Puget Sound Clean Air Agency climate stakeholder process throughout much of 2004. This process identified adoption of California tailpipe emission standards as the top priority for reducing emissions in the heavily populated Puget Sound region.  In addition to my work on the broad stakeholder committee, I served on the Transportation Working Group, which developed the Washington clean cars program that was submitted to the legislature.

6.  Accordingly, EPA's continued failure to issue a decision on California's waiver request harms me both (1) personally, by resulting in more severe climate change and its associated impacts on my activities and property,  and (2) professionally, by undermining my work with and the objectives of Environment Washington.  On the other hand, if EPA quickly issues its decision, then we will have moved an important step closer to mitigating climate change.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed at Seattle, WA on November 19, 2007

William P. LaBorde
Environment Washington
3240 Eastlake Ave. E. Ste 102
Seattle, WA 98102
(206) 568-2850 ext. 101

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF CALIFORNIA, by and through                1-07-CV-2024
ARNOLD SCHWARZENEGGER, Governor of
the State of California, and CALIFORNIA AIR
RESOURCES BOARD

              Plaintiffs,

and

WASHINGTON ENVIRONMENTAL COUNCIL
615 Second Ave., Suite 380
Seattle, WA 98104

CLIMATE SOLUTIONS
219 Legion Way SW, Ste 201
Olympia, WA 98501

ENVIRONMENT WASHINGTON
3240 Eastlake Ave E., Ste 102
Seattle, WA 98102

OREGON WILD
5825 N. Greeley Ave
Portland, Oregon 97217

3E STRATEGIES
16 NW Kansas Ave.
Bend, OR 97702

ENVIRONMENT OREGON
1536 SE 11th Avenue, Suite B
Portland, OR 97214

ANGUS DUNCAN
11334 S.W. Aventine Circus
Portland, OR 97219

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252

FRIENDS OF THE EARTH
311 California Street, Suite 510
San Francisco, CA 94104

Applicants-in-Intervention/
Plaintiffs

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and STEPHEN L.
JOHNSON, Administrator of the Environmental
Protection Agency Interior,

Defendants.

_____

**DECLARATION OF KASSIA R. SIEGEL
IN SUPPORT OF MOTION TO INTERVENE**

I, Kassia R. Siegel, declare as follows:

1.    The facts set forth in this declaration are based on my personal knowledge. If called as a witness in these proceedings, I could and would testify competently to these facts.

2.    I am the Director of the Center for Biological Diversity's Climate, Air, and Energy Program ("Climate Program").  I have also been a staff attorney for the Center for Biological Diversity ("Center") since December, 2000, and prior to that I was a legal fellow for the organization.  I am also a member of the organization and I rely on the Center to represent my interests in all environmental matters, including with regard to global warming.

3.    The Center is a 501(c)(3) non-profit corporation with over 35,000 members and offices in San Francisco, San Diego, Joshua Tree, and Shelter Cove California; Tucson, Arizona; Portland, Oregon; Silver City, New Mexico; and Washington, D.C.  The Center is dedicated to protecting imperiled species and their habitats by combining scientific research, public organizing, and administrative and legal advocacy.

4.    The overarching goal of the Center's Climate, Air, and Energy Program is to protect biological diversity, public health, and the environment from global warming.  In my role as Director of the Climate Program I am responsible for developing and helping to implement strategies and projects to achieve this goal.  Because the Center is a science-based advocacy organization, my work is informed by a deep immersion in the scientific literature related to global warming.  I have read scores of reports and articles relating to the detection, attribution, and impacts of global warming, and I review major new works as they become available.  I have focused in particular on the impacts of global warming on biodiversity.  As the lead author of the Center's Petition to the Secretary of the Interior to list the polar bear under the Endangered Species Act due to the melting of its sea ice habitat, I conducted a particularly thorough review of the literature relating to the impacts of global warming in the Arctic and on the polar bear.  The U.S. Fish and Wildlife Service issued a proposed decision in January, 2007 to list the polar bear as threatened in response to this petition.  I have also conducted an in depth review of the impacts of global warming on California, and on species that occur there, such as

the American pika.  I co-authored a chapter on global warming, biodiversity, and the

Endangered Species Act for an upcoming law school textbook on global warming litigation

from Cambridge University Press.   I frequently give presentations on the impact of global

warming on biodiversity at law conferences and at other venues.

5.      Based on recent scientific studies and consultation with experts, it is the Center's

position that global warming represents the most significant and pervasive threat to biodiversity

worldwide, affecting both terrestrial and marine species from the tropics to the poles, and I

believe that global warming poses an overwhelming and extraordinarily urgent threat to human

society as well.   This belief is based on my understanding of recent scientific literature on the

detection, attribution, and prediction of future impacts from climate change.  As Director of the

Center's Climate Program, it is my job and my responsibility to keep abreast of the scientific

literature and latest findings in the scientific community and to communicate recent findings to

our organizations' members.

6.      I have determined that one of the Climate Program's most important tasks is to

help bridge the gap in this country between the timely emissions reductions that scientists tell us

are essential and the current lack of action to achieve these reductions.  I believe that it is

absolutely essential that we achieve substantial and rapid greenhouse gas emissions reductions

in this country, with emissions ultimately falling to a very small fraction of current levels by

mid-century.   I have developed a number of strategies to achieve these goals.  These strategies

include the following:  (1) Ensuring compliance with existing laws in order to reduce U.S.

emissions; (2) Obtaining Endangered Species Act protection for species threatened by climate

change; (3) Educating and mobilizing the public on Climate issues; and (4) Advocating for

stringent regulation of greenhouse gas emissions from vehicles, increased fuel economy,

increased energy efficiency, and the increased use of renewable energy, and advocating against

fossil fuel production.

7.      I believe that reducing greenhouse gas emissions from cars and trucks is an

essential part of any plan to reduce greenhouse gas emissions.  The transportation sector,

including cars and trucks, accounts for about one third of the nation's overall emissions. For this reason, the Center's climate program has advocated for reduced greenhouse gas emissions from vehicles and for increased fuel economy standards. For example, the Center is currently in litigation with the National Highway Traffic Safety Administration ("NHTSA") over its failure to adequately consider global warming and greenhouse gas emissions from the vehicles regulated by its fuel economy rulemaking for light truck model years 2008-2011. Center for Biological Diversity v. National Highway Traffic Safety Administration, No. 06-71891 (9th Cir., filed Apr. 6, 2006.)

8.      In California, the transportation sector accounts for an even larger percentage of greenhouse gas emissions than the nation as a whole: nearly 41% of California's total greenhouse gas emissions in 2004.[1] The greenhouse gas emission standards that are the subject of California's waiver request will result in about a 30% reduction in these emissions by 2016. I believe that a reduction of this magnitude in emissions from California's cars and trucks is extremely significant. The Center supports the immediate issuance of a waiver so that the new standards can go into effect. On June 15, 2007, I responded to EPA's request for comment on the waiver request with a letter advocating the immediate issuance of the waiver.

9.      The EPA's failure to act on California's waiver request has prevented the implementation of California's new standards and will delay these vitally important greenhouse gas reductions. The EPA's failure to act also prevents other states which have adopted California's standards from implementing them. I am thus injured by the EPA's failure to act in a number of ways.

10.      First, I am injured because my professional goal of promoting reductions in greenhouse gas pollution to slow global warming and protect biodiversity, public health and the environment is frustrated by the EPA's failure to act. This goal cannot be fully realized while the EPA's inaction continues to impede such an important part of the overall solution, namely,

---

1      California Energy Commission, *Inventory of Greenhouse Gas Emissions and Sinks: 1990 to 2004* (2006), available at: http://www.energy.ca.gov/2006publications/CEC-600-2006-013/CEC-600-2006-013-SF.PDF.

the reduction of greenhouse gas emissions from vehicles.  The EPA's violation has the direct result of allowing current greenhouse gas emissions trends from vehicles to continue, leading us further down the path towards species extinction and climate catastrophe, and impeding virtually all of my professional goals.  I have every intention of remaining in my current position indefinitely, and therefore will continue to be injured in this way in the future.

11.     I am also injured by the EPA's failure to comply with the Clean Air Act, one of our nation's most important environmental laws, because I have a strong professional interest in the full implementation of the statue and its implementing regulations.  I cannot fully realize my professional or personal goals of full implementation of the Clean Air Act while the EPA unlawfully prevents the implementation of California's greenhouse gas emissions standards with a pocket veto.

12.     I am further harmed by the EPA's violation because the EPA is preventing the implementation of an important measure to reduce greenhouse gas emissions and therefore contributing to the continuation of existing emissions trends and dangerous anthropogenic climate change.  I care deeply about the natural world, and the health of species, their habitats, and the environment is of paramount importance in my life.  I frequently spend time in the outdoors, hiking and camping, both in California where I currently reside and in Alaska.  I have witnessed many changes in both of these places.  For example, since moving to southern California in 2001, I have experienced several unusually intense and prolonged droughts, as well as unusually intense and frequent wildfires including the Sawtooth Complex, Whispering Pines, and Covington fires in July and August, 2006 near my Joshua Tree, California property.  From my review of the scientific literature, I have concluded that these changes are due, at least in part, to global warming.  These changes harm wildlife, which distresses me, and reduce my enjoyment of the outdoors for recreation, relaxation, and observing and appreciating wildlife and natural habitat.  EPA's failure to act is allowing greenhouse gas emissions to continue to increase, further exacerbating all of these changes.

13.     I am particularly concerned about the rapid warming of the Arctic and its impact on polar bears and the entire Arctic ecosystem.  The Arctic is warming more rapidly than the rest of world as a whole, and the Arctic sea ice is rapidly melting.  The Arctic sea ice reached a shocking new record minimum extent in 2007, fully one million square miles below the average minimum sea ice extent between 1979 and 2000.  Polar bears need sea ice for all of their essential behaviors, including traveling, mating, and hunting their primary prey of ice-dependent seals.  Five of the world's polar bear populations are now classified as declining.  In Western Hudson Bay, near the southern portion of the species range, the sea ice season has shortened by approximately 3 weeks over the past several decades.  Polar bears no longer have sufficient time out on the ice to reach their optimum body weight.  The bears in this population have become thinner, and fewer cubs are surviving.  A decline of 22% between 1987 and 2004 has been recorded in the Western Hudson Bay population.

14.     In response to the Center for Biological Diversity's Petition to list the polar bear under the Endangered Species Act due to global warming, the U.S. Fish and Wildlife Service has proposed to list the polar bear as a threatened species.   The U.S. Geological Service recently released a report, conducted to inform the listing process, concluding that two thirds of the world's polar bears, including all of the bears in Western Hudson Bay, and all of the bears in Alaska, will be extinct by 2050.  This conclusion was based on modeling conducted using the Intergovernmental Panel on Climate Change's (IPCC's) A1B "business as usual" scenario in which atmospheric carbon dioxide concentrations are assumed to reach 717 parts per million by 2100.  I believe there is still time to save polar bears, but that they will become extinct if "business as usual" emissions trends continue.

15.     I am injured both personally and professionally by the EPA's failure to act on California's waiver request, because the EPA's violation is preventing implementation of a very important measure to reduce greenhouse gas emissions and get us off the "business as usual" emissions trajectory which will lead to the extinction of the polar bear and other catastrophic impacts.  If emissions are not reduced, polar bears will become extinct.  Preventing the

implementation of California's significant measures to reduce greenhouse gas emissions from vehicles will exacerbate global warming and therefore exacerbate the impacts to polar bears. Over the past two days I observed polar bears on the coast of Western Hudson Bay outside of Churchill, Manitoba, Canada. Many of the bears I observed are thinner than they would ordinarily be. In particular, mothers and cubs are suffering. In Western Hudson Bay, mother polar bears must fast while they raise their cubs during the ice-free summer and early fall, placing them under extreme energetic stress. Global warming has lengthened the ice-free season in Western Hudson Bay by approximately 3 weeks over the past several decades, making it increasingly difficult for mother polar bears to successfully rear cubs, and leading to the decline of the population. Yesterday I viewed one mother in particular that was thin and lethargic, with two cubs that were much smaller than normal ten-month old polar bear cubs, and also appeared listless and lethargic. It appears that this mother can no longer nurse her cubs because she is starving. It is unlikely that these cubs will survive. The impacts both to individual animals and the polar bear population as a whole cause me extreme distress. I am injured both personally and professionally by the decline of this species. I plan to return to Churchill, Manitoba to view polar bears again next year and in the future and am therefore likely to personally witness more extremely thin and unhealthy bears. Moreover, if greenhouse gas emissions are not reduced, polar bears will continue to decline in both numbers and body condition and become extinct in the wild. If this occurs I will no longer be able to experience the awe-inspiring spectacle of polar bears in their natural habitat. Without steps such as the implementation of California's Clean Vehicle Law by California and the other states that have adopted it, I believe the United States will not make the necessary progress in addressing global warming fast enough to prevent the loss of Arctic sea ice and the polar bear. The decline and possible extinction of the polar bear, and the fact that we are not acting fast enough in the short window to save the Arctic also distresses me both professionally and personally.

16. However, if California is allowed to implement its Clean Vehicle Law, greenhouse emissions will begin to be reduced in California and in the other states that have

adopted the law and that may adopt it in the future.  Such action may be the difference between turning greenhouse emissions in the United States around fast enough to save the polar bear, the Arctic, and many of other species in which my organization and myself have an interest.

17.     I believe that a favorable decision in this case compelling the EPA to act on California's waiver request would redress these injuries.  I believe that the EPA is legally obligated to grant the request.  Even were the EPA to deny the request, however, I and the Center would still be in a better position than we are today, as we would then be able to challenge that decision.

18.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed at Churchill, Manitoba, Canada on November 7, 2007.


 /s/ Kassia R. Siegel_____
Kassia R. Siegel

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF CALIFORNIA, by and through          1-07-CV-2024
ARNOLD SCHWARZENEGGER, Governor of
the State of California, and CALIFORNIA AIR
RESOURCES BOARD

                       Plaintiffs,

and

WASHINGTON ENVIRONMENTAL COUNCIL
615 Second Ave., Suite 380
Seattle, WA 98104

CLIMATE SOLUTIONS
219 Legion Way SW, Ste 201
Olympia, WA 98501

ENVIRONMENT WASHINGTON
3240 Eastlake Ave E., Ste 102
Seattle, WA 98102

OREGON WILD
5825 N. Greeley Ave
Portland, Oregon 97217

3E STRATEGIES
16 NW Kansas Ave.
Bend, OR 97702

ENVIRONMENT OREGON
1536 SE 11th Avenue, Suite B
Portland, OR 97214

ANGUS DUNCAN
11334 S.W. Aventine Circus
Portland, OR 97219

CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 549
Joshua Tree, CA 92252

FRIENDS OF THE EARTH
311 California Street, Suite 510
San Francisco, CA 94104

Applicants-in-Intervention/
Plaintiffs

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and STEPHEN L.
JOHNSON, Administrator of the Environmental
Protection Agency Interior,

Defendants.

_____

**[PROPOSED] ORDER ON MOTION TO INTERVENE**

This Court, having reviewed Applicants' Amended, Corrected, Unopposed Motion to

Intervene and accompanying papers, hereby GRANTS Applicants' Motion for Intervention.

IT IS SO ORDERED.

Dated this ___ day of _____ 2007.

_____
UNITED STATES DISTRICT JUDGE

1