EDMUND G. BROWN JR.
Attorney General of the State of California
MARY E. HACKENBRACHT
Senior Assistant Attorney General
ELLEN M. PETER
Supervising Deputy Attorney General
MARK POOLE
GAVIN MCCABE
JAN ZABRISKIE
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone:  (916) 322-5181
 Fax:  (916) 327-2319
 Email:  jan.zabriskie@doj.ca.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF CALIFORNIA, by and through ARNOLD SCHWARZENEGGER, GOVERNOR OF THE STATE OF CALIFORNIA, and the CALIFORNIA AIR RESOURCES BOARD,**<br><br>Plaintiff,<br><br>**COMMONWEALTH OF MASSACHUSETTS, et al.**,<br><br>Intervenor Plaintiffs,<br><br>**WASHINGTON  ENVIRONMENTAL COUNCIL, et al.**,<br><br>Intervenor Plaintiffs,<br><br>**STATE OF DELAWARE**<br><br>Intervenor Plaintiff,<br><br>and<br><br>**NATURAL RESOURCES DEFENSE COUNCIL, et al.**,<br><br>Intervenor Plaintiffs,<br><br>v.<br><br>**THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and STEPHEN L. JOHNSON, Administrator,**<br><br>Defendants. | Case No: 1:07-CV-02024-RCL<br><br><br>**PLAINTIFF STATE OF CALIFORNIA AND PLAINTIFF-INTERVENORS' MOTION FOR SUMMARY JUDGMENT**<br>**(Rule 56)** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................ 1

STATEMENT OF FACTS AND PROCEDURAL BACKGROUND .............. 4

STANDARD OF REVIEW ON SUMMARY JUDGMENT ........................... 14

ARGUMENT .................................................................................................. 15

    I.    THE COURT SHOULD GRANT CALIFORNIA'S
    PETITION BECAUSE EPA HAS EXCEEDED ITS OWN
    DEADLINE FOR PROVIDING A FINAL ACTION. ............... 15

        A.    The Court Uses A Rule Of Reason To Evaluate The
        Reasonableness Of EPA's Delay. ............................... 15

        B.    EPA Broke Its Promise To Provide California A
        "Final Determination" On California's Waiver
        Application Before The End Of 2007. ....................... 17

    II.    EPA HAS NO JUSTIFICATION FOR ITS CONTINUED
    DELAY. ...................................................................... 21

        A.    EPA's Remaining Task Of Drafting The Details Of
        Its Decision Is Not Complex. ..................................... 21

        B.    EPA Has Acknowledged That Agency Resources Were
        Devoted To Finishing The Decision Last Year And That
        California's Application Has High Priority. ................. 24

        C.    There Are Significant Adverse Impacts To California
        And The Public Interest From EPA's Continued Delay. ... 25

            1.    The Time Required to Obtain an Enforceable
            Regulation Prejudices California and the Other
            States By Delaying Greenhouse Gas Reductions. ... 26

|     | 2. | Immediate and Incremental Reductions of Greenhouse Gases Are Critical. | 28 |
|     | 3. | No Regulations Comparable to California's Currently Exist. | 30 |
| CONCLUSION | | | 32 |

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)      15

*Celotex Corp. v. Catrett,*
    477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)      14, 15

*Central Valley Chrsyler-Jeep, Inc. v. Goldstene*
    ___ F.Supp.2d ___, 2007 WL 4372878 at *18 (E.D. Cal. 2007)      29

*Cutler v. Hayes*
    818 F.2d 879 (D.C.Cir.1987)      16, 20, 21, 26, 31

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*
    508 F.Supp.2d 295  (D.Vt. 2007)      29, 30

*In re Am. Rivers & Idaho Rivers United*
    372 F.3d 413 (D.C. Cir. 2004)      15, 16

*In re International Chemical Workers Union*
    958 F.2d 1144 (D.C. Cir. 1992)      17, 21, 26

*Liberty v. Chao*
    394 F.Supp.2d 105 (D.D.C. 2005)      17, 25

*Liu v. Novak*
    509 F.Supp.2d 1 (D.D.C. 2007)      26

* *Mashpee Wampanoag Tribal Council, Inc., v. Norton*
    336 F.3d 1094 (D.C. Cir. 2003)      16, 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
    475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)      14

\* *Massachusetts v. EPA*
    \_\_\_U.S. \_\_\_, 127 S. Ct. 1438 (2007)    4, 5, 8, 11, 18, 20, 28, 29

*Motor & Equip. Mfrs. Ass'n v. EPA*
    627 F.2d 1095 (D.C. Cir. 1979)    8

*Muwekma Tribe v. Babbitt*
    130 F.Supp.2d 30 (D.D.C. 2000)    20

*Public Citizen Health Research Group v. Auchter*
    702 F.2d 1150 (D.C. Cir. 1983.)    26

*Telecommunications Research & Action Center v. FCC*
    750 F.2d 70 (D.C. Cir. 1984)    16, 17

*United Steelworkers of America v. Rubber Manufacturers Ass'n*
    783 F.2d 1117  (D.C. Cir. 1986)    17

*Waterhouse v. Dist. of Columbia*
    298 F.3d 989, 991 (D.C.Cir. 2002)    14

**Federal Statutes**

Clean Air Act section 177, 42 U.S.C
    § 7507    7, 13

Clean Air Act section  202 (a), 42 U.S.C.    8
    § 7537(a)

Clean Air Act section  209(b), 42 U.S.C.    2, 7, 18, 23
    § 7543(b)
    § 7543(b)(1)(A)-(C)    7, 8

Clean Air Act section 304(a),  42 U.S.C.    15
    § 7604(a)    8, 15

Clean Air Act section 307, 42 U.S.C.
    § 7607(b)    9

5 U.S.C.
    § 555(b)                                             15
    § 706(1)                                       15, 20

42 U.S.C.
    § 7543(b)                                      1, 7

**Federal Administrative Decisions**

49 Fed. Reg. 18887, May 3, 1984
                                                       23

71 Fed. Reg. 78190, December 28, 2006.          23

**Statutes, Regulations, and Executive Orders**

Cal. Health & Safety Code
    § 42823                                            5
    § 43018.5                                      4
    § 43018.5(b)(1)                             26

2002 Cal. Stats., Chptr. 200, (AB1493)
    § 1                                               4, 5

California Cal. Code Regs., tit. 13
    § 1961.1(a)                                  6, 7
    § 1961.1(b)                                   6
    § 1961.1(c)                                    26

\* Authorities upon which we chiefly rely are marked with an asterisk.

Plaintiff State of California, by and through Arnold Schwarzenegger, Governor of the State of California and the California Air Resources Board, (California) hereby moves for summary judgment on its complaint seeking to compel Defendants United States Environmental Protection Agency (EPA) and its Administrator, Stephen L. Johnson, to end their unreasonable delay and issue a decision on California's application for waiver of federal preemption of California's greenhouse gas regulation under 42 U.S.C. § 7543(b).  California is joined in its motion by the following plaintiff-intervenors:  States of Arizona, Connecticut, Delaware, Illinois, Maine, Maryland, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington, the Commonwealth of Massachusetts, the Commonwealth of Pennsylvania's Department of Environmental Protection, Washington Environmental Council, Climate Solutions, Environment Washington, Oregon Wild, Environment Oregon, 3E Strategies, Angus Duncan, Center for Biological Diversity, Friends of the Earth, Conservation Law Foundation, Sierra Club, Environmental Defense Fund, and Natural Resources Defense Council.

## INTRODUCTION

In an effort to reduce the escalating impacts of global warming and in the face of federal inaction, the State of California adopted greenhouse gas emission standards in 2005 for new motor vehicles sold in California starting in model-year 2009.  Soon thereafter, in December 2005, California applied to the EPA for the

waiver of preemption authorized by Clean Air Act section 209(b) that would allow California, and twelve other States, to enforce these standards.  After a two year delay, the EPA consigned the waiver request to an unprecedented legal limbo by denying the waiver request but deferring publication of a formal decision document in the Federal Register into the indefinite future.

By this stratagem, EPA has sought to defer its exposure to judicial review. While EPA has said it will issue the Federal Register document "as soon as possible," it has resisted providing California, Congress, or this Court with a date certain.  The EPA Administrator recently told Congress he "expects" to issue the remaining documents by the end of February but EPA has rebuffed California's offers to settle this case by agreeing to an enforceable deadline.  The purpose of this action is to set a judicially-enforceable date certain as soon as possible for EPA's publication of the Federal Register document.

The undisputed facts will show that EPA has unreasonably delayed in completing its decision process.  The EPA Administrator repeatedly represented that he would make a final decision by the end of 2007.  By EPA's own admission, the Administrator committed the agency resources needed to make a decision by that date.  The task of reducing the Administrator's denial to written exposition in the Federal Register is relatively simple.  There is no legitimate excuse for EPA's failure to complete the task by the end of 2007 as it had promised.

The delay prejudices California's, and the other States', timely implementation of these greenhouse gas standards, which are scheduled to take effect in the 2009 model-year; a model-year that begins with vehicles offered for sale as early as January 2008.  EPA's finalization of its decision documents is immediately required in order to allow for judicial review and EPA to act on any remand in time to preserve an orderly implementation of the states' greenhouse gas emission standards in the 2010 and later model-year vehicles.[1]

In light of EPA's foot-dragging, California, the intervenor States, and the intervenor environmental organizations respectfully request that this Court grant their motion for summary judgment and require EPA and Administrator Johnson to publish the promised written explanation within 15 days of the Court's decision.  This would reduce the risk of a prolonged EPA deferral of that written decision and continued evasion of judicial review on the merits of EPA's refusal to allow the implementation of California's greenhouse gas regulations.

---

1. California filed a petition for review in the United States Court of Appeals for the Ninth Circuit based on the December 19, 2007 announcement by the Administrator of his decision to deny the California waiver.  *State of California et al v. EPA*, Case No. 08-70011.  While California contends that the December 19 announcement was final action, California maintains this unreasonable delay action in case EPA prevails in its contention that the December 19 letter is not reviewable by the courts.

## STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

This action concerns the efforts of California (and seventeen other States) to reduce greenhouse gas emissions from automobiles. The following chronology of relevant facts shows (1) the need to protect California and the other States from climate change through the prompt implementation of incremental as well as broader regulations, (2) how the EPA has resisted regulating greenhouse gases, (3) that EPA agreed to commit the resources needed to make a waiver decision on California's regulation of greenhouse gases by the end of 2007, (4) that EPA reneged on its commitment to make what it considers to be a final judicially reviewable decision by the end of 2007, and (5) that judicial intervention is now needed to compel the EPA to produce the remaining documentation it contends is needed for a judicially reviewable waiver decision.

**_Massachusetts v. EPA._**  Near the beginning of this decade, a number of environmental groups petitioned EPA to assert its jurisdiction over carbon dioxide and other greenhouse gases by setting greenhouse gas emission standards for new motor vehicles. EPA refused, claiming (1) the Clean Air Act did not authorize it to issue mandatory regulations to address climate change, and (2) even if it had the authority to set such standards, it would not do so for a variety of "policy" reasons. _Massachusetts v. EPA_, __ U.S. __, 127 S.Ct. 1438, 1450 (2007). The Supreme Court rejected EPA's position. _Id._ at 1438. The Court determined that carbon dioxide and other greenhouse gases easily meet the Clean Air Act's definition of

"air pollutants." *Id*. at 1459-60.  The Court then rejected EPA's "laundry list" of

reasons for not exercising its discretion to regulate greenhouse gases.  *Id.* at 1462.

The Court found that EPA could avoid promulgating regulations only if it

determined that greenhouse gases do not contribute to climate change or if it

provided some reasonable explanation as to why it cannot or will not exercise its

discretion to determine whether they do.  *Id.*  EPA has yet to do so.

  **California's Adoption of Greenhouse Gas Standards.**  As the

*Massachusetts v. EPA* litigation wound its way through the courts, California

exercised its unique authority under the Clean Air Act and took action to combat

greenhouse gas emissions from new motor vehicles.  In 2002, the California

Legislature enacted legislation directing the California Air Resource Board

(CARB) to adopt a regulation for the control of greenhouse gas emissions by light-

duty motor vehicles.  2002 Cal. Stats., Chptr.  200, (AB1493), amending Cal.

Health & Safety Code § 42823 and adding § 43018.5; Undisputed Material Fact

No. 1 (UF 1).[2]  In enacting this legislation, the California Legislature made the

following findings:

   Global warming would impose on California, in particular,
   compelling and extraordinary impacts including:

---

  2.  The evidence supporting the undisputed material facts is contained in
the Request for Judicial Notice and the Declaration of Jan Zabriskie filed
contemporaneously with this motion.

(1) Potential reductions in the state's water supply due to changes in the snowpack levels in the Sierra Nevada Mountains and the timing of spring runoff.
(2) Adverse health impacts from increases in air pollution that would be caused by higher temperatures.
(3) Adverse impacts upon agriculture and food production caused by projected changes in the amount and consistency of water supplies and significant increases in pestilence outbreaks.
(4) Projected doubling of catastrophic wildfires due to faster and more intense burning associated with drying vegetation.
(5) Potential damage to the state's extensive coastline and ocean ecosystems due to the increase in storms and significant rise in sea level.
(6) Significant impacts to consumers, businesses, and the economy of the state due to increased costs of food and water, energy, insurance, and additional environmental losses and demands upon the public health infrastructure.

2002 Cal. Stats., Chptr. 200, (AB1493) § 1; UF 2.

Following scientific and engineering studies and public comment, CARB approved the greenhouse gas regulations and filed them with the California Secretary of State on September 15, 2005. UF 3. The regulations require the major manufacturers of light-duty vehicles sold in California reduce the vehicular emissions of greenhouse gases on a fleet-wide basis beginning with the 2009 model-year. Cal. Code Regs., tit.13, § 1961.1(a); UF 4. The emission standards gradually ramp down greenhouse gas emissions each model-year beginning with the 2009 model-year and carrying through the 2016 model-year. Cal. Code Regs., tit.13, § 1961.1(a). When fully implemented, California's standards will achieve a thirty percent decrease in greenhouse gas emissions from automobiles. *Id.*

Automakers can satisfy these emission limits through a combination of actions, including improving drive-train technology, using alternative fuels, earning credits for air conditioner improvements, carrying credits over from another year or portion of their fleet, and trading credits among manufacturers.  Cal. Code Regs., tit.13, § 1961.1(a)(1)(A)-(D), and 1961.1(b).

In California, greenhouse gas emissions from transportation sources represent more than forty percent of the total emissions of greenhouse gases. Twenty-eight percent of the overall emissions come from the passenger cars and light duty trucks that are subject to the California regulations.  UF 40.  As such, emissions from transportation are the single largest source of greenhouse gas emissions in the State.

**California's Waiver Application and EPA's Response.**  Following adoption of these regulations, CARB applied to EPA on December 21, 2005, for a waiver of its greenhouse regulations from federal preemption under section 209(b) of the Clean Air Act, 42 U.S.C. § 7543(b).  UF 5.  Clean Air Act section 209(b) requires EPA to waive preemption unless the EPA Administrator finds that California failed to meet one of the three criteria specified in the Act.  42 U.S.C. § 7543(b)(1)(A)-(C).[3/]

---

3.  Section 209(b) requires EPA to approve a waiver unless EPA makes one of three findings: (1) California's "determinat[ion] that the State standards will be, in the aggregate, at least as protective of public health and welfare as

(continued...)

When EPA failed to inform California of any work being done on the waiver application, Governor Schwarzenegger wrote to President Bush on April 10, 2006, to request prompt EPA action.  UF 6.  Receiving no response, Governor Schwarzenegger wrote EPA on October 24, 2006, again requesting prompt action.  UF 7, 8.  A senior EPA official finally wrote California on February 21, 2007, stating that EPA would do nothing on the waiver until the Supreme Court issued its decision in *Massachusetts v. EPA*.  UF 10.  On April 2, 2007, the Supreme Court ruled against EPA.  *Massachusetts v. EPA*, *supra,* 127 S.Ct. at 1438.

Shortly thereafter, Governor Schwarzenegger gave EPA Administrator Johnson formal notice under Clean Air Act section 304(a) of his intent to sue EPA to end the unreasonable delay in issuing the waiver decision.  UF 11.  EPA finally published a notice of hearing and solicitation of public comments on California's waiver application on April 30, 2007, 16 months after CARB submitted its application.  UF 12, 13.  EPA held hearings on May 22 and 30, 2007.  UF 14.  The noticed comment period formally expired on June 15, 2007.  UF 15.

---

3.  (...continued)
applicable Federal standards" is "arbitrary and capricious"; (2) California "does not need such State standards to meet compelling and extraordinary conditions"; or (3) "such State standards and accompanying enforcement procedures are not consistent with" Clean Air Act section 202(a) (by which EPA sets federal motor vehicle emissions standards).  42 U.S.C. § 7543(b)(1)(A)-(C); *Motor & Equip. Mfrs. Ass'n v. EPA*, 627 F.2d 1095, 1111 (D.C. Cir. 1979).  Other states can, if additional criteria are met, adopt regulations identical to California's.  42 U.S.C. § 7507.

EPA Administrator Johnson informed Governor Schwarzenegger on June 21, 2007 that he had "evaluated the volume and nature of the comments received during the public comment period" and promised that he would "make a final determination on the State's request by the end of this year."  UF 16, 17.  The Administrator further stated that the "time frame is consistent with that of earlier California requests involving fact-based technical assessments and legal analysis," and assured the Governor that a decision "by the end of this year is both responsible and expeditious."  UF 22, 23.

On July 26, 2007, the Administrator reiterated in testimony before Congress that he was "committed to issuing a decision on the waiver by the end of this year."  UF 18. Moreover, the Administrator stated that EPA was "devoting the necessary resources in order to expeditiously review. . .and respond to the waiver request."  UF 18, 20.

As reflected in prior agency decisions on California's waiver requests, the Administrator intended that his "final determination" would be a decision published in the Federal Register.  UF 19, 22, 33.

California initiated this action on November 8, 2007.  On the same date, the Administrator repeated to Congress that he would abide by his promise to make a final determination by the end of 2007.  UF 24.

EPA Administrator Johnson finally announced his decision to deny California's application in a December 19, 2007, letter to Governor

Schwarzenegger.  UF 25, 26.  The Administrator's decision was based on his

finding that "California does not have a 'need to meet compelling and

extraordinary circumstances.'" UF 27.[4/]  The Administrator stated that he had

instructed his staff to write down his "denial in more detail" and to have the

"appropriate documents" ready for his signature "as soon as possible." UF 28.

Two days later, EPA filed a brief in the D.C. Circuit stating that "[A]lthough the

Administrator's December 19 letter is not final agency action for purposes of

judicial review under section 307(b) of the Act, 42 U.S.C. § 7607(b), this case is

likely to become moot in the near future."  UF 30.  On that same day, an attorney

for EPA separately indicated that he "anticipate[s] a final decision soon."   UF 31.

That has not come to pass.

> The Administrator testified to Congress on January 24, 2008, that
>
>> [I]t was only after a thorough review of the numerous
>> arguments and material presented to the Agency and
>> developed internally within the Agency, as well as my
>> own personal consideration of this matter, that I
>> announced that I directed my staff to prepare a
>> decision document for my signature.  The final
>> decision document and federal register notice are
>> currently being prepared by Agency staff.  UF 29.

_____

4.  By resting his decision on this finding in the December 19 letter, the
Administrator is not basing his decision on an analysis of "fact-based technical
assessments" of the relevant technologies as stated in his June 21, 2007 letter to
Governor Schwarzenegger.  UF 22, 27.

The Administrator also testified that he "expect[s]" the final decision documents will be published "by the end of February." UF 34. But the agency has rebuffed attempts to settle this case with an enforceable deadline on that schedule.

More than seven weeks have now passed since the Administrator announced his decision. However, EPA has not provided the additional documentation and has refused to commit to a date certain for when those documents will be forthcoming. UF 32.

**The Impact of Climate Change on California and EPA's Awareness of Those Unique Impacts.** The harm to the public health and welfare that will be caused in the absence of reduced greenhouse gas emissions has been extensively documented and is no longer subject to meaningful dispute. *See Massachusetts v. EPA*, *supra*, 127 S. Ct. at 1455 ("The harms associated with climate change are serious and well recognized.") The harms include "a precipitate rise in sea levels by the end of the century, severe and irreversible changes to natural ecosystems, a significant reduction in water storage in winter snowpack in mountainous regions with direct and important economic consequences, and an increase in the spread of disease." *Id.* at 1456 (citations and quotation marks omitted). The "significant harms" have already started to occur. *Id.* at 1455 (citing National Research Council, Climate Change: An Analysis of Some Key Questions (2001)).

The harm to California and the other States is severe and becoming worse. For example, California's population and agricultural industry depend on water provided by an extensive water supply system that stores and transports snowmelt from the Sierra Nevada Mountains and the Colorado River Basin to much of the State. UF 37. The United Nations Intergovernmental Panel on Climate Change (IPCC) states with "high confidence" that the western United States "will suffer a decrease in water resources due to climate change." *Id.* The "[w]arming in the western mountains is projected to cause decreased snowpack, more winter flooding, and reduced summer flows, exacerbating competition for over-allocated water resources." *Id*. Thus, climate change will diminish the water resources required in California for irrigation and domestic consumption. *Id.*

Increased temperatures will also increase ozone formation, and the length and severity of debilitating heat waves in California. UF 37. As the IPCC stated, "[C]ities, that currently experience heat waves are expected to be further challenged by an increased number, intensity and duration of heatwaves during the course of the century, with potential for adverse health impacts." *Id*. The combination of earlier snowmelts and rising ambient temperatures will also extend the fire season and increase the size of large wildfires in California. *Id*.

The bad news continues. The Pacific Ocean's rising sea level and the more extreme storms caused by global warming will erode California's 1100-mile coastline, inundate low-lying coastal lands, exacerbate flooding, increase the risk

of salt water intrusion into estuaries and coastal aquifers, increase the risk of levee failures, and impair the State's system for controlling water flow in the Sacramento-San Joaquin Delta.  UF 37.  These events have already begun.  UF 36, 37.

**Under the Clean Air Act, Other States Have Adopted California's Greenhouse Gas Standards.**  Section 177 of the Clean Air Act, 42 U.S.C. § 7507, permits other States to adopt standards identical to California's Clean Air Act emission standards.  The following 17 States have adopted or are in the process of adopting the California standards established under its greenhouse regulation:  Arizona, Colorado, Connecticut, Florida, Iowa, Maine, Maryland, Massachusetts, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Utah, Vermont, and Washington.  UF 42, 43.

California and these 17 other States account for approximately 45% of the nation's new car sales and more than 45% of the nation's population.  UF 44.  The greenhouse gas regulations in 12 of these states—California, Connecticut, Maine, Maryland, Massachusetts, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont and Washington—apply to the 2009 and subsequent model-year vehicles.   New Mexico's regulations start applying in model-year 2011.  UF 42.

These States, while each having unique climates and topography, all face increasing consequences from climate change.  States on the East Coast are particularly vulnerable due to climate change from problems such as the loss of

coastal wetlands, erosion of beaches, saltwater intrusion of drinking water, and

damage to low-lying infrastructure.  UF 45.  Many mid-Atlantic and Midwestern

states are particularly susceptible to heat-related deaths and illnesses from intense

heat waves.  *Id*.  Many Western states are at risk from climate change of increased

frequency and intensity of wildfires and the disruption of water supplies.  *Id*.

Certain states, such as Vermont, are at risk from the alteration of forest character

as a result of climate change, including the loss of hardwood trees that give many

Northeastern forests their brilliant fall colors and support the maple syrup

industry.  *Id*.  While the impacts may be different in different states, there is no

denying the threat of harm from climate change.

## STANDARD OF REVIEW ON SUMMARY JUDGMENT

Summary judgment should be granted if the moving party has shown that

there are no genuine issues of material fact and that the moving party is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477

U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Waterhouse v. Dist. of*

*Columbia,* 298 F.3d 989, 991 (D.C. Cir. 2002).  In determining whether a genuine

issue of material fact exists, the Court must view all facts in the light most

favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  The

non-moving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits or other

competent evidence setting forth specific facts showing that there is a genuine

issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp., supra*, 477 U.S. at 324,

106 S.Ct. 2548.  "If the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## ARGUMENT

## I.

## THE COURT SHOULD GRANT CALIFORNIA'S PETITION BECAUSE EPA HAS EXCEEDED ITS OWN DEADLINE FOR PROVIDING A FINAL ACTION.

### A.    The Court Uses A Rule Of Reason To Evaluate The Reasonableness Of EPA's Delay.

Section 304(a) of the Clean Air Act authorizes a civil action against the

Administrator where there "is alleged a failure of the Administrator to perform any

act or duty" which is not discretionary.  42 U.S.C. § 7604(a)(2).  The

Administrative Procedure Act requires agencies to "proceed to conclude a matter

presented to it . . . within a reasonable time" and, similar to section 304 of the

Clean Air Act, authorizes actions to "compel agency action unlawfully withheld or

unreasonably delayed."  5 U.S.C. §§ 555(b), 706(1).  The U.S. Court of Appeals

for the District of Columbia Circuit (D.C. Circuit) has stated generally that "a

reasonable time for agency action is typically counted in weeks or months, not

years."  *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir.

2004). The Court has a duty to "ascertain the length of time that has elapsed since the agency came under a duty to act, and . . . evaluate any prospect of early completion." *Cutler v. Hayes,* 818 F.2d 879, 897 (D.C. Cir.1987).

A "rule of reason" governs the time limit of agency proceedings. *Mashpee Wampanoag Tribal Council, Inc., v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003). "[E]xcessive delay saps the public confidence in an agency's ability to discharge its responsibilities and creates uncertainty for the parties . . . . Moreover, unjustifiable delay may undermine the statutory scheme and could inflict harm on individuals in need of final action. In some cases, agency delay may collide with the right to judicial review." *Cutler v. Hayes*, *supra*, 818 F.2d at 896-97. The agency bears the burden of "justify[ing] its delay to the court's satisfaction. If the court determines that the agency delays in bad faith, it should conclude that the delay is unreasonable." *Id.* at 898.

While there is no bright line rule for determining how much delay is too much, the D.C. Circuit has identified a list of factors that can provide "useful guidance in assessing claims of agency delay." *Telecommunications Research & Action Center v. FCC*, (TRAC) 750 F.2d 70, 80 (D.C. Cir. 1984). These factors can include an "indication of the speed with which [Congress] expects the agency to proceed; the nature and extent of the interests prejudiced by delay, particularly in matters involving human health and welfare; and the effect of expediting delayed action on agency activities of a competing or higher priority." *Id.* The

*TRAC* Court emphasized that the time agencies take to make decisions must be governed by a rule of reason, and finally stated that a court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.  *Id.*

More recently, the D.C. Circuit stated that the issue of unreasonable delay "will depend in large part, . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Mashpee  v. Norton*, *supra*, 336 F.3d at 1102.  Application of these principal factors shows that EPA has unreasonably delayed issuing the detailed documents that it considers essential for final agency action.

**B.    EPA Broke Its Promise To Provide California A "Final Determination" On California's Waiver Application Before The End Of 2007.**

In applying the "rule of reason" an important fact is the agency's own commitments to the aggrieved party and its failure to live up to those commitments.  The D.C. Circuit has held that in these cases a "court must consider the agency's performance record and its proposed timetable for completing its work. . . . [T]he specifics of the agency's proposed timetable [are] highly relevant." *United Steelworkers of America v. Rubber Manufacturers Ass'n,* 783 F.2d 1117, 1119.  (D.C. Cir. 1986); see also, *In re International Chemical Workers Union*, 958 F.2d 1144, 1150 (D.C. Cir. 1992); *Liberty v. Chao*, 394 F.Supp.2d 105, 116 (D.D.C. 2005).  To ensure public confidence in agency decision-making, even

where an agency has the discretion to set its priorities, it is appropriate to hold an agency to its self-imposed deadlines. Accordingly, EPA should be held to its repeated commitments in this case.

More than two years ago, California applied to EPA for the waiver authorized by Clean Air Act section 209(b) in order to implement its greenhouse gas regulations. EPA refused to even begin to act on that application until the Supreme Court rejected EPA's construction of the Clean Air Act in *Massachusetts v. EPA*. UF 10. This unjustified sixteen month delay itself far exceeds the typical decision-making process for California waivers and is unreasonable.[5] Even after the Supreme Court's decision in April 2007, EPA continued to delay its action on California's waiver application, despite the repeated entreaties of Governor Schwarzenegger, other government officials and members of the public that EPA terminate its delay. UF 11, 16-18, 24-25, 28-32, 34.

With growing public outcry over EPA's inaction, EPA's Administrator promised Governor Schwarzenegger, the Governors of other States, and the United States Senate Environment and Public Works Committee that he would

---

5. Because the Administrator could have made his finding denying California's waiver request under section 209(b) – that California does not have a need to meet compelling and extraordinary conditions – entirely independently, and well in advance, of the *Massachusetts v. EPA* decision, this provides another basis for finding the initial sixteen month delay is unreasonable.

make a "final determination" on the California waiver by the end of 2007. UF 16,

18, 19. With the deadline approaching, Administrator Johnson reiterated his

promises to the House Oversight Committee on November 8, 2007. UF 24.

On December 19, 2007, EPA issued its decision to deny California's

waiver application. UF 25-26. With the ink barely dry, however, EPA sought to

avoid judicial accountability by claiming that its denial was not a "final action" for

the purposes of judicial review. UF 30-31. It is unclear what changed in the

weeks between the Administrator's testimony in November and his December

decision. EPA still has never adequately explained why it did not honor its

commitment to issue a final determination by the end of 2007. Nor has it

committed to a date certain when it will provide the "appropriate documents" that

it believes are necessary to make its decision final. UF 32, 34.[6] Instead, the

Administrator offers his "expectation" that he will sign and publish the decision

documents by the end of February. UF 34. Without some binding order,

however, this new commitment carries no more weight than the Administrator's

prior commitments to issue his final determination by the end of 2007.

_____

6. Moreover, while EPA has never before denied a waiver request, this
denial also runs counter to EPA's typical decision-making timeline on California
waivers. EPA has consistently published its decision documents in the Federal
Register within two weeks of the decision. UF 33. Despite its commitment to
decide the current waiver "expeditiously" and according it high priority, EPA
has varied from its consistent past practice without explanation.

Having waited in vain for sixteen months for the Supreme Court to endorse EPA's erroneous legal position, only then changing course and "devoting" the "necessary resources" to "expeditiously decide" the California waiver, and now having breached his promises to issue the final determination on time, Administrator Johnson's current "expectation" provides little comfort to California and the other States that have followed California's lead.  UF 5, 10, 18, 20, 25, 27-28, 30-32, 34.  Making matters worse, EPA's preferred legal strategy would force California, and the other States, to wait until the Administrator chooses to meet this "expectation" in order to challenge the merits of the waiver denial.  As this Court has held, an "ambiguous, indefinite time frame for review of the plaintiff's [application] constitutes unreasonable delay within the meaning of APA § 706(1)."  *Muwekma Tribe v. Babbitt*, 130 F.Supp.2d 30, 37 (D.D.C. 2000) [holding that a two year delay with no end in sight was unreasonable].

This is more than simple political or legal gamesmanship.  EPA's more than two year delay and the legal limbo EPA created with its novel bifurcation of the waiver decision process erodes public confidence in the ability of the EPA to satisfy its "environmental responsibilities" and to "protect the public's 'health' and 'welfare.'"  *Massachusetts v. EPA*, *supra*,  127 S.Ct. at 1462; 42 U.S.C. § 7521(a)(1); *Cutler v. Hayes*, *supra*,  818 F.2d at 896-97.  EPA's unexplained failure to honor its commitment is both irresponsible and unreasonable.

## II.

## EPA HAS NO JUSTIFICATION FOR
## ITS CONTINUED DELAY.

### A.    EPA's Remaining Task Of Drafting The Details Of
### Its Decision Is Not Complex.

EPA may claim that this particular waiver application is unusually

complex, and that this absolves its delay.  EPA, however, was fully aware of the

issues raised by and the extent of the public comments associated with California's

application when it committed to the 2007 deadline.  According to Administrator

Johnson, a "thorough review" was completed prior to the announcement of his

decision on December 19.  UF 29.  What remains is rote administrative process.

Complexity, therefore, is no excuse for EPA's delay.

Further, while the complexity of the decision facing the agency is a factor

in ascertaining reasonableness, it is not always sufficient to justify the agency's

delay.  *Cutler v. Hayes*, *supra*, 818 F.2d at 898.  An agency's "asserted

justifications for the delay become less persuasive the longer the delay continues."

*In re International Chemical Workers Union*, *supra*, 958 F.2d at 1150.

Here, based on EPA's own words, the bulk of the work has already been

done.  Administrator Johnson wrote Governor Schwarzenegger on June 21, 2007,

> Having evaluated the volume and nature of the
> comments received during the public comment period,
> I will make a final determination on the State's request
> by the end of this year.  This time frame is consistent
> with that of earlier California requests involving fact-

> based technical assessments and legal analysis. . . . The
> pending petition presents issues of similar, if not
> greater, complexity.  I believe a schedule that provides
> for a decision by the end of the year is both
> responsible and expeditious.  UF 16-17, 22-23.

Administrator Johnson then testified in July 2007 that

> We are now examining the full range of technical and
> legal issues raised by the comments.  Given the
> complexity of the issues presented in the California
> waiver request, EPA is devoting the necessary
> resources in order to expeditiously review the
> extensive comments we have received, and respond to
> the waiver request.  UF 18, 20.

Finally, following his December 19 decision, the Administrator testified

that

> [I]t was only after a <u>thorough review</u> of the numerous
> arguments and material presented to the Agency and
> developed internally within the Agency, as well as my
> own personal consideration of this matter, that I
> announced that I directed my staff to prepare a
> decision document for my signature.  The final
> decision document and federal register notice are
> currently being prepared by Agency staff.  (emphasis
> added)  UF 29.

According to the Administrator himself, EPA "thoroughly" analyzed the

issues involved in the California waiver application last year.  The "full range of

options" was presented to the Administrator sometime in fall 2007.  According to

EPA, it was only after spending a considerable amount of staff and the

Administrator's time and his own personal consideration of these options, that the

Administrator made his decision.  No explanation has been offered, however, for

why after almost seven months of analysis the Administrator did not have a formal decision document prepared by the end of 2007.

The Administrator's December 19, 2007 letter confirms that the only remaining task is the exposition of the details supporting his rationale. UF 28. In light of the now eight months that the agency has had to compile an analysis of all the available options, completion of a narrative explanation of the Administrator's decision should be little more than a ministerial act.

The scope of EPA's task is also limited. The Administrator based his denial solely on the hotly disputed conclusion that California does not need its greenhouse gas regulations to "meet compelling and extraordinary conditions," one of the criteria considered in making a waiver determination under section 209(b). UF 27. EPA has applied this criterion in many of its prior decisions, and therefore EPA already has developed a legal framework to analyze that criterion in this case. *See, e.g.*, 49 Fed. Reg. 18887, 18889-18890, May 3, 1984; 71 Fed. Reg. 78190, 78192, December 28, 2006. The Administrator himself touted the similarities of this waiver application to decisions made on two prior California waiver applications in his letter to Governor Schwarzenegger on June 21, 2007. UF 22.

Finally, as discussed above, EPA has extensive knowledge and experience regarding the impacts of global warming in California. EPA reported on these impacts, as well as the impacts on other States, more than 10 years ago. UF 37,

45.  EPA currently maintains extensive web content related to climate change.  UF 35-37.  EPA staff scientists are actively involved with the IPCC.  UF 52.  Thus, EPA's familiarity with the issues, both legal and scientific, make its delay that much less reasonable.

**B.     EPA Has Acknowledged That Agency Resources Were Devoted To Finishing The Decision Last Year And That California's Application Has High Priority.**

By July 2007, following the close of the public comment period, EPA also clearly had assigned the resources needed to draft the final documentation to support the Administrator's decision.  At that time, the Administrator reported to Congress that EPA was committing all necessary resources to the project and was performing a rigorous analysis:

> EPA is devoting the <u>necessary resources in order to expeditiously review</u> the extensive comments we have received, <u>and respond to the waiver request</u>. <u>The Agency is performing a rigorous analysis</u> in order to properly consider the legal and technical issues that we must address in making a decision under the Clean Air Act waiver criteria. In recent written correspondence with California's Governor Schwarzenegger, <u>I have committed to issuing a decision on the waiver by the end of this year</u>. We will continue to inform the Committee of our progress in this matter.  (emphasis added)  UF 18-20.

On January 24, 2008, in testimony again in front of the Senate Committee on Environment and Public Works a month after his December 19 decision, the Administrator further conceded that

> EPA has also devoted the necessary staff resources to review the extensive comments that were received and to examine the various technical and legal issues related to the full range of options available to me. Within the Agency, these issues have been considered in great detail and I requested a number of briefings and follow-up briefings and spent many hours reviewing these materials as well as the record directly. These briefings have consumed a considerable amount of staff time and many hours of my personal time and attention.   UF 20-21.

Thus, EPA's drafting delay cannot be blamed on a lack of resources or the need for new rigorous analysis.  UF 18-21.  Although courts are understandably reluctant to get involved in setting an agency's priorities, this is not such a case—the EPA Administrator himself set the priority on this task, by stating that California's application was receiving the most expeditious review and would be completed by the end of 2007.  As this Court has held in considering unreasonable delay, it is proper to give weight to the "projected timeline that the [agency] has provided."  *Liberty v. Chao*, *supra*, 394 F.Supp.2d at 116.  After committing the "necessary resources" to issue the final determination on the Administrator's timeline and conducting a "thorough review"of the issues, EPA cannot now claim the lack of resources is the cause of its continued delay.

**C.** **There Are Significant Adverse Impacts To California And The Public Interest From EPA's Continued Delay.**

Where human health and welfare are at stake, the D.C. Circuit and this Court have repeatedly compelled agency action that is unreasonably delayed.

*Public Citizen Health Research Group v. Auchter*, 702 F.2d 1150, 1158 (D.C. Cir. 1983.); *In re International Chemical Workers Union*, *supra*, 958 F.2d at 1150; *Liu v. Novak*, 509 F.Supp.2d 1 (D.D.C. 2007); *Cutler v. Hayes*, *supra*, 818 F.2d at 895, n.137.  Agency delay that jeopardizes human health and welfare is therefore scrutinized closely.

As explained below, EPA's delay has overtaken timely certification of compliance with the California greenhouse gas regulations for the 2009 model-year and threatens California's and the other affected States' ability to require certification of the 2010 models before they are offered for sale.  If EPA's delay can be promptly terminated, the States should be able to require certification in time for automakers' 2010 models to be offered for sale only after demonstrating that they meet the lower emission standards for that model-year.  Certification of the 2010 vehicle fleets before sale would ensure a reduction in the otherwise increasing rate of climate changing emissions that are already adversely impacting human health and welfare.

> 1.    **The Time Required to Obtain an Enforceable Regulation Prejudices California and the Other States By Delaying Greenhouse Gas Reductions.**

The greenhouse gas regulations require that major automakers certify that their new models meet the greenhouse gas standards on a fleet-wide basis before marketing them.  Cal. Health & Safety Code § 43018.5(b)(1); Cal Code Regs., tit. 13, § 1961.1(c).  Automakers traditionally market their new model-year vehicles

in the last half of the preceding calendar year.  They certify the new models for compliance with California's clean air regulations in the spring of the calendar year preceding the model-year.  UF 47.  Thus, model-year 2009 vehicles will be undergoing certification in the very near future, and had the waiver been granted, this certification would require the automakers to demonstrate now that they can meet the lower greenhouse gas standard in the California regulations for the 2009 model-year.  As model-year 2009 progresses in the absence of the waiver, more vehicle engine families will be certified to be sold in California, and the other States, without demonstrating their greenhouse gas levels.  Since the median time for an appeal in the United States Court of Appeals is one year, EPA's delayed denial of California's waiver allows automakers to market 2009 model-year vehicles without having to show they meet the emission standards for that model-year.  UF 50, 48-49.  As certification is the only way to ensure that manufacturers meet greenhouse gas standards up front, there is nothing preventing a manufacturer from exceeding the early model-year standards, even if doing so jeopardizes its compliance once the standards are in place.  This would postpone greenhouse gas reductions at the very moment when immediate reductions are essential if the goal of slowing, and ultimately reversing, climate change is to be attained.

However, prompt issuance of the decision documents make it more likely that, with a favorable judicial outcome on the waiver denial, California could

compel certification of the 2010 and later model-years in advance of their sales.  It would also provide certainty to the automakers on the increasingly stringent standards for later model-years they would be required to meet.

The time it will take to successfully complete judicial review and obtain EPA approval of California's waiver request on remand is not specifically known. Nevertheless, it is clear that the prospects of obtaining an orderly and timely certification of the 2010 and later model-year fleets improve the sooner the EPA issues the judicially reviewable decision documents.  The longer the EPA delays, the more difficult it becomes for California and the other States to achieve greenhouse gas reductions in the early years.  Because greenhouse gases accumulate in the atmosphere and remain there for decades, every year that passes without action increases both the risks of climate change and the costs of mitigating the harms.  UF 37-39.  Accordingly, continued delay further prejudices California's ability to reduce greenhouse gas emissions.

### 2.    Immediate and Incremental Reductions of Greenhouse Gases Are Critical.

As discussed above, specific harm from climate change has already begun in California and the other States.  See pp. 10-13, *supra*.  The Supreme Court has noted that incremental steps timely taken are important in mitigating the harm of global warming:

> Because of the enormity of the potential consequences associated with man-made climate change, the fact that

> the effectiveness of a remedy might be delayed during
> the (relatively short) time it takes for a new motor-
> vehicle fleet to replace an older one is essentially
> irrelevant. . . . A reduction in domestic emissions
> would slow the pace of global emissions increases, no
> matter what happens elsewhere.

*Massachusetts v. EPA*, *supra*, 127 S. Ct. at 1458.

The benefit of incremental reduction has been specifically noted in regard

to California's greenhouse gas standards.   In ruling against the automakers in an

action to invalidate the California standards, the United States District Court for

the Eastern District of California stated:

> Ongoing scientific research into the area of climate
> science has produced a continuous stream of analytical
> documents that, over recent time, point with increasing
> alarm to the rapidity of evolution of measurable
> changes in climate instability and evince a growing
> consensus that human-caused greenhouse gas
> emissions <u>must be curtailed more rather than less and
> sooner rather than later</u>.

*Central Valley Chrysler-Jeep, Inc. v. Goldstene*, ___ F.Supp.2d ___, 2007 WL

4372878 at *18 (E.D. Cal. 2007) (emphasis added).

The United States District Court for the District of Vermont effectively

reached the same conclusion in the automakers' action to invalidate the State of

Vermont's adoption of standards identical to the California standards.  *Green*

*Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F.Supp.2d 295 (D.Vt.

2007) (on appeal).  The Vermont District Court observed that greenhouse gas

reductions in Vermont "are scientifically important, not because of their effects

when taken alone, but because they are consistent with the rates of change necessary to avoid the most drastic consequences of global warming." *Id.* at 316. The Vermont Court also noted the need to act sooner, rather than later, stating, "it is hard to say what straw will break the camel's back in terms of tipping points"; thus, "action must be immediate." *Id.* at 313-14, 316.

Scientists emphasize the need for immediate action to begin to reverse the levels of greenhouse gas emissions. For example, on November 15, 2007, the IPCC reported that the growth in greenhouse gases would have to be reversed by 2015 in order to avoid an equilibrium global increase of 2 to 2.4 degrees Celsius from pre-industrial levels. UF 38. Just a few weeks earlier, scientists reported in the Proceedings of the National Academy of Sciences that atmospheric carbon dioxide concentrations are increasing at a greater rate than previously anticipated and are generating "stronger-than-expected climate forcing sooner than expected." UF 39.

### 3. No Regulations Comparable to California's Currently Exist.

There are no regulations currently in place in this country that will achieve the level of greenhouse gas emission reductions of the California regulations. Every passing year means that California, and the other States, must wait to enforce these regulations, preventing them from addressing the consequences of global warming. Because climate change is due to an accumulation of greenhouse

gases in the atmosphere over time, this delay means that greater reductions will need to be made in the future to prevent additional harm.  These harms will continue, even after this Court issues a decision in this case, until such time that California can get a decision on the merits of the waiver denial itself.  All California and the other States are seeking here is that EPA live up to its broken promises to issue the final decision documents so that this dispute can move to the final stage where California's right to enforce its regulations will be resolved.

Agency justifications "become less persuasive as delay progresses, and must always be balanced against the potential for harm."  *Cutler v. Hayes*, *supra*, 818 F.2d at 898.  Here, the harm from further delay outweighs any attempted justification. Accordingly, this third factor also weighs in favor of a decision requiring the EPA to immediately complete its decision documents.

## CONCLUSION

Plaintiff California and the plaintiff-intervenors respectfully ask this Court to grant their motion for summary judgment and compel EPA to live up to Administrator Johnson's commitment to make a final determination on California's waiver. Plaintiff and plaintiff-intervenors request that EPA be ordered to publish its decision documents in the Federal Register no later than fifteen days from the date of the Court's order.

Dated: February 11, 2008    Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

MARY E. HACKENBRACHT
Senior Assistant Attorney General

ELLEN M. PETER
Supervising Deputy Attorney General


/s/ Mark Poole
Mark Poole
Deputy Attorney General
Attorneys for Plaintiff State of California

/s/ Yueh-ru Chu    (authorized on 2/8/08)
FOR THE STATE OF NEW YORK
ANDREW M. CUOMO
ATTORNEY GENERAL
Katherine Kennedy
Michael Myers
Yueh-ru Chu
Assistant Attorneys General
120 Broadway, 26th Floor
New York, NY 10271
(212) 416-6588

*Lead Counsel for attorneys Representing
Plaintiff Intervenors the State of New
York, Commonwealth of Massachusetts, State
of Arizona, State of Connecticut, State of
Illinois, State of Maine, State of Maryland,
State of New Jersey, State of New Mexico,
State of Oregon, Commonwealth of
Pennsylvania Department of Environmental
Protection, State of Rhode Island, State of
Vermont, State of Washington*


/s/ Frederick D. Augenstern  (authorized on 2/8/08)
FOR THE COMMONWEALTH OF
MASSACHUSETTS
MARTHA COAKLEY
ATTORNEY GENERAL
Frederick D. Augenstern
Assistant Attorneys General
Environmental Protection Division
1 Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200

*Co-Lead Counsel for attorneys Representing
Plaintiff Intervenors the State of New York,
Commonwealth of Massachusetts, State of
Arizona, State of Connecticut, State of Illinois,
State of Maine, State of Maryland, State of New*

*Jersey, State of New Mexico, State of Oregon, Commonwealth of Pennsylvania Department of Environmental Protection, State of Rhode Island, State of Vermont, State of Washington*

/s/ Valerie Csizmadia    (authorized on 2/8/08)
Valerie Csizmadia
Deputy Attorney General
Delaware Department of Justice
102 West Water Street, 3rd Floor
Dover, Delaware 19904
(302) 739-4636

*Representing Plaintiff Intervenor State of Delaware*

/s/ Matt Kenna        (authorized on 2/8/08)
Matt Kenna (CO Bar No. CO0028)
Western Environmental Law Center
679 E. 2nd Ave., Suite 11B
Durango, CO 81301
(970) 385-6941

*Representing Plaintiff Intervenors Washington Environmental Council, Climate Solutions, Environment Washington, Oregon Wild, Environment Oregon, 3E Strategies, Angus Duncan, Center For Biological Diversity and Friends of the Earth*

*/s/*  Benjamin Longstreth (authorized on 2/8/08)
Benjamin Longstreth (D.C. Bar No. 455525)
Natural Resources Defense Counsel
1200 New York Ave., NW, Suite 400
Washington, DC 20005
(202) 289-6868

*Representing Plaintiff Intervenors the Natural Resources Defense Council, Environmental Defense Fund, Sierra Club and the Conservation Law Foundation*

EDMUND G. BROWN JR.
Attorney General of the State of California
MARY E. HACKENBRACHT
Senior Assistant Attorney General
ELLEN M. PETER
Supervising Deputy Attorney General
MARK POOLE
GAVIN MCCABE
JAN ZABRISKIE
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone:  (916) 322-5181
 Fax:  (916) 327-2319
 Email:  jan.zabriskie@doj.ca.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF CALIFORNIA, by and through ARNOLD SCHWARZENEGGER, GOVERNOR OF THE STATE OF CALIFORNIA, and the CALIFORNIA AIR RESOURCES BOARD,**<br>Plaintiff,<br><br>**COMMONWEALTH OF MASSACHUSETTS, et al.**,<br>Intervenor Plaintiffs,<br><br>**WASHINGTON  ENVIRONMENTAL COUNCIL, et al.**,<br>Intervenor Plaintiffs,<br><br>**STATE OF DELAWARE**<br>Intervenor Plaintiff,<br>and<br><br>**NATURAL RESOURCES DEFENSE COUNCIL, et al.,**<br>Intervenor Plaintiffs,<br>v.<br><br>**THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and STEPHEN L. JOHNSON, Administrator,**<br>Defendants. | Case No: 1:07-CV-02024-RCL<br><br>**PLAINTIFF STATE OF CALIFORNIA AND PLAINTIFF-INTERVENORS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

| **UNDISPUTED MATERIAL FACTS** | **EVIDENCE** |
|---|---|
| 1.  In 2002, the California Legislature required the California Air Resource Board (CARB) to develop and adopt a regulation for the control of greenhouse gas emissions by light-duty motor vehicles. | 2002 Cal. Stats., Chptr.  200, (AB1493), amending Cal. Health & Safety Code § 42823 and adding § 43018.5. |
| 2.  In enacting this legislation, the California Legislature made the following findings:<br><br>Global warming would impose on California, in particular, compelling and extraordinary impacts including:<br>(1) Potential reductions in the state's water supply due to changes in the snowpack levels in the Sierra Nevada Mountains and the timing of spring runoff.<br>(2) Adverse health impacts from increases in air pollution that would be caused by higher temperatures.<br>(3) Adverse impacts upon agriculture and food production caused by projected changes in the amount and consistency of water supplies and significant increases in pestilence outbreaks.<br>(4) Projected doubling of catastrophic wildfires due to faster and more intense burning associated with drying vegetation.<br>(5) Potential damage to the state's extensive coastline and ocean ecosystems due to the increase in storms and significant rise in sea level. | Stats.2002, c.200 (A.B.1493) § 1. |

| **UNDISPUTED MATERIAL FACTS** | **EVIDENCE** |
|---|---|
| 3.  On September 15, 2005,  CARB filed its greenhouse gas regulations with the California Secretary of State. | CARB webpage as of February 8, 2008 (last updated January 23, 2008).  Attached as Exhibit 1 to the Request for Judicial Notice filed herewith ("RJN Ex. 1"). |
| 4.  The regulations require that the major manufacturers of light-duty vehicles sold in California reduce the vehicular emissions of greenhouse gases on a fleet-wide basis beginning with the 2009 model-year.  The required reductions increase each model-year through the 2016 model-year. | Cal. Code Regs., tit.13, § 1961.1(a), (b). |
| 5.  On December 21, 2005, CARB applied to the EPA for a waiver of its greenhouse regulations from federal preemption under section 209(b) of the Clean Air Act, 42 U.S.C. § 7543(b). | CARB webpage as of February 8, 2008 (last updated January 23, 2008).  RJN Ex. 1. |
| 6.  On April 10, 2006, Governor Schwarzenegger wrote to President Bush, and copied the EPA administrator, asking for "assistance in directing the Environmental Protection Agency to grant California's waiver without further delay." | April 10, 2006 letter from Gov. Schwarzenegger to President Bush.  RJN Ex. 2. |
| 7.  The federal government did not respond to the Governor's April 10, 2006, letter. | October 24, 2006 letter from Gov. Schwarzenegger to President Bush.  RJN Ex. 3. |
| 8.  On October 24, 2006, Governor Schwarzenegger wrote the President and copied the EPA Administrator, repeating his request for prompt action on California's waiver application. | October 24, 2006 letter from Gov. Schwarzenegger to President Bush.  RJN Ex. 3. |
| 9.  On or about February 9, 2007, the EPA opened an administrative docket on California's waiver application. | EPA administrative docket EPA-HQ-OAR-2006-0173.  RJN Ex. 4. |

| **UNDISPUTED MATERIAL FACTS** | **EVIDENCE** |
| --- | --- |
| 10.  On February 21, 2007, EPA wrote ARB stating that nothing would be done on the waiver until the Supreme Court issued its decision in *Massachusetts v. EPA*. | February 21, 2007 letter from William Wehrum to Catherine Witherspoon.  RJN Ex. 5. |
| 11.  On April 25, 2007, Governor Schwarzenegger asked the EPA to issue its decision on the waiver request within 180 days in order to avoid California taking legal action for unreasonable delay under Clean Air Act Sections 304(a) and 307(b) (42 U.S.C. §§ 7604(a), 7607(b), and Administrative Procedure Act Section 706 (5 U.S.C. § 706). | April 25, 2007 letter from Gov. Schwarzenegger to EPA Administrator Johnson.  RJN Ex. 6. |
| 12.  Also in late April, EPA issued a public notice of California's waiver request, noticed a  hearing date, and solicited public comments on the request. | April 24, 2007 Notice of Opportunity for Public Hearing and Comment.  RJN Ex. 7. |
| 13.  The EPA notice was published in the Federal Register on April 30, 2007. | 72 Fed. Reg. 21260. RJN Ex.8. |
| 14.  EPA held public hearings on May 22 and 30, 2007. | 72 Fed. Reg. 21260. RJN Ex.8. 72 Fed. Reg. 26626. RJN Ex.9. |
| 15.  The noticed comment period expired on June 15, 2007. | 72 Fed. Reg. 21260. RJN Ex.8. 72 Fed. Reg. 26626. RJN Ex 9. |
| 16.  After the comment period expired, EPA's Administrator said he would issue "a final determination on the State's request by the end of the year." | June 21, 2007 letter from Administrator Johnson to Gov. Schwarzenegger.  RJN Ex. 10.<br><br>July 26, 2007 written testimony of Administrator Johnson to U.S. Senate Environment and Public Works Committee, at pp. 2-3.  RJN Ex. 11. |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| 17.  The EPA Administrator "evaluated the volume and nature of the comments received during the public comment period" before expressing his commitment to make a decision by the end of 2007. | June 21, 2007 letter from Administrator Johnson to Gov. Schwarzenegger.  RJN Ex. 10.<br><br>July 26, 2007 written testimony of Administrator Johnson to U.S. Senate Environment and Public Works Committee, at pp. 2-3.  RJN Ex. 11. |
| 18.  The EPA Administrator reiterated his commitment to decide the waiver by the end of the year in testimony before Congress. | June 21, 2007 letter from Administrator Johnson to Gov. Schwarzenegger.  RJN Ex. 10.<br><br>July 26, 2007 written testimony of Administrator Johnson to U.S. Senate Environment and Public Works Committee, at pp. 2-3.  RJN Ex. 11. |
| 19.  When the EPA Administrator wrote California's governor that he would make a "final determination" and told Congress that he "was committed to issuing a decision," the Administrator was referring to final agency action as that term is used in 42 U.S.C. § 7607(b). | June 21, 2007 letter from Administrator Johnson to Gov. Schwarzenegger.  RJN Ex. 10.<br><br>July 26, 2007 written testimony of Administrator Johnson to U.S. Senate Environment and Public Works Committee, at p.3.  RJN Ex. 11.<br><br>71 Fed Reg, 78190, 78192 (December 28, 2006) RJN Ex. 12.<br><br>71Fed.Reg. 335, 336 (January 4, 2006) RJN Ex. 13.<br><br>70 Fed.  Reg.  50322 (August 26, 2005) RJN Ex. 14. |
| 20.  The EPA had the "necessary resources in order to expeditiously review" and "respond to the waiver request" by the end of the 2007. | January 24, 2008 written  testimony of Administrator Johnson to the U.S. Senate Environment and Public Works Committee at p. 2.  RJN Ex. 15. |

| **UNDISPUTED MATERIAL FACTS** | **EVIDENCE** |
|---|---|
| 21. The EPA considered the issues in great detail and the Administrator requested a number of briefings and follow-up briefings and spent many hours reviewing these materials as well as the record directly. | January 24, 2008 written testimony of Administrator Johnson before the U.S. Senate Environment and Public Works Committee at p. 3. RJN Ex. 15. |
| 22. Issuing a final determination on California's waiver request by the end of 2007 "is consistent with that of earlier California requests involving fact-based technical assessments and legal analysis." | June 21, 2007 letter from Administrator Johnson to Gov. Schwarzenegger. RJN Ex. 10. |
| 23. Issuing a final determination on California's waiver request by the end of 2007 is "both responsible and expeditious." | June 21, 2007 letter from Administrator Johnson to Gov. Schwarzenegger. RJN Ex. 10. |
| 24. On November 8, 2007, Administrator Johnson again said that he would make a final decision on California's waiver request by the end of 2007. | Preliminary Transcript of November 8, 2007 Hearing before the U.S. House of Representatives Committee on Oversight and Government Reform, at 107:2563-2568, 102:2442-2447, 69:1633-1637, 54:1252-1260. RJN Ex. 16. |
| 25. On December 19, 2007, EPA Administrator Johnson sent a letter in which he informed the Governor of California that he had "decided that EPA will be denying the waiver." | December 19, 2007 letter from Administrator Johnson to Gov. Schwarzenegger. RJN Ex. 17. |
| 26. EPA posted on its website that, in fact, "EPA denied California's request Dec. 19, 2007." | http://www.epa.gov/otaq/ca/-waiver.htm RJN Ex. 18. |
| 27. In his letter, the Administrator explained that his decision was based on his finding "that California does not have a 'need to meet compelling and extraordinary conditions.'" | December 19, 2007 letter from Administrator Johnson to Gov. Schwarzenegger. RJN Ex. 17. |

| **UNDISPUTED MATERIAL FACTS** | **EVIDENCE** |
| --- | --- |
| 28. On or before December 19, 2007, the Administrator instructed his staff to write down his "denial in more detail" and to have the "appropriate documents" ready for his signature "as soon as possible." | December 19, 2007 letter from Administrator Johnson to Gov. Schwarzenegger. RJN Ex. 17 |
| 29. The December 19 decision came after a "thorough review" of all the material presented to the Agency and developed internally. | January 24, 2008 written testimony of Administrator Johnson before the U.S. Senate Environment and Public Works Committee at p. 5. RJN Ex. 15. |
| 30. EPA denies that EPA's December 2007 decision is "final agency action for purposes of judicial review under section 307(b) of the Act, 42 U.S.C. § 7607(b)." | Respondents' Opposition to Petitioner California's Motion to Expedite Consideration, at p. 2. (U.S. Court of Appeals for the D.C. Circuit Case No. 07-1457.) RJN Ex. 19.<br><br>January 24, 2008 written testimony of Administrator Johnson before the U.S. Senate Environment and Public Works Committee at p. 5. RJN Ex. 15. |
| 31. On December 21, 2007, the EPA represented that a final decision for purposes of judicial review would occur "in the near future." | Respondents' Opposition to Petitioner California's Motion to Expedite Consideration, at p. 2. (U.S. Court of Appeals for the D.C. Circuit Case No. 07-1457.) RJN Ex. 19.<br><br>December 21, 2007 email from Michael Horowitz, U.S. EPA, to Marc Melnick, California Dept. of Justice (attached as Exhibit A to the Zabriskie Declaration filed herewith). |

| <u>UNDISPUTED MATERIAL FACTS</u> | <u>EVIDENCE</u> |
|---|---|
| 32.  EPA refuses to provide California a date for the issuance of the "decision documents" that it contends are necessary for purposes of judicial review. | January 29, 2008 Letter from Jan Zabriskie, CA Dept. of Justice, to  Norman Rave, U.S. Dept. of Justice (attached as Exhibit B to the Zabriskie Declaration filed herewith).<br><br>December 21, 2007 email from Michael Horowitz, U.S. EPA, to Marc Melnick, California Dept. of Justice (attached as Exhibit A to the Zabriskie Declaration filed herewith). |
| 33.  The time period between EPA's last four decisions on California waiver requests and publication of those decisions in the Federal Register lasted no longer than two weeks. | 71 Fed Reg, 78190, 78192 (December 28, 2006) RJN Ex. 12;<br><br>71 Fed. Reg.  44027 (August 3, 2006) RJN Ex. 20;<br><br>71Fed. Reg.  335, 336 (January 4, 2006) RJN Ex. 13;<br><br>70 Fed. Reg.  50322 (August 26, 2005) RJN Ex. 14. |
| 34.  On January 24, 2008, the EPA Administrator testified that he expects to issue the "decision documents" by the end of February 2008. | Declaration of  Jan Zabriskie in Support of Plaintiff State of California and Plaintiff Intervenors' Motion for Summary Judgment, filed herewith, at paragraph 4. |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
| --- | --- |
| 35.  Atmospheric concentrations of greenhouse gases are increasing. | Excerpt of Intergovernmental Panel on Climate Change (IPCC) 2007 Synthesis Report:  Table SPM.6.  RJN Ex. 21.<br><br>National Academy of Sciences Publication entitled:  "Contributions to accelerating atmospheric CO2 growth from economic activity, carbon intensity, and efficiency of natural sinks" (Canadell et al., 2007). RJN Ex. 22.<br><br>EPA Website publication entitled:  Future Climate Change; http://www.epa.gov/climatechange/science/futurecc.html; RJN Ex. 23;<br><br>EPA Website publication entitled: Greenhouse Gas Emissions: emission trends and projections; http://www.epa.gov/climatechange/emissions/index.html#proj; RJN Ex. 24. |
| 36.  As the concentration of atmospheric greenhouse gases increases, climate change increases. | EPA Website Publication entitled:  Climate Change - Science: State of Knowledge; http:/epa.gov/climatechange/science/stateofknowledge.html; RJN Ex. 25. |

| **UNDISPUTED MATERIAL FACTS** | **EVIDENCE** |
|---|---|
| 37.  Scientists have established that climate change adversely affects California by, among other things, causing or contributing to an increase in ambient temperature, ground level ozone, rising sea level, more extreme storms, coastal erosion, saltwater intrusion, an increasing number, intensity and duration of heat waves, smaller snowpacks, earlier snowmelt, increasing winter flooding, increased risk of levee failures, reduced summer flows of water for irrigation and domestic consumption, increased number of large wildfires, increase in agricultural pests, and reduction in native plant and animal species. | Excerpt of IPCC 2007 Synthesis Report: Summary for Policymakers, RJN Ex. 27; <br><br> California Dept. of Water Resources report: "Progress on Incorporating Climate Change into Management of California's Water Resources" (July 2006)  RJN Ex. 28; <br><br> California Climate Change Center report: "Climate Change: Challenges and Solutions for California Agricultural Landscapes" (February 2006) RJN Ex. 29; <br><br> Science Magazine: "Model Projections of an Imminent Transition to a More Arid Climate in Southwestern North America, Science" (Seager et al.,May 25, 2007 at pp. 1181-1184), RJN Ex. 56; <br><br> National Academy of Sciences publication: "Emissions pathways, climate change, and impacts on California" at 12422 (Hayhoe et al., August 24, 2004) RJN Ex. 57; <br><br> Science Magazine: "Warming and Earlier Spring Increase Western U.S. Forest Wildfire Activity," (Westerling et al., August 18, 2006 at 940), RJN Ex. 58; <br><br> EPA Publication: "Climate Change and California" Sept. 1997;  RJN Ex. 59. |
| 38.  On November 15, 2007, the Intergovernmental Panel on Climate Change (IPCC) reported that the growth in greenhouse gases would have to be reversed by 2015 in order to avoid an equilibrium global increase of 2 to 2.4 degrees Celsius from pre-industrial levels | Excerpt of IPCC 2007 Synthesis Report: Table SPM.6.  RJN Ex. 21. |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| 39.  In late October 2007, scientists reported in the Proceedings of the National Academy of Sciences that atmospheric CO2 concentrations are increasing at a greater rate than previously anticipated and generating "stronger-than-expected climate forcing sooner than expected." | National Academy of Sciences Publication entitled:  "Contributions to accelerating atmospheric CO2 growth from economic activity, carbon intensity, and efficiency of natural sinks" (Canadell et al., 2007). RJN Ex. 22. |
| 40.  In 2004, 28% of the greenhouse gases emitted in California came from cars and light-duty trucks. | California Air Resources Board Website publication:  Draft California Greenhouse Gas Inventory - By IPCC Category; http://www.arb.ca.gov/cc/ccei/inventory/tables/rpt_inventory_ipcc_all_2007-11-19.pdf; RJN Ex. 30. |
| 41.  California's greenhouse gas regulations reduce greenhouse gas emissions beginning with the 2009 model year and further reductions are required in each subsequent model year through 2016. | Cal. Code Regs., tit.13, § 1961.1(a), (b). |
| 42.  The following twelve states have adopted California's greenhouse gas standards:  Connecticut, Maine, Maryland, Massachusetts, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont and Washington. | *See*, Conn. Agencies Regs. § 22a-174-36b (2007); 06-096-127 Me. Code R. §§ 3-4 (2007); Md. Reg. 1609 (August 31, 2007); 310 Mass. Code Regs. 7.40 (2007); N.J. Admin. Code § 7:27-29.13 (2007); N.M. Code R. §§ 20.2.88.101, 20.11.104.101 (2007); N.Y. Comp. Codes R. & Regs. tit. 6, § 218-8.3 (2007); Or. Admin. R. 340-257-0100 (2007); 25 Pa. Code § 126.411 (2007); 12-031-037 R.I. Code R. § 37.2 (2007); 158 Vt. Gov't Reg. 2 (March 2004); and Wash. Admin. Code 173-423-050 (2007). |

| **UNDISPUTED MATERIAL FACTS** | **EVIDENCE** |
|---|---|
| 43.  The following five states are in the process of adopting the California standards established under its greenhouse gas regulation:  Arizona, Colorado,  Florida, Iowa, and Utah. | Arizona Executive Order 2006-13 (September 8, 2006), RJN Ex. 31; <br><br> Colorado Climate Action Plan (November 2007) at pp. 14-15, RJN Ex. 32; <br><br> Florida Executive Order 07-127, RJN Ex. 33; <br><br> Iowa Plan for Energy Independence, RJN Ex. 34, 35; <br><br> State of  Utah Energy Efficiency Strategy, RJN Ex. 36. |
| 44.  California and these seventeen other states account for approximately 45% of the nation's new car sales and more than 45% of the nation's population. | U.S. Census Bureau - 2006 Population Estimates, RJN Ex. 37; <br><br> National Academy of Sciences,  Report on State and Federal Standards for Mobile-Source Emissions (2006), RJN Ex. 38. |

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| 45. Other States that have adopted or are considering adoption of the California Standard are also adversely affected by increasing concentrations of atmospheric greenhouse gases, including an increase in coastal erosion, damage to low-lying coastal infrastructure, increased heat waves, increased frequency and intensity of wildfires and the alteration of hardwood forests. | EPA Website Publication entitled: Global Warming - Impacts (with links to state impacts on a state-by-state basis); RJN Ex. 39; EPA Publication: "Climate Change and Connecticut," (Sept. 1997) at 3; RJN Ex. 40; EPA Publication: "Climate Change and Maryland" (Sept. 1998) at 3; RJN Ex. 41; EPA Publication: "Climate Change and Massachusetts" (Sept. 1997) at 3; RJN Ex. 42; EPA Publication: "Climate Change and New Jersey" (Sept. 1997) at 3; RJN Ex. 43; EPA Publication: "Climate Change and New York" (Sept. 1997) at 3; RJN Ex. 44; EPA Publication: "Climate Change and Rhode Island" (Sept. 1997) at 3; RJN Ex. 45; EPA Publication: "Climate Change and Pennsylvania" (Sept. 1997) at 3; RJN Ex 46; EPA Publication: "Climate Change and Arizona" (Sept. 1997) at 4; RJN Ex. 47; EPA Publication: "Climate Change and New Mexico" (Sept. 1997) at 4; RJN Ex. 48; EPA Publication: "Climate Change and Oregon", Sept. 1998, at pp. 3-4. RJN Ex. 49; EPA Publication: "Climate Change and Washington," Sept. 1997, at pp. 3-4. RJN Ex. 50; EPA Publication: "Climate Change and Vermont," Sept. 1998, at p. 4; RJN Ex. 51; EPA Publication: "Climate Change and Maine," Sept. 1998, p. 4.; RJN Ex. 52 |
| 46. Other States cannot implement their regulations to reduce automotive emissions of greenhouse gases unless the EPA grants California's waiver application. | Section 177 of the Clean Air Act, 42 U.S.C. § 7507 |
| 47. If a waiver is granted to California, the automakers will need to certify compliance with the GHG regulation in order to sell new model vehicles in California. | California Health and Safety Code section 43018.5(b)(1); Title 13, California Code of Regulations, section 1961.1(c) |

| **UNDISPUTED MATERIAL FACTS** | **EVIDENCE** |
|---|---|
| 48.  Automakers typically begin certification procedures for new model vehicles under California's existing clean air regulations in the spring of the preceding calendar year. For example, certification of 2008 model year vehicles began in the spring of 2007. | California Air Resources Board 2008 Executive Orders regarding Passenger Car, Light Duty Truck, and Medium Duty Vehicle Executive Orders; RJN Ex. 53. |
| 49.  These certification procedures occur mostly in the summer and fall of the calendar year that precedes the model year. | California Air Resources Board 2008 Executive Orders regarding Passenger Car, Light Duty Truck, and Medium Duty Vehicle Executive Orders; RJN Ex. 53. |
| 50.  The median time from filing a notice of appeal to disposition of the appeal in the United States Court of Appeals had increased to one year by 2006. | U.S. Courts Website Publication:  U.S. Court of Appeals: Judicial Caseload Profiles; RJN Ex. 54 |
| 51.  In a complaint filed against CARB's executive officer in the United States District Court for the Eastern District of California, automakers alleged that "it is essential for manufacturers subject to the rules like the AB 1493 Regulations to obtain approval of their vehicle models well before the relevant model-year begins." | First Amended Complaint For Declaratory and Injunctive Relief, *Central Valley Chrysler-Jeep, Inc., v. Witherspoon*, United States District Court for the Eastern District of California, Case No. 1:04-cv-06663-AWI at  p. 34:3-4.  RJN Ex. 55 |
| 52.  The Administrator has indicated that climate change is a "serious concern" and that he is "very proud" of the "capable and competent" EPA scientists who are part of the Intergovernmental Panel on Climate Change. | Preliminary Transcript of November 8, 2007 Hearing before the U.S. House of Representatives Committee on Oversight and Government Reform, at 34:760-768. RJN Ex. 16. |

Dated: February 11, 2008   Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

MARY E. HACKENBRACHT
Senior Assistant Attorney General

ELLEN M. PETER
Supervising Deputy Attorney General


/s/ Mark Poole_____
Mark Poole
Deputy Attorney General
Attorneys for Plaintiff State of California


/s/  Yueh-ru Chu     (authorized on 2/08/08)
FOR THE STATE OF NEW YORK
ANDREW M. CUOMO
ATTORNEY GENERAL
Katherine Kennedy
Michael Myers
Yueh-ru Chu
Assistant Attorneys General
120 Broadway, 26th Floor
New York, NY 10271
(212) 416-6588

*Lead Counsel for attorneys Representing Plaintiff
Intervenors the State of New York, Commonwealth
of Massachusetts, State of Arizona, State of
Connecticut, State of Illinois, State of Maine, State of
Maryland, State of New Jersey, State of New Mexico,
State of Oregon, Commonwealth of Pennsylvania
Department of Environmental Protection, State of
Rhode Island, State of Vermont, State of Washington*

/s/ Frederick D. Augenstern    (authorized on 2/08/08)
FOR THE COMMONWEALTH OF
MASSACHUSETTS
MARTHA COAKLEY
ATTORNEY GENERAL
Frederick D. Augenstern
Assistant Attorneys General
Environmental Protection Division
1 Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200

*Co-Lead Counsel for attorneys Representing
Plaintiff Intervenors the State of New York,
Commonwealth of Massachusetts, State of Arizona,
State of Connecticut, State of Illinois, State of Maine,
State of Maryland, State of New Jersey, State of New
Mexico, State of Oregon, Commonwealth of
Pennsylvania Department of Environmental
Protection, State of Rhode Island, State of Vermont,
State of Washington*

/s/ Valerie Csizmadia      (authorized on 2/08/08)
Valerie Csizmadia
Deputy Attorney General
Delaware Department of Justice
102 West Water Street, 3rd Floor
Dover, Delaware 19904
(302) 739-4636

*Representing Plaintiff Intervenor State of Delaware*

/s/ Matt Kenna      (authorized on 2/08/08)
Matt Kenna (CO Bar No. CO0028)
Western Environmental Law Center
679 E. 2nd Ave., Suite 11B
Durango, CO 81301
(970) 385-6941

*Representing Plaintiff Intervenors Washington
Environmental Council, Climate Solutions,
Environment Washington, Oregon Wild,
Environment Oregon, 3E Strategies, Angus Duncan,
Center For Biological Diversity and Friends of the
Earth*

/s/ Benjamin Longstreth  (authorized on 2/08/08)
Benjamin Longstreth (D.C. Bar No. 455525)
Natural Resources Defense Counsel
1200 New York Ave., NW, Suite 400
Washington, DC 20005
(202) 289-6868

*Representing Plaintiff Intervenors the Natural
Resources Defense Council, Environmental Defense
Fund, Sierra Club and the Conservation Law
Foundation*

EDMUND G. BROWN JR.
Attorney General of the State of California
MARY E. HACKENBRACHT
Senior Assistant Attorney General
ELLEN M. PETER
Supervising Deputy Attorney General
MARK POOLE
GAVIN MCCABE
JAN ZABRISKIE
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone:  (916) 322-5181
 Fax:  (916) 327-2319
 Email:  jan.zabriskie@doj.ca.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF CALIFORNIA, by and through ARNOLD SCHWARZENEGGER, GOVERNOR OF THE STATE OF CALIFORNIA, and the CALIFORNIA AIR RESOURCES BOARD,**<br><br>Plaintiff,<br><br>**COMMONWEALTH OF MASSACHUSETTS, et al.,**<br><br>Intervenor Plaintiffs,<br><br>**WASHINGTON  ENVIRONMENTAL COUNCIL, et al.,**<br><br>Intervenor Plaintiffs,<br><br>**STATE OF DELAWARE**<br><br>Intervenor Plaintiff,<br><br>and<br><br>**NATURAL RESOURCES DEFENSE COUNCIL, et al.,**<br><br>Intervenor Plaintiffs,<br><br>v.<br><br>**THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and STEPHEN L. JOHNSON, Administrator,**<br><br>Defendants. | Case No: 1:07-CV-02024-RCL<br><br><br>**DECLARATION OF JAN ZABRISKIE IN SUPPORT OF PLAINTIFF STATE OF CALIFORNIA AND PLAINTIFF-INTERVENORS' MOTION FOR SUMMARY JUDGMENT** |

I, Jan Zabriskie, declare:

1.      I am a Deputy Attorney General for the State of California and licensed to practice before all courts of this State. I am certified to appear in the United States District Court for the District of Columbia by virtue of Local Civil Rule 83.2(f). I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify thereto.

2.      Attached hereto as Exhibit A is a true and correct copy of an email I received on December 21, 2007, from Michael Horowitz, Attorney Advisor for the Office of General Counsel in the Air and Radiation Law Office of the U.S. Environmental Protection Agency (EPA).

3.      Attached hereto as Exhibit B is a true and correct copy of my January 29, 2008, letter to Norman L. Rave, Jr., counsel for EPA in this action.

4.      On January 24, 2008, I listened to and watched, via webcast, Stephen L. Johnson, Administrator for the United States Environmental Protection Agency testify before the United States Senate Committee on the Environment and Public Works. During the course of that hearing, Mr. Johnson testified that he expects to have the remaining decision documents for California's waiver request "by the end of February" 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 8, 2008,                    _____/s/ Jan Zabriskie_____

at Sacramento, California

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Declaration of Jan Zabriskie in Support of
Plaintiff California and Plaintiff-Intervenors'
Motion for Summary Judgment

# EXHIBIT A

**From:**        &lt;horowitz.michael@epamail.epa.gov&gt;
**To:**          Marc Melnick &lt;Marc.Melnick@doj.ca.gov&gt;
**Date:**        12/21/2007 9:28:04 AM
**Subject:**     Re: California waiver denial * EPA-HQ-OAR-2006-0173 * decision
documents

Marc,

    The process for finalizing the decision is underway and we
anticipate a final decision soon.  However, at this point, we don't have
a date for  completing the process.

Michael.


_____
Michael Horowitz
Attorney Advisor
Office of General Counsel
Air and Radiation Law Office
U.S. Environmental Protection Agency




              "Marc Melnick"
              &lt;Marc.Melnick@do
              j.ca.gov&gt;                                              To
                                   Michael Horowitz/DC/USEPA/US@EPA
              12/20/2007 06:28                                       cc
              PM                   "Aron Livingston"
                                   &lt;dlivings@arb.ca.gov&gt;, "Ellen
                                   Peter" &lt;Ellen.Peter@doj.ca.gov&gt;,
                                   "Jan Zabriskie"
                                   &lt;Jan.Zabriskie@doj.ca.gov&gt;, David
                                   Dickinson/DC/USEPA/US@EPA,
                                   &lt;Norman.rave@usdoj.gov&gt;
                                                                Subject
                                   Re: California waiver denial *
                                   EPA-HQ-OAR-2006-0173 * decision
                                   documents










Thank you, Michael.  Is there anything you can tell me about when EPA
estimates that these additional documents will be prepared and released?

Marc

>>> <horowitz.michael@epamail.epa.gov> 12/20/2007 9:58 AM >>>
Mr. Melnick;

        I have attached Administrator Johnson's letter to Governor
Schwarzenegger.  As the letter indicates, EPA will be denying the
request for a waiver and appropriate documents setting forth the
rationale for this denial will be available at that time.  (See attached
file: Letter to Governor.pdf)
_____
Michael Horowitz
Attorney Advisor
Office of General Counsel
Air and Radiation Law Office
U.S. Environmental Protection Agency


              "Marc Melnick"
              <Marc.Melnick@do
              j.ca.gov>                                              To
                                  Michael Horowitz/DC/USEPA/US@EPA
              12/19/2007 08:09                                      cc
              PM                "Aron Livingston"
                                <dlivings@arb.ca.gov>, "Ellen
                                Peter" <Ellen.Peter@doj.ca.gov>,
                                "Jan Zabriskie"
                                <Jan.Zabriskie@doj.ca.gov>, David
                                Dickinson/DC/USEPA/US@EPA,
                                <Norman.rave@usdoj.gov>
                                                               Subject
                                California waiver denial *
                                EPA-HQ-OAR-2006-0173 * decision
                                documents




Michael —

This afternoon, Administrator Johnson announced the denial of the waiver
for California's greenhouse gas emission standards.  Given the briefing
schedule in the unreasonable delay case in the U.S. Court of Appeals,
please immediately forward to us the decision document(s) for the waiver
denial.  We expect to see them in our email inboxes when we get here in
the morning.  Thank you.

Marc N. Melnick
Deputy Attorney General
California Attorney General's Office
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA  94612-1413
510/622-2133
fax 510/622-2270
marc.melnick@doj.ca.gov

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**CC:**        <Dickinson.David@epamail.epa.gov>, Aron Livingston <dlivings@arb.ca.gov>, Ellen Peter <Ellen.Peter@doj.ca.gov>, Jan Zabriskie <Jan.Zabriskie@doj.ca.gov>, <Norman.rave@usdoj.gov>

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Declaration of Jan Zabriskie in Support of
Plaintiff California and Plaintiff-Intervenors'
Motion for Summary Judgment

# EXHIBIT B



*EDMUND G. BROWN JR.*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Telephone: (916) 322-5181
Facsimile:(916) 327-2319
E-Mail: Jan.Zabriskie@doj.ca.gov

*via email and regular mail*

January 29, 2008

Norman L.  Rave, Jr., Esq.
U.S. Department of Justice
Environmental Defense Section
P.O. Box 23986
Washington, D.C. 20026-3986

RE:    *State of California v. United States Environmental Protection Agency, et al.,*
        U. S. Court of Appeals for the District of Columbia Circuit, Case No.  07-1457
        U. S. District Court for the District of Columbia, Case No.  1:07-CV-020240-RCL

Dear Norman:

        As we discussed yesterday on the telephone, the Administrator for the Environmental
Protection Agency, Stephen L.  Johnson, testified on January 24 before the United States Senate
Committee on the Environment and Public Works regarding California's request for waiver of
federal preemption of its Regulation to Control Greenhouse Gas Emissions from Motor Vehicles
under 42 U.S.C. § 7543(b).  In the course of his testimony, Mr.  Johnson said that he expects to
issue the detailed decision documents on EPA's denial of California's request by the end of
February.

        In light of the Administrator's statement on Thursday, our office proposed yesterday that
the parties to the two unreasonable delay cases enter into a stipulation that EPA would publish its
decision in the Federal Register by a date certain.  You indicated the proposal would require the
stipulation to be immediately lodged with both courts and then the settlement published for
comment.  We originally made a similar proposal for an enforceable decision date to EPA in
October before California filed suit.  This offer was reiterated to you in my letters of November
15 and November 29, 2007, after California filed suit.

        As you know, the Administrator made his decision on December 19, 2007, but the legal
effect of that decision remains in dispute.  With his testimony on Thursday to the Senate
Committee, the Administrator appears ready to make that dispute moot.  Consistent with these
events, California is willing to suspend the litigation on the two unreasonable delay cases during
this interim period if EPA will enter into a stipulation for a date certain and initiate the process to
obtain a court order.  We are also willing to stipulate to a compliance date that allows EPA extra

Norman L. Rave, Jr.
January 29, 2008
Page 2

time, for example, until March 17, 2008, to allow the time for publication in the Federal Register. You indicated yesterday that you would let EPA know about our proposal, and this letter confirms the details. Please let me know if the EPA is interested in such a stipulation or if it wishes to propose and alternate publication date. Although this proposal is subject to the intervenors' agreement, I expect they will agree.

Sincerely,

JAN ZABRISKIE
Deputy Attorney General

For    EDMUND G. BROWN JR.
Attorney General

JZ:

30382785_2.wpd

EDMUND G. BROWN JR.
Attorney General of the State of California
MARY E. HACKENBRACHT
Senior Assistant Attorney General
ELLEN M. PETER
Supervising Deputy Attorney General
MARK POOLE
GAVIN MCCABE
JAN ZABRISKIE
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone:  (916) 322-5181
 Fax:  (916) 327-2319
 Email:  jan.zabriskie@doj.ca.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF CALIFORNIA, by and through ARNOLD SCHWARZENEGGER, GOVERNOR OF THE STATE OF CALIFORNIA, and the CALIFORNIA AIR RESOURCES BOARD,**<br><br>Plaintiff,<br><br>**COMMONWEALTH OF MASSACHUSETTS, et al.,**<br><br>Intervenor Plaintiffs,<br><br>**WASHINGTON  ENVIRONMENTAL COUNCIL, et al.,**<br><br>Intervenor Plaintiffs,<br><br>**STATE OF DELAWARE**<br><br>Intervenor Plaintiff,<br><br>and<br><br>**NATURAL RESOURCES DEFENSE COUNCIL, et al.,**<br><br>Intervenor Plaintiffs,<br><br>v.<br><br>**THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and STEPHEN L. JOHNSON, Administrator,**<br><br>Defendants. | Case No: 1:07-CV-02024-RCL<br><br>**PLAINTIFF STATE OF CALIFORNIA AND PLAINTIFF-INTERVENORS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Plaintiff State of California and Plaintiff-Intervenors request that this Court take judicial notice of the following documents, copies of which are attached hereto, pursuant to Federal Rules of Evidence, Rule 201.

1.      Exhibit 1 - California Air Resources Board ("CARB") Website as of February 8, 2008 (last updated January 23, 2008):  Climate Change Program for Mobile Sources, p. 2; located at http://www.arb.ca.gov/cc/ccms/ccms.htm.

2.      Exhibit 2 - April 10, 2006, letter from Governor Schwarzenegger to President Bush, with cc: to US EPA Administrator Johnson.

3.      Exhibit 3 -  October 24, 2006, letter from Governor Schwarzenegger to President Bush, with cc: to US EPA Administrator Johnson.

4.      Exhibit 4 - US EPA memorandum noting that the administrative docket on California's waiver request was opened for public access under Docket No. EPA-HQ-OAR-2006-0173.

5.      Exhibit 5 - February 21, 2007, letter from William Wehrum, US EPA Acting Assistant Administrator,  to Catherine Witherspoon, CARB Executive Officer;  EPA Docket No. EPA-HQ-OAR-2006-0173-0002.

6.      Exhibit 6 - April 25, 2007, letter from Governor Schwarzenegger to US EPA Administrator Johnson.

7.      Exhibit 7 - April 24, 2007, prepublication Notice of Opportunity for Public Hearing and Comment, signed by William Wehrum, US EPA Acting Assistant Administrator.

8.      Exhibit 8 - US EPA Federal Register Notice entitled:  "California State Motor Vehicle Pollution Control Standards; Request for Waiver of Federal Preemption; Opportunity for Public Hearing."  72 Fed. Reg. 21260 (April 30, 2007).

9.      Exhibit 9 - US EPA Federal Register Notice announcing additional hearing and hearing locations, entitled:  "California State Motor Vehicle Pollution Control Standards; Request for Waiver of Federal Preemption; Opportunity for Public Hearing.  72 Fed. Reg. 26626 (May 10, 2007).

10.     Exhibit 10 - June 21, 2007, letter from US EPA Administrator Johnson to Governor Schwarzenegger.

11.     Exhibit 11 - Excerpts from the testimony of US EPA Administrator Johnson before the U.S. Senate Committee on Environment & Public Works, July 26, 2007; located at:  http://epa.gov/ocir/hearings/testimony/110_2007_2008/2007_0726_slj.pdf.

12.     Exhibit 12 - US EPA Federal Register Notice entitled:  "California State Motor Vehicle Pollution Control Standards; Notice of Within-the-Scope Determination for Amendments To California's Zero-Emission Vehicle (ZEV) Standards and Notice of Waiver of Federal Preemption Decision for Other ZEV standards;" 71 Fed Reg, 78190, 78192 (December 28, 2006).

13.     Exhibit 13 - US EPA Federal Register Notice entitled:  "California State Motor Vehicle Pollution Control Standards; Waivers of Federal Preemption; Notice of Decision;" 71 Fed. Reg. 335, 336 (January 4, 2006).

14.     Exhibit 14 - US EPA Federal Register Notice entitled:  "California State Motor

Vehicle Pollution Control Standards; Waiver of Federal Preemption; Notice of

Decision;"  70 Fed. Reg. 50322 (August 26, 2005).

15.     Exhibit 15 - January 24, 2008, written testimony of US EPA Administrator

Johnson to the United States Senate Environment and Public Works Committee, at pp. 3

and 5; http://www.epa.gov/ocir/hearings/testimony/110_2007_2008/2008_0124_slj.pdf.

16.     Exhibit 16 - Excerpts from preliminary transcript of November 8, 2007, Hearing

held by the U.S. House of Representatives Committee on Oversight and Government

Reform, at 107:2563-2568, 102:2442-2447, 69:1633-1637, 54:1252-1260, 34:760-768;

http://oversight.house.gov/story.asp?ID=1599.

17.     Exhibit 17 - December 19, 2007, letter from US EPA Administrator Johnson to

Governor Schwarzenegger; EPA Docket No. EPA-HQ-OAR-2006-0173-4702.

18.     Exhibit 18 - US EPA Website Publication entitled:  "California Greenhouse-Gas

Waiver Decision;" located at http://www.epa.gov/OMS/ca-waiver.htm; as of February 7,

2008.

19.     Exhibit 19 - Respondents' Opposition to Petitioner California's Motion to

Expedite Consideration. (United States Court of Appeals for the District of Columbia

Circuit Case No. 07-1457.)

20.     Exhibit 20 - US EPA Federal Register Notice entitled:  "California State Motor

Vehicle Pollution Control Standards; Waiver of Federal Preemption for Amendments

to California's Exhaust Emission Standards and Test Procedures for On-Road

Motorcycles and Motorcycle Engines; Notice of Decision;" 71 Fed. Reg. 44027 (August

3, 2006).

21.    Exhibit 21 - Intergovernmental Panel on Climate Change ("IPCC") - Excerpt of

2007 Synthesis Report:  Table SPM.6.

22.    Exhibit 22 - National Academy of Sciences report entitled:  "Contributions to

accelerating atmospheric CO2 growth from economic activity, carbon intensity, and

efficiency of natural sinks" (Canadell et al., 2007).

23.    Exhibit 23 - US EPA Website publication:  Climate Change - Science: Future

Climate Change; http://www.epa.gov/climatechange/science/futurecc.html; as of

February 7, 2008.

24.    Exhibit 24  - US EPA Website publication:  Climate Change - Greenhouse Gas

Emissions: emission trends and projections;

http://www.epa.gov/climatechange/emissions/index.html; as of February 7, 2008.

25.    Exhibit 25 -  US EPA Website publication: Climate Change - Science: State of

Knowledge; http:/epa.gov/climatechange/science/stateof knowledge.html; as of February

7, 2008.

26.    Exhibit 26 -US EPA Website publication:  Climate Change - Science:

Atmosphere Changes; http://www.epa.gov/climatechange/science/recentac.html; as of

February 7, 2008.

27.     Exhibit 27-  Excerpt of IPCC 2007 Synthesis Report:  Summary for

Policymakers; located at:

http://www.ipcc.ch/pdf/assessment-report/ar4/syr/ar4_syr_spm.pdf.

28.     Exhibit 28 - California Department of Water Resources report:  "Progress on

Incorporating Climate Change into Management of California's Water Resources;" (July

2006).

29.     Exhibit 29 - California Climate Change Center, Climate Change report:

"Challenges and Solutions for California Agricultural Landscapes;" (February 2006).

30.     Exhibit 30 - CARB Website publication:  Draft California Greenhouse Gas

Inventory - by IPCC Category; located at:

http://www.arb.ca.gov/cc/inventory/data/tables/rpt_Inventory_IPCC_All_2007-11-19.pdf

; as of February 7, 2008.

31.     Exhibit 31 - State of Arizona Executive Order 2006-13, Climate Change Action,

(September 7, 2006); located at:

http://www.governor.state.az.us/dms/upload/EO_2006-13_090806.pdf

32.     Exhibit 32 - State of Colorado Climate Action Plan, pp. 14-15, (November 2007);

located at:  http://www.pewclimate.org/docUploads/COClimatePlan.pdf.

33.     Exhibit 33 -  State of Florida Executive Order 07-12:  Establishing Immediate

Actions to Reduce Greenhouse gas Emissions Within Florida (July 13, 2007); located at

http://www.flgov.com/pdfs/orders/07-127-emissions.pdf.

34.      Exhibit 34 - Iowa Office of Energy Independence, Iowa Plan for Energy

Independence (December 2007); http://www.energy.iowa.gov/OEI/docs/Final_Plan.pdf,

as of February 7, 2008.

35.      Exhibit 35 - December 14, 2007 News Release from Iowa Governor Chet Culver

entitled:  "Office of Energy Independence Releases Iowa's 'Plan for Energy

Independence.'  http://www.governor.iowa.gov/news/2007/12/14_1.php; as of February

7, 2008.

36.      Exhibit 36 - News Release from Utah Governor Jon Huntsman, Jr., entitled:

"Utah Energy Efficiency Strategy Released to Governor and Utah Lawmakers";

http://www.utah.gov/governor/news/2007/news_10_16_07.html.

37.      Exhibit 37  -  U.S. Census Bureau publication regarding 2006 Population

Estimates for the 50 Sates and Puerto Rico; located at:

http://factfinder.census.gov/servlet/GCTTable?_bm=y&-_box_head_nbr=GCT-T1-R&-d

s_name=PEP_2006_EST&-_lang=en&-format=US-9S.

38.      Exhibit 38 -  National Research Council, Committee on State Practices in Setting

Mobile Source Emissions Standards:  excerpt of report entitled "State and Federal

Standards for Mobile-Source Emissions"  published by National Academy of Sciences

(2006).

39.      Exhibit 39 - US EPA Website Publication:  Global Warming - Impacts (with links

to impacts on a state-by-state basis);

 http://yosemite.epa.gov/OAR/globalwarming.nsf/content.html; as of February 8, 2008.

40.     Exhibit 40  -  US EPA Publication No. EPA 230-F-97-008g:  Climate Change and Connecticut (Sept. 1997, at p. 3).

41.     Exhibit 41 -  US EPA Publication No. EPA 236-F-98-007l:  Climate Change and Maryland (Sept. 1998, at p. 3).

42.     Exhibit 42 -  US EPA Publication No. EPA 230-F-97-008u:  Climate Change and Massachusetts (Sept. 1997, at p. 3).

43.     Exhibit 43 -  US EPA Publication No. EPA 230-F-97-008dd:  Climate Change and New Jersey (Sept.1997, at p. 3).

44.     Exhibit 44 -  US EPA Publication No. EPA 230-F-97-008ff:  Climate Change and New York (Sept. 1997, at p. 3).

45.     Exhibit 45 -  US EPA Publication No. EPA 236-F-98-007v:  Climate Change and Rhode Island (Sept. 1998, at p. 3).

46.     Exhibit 46 -  US EPA Publication No. EPA 230-F-97-008ll: Climate Change and Pennsylvania (Sept. 1997,  at p. 3).

47.     Exhibit 47 -  US EPA Publication No. EPA 236-F-98-007c:  Climate Change and Arizona (Sept. 1998, at p. 4).

48.     Exhibit 48 -  US EPA Publication No. EPA 236-F-98-007p:  Climate Change and New Mexico (Sept. 1998, at p. 4).

49.     Exhibit 49 -  US EPA Publication No. EPA 236-F-98-007u:  Climate Change and Oregon (Sept. 1998, at pp. 3-4).

50.     Exhibit 50 -  US EPA Publication No. EPA 230-F-97-008uu:  Climate Change and Washington (Sept. 1997, at pp. 3-4).

51.     Exhibit 51 - US EPA Publication No. EPA 236-F-98-007aa:  Climate Change

and Vermont (Sept. 1998, at p. 4).

52.     Exhibit 52 -  US EPA Publication No. EPA 236-F-98-007k:  Climate Change and

Maine (Sept. 1998, at p. 4).

53.     Exhibit 53 -  CARBoard 2008 Executive Orders regarding Passenger Car, Light

Duty Truck, and Medium Duty Vehicle Executive Orders; located at

http://www.arb.ca.gov/msprog/onroad/cert/pcldtmdv/2008/2008.php?so=4; as of

February 7, 2008.

54.     Exhibit 54 -  United States Courts Website Publication:  "U.S. Court of Appeals:

Judicial Caseload Profiles;" located at http://www.uscourts.gov/cgi-bin/cmsa2006.pl; as

of February 7, 2008.

55.     Exhibit 55 -  Excerpts from First Amended Complaint For Declaratory and

Injunctive Relief, *Central Valley Chrysler-Jeep, Inc., v. Witherspoon*, United States

District Court for the Eastern District of California, Case No. 1:04-cv-06663-AWI at  p.

34:3-4.

56.     Exhibit 56 - Science Magazine: "Model Projections of an Imminent Transition to

a More Arid Climate in Southwestern North America, Science" (Seager et al.,May 25,

2007 at pp. 1181-1184).

57.     Exhibit 57 - National Academy of Sciences publication:  "Emissions pathways,

climate change, and impacts on California" at 12422 (Hayhoe et al., August 24, 2004).

58.     Exhibit 58 - Science Magazine: "Warming and Earlier Spring Increase Western

U.S. Forest Wildfire Activity," (Westerling et al., August 18, 2006, at 940).

59.    Exhibit 59 - US EPA Publication No. EPA 230-F-97-008e:  Climate Change and

California, (Sept. 1997 at p. 2).

Dated: February 11, 2008   Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

MARY E. HACKENBRACHT
Senior Assistant Attorney General

ELLEN M. PETER
Supervising Deputy Attorney General


/s/ Mark Poole
Mark Poole
Deputy Attorney General
Attorneys for Plaintiff State of California


/s/  Yueh-ru Chu     (authorized on 2/08/08)
FOR THE STATE OF NEW YORK
ANDREW M. CUOMO
ATTORNEY GENERAL
Katherine Kennedy
Michael Myers
Yueh-ru Chu
Assistant Attorneys General
120 Broadway, 26th Floor
New York, NY 10271
(212) 416-6588

*Lead Counsel for attorneys Representing Plaintiff
Intervenors the State of New York, Commonwealth
of Massachusetts, State of Arizona, State of
Connecticut, State of Illinois, State of Maine, State of
Maryland, State of New Jersey, State of New Mexico,
State of Oregon, Commonwealth of Pennsylvania
Department of Environmental Protection, State of
Rhode Island, State of Vermont, State of Washington*

/s/ Frederick D. Augenstern    (authorized on 2/08/08)
FOR THE COMMONWEALTH OF
MASSACHUSETTS
MARTHA COAKLEY
ATTORNEY GENERAL
Frederick D. Augenstern
Assistant Attorneys General
Environmental Protection Division
1 Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200

*Co-Lead Counsel for attorneys Representing
Plaintiff Intervenors the State of New York,
Commonwealth of Massachusetts, State of Arizona,
State of Connecticut, State of Illinois, State of Maine,
State of Maryland, State of New Jersey, State of New
Mexico, State of Oregon, Commonwealth of
Pennsylvania Department of Environmental
Protection, State of Rhode Island, State of Vermont,
State of Washington*

/s/ Valerie Csizmadia      (authorized on 2/08/08)
Valerie Csizmadia
Deputy Attorney General
Delaware Department of Justice
102 West Water Street, 3rd Floor
Dover, Delaware 19904
(302) 739-4636

*Representing Plaintiff Intervenor State of Delaware*

/s/ Matt Kenna          (authorized on 2/08/08)
Matt Kenna (CO Bar No. CO0028)
Western Environmental Law Center
679 E. 2nd Ave., Suite 11B
Durango, CO 81301
(970) 385-6941

*Representing Plaintiff Intervenors Washington Environmental Council, Climate Solutions, Environment Washington, Oregon Wild, Environment Oregon, 3E Strategies, Angus Duncan, Center For Biological Diversity and Friends of the Earth*

/s/  Benjamin Longstreth   (authorized on 2/08/08)
Benjamin Longstreth (D.C. Bar No. 455525)
Natural Resources Defense Counsel
1200 New York Ave., NW, Suite 400
Washington, DC 20005
(202) 289-6868

*Representing Plaintiff Intervenors the Natural Resources Defense Council, Environmental Defense Fund, Sierra Club and the Conservation Law Foundation*

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 1

CLIMATE CHANGE PROGRAM FOR MOBILE SOURCES

*This page last reviewed January 23, 2008*

*This page provides information regarding ARB's climate change regulations for mobile sources. These regulations are pursuant to Assembly Bill 1493 (Pavley). For updated information on this program, please consider joining ARB's* climate change mobile source e-list.



- **What's New?**
- **Fact Sheets**
- **Workshops and Meetings**
- **Background Information**
- **Related Links**
- **Additional Information**

---

**What's New?**

**ARB issues its technical study and addendum comparing AB 1493 (Pavley Rules) and the CAFE standard in the Federal Energy Bill in terms of greenhouse gas reductions**

- Addendum Comparing GHG Benefits for AB1493 Pavley Rules and the CAFE Standards for All 50 United States (January 23, 2008)
- Comparison of Greenhouse Gas Reductions under CAFE Standards and ARB Regulations Adopted Pursuant to AB 1493 (January 2, 2008)

**Fact Sheets**

- Climate Change Emissions Control Regulations (English)
- Reducing Climate Change Emissions from Motor Vehicles (English) (Spanish)
- FAQ: Reducing Climate Change Emissions from Motor Vehicles (English) (Spanish)
- Backgrounder: The Greenhouse Effect and California (English) (Spanish)

---

**Previous Workshops and Meetings**

**May 22 & 30, 2007 Public Hearing**

**U.S. EPA Public Hearings on California's request for a waiver to implement a Greenhouse gases reduction measure for motor vehicles.**

ARB submitted comments on July 24, 2007. View Document
ARB submitted comments on June 14, 2007. View Document

The first hearing was held May 22 at the U.S. EPA's Potomac Yard Conference Center, in Arlington, Virginia.
 ARB's Waiver Presentation (PPT - 10.3MB)

The second hearing was held May 30 at the Cal/EPA Headquarters, in Sacramento, California.
ARB's Waiver Presentation (PPT - 4.3MB)

The U.S. EPA's contact for these meetings was David Dickinson, Compliance and Innovative Strategies Division, email at Dickinson.David@EPA.GOV telephone (202) 343-9256.
To read the U.S. EPA's meeting notices, refer to the two links below:

- Notice of Public Hearing
- EPA Registry Document

---

**December 21, 2005 Waiver Request**

On December 21, 2005 the Air Resources Board submitted to the U.S. Environmental Protection Agency a Request for Waiver of Preemption Under Clean Air Act Section 209(b) regarding California's regulations to control greenhouse gas emissions from motor vehicles:

- Request for Waiver of Preemption
- Attachment 1: Executive Order G-05-061
- Attachment 2: Support Document
- Attachment 3: List of Support Documentation.

The final rulemaking package was approved by OAL and filed with the Secretary of the State on September 15, 2005. It will become operative on October 15, 2005. Pursuant to section 1961.1(g), Title 13, California Code of Regulations, it will be effective on January 1, 2006.

---

**September 23, 2004 Board Meeting**

**Public Hearing Notice and Final Staff Report:** Go to the Formal Regulatory Documents website to download a copy of the Public Hearing Notice and Final Staff Report for the rulemaking on the proposed regulations to control greenhouse gas emissions from motor vehicles. (**Hearing Date:** September 23)

- **Staff Presentation**
- **ISOR Peer Review Comments and Staff Responses**
- **Addendum** Presenting and Describing Revisions to Initial Statement of Reasons

    **Technical Support Documents for the Final Staff Report**

- Climate Change Overview                                          **Draft    Final**

- Climate Change Emissions Inventory                               **Draft    Final**

- Economic Impacts of the Climate Change Emissions Regulations     **Draft    Final**

- HFC-134A as an Automotive Refrigerant - Background, Emissions and Effects of Potential Controls    **Draft**    **Final**

- Mobile Air Conditioning Systems - Direct Emissions Technology Assessment    **Draft**    **Final**

- Mobile Air Conditioning Systems - Indirect Emissions    **Draft**    **Final**

- Air Conditioning Thermodynamics    **Draft**    **Final**

- Other Considerations    **Draft**    **Final**

- **AB 1493 Draft Staff Report**: Maximum Feasible and Cost-Effective Reduction of Greenhouse Gas Emissions from Motor Vehicles.

---

**Tuesday - July 13, 2004 (Pacoima)**

**Environmental Justice Focused Workshop**

- **Workshop Agenda**
- **Workshop Notice**
- **Staff Presentation**
- **Informational Flyer** (English) (Spanish)

---

**July 8, 2004 (Fresno)**

**Environmental Justice Focused Workshop**

- **Workshop Agenda**
- **Workshop Notice**
- **Staff Presentation**
- **Informational Flyer** (English) (Spanish)

---

**July 7, 2004 (Sacramento)**

**Regulatory Workshop**

- **Workshop Agenda**
- **Workshop Notice**
- **Staff Presentation** - Technology Assessment and Standard Development

- **Staff Presentation** - Economic and Environmental Analysis

---

**July 6, 2004 (Oakland)**

**Environmental Justice Focused Workshop**

- **Workshop Agenda**
- **Workshop Notice**
- **Staff Presentation**
- **Informational Flyer** (English) (Spanish)

---

**April 20, 2004**

**Technology Assessment Workshop on Climate Change Emission Regulations for Light-Duty Vehicles**

- **Speaker Presentations**
- **Notice of Public Workshop**
- **Agenda**
- **"Draft Technology and Cost Assessment for Proposed Regulations** to Reduce Vehicle Climate Change Emissions Pursuant to Assembly Bill 1493"
- **Appendix C:** Mobile Air Conditioning System Assessment
  - **Appendix C.1:** Mobile Air Conditioning System Technology Assessment
  - **Appendix C.2:** Air Conditioning Thermodynamics
  - **Appendix C.3:** HFC-134a Emissions from Current Light- and Medium-Duty Vehicles
  - **Appendix C.4:** Mobile Air Conditioning Systems - Indirect Emissions

---

**February 18, 2004**

**Climate Change Workshop: Climate Change Regulations for Motor Vehicles - Environmental Justice Concerns**

- **Notice of Public Workshop**
- **Workshop Flyer** (English) or (Spanish)
- **Speaker Presentation**

---

**November 20, 2003**

**Board Update on Climate Change Emissions Regulations Progress**

- **Notice of November Board Update**
- **Presentation to the Board**

---

**October 14, 2003**

**Climate Change Emissions Regulations Workshop: Alternative Compliance Strategies**

- **Notice of Public Workshop**
- **Agenda**
- **Discussion Paper**
- **Presentations**

---

**September 18, 2003**

**Climate Change Emissions Regulations Workshop:  Standards and Economics**

- **Speaker Presentations**
- **Notice of Public Workshop** to discuss the development of climate change emissions regulations.
- **Agenda**
- **Attachment A:** Form of the Standard
- **Attachment B:** Modeling Economic Impacts
    - **CARBITS Model Background**: Joint mixed logit models of stated and revealed preferences for alternative-fuel vehicles.
    - **CARBITS Model Background:** A transactions choice model for forecasting demand for alternative-fuel vehicles.

---

**March 11-13, 2003**

**International Vehicle Technology Symposium**

- Agenda
- Speaker Presentations

---

**December 3, 2002**

**Public Workshop**

- **Notice of Public Workshop** to discuss the emission inventory used to support the implementation of Assembly Bill (AB) 1493.

  - **Workshop Agenda**
  - **Emissions Inventories** for December 3, 2002 Workshop
  - **Workshop Presentation** (PowerPoint Presentation Including Speakers' Notes)

---

**September 26, 2002**

Board Meeting

- Staff Presentation to Board Regarding AB 1493 Implementation - Presented at September 26, 2002 Board Meeting

---

**Background Information**

- Report to the Legislature and the Governor on Regulations to Control Greenhouse Gas Emissions from Motor Vehicles
- AB 1493 (Pavley) Press Release
- AB 1493 (Pavley) Text
- Facts on Global Warming - A PowerPoint presentation on global warming, greenhouse gas emissions and AB 1493, with note pages containing more information. This requires PowerPoint Viewer for users without Microsoft PowerPoint. This is an 8.4 MB file; users with 28.8 modem connection may take 30-40 minutes to download. Users with Microsoft PowerPoint should click on "Edit" to read the associated Notes for each slide.
- Summary for Policy Makers
- Sign up for email updates regarding ARB's activities concerning climate change.

---

**Other Related Links**

- California Climate Change Portal
- California Climate Action Registry
- California Energy Commission
- United States Environmental Protection Agency

---

Case 1:07-cv-02024-RCL     Document 31-4     Filed 02/11/2008     Page 8 of 68

**Additional Information**

For question or comments regarding any materials found on this page, please contact Richard Varenchik at (626) 575-6730

ARB's Climate Change Program

ARB Programs

The Board is one of six boards, departments, and offices under
the umbrella of the California Environmental Protection Agency.
Cal/EPA | **ARB** | CIWMB | DPR | DTSC | OEHHA | SWRCB

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 2

Office of the Governor of the State of California
Page 1 of 2
Case 1:07-cv-02024-RCL   Document 31-4   Filed 02/11/2008   Page 10 of 68



**Office of the Governor**

ARNOLD SCHWARZENEGGER
THE PEOPLE'S GOVERNOR

# PRESS RELEASE

04/11/2006  GAAS:224:06   FOR IMMEDIATE RELEASE

### Letter from Gov. Schwarzenegger to President Bush Regarding Greenhouse Gas Emissions Waiver

The following letter was sent by Governor Arnold Schwarzenegger to President George W. Bush regarding a requested waiver of federal preemption of California's Greenhouse Gas Emissions Standards.

April 10, 2006

The President
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

Dear Mr. President,

California has a thirty-five year tradition of leadership in minimizing the amount of automobile pollution and striving for cleaner air for our citizens. The hallmarks of California's leadership have been progressively cleaner passenger vehicle technologies and well-crafted regulations that jointly reduce greenhouse gas emissions from automobiles. Presently, these regulations have been adopted by ten other states representing one-third of the country's motor vehicle market.

On December 21, 2005, the California Air Resources Board sent your Administration the attached letter and associated documents requesting a waiver of federal preemption of California's Greenhouse Gas Emissions Standards. I am writing to reiterate the urgency of approving California's request to address global warming.

Beginning in model year 2009, the new standards will phase in and ramp up over eight years to cut global warming emissions nearly 30 percent by model year 2016. The standards can be met with technology already in the market and will save vehicle owners in lower maintenance and fuel costs over the lifetimes of the vehicle.

The Clean Air Act expressly recognizes California's right to set its own vehicle emission standards, and the right of other states to adopt those standards. The Environmental Protection Agency has granted California's waiver request more than 40 times in the last three decades. I urge you to continue this practice.

Global warming is a grave threat to California's water supply, our coastline, our environment, our economy and the public health of our citizens. And global warming is likely worsening the severe weather that has caused so much damage of late in the States. This imminent danger has led my Administration to actively pursue strategies to reduce greenhouse gas emissions in order to protect our environment while also strengthening our economy.

I ask for your assistance in directing the Environmental Protection Agency to grant California's waiver without further delay. California and those other states that want to be free to protect the environment deserve nothing less.

Sincerely,

Governor Arnold Schwarzenegger

cc: Stephen L. Johnson, Administrator,
United States Environmental Agency

Link to California Air Resources Board Letter Requesting Waiver

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 3



GOVERNOR ARNOLD SCHWARZENEGGER

October 24, 2006


The President
The White House
Washington, DC  20500

Dear Mr. President,

I am writing to again urge you to take action on a long-standing request for a waiver of federal preemption of California's greenhouse gas emissions standards for vehicles.

On December 21, 2005, the California Air Resources Board requested that the Environmental Protection Agency (EPA) grant a waiver to allow California to exercise its authority under the Clean Air Act to set vehicle emissions standards in the state.  The EPA has granted this request more than 40 times over the past three decades.  Yet this latest request has been ignored with no explanation.  I wrote to you on April 10, 2006, to ask for your assistance in directing the EPA to grant this waiver request without further delay.  There is still no decision or even an indication of movement on my request.

Now, nearly one year after California's initial request, I am asking again for your help with the immediate approval of this waiver.  Further delay will result in California losing its right as a state to develop forward-thinking environmental policies.  I urge you to take this action so that California can continue to be a global leader in the regulation of vehicle emissions and help stimulate American economic growth with the development of new industries and technologies in this area.

In the absence of a coherent federal policy to limit harmful greenhouse gas emissions, I worked with the California Legislature to sign into law AB 32, the California Global Warming Solutions Act.  AB 32 balances market mechanisms and the needs of our economy, while establishing historic greenhouse gas emissions goals and creating the world's most comprehensive emissions reduction program.  This effort will allow us to reduce emissions and costs to industry, and stimulate innovation so that more reductions can be realized over time.  However, in order to continue our progress, we need the federal government to recognize California's right to set its own vehicle emissions standards as we have previously requested.

The President
October 24, 2006
Page two

Ignoring the challenge of climate change will not only threaten our collective future, but will be a significant drag on the economic vitality of our state and nation within the world economy. The economic arguments for market-based solutions to global warming are overwhelming. Cutting-edge technologies in this area are creating entire new industries, and properly designed emissions trading programs can reduce compliance costs significantly compared to alternatives.

I know that we can craft policies that help business and enhance, not compromise, environmental goals. I urge you to do your part in helping us take this historic step forward.

Sincerely,

Arnold Schwarzenegger

cc: Stephen L. Johnson, Administrator
    United States Environmental Protection Agency

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 4

Memorandum:

TO:             EPA Docket Management
FROM:           David Dickinson, Attorney-Advisor, Office of Air and Radiation
                Michael Horowitz, Attorney-Advisor, Office of General Counsel
RE:             Docket EPA-HQ-OAR-2006-0173


This memorandum serves as concurrence from a representative of the Office of General Counsel, along with a representative from the Office of Air and Radiation, that the docket noted above should be opened for public access.  Any comments submitted to the docket at this time should be considered, if possible, as comments received before the publication of the official Federal Register Notice for Hearing and Comment.  However, we recognize that this memorandum will coded as a Federal Register Notice for purposes of triggering the opening of the electronic docket.   Once the official Federal Register Notice is published the comment period noted in that Notice will be the official comment period.

Thank you for your consideration.

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 5



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

FEB 2 1 2007

OFFICE OF
AIR AND RADIATION

Ms. Catherine Witherspoon
Executive Officer
California Air Resources Board
1001 I Street
Sacramento, California 95812

Dear Ms. Witherspoon:

I am writing in response to, and to provide an update regarding, the December 21, 2005, request from the California Air Resources Board (CARB) that the Environmental Protection Agency (EPA) grant the State of California a waiver of preemption, under Section 209(b) of the Clean Air Act, for CARB's greenhouse gas emission regulations for certain new motor vehicles beginning with the 2009 model year.

The timing of EPA's consideration of CARB's waiver request is related to the Massachusetts v. EPA case, No. 05-1120, currently pending before the United States Supreme Court. That case involves EPA's determination that it does not have authority under the Clean Air Act to regulate greenhouse gas emissions from new motor vehicles in order to address global climate change, as well as EPA's assertion that, even if it did have such authority, it properly exercised its discretion at that time in deciding not to so regulate. EPA believes that the decision and opinion from the Supreme Court in the Massachusetts case, anticipated by the close of the Court's current term in June 2007, could be directly relevant to issues EPA must address in the context of CARB's waiver request. Because of this, EPA intends to proceed with the waiver request after the Supreme Court has issued its decision in Massachusetts v. EPA.

We note that related issues are currently pending in other proceedings. For example, the U.S. District Court for the Eastern District of California, in Central Valley Chrysler-Jeep v. Witherspoon, recently stayed its proceedings pending the announcement of the Supreme Court's decision in Massachusetts v. EPA because of the relationship of the enforcement of California's greenhouse gas regulations to the issues pending before the Supreme Court.[1] In addition, the Department of Transportation, National Highway Traffic Safety Administration's proposed regulation that, among other things, adopts a CAFE standard for light trucks manufactured in model years 2008-2011 is currently before the U.S. Court of Appeals for the Ninth Circuit. See

---

[1] Central Valley Chrysler-Jeep v. Witherspoon, No. 04-6663, Memorandum Opinion and Order on Defendants' Motion for Summary Judgment on the Issue of Ripeness and/or Mootness and Order for Stay of Further Proceedings, slip op. at 5, 19, 22 (Jan. 16, 2007 E.D. Cal.).

Center for Biological Diversity v. National Hwy. Traffic Safety Admin., Nos. 06-71891, et al. (addressing challenge to Average Fuel Economy Standards for Light Trucks Model Years 2008-2011, 71 Fed. Reg. 17566, 17679 (April 6, 2006)).[2]

EPA has placed California's request and related materials into its official electronic docket, which can be accessed at regulations.gov with the reference number EPA-HQ-OAR-2006-0173.

If you have any questions, please feel free to contact me, or your staff can contact David Dickinson, in EPA's Office of Transportation and Air Quality, at (202) 343-9256.

Sincerely,

William L. Wehrum
Acting Assistant Administrator

---

[2] See also Green Mountain Chrysler-Plymouth-Dodge, et al. v. Torti, et al., No. 2:05-CV-302 (D. Vt.) (challenging, as being in conflict with and preempted by federal law, the Vermont Low Emissions Vehicle Program that proposes to regulate, among other things, carbon dioxide emissions from automobiles); Association of Internat'l Auto. Mfrs., et al. v. Sullivan, et al., No. 06-69T (D. R.I.) (similar case, but challenging Rhode Island regulations proposing to control emissions of carbon dioxide, methane, nitrous oxide and hydrofluorocarbons).

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 6



# GOVERNOR ARNOLD SCHWARZENEGGER

April 25, 2007

The Honorable Stephen L. Johnson
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue
Washington, DC  20460

RE:    Regulations to Control Greenhouse Gas Emissions from Motor Vehicles; Request for
        Waiver of Preemption Under Clean Air Act Section 209(b),
        DOCKET ID EPA-HQ-OAR-2006-0173

Dear Mr. Administrator,

Thank you for speaking with me today regarding our request for a federal preemption waiver for
California's motor vehicle greenhouse gas emissions standards.

While I support the timing of the hearing and comment deadline you have announced, your
agency's schedule for action must take into account that our waiver request was submitted more
than 16 months ago.  Failure to take action by the end of October would mean that more than 22
months have passed with no decision.  This is clearly an unreasonable delay under the Clean Air
Act, and I ask that the EPA issue its decision on California's request within the next 180 days in
order to avoid legal action by CARB.

This letter also provides you with notice of our intent to commence an action, if necessary, under
Clean Air Act Sections 304(a) and 307(b) (42 U.S.C. §§ 7604(a), 7607(b), and Administrative
Procedure Act Section 706 (5 U.S.C. § 706), to compel this unreasonably delayed agency action.
If this action by CARB is required, we will seek declaratory and injunctive relief, and other relief
as the court may deem appropriate.

The Honorable Stephen L. Johnson
April 25, 2007
Page two

I applaud you for taking this long overdue and important step toward addressing California's
waiver request. We hope that your announcement reflects not only a response to the Supreme
Court's decision in *Massachusetts et al. v. EPA* ((2007) ___ U.S. ___ [127 S.Ct. 1438, 75
U.S.L.W. 4149]), but also a recognition of the importance of acting expeditiously to address the
critical climate change issues that we are facing.

Please enter this letter in the subject docket. Thank you for your prompt attention to this
important issue.

Sincerely,

Arnold Schwarzenegger

cc:    Linda S. Adams, Secretary for Environmental Protection

       Via U.S. Mail addressed to:

       William L. Wehrum
       Acting Assistant Administrator
       U.S. EPA Headquarters
       Ariel Rios Building
       1200 Pennsylvania Avenue, Northwest
       Washington, DC 20460

       David Dickinson
       EPA Office of Transportation and Air Quality
       U.S. EPA Headquarters
       Ariel Rios Building
       1200 Pennsylvania Avenue, Northwest
       Washington, DC 20460

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 7

ENVIRONMENTAL PROTECTION AGENCY

[AMS-FRL        ]

California State Motor Vehicle Pollution Control Standards; Request for Waiver of Federal Preemption; Opportunity for Public Hearing

**AGENCY:**    Environmental Protection Agency (EPA)

**ACTION:**    Notice of Opportunity for Public Hearing and Comment

**SUMMARY:** The California Air Resources Board (CARB) has notified EPA that it has adopted Greenhouse Gas Emission (GHG) regulations for passenger cars, light-duty trucks and medium-duty passenger vehicles beginning with the 2009 model year (MY).  By letter dated December 21, 2005, CARB submitted a request that EPA grant a waiver of preemption under section 209(b) of the Clean Air Act (CAA), 42 U.S.C. 7543(b) for these regulations.  This notice announces that EPA has scheduled a public hearing concerning California's request and that EPA is accepting written comment on the request.

**DATES**: EPA has scheduled a public hearing concerning CARB's request on May 22, 2007, beginning at 9:00 a.m.  Any party planning to present oral testimony should notify EPA by May 15, 2007, expressing its interest.  Any party may submit written comments by June 15, 2007.

**ADDRESSES:** EPA will make available for in person inspection, at the Air and Radiation Docket and Information Center, written comments received from interested parties, in addition to any testimony given at the public hearing.  The official public docket is the collection of materials that is available for public viewing at the Air and Radiation Docket in the EPA Docket Center, (EPA/DC) EPA West, Room B102, 1301 Constitution Ave., NW, Washington, D.C.  The

1

EPA Docket Center Public Reading Room is open from 8:30 to 4:30 p.m., Monday through

Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202)

566-1744, and the telephone number for the Air and Radiation Docket is (202) 566-1743.  The

reference number for this docket is EPA-HQ-OAR-2006-0173.  Parties wishing to present oral

testimony at the public hearing should provide notice to David Dickinson at the address noted

below.  We plan to hold the public hearing at EPA Headquarters in Washington, DC.

**FOR FURTHER INFORMATION CONTACT:** David Dickinson, Compliance and

Innovative Strategies Division (6405J), U.S. Environmental Protection Agency, 1200

Pennsylvania Ave, NW, Washington, D.C. 20460.  Telephone: (202) 343-9256, Fax: (202) 343-

2804, e-mail address: Dickinson.David@EPA.GOV.  EPA will make available an electronic

copy of this Notice on the Office of Transportation and Air Quality's (OTAQ's) homepage

(http://www.epa.gov/otaq/).  Users can find this document by accessing the OTAQ homepage

and looking at the path entitled "Regulations."  This service is free of charge, except any cost

you already incur for Internet connectivity.  Users can also get the official *Federal Register*

version of the Notice on the day of publication on the primary website:

(http://www.epa.gov/docs/fedrgstr/EPA-AIR/).

Please note that due to differences between the software used to develop the documents

and the software into which the documents may be downloaded, changes in format, page length,

etc., may occur.

**FOR OBTAINING AND SUBMITTING ELECTRONIC COPIES OF COMMENTS**

Submit your comments, identified by Docket ID No. EPA-HQ-OAR-2006-0173, by one

of the following methods:

• http://www.regulations.gov:  Follow the on-line instructions for submitting comments.

• E-mail: dickinson.david@epa.gov

• Fax: (202)343-2804.

• Mail: U.S. Environmental Protection Agency, EPA West (Air Docket), 1200 Pennsylvania Ave., NW., Room B108, Mail Code 6102T, Washington, D.C. 20460, Attention Docket ID No. EPA-HQ-OAR-2006-0173. Please include a total of two copies.

• Hand Delivery: EPA Docket Center, EPA/DC, EPA West, Room B102, 1301 Constitution Ave., NW., Washington, D.C. Such deliveries are only accepted during the Docket's normal hours of operation, and special arrangements should be made for deliveries of boxed information.  Instructions: Direct your comments to Docket ID No EPA-HQ-OAR-2006-0173.

EPA's policy is that all comments received will be included in the public docket without change and may be made available online at http://www.regulations.gov, including any personal information provided, unless the comment includes information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI or otherwise protected through http://www.regulations.gov or e-mail.

The http://www.regulations.gov website is an ``anonymous access'' system, which means EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send an e-mail comment directly to EPA without going through http://www.regulations.gov your e-mail address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you

submit an electronic comment, EPA recommends that you include your name and other contact information in the body of your comment and with any disk or CD-ROM you submit. If EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, EPA may not be able to consider your comment. Electronic files should avoid the use of special characters, any form of encryption, and be free of any defects or viruses.  Docket: All documents in the docket are listed in the http://www.regulations.gov index. Although listed in the index, some information is not publicly available, e.g., CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy.

**SUPPLEMENTARY INFORMATION:**

### (A) Background and Discussion

Section 209(a) of the Clean Air Act, as amended ("Act"), 42 U.S.C. 7543(a), provides:

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No state shall require certification, inspection or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

Section 209(b) of the Act requires the Administrator, after notice and opportunity for public hearing, to waive application of the prohibitions of section 209(a) for any state that has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the state determines that the state standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards.  California is the only state that is qualified to seek

4

and receive a waiver under section 209(b).  The Administrator must grant a waiver unless he finds that (A) the determination of the state is arbitrary and capricious, (B) the state does not need the state standards to meet compelling and extraordinary conditions, or (C) the state standards and accompanying enforcement procedures are not consistent with section 202(a) of the Act.  Previous decisions granting waivers of Federal preemption for motor vehicles have stated that State standards are inconsistent with section 202(a) if, for example, there is inadequate lead time to permit the development of the necessary technology giving appropriate consideration to the cost of compliance within that time period or if the Federal and State test procedures impose inconsistent certification procedures.[1]

CARB's December 21, 2005, letter to the Administrator notified EPA that the CARB Board had adopted its GHG regulations at a public hearing on September 23-24, 2004 and subsequently California's Office of Administrative Law approved the regulatory action on September 15, 2005.  The amendment and adoption of regulations can be found at title 13, California Code of Regulations (CCR), sections 1900, 1961 and 1961.1.

Please provide comment as to whether (a) California's determination that its motor vehicle emission standards are, in the aggregate, at least as protective of public health and welfare as applicable Federal standards is arbitrary and capricious, (b) California needs such standards to meet compelling and extraordinary conditions, and (c) California's standards and accompanying enforcement procedures are consistent with section 202(a) of the Clean Air Act.  Within the context of these statutory criteria we also request comment on the following: 1) given

---

[1]  To be consistent, the California certification procedures need not be identical to the Federal certification procedures.  California procedures would be inconsistent, however, if manufacturers would be unable to meet the

that the regulations referenced in the December 21, 2005, request letter relate to global climate

change, should that have any effect on EPA's evaluation of the criteria, and if so, in what

manner; 2) whether the United States Supreme Court's decision, issued on April 2, 2007 (549

U.S. _____ (2007)), regarding the regulation of emissions of greenhouse gases from new motor

vehicles under Title II of the Clean Air Act, is relevant to EPA's evaluation of the three criteria,

and if so, in what manner; and 3) whether the Energy Policy and Conservation Act (EPCA) fuel

economy provisions are relevant to EPA's consideration of this petition or to CARB's authority

to implement its vehicle GHG regulations.

**PROCEDURES FOR PUBLIC PARTICIPATION:**

In recognition that public hearings are designed to give interested parties an opportunity

to participate in this proceeding, there are no adverse parties as such.  Statements by participants

will not be subject to cross-examination by other participants without special approval by the

presiding officer. The presiding officer is authorized to strike from the record statements that he

or she deems irrelevant or repetitious and to impose reasonable time limits on the duration of the

statement of any participant.

The Agency will make a verbatim record of the proceedings.  Interested parties may

arrange with the reporter at the hearing(s) to obtain a copy of the transcript at their own expense.

EPA will keep the record open until June 15, 2007.  Upon expiration of the comment period, the

Administrator will render a decision on CARB's request based on the record of the public

hearing, relevant written submissions, and other information that he deems pertinent.

Persons with comments containing proprietary information must distinguish such

---

state and the Federal requirements with the same test vehicle in the course of the same test.  See, e.g., 43 FR 32182

information from other comments to the greatest possible extent and label it as "Confidential

Business Information" (CBI).  If a person making comments wants EPA to base its decision in

part on a submission labeled CBI, then a non-confidential version of the document that

summarizes the key data or information should be submitted for the public docket.  To ensure

that proprietary information is not inadvertently placed in the docket, submissions containing

such information should be sent directly to the contact person listed above and not to the public

docket.  Information covered by a claim of confidentiality will be disclosed by EPA only to the

extent allowed and by the procedures set forth in 40 CFR part 2.  If no claim of confidentiality

accompanies the submission when EPA receives it, EPA will make it available to the public

without further notice to the person making comments.

Dated:  __4.24.07__

_____

William L. Wehrum
Acting Assistant Administrator
Office of Air and Radiation

(July 25, 1978).

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 8

maintaining information, and disclosing and providing information; adjust the existing ways to comply with any previously applicable instructions and requirements which have subsequently changed; train personnel to be able to respond to a collection of information; search data sources; complete and review the collection of information; and transmit or otherwise disclose the information.

Respondents/Affected Entities: Secondary brass and bronze production facilities, primary copper/zinc/lead smelters, primary aluminum reduction plants and ferroalloy production facilities.

*Estimated Number of Respondents:* 18.

*Frequency of Response:* Initially and semi-annually.

*Estimated Total Annual Hour Burden:* 4,914.

*Estimated Total Annual Cost:* $442.450 which includes $0 annualized capital startup costs, $131,600 in annualized Operation and Maintenance costs (O&M), and $310,850 annualized labor costs.

*Changes in the Estimates:* There is no change in the total estimated burden currently identified in the OMB Inventory of Approved ICR Burdens.

Dated: April 12, 2007.

**Robert Gunter,**

*Acting Director, Collection Strategies Division.*

[FR Doc. E7–8181 Filed 4–27–07; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

**[AMS–FRL–8307–6]**

### California State Motor Vehicle Pollution Control Standards; Request for Waiver of Federal Preemption; Opportunity for Public Hearing

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of opportunity for public hearing and comment.

**SUMMARY:** The California Air Resources Board (CARB) has notified EPA that it has adopted Greenhouse Gas Emission (GHG) regulations for passenger cars, light-duty trucks and medium-duty passenger vehicles beginning with the 2009 model year (MY). By letter dated December 21, 2005, CARB submitted a request that EPA grant a waiver of preemption under section 209(b) of the Clean Air Act (CAA), 42 U.S.C. 7543(b) for these regulations. This notice announces that EPA has scheduled a

public hearing concerning California's request and that EPA is accepting written comment on the request.

**DATES:** EPA has scheduled a public hearing concerning CARB's request on May 22, 2007, beginning at 9 a.m. Any party planning to present oral testimony should notify EPA by May 15, 2007, expressing its interest. Any party may submit written comments by June 15, 2007.

**ADDRESSES:** EPA will make available for in person inspection, at the Air and Radiation Docket and Information Center, written comments received from interested parties, in addition to any testimony given at the public hearing. The official public docket is the collection of materials that is available for public viewing at the Air and Radiation Docket in the EPA Docket Center, (EPA/DC) EPA West, Room B102, 1301 Constitution Ave., NW., Washington, DC. The EPA Docket Center Public Reading Room is open from 8:30 to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the Air and Radiation Docket is (202) 566–1743. The reference number for this docket is EPA–HQ–OAR–2006–0173. Parties wishing to present oral testimony at the public hearing should provide notice to David Dickinson at the address noted below. We plan to hold the public hearing at EPA Headquarters in Washington, DC.

**FOR FURTHER INFORMATION CONTACT:** David Dickinson, Compliance and Innovative Strategies Division (6405J), U.S. Environmental Protection Agency, 1200 Pennsylvania Ave, NW., Washington, DC 20460. Telephone: (202) 343–9256, Fax; (202) 343–2804, e-mail address: *Dickinson.David@EPA.GOV.* EPA will make available an electronic copy of this Notice on the Office of Transportation and Air Quality's (OTAQ's) homepage (*http://www.epa.gov/otaq/*). Users can find this document by accessing the OTAQ homepage and looking at the path entitled "Regulations." This service is free of charge, except any cost you already incur for Internet connectivity. Users can also get the official **Federal Register** version of the Notice on the day of publication on the primary website: (*http://www.epa.gov/docs/fedrgstr/EPA-AIR/*).

Please note that due to differences between the software used to develop the documents and the software into which the documents may be

downloaded, changes in format, page length, etc., may occur.

*For Obtaining and Submitting Electronic Copies of Comments:*

Submit your comments, identified by Docket ID No. EPA–HQ–OAR–2006–0173, by one of the following methods:

• *http://www.regulations.gov:* Follow the on-line instructions for submitting comments.

• *E-mail: dickinson.david@epa.gov.*

• *Fax:* (202)343–2804.

• *Mail:* U.S. Environmental Protection Agency, EPA West (Air Docket), 1200 Pennsylvania Ave., NW., Room B108, Mail Code 6102T, Washington, DC 20460, Attention Docket ID No. EPA–HQ–OAR–2006–0173. Please include a total of two copies.

• *Hand Delivery:* EPA Docket Center, EPA/DC, EPA West, Room B102, 1301 Constitution Ave., NW., Washington, DC Such deliveries are only accepted during the Docket's normal hours of operation, and special arrangements should be made for deliveries of boxed information. Instructions: Direct your comments to Docket ID No EPA–HQ–OAR–2006–0173.

EPA's policy is that all comments received will be included in the public docket without change and may be made available online at *http://www.regulations.gov*, including any personal information provided, unless the comment includes information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI or otherwise protected through *http://www.regulations.gov* or e-mail.

The *http://www.regulations.gov* web site is an "anonymous access" system, which means EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send an e-mail comment directly to EPA without going through *http://www.regulations.gov* your e-mail address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you submit an electronic comment, EPA recommends that you include your name and other contact information in the body of your comment and with any disk or CD–ROM you submit. If EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, EPA may not be able to consider your comment. Electronic files should avoid the use of special characters, any form of encryption, and be free of any defects or viruses. *Docket:* All documents in the

docket are listed in the *http://www.regulations.gov* index. Although listed in the index, some information is not publicly available, e.g., CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy.

**SUPPLEMENTARY INFORMATION:**

**(A) Background and Discussion**

Section 209(a) of the Clean Air Act, as amended ("Act"), 42 U.S.C. 7543(a), provides:

No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No state shall require certification, inspection or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

Section 209(b) of the Act requires the Administrator, after notice and opportunity for public hearing, to waive application of the prohibitions of section 209(a) for any state that has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the state determines that the state standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. California is the only state that is qualified to seek and receive a waiver under section 209(b). The Administrator must grant a waiver unless he finds that (A) the determination of the state is arbitrary and capricious, (B) the state does not need the state standards to meet compelling and extraordinary conditions, or (C) the state standards and accompanying enforcement procedures are not consistent with section 202(a) of the Act. Previous decisions granting waivers of Federal preemption for motor vehicles have stated that State standards are inconsistent with section 202(a) if, for example, there is inadequate lead time to permit the development of the necessary technology giving appropriate consideration to the cost of compliance within that time period or if the Federal and State test procedures impose inconsistent certification procedures.[1]

CARB's December 21, 2005, letter to the Administrator notified EPA that the CARB Board had adopted its GHG regulations at a public hearing on September 23–24, 2004 and subsequently California's Office of Administrative Law approved the regulatory action on September 15, 2005. The amendment and adoption of regulations can be found at title 13, California Code of Regulations (CCR), sections 1900, 1961 and 1961.1.

Please provide comment as to whether (a) California's determination that its motor vehicle emission standards are, in the aggregate, at least as protective of public health and welfare as applicable Federal standards is arbitrary and capricious, (b) California needs such standards to meet compelling and extraordinary conditions, and (c) California's standards and accompanying enforcement procedures are consistent with section 202(a) of the Clean Air Act. Within the context of these statutory criteria we also request comment on the following: (1) Given that the regulations referenced in the December 21, 2005, request letter relate to global climate change, should that have any effect on EPA's evaluation of the criteria, and if so, in what manner; (2) whether the United States Supreme Court's decision, issued on April 2, 2007 (549 U.S. _____(2007)), regarding the regulation of emissions of greenhouse gases from new motor vehicles under Title II of the Clean Air Act, is relevant to EPA's evaluation of the three criteria, and if so, in what manner; and (3) whether the Energy Policy and Conservation Act (EPCA) fuel economy provisions are relevant to EPA's consideration of this petition or to CARB's authority to implement its vehicle GHG regulations.

*Procedures for Public Participation*

In recognition that public hearings are designed to give interested parties an opportunity to participate in this proceeding, there are no adverse parties as such. Statements by participants will not be subject to cross-examination by other participants without special approval by the presiding officer. The presiding officer is authorized to strike from the record statements that he or she deems irrelevant or repetitious and to impose reasonable time limits on the duration of the statement of any participant.

The Agency will make a verbatim record of the proceedings. Interested parties may arrange with the reporter at the hearing(s) to obtain a copy of the transcript at their own expense. EPA will keep the record open until June 15, 2007. Upon expiration of the comment period, the Administrator will render a decision on CARB's request based on the record of the public hearing, relevant written submissions, and other information that he deems pertinent.

Persons with comments containing proprietary information must distinguish such information from other comments to the greatest possible extent and label it as "Confidential Business Information" (CBI). If a person making comments wants EPA to base its decision in part on a submission labeled CBI, then a non-confidential version of the document that summarizes the key data or information should be submitted for the public docket. To ensure that proprietary information is not inadvertently placed in the docket, submissions containing such information should be sent directly to the contact person listed above and not to the public docket. Information covered by a claim of confidentiality will be disclosed by EPA only to the extent allowed and by the procedures set forth in 40 CFR part 2. If no claim of confidentiality accompanies the submission when EPA receives it, EPA will make it available to the public without further notice to the person making comments.

Dated: April 24, 2007.

**William L. Wehrum,**

*Acting Assistant Administrator, Office of Air and Radiation.*

[FR Doc. E7–8168 Filed 4–27–07; 2:09 pm]

**BILLING CODE 6560–50–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**[EPA-HQ-OPP-2006-0936; FRL-8124-5]**

**Notice of Filing of Pesticide Petitions for Residues of Pesticide Chemicals in or on Various Commodities**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice.

---

**SUMMARY:** This notice announces the initial filing of pesticide petitions proposing the establishment or modification of regulations for residues of pesticide chemicals in or on various commodities.

**DATES:** Comments must be received on or before May 30, 2007.

**ADDRESSES:** Submit your comments, identified by docket identification (ID) number and the pesticide petition

---

[1] To be consistent, the California certification procedures need not be identical to the Federal certification procedures. California procedures would be inconsistent, however, if manufacturers would be unable to meet the state and the Federal requirements with the same test vehicle in the course of the same test. See, e.g., 43 FR 32182 (July 25, 1978).

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 9

relevant, such persons should contact staff in advance to discuss the matter.

For further information about these conferences, please contact:

W. Mason Emnett, Office of the General Counsel—Energy Markets, Federal Energy Regulatory Commission, 888 First Street, NE., Washington, DC 20426, (202) 502–6540, *Mason.Emnett@ferc.gov.*

Daniel Hedberg, Office of Energy Markets and Reliability, Federal Energy Regulatory Commission, 888 First Street, NE., Washington, DC 20426, (202) 502–6243, *Daniel.Hedberg@ferc.gov.*

**Kimberly D. Bose,**
*Secretary.*

[FR Doc. E7–8973 Filed 5–9–07; 8:45 am]

**BILLING CODE 6717–01–P**

---

## DEPARTMENT OF ENERGY

### Federal Energy Regulatory Commission

### Notice of Commission Staff Attendance at Midwest Iso-Related Meetings

May 3, 2007.

The Federal Energy Regulatory Commission hereby gives notice that members of the Commission and Commission staff may attend the following Midwest ISO-related meetings:

• Reliability First and Midwest Reliability Organization Resource Adequacy Conference (9 a.m.–4:30 p.m., ET)
  ○ May 10, 2007.
  Marriott Downtown Indianapolis, 350 West Maryland Street, Indianapolis, Indiana.
• Midwest ISO Supply Adequacy Working Group/OMS Resource Adequacy Working Group (1 p.m.– 5 p.m., ET)
  ○ May 17, 2007.
  Lakeside Conference Center, 630 West Carmel Drive, Carmel, IN 46032.

Further information may be found at *http://www.midwestiso.org* and *http://www.rfirst.org.*

The discussions at each of the meetings described above may address matters at issue in the following proceedings:

Docket No. ER02–2595, *Midwest Independent Transmission System Operator, Inc.*

Docket No. ER04–375, *Midwest Independent Transmission System Operator, Inc.*

Docket No. ER04–458, *Midwest Independent Transmission System Operator, Inc.*

Docket Nos. ER04–691 and ER04–106, *Midwest Independent Transmission System Operator, Inc.*

Docket No. EL04–104, *Public Utilities With Grandfathered Agreements In the Midwest ISO Region*

Docket No. ER05–6, EL04–135, EL02– 111 and EL03–212, *Midwest Independent Transmission System Operator, Inc.*

Docket No. ER05–752, *Midwest Independent Transmission System Operator, Inc. and PJM Interconnection, L.L.C.*

Docket No. ER05–1083, *Midwest Independent Transmission System Operator, Inc.*

Docket No. ER05–1085, *Midwest Independent Transmission System Operator, Inc.*

Docket No. ER05–1138, *Midwest Independent Transmission System Operator, Inc.*

Docket No. ER05–1201, *Midwest Independent Transmission System Operator, Inc.*

Docket No. ER05–1230, *Midwest Independent Transmission System Operator, Inc.*

Docket No. EL05–103, *Northern Indiana Power Service Co.* v. *Midwest Independent Transmission System Operator, Inc. and PJM Interconnection, L.L.C.*

Docket No. EL05–128, *Quest Energy, L.L.C.* v. *Midwest Independent Transmission System Operator, Inc.*

Docket No. ER06–18, *Midwest Independent Transmission System Operator, Inc.*

Docket No. ER06–27, *Midwest Independent Transmission System Operator, Inc.*

Docket Nos. EC06–4 and ER06–20, *E.ON U.S., LLC*

Docket No. ER06–1308, *Midwest Independent Transmission System Operator, Inc.*

Docket Nos. ER06–360, ER06–360, ER06–361, ER06–362, ER06–363, ER06–372 and ER06–373, *Midwest Independent Transmission System Operator, Inc.*

Docket No. ER06–356, *Midwest Independent Transmission System Operator, Inc.*

Docket No. ER06–532, *Midwest Independent Transmission System Operator, Inc.*

Docket No. ER06–313, *Midwest Independent Transmission System Operator, Inc.*

Docket No. EL06–31, *Midwest Independent Transmission System Operator, Inc.*

Docket No. EL06–49, *Midwest Independent Transmission Systemerator, Inc.*

Docket No. ER06–56, *Midwest Independent Transmission System Operator, Inc.*

Docket No. ER07–478, *Midwest Independent Transmission System Operator, Inc.*

Docket No. ER07–550, *Midwest Independent Transmission System Operator, Inc.*

Docket No. ER07–701, *Midwest Independent Transmission System Operator, Inc.*

These meetings are open to the public.

For more information, contact Patrick Clarey, Office of Energy Markets and Reliability, Federal Energy Regulatory Commission at (317) 249–5937 or *patrick.clarey@ferc.gov,* or Christopher Miller, Office of Energy Markets and Reliability, Federal Energy Regulatory Commission at (317) 249–5936 or *christopher.miller@ferc.gov.*

**Kimberly D. Bose,**
*Secretary.*

[FR Doc. E7–8935 Filed 5–9–07; 8:45 am]

**BILLING CODE 6717–01–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

[AMS–FRL–8311–3]

### California State Motor Vehicle Pollution Control Standards; Request for Waiver of Federal Preemption; Opportunity for Public Hearing

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice announcing an additional hearing and hearing locations.

---

**SUMMARY:** EPA previously announced the opportunity for public hearing and written comment on the California Air Resources Board's request for a waiver of preemption for its Greenhouse Gas Emission (GHG) regulations for passenger cars, light-duty trucks and medium-duty passenger vehicles beginning with the 2009 model year (MY). This previous announcement occurred on April 30, 2007 at 72 FR 21260. By this notice EPA is announcing the location of the May 22, 2007 hearing which commences at 9 a.m. EPA is also announcing an additional hearing, and location, for May 30, 2007 which will commence at 9 a.m. If you wish to present testimony at the May 22, 2007 hearing please follow the directions provided at 72 FR 21260. If you wish to present testimony at the May 30, 2007 hearing please follow the contact directions below.

**ADDRESSES:** The May 22, 2007 hearing will take place at the EPA Potomac Yard Conference Center, 2777 Crystal Drive—Room S–1204, Arlington, VA 22202. The May 30, 2007 hearing will take place at the Byron Sher Auditorium, Cal/EPA Headquarters, 1001 I Street, Sacramento, CA 95814.

**FOR FURTHER INFORMATION CONTACT:** If you wish to present testimony at the Sacramento, CA hearing then provide notification by May 23, 2007 to David Dickinson, Compliance and Innovative Strategies Division (6405J), U.S. Environmental Protection Agency, 1200 Pennsylvania Ave, NW., Washington, DC 20460, e-mail address: *Dickinson.David@EPA.GOV.*

Dated: May 4, 2007.

**William L. Wehrum,**

*Acting Assistant Administrator, Office of Air and Radiation.*

[FR Doc. E7–9025 Filed 5–9–07; 8:45 am]

**BILLING CODE 6560–50–P**

---

# ENVIRONMNETAL PROTECTION AGENCY

**[FRI–8311–8]**

## Office of Research and Development; Ambient Air Monitoring Reference and Equivalent Methods: Designation of a New Equivalent Method

**AGENCY:** Environmental Protection Agency.

**ACTION:** Notice of the designation of a new equivalent method for monitoring ambient air quality.

**SUMMARY:** Notice is hereby given that the Environmental Protection Agency (EPA) has designated, in accordance with 40 CFR Part 53, a new equivalent method for measuring concentrations of sulfur dioxide ($SO_2$) in the ambient air.

**FOR FURTHER INFORMATION CONTACT:** Elizabeth Hunike, Human Exposure and Atmospheric Sciences Division (MD–D205–03), National Exposure Research Laboratory, U.S. EPA, Research Triangle Park, North Carolina 27711. Phone: (919) 541–3737, e-mail: *Hunike.Elizabeth@epa.gov.*

**SUPPLEMENTARY INFORMATION:** In accordance with regulations at 40 CFR Part 53, the EPA evaluates various methods for monitoring the concentrations of those ambient air pollutants for which EPA has established National Ambient Air Quality Standards (NAAQSs) as set forth in 40 CFR Part 50. Monitoring methods that are determined to meet specific requirements for adequacy are designated by the EPA as either reference methods or equivalent

methods (as applicable), thereby permitting their use under 40 CFR Part 58 by States and other agencies for determining attainment of the NAAQSs.

The EPA hereby announces the designation of a new equivalent method for measuring concentrations of sulfur dioxide ($SO_2$) in the ambient air. This designation is made under the provisions of 40 CFR Part 53, as amended on December 18, 2006 (71 FR 61271).

The new equivalent method is an automated method (analyzer) that utilizes a measurement principle based on ultraviolet fluorescence. The newly designated equivalent $SO_2$ method is identified as follows:

EQSA–0507–166, "SIR, S.A. Model S–5001 U.V. Fluorescence $SO_2$ Analyzer, " operated with a full-scale measurement range of 0–0.5 ppm, with an integration time setting of 1 minute, and with or without an optional PCMCIA Card or the optional Internal Span permeation oven.

An application for an equivalent method determination for the candidate method based on this $SO_2$ analyzer was received by the EPA on October 4, 2006. The sampler is commercially available from the applicant, SIR USA, 826 West Braddock Road, Alexandria, VA 22302–3605 or from SIR Spain, Avenida de la Industria, 3; 28760 Tres Cantos (Madrid), Spain.

A test analyzer representative of this method has been tested in accordance with the applicable test procedures specified in 40 CFR Part 53 (as amended on December 18, 2006). After reviewing the results of those tests and other information submitted by the applicant in the application, EPA has determined, in accordance with Part 53, that this method should be designated as an equivalent method. The information submitted by the applicant in the application will be kept on file, either at EPA's National Exposure Research Laboratory, Research Triangle Park North Carolina 27711 or in an approved archive storage facility. That information will be made available for inspection (upon request and with advance notice) to the extent consistent with 40 CFR Part 2 (EPA's regulations implementing the Freedom of Information Act).

As a designated reference or equivalent method, this method is acceptable for use by states and other air monitoring agencies under the requirements of 40 CFR Part 58, Ambient Air Quality Surveillance. For such purposes, the method must be used in strict accordance with the operation or instruction manual associated with the method and subject to any specifications and limitations

(*e.g.,* configuration or operational settings) specified in the applicable designation method description (see the identifications of the method above).

Use of the method should also be in general accordance with the guidance and recommendations of applicable sections of the "Quality Assurance Handbook for Air Pollution measurement Systems, Volume I," EPA/600/R–94/038a and "Quality Assurance Handbook for Air Pollution Measurement Systems, Volume II, Part 1," EPA–454/R–98–004 (available at *http://www.epa.gov/ttn/amtic/qabook.html*). Vendor modifications of a designate reference or equivalent method used for purposes of Part 58 are permitted only with prior approval of the EPA, as provided in Part 53. Provisions concerning modification of such methods by users are specified under Section 2.8 (Modifications of Methods by Users) of Appendix C to 40 CFR Part 58.

In general, a method designation applies to any sampler or analyzer which is identical to the sampler or analyzer described in the application for designation. In some cases, similar samplers or analyzers manufactured prior to the designation may be upgraded or converted (*e.g.,* by minor modification or by substitution of the approved operation or instruction manual) so as to be identical to the designated method and thus achieve designated status. The manufacturer should be consulted to determine the feasibility of such upgrading or conversion.

Part 53 requires that sellers of designated reference or equivalent method analyzers or samplers comply with certain conditions. These conditions are specified in 40 CFR 53.9 and are summarized below:

(a) A copy of the approved operation or instruction manual must accompany the sampler or analyzer when it is delivered to the ultimate purchaser.

(b) The sampler or analyzer must not generate any unreasonable hazard to operators or to the environment.

(c) The sampler or analyzer must function within the limits of the applicable performance specifications given in 40 CFR 50 and 53 for at least one year after delivery when maintained and operated in accordance with the operation or instruction manual.

(d) Any sampler or analyzer offered for sale as part of a reference or equivalent method must bear a label or sticker indicating that it as been designated as part of a reference or equivalent method in accordance with Part 53 and showing its designated method identification number.

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 10



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

June 21, 2007

THE ADMINISTRATOR

The Honorable Arnold Schwarzenegger
Governor of California
State Capitol
Sacramento, California 95814

Dear Governor Schwarzenegger:

As I committed to you in my letter of June 13, 2007, I am writing to inform you of our intended time frame for making a decision on California's request for a waiver of Federal preemption for its motor vehicle greenhouse gas emission standards.

As you know, the California Air Resources Board (CARB) submitted its waiver request to the Agency on December 21, 2005. EPA communicated to CARB that it was withholding consideration of the waiver request pending a decision by the United States Supreme Court in the *Massachusetts v. EPA* lawsuit. Our reason for withholding consideration was that the decision and opinion from the Supreme Court could be directly relevant to issues EPA must address in the context of CARB's waiver request. The Agency subsequently asked for comment on whether the *Massachusetts v. EPA* decision is relevant to EPA's consideration of the waiver criteria under the Clean Air Act.

When the Supreme Court issued its decision on April 2, 2007, finding, among other things, that carbon dioxide and other greenhouse gases are covered by the definition of a "pollutant" under Section 202 of the Clean Air Act, I committed to move expeditiously to evaluate the petition. On April 11, 2007, I met with you and we discussed the plan for moving forward. At that time, I informed you that the Agency would conduct the necessary public hearing on the petition in late May. In addition, the Agency offered to conduct an additional hearing in California.

On April 30, 2007, the Agency published a Federal Register notice announcing a public hearing in Washington, DC and a written public comment period. We held public hearings in Washington, D.C., on May 22, 2007, and in Sacramento, California, on May 30, 2007. EPA received several requests to extend the June 15, 2007 comment deadline but the Agency declined to do so. We heard from over 80 individuals at these hearings and have received over 34,000 written comments from parties representing a broad scope of interests, including state and local governments, public health and environmental organizations, academia, industry and citizens. EPA has received thousands of pages of substantive comments and hundreds of attachments of a technical and scientific nature.

Having evaluated the volume and nature of the comments received during the public comment period, I will make a final determination on the State's request by the end of this year. This time frame is consistent with that of earlier California requests involving fact-based technical assessments and legal analysis. For example, the State's petition for a waiver of Federal LEV I standards was decided by the Agency in January 1993, approximately nine months after the public hearing. Similarly, California's petition for a waiver of LEV II standards was decided in April 2003, again approximately nine months following the public hearing. The pending petition presents issues of similar, if not greater, complexity. I believe a schedule that provides for a decision on the pending petition by the end of this year is both responsible and expeditious.

Thank you for your continued interest. I look forward to working with you on this and other important issues.

Sincerely,

Stephen L. Johnson

2

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 11

**TESTIMONY OF**
**STEPHEN L. JOHNSON**
**ADMINISTRATOR**
**U.S. ENVIRONMENTAL PROTECTION AGENCY**
**BEFORE THE**
**COMMITTEE ON ENVIRONMENT & PUBLIC WORKS**
**UNITED STATES SENATE**

**July 26, 2007**

Good morning, Chairman Boxer and members of the Senate Committee on Environment and Public Works. I appreciate the opportunity to come before this Committee again to update you on the status of EPA's response to California's request for a waiver of preemption for its greenhouse gas motor vehicle emission standards. I also will address other recent developments regarding the Administration's efforts to address the long term challenge of global climate change.

**I. The California Waiver Request**

First, I want to clarify that EPA is following two separate tracks for the consideration of greenhouse gas regulations for motor vehicles. As I have previously indicated in Congressional testimony, EPA is working with its interagency partners to develop a proposed rule for the federal regulation of emissions of greenhouse gases from new motor vehicles. After considering public input through a notice and comment process, it is our intention to issue a final rule by the end of 2008. Separately, EPA is considering California's waiver request for its motor vehicle greenhouse gas regulation, under the statutory waiver authority provided in section 209 of the Clean Air Act.

With respect to the California waiver request, we have completed the public comment process required by the Clean Air Act.  In addition to our normal practice of offering a public hearing in Washington, DC, which was held on May 22nd, at the request of the state, we held an additional hearing in Sacramento, California, on May 30th.   We heard from over 80 individuals representing a broad scope of interests including States and local governments, public health and environmental organizations, academia, industry and citizens.

In our Notice announcing the public comment process we stated that the written comment period would close on June 15, 2007.  We received requests to extend the deadline but did not do so.  We received well over 60,000 comments.  This is an unprecedented number of comments on a California waiver request.  Parties commented on the three statutory waiver criteria as well as the additional three questions we raised in our April notice.

We are now examining the full range of technical and legal issues raised by the comments.   Given the complexity of the issues presented in the California waiver request, EPA is devoting the necessary resources in order to expeditiously review the extensive comments we have received, and respond to the waiver request. The Agency is performing a rigorous analysis in order to properly consider the legal and technical issues that we must address in making a decision under the Clean Air Act waiver criteria.    In recent written correspondence with California's Governor Schwarzenegger, I have

committed to issuing a decision on the waiver by the end of this year.  We will continue to inform the Committee of our progress in this matter.

**II.      The "Twenty in Ten" Rulemaking Process**

Earlier this year, the Administration sent Congress legislative proposals to achieve the "Twenty in Ten" plan.  The plan would increase the supply of renewable and other alternative fuels by setting a mandatory fuels standard to require the equivalent of 35 billion gallons of renewable and other alternative fuels in 2017, nearly five times the 2012 Renewable Fuels Standard (RFS) mandate established by the Energy Policy Act of 2005.  In 2017, this will displace 15 percent of projected annual gasoline use.  This plan would replace the RFS in the year 2010, while retaining the flexible credit, banking, and trading mechanisms contained in the RFS.  It would provide an accelerated schedule for alternative fuel requirements in the years 2010 to 2017.

The plan also would reform and modernize Corporate Average Fuel Economy (CAFE) standards for cars, and further increase the CAFE standards for light trucks.  Fuel efficiency standards for cars would be increased substantially beginning in 2010, and for light trucks beginning in 2012.  In 2017, we aim to reduce projected annual gasoline use by up to 8.5 billion gallons, a further 5 percent reduction that, in combination with increasing the supply of renewable and other alternative fuels, will bring the total reduction in projected annual gasoline use to 20 percent.

While the President continues to believe that effective legislation is the best approach to implementing his "Twenty In Ten" plan, he has directed EPA and our federal partners to work toward these goals now by developing regulations based on the framework of "Twenty in Ten".  The President has directed us to complete this regulatory process by the end of 2008. This is a very aggressive timeframe, but one that I am confident that my staff, working with our federal partners, can achieve.

EPA meets regularly with the Departments of Transportation, Energy, and Agriculture to ensure coordination of our work efforts. In addition, we are holding more than a dozen meetings with major stakeholder groups to ensure that they are involved in the process from the very beginning.  We also have begun the analytical work necessary to establish standards that carefully consider science, available technologies, lead time, and vehicle safety while evaluating benefits and costs.  As part of this process, we are working to identify the appropriate analytical resources that exist across the federal government to help EPA and other Departments and Agencies in their efforts to develop a rulemaking based on sound data and thorough technical analysis.

Any regulation of greenhouse gas emissions from new motor vehicles under Clean Air Act section 202(a) requires that EPA make a determination that emissions of greenhouse gases from new motor vehicles, primarily carbon dioxide emissions, cause or contribute to air pollution that may reasonably be anticipated to endanger public health or welfare. Section 211(c) of the Clean Air Act contains a similar standard with respect to motor vehicle fuels.  We are therefore reviewing the most recent and robust scientific evidence

4

from the climate change research community, including EPA's own Global Change Research Program.

A substantial amount of work remains to determine the scope of our assessment. For example, EPA may need to consider a range of science and impact issues, such as the accumulation of greenhouse gas concentrations in the atmosphere; the observed trends in average global warming, projected sea level rise, and precipitation patterns; the attribution of these and other observed changes to emissions of carbon dioxide and other greenhouse gases from human activities; the impact of US greenhouse gas emissions on global CO2 concentrations; the vulnerability of the natural environment, human health, and society to climate change; and the future projected effects within the U.S. under various projected rates of climate change over the course of this century. As directed by Executive Order 13432, EPA will coordinate with, and seek input from, climate change experts in other government agencies as well as the public.

When approaching the issue of greenhouse gas emissions estimates from the transportation sector, it should be recognized that 95 percent of such emissions consist of carbon dioxide, with the remaining 5 percent of emissions consisting of nitrous oxide and methane exhaust emissions and hydrofluorocarbons from air conditioners. In addressing greenhouse gas emissions from the transportation sector, one must recognize that on-board technology to control carbon dioxide emissions from vehicles does not currently exist, however carbon dioxide emissions from vehicles can be reduced by increasing their fuel economy. In addition, using a Department of Energy model, EPA analysis

conducted as part of the Renewable Fuel Standard shows that fuels such as cellulosic ethanol have the potential to offset lifecycle greenhouse gas emissions by over 90 percent when compared with gasoline derived from crude oil.  Biodiesel can result in the displacement of nearly 68 percent of lifecycle greenhouse gas emissions relative to diesel made from petroleum.  Increasing the use of such fuels in the transportation sector has the potential to make substantial reductions in greenhouse gas emissions.  Increasing the fuel economy of a vehicle can also decrease greenhouse gas emissions.

## III.      A New International Framework on Energy Security and Climate Change

On May 31st, the President called upon the world's major economies to work together to develop a long term global goal to reduce greenhouse gas emissions.  The President's plan recognizes that a new climate framework must be developed in a way that enhances energy security and promotes economic growth and includes both major developed and developing economies.   This fall, the United States will convene the first of a series of meetings for the world's largest economies and energy consumers to advance and contribute to a new global agreement under the United Nations Framework Convention on Climate Change (UNFCCC).  The participants in the framework will work together to develop a global emissions reduction goal, underpinned by national strategies and sectoral approaches that will set a practical, but flexible, path forward.  The effort will build on the Asia Pacific Partnership on Clean Development and Climate and other partnerships to develop and implement clean energy technologies.   We were pleased that

the major elements of the President's proposal were favorably received and incorporated into the leaders' statement at the recent meetings of the G8+5 in Germany a short time ago.

**IV.    Conclusion**

Ms. Chairman, today I have outlined EPA's consideration of California's request for a waiver of preemption for its greenhouse gas motor vehicle emission standards, our "Twenty in Ten" legislative proposals, as well as recent developments regarding the Administration's efforts to address the important issue of global climate change.  I look forward to working with you and other Members of the Committee on these challenging issues, and would be pleased to answer any questions that you might have.  Thank you for the opportunity to testify.

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 12

Dated: December 21, 2006.

Clay Sell,

*Deputy Secretary.*

## DEPARTMENT OF ENERGY, DEPUTY SECRETARY

*In the Matter of: Western Area Power Administration Rates Extension for the Pacific Northwest-Pacific Southwest Intertie Project Transmission Service Rates*

## Order Confirming and Approving an Extension of the Pacific Northwest-Pacific Southwest Intertie Project Transmission Service Rates

These transmission service rates were established following section 302 of the Department of Energy (DOE) Organization Act (42 U.S.C. 7152). This Act transferred to and vested in the Secretary of Energy the power marketing functions of the Secretary of the Department of the Interior and the Bureau of Reclamation under the Reclamation Act of 1902 (ch. 1093, 32 Stat. 388), as amended and supplemented by subsequent laws, particularly section 9(c) of the Reclamation Project Act of 1939 (43 U.S.C. 485h(c)), and other Acts that specifically apply to the project system involved.

By Delegation Order No. 00–037.00, effective December 6, 2001, the Secretary of Energy delegated: (1) the authority to develop power and transmission rates to the Administrator of the Western Area Power Administration (Western); (2) the authority to confirm, approve, and place such rates into effect on an interim basis to the Deputy Secretary of Energy; and (3) the authority to confirm, approve, and place into effect on a final basis, to remand, or to disapprove such rates to the Federal Energy Regulatory Commission.

## Background

The existing Rate Schedules consist of separate firm transmission service rates for the 230/345-kilovolt (kV) and 500-kV transmission systems and a nonfirm transmission service rate for the 230/345/500-kV transmission system. Rate Schedules INT-FT2 and INT-NFT2, Rate Order No. WAPA–71, were approved for a 53-month period, beginning February 1, 1996, and ending September 30, 2000. Rate Order No. WAPA–91 extended these rate schedules for a 39-month period, beginning October 1, 2000, through December 31, 2003. Rate Order No. WAPA–108 extended these rate schedules again beginning January 1, 2004, through December 31, 2006. Rate Schedule INT-FT3, contained in Rate Order No. WAPA–76, was approved for

a 5-year period, beginning January 1, 1999, and ending December 31, 2003. Rate Order No. WAPA–108 extended this rate schedule beginning January 1, 2004, through December 31, 2006.

## Discussion

Western's Desert Southwest Customer Service Region entered into a rate adjustment process with a **Federal Register** notice published on July 12, 2006, (71 FR 39310), which began the initial public consultation and comment period that ended on October 10, 2006. Western seeks an extension of the public process to provide more time to evaluate additional alternatives to the proposed rates. During the original consultation and comment period, Western was evaluating the impacts of a transmission sale arrangement that would have mitigated the proposed rate increase. However, a deferral of that transaction requires Western to assess the impact on the proposed rates as presented in the public process. The evaluation period and public process will take approximately 6 months to complete, including additional formal public forums. This makes it necessary to extend the current rates pursuant to 10 CFR part 903.23(b). Upon its approval, Rate Order No. WAPA–71 and Rate Order No. WAPA–76, previously extended under Rate Order No. WAPA–91 and Rate Order No. WAPA–108, will be extended under Rate Order No. WAPA–133.

## ORDER

In view of the above and under the authority delegated to me by the Secretary, I hereby extend the existing Rate Schedules INT-FT2, INT-FT3, and INT-NFT2 for firm and nonfirm transmission service from January 1, 2007, through December 31, 2007.

Dated: 12/21/06.

Clay Sell,

*Deputy Secretary.*

[FR Doc. E6–22268 Filed 12–27–06; 8:45 am]

**BILLING CODE 6450–01–P**

## ENVIRONMENTAL PROTECTION AGENCY

[FRL–8263–2]

## California State Motor Vehicle Pollution Control Standards; Notice of Within-the-Scope Determination for Amendments To California's Zero-Emission Vehicle (ZEV) Standards and Notice of Waiver of Federal Preemption Decision for Other ZEV standards

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice Regarding Confirmation of Within-the-Scope Finding and Waiver of Federal Preemption for Amendments to California's Emission Regulations for Zero Emission Vehicles.

**SUMMARY:** By this decision, issued under section 209(b) of the Clean Air Act, as amended, (hereafter ''Act''), 42 U.S.C. 7543(b), the Environmental Protection Agency (EPA) today has determined that provisions of the California Air Resources Board's (CARB's) 1999–2003 amendments to the California Zero-Emission Vehicle (ZEV) regulations as they affect 2006 and prior model years (MYs) are within-the-scope of previous waivers of federal preemption granted to California for its ZEV regulations. In the alternative, EPA is also granting a waiver of federal preemption for these MYs. EPA is also granting California(s request for a waiver of federal preemption to enforce provisions of the ZEV regulations as they affect 2007 through 2011 MYs. As explained below, EPA is also making a finding that although we believe it appropriate to grant a full waiver of federal preemption for the 2007 MY, we also believe it appropriate to consider the 2007 MY regulations within-the-scope of previous waivers of federal preemption as they apply to certain vehicles that were already subject to the preexisting ZEV regulations, with the exception that requirements pertaining to heavier light-duty trucks (LDT2s) are subject to a full waiver of federal preemption. EPA, by this decision, is not making any findings or determinations with regard to the 2012 and later model years under CARB's ZEV regulations.

**DATES:** Any objections to the findings in this notice regarding EPA's confirmation that CARB's ZEV amendments, as they affect the 2007 MY, are within-the-scope of previous waivers must be filed January 29, 2007. Otherwise, at the end of the 30-day period, these findings will become final. Upon receipt of any timely objection, EPA will consider scheduling a public hearing to reconsider these finding in a subsequent **Federal Register** Notice. Under section 307(b)(1) of the Act, judicial review of this final action may be sought only in the United States Court of Appeals for the District of Columbia Circuit. Petitions for review must be filed February 26, 2007. Under section 307(b)(2) of the Act, judicial review of this final action may not be obtained in subsequent enforcement proceedings.

**ADDRESSES:** Any objections to the within-the-scope findings in this notice, applicable to the 2007 MY, should be filed with David Dickinson at the

address noted below. The Agency's Decision Document, containing an explanation of the Assistant Administrator's decision, as well as all documents relied upon in making that decision, including those submitted to EPA by CARB, are available at EPA's Air and Radiation Docket and Information Center (Air Docket). Materials relevant to this decision are contained in Docket No. EPA–HQ–OAR–2004–0437. The docket is located at The Air Docket, room B–108, 1301 Constitution Avenue, NW., Washington, DC 20460, and may be viewed between 8 a.m. and 5:30 p.m., Monday through Friday. The telephone is (202) 566–1742. A reasonable fee may be charged by EPA for copying docket material.

Additionally, an electronic version of the public docket is available through the Federal government's electronic public docket and comment system. You may access EPA dockets at *www.regulations.gov.* After opening the *www.regulations.gov* Web site, select "Environmental Protection Agency" from the pull-down Agency list, then scroll to "Keyword or ID" and enter EPA-HQ-OAR–2004–0437 to view documents in the record of this California request. Although a part of the official docket, the public docket does not include Confidential Business Information (CBI) or other information whose disclosure is restricted by statute.

**FOR FURTHER INFORMATION CONTACT:** David Dickinson, Compliance and Innovative Strategies Division, U.S. Environmental Protection Agency, Ariel Rios Building (6405J), 1200 Pennsylvania Avenue, NW., Washington, DC 20460. Telephone: (202)343–9256. E-Mail Address: *Dickinson.David@EPA.GOV.*

**SUPPLEMENTARY INFORMATION:** In this decision, EPA has determined that the California Air Resources Board(s (CARB's) 1999–2003 amendments to the California Zero-Emission Vehicle (ZEV) regulations as they affect 2006 and prior model years (MYs) are within-the-scope of previous waivers of federal preemption granted to California for its ZEV regulations pursuant to section 209(b) of the Act. In the alternative, EPA is also granting a waiver of federal preemption for such MYs. EPA is also granting California's request for a waiver of federal preemption to enforce certain provisions of the ZEV regulations as they affect 2007 through 2011 MY vehicles. Because the 2007 MY provisions are similar to the provisions for previous model years (with the exception of new requirements for LDT2s) EPA is also confirming that such

provisions are within-the-scope of previous waivers of federal preemption.

By letter dated September 23, 2004, CARB submitted a request seeking confirmation that the amendments as they pertain to the 2003–2006 model years are within-the-scope of previous waivers and seeking a waiver of Federal preemption as the amendments pertain to the 2007 and subsequent model years. The first set of amendments, the "1999 ZEV amendments," amended the existing requirement that at least 10 percent of a manufacturer(s 2003 and subsequent MY passenger cars and lightest light-duty trucks (the LDT1 category) delivered for sale in California be ZEV vehicles with no emissions. The 1999 ZEV amendments added a new option for meeting the 10 percent requirement, including up to 60 percent of the ZEV obligation of a large-volume manufacturer—and 100 percent of the obligations of an intermediate-volume manufacturer—that could be met with allowances from partial ZEV allowance vehicles (PZEVs). The "2001 ZEV amendments" maintained a core ZEV component but reduced the numbers of vehicles required in the near-term and broadened the scope of vehicle technologies allowed and provided a variety of multipliers to earn credits for the early introduction of ZEVs. The third set of amendments to the ZEV regulation, the "2003 ZEV amendments," delayed the start of the percentage of ZEV requirements from MY 2003 to MY 2005, added the heavier light-duty trucks (LDT2s) into a manufacturers fleet population count, established an alternative compliance path for large-volume manufacturers that choose to focus on the development of fuel cell ZEVs, eliminated all references to fuel economy and vehicle efficiency from the 2001 ZEV amendments, and adjusted the credit structure for the various vehicles types. Finally, the fourth set of amendments include a requirement that 2006 and later MY battery EVs other than neighborhood electric vehicles (NEVs) be equipped with a conductive charger inlet port and an on-board charger, and a separate minor element from CARB's LEV II regulations which revised the standards for alternative fuel vehicles qualifying as partial ZEV allowance vehicles and for which CARB seeks a within-the-scope confirmation.

On January 18, 2005, a **Federal Register** notice was published announcing an opportunity for hearing and comment on CARB's request.[1] EPA received a request for a public hearing and conducted a hearing on February

17, 2005. The written comment period expired on March 29, 2005. After the close of the written comment period EPA also received a series of letters for the 2007 MY since EPA had not acted upon CARB's request at the time of the letters. Included in these letters, regarding the 2007 MY, was a new request from CARB to EPA seeking EPA's confirmation that the ZEV amendments as they affect 2007 MY are within-the-scope of previous waivers. CARB did not include the requirements applicable to LDT2s that commence in the 2007 MY as part of this within-the-scope request.

Section 209(b) of the Act provides that, if certain criteria are met, the Administrator shall waive Federal preemption for California to enforce new motor vehicle emission standards and accompanying enforcement procedures. The criteria include consideration of whether California arbitrarily and capriciously determined that its standards are, in the aggregate, at least as protective of public health and welfare as the applicable federal standards; whether California needs state standards to meet compelling and extraordinary conditions; and whether California's amendments are consistent with section 202(a) of the Act.

If California acts to amend a previously waived standard or accompanying enforcement procedure, the amendment may be considered within-the-scope of a previously granted waiver provided that it does not undermine California's determination that its standards, in the aggregate, are as at least as protective of public health and welfare as applicable Federal standards, does not affect its consistency with section 202(a) of the Act, and raises no new issues affecting EPA's previous waiver decisions.

In its request letter to EPA, CARB stated that the amendments to its ZEV requirements will not cause the California standards, in the aggregate, to be less protective of public health and welfare than the applicable Federal standards. EPA received information during this proceeding that questioned whether the CARB ZEV amendments may be less protective for various reasons. EPA finds that the party opposing the within-the-scope determination and the waiver have not meet their burden of proof to demonstrate that the ZEV amendments undermine CARB's previous protectiveness determination or that CARB was arbitrary and capricious in its protectiveness determination. I cannot find that CARB's ZEV regulations would cause the California motor vehicle emission standards, in the

---

[1] 70 FR 2860 (January 18, 2005).

**78192**    **Federal Register** / Vol. 71, No. 249 / Thursday, December 28, 2006 / Notices

aggregate, to be less protective of public health and welfare than applicable Federal standards.

CARB also demonstrated continuing existence of compelling and extraordinary conditions, justifying the state's need for its own motor vehicle pollution control program. Because EPA has not received adverse public comment challenging the need for CARB's own motor vehicle pollution control program, I cannot deny the waiver based on a lack of a compelling and extraordinary conditions.

CARB stated in its request letters that the amendments do not raise any concerns of inadequate leadtime or impose any inconsistent certification requirements. EPA received information during this proceeding that questioned: whether the advance-technology partial-zero-emission vehicles (ATPZEVs) provisions of the ZEV requirements were of a type not consistent with § 202(a), and whether the partial-zero-emission vehicle (PZEV) and fuel-cell vehicle (FCV) provisions of the ZEV requirements were not consistent with § 202(a) due to considerations of technological feasibility, lead time, and cost. EPA finds that the party opposing the within-the-scope confirmation and the waiver of federal preemption has not met its burden of proof that the ZEV amendments are inconsistent with § 202(a). I cannot find that CARB's ZEV regulations, as noted, would cause the California motor vehicle emission standards to be inconsistent with § 202(a).

As explained further in the Decision Document, EPA also received comment that CARB's ZEV regulations raise "new issues" which require EPA to consider CARB's within-the-scope request under the criteria for a full waiver of federal preemption. EPA finds that the party opposing the within-the-scope confirmation has not met its burden of proof that the ZEV amendments raise new issues and therefore I cannot find that the within-the-scope confirmation should be denied on this basis.

Therefore I confirm that CARB's ZEV amendments as they affect the 2006 and earlier MYs, as noted above, are within-the-scope of existing waivers of federal preemption. I also find that the ZEV amendments as they affect the 2006 and earlier MYs meet the criteria for a full waiver and thus I alternatively grant a waiver of federal preemption for these MYs. I also grant a waiver of federal preemption of CARB's ZEV amendments as they affect the 2007 through 2011 MYs. As explained further in the Decision Document, EPA is not making any determinations regarding a

waiver of federal preemption applicable to 2012 and later MYs.

CARB did not seek a within-the-scope confirmation of the 2007 MY as part of its initial request to EPA. However, CARB later requested EPA to consider the 2007 MY provisions (with the exception of the LDT2 requirement) as within-the-scope. While EPA did request comment regarding CARB's within-the-scope request for the 2003–2006 MYs, EPA has not done so for the 2007 MY. As explained in the Decision Document, EPA does not believe that a further official request for comment is needed at this time. Because the 2007 MY provisions are very similar to the 2005–2006 MY provisions, I confirm that the 2007 MY requirements (with the exception of the LDT2 requirement) are within-the-scope of previous waivers of federal preemption. However, any party that wishes to object to this determination may file such objection as indicated in the DATES and ADDRESSES section above. Upon receipt of a timely objection, EPA will consider scheduling a public hearing to reconsider these findings in a subsequent **Federal Register** Notice.

A full explanation of EPA's decision, including our review of comments received in opposition to CARB's request, is contained in a Decision Document which may be obtained as explained above.

My decision will affect not only persons in California but also the manufacturers outside the State who must comply with California's requirements in order to produce nonroad engines and vehicles for sale in California. For this reason, I hereby determine and find that this is a final action of national applicability.

As with past waiver decisions, this action is not a rule as defined by Executive Order 12866. Therefore, it is exempt from review by the Office of Management and Budget as required for rules and regulations by Executive Order 12866.

In addition, this action is not a rule as defined in the Regulatory Flexibility Act, 5 U.S.C. 601(2). Therefore, EPA has not prepared a supporting regulatory flexibility analysis addressing the impact of this action on small business entities.

Finally, the Administrator has delegated the authority to make determinations regarding waivers under section 209(b) of the Act to the Assistant Administrator for Air and Radiation.

Dated: December 21, 2006.

**William L. Wehrum,**

*Acting Assistant Administrator for Air and Radiation.*

[FR Doc. E6–22314 Filed 12–27–06; 8:45 am]

**BILLING CODE 6560–50–P**

---

# ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OAR–2006–0340; FRL–8262–6]**

## Boutique Fuels List under Section 1541(b) of the Energy Policy Act

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice.

---

**SUMMARY:** The Energy Policy Act of 2005 (EPAct) includes a number of provisions addressing state boutique fuel programs. Section 1541(b) of this Act requires EPA, in consultation with the Department of Energy, to determine the total number of fuels approved into all state implementation plans (SIPs) as of September 1, 2004, under section 211(c)(4)(C) of the Clean Air Act (CAA). The EPAct also requires us to publish a list of such fuels, including the states and Petroleum Administration for Defense District (PADD) in which they are used, for public review and comment. On June 6, 2006, we published a draft list based upon a "fuel type approach" along with an explanation of our rationale in developing it. We also published an alternative list based upon a "state specific approach." In this notice we are finalizing the list of total number of fuels approved into all SIPs as of September 1, 2004, based upon the fuel type approach. This notice also addresses comments that we received on the proposed draft notice and list.

**FOR FURTHER INFORMATION CONTACT:** Anne Pastorkovich, Environmental Protection Agency, MC 6406J, 1200 Pennsylvania Ave., NW, Washington, DC 20460; telephone number: 202–343–9623; fax number: 202–343–2801; email address: *pastorkovich.anne-marie@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

Under the Clean Air Act (CAA), state fuel programs respecting a fuel characteristic or component that we have regulated under section 211(c) (1) are preempted.[1] EPA may waive preemption through approval of the fuel program into a State Implementation Plan (SIP). Approval into the SIP

---

[1] See CAA section 211(c)(4)(A), 42 U.S.C. 7545(c)(4)(A).

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 13

**What Is the Next Step in the Process for This ICR?**

EPA will consider the comments received and amend the ICR as appropriate. The final ICR package will then be submitted to OMB for review and approval pursuant to 5 CFR 1320.12. At that time, EPA will issue another **Federal Register** notice pursuant to 5 CFR 1320.5(a)(1)(iv) to announce the submission of the ICR to OMB and the opportunity to submit additional comments to OMB. If you have any questions about this ICR or the approval process, please contact the technical person listed under **FOR FURTHER INFORMATION CONTACT**.

Dated: December 20, 2005.

**William Lamson,**

*Acting Director, Emissions Monitoring and Analysis Division.*

[FR Doc. E5–8269 Filed 1–3–06; 8:45 am]

**BILLING CODE 6560–50–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

[AMS–FRL–8018–3]

**California State Motor Vehicle Pollution Control Standards; Waivers of Federal Preemption; Notice of Decision**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice regarding waiver of federal preemption.

**SUMMARY:** EPA today, pursuant to section 209(b) of the Clean Air Act (Act), 42 U.S.C. 7543(b), is granting California its request for a waiver of Federal preemption for its Engine Manufacturers Diagnostics regulations for 2007 and subsequent model year heavy-duty vehicle engines (2007 EMD standards). By letter dated March 7, 2005, the California Air Resources Board (CARB) requested that EPA grant California a waiver of federal preemption for its 2007 EMD standards, which require the functional monitoring of major emission control components/systems.

**ADDRESSES:** The Agency's Decision Document, containing an explanation of the Assistant Administrator's decision, as well as all documents relied upon in making that decision, including those submitted to EPA by CARB, are available at the EPA's Air and Radiation Docket and Information Center (Air Docket). Materials relevant to this decision are contained in Docket No. OAR–2005–100. The docket is located at The Air Docket, room B–108, 1301 Constitution Avenue, NW., Washington,

DC 20460, and may be viewed between 8 a.m. and 5:30 p.m., Monday through Friday. The telephone number is (202) 566–1742. A reasonable fee may be charged by EPA for copying docket material. Additionally, an electronic version of the public docket is available through EPA's electronic public docket and comment system. You may use EPA dockets at *http://www.epa.gov/edocket/* to view public comments, access the index listing of the contents of the official public docket, and to access those documents in the public docket that are available electronically. Although a part of the official docket, the public docket does not include Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Once in the electronic docket system, select "search," then key in the appropriate docket ID number for Docket OAR–2005–100.

Electronic copies of this Notice and the accompanying Decision Document are available via the Internet on the Office of Transportation and Air Quality (OTAQ) Web site *http://www.epa.gov/OTAQ.* Users can find these documents by accessing the OTAQ Web site and looking at the path entitled, "Regulations." This service is free of charge, except for any cost you already incur for Internet connectivity. The electronic **Federal Register** version of the Notice is made available on the day of publication on the primary Web site *http://www.epa.gov/docs/fedrgstr/EPA-AIR.*

Please note that due to differences between the software used to develop the documents and the software into which the documents may be downloaded, changes in format, page length, etc., may occur.

**FOR FURTHER INFORMATION CONTACT:** David J. Dickinson, Compliance and Innovative Strategies Division, U.S. Environmental Protection Agency, Ariel Rios Building (6405J), 1200 Pennsylvania Avenue, NW., Washington, DC 20460. Telephone: (202) 343–9256. E-Mail Address: *Dickinson.David@EPA.GOV.*

**SUPPLEMENTARY INFORMATION:** I have decided to grant California a waiver of Federal preemption pursuant to section 209(b) of the Act for the 2007 EMD regulations.[1]

---

[1] The CARB Board approved the 2007 EMD standards by Resolution 04–16 on May 20, 2004 (See Attachment 3 to CARB's March 7, 2005, Waiver Request Letter). The regulations covered by today's waiver include title 13, California Code of Regulations (CCR), section 1971. For further discussion of the regulations covered by today's decision please see the Decision Document.

Section 209(b) of the Act provides that, if certain criteria are met, the Administrator shall waive federal preemption for California to enforce new motor vehicle emission standards and accompanying enforcement procedures. The criteria include consideration of whether California arbitrarily and capriciously determined that its standards are, in the aggregate, at least as protective of public health and welfare as the applicable Federal standards; whether California needs State standards to meet compelling and extraordinary conditions; and whether California's amendments are consistent with section 202(a) of the Act.

As further explained in the Decision Document supporting today's decision, EPA did not receive any comment suggesting that CARB's request should be denied based on the criteria set forth in section 209(b) of the Act.[2]

CARB determined that its 2007 EMD standards do not cause California's standards, in the aggregate, to be less protective of public health and welfare than the applicable Federal standards. No information has been submitted to demonstrate that California's standards, in the aggregate, are less protective of public health and welfare than the applicable Federal standards. Thus, EPA cannot make a finding that CARB's determination, that its 2007 EMD standards are, in the aggregate, at least as protective of public health and welfare, is arbitrary and capricious.

CARB has continually demonstrated the existence of compelling and extraordinary conditions justifying the need for its own motor vehicle pollution control program, which includes the subject 2007 EMD standards. No information has been submitted to demonstrate that California no longer has a compelling and extraordinary need for its own program. Therefore, I agree that California continues to have compelling and extraordinary conditions which require its own program, and, thus, I cannot deny the waiver on the basis of the lack of compelling and extraordinary conditions.

CARB has submitted information that the requirements of its 2007 EMD standards are technologically feasible and present no inconsistency with federal requirements and are, therefore, consistent with section 202(a) of the Act. No information has been presented to demonstrate that CARB's requirements are inconsistent with section 202(a) of the Act, nor does EPA have any other reason to believe that

---

[2] EPA published a notice for hearing and comment on July 18, 2005 (70 FR 41218).

CARB's requirements are inconsistent with section 202(a). Thus, I cannot find that California's 2007 California EMD standards are inconsistent with section 202(a) of the Act. Accordingly, I hereby grant the waiver requested by California.

This decision will affect not only persons in California but also the manufacturers outside the State who must comply with California's requirements in order to produce motor vehicles for sale in California. For this reason, I hereby determine and find that this is a final action of national applicability.

Under section 307(b)(1) of the Act, judicial review of this final action may be sought only in the United States Court of Appeal for the District of Columbia Circuit. Petitions for review must be filed by March 6, 2006. Under section 307(b)(2) of the Act, judicial review of this final action may not be obtained in subsequent enforcement proceedings.

As with past waiver decisions, this action is not a rule as defined by Executive Order 12866. Therefore, it is exempt from review by the Office of Management and Budget as required for rules and regulations by Executive Order 12866.

In addition, this action is not a rule as defined in the Regulatory Flexibility Act, 5 U.S.C. sec. 601(2). Therefore, EPA has not prepared a supporting regulatory flexibility analysis addressing the impact of this action on small business entities.

Finally, the Administrator has delegated the authority to make determinations regarding waivers of Federal preemption under section 209(b) of the Act to the Assistant Administrator for Air and Radiation.

Dated: December 22, 2005.

**William L. Wehrum,**

*Acting Assistant Administrator, Office of Air and Radiation.*

[FR Doc. E5–8263 Filed 1–3–06; 8:45 am]

**BILLING CODE 6560–50–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**[OPP–2005–0268; FRL–7725–3]**

**Minor and Specialty Crops Integrated Pest Management (IPM) Special Projects; Request for Proposals**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice.

---

**SUMMARY:** EPA's Office of Prevention, Pesticides and Toxic Substances (OPPTS) announces the availability of up to $615,000 to address critical pest management needs of U.S. minor and specialty crop growers. The Agency anticipates funding up to five projects. The project period of performance is 3 years, with the possibility of extension. Proposed projects should address minor and specialty crop producers' critical pest management needs and demonstrate the importance and relevancy of the project to implementation of the Food Quality Protection Act (FQPA). This request for proposal was developed in response to recommendations made by the Committee to Advise on Reassessment and Transition (CARAT), a joint EPA and U.S. Department of Agriculture-sponsored federal advisory committee established to advise on the implementation of the FQPA, that the Agency facilitate the transition to reduced-risk pest management approaches for minor and specialty crops. You may access the full text of the grant announcement at *http://www.epa.gov/pesticides/grants/index.htm*.

**DATES:** Proposals must be postmarked on or before February 21, 2006.

**FOR FURTHER INFORMATION CONTACT:** Pat Cimino, Office of Pesticide Programs (7501C), Minor Crop Advisor, Environmental Protection Agency, 1200 Pennsylvania Ave., NW., Washington, DC 20460–0001; telephone number: (703) 308–9357; e-mail: *cimino.patricia@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

**I. General Information**

*A. Does this Action Apply to Me?*

This action is directed to the 50 states, District of Columbia, U.S. territories or possessions, federally recognized Indian tribal governments and Native American Organizations, public and private universities and colleges, hospitals, laboratories, other public or private nonprofit institutions, and individuals.

If you have any questions regarding the applicability of this action to a particular entity, consult the person listed under **FOR FURTHER INFORMATION CONTACT**.

*B. How Can I Get Additional Information, Including Copies of this Document and Other Related Documents?*

1. *Docket*. EPA has established an official public docket for this action under docket identification (ID) number OPP–2005–0268. The official public docket is the collection of materials that is available for public viewing at the Public Information and Records Integrity Branch (PIRIB), Room 119, Crystal Mall #2, 1800 S. Bell St., Arlington, VA. This docket facility is open from 8:30 a.m. to 4 p.m., Monday through Friday, excluding legal holidays. The docket telephone number is (703) 305–5805.

2. *Electronic access*. You may obtain electronic copies of this document through the EPA Internet under the ''**Federal Register**'' listings at *http://www.epa.gov/fedrgstr/*.

EDOCKET, EPA's electronic public docket and comment system was replaced on November 25, 2005, by an enhanced federal-wide electronic docket management and comment system located at *http://www.regulations.gov/*. Follow the on-line instructions.

An electronic version of the public docket is available through EPA's electronic public docket and comment system, EPA Dockets. You may use EPA Dockets at *http://www.epa.gov/edocket/* to access the index listing of the contents of the official public docket, and to access those documents in the public docket that are available electronically. Although not all docket materials may be available electronically, you may still access any of the publicly available docket materials through the docket facility identified in Unit I.B.1. Once in the system, select ''search,'' then key in the appropriate docket ID number.

You may access the full text of the grant announcement at *http://www.epa.gov/pesticides/grants/index.htm*. Go to *http://www.grants.gov* to electronically find and apply for competitive grant opportunities from all Federal grant-making agencies. Grants.gov is the single access point for over 1,000 grant programs offered by the 26 Federal grant-making agencies.

**II. Overview**

The following list provides key information concerning this funding opportunity:

• *Federal agency name*: Environmental Protection Agency (EPA).

• *Funding opportunity title*: Minor and Specialty Crops Integrated Pest Management Special Projects; Request for Proposals.

• *Funding opportunity number*: EPA–OPP–005.

• *Announcement type*: Announcement of a funding opportunity.

• *Catalog of Federal Domestic Assistance (CFDA) number*: 66.716.

• *Dates*: Proposals must be postmarked on or before February 21, 2006.

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 14

a rulemaking of particular applicability involving rates or services applicable to public property.

*Environmental Compliance*

In compliance with the National Environmental Policy Act (NEPA) of 1969 (42 U.S.C. 4321, *et seq.*); Council on Environmental Quality Regulations (40 CFR parts 1500–1508); and DOE NEPA Regulations (10 CFR part 1021), Western has determined that this action is categorically excluded from preparing an environmental assessment or an environmental impact statement.

*Determination Under Executive Order 12866*

Western has an exemption from centralized regulatory review under Executive Order 12866; accordingly, no clearance of this notice by the Office of Management and Budget is required.

*Small Business Regulatory Enforcement Fairness Act*

Western has determined that this rule is exempt from congressional notification requirements under 5 U.S.C. 801 because the action is a rulemaking of particular applicability relating to rates or services and involves matters of procedure.

*Submission to the Federal Energy Regulatory Commission*

The interim ratesetting formula and FY 2006 Base Charge and rates herein confirmed, approved, and placed into effect, together with supporting documents, will be submitted to the Commission for confirmation and final approval.

**Order**

In view of the foregoing and under the authority delegated to me, I confirm and approve on an interim basis, effective October 1, 2005, Rate Schedule BCP–F7, for the Boulder Canyon Project of the Western Area Power Administration. The rate schedule shall remain in effect on an interim basis, pending the Commission's confirmation and approval of it or substitute rates on a final basis through September 30, 2010.

Dated: August 11, 2005.

Clay Sell,

Deputy Secretary.

Rate Schedule BCP–F7 (Supersedes Schedule BCP–F6)

**United States Department of Energy, Western Area Power Administration**

*Boulder Canyon Project, Arizona, Nevada, Southern California; Schedule of Rates for Electric Service*

*Effective:* The first day of the first full billing period beginning on or after October 1, 2005, and remaining in effect through September 30, 2010, or until superseded.

*Available:* In the marketing area serviced by the Boulder Canyon Project (BCP).

*Applicable:* To power Contractors served by the BCP supplied through one meter, at one point of delivery, unless otherwise provided by contract.

*Character and Conditions of Service:* Alternating current at 60 hertz, three-phase, delivered and metered at the voltages and points established by contract.

*Base Charge:* The total charge paid by a Contractor for annual capacity and energy based on the annual revenue requirement. The base charge shall be composed of an energy component and a capacity component:

Energy Charge: Each Contractor shall be billed monthly an energy charge equal to the Rate Year Energy Dollar multiplied by the Contractor's firm energy percentage multiplied by the Contractor's monthly energy ratio as provided by contract.

Capacity Charge: Each Contractor shall be billed monthly a capacity charge equal to the Rate Year Capacity Dollar divided by 12 multiplied by the Contractor's contingent capacity percentage as provided by contract.

*Forecast Rates:* Energy: Shall be equal to the Rate Year Energy Dollar divided by the lesser of the total master schedule energy or 4,501.001 million kWhs. This rate is to be applied for use of excess energy, unauthorized overruns, and water pump energy.

Capacity: Shall be equal to the Rate Year Capacity Dollar divided by 1,951,000 kWs, to be applied for use of unauthorized overruns.

*Calculated Energy Rate:* Within 90 days after the end of each rate year, a Calculated Energy Rate shall be calculated. If the energy deemed delivered is greater than 4,501.001 million kWhs, then the Calculated Energy Rate shall be applied to each Contractor's energy deemed delivered. A credit or debit shall be established based on the difference between the Contractor's Energy Dollar and the Contractor's actual energy charge, to be applied the following month calculated or as soon as possible thereafter.

*Lower Basin Development Fund Contribution Charge:* The contribution

charge is 4.5 mills/kWh for each kWh measured or scheduled to an Arizona purchaser and 2.5 mills/kWh for each kWh measured or scheduled to a California or Nevada purchaser, except for purchased power.

*Billing for Unauthorized Overruns:* For each billing period in which there is a contract violation involving an unauthorized overrun of the contractual power obligations, such overrun shall be billed at 10 times the Forecast Energy Rate and Forecast Capacity Rate. The contribution charge shall be applied also to each kWh of overrun.

*Adjustments:* None.

[FR Doc. 05–17000 Filed 8–25–05; 8:45 am]

**BILLING CODE 6450–01–P**

## ENVIRONMENTAL PROTECTION AGENCY

[AMS–FRL–7961–1]

**California State Motor Vehicle Pollution Control Standards; Waiver of Federal Preemption; Notice of Decision**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice Regarding Waiver of Federal Preemption.

**SUMMARY:** EPA today, pursuant to section 209(b) of the Clean Air Act (Act), 42 U.S.C. 7543(b), is granting California its request for a waiver of federal preemption for its heavy-duty diesel regulations for 2007 and subsequent model year vehicles and engines (2007 California Heavy Duty Diesel Engine Standards) and related test procedures including the not-to-exceed (NTE) and supplemental steady-state tests (supplemental test procedures) to determine compliance with applicable standards. By letter dated July 16, 2004, the California Air Resources Board (CARB) requested that EPA grant California a waiver of federal preemption for its 2007 California Heavy Duty Diesel Engine Standards, which primarily align California's standards and test procedures with the federal standards and test procedures for 2007 and subsequent model year vehicles and engines.

**ADDRESSES:** The Agency's Decision Document, containing an explanation of the Assistant Administrator's decision, as well as all documents relied upon in making that decision, including those submitted to EPA by CARB, are available at the EPA's Air and Radiation Docket and Information Center (Air Docket). Materials relevant to this decision are contained in Docket No. OAR–2004–0132. The docket is located

at The Air Docket, room B–108, 1301 Constitution Avenue, NW., Washington, DC 20460, and may be viewed between 8 a.m. and 5:30 p.m., Monday through Friday. The telephone number is (202) 566–1742. A reasonable fee may be charged by EPA for copying docket material. Additionally, an electronic version of the public docket is available through EPA's electronic public docket and comment system. You may use EPA dockets at *http://www.epa.gov/edocket/* to submit or view public comments, access the index listing of the contents of the official public docket, and to access those documents in the public docket that are available electronically. Although a part of the official docket, the public docket does not include Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Once in the electronic docket system, select "search," then key in the appropriate docket ID number for Docket OAR–2004–0132.

Electronic copies of this Notice and the accompanying Decision Document are available via the Internet on the Office of Transportation and Air Quality (OTAQ) Web site (*http://www.epa.gov/OTAQ*). Users can find these documents by accessing the OTAQ Web site and looking at the path entitled, "Regulations." This service is free of charge, except for any cost you already incur for Internet connectivity. The electronic **Federal Register** version of the Notice is made available on the day of publication on the primary Web site (*http://www.epa.gov/docs/fedrgstr/EPA-AIR*).

Please note that due to differences between the software used to develop the documents and the software into which the documents may be downloaded, changes in format, page length, etc., may occur.

**FOR FURTHER INFORMATION CONTACT:** David J. Dickinson, Certification and Compliance Division, U.S. Environmental Protection Agency, Ariel Rios Building (6405J), 1200 Pennsylvania Avenue, NW., Washington, DC 20460. Telephone: (202) 343–9256. E-Mail Address: *Dickinson.David@EPA.GOV.*

**SUPPLEMENTARY INFORMATION:** I have decided to grant California a waiver of federal preemption pursuant to section 209(b) of the Act for the 2007 California Heavy Duty Diesel Engine Standards.[1]

---

[1] The CARB Board approved the 2007 Heavy Duty Diesel Engine Standards by Resolution 01–38 on October 25, 2001 (See Attachment 1 to CARB's July 16, 2004 Waiver Request Letter). The regulations covered by today's waiver include CARB's amendments to title 13, California Code of

Section 209(b) of the Act provides that, if certain criteria are met, the Administrator shall waive federal preemption for California to enforce new motor vehicle emission standards and accompanying enforcement procedures. The criteria include consideration of whether California arbitrarily and capriciously determined that its standards are, in the aggregate, at least as protective of public health and welfare as the applicable Federal standards; whether California needs State standards to meet compelling and extraordinary conditions; and whether California's amendments are consistent with section 202(a) of the Act.

As further explained in the Decision Document supporting today's decision, EPA received a series of comments supporting CARB's request for a waiver of federal preemption. EPA did not receive any comment suggesting that CARB's request should be denied or a decision delayed based on the criteria set forth in section 209(b) of the Act. EPA did receive comment that the waiver of federal preemption should otherwise be delayed, but for the reasons set forth below and further discussed in the Decision Document, EPA is granting CARB's request for a waiver of federal preemption.

CARB determined that its 2007 California Heavy Duty Diesel Engine Standards do not cause California's standards, in the aggregate, to be less protective of public health and welfare than the applicable Federal standards. No information has been submitted to demonstrate that California's standards, in the aggregate, are less protective of public health and welfare than the applicable Federal standards. Thus, EPA cannot make a finding that CARB's determination, that its 2007 California Heavy Duty Diesel Engine Standards are, in the aggregate, at least as protective of public health and welfare, is arbitrary and capricious.

CARB has continually demonstrated the existence of compelling and extraordinary conditions justifying the need for its own motor vehicle pollution control program, which includes the subject 2007 California Heavy Duty Diesel Engine Standards. No

---

Regulations (CCR), section 1956.8. The specific regulatory text and the incorporated documents covered by the 2007 Heavy Duty Diesel Engine Standards regulation are: section 1956.8, title 13, CCR, as shown in Attachment 2 to CARB's Waiver Request Letter, and amendments to the related test procedures incorporated in section 1956.8(b), "California Exhaust Emission Standards and Test Procedures for 1985 and Subsequent Model Heavy-Duty Diesel Engines and Vehicles," also shown in Attachment 2. For further discussion of the regulations covered by today's decision please see the Decision Document.

information has been submitted to demonstrate that California no longer has a compelling and extraordinary need for its own program. Therefore, I agree that California continues to have compelling and extraordinary conditions which require its own program, and, thus, I cannot deny the waiver on the basis of the lack of compelling and extraordinary conditions.

CARB has submitted information that the requirements of its 2007 California Heavy Duty Diesel Engine Standards are technologically feasible and present no inconsistency with federal requirements and are, therefore, consistent with section 202(a) of the Act. No information has been presented to demonstrate that CARB's requirements are inconsistent with section 202(a) of the Act, nor does EPA have any other reason to believe that CARB's requirements are inconsistent with section 202(a). Thus, I cannot find that California's 2007 California Heavy Duty Diesel Engine Standards are inconsistent with section 202(a) of the Act. Accordingly, I hereby grant the waiver requested by California.

This decision will affect not only persons in California but also the manufacturers outside the State who must comply with California's requirements in order to produce vehicles for sale in California. For this reason, I hereby determine and find that this is a final action of national applicability.

Under section 307(b)(1) of the Act, judicial review of this final action may be sought only in the United States Court of Appeal for the District of Columbia Circuit. Petitions for review must be filed by October 25, 2005. Under section 307(b)(2) of the Act, judicial review of this final action may not be obtained in subsequent enforcement proceedings.

As with past waiver decisions, this action is not a rule as defined by Executive Order 12866. Therefore, it is exempt from review by the Office of Management and Budget as required for rules and regulations by Executive Order 12866.

In addition, this action is not a rule as defined in the Regulatory Flexibility Act, 5 U.S.C. sec. 601(2). Therefore, EPA has not prepared a supporting regulatory flexibility analysis addressing the impact of this action on small business entities.

Finally, the Administrator has delegated the authority to make determinations regarding waivers of Federal preemption under section 209(b) of the Act to the Assistant Administrator for Air and Radiation.

Dated: August 19, 2005.

**Jeffrey R. Holmstead,**

*Assistant Administrator for Air and Radiation.*

[FR Doc. 05–17037 Filed 8–25–05; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

**[FRL–7960–5]**

**Notice of Prevention of Significant Deterioration Final Determination for BP Cherry Point Cogeneration Facility**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of final action.

**SUMMARY:** This document announces that on June 21, 2005, the Environmental Appeals Board ("EAB") of EPA denied review of a petition for review of a Prevention of Significant Deterioration ("PSD") permit ("Permit") that EPA Region 10 and the State of Washington's Energy Facility Site Evaluation Council ("EFSEC") issued to BP West Coast Products, L.L.C. ("BP") for construction and operation of the BP Cherry Point Cogeneration Facility ("Facility"), a natural gas-fired cogeneration facility. The Permit was issued pursuant to 40 CFR 52.21.

**DATES:** The effective date of the EAB's decision is June 21, 2005. Judicial review of this permit decision, to the extent it is available pursuant to section 307(b)(1) of the Clean Air Act ("CAA"), may be sought by filing a petition for review in the United States Court of Appeals for the Ninth Circuit within 60 days of August 26, 2005.

**ADDRESSES:** The documents relevant to the above action are available for public inspection during normal business hours at the following address: EPA, Region 10, 1200 Sixth Avenue (AWT–107), Seattle, Washington 98101. To arrange viewing of these documents, call Dan Meyer at (206) 553–4150.

**FOR FURTHER INFORMATION CONTACT:** Dan Meyer, EPA, Region 10, 1200 Sixth Avenue (AWT–107), Seattle, Washington 98101.

**SUPPLEMENTARY INFORMATION:** This supplemental information is organized as follows:

A. What Action Is EPA Taking?
B. What Is the Background Information?
C. What Did the EAB Decide?

### A. What Action Is EPA Taking?

We are notifying the public of a final decision by the EAB on the Permit issued by EPA Region 10 and EFSEC ("Permitting Authorities") pursuant to the PSD regulations found at 40 CFR 52.21.

### B. What Is the Background Information?

The Facility will be a 720-megawatt natural gas-fired, combined cycle combustion turbine cogeneration facility located on a 33-acre parcel of land adjacent to BP's existing Cherry Point petroleum refinery in Whatcom County, Washington. The Facility will combust natural gas and will employ selective catalytic reduction (SCR) and an oxidation catalyst to reduce emissions.

On November 7, 2003, EFSEC issued the draft PSD permit for public review and comment. On December 21, 2004, after providing an opportunity for public comment and a public hearing, EFSEC approved the Permit. On January 11, 2005, EPA approved the Permit. On February 4, 2005, Ms. Cathy Cleveland ("Petitioner") petitioned the EAB for review of the Permit.

### What Did the EAB Decide?

Petitioner, acting *pro se*, raised the following issues on appeal: (1) The Permitting Authorities failed to protect Peace Arch Park, a Class I area; (2) the Permitting Authorities failed to properly evaluate particulate matter ("PM") emissions from the Facility and failed to consider the health impacts related to PM; (3) the Permitting Authorities failed to properly model the ambient air quality; (4) the National Ambient Air Quality Standards ("NAAQS") designation was incorrectly identified in the Permit; (5) EPA's recommended nitrogen oxide ("$NO_x$") limit was not included in the Permit; and (6) the Memorandum of Understanding ("MOU") between BP and the Province of British Columbia was missing from the Permit attachments.

The EAB denied review of the following three issues because these issues were not raised during the public comment period on the draft Permit or during the public hearing on the draft Permit: (1) the Permitting Authorities failed to protect Peace Arch Park, a Class I area; (2) the Permitting Authorities failed to properly model the ambient air quality; and (3) the NAAQS designation was incorrectly identified in the Permit. The EAB further concluded that the Permitting Authorities properly considered the impacts of emissions of particulate matter less than 10 microns ("$PM_{10}$") and particulate matter less than 2.5 microns ("$PM_{2.5}$"). Moreover, the EAB found that Petitioner failed to demonstrate that the Permitting Authorities committed clear error in adopting a $NO_x$ limit of 2.5 parts per million ("ppm") rather than 2.0 ppm.

Last, the EAB concluded that Petitioner failed to demonstrate that the Permitting Authorities committed clear error by failing to include the MOU between BP and the Province of British Columbia in the administrative record. For these reasons, the EAB denied review of the petition for review in its entirety.

Pursuant to 40 CFR 124.19(f)(1), for purposes of judicial review, final agency action occurs when a final PSD permit is issued and agency review procedures are exhausted. This notice is being published pursuant to 40 CFR 124.19(f)(2), which requires notice of any final agency action regarding a PSD permit to be published in the **Federal Register**. This notice constitutes notice of the final agency action denying review of the PSD Permit and consequently, notice of the Permitting Authorities' issuance of PSD Permit No. EFSEC/2001–02 to BP. If available, judicial review of these determinations under section 307(b)(1) of the CAA may be sought only by the filing of a petition for review in the United States Court of Appeals for the Ninth Circuit, within 60 days from the date on which this notice is published in the **Federal Register**. Under section 307(b)(2) of the Clean Air Act, this determination shall not be subject to later judicial review in any civil or criminal proceedings for enforcement.

Dated: August 1, 2005.

**Ronald A. Kreizenbeck,**

*Acting Regional Administrator, Region 10.*

[FR Doc. 05–17027 Filed 8–25–05; 8:45 am]

**BILLING CODE 6560–50–M**

---

## ENVIRONMENTAL PROTECTION AGENCY

**[FRL–7960–6]**

**Notice of Prevention of Significant Deterioration Final Determination for Cardinal FG Company**

**AGENCY:** Environmental Protection Agency (EPA)

**ACTION:** Notice of final action.

**SUMMARY:** This document announces that on March 22, 2005, the Environmental Appeals Board ("EAB") of EPA denied review of a petition for review of a Prevention of Significant Deterioration ("PSD") permit ("Permit") that the State of Washington's Department of Ecology ("Ecology") issued to Cardinal FG Company ("Cardinal") for construction and operation of a flat glass production plant ("Facility") near Chehalis, Washington. The Permit was issued pursuant to 40 CFR 52.21. Ecology has the authority to

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 15

**STATEMENT OF**
**STEPHEN L. JOHNSON**
**ADMINISTRATOR**
**U.S. ENVIRONMENTAL PROTECTION AGENCY**
**BEFORE THE**
**COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS**
**UNITED STATES SENATE**

**January 24, 2008**

Good morning, Chairman Boxer and members of the Senate Committee on Environment and Public Works.  I appreciate the opportunity to come before this Committee to discuss EPA's response to California's request for a waiver of preemption for its greenhouse gas motor vehicle emission standards.

Let me begin by saying that climate change and greenhouse gases are global problems.  As the President recognized at the Major Economies Meeting last September, the leading countries of the world are at a deciding moment when, together, we must reduce greenhouse gas emissions instead of allowing the problem to grow.  In fact, in my letter to Governor Schwarzenegger I stated that the problem of climate change "poses challenges for the entire nation and indeed the world" and that "greenhouse gas emissions harm the environment in California and elsewhere regardless of where the emissions occur."

The President has committed the United States to take the lead in reducing greenhouse gas emissions by pursuing new, quantifiable actions.  I congratulate the Congress and the President for doing just that; by enacting the Energy Independence and Security Act (EISA) the nation will be taking many new, quantifiable actions that will

reduce greenhouse gases and improve our energy security.  In particular I would like to congratulate Congress in passing significant increases to the nation's fuel economy standards.  These national standards recognize that climate change is a global problem and are part of the solution.  Also, as you know EISA mandates substantial requirements for renewable fuels (36 billion gallons annually) and efficiency of appliances, lighting systems, and government operations. This law—which is mandatory and binding—will produce some of the largest emission cuts in our nation's history.  Early estimates suggest more than 6 billion metric tons of greenhouse gases will be avoided through 2030.

As I have previously testified before this committee, EPA's consideration of the California waiver request has involved a thorough review of the issues which were presented both in the original request and in thousands of pages of comments, documents, and technical information that were filed with the Agency as part of our process to consider the request under section 209 of the Clean Air Act.

Consistent with the requirements of section 209, EPA has undertaken an extensive public notice and comment process.  The Agency held two public hearings.  One occurred on May 22, 2007 in Washington, D.C. and the other in Sacramento, California on May 30, 2007.  The Agency directly heard from over 80 individuals at these hearings who represented a broad set of interests, including state and local governments, public health and environmental organizations, academia, industry, and citizens.

EPA received a substantial amount of written material both during the public comment period for the waiver request, which ended on June 15, 2007, and thereafter. We received supplemental comments from the California Air Resources Board on July 24, 2007, and November 5, 2007, and from automobile manufacturers on October 1, 2007, and October 9, 2007.  Utilizing my available discretion, I decided EPA would consider all belated comments in its decision-making process, to the fullest extent practicable.

EPA has also devoted the necessary staff resources to review the extensive comments that were received and to examine various technical and legal issues related to the full range of options available to me.  Within the Agency, these issues have been considered in great detail and I requested a number of briefings and follow-up briefings and spent many hours reviewing these materials as well as the record directly.  These briefings have consumed a considerable amount of staff time and many hours of my personal time and attention.

EPA's review of the California waiver petition included an assessment of the information presented by California and others in support of its waiver request, an assessment of comments received from those in opposition to the waiver request, a review of the legislative history of the relevant Clean Air Act provisions, a review of relevant past litigation with respect to California waiver decisions, and a consideration of the options available to EPA in addressing and responding to the waiver request.

During the briefing process, I encouraged an open discussion of issues involved regarding the waiver criteria specified in section 209.  At the outset, I asked that staff develop the full range of options available and their ramifications.  I asked for both technical information and personal viewpoints relevant to the consideration of the waiver request.  I also received information relevant to the legal framework, options, and ramifications under which my decision on the waiver request would be made.

At the end of this process, however, there is a judgment to be made.  The Clean Air Act indicates that waivers shall not be granted to California if the Administrator makes any of three separate findings spelled out in the Act.  The Act vests this authority and responsibility with me as the head of the Agency.

I am well aware that many members of Congress, governors, and others urged me to approve the California waiver request and to act quickly in this regard.  Proposed legislation under the cosponsorship of this Committee's Chair and several members of this Committee was, in fact, reported on August 2, 2007, with a written report filed on December 12, 2007.  This legislation would have required EPA to make decisions with respect to pending waiver requests by September 30, 2007 and to make decisions with respect to future waiver requests within 180 days.

I fully understand the serious concerns that were expressed in requests to grant the California waiver and the perspectives on law and policy on which they were based.

4

Those advocating approval of the waiver made their views regarding the law and relevant policy abundantly clear.

Throughout my consideration of this matter, however, my responsibilities under the Clean Air Act remained unaltered.  And it was only after a thorough review of the numerous arguments and material presented to the Agency and developed internally within the Agency, as well as my own personal consideration of this matter, that I announced that I directed my staff to prepare a decision document for my signature.  The final decision document and federal register notice are currently being prepared by Agency staff.  When I review and sign the decision document for publication, that will be the final agency action and that will be the time for any court challenges.  As with prior waivers, I expect that decision to be a final action of national applicability, and accordingly, as is the normal course of Agency practice on a waiver request, the Federal Register notice of the decision will say so.  The decision document will be placed in EPA's docket for this proceeding at that time.

As I explained in my December 19, 2007 letter to Governor Schwarzenegger, and as this Committee well knows, EPA has considered and granted numerous previous waivers requested by the State of California.  These waivers have covered a range of issues.  Some waivers have effectively granted approval to large, multiyear programs to improve the emission performance of entire fleets of cars and trucks.  And EPA has acted on many smaller, discrete issues such as emission test procedures and minor amendments

to existing standards.  Often the notice describing EPA's consideration and findings with respect to these issues has consumed barely a page in the Federal Register.

Previous waiver requests and previous waiver decisions, however, have addressed air pollutants that predominantly affected local and regional air quality.  In these cases, the purpose of the waiver was to help the state make further progress on its long, unfinished struggle to comply with Federal, State and local air quality requirements.  As I stated in my letter to the Governor, "[i]n contrast, the current waiver request for greenhouse gases is far different; it presents numerous issues that are distinguishable from all prior waiver requests."  My letter noted that greenhouse gases are "fundamentally global in nature. Greenhouse gases contribute to the problem of global climate change, a problem that poses challenges for the entire nation and indeed the world.  Unlike pollutants covered by other waivers, greenhouse gas emissions harm the environment in California and elsewhere regardless of where the emissions occur."  This challenge "is not exclusive or unique to California and differs in a basic way from the previous local and regional air pollution problems addressed in prior waivers."  In light of the global nature of the problem, I therefore indicated that it is my view that California does not have a need for these greenhouse gas standards to meet compelling and extraordinary conditions. That is, under the statutory criteria spelled out in Section 209 of the Clean Air Act, California had not met the requirements for a waiver.

In addition to the need for me to make a decision of great importance for both the Clean Air Act and the country as a whole, I have also been aware of the Congressional

debate and approval of the Energy Independence and Security Act.  I was aware, during the fall of 2007, that Congress was considering amendments to Title II of the Clean Air Act respecting the regulation of both vehicles and fuels.

Indeed, this legislative effort included proposed language that could have affected EPA's authority under the Clean Air Act with respect to greenhouse gas emissions generally and/or motor vehicles specifically.  This consideration and debate was recognized within subsequent statements on the Senate floor with respect to the intent and reach of H.R. 6, the Energy Independence and Security Act of 2007.  Senators sought to clarify in their remarks the effect of this law both on Federal regulations and regulations promulgated by the State of California.

In the context of this ongoing consideration of legislation in both bodies of Congress and subsequently in the Conference Committee on H.R. 6, it was important for me to review the legislation Congress approved before announcing my decision and directing staff to prepare the final decision document.  It is particularly important given that Congress was specifically contemplating amendments to the Clean Air Act, and in fact amended Section 211 of the law.

Ultimately, as you know, Congress did not amend either section 209 of the Clean Air Act, or approve specific legislative language addressing the California waiver request in the legislation which was cleared by the House of Representatives on December 18th and signed into law by President Bush on December 19, 2007.

With respect to the timing of my review of this matter and my letter to Governor Schwarzenegger, from December 10th to December 15th, 2007, I traveled to Beijing, China to participate in the U.S.-China Strategic Economic Dialogue and to co-chair the second Joint Committee on Environmental Cooperation with Chinese Minister Zhou Sengxian. Upon my return from these meetings and with the Congress nearing completion of its work on energy legislation, I informed EPA staff of my intention to deny the waiver request based on the criteria specified in section 209.

As indicated above, the energy legislation enacted by Congress ultimately did not amend section 209 of the Clean Air Act, but it does provide a policy context in which the issue of federal versus state standards affecting greenhouse gas emissions can be reviewed. Clearly, Congress intended to take action to substantially strengthen fuel economy standards and to thereby promote several policy goals, including increased energy security for our country and environmental improvements.

I believe that it is preferable, as a matter of policy, to have uniform national standards to address fuel economy issues across the entire fleet of domestic and foreign manufactured vehicles sold in the United States. I just think this is common sense and I am glad the Congress moved away from previous policy positions that effectively blocked increases in fuel economy standards to proactively approve a substantial increase in fuel economy for cars and light duty trucks.

But let me be clear.  My letter indicating how I plan to proceed with respect to the instant matter of the California waiver request is based on the exercise of my own judgment in this matter given the application of the law, the facts and information that were presented to me.  While I know that some on this Committee disagree with my direction to Agency staff on the California waiver request, I believe this direction is the proper course under the Clean Air Act, just as I believe Congress's decision to increase fuel economy standards is the proper course for our nation.

Again, thank you for the opportunity to appear before the committee today.  I stand ready to answer your questions.

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 16

STENOGRAPHIC MINUTES
Unrevised and Unedited
Not for Quotation or
Duplication

ORIGINAL

# **Preliminary Transcript**

HEARING ON EPA APPROVAL OF NEW POWER

PLANTS: FAILURE TO ADDRESS GLOBAL

WARMING POLLUTANTS

Thursday, November 8, 2007

House of Representatives,

Committee on Oversight

and Government Reform,

Washington, D.C.

"This is a preliminary transcript of a Committee Hearing.  It has not yet been subject to a review process to ensure that the statements within are appropriately attributed to the witness or member of Congress who made them, to determine whether there are any inconsistencies between the statements within and what was actually said at the proceeding, or to make any other corrections to ensure the accuracy of the record."

## Committee Hearings

### of the

## U.S. HOUSE OF REPRESENTATIVES



**OFFICE OF THE CLERK**
**Office of Official Reporters**

```
 1  Court Reporting Services, Inc.

 2  HGO312.000



 3  HEARING ON EPA APPROVAL OF NEW POWER

 4  PLANTS: FAILURE TO ADDRESS GLOBAL

 5  WARMING POLLUTANTS

 6  Thursday, November 8, 2007

 7  House of Representatives,

 8  Committee on Oversight

 9  and Government Reform,

10  Washington, D.C.



11       The committee met, pursuant to call, at 10:00 a.m., in

12  room 2154, Rayburn House Office Building, the Honorable Henry

13  A. Waxman [chairman of the subcommittee] presiding.

14       Present: Representatives Waxman, Towns, Kucinich,

15  Tierney, Watson, Yarmuth, McCollum, Hodes, Sarbanes, Davis of

16  Virginia, Shays, Platts, Issa, Sali

17       Staff Present: Karen Lightfoot, Communications Director

18  and Senior Policy Advisor; Greg Dotson, Chief Environmental

19  Counsel; Alexandra Teitz, Senior Environmental Counsel; Erik

20  Jones, Counsel; Earley Green, Chief Clerk; Teresa Coufal,
```

```
21   Deputy Clerk; Caren Auchman, Press Assistant; Zhongrui ''JR''
22   Deng, Chief Information Officer; Leneal Scott, Information
23   Systems Manager; Kerry Gutknecht, Staff Assistant; William
24   Ragland, Staff Assistant; Larry Halloran, Minority Deputy
25   Staff Director; Ellen Brown, Minority Legislative Director
26   and Senior Policy Counsel; A. Brooke Bennett, Minority
27   Counsel; Howie Denis, Minority Senior Professional Staff
28   Member; Kristina Husar, Minority Counsel; John Cuaderes,
29   Minority Senior Investigator and Policy Advisor; Larry Brady,
30   Minority Senior Investigator and Policy Advisor; Patrick
31   Lyden, Minority Parliamentarian and Member Services
32   Coordinator; Brian McNicoll, Minority Communications
33   Director; Benjamin Chance, Minority Clerk; Ali Ahmad,
34   Minority Deputy Press Secretary; John Ohly, Minority Staff
35   Assistant
```

HGO312.000                                         PAGE

36      Chairman WAXMAN. The Committee will please come to

37   order.

38      Today's hearing will examine carbon dioxide emissions

39   from new coal-fired power plants.  Pending before the

40   Environmental Protection Agency and State agencies are dozens

41   of applications to build new coal-fired power plants.  These

42   power plants are huge and they are enormous sources of

43   greenhouse gas emissions.

44      A single plant, the White Pine Plant proposed in Nevada,

45   will emit over a billion tons of CO2 over its lifetime.  If

46   approved without carbon controls, this one plant will emit as

47   much carbon dioxide as all of the vehicles, factories and

48   power plants in South Dakota.

49      Scientists say that we need to reduce CO2 emissions by

50   80 percent from today's level to avoid catastrophic global

51   warming.  This is a big challenge.  It will require all

52   sectors of our economy to become more efficient and cut their

53   emissions.  But these changes are absolutely to prevent

54   irreversible climate change.  The very last thing we should

55   be doing is making the problem worse by approving massive new

56   sources of uncontrolled CO2 emissions.

57      But that is exactly what the Bush Administration is

58   doing.  The Administration's policy is the climate equivalent

59   of pouring gasoline on a fire.  The approval of new power

60   plants without carbon controls is irresponsible, it is

747  discussions of the public health effects of climate change.

748  When the CDC director testified before the Senate, her

749  testimony was edited by the White House to delete the

750  statement that CDC ``considers climate change a serious

751  public health concern.''  And a White House spokesman

752  emphasized in the press that there could be health benefits

753  from climate change.

754       Now, we have heard in this Committee plenty about the

755  politicization of science by this Administration.  You are

756  now here as the Administrator of the Environmental Protection

757  Agency.  And I have a very simple question for you, to which

758  I would like a yes or no answer.  Do you agree that climate

759  change is a serious public health concern?

760       Mr. JOHNSON.  Sir, I believe that climate change is a

761  serious concern.  In the context of the Clean Air Act, the

762  Clean Air Act defines whether it causes or contributes to

763  public welfare or public health.  So in the context of the

764  Clean Air Act, we are currently evaluating all of the

765  science, and by the way, I am very proud of the EPA

766  scientists who are part of and participated in the

767  Intergovernmental Panel on Climate Change.  They are very

768  capable and competent scientists.

769       So we are, as I mentioned to the Chairman, we are going

770  to be addressing the issue of endangerment, which then

771  focuses on public welfare or public health as part of our

772  proposal to regulate carbon dioxide for the first time in our

773  Nation's history from mobile sources later this year.

774      Mr. HODES. That is a long way of not answering my

775  question.  I am asking you, Mr. Johnson, to tell us today,

776  here, right now, do you consider climate change a serious

777  public health concern?  I want to know what you think.

778      Mr. JOHNSON. I have said what I think, and I will be

779  happy to repeat it.

780      Mr. HODES. I don't want you to repeat that answer.

781      Mr. JOHNSON. All right.  That is what I think, sir.

782      Mr. HODES. So the answer is, you don't know whether or

783  not climate change is a serious public health concern?

784      Mr. JOHNSON. No, the answer is, in the context of the

785  Clean Air Act, I do not want to prejudge an issue that is

786  before me called endangerment, which I will be proposing to

787  address later this year, by the end of the year, so that

788  there will be an opportunity for everyone to comment on

789  whether it is or isn't.  We are working to address that

790  issue, and it will be part of our notice and comment process

791  later this year.

792      Mr. HODES. I will just finish up, Mr. Chairman, by

793  saying this.  Your refusal to answer the question which I

794  have posed to you, even understanding the context of what you

795  say is coming in terms of various evaluations you are

796  performing, is stunning in the light of the scientific

1247  the White House staff discussed the California waiver and the

1248  DOT's lobbying effort with you.  Did you discuss the lobbying

1249  effort with anyone at the White House?

1250      Mr. JOHNSON. I don't recall having any discussion on

1251  that topic with anyone in the White House.

1252      Ms. WATSON. Okay.  Now, remember, Administrator Johnson,

1253  you are under oath, can you promise us now that you will

1254  decide California' request for a waiver purely upon the

1255  merits of the request and not based on political factors?

1256      Mr. JOHNSON. I can assure you that under the Clean Air

1257  Act, it is the responsibility of me to make a decision,

1258  independent, based upon the record.  I intend to do so, and I

1259  have committed to the Governor to have that decision made by

1260  the end of the year.  As you are probably well aware, this

1261  waiver request--

1262      Ms. WATSON. As what is all aware?

1263      Mr. JOHNSON. I was just going to say--

1264      Ms. WATSON. As Republicans are all aware?

1265      Mr. JOHNSON. No, as everyone is well aware, we have over

1266  100,000 comments, literally thousands of pages of comments,

1267  of technical and scientific comments, that are expeditiously

1268  yet responsibility reviewing.

1269      Ms. WATSON. My time is over.  Let me just make this last

1270  statement, Mr. Chairman, if I may.  My understanding that

1271  California is filing suit today against you for failure to

1614  Administrator Johnson just called and would like to speak

1615  with we will say Secretary Peters this morning.  Mr. Duvall,

1616  the Assistant Secretary, responded, ``Okay, they think it

1617  might be about the California wavier.''  So within the

1618  Department of Transportation, they didn't think you were

1619  calling about extensions of time to file comments.  They

1620  thought you were calling about her campaign to stop the

1621  California waiver.

1622       Did you ever discuss with Secretary Peters efforts to

1623  undermine or efforts--no, did you ever discuss with Secretary

1624  Peters her views about the California waiver?

1625       Mr. JOHNSON. As I said, Mr. Chairman--

1626       Chairman WAXMAN. In the substance.

1627       Mr. JOHNSON.--I talked to her about the extension of the

1628  comment period for the California waiver petition.  That was

1629  the nature and the extent of the conversation to the best of

1630  my recollection.

1631       Chairman WAXMAN. And therefore, you did not talk to her

1632  about her desire to not see the California waiver granted?

1633       Mr. JOHNSON. Again, under the Clean Air Act, it is the

1634  responsibility of me to make an independent decision on the

1635  California waiver petition.  I intend to do that, and I

1636  promised the Governor that I would make that decision by the

1637  end of the year.

1638       Chairman WAXMAN. Well, I just would repeat that it makes

2436       Ms. WATSON. Just very quickly, thank you, Mr. Chairman.

2437   I want to hear from the other panel.  But I have just called

2438   up from California to get the bill, my staff is bringing it

2439   in to me.  What I am gathering from the conversation that we

2440   had prior is that there was a bias against California's

2441   request for a waiver.  Would you say that that were true?

2442       Mr. JOHNSON. There are many opinions.  I am aware of the

2443   many diverse opinions.  My responsibility as Administrator

2444   and under the Clean Air Act is to make an independent

2445   decision based upon the record, based upon what the statutory

2446   requirements are.  I will do that, and I have committed to

2447   the Governor to do that by the end of the year.

2448       Ms. WATSON. All right.  I did hear you say that you make

2449   your decisions based case by case.  California discussed and

2450   debated how we could continue to improve our air quality. The

2451   bill went through both Houses, went to our Governor, it was

2452   signed.  We are implementing it.  It looks like--or we are

2453   trying to--that it is a model for other States.  And other

2454   States have been inquiring to California to see if this is

2455   something they could customize to their air quality bills.

2456       I am really highly concerned that there is a built-in

2457   bias against California, against what we are trying to do.

2458   That is the reason why we are filing, as we speak, a suit

2459   against EPA, because we are gathering more and more evidence

2460   that there was conversation about denying the waiver.  I am

2561  all these other fronts.

2562       Thank you, Mr. Chairman.

2563       Chairman WAXMAN. The gentleman's time has expired.

2564       Your aggressive path, what does that mean in terms of

2565  your decision on the California waiver?  Is that going to be

2566  aggressively decided soon?

2567       Mr. JOHNSON. By the end of the year was my commitment to

2568  the Governor.

2569       Chairman WAXMAN. Mr. Tierney?

2570       Mr. TIERNEY. Thank you, Mr. Chairman.

2571       Administrator Johnson, let's turn to the question of

2572  whether you are legally required to regulate carbon dioxide

2573  when you approve new power plants.  Let's get back to that.

2574  If you look at your decision on the Deseret Plant, and your

2575  reasoning appears to be one of a bootstrap sort of argument,

2576  your position seems to be that you are required to regulate

2577  on pollutants that the EPA has already regulated on in some

2578  other context.  And since the EPA has never previously

2579  regulated CO2, you take the position that you are not

2580  required to regulate it now.  Is that pretty much it?

2581       Mr. JOHNSON. What the law says, and certainly it is not

2582  a regulated pollutant under the law at this time--

2583       Mr. TIERNEY. Because it is not a regulated pollutant,

2584  you don't have to regulate it now until you get the

2585  regulation?

3623    Mr. DONIGER. Two points.  As I said in my testimony,

3624  subject to regulation, we believe that CO2 already is.  But

3625  the alternatives, the requirement to analyze alternatives and

3626  consider collateral environmental damages does not turn on

3627  subject to regulation.  So there is authority to do this now.

3628  A responsible administrator would do this now.

3629    Mr. SHAYS. But it can be disagreed.  Mr. Cline, is it

3630  clear-cut, Mr. Cline?

3631    Mr. CLINE. I would respectfully submit that the

3632  collateral impacts analysis is not a vehicle to determine

3633  BACT for an un-regulated pollutant.  It just simply does not

3634  work that way.

3635    Mr. SHAYS. Okay.  All right.  I guess I have passed the

3636  time, I have a minute left to get to vote.  This has been an

3637  interesting session and I know the Chairman would thank you

3638  for being here.  I guess I call it closed.  Thank you very

3639  much.

3640    [Whereupon, at 2:38 p.m., the committee was adjourned.]

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 17



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

DEC 1 9 2007

OFFICE OF THE
ADMINISTRATOR

The Honorable Arnold Schwarzenegger
Governor of the State of California
State Capitol
Sacramento, California 95814

Dear Governor Schwarzenegger,

As I have committed to you in previous correspondence, I am writing to inform you of my decision with respect to the request for a waiver of Federal preemption for motor vehicle greenhouse gas emission standards submitted by the California Air Resources Board (CARB).

As you know, EPA undertook an extensive public notice and comment process with regard to the waiver request. The Agency held two public hearings: one on May 22, 2007 in Washington, D.C. and one in Sacramento, California on May 30, 2007. We heard from over 80 individuals at these hearings and received thousands of written comments during the ensuing public comment process from parties representing a broad set of interests, including state and local governments, public health and environmental organizations, academia, industry and citizens. The Agency also received and considered a substantial amount of technical and scientific material submitted after the close of the comment deadline on June 15, 2007.

EPA has considered and granted previous waivers to California for standards covering pollutants that predominantly affect local and regional air quality. In contrast, the current waiver request for greenhouse gases is far different; it presents numerous issues that are distinguishable from all prior waiver requests. Unlike other air pollutants covered by previous waivers, greenhouse gases are fundamentally global in nature. Greenhouse gases contribute to the problem of global climate change, a problem that poses challenges for the entire nation and indeed the world. Unlike pollutants covered by the other waivers, greenhouse gas emissions harm the environment in California and elsewhere regardless of where the emissions occur. In other words, this challenge is not exclusive or unique to California and differs in a basic way from the previous local and regional air pollution problems addressed in prior waivers.

Also, I firmly believe that, just as the problem extends far beyond the borders of California, so too must be the solution. Congress has recognized the need for very aggressive yet technically feasible national standards to address greenhouse gases and energy security by passing the Energy Independence and Security Act. Just today the President signed these national standards into law, providing environmental benefits and economic certainty for Californians and all Americans. I strongly support this national approach to this national challenge which establishes an aggressive standard of 35 miles per gallon for all 50 states, as opposed to 33.8 miles per gallon in California and a patchwork of other states. This legislation

will deliver energy security benefits and bring a much needed national approach to addressing global climate change, improving the environment for all Americans.

In light of the global nature of the problem of climate change, I have found that California does not have a "need to meet compelling and extraordinary conditions." Accordingly, I have decided that EPA will be denying the waiver and have instructed my staff to draft appropriate documents setting forth the rationale for this denial in further detail and to have them ready for my signature as soon as possible.

Please be assured that my decision in this matter is made specific to the facts and circumstances of this request, which, as explained above, are distinctly different from prior waiver requests. I do not intend for this decision to affect any future requests by the State of California for waiver determinations for non-greenhouse gas emissions from vehicles.

Finally, I want to acknowledge the leadership that you and your state have shown to increase vehicle fuel economy, to address energy security, and to reduce greenhouse gases. I agree that increased vehicle standards can be a win-win for the environment and the economy. I have no doubt that the national standards Congress adopted and the President signed into law this week were enacted, in part, because of your efforts.

Sincerely,

Stephen L. Johnson

cc:    Governor Janet Napolitano
        Governor Bill Ritter
        Governor Charlie Crist
        Governor Deval Patrick
        Governor Martin O' Malley
        Governor John Baldacci
        Governor Jon S. Corzine
        Governor Eliot Spitzer
        Governor Ted Kulongoski
        Governor Don Carcieri
        Governor Jon Huntsman, Jr.
        Governor Jim Douglas
        Governor Christine Gregoire
        Governor M. Jodi Rell
        Governor Edward Rendell
        Governor Bill Richardson
        Senator Barbara Boxer
        Senator Dianne Feinstein
        Representative Xavier Becerra
        Representative Howard Berman
        Representative Brian Bilbray
        Representative Mary Bono
        Representative Ken Calvert
        Representative John Campbell
        Representative Lois Capps
        Representative Dennis Cardoza
        Representative Jim Costa
        Representative Susan Davis
        Representative John Doolittle
        Representative David Dreier
        Representative Anna Eshoo
        Representative Sam Farr
        Representative Bob Filner
        Representative Elton Gallegly
        Representative Jane Harman
        Representative Wally Herger
        Representative Mike Honda
        Representative Duncan Hunter
        Representative Darrell Issa
        Representative Tom Lantos
        Representative Barbara Lee
        Representative Jerry Lewis
        Representative Zoe Lofgren
        Representative Dan Lungren
        Representative Doris Matsui
        Representative Kevin McCarthy

Representative Howard "Buck" McKeon
Mary D. Nichols, California Air Resources Board

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 18



Overview: Pollutants and Programs

You are here: <u>EPA Home</u>     <u>Transportation and Air Quality</u>     <u>Overview: Pollutants and Programs</u>     <u>Greenhouse-Gas Emissions from Transportation and Other Mobile Sources</u>     *California Greenhouse-Gas Waiver Decision*

# California Greenhouse-Gas Waiver Decision

The California Air Resources Board in December 2005 requested a waiver of pre-emption for its greenhouse-gas regulations for certain new motor vehicles beginning with Model Year 2009 <u>(see the request)</u>. California's request was subject to the waiver criteria set forth in the Clean Air Act. EPA followed the statutory process used for all waivers to review California's request. EPA denied California's request Dec. 19, 2007, in favor of a national solution for vehicle greenhouse-gas emissions. Read the <u>letter to Governor Schwarzenegger from EPA Administrator Johnson (PDF)</u> (4 pp, 2MB) and the <u>press release</u>.

## Waiver Process

The Clean Air Act gives California special authority to enact stricter air-pollution standards for motor vehicles than the federal government's. EPA must approve a waiver, however, before California's rules may go into effect. Once California files a waiver request, EPA publishes a notice for public hearing and written comment in the Federal Register. The written comment period typically remains open for a period of time after the public hearing. Once the comment period expires, EPA reviews the comments and the administrator determines whether California has satisfied the law's requirements for obtaining a waiver.

> NOTE: You will need Adobe Acrobat Reader, available as a free download, to view some of the files on this page. See <u>EPA's PDF page</u> to learn more about PDF, and for a link to the free Acrobat Reader.

According to the <u>Clean Air Act Section 209 – State Standards</u>, EPA shall grant a waiver unless it finds that California:

- was arbitrary and capricious in its finding that its standards are in the aggregate at least as protective of public health and welfare as applicable federal standards;
- does not need such standards to meet compelling and extraordinary conditions; or
- has proposed standards not consistent with Section 202(a) of the Clean Air Act.

You can read <u>all the documents associated with this waiver request</u> at www.regulations.gov (Or go to the <u>main page for the regulations docket</u>, select Advanced Search, then Docket Search, and type EPA-HQ-OAR-2006-0173 as the Docket ID). Below we have provided direct links to some of the relevant documents.

For extensive information about federal environmental laws, EPA regulations, significant guidance documents, and dockets -- including how to search for rules and comment on them -- see the <u>Laws, Regulations, Guidance, and Dockets site</u>.

## Related Documents

| Date | Document |
|------|----------|

| Dec. 21, 2005 | <u>Letter to EPA Administrator Stephen Johnson from Catherine Witherspoon of the California Air Resources Board Requesting a Waiver of Pre-emption for Its Greenhouse-Gas Regulations</u> |
| --- | --- |
| | <u>Attachment 1: CARB Executive Order G-05-061</u> |
| | <u>Attachment 2: Support Documents</u> |
| Feb. 21, 2007 | <u>Letter to Catherine Witherspoon from William Wehrum, EPA Acting Assistant Administrator for Air and Radiation, Regarding the Massachusetts v. EPA Case Pending Before the U.S. Supreme Court</u> |
| Apr. 30, 2007 | <u>Federal Register Notice: Opportunity for Public Hearing</u> | <u>PDF Version</u> (2 pp, 81K) |
| May 10, 2007 | <u>Federal Register Notice: Opportunity for Second Public Hearing</u> | <u>PDF Version</u> (2 pp, 88K, May 2007) announcing the location of the May 22, 2007, public hearing and announcing an additional public hearing. |
| May 11, 2007 | <u>Energy Security & Climate Change (PDF)</u> (21 pp, 73K) Testimony by EPA Administrator Stephen Johnson before the House Committee on Transportation & Infrastructure |
| July 24, 2007 | <u>California's Waiver Request to Control Greenhouse Gases Under the Clean Air Act (PDF)</u> EXIT Disclaimer (19 pp, 133K) Congressional Research Service report RL34099. |
| July 26, 2007 | <u>California Waiver Request/Greenhouse-Gas Motor-Vehicle Emission Standards (PDF)</u> (7 pp, 27K) Testimony by EPA Administrator Stephen Johnson before the Senate Environment & Public Works Committee |
| Dec. 19, 2007 | <u>Letter to Governor Arnold Schwarzenegger from EPA Administrator Stephen Johnson Denying California's Request for a Waiver of Pre-emption for Its Greenhouse-Gas Regulations (PDF)</u> (4 pp, 2MB) |

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 19

ORAL ARGUMENT NOT YET SCHEDULED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| STATE OF CALIFORNIA, et al., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Docket No. 07-1457 |
| | ) | (and consolidated case) |
| UNITED STATES ENVIRONMENTAL | ) | |
| PROTECTION AGENCY, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

**RESPONDENTS' OPPOSITION TO
PETITIONER STATE OF CALIFORNIA'S
MOTION TO EXPEDITE CONSIDERATION**

Respondents United States Environmental Protection Agency and Stephen

L. Johnson, Administrator (collectively "EPA") submit this opposition to

petitioner State of California's motion to expedite this Court's consideration of its

petition for an order compelling EPA to make a final determination on California's

request for a waiver of preemption under section 209(b) of the Clean Air Act, 42

U.S.C. § 7543(b).[1/] As demonstrated in EPA's motion to dismiss, filed December

---

[1/] On December 19, 2007, the EPA Administrator announced that EPA will be
denying the waiver and that he has instructed his staff to draft appropriate
(continued...)

10, 2007, this Court lacks subject matter jurisdiction over California's claims, and thus the petition should be dismissed, not expedited.  See Steel Company v. Citizens for a Better Environment, 523 U.S. 83, 94-101 (1998) (courts must resolve jurisdictional questions before considering merits of a party's claim).

It should be understood that dismissal of this action will not leave California without a forum to pursue its claims, since EPA does not dispute that the United States District Court for the District of Columbia has jurisdiction over California's claims, and the State has filed an action in that court seeking the identical relief that it seeks in this Court.  State of California v. EPA, No. 07-2024-RCL (D.D.C.). Because this Court lacks jurisdiction and California has an alternative forum to pursue its claims, it would serve no purpose for this Court to expedite review.

Moreover, even if this Court does have jurisdiction, California has failed to meet the stringent standards for expedited consideration.  This Court's Handbook of Practice and Internal Procedures provides that the Court "grants expedited consideration very rarely."  Handbook at 33.  The Handbook sets out a standard for expedited review similar to that for obtaining a preliminary injunction, i.e., that

---

[1]/(...continued)
documents and have them ready for his signature as soon as possible.  December 19, 2007 letter from Stephen L. Johnson, EPA Administrator, to Arnold Schwarzenegger, Governor of California, at 2 (attached).  Although the Administrator's December 19 letter is not final agency action for purposes of judicial review under section 307(b) of the Act, 42 U.S.C. § 7607(b), this case is likely to become moot in the near future.

2

immediate harm, and the broad range of environmental issues the Agency has to address, there is no basis for the Court to do so.

## CONCLUSION

For the reasons stated above, California's motion to expedite consideration of its petition should be denied.

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General

NORMAN L. RAVE, JR.
Environmental Defense Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
(202) 616-7568
Counsel for Respondents

Of Counsel:

MICHAEL HOROWITZ
Office of General Counsel
U. S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, DC 20460

December 21, 2007

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 20

CFR 264.118–.120; 40 CFR 264.142(a), 40 CFR 264.143(a); 40 CFR 264.144(a); 40 CFR 264.145(a); 40 CFR 264.147; 40 CFR 264.148; 40 CFR 264.149; 40 CFR 264.150; 40 CFR 265.12(a)–(b); 40 CFR 265.13(a)(1), (b)–(c); 40 CFR 265.15(d); 40 CFR 265.16(d); 40 CFR 265.19; 40 CFR 265.51–54; 40 CFR 265.56; 40 CFR 265.73–.74; 40 CFR 265.112; 40 CFR 265.113(a), (b), (d); 40 CFR 265.115; 40 CFR 265.116; 40 CFR 265.118–.120; 40 CFR 264.142(a); 40 CFR 265.143(a); 40 CFR 265.144(a); 40 CFR 265.145(a); 40 CFR 265.147; 40 CFR 265.148; 40 CFR 265.149; 40 CFR 265.150; 40 CFR part 264, subpart H; 40 CFR part 265, subpart H; 40 CFR 270.30; was approved 06/06/2006; OMB Number 2050–0120; expires 06/30/2009.

EPA ICR No. 1951.03; NESHAP for Paper and Other Web Coating Renewal; in 40 CFR part 63, subpart JJJJ; was approved 06/13/2006; OMB Number 2060–0511; expires 06/30/2009.

EPA ICR No. 1954.03; NESHAP for the Surface Coating of Large Household and Commercial Appliances; in 40 CFR part 63, subpart NNNN, (Renewal); was approved 06/13/2006; OMB Number 2060–0457; expires 06/30/2009.

EPA ICR No. 1976.03; NESHAP for Reinforced Plastic Composites Production (Renewal); in 40 CFR part 63, subpart WWWW; was approved 06/12/2006; OMB Number 2060–0509; expires 06/30/2009.

EPA ICR No. 2022.03; NESHAP for Brick and Structural Clay Manufacturing (Renewal); in 40 CFR part 63, subpart JJJJJ; was approved 06/13/2006; OMB Number 2060–0508; expires 06/30/2009.

EPA ICR No. 2040.03; NESHAP for Refractory Products Manufacturing (Renewal); in 40 CFR part 63, subpart SSSSS; was approved 06/12/2006; OMB Number 2060–0515; expires 06/30/2009.

EPA ICR No. 2071.03; NESHAP for Printing, Coating and Dyeing of Fabrics and Other Textiles (Renewal); in 40 CFR part 63, subpart OOOO; was approved 06/12/2006; OMB Number 2060–0522; expires 06/30/2009.

EPA ICR No. 2211.01; Focus Group Research for Fuel Economy Label Designs; was approved 06/09/2006; OMB Number 2060–0581; expires 08/31/2006.

EPA ICR No. 2228.01; Reformulated Gasoline Commingling Provisions; in 40 CFR part 80.78; was approved 06/09/2006; OMB Number 2060–0587; expires 11/30/2006.

EPA ICR No. 1591.21; Regulation of Fuel and Fuel Additives: Refiner and Importer Quality Assurance Requirements for Downstream Oxygen Blending and Requirements for Disposition of Pipeline Interfaces (Direct Final Rule); in 40 CFR 80.69; 40 CFR 80.74; 40 CFR 80.77; 40 CFR 80.84; 40 CFR 80.104; 40 CFR 80.213; 40 CFR 80.365; 40 CFR 80.840; was approved 07/12/2006; OMB Number 2060–0277; expires 10/31/2007.

EPA ICR No. 2104.02; Brownfields Programs—Revitalization Grantee Reporting (Renewal); was approved 07/05/2006; OMB Number 2050–0192; expires 07/31/2009.

EPA ICR No. 0575.10; Health and Safety Data Reporting; Submission of Lists and Copies of Health and Safety Studies; in 40 CFR part 716; was approved 07/06/2006; OMB Number 2070–0004; expires 07/31/2009.

EPA ICR No. 2055.02; Data Submissions for the Voluntary Children's Chemical Evaluation Program (VCCEP); was approved 07/09/2006; OMB Number 2070–0165; expires 07/31/2009.

EPA ICR No. 2014.03; Reporting and Recordkeeping Requirements of the HCFC Allowance System (Renewal); in 40 CFR part 82.23, 40 CFR part 82.24; was approved 07/10/2006; OMB Number 2060–0498; expires 07/31/2009.

EPA ICR No. 2184.02; Inclusion of Delaware and New Jersey in the Clean Air Interstate Rule (Final Rule); in 40 CFR 51.123(c)(1), (c)(3), (e)(2), (e)(4)(ii); 40 CFR 51.124(c), (e)(2); 40 CFR 51.125 (a)(1); 40 CFR 96.140; 40 CFR 96.143(a); was approved 07/10/2006; OMB Number 2060–0584; expires 07/31/2009.

*Comment Filed*

EPA ICR No. 0328.12; Spill Prevention, Control and Countermeasure (SPCC) Plants (Proposed Rule); OMB Number 2050–0021; in 40 CFR 112.3(e); 40 CFR 112.4(a), (e)–(f); 40 CFR 112.5(a); 40 CFR 112.7(a)–(i); OMB filed comments on 06/12/2006.

EPA ICR No. 0783.50; Cold Temperature Hydrocarbon Emissions Standards for Light-Duty Vehicles, Light-Duty Trucks, and Medium-Duty Passenger Vehicles (Proposed Rule); in 40 CFR part 85, subparts R, S, T, V, W, and Y; 40 CFR part 86, subparts B, E, F, G, H, J, K, L, O, P, R, and S; 40 CFR part 600, subparts A, B, D, and F; OMB filed comments on 06/23/2006.

EPA ICR No. 1989.03; Revised NPDES and Effluent Limitation Guidelines for Concentrated Animal Feeding Operations in Response to Waterkeeper Decision (Proposed Rule); in 40 CFR 122, 40 CFR 122.21(i)(1)(i–xi), 40 CFR 122.21(f), 40 CFR 122.21(f)(1), 40 CFR 122.21(f)(7), 40 CFR 122.23(f)(1–3), 40 CFR 122.23(g–h), 40 CFR 122.28(b)(3)(iv), 40 CFR 122.41, 40 CFR 122.42(e)(1), 40 CFR 122.42(e)(1)(i–iv), 40 CFR 122.42(e)(4), 40 CFR 122.42(e)(3), 40 CFR 122.62, 40 CFR 122.62(b)(2–4), 40 CFR 123, 40 CFR 123.25, 40 CFR 123.40, 40 CFR 123.25(a)(22, 27, 30, 31, 33, 34), 40 CFR 123.26(b), 40 CFR 123.42(e)(3–4), 40 CFR 123.42(e)(4)(i–vi), 40 CFR 123.62, 40 CFR 123.62(a), 40 CFR 123.62(b)(1), 40 CFR 412, 40 CFR 412(a)(1)(i–iii), 40 CFR 412.37(b), 40 CFR 412.37(b)(1–6), 40 CFR 412.37(c), 40 CFR 412.37(c)(1–9); OMB filed comments on 07/11/2006.

*Short Term Extensions*

EPA ICR No. 2212.01; MBE/WBE Utilization under Federal Grants, Cooperative, Agreements and Interagency Agreements; OMB Number 2090–0025; on 06/29/2006 OMB extended the expiration date to 08/31/2006.

EPA ICR No. 1842.04; Notice of Intent for Storm Water Discharges Associated with Construction Activity under a NPDES General Permit; OMB Number 2040–0188; on 06/29/2006 OMB extended the expiration date to 09/30/2006.

EPA ICR No. 0226.17; applications for NPDES Discharge Permits and the Sewage Sludge Management Permits; OMB Number 2040–0086; on 06/29/2006 OMB extended the expiration date to 09/30/2006.

EPA ICR No. 1820.03; NPDES Storm Water Program Phase II; OMB Number 2040–0211; on 06/29/2006 OMB extended the expiration date to 09/30/2006.

EPA ICR No. 2003.02; NESHAP for Integrated Iron and Steel Manufacturing (Final Rule); OMB Number 2060–0517; on 06/29/2006 OMB extended the expiration date to 08/30/2006.

Dated: July 27, 2006.

**Oscar Morales,**

*Director, Collection Strategies Division.*

[FR Doc. E6–12540 Filed 8–2–06; 8:45 am]

**BILLING CODE 6560–50–P**

# ENVIRONMENTAL PROTECTION AGENCY

**[AMS–FRL–8205–4]**

**California State Motor Vehicle Pollution Control Standards; Waiver of Federal Preemption for Amendments to California's Exhaust Emission Standards and Test Procedures for On-Road Motorcycles and Motorcycle Engines; Notice of Decision**

**AGENCY:** Environmental Protection Agency.

**ACTION:** Notice of Decision Regarding Waiver of Federal Preemption for California Motorcycle Emission Standards.

**SUMMARY:** The California Air Resources Board (CARB) requested that the Environmental Protection Agency (EPA) confirm CARB's finding that amendments to its on-road motorcycle and motorcycle engines exhaust emission regulations, approved by CARB on October 22, 1999, are within the scope of previous Clean Air Act Section 209(b) waivers of federal preemption. Instead of confirming CARB's request that the amendments are within the scope of a previously granted waiver of federal preemption EPA is, by today's action, granting a full waiver of federal preemption.

**ADDRESSES:** The Agency's Decision Document, containing an explanation of the Assistant Administrator's decision, as well as all documents relied upon in making that decision, including those submitted to EPA by CARB, are contained in the public docket. The official public docket is the collection of materials that is available for public viewing. The EPA Docket Center Public Reading Room is open from 8:30 to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the Air and Radiation Docket is (202) 566–1743. The reference number for this docket is EPA–HQ–OAR–2004–0486. The location of the Docket Center is the Environmental Protection Agency, (EPA/DC) EPA West, Room B102, 1301 Constitution Ave., NW., Washington, D.C. Copies of the Decision Document for this determination can also be obtained by contacting David Dickinson as noted below, or can be accessed on the EPA's Office of Transportation and Air Quality Web site, also noted below.

**FOR FURTHER INFORMATION CONTACT:** David Dickinson, Attorney-Advisor, Certification and Compliance Division, (6405J), U.S. Environmental Protection Agency, 1200 Pennsylvania Avenue, NW., Washington, DC 20460. Telephone: (202) 343–9256, FAX: (202) 343–2804, e-mail: *Dickinson.David@EPA.GOV.*

**SUPPLEMENTARY INFORMATION:**

## I. Obtaining Electronic Copies of Documents

Electronic copies of this Notice and the accompanying Decision Document are available via the Internet on the Office of Transportation and Air Quality (OTAQ) Web site (*http://www.epa.gov/OTAQ*). Users can find these documents by accessing the OTAQ Home Page and looking at the path entitled "Chronological List of All OTAQ Regulations." This service is free of charge, except for any cost you already

incur for Internet connectivity. The official **Federal Register** version of the Notice is made available on the day of publication on the primary Web site (*http://www.epa.gov/docs/fedrgstr/EPA–AIR/).*

Please note that due to differences between the software used to develop the documents and the software into which the documents may be downloaded, changes in format, page length, etc. may occur.

*Docket:* EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2004–0486. All documents in the docket are listed in the *http://www.regulations.gov* index. Although listed in the index, some information is not publicly available, *e.g.*, CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy at the Docket Center noted above.

## II. Determination

I have determined that CARB's amendments to its on-highway motorcycle and motorcycle engine regulations constitute new standards and therefore require a new waiver of federal preemption rather than confirmation that the amendments are within the scope of a prior waiver issued under section 209(b) of the Clean Air Act (Act), 42 U.S.C. 7543(b), granted by EPA to CARB.[1] The amendments to the regulations, outlined in CARB's request letter[2], and fully described in CARB's submissions, provide for: (1) A combined level of hydrocarbon (HC) and oxides of nitrogen (NO$_X$) emissions as HC + NO$_X$ for 2004 and subsequent model years (in comparison to the preexisting on-road Class III motorcycle HC-only standard); (2) two tiers of standard (Tier-1 and -2), with a Tier-1

standard of 1.4 g/km for HC + NO$_X$ for model years 2004 through 2007 and a Tier-2 standard of 0.08 for HC + NO$_X$ for model year 2008 and beyond; (3) retention of corporate averaging for Class III engine families but an addition of a not-to-exceed cap limit for each emission level from each engine family; and (4) a new definition of "small volume manufacturer" that applies in model year 2008 and beyond and clarification of the definition for "motorcycle engine."

In a June 18, 2003 letter to EPA, CARB notified EPA of the above-described amendments to its motorcycle regulations and asked EPA to confirm that these amendments are within-the-scope of EPA's previous waivers. EPA can make such a confirmation if certain conditions are present. Specifically, if California acts to amend a previously waived standard or accompanying enforcement procedure, the amendment may be considered within-the-scope of a previously granted waiver provided that it does not undermine California's determination that its standards, in the aggregate, are as protective of public health and welfare as applicable Federal standards, does not affect the consistency with section 202(a) of the Act, and raises no new issues affecting EPA's previous waiver.[3]

In its request letter, CARB stated that the amendments will not cause the California standards, in the aggregate, to be less protective of public health and welfare than the applicable Federal standards. Regarding consistency with section 202(a), CARB stated that the amendments do not raise any concerns of inadequate leadtime or technological feasibility or impose any inconsistent certification requirements (compared to the Federal requirements). Finally, CARB stated that the amendments raise no new issues affecting the prior EPA authorization determinations.

Because EPA believed it possible that CARB's amendments do in fact raise "new issues" as they impose new more stringent standards, EPA offered the opportunity for a public hearing, and requested public comments, on these new standards, as the Act requires us to do, by publication of a **Federal Register** notice to such effect on November 21, 2005.[4] There was no request for a public hearing, nor were any comments received on the CARB standards at issue. Therefore, EPA has made this

---

[1] EPA previously granted CARB a waiver of federal preemption for California's exhaust emission standards and test procedures for 1978 and subsequent model year motorcycles at 41 FR 44209 (October 7, 1976) and 43 FR 998 (January 5, 1978). EPA also confirmed that a subsequent amendment to the HC exhaust standard for certain small volume manufacturers for the 1982 model year was within the scope of a previously granted waiver at 47 FR 23204 (May 27, 1982). Finally, EPA also confirmed that CARB's HC exhaust standards for 1984 and subsequent model year Class III motorcycles (280 cc and above) was within the scope of a previously granted waiver at 53 FR 6195 (March 1, 1988). EPA also previously waiver federal preemption for California's evaporative emission standards and test procedures for motorcycles and confirmed subsequent amendments as within the scope of previously granted waivers at 47 FR 1015 (January 8, 1982); 47 FR 23204 (May 27, 1982); 53 FR 6195 (March 1, 1988); and 53 FR 36116 (September 16, 1988).

[2] Docket entry EPA–HQ–OAR 2004–0486–0002, letter to EPA, from CARB, dated June 18, 2003.

[3] Decision Document accompanying scope of waiver determination in 51 FR 12391 (April 10, 1986).

[4] 70 FR 70073 (November 21, 2005).

determination based on the information submitted by CARB in its request.

EPA's analysis finds that the criteria for granting a full waiver have been met for these amendments. A full explanation of EPA's decision is contained in a Decision Document which may be obtained from EPA as noted above.

My decision will affect not only persons in California but also the manufacturers outside the State who must comply with California's requirements in order to produce vehicles for sale in California. For this reason, I hereby determine and find that this is a final action of national applicability.

Under section 307(b)(1) of the Act, judicial review of this final action may be sought only in the United States Court of Appeals for the District of Columbia Circuit. Petitions for review must be filed by October 2, 2006. Under section 307(b)(2) of the Act, judicial review of this final action may not be obtained in subsequent enforcement proceedings.

As with past waiver decisions, this action is not a rule as defined by Executive Order 12866. Therefore, it is exempt from review by the Office of Management and Budget as required for rules and regulations by Executive Order 12866.

In addition, this action is not a rule as defined in the Regulatory Flexibility Act, 5 U.S.C. 601(2). Therefore, EPA has not prepared a supporting regulatory flexibility analysis addressing the impact of this action on small business entities.

The Congressional Review Act, 5 U.S.C. 801 *et seq.*, as added by the Small Business Regulatory Enforcement Fairness Act of 1996, does not apply because this action is not a rule, for purposes of 5 U.S.C. 804(3).

Finally, the Administrator has delegated the authority to make determinations regarding waivers under section 209(b) of the Act to the Assistant Administrator for Air and Radiation.

Dated: July 27, 2006.

**William L. Wehrum,**

*Acting Assistant Administrator, Office of Air and Radiation.*

[FR Doc. E6–12546 Filed 8–2–06; 8:45 am]

**BILLING CODE 6560–50–P**

## FEDERAL COMMUNICATIONS COMMISSION

**[Report No. 2783]**

### Petitions for Reconsideration of Action in Rulemaking Proceeding

July 27, 2006.

Petitions for Reconsideration have been filed in the Commission's Rulemaking proceeding listed in this Public Notice and published pursuant to 47 CFR 1.429(e). The full text of these documents is available for viewing and copying in Room CY–B402, 445 12th Street, SW., Washington, DC or may be purchased from the Commission's copy contractor, Best Copy and Printing, Inc. (BCPI) (1–800–378–3160). Oppositions to these petitions must be filed by August 18, 2006. See Section 1.4(b)(1) of the Commission's rules (47 CFR 1.4(b)(1)). Replies to an opposition must be filed within 10 days after the time for filing oppositions have expired.

*Subject:* In the Matter of Amendment of Parts 1, 21, 73, 74 and 101 of the Commission's Rules to Facilitate the Provision of Fixed and Mobile Broadband Access, Educational And Other Advanced Services in the 2150–2162 and 2500–2690 MHz Bands (WT Docket No. 03–66).

Part 1 of the Commission's Rules—Further Competitive Bidding Procedures (WT Docket No. 03–67).

Amendment of Parts 21 and 74 to Enable Multipoint Distribution Service and the Instructional Television Fixed Service to Engage in Fixed Two-Way Transmissions (MM Docket No. 97–217).

Amendment of Parts 21 and 74 of the Commission's Rules with Regard to Licensing in the Multipoint Distribution Service and in the Instructional Television Fixed Service for the Gulf of Mexico (WT Docket No. 02–68).

Promoting Efficient Use of Spectrum through Elimination of Barriers to the Development of Secondary Markets (WT Docket No. 00–230).

Review of the Spectrum Sharing Plan among Non-Geostationary Satellite Orbit Mobile Satellite Service Systems in the 1.6/2.4 GHz Bands (IB Docket No. 02–364).

*Number of Petitions Filed:* 10.

**Marlene H. Dortch,**

*Secretary.*

[FR Doc. E6–12545 Filed 8–2–06; 8:45 am]

**BILLING CODE 6712–01–P**

## FEDERAL RESERVE SYSTEM

### Change in Bank Control Notices; Acquisition of Shares of Bank or Bank Holding Companies

The notificants listed below have applied under the Change in Bank Control Act (12 U.S.C. 1817(j)) and § 225.41 of the Board's Regulation Y (12 CFR 225.41) to acquire a bank or bank holding company. The factors that are considered in acting on the notices are set forth in paragraph 7 of the Act (12 U.S.C. 1817(j)(7)).

The notices are available for immediate inspection at the Federal Reserve Bank indicated. The notices also will be available for inspection at the office of the Board of Governors. Interested persons may express their views in writing to the Reserve Bank indicated for that notice or to the offices of the Board of Governors. Comments must be received not later than August 18, 2006.

**A. Federal Reserve Bank of Minneapolis** (Jacqueline G. King, Community Affairs Officer) 90 Hennepin Avenue, Minneapolis, Minnesota 55480-0291:

*1. Jon W. Neumann,* Hawley, Minnesota; to acquire voting shares of First Hawley Bancshares, Inc., Hawley, Minnesota, and thereby indirectly acquire voting shares of First National Bank, Hawley, Minnesota.

Board of Governors of the Federal Reserve System, July 28, 2006.

**Robert deV. Frierson,**

*Deputy Secretary of the Board.*

[FR Doc. E6–12487 Filed 8–2–06; 8:45 am]

**BILLING CODE 6210–01–S**

## FEDERAL RESERVE SYSTEM

### Formations of, Acquisitions by, and Mergers of Bank Holding Companies

The companies listed in this notice have applied to the Board for approval, pursuant to the Bank Holding Company Act of 1956 (12 U.S.C. 1841 *et seq.*) (BHC Act), Regulation Y (12 CFR Part 225), and all other applicable statutes and regulations to become a bank holding company and/or to acquire the assets or the ownership of, control of, or the power to vote shares of a bank or bank holding company and all of the banks and nonbanking companies owned by the bank holding company, including the companies listed below.

The applications listed below, as well as other related filings required by the Board, are available for immediate inspection at the Federal Reserve Bank indicated. The application also will be

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 21

Table SPM.6 and Figure SPM.11 summarise the required emission levels for different groups of stabilisation concentrations and the resulting equilibrium global warming and long-term sea level rise due to thermal expansion only.[21] The timing and level of mitigation to reach a given temperature stabilisation level is earlier and more stringent if climate sensitivity is high than if it is low. {5.4, 5.7}

Sea level rise under warming is inevitable. Thermal expansion would continue for many centuries after GHG concentrations have stabilised, for any of the stabilisation levels assessed, causing an eventual sea level rise much larger than projected for the 21st century. The eventual contributions from Greenland ice sheet loss could be several metres, and larger than from thermal expansion, should warming in excess of 1.9-4.6°C above pre-industrial be sustained over many centuries. The long time scales of thermal expansion and ice sheet response to warming imply that stabilisation of GHG concentrations at or above present levels would not stabilise sea level for many centuries. {5.3, 5.4}

**Table SPM.6.** Characteristics of post-TAR stabilisation scenarios and resulting long-term equilibrium global average temperature and the sea level rise component from thermal expansion only. {Table 5.1}[a]

| Category | CO$_2$ concentration at stabilisation (2005 = 379 ppm) [b] | CO$_2$-equivalent Concentration at stabilisation including GHGs and aerosols (2005 = 375 ppm) [b] | Peaking year for CO$_2$ emissions [a, c] | Change in global CO$_2$ emissions in 2050 (% of 2000 emissions) [a, c] | Global average temperature increase above pre-industrial at equilibrium, using 'best estimate' climate sensitivity [d], [e] | Global average sea level rise above pre-industrial at equilibrium from thermal expansion only [f] | Number of assessed scenarios |
|---|---|---|---|---|---|---|---|
|  | ppm | ppm | year | percent | °C | metres |  |
| I | 350 – 400 | 445 – 490 | 2000 – 2015 | -85 to -50 | 2.0 – 2.4 | 0.4 – 1.4 | 6 |
| II | 400 – 440 | 490 – 535 | 2000 – 2020 | -60 to -30 | 2.4 – 2.8 | 0.5 – 1.7 | 18 |
| III | 440 – 485 | 535 – 590 | 2010 – 2030 | -30 to +5 | 2.8 – 3.2 | 0.6 – 1.9 | 21 |
| IV | 485 – 570 | 590 – 710 | 2020 – 2060 | +10 to +60 | 3.2 – 4.0 | 0.6 – 2.4 | 118 |
| V | 570 – 660 | 710 – 855 | 2050 – 2080 | +25 to +85 | 4.0 – 4.9 | 0.8 – 2.9 | 9 |
| VI | 660 – 790 | 855 – 1130 | 2060 – 2090 | +90 to +140 | 4.9 – 6.1 | 1.0 – 3.7 | 5 |

Notes:
a)  The emission reductions to meet a particular stabilization level reported in the mitigation studies assessed here might be underestimated due to missing carbon cycle feedbacks (see also Topic 2).
b)  Atmospheric CO$_2$ concentrations were 379 ppm in 2005. The best estimate of total CO$_2$-eq concentration in 2005 for all long-lived GHGs is about 455 ppm, while the corresponding value including the net effect of all anthropogenic forcing agents is 375 ppm CO$_2$-eq.
c)  Ranges correspond to the 15th to 85th percentile of the post-TAR scenario distribution. CO$_2$ emissions are shown so multi-gas scenarios can be compared with CO$_2$-only scenarios (see Figure SPM.3).
d)  The best estimate of climate sensitivity is 3°C.
e)  Note that global average temperature at equilibrium is different from expected global average temperature at the time of stabilization of GHG concentrations due to the inertia of the climate system. For the majority of scenarios assessed, stabilisation of GHG concentrations occurs between 2100 and 2150 (see also Footnote 21).
f)  Equilibrium sea level rise is for the contribution from ocean thermal expansion only and does not reach equilibrium for at least many centuries. These values have been estimated using relatively simple climate models (one low resolution AOGCM and several EMICs based on the best estimate of 3°C climate sensitivity) and do not include contributions from melting ice sheets, glaciers and ice caps. Long-term thermal expansion is projected to result in 0.2 to 0.6 m per degree Celsius of global average warming above pre-industrial. (AOGCM refers to Atmosphere Ocean General Circulation Models and EMICs to Earth System Models of Intermediate Complexity.)

---

[21] Estimates for the evolution of temperature over the course of this century are not available in the AR4 for the stabilisation scenarios. For most stabilisation levels global average temperature is approaching the equilibrium level over a few centuries. For the much lower stabilisation scenarios (category I and II, Figure SPM.11), the equilibrium temperature may be reached earlier.

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 22

# Contributions to accelerating atmospheric CO₂ growth from economic activity, carbon intensity, and efficiency of natural sinks

Josep G. Canadell[a,b], Corinne Le Quéré[c,d], Michael R. Raupach[a], Christopher B. Field[e,] Erik T. Buitenhuis[c], Philippe Ciais[f], Thomas J. Conway[g], Nathan P. Gillett[c], R. A. Houghton[h], and Gregg Marland[i,j]

[a]Global Carbon Project, Commonwealth Scientific and Industrial Research Organisation Marine and Atmospheric Research, GPO Box 3023, Canberra ACT 2601, Australia; [c]School of Environment Sciences, University of East Anglia, Norwich NR4 7TJ, United Kingdom; [d]British Antarctic Survey, Madingley Road, Cambridge CB3 0ET, United Kingdom; [e]Department of Global Ecology, Carnegie Institution of Washington, Stanford, CA 94305; [f]Laboratoire des Sciences du Climat et de l'Environnement, Commissariat a L'Energie Atomique, 91191 Gif sur Yvette, France; [g]National Oceanic and Atmospheric Administration Earth System Research Laboratory, Boulder, CO 80305; [h]Woods Hole Research Center, Falmouth, MA 02540; [i]Carbon Dioxide Information Analysis Center, Oak Ridge National Laboratory, Oak Ridge, TN 37831; and [j]International Institute for Applied Systems Analysis, A-2361 Laxenburg, Austria

Edited by William C. Clark, Harvard University, Cambridge, MA, and approved September 17, 2007 (received for review March 27, 2007)

**The growth rate of atmospheric carbon dioxide (CO₂), the largest human contributor to human-induced climate change, is increasing rapidly. Three processes contribute to this rapid increase. Two of these processes concern emissions. Recent growth of the world economy combined with an increase in its carbon intensity have led to rapid growth in fossil fuel CO₂ emissions since 2000: comparing the 1990s with 2000–2006, the emissions growth rate increased from 1.3% to 3.3% $y^{-1}$. The third process is indicated by increasing evidence ($P = 0.89$) for a long-term (50-year) increase in the airborne fraction (AF) of CO₂ emissions, implying a decline in the efficiency of CO₂ sinks on land and oceans in absorbing anthropogenic emissions. Since 2000, the contributions of these three factors to the increase in the atmospheric CO₂ growth rate have been ≈65 ± 16% from increasing global economic activity, 17 ± 6% from the increasing carbon intensity of the global economy, and 18 ± 15% from the increase in AF. An increasing AF is consistent with results of climate–carbon cycle models, but the magnitude of the observed signal appears larger than that estimated by models. All of these changes characterize a carbon cycle that is generating stronger-than-expected and sooner-than-expected climate forcing.**

airborne fraction | anthropogenic carbon emissions | carbon–climate feedback | terrestrial and ocean carbon emissions | vulnerabilities of the carbon cycle

The rate of change of atmospheric CO₂ reflects the balance between anthropogenic carbon emissions and the dynamics of a number of terrestrial and ocean processes that remove or emit CO₂ (1, 2). The long-term evolution of this balance will determine to a large extent the speed and magnitude of human-induced climate change and the mitigation necessary to stabilize atmospheric CO₂ concentrations at any given level.

In recent years, components of the global carbon balance have changed substantially with major increases in anthropogenic emissions (3) and changes in land and ocean sink fluxes due to climate variability and change (4).

In this article, we report a number of changes in the global carbon cycle, particularly since 2000, with major implications for current and future growth of atmospheric CO₂. To quantify the importance of these changes, we update and analyze datasets on CO₂ emissions from fossil fuel combustion and cement production ($F_{Foss}$), CO₂ emissions from land use change ($F_{LUC}$), the carbon intensity of global economic activity, and estimated trends in the CO₂ balance of the oceans and of ecosystems on land.

We also quantify the relative importance of key processes responsible for the observed acceleration in atmospheric CO₂ concentrations. This attribution provides insights into key leverage points for management of the carbon cycle and also indicates

the present significance of carbon–climate feedbacks associated with the long-term dynamics of natural CO₂ sinks and sources.

## Results and Discussion

**Growth in Atmospheric CO₂.** Global average atmospheric CO₂ rose from 280 ppm at the start of the industrial revolution (≈1,750) to 381 ppm in 2006. The present concentration is the highest during the last 650,000 years (5, 6) and probably during the last 20 million years (7). The growth rate of global average atmospheric CO₂ for 2000–2006 was 1.93 ppm $y^{-1}$ [or 4.1 petagrams of carbon (PgC) $y^{-1}$, Table 1]. This rate is the highest since the beginning of continuous monitoring in 1959 and is a significant increase over growth rates in earlier decades: the average growth rates for the 1980s and the 1990s were 1.58 and 1.49 ppm $y^{-1}$, respectively (Fig. 1).

**CO₂ Emissions.** From 1850 to 2006, fossil fuel and cement emissions released a cumulative total of ≈330 PgC to the atmosphere (1 PgC = 1 petagram or $10^9$ metric tons of carbon). An additional 158 PgC came from land-use-change emissions, largely deforestation and wood harvest (see *Methods* for data sources and uncertainties).

Fossil fuel and cement emissions ($F_{Foss}$) increased from 7.0 PgC $y^{-1}$ in 2000 to 8.4 PgC $y^{-1}$ in 2006, 35% above emissions in 1990. The average $F_{Foss}$ for 2000–2006 was 7.6 ± 0.4 PgC $y^{-1}$ (Table 1). The average proportional growth rate of $F_{Foss}$[k] increased from 1.3% $y^{-1}$ for 1990–1999 to 3.3% $y^{-1}$ for 2000–2006 (Fig. 1B).

Model-based estimates of emissions from land-use change ($F_{LUC}$) remained approximately constant from 1959 to 2006,

Author contributions: J.G.C., C.L.Q., M.R.R., C.B.F., and P.C. designed research; J.G.C., C.L.Q., M.R.R., C.B.F., E.T.B., P.C., T.J.C., R.A.H., and G.M. performed research; J.G.C., C.L.Q., M.R.R., E.T.B., P.C., T.J.C., N.P.G., R.A.H., and G.M. analyzed data; and J.G.C., C.L.Q., M.R.R., C.B.F., P.C., and R.A.H. wrote the paper.

The authors declare no conflict of interest.

This article is a PNAS Direct Submission.

Freely available online through the PNAS open access option.

Abbreviations: AF, airborne fraction; GWP, gross world product; kgC, kilograms of carbon; PgC, petagrams of carbon.

[b]To whom correspondence should be addressed. E-mail: pep.canadell@csiro.au.

[k]These growth rates are slightly different from those in ref. 3 because the CDIAC dataset used in ref. 3 was for 2000–2005, and the one used here is for 2000–2006. This update involved revisions to global emissions data for the 1990s, as well as the addition of 2006 data, mainly to resolve earlier discrepancies in emissions data from China (supporting information figure 10 in ref. 3).

This article contains supporting information online at www.pnas.org/cgi/content/full/0702737104/DC1.

© 2007 by The National Academy of Sciences of the USA

**Table 1. Summary of means and proportional trends of the global carbon budget for various time periods**

| Global carbon budget | Mean | | | | Proportional trend, % $y^{-1}$ |
|---|---|---|---|---|---|
| | 1959–2006 | 1970–1999 | 1990–1999 | 2000–2006 | 1959–2006 |
| Economy, kgC/U.S. dollars | | | | | |
| Carbon intensity | 0.29* | 0.30 | 0.26 | 0.24 | −1.18† |
| Sources, PgC $y^{-1}$ | | | | | |
| Fossil Fuel ($F_{Foss}$) | 5.3 | 5.6 | 6.5 | 7.6 | 2.12 |
| Land Use Change ($F_{LUC}$) | 1.5 | 1.5 | 1.6 | 1.5 | 0.21 |
| Total ($F_{Foss} + F_{LUC}$) | 6.7 | 7.0 | 8.0 | 9.1 | 1.71 |
| Sinks, PgC $y^{-1}$ | | | | | |
| Atmosphere | 2.9 | 3.1 | 3.2 | 4.1 | 1.89 |
| Ocean | 1.9 | 2.0 | 2.2 | 2.2 | 1.25 |
| Land | 1.9 | 2.0 | 2.7 | 2.8 | 1.87 |
| Distribution of annual emissions | | | | | |
| Atmosphere‡ | 0.43 | 0.44 | 0.39 | 0.45 | 0.25 ± 0.21§ |
| Ocean | 0.28 | 0.28 | 0.27 | 0.24 | −0.42 |
| Land | 0.29 | 0.28 | 0.34 | 0.30 | 0.06 |

*The proportional trend for a quantity $X(t)$ is $\langle X \rangle^{-1} \langle dX/dt \rangle$, where angle brackets denote an average over the indicated period.
†Data available from 1970 only.
‡This is the airborne fraction.
§This value (mean ± standard deviation) of the proportional trend in AF was determined from the noise-reduced (monthly) series for AF (see *Methods* and *SI Text*). All other proportional trend estimates were derived from the annual series.

averaging 1.5 ± 0.5 PgC $y^{-1}$. These estimates were based on rates of change in areas of land cultivated, harvested, or reforested (see *Methods*). From 1959 to 1980, ≈30% of emissions from land-use change originated in the extratropics. This extratropical contribution decreased after 1980, reaching zero by 2000. The remaining land-use emissions originated largely from deforestation in tropical America and Asia, with a smaller contribution from tropical Africa. From 2000 to 2006, land-use emissions from tropical Asia rose significantly to 0.6 PgC $y^{-1}$, whereas emissions from the American tropics decreased from >0.9 PgC $y^{-1}$ in 1990 to 0.6 PgC $y^{-1}$ in 2006. The emissions from these two regions are now similar in magnitude for the first time since the 1950s. Emissions from tropical Africa have remained constant at ≈0.2 PgC $y^{-1}$ for the last 25 years.

From 2000 to 2006, the average total anthropogenic $CO_2$ emission ($F_{Foss} + F_{LUC}$) was 9.1 PgC $y^{-1}$, rising from 8.4 PgC $y^{-1}$ in 2000 to 9.9 PgC $y^{-1}$ in 2006, with an annual rate of increase of 2.9% $y^{-1}$ compared with an average rate of increase of 0.7% $y^{-1}$ for the period of the 1990s (Table 1).

**Carbon Intensity of the Global Economy.** The carbon intensity of gross world product (GWP), defined as the ratio $F_{Foss}$/GWP, provides a measure of the $CO_2$ emissions required to produce a unit of economic activity at a global scale. In the 3 decades before 2000, the carbon intensity of GWP† declined from 0.35 kilograms of carbon (kgC)/dollar in 1970 to 0.24 kgC/dollar in 2000. This trend represents a decrease (improvement) of ≈1.3% per year. Since 2000, however, the carbon intensity of GWP stopped decreasing and has increased (deteriorated) at ≈0.3% per year (Fig. 1A and Table 1) (3).

Continuous improvements in the carbon intensity of the world economy are postulated in practically all scenarios for future emissions (8). The effect of these projected improvements is to hold the rate of global emissions growth below the rate of global economic growth. The recent combination of rapidly increasing emissions and deteriorating carbon intensity of GWP amplifies the challenge of stabilizing atmospheric $CO_2$ (9).

**Natural Sinks and $CO_2$ Airborne Fraction (AF).** The annual increment in atmospheric $CO_2$ is substantially smaller than the increment in anthropogenic emissions, because natural sinks on land and in the ocean remove part of the anthropogenic $CO_2$. The relative efficiency of these sinks can be measured by the annual AF, the ratio of the atmospheric $CO_2$ increase in a given year to that year's total emissions ($F_{Foss} + F_{LUC}$). AF is a function of the biological and physical processes governing land–atmosphere and ocean–atmosphere $CO_2$ exchanges, as well as the trajectory of anthropogenic $CO_2$ emissions. The AF has a large interannual variability and has ranged from 0.0 to 0.8 since 1959 (Fig. 2A). This variability is mainly due to the responses of natural sinks, particularly land sinks (Fig. 1B), to interannual climate variability (e.g., from El Niño/Southern Oscillation) and volcanic eruptions (10). Of the average 9.1 PgC $y^{-1}$ of total anthropogenic emissions ($F_{Foss} + F_{LUC}$) from 2000 to 2006, the AF was 0.45; almost half of the anthropogenic emissions remained in the atmosphere, and the rest were absorbed by land and ocean sinks. To partition the fluxes between these two sinks, we estimated the annual ocean uptake for 1959–2006 with an ocean general-circulation model coupled to a biogeochemical model, forced by observed climate and $CO_2$ concentration (11). The model reproduces the observed mean sink of 2.2 ± 0.4 PgC $y^{-1}$ for the 1990s (12). We calculated net land exchange (excluding emissions from land-use change) as the residual. On the basis of this partitioning, the ocean sink accounted for 0.24 of total anthropogenic emissions from 2000 to 2006, and the land sinks accounted for the remaining 0.30.

Changes in the long-term efficiency of the natural sinks in removing atmospheric $CO_2$, as measured by the ratio of sinks to emissions, are indicated by the proportional trend in the AF [(1/AF)dAF/dt]. Over the period 1959–2006, this was +0.25 ± 0.21% $y^{-1}$ (mean ± standard deviation of estimate), with significance $P = 0.89$ for a trend >0 [Table 1 and Fig. 2A; see *Methods* and supporting information (SI) Text for computational and statistical details]. Although the significance of this trend is lower than the conventional criterion of $P = 0.95$, the observed AF trend is sufficiently significant to justify reflecting it in the attribution of recent changes in the growth rate of atmospheric $CO_2$.

Climate models that include a representation of carbon cycle

---

†The GWP data used throughout this paper are based on market exchange rates (MER). In ref. 3, we show that our main conclusions, particularly the reversal of the trend in Fig. 1A, are evident using either the MER or purchasing power parity definition for GWP.



**Fig. 1.** Fossil-fuel intensity of the GWP from 1970 to 2006 (*A*) and the $CO_2$ budget from 1959 to 2006 (*B*). Fossil-fuel intensity uses GWP data based on market exchange rates, expressed in U.S. dollars (referenced to 1990, with inflation removed). (*B Upper*) $CO_2$ emissions to the atmosphere (sources) as the sum of fossil fuel combustion, land-use change, and other emissions, which are primarily from cement production. (*Lower*) The fate of the emitted $CO_2$, including the increase in atmospheric $CO_2$ plus the sinks of $CO_2$ on land and in the ocean. Flux is in Pg $y^{-1}$ carbon (left axis) and Pg $y^{-1}$ $CO_2$ (right axis).

sinks estimate a proportional trend in the AF during the 21st century of $0.41 \pm 0.23\% \, y^{-1}$ (mean ± standard deviation across 11 models) under a Special Report on Emission Scenarios (SRES) A2 scenario (13). However, over the 1959–2006 time period, 9 of the 11 models estimate a decrease in AF, and the mean proportional trend is $-0.27 \pm 0.36\% \, y^{-1}$ (11 models). These results suggest that the observed carbon-cycle feedbacks occur faster than expected by our current understanding of the processes driving the sinks.

The increase in the AF implies that carbon emissions have grown faster than $CO_2$ sinks on the land and oceans. Because the land and oceans are both mosaics of regions that are gaining and regions that are losing carbon, this trend could result from any or all of three scenarios: sink regions could have weakened, either absolutely or relative to growing emissions; source regions could have intensified; or sink regions could have transitioned to sources.

Whereas both land and ocean sinks continue to accumulate carbon on average at $\approx 5.0 \pm 0.6$ PgC $y^{-1}$ since 2000, large regional sinks have been weakening. In the Southern Ocean, the poleward displacement and intensification of westerly winds caused by human activities have enhanced the ventilation of carbon-rich waters normally isolated from the atmosphere at least since 1980, and contributed nearly half of the decrease in the ocean $CO_2$ uptake fraction estimated by the model (Fig. 2*C*; ref. 11). On land, a number of major droughts in midlatitude regions in 2002–2005 have contributed to the weakening of the growth rate of terrestrial carbon sinks in these regions (14–17).



**Fig. 2.** Fraction of the total emissions ($F_{foss} + F_{LUC}$) that remains in the atmosphere (*A*), the land biosphere (*B*), and the ocean (*C*).

**Attribution of Factors Driving the Atmospheric $CO_2$ Growth Rate.** The growth rate of atmospheric $CO_2$ depends on three classes of factors: global economic activity (generated from the use of fossil fuels and land-use change), the carbon intensity of the economy, and the functioning of unmanaged carbon sources and sinks on land and in oceans. Since 2000, a growing global economy, an increase in the carbon emissions required to produce each unit of economic activity, and a decreasing efficiency of carbon sinks on land and in oceans have combined to produce the most rapid 7-year increase in atmospheric $CO_2$ since the beginning of continuous atmospheric monitoring in 1959. This is also the most rapid increase since the beginning of the industrial revolution (18).

We estimate that $35 \pm 16\%$ of the increase in atmospheric $CO_2$ growth rate between 1970–1999 and 2000–2006 was caused by the decrease in the efficiency of the land and ocean sinks in removing anthropogenic $CO_2$ ($18 \pm 15\%$) and by the increase in carbon intensity of the global economy ($17 \pm 6\%$). The remaining $65 \pm 16\%$ was due to the increase in the global economy (see *Methods*).

Many of the existing scenarios for the 21st century assume continued economic growth (9), although none assume the long-term maintenance of the growth rates that have characterized China and India over the last decade. The overwhelming majority of the existing scenarios project sustained decreases in the carbon intensity of the global energy system. The recent

SUSTAINABILITY SCIENCE

acceleration of emissions is a consequence of many factors, including an overall surge in energy demand and production of electricity from coal, increased energy per capita, and population growth (3, 19).

The rapid growth in the atmospheric $CO_2$ growth rate since 2000 is caused by increasing $CO_2$ emissions (associated in turn with accelerating global economic growth and an increasing carbon intensity of the global economy) and also an increase in the AF of $CO_2$ emissions. Together, these effects characterize a carbon cycle that is generating stronger-than-expected climate forcing sooner than expected.

## Methods

Original data to complete the global carbon budget are generated by multiple agencies and research groups around the world and are collated annually by the Global Carbon Project (www.globalcarbonproject.org). Data are available for the period of 1850–2006 and can be downloaded from www.globalcarbonproject.org/carbontrends.

**Atmospheric $CO_2$ Concentration.** We use monthly and annual-mean atmospheric $CO_2$ concentration analyzed and compiled by the National Oceanic and Atmospheric Administration (NOAA) Earth System Research Laboratory in Colorado (www.esrl.noaa.gov/gmd/ccgg/trends) and published by the Carbon Dioxide Information Analysis Center (CDIAC) along other historical data based on ice core analyses (http://cdiac.ornl.gov/trends/co2/contents.htm). From 1959 to 1980, data came from the Mauna Loa observatory (Hawaii, U.S.) and since 1980 represent a globally averaged $CO_2$ concentration using weighted observations from many laboratories.

**Carbon Emissions from Fossil Fuel.** Carbon emissions from fossil fuel combustion were based on country-level energy data, plus estimates on the global consumption of coal, oil, and natural gas, by using standard conversions to $CO_2$ emission (20, 21). Emissions from the calcining of limestone to produce cement add ≈3.8% to global $CO_2$ emissions. From 1950 to 2004, we used the energy statistics published by the United Nations (U.N.) Department for Economic and Social Information and Policy Analysis (22). Energy statistics are compiled from annual questionnaires distributed by the U.N. Statistical Office and supplemented by official national statistical publications. For the years 2005 and 2006, data from the British Petroleum *Statistical Review of World Energy* (23) were used. Statistics on cement production are compiled by the U.S. Department of Interior's Geological Survey. Carbon dioxide emissions from fossil fuels and cement since 1751 are archived and distributed by the CDIAC (24).

**Carbon Emissions from Land-Use Change.** Emissions due to land use change (e.g., harvesting of forest products and clearing for agriculture) include the net flux of carbon between the terrestrial biosphere and the atmosphere resulting from deliberate changes in land cover and land use (25, 26). Global net-carbon fluxes from changes in land use were estimated with a bookkeeping model to track the carbon in living vegetation, dead plant material, wood products, and soils for each hectare of land cultivated, harvested, or reforested. We used the carbon emissions for the period of 1959–2000 (25), calculated the emissions for the period 2000–2005, and revised the estimates for the 1990s (which changed from 2.1 PgC $y^{-1}$ to 1.6 PgC $y^{-1}$) by using the updated and revised data on land-use change from the U.N. Food and Agriculture Organization Global Forest Resource Assessment (26). Data for 2006 are not available, but it has been assumed to be the same as in the period 1990–2005. Historical data from 1850 are archived and distributed by the CDIAC (27).

**Carbon Intensity of the Global Economy.** The carbon intensity of the global economy is calculated as $F_{Foss}$/GWP. This measure is the product of the energy consumed per dollar of economic activity (the energy intensity of the economy) and the carbon emitted per unit of energy (the carbon intensity of the energy). The GWP is the total gross national product of all of the countries in the world, i.e., the total world gross domestic product. The data are collected and analyzed by the United Nations Statistics Division. The data are based on market exchange rates expressed in U.S. dollars and referenced to 1990, with inflation removed.

**Trend in AF.** We used three time series to determine the trend in the AF, AF = $(dC_a/dt)/(F_{Foss} + F_{LUC})$, where $dC_a/dt$ is the growth rate of atmospheric $CO_2$ ($C_a$, PgC $y^{-1}$). The first "annual" AF series used the annual mean data as described above. The second "monthly" series was constructed from monthly atmospheric $CO_2$ data, with removal from $dC_a/dt$ of the regularly repeating annual cycle in global $CO_2$ caused mainly by the spring vegetation flush in the Northern Hemisphere. The third "noise-reduced" series was another monthly series in which a filtering method was used to reduce noise by removing the component of $dC_a/dt$ correlated with El Niño events and volcanic activity. Methodologies for constructing the second and third series are given in *SI Text*.

The trend in AF was estimated by fitting a first-order autoregressive (1) model to the monthly AF data as in ref. 12. The statistical significance of the trend was estimated from a 1,000-member Monte Carlo ensemble simulation, which had similar noise properties as the AF data. Finally, the standard deviation of the trends from the 1,000-member simulation was calculated to provide the uncertainty in the result.

The three time series yielded nearly identical proportional trends in AF, with values of 0.24 ± 0.33% $y^{-1}$ ($P = 0.76$) for the annual series, 0.24 ± 0.34% $y^{-1}$ ($P = 0.79$) for the monthly series, and 0.25 ± 0.21% $y^{-1}$ ($P = 0.89$) for the noise-reduced series. The significance of the results increases between the annual and the monthly series because of the larger number of independent data, as well as between the monthly and noise-reduced series because of the removal of natural variability, which does not show any trends. We used the results with the highest significance, those from the noise-reduced data.

**Data Uncertainty.** The uncertainty in the sources and sinks of $CO_2$ were estimated as follows:

- An uncertainty of 5% was assigned to emissions from fossil fuel and cement, which takes into account errors in the reporting of energy statistics and in the conversion from energy consumption to $CO_2$ emissions.
- An uncertainty of ±0.5 PgC $y^{-1}$ was assigned to land-use change. This uncertainty is revised downwards from previous assessments (28) because our land-use estimates calculated with the revised Food and Agriculture Organization Global Forest Assessment (26) are now consistent with three independent estimates based of satellite data and terrestrial models (29–31). Emissions from land-use change remain as the most important of all quantities required to close the global carbon budget.
- An uncertainty of ±0.04 PgC $y^{-1}$ was estimated for the C accumulation in the atmosphere on the basis of the standard deviation of the observations. This uncertainty is low because of the high quality of atmospheric $CO_2$ measurements and because of the fast-mixing time scale of the atmosphere, which allows for an estimation of a global mean value with relatively few sites.
- An uncertainty of ±0.4 PgC $y^{-1}$ was assigned to the ocean $CO_2$ sink on the basis of the convergence of the estimates for the

1990s by both the model used here and estimates based on oceanic and atmospheric observations (32–34), as in ref. 12.

- An uncertainty of $\pm 0.7$ PgC $y^{-1}$ was assigned to the land sink from a quadratic sum of the uncertainty in the other components of the $CO_2$ budget. Note that the uncertainty of the land plus ocean sinks ($\pm 0.6$ PgC $y^{-1}$) is smaller than their combined uncertainties because it is based on the quadratic sum of the uncertainties in the emissions and atmospheric $CO_2$ growth rate.

- The uncertainty in AF is 9%, which is based on the quadratic sum of the uncertainties in $dC_a/dt$ and of the total emissions. The trend in annual AF of 0.25% $y^{-1}$ exceeds the uncertainty in the annual AF after 36 years, for a total time series of 48 years.

**Attribution of Factors Driving the Atmospheric $CO_2$ Growth Rate.** We estimated the impact of the change in trajectory of carbon intensity between 1970–1999 and 2000–2006 by projecting the trend in carbon intensity during 1970–1999 ($-0.0038$ kgC/U.S. dollar per year) to the later period. The projected carbon intensity of 0.229 kgC/U.S. dollar is lower than the observed value of 0.242 in 2000–2006. The difference of $0.0129 \pm 0.0045$ kgC/U.S. dollar includes an uncertainty of $\pm 1$ standard deviation estimated from fitting a first-order autoregressive (1) model and computing a 1,000-member simulation, as for the AF, but applied to the departure of the 2000–2006 carbon intensity from the extrapolated trend. The $P$ value of this time series exceeds 0.99. To calculate $CO_2$ emissions, we multiplied this projected intensity by the GWP for 2000–2006 of $31.4 trillion (including

an estimated uncertainty on GWP of $\approx 5\%$) to obtain an excess emission in 2000–2006 of $0.405 \pm 0.143$ PgC $y^{-1}$. Finally, we used the observed AF of 0.45 (including its 9% uncertainty) to estimate the excess atmospheric $CO_2$ growth rate in 2000–2006 of $0.182 \pm 0.066$ PgC $y^{-1}$. This contribution corresponds to $17 \pm 6\%$ of the observed increase in the $CO_2$ growth rate between 1970–1999 and 2000–2006, which was 1.047 PgC $y^{-1}$.

We estimated the impact of the increase in AF by multiplying the trend in AF ($0.25 \pm 0.21\% \, y^{-1}$) by the time interval between 1970–1999 and 2000–2006 (18.5 years) and then by the total anthropogenic emissions ($F_{Foss} + F_{LUC}$) during 2000–2006 (9.1 PgC $y^{-1}$). This product of $0.19 \pm 0.16$ PgC $y^{-1}$ is the excess $CO_2$ growth rate due to the increase in AF. It corresponds to $18 \pm 15\%$ of the increase in atmospheric $CO_2$ growth rate between the two time periods [(0.19 PgC $y^{-1}$)/(1.047 PgC $y^{-1}$)].

We thank P. Friedlingstein for discussions, the C4MIP community for access to their model results, H. Kheshgi for helping to reconcile the C emissions from fossil fuel combustion for the year 2005, and C. Enright for helping with ocean model updates. We acknowledge the support of the Commonwealth Scientific and Industrial Research Organisation and the Australian Greenhouse Office to the Global Carbon Project International Project Office in Canberra, Australia (J.G.C. and M.R.R.), the European Union-funded CarboEurope integrated project (P.C.), Geoland-integrated Global Monitoring for Environment and Security (P.C.), the European Union-funded CarboOceans (E.T.B.), and the U.K. Quest Project (E.T.B.). This article is the result of a collaborative effort organized by the Global Carbon Project of the Earth System Science Partnership and is a contribution to the Global Carbon Project Annual Budget Update activity.

1. Sabine CL, Heimann M, Artaxo P, Bakker DCE, Chen C-TA, Field CB, Gruber N, Le Quéré C, Prinn RG, Richey JE, *et al.* (2004) in *Global Carbon Cycle: Integrating Humans, Climate and the Natural World,* eds Field C, Raupach MR (Island Press, Washington, DC), pp 17–44.
2. Canadell JG, Pataki D, Gifford R, Houghton RA, Lou Y, Raupach MR, Smith P, Steffen W (2007) in *Terrestrial Ecosystems in a Changing World,* International Geosphere–Biosphere Programme Series, eds Canadell JG, Pataki D, Pitelka L (Springer, Berlin), pp 59–78.
3. Raupach MR, Marland G, Ciais P, Le Quéré C, Canadell JG, Klepper G, Field CB, *Proc Natl Acad Sci USA* (2007) 104:10288–10293.
4. Buermann W, Lintner BR, Koven CD, Angert A, Pinzon JE, tucker CJ, Fung IY (2007) *Proc Natl Acad Sci USA* 104:4249–4254.
5. Petit JR, Jouzel J, Raynaud D, Barkov NI, Barnola JM, Basile I, Bender M, Chappellaz J, Davisk M, Delaygue G, *et al.* (1999) *Nature* 399:429–436.
6. Siegenthaler U, Stocker TF, Monnin E, Luthi D, Schwander J, Stauffer B, Raynaud D, Barnola J-M, Fische H, Masson-Delmotte V, *et al.* (2005) *Science* 310:1313–1317.
7. Pearson PN, Palmer MR (2000) *Nature* 406:695–699.
8. Edmonds J, Joos F, Nakicenovic N, Richels RG, Sarmiento J (2004) in *The Global Carbon Cycle: Integrating Humans, Climate and the Natural World,* eds Field CB, Raupach MR (Island Press, Washington, DC), pp 77–102.
9. Nakicenovic N, Swart S (2000) *IPCC Emissions Scenarios* (Cambridge Univ Press, Cambridge, UK), p 599.
10. Jones CD, Cox PM (2005) *Geophys Res Lett* 32:L14816.
11. Le Quéré C, Rödenbeck C, Buitenhuis ET, Thomas J, Conway TJ, Langenfelds R, Gomez A, Labuschagne C, Ramonet M, Nakazawa T, *et al.* (2007) *Science* 316:1735–1738.
12. Denman KL, Brasseur G, Chidthaisong A, Ciais P, Cox PM, Dickinson RE, Hauglustaine D, Heinze C, Holland E, Jacob D, *et al.* (2007) in *Climate Change 2007: The Physical Science Basis,* eds Solomon S, Qin D, Manning M, Chen Z, Marquis M, Averyt KB, Tignor M, Miller HL (Cambridge Univ Press, Cambridge, UK), pp 499–587.
13. Friedlingstein P, Cox P, Betts R, Bopp L, von Bloh W, Brovkin V, Doney S, Eby M, Fung I, Govindasamy B, *et al.* (2006) *J Climate* 19:3337–3353.
14. Angert A, Biraud S, Bonfils C, Henning CC, Buermann W, Pinzon J, Tucker CJ, Fung I (2005) *Proc Natl Acad Sci USA* 102:10823–10827.
15. Breshears DD, Cobb NS, Richd PM, Price KP, Allen CD (2005) *Proc Natl Acad Sci USA* 102:15144–15148.
16. Ciais P, Reichstein M, Viovy N, Granier A, Ogée J, Allard V, Aubinet M, Buchmann N, Bernhofer Ch, Carrara A, *et al.* (2005) *Nature* 437:529–533.
17. Knorr W, Scholze WM, Gobron N, Pinty B, Kaminski T (2005) *EOS Trans Am Geophys Union* 86:178–181.

18. Etheridge DM, Steele LP, Langenfelds RL, Francey RJ, Barnola J-M, Morgan VI (1996) *J Geophys Res Atmos* 101:4115–4128.
19. International Energy Agency (2006) *World Energy Outlook* (Organization for Economic Cooperation and Development/International Energy Agency, Paris).
20. Marland G, Rotty RM (1984) *Tellus* 36:232–261.
21. Boden TA, Marland G, Andres RJ (1995) *Estimates of Global, Regional, and Naitonal Annual $CO_2$ Emissions from Fossil-Fuel Burning, Hydraulic Cement Production, and Gas Flaring: 1950–1992* (Oak Ridge National Laboratory, U.S. Department of Energy, Oak Ridge, TN), Available at http://cdiac.esd.ornl.gov/epubs/ndp/ndp030/ndp0301.htm.
22. United Nations Department for Economic and Social Information and Policy Analysis (2004) *Energy Statistics Yearbook* (United Nations Statistical Office, New York).
23. British Petroleum (2007) *Statistical Review of World Energy 2007.* Available at www.bp.com/productlanding.do?categoryId=6848&contentId=7033471. Accessed June 2007.
24. Marland G, Boden TA, Andres RJ (2007) in *Trends: A Compendium of Data on Global Change* (Carbon Dioxide Information Analysis Center, Oak Ridge National Laboratory, U.S. Department of Energy, Oak Ridge, TN), Available at http://cdiac.ornl.gov/trends/emis/meth.reg.htm.
25. Houghton RA (2003) *Tellus* 55B:378–390.
26. Global Forest Resource Assessment (2005) *FAO Forestry Paper* 147.
27. Houghton RA, Hackler JL (2002) in *Trends: A Compendium of Data on Global Change* (Carbon Dioxide Information Analysis Center, Oak Ridge National Laboratory, U.S. Department of Energy, Oak Ridge, TN), Available at http://cdiac.ornl.gov/trends/landuse/houghton/houghton.html.
28. Prentice IC (2001) in *Climate Change: The Scientific Basis,* eds Houghton JT, Ding Y, Griggs DJ, Noguer M, van der Linden PJ, Dai X, Maskell K, Johnson CA (Cambridge Univ Press, Cambridge, UK), pp 182–237.
29. DeFries RS, Field CB, Fung I, Collatz JI, Bounoua L (1999) *Global Biogeochem Cycles* 13:803–815.
30. McGuire AD, Sitch S, Clein JS, Dargaville R, Esser G, Foley J, Heimann M, Joos F, Kaplan J, Kicklighter DW, *et al.* (2001) *Global Biogeochem Cycles* 15:183–2006.
31. Jain AK, Yang XJ (2005) *Global Biogeochem Cycles,* 10.1029/2004GB002349.
32. Manning AC, Keeling RF (2006) *Tellus* 58B:95–116.
33. McNeil BI, Richard J, Matear RK, Robert M, Key RM, Bullister JL, Sarmiento JL (2003) *Science* 299:235–239.
34. Fletcher SEM, Gruber N, Jacobson R, Doney SC, Dutkiewicz S, Gerber M, Follows M, Joos F, Lindsay K, Menemenlis D, *et al.* (2006) *Global Biogeochem Cycles,* 10.1029/2005GB002530.

SUSTAINABILITY SCIENCE

PNAS

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 23



http://www.epa.gov/climatechange/science/futurecc.html
Last updated on Thursday, December 20th, 2007.

Climate Change - Science

You are here: <u>EPA Home</u>    <u>Climate Change</u>    <u>Science</u>    Future Climate Change

- <u>Future Climate Change</u>
- <u>Atmosphere</u>
- <u>Temperature</u>
- <u>Precipitation and Storms</u>
- <u>Sea Levels</u>

# Future Climate Change

**Related Links**

Greenhouse gas concentrations in the atmosphere will increase during the next century unless <u>greenhouse gas emissions</u> decrease substantially from present levels. Increased greenhouse gas concentrations are very likely to raise the Earth's average temperature, influence precipitation and some storm patterns as well as raise sea levels (<u>IPCC, 2007</u>). The magnitude of these changes, however, is uncertain.

Extreme Events

CCSP

- Product 3.1 - Climate Models: An Assessment of Strengths and Limitations for User Applications
- Product 3.3 - Climate Extremes: Analysis of the Observed Changes and Variations and Prospects for the Future

The amount and speed of future climate change will ultimately depend on:

- Whether greenhouse gases and aerosol concentrations increase, stay the same or decrease.
- How strongly features of the climate (e.g. temperature, precipitation and sea level) respond to changes in greenhouse gas and aerosol concentrations.
- How much the climate varies as a result of natural influences (e.g. from volcanic activity and changes in the sun 's intensity) and its internal variability (referring to random changes in the circulation of the atmosphere and oceans).

**Climate Models**

Virtually all published estimates of how the climate could change in the future are produced by computer models of the Earth's climate system. These models are known as general circulation models (GCMs). <u>According to the IPCC (2007):</u>

"[C]onfidence in models comes from their physical basis, and their skill in representing observed climate and past climate changes. Models have proven to be extremely important tools for simulating and understanding climate, and there is considerable confidence that they are able to provide credible quantitative estimates of future climate change, particularly at larger scales. Models continue to have significant limitations, such as in their representation of clouds, which lead to uncertainties in the magnitude and timing, as well as regional details, of predicted climate change. Nevertheless, over several decades of model development, they have consistently provided a

robust and unambiguous picture of significant climate warming in response to increasing greenhouse gases."

It is important to recognize that projections of climate change in specific areas are not forecasts comparable to tomorrow's weather forecast. Rather, they are hypothetical examples of how the climate might change and usually contain a range of possibilities as opposed to one specific high likelihood outcome.

The following pages provide a summary of the projected changes in the atmosphere and climate over the next century based on the current state of knowledge:

- Future Atmosphere Changes in Greenhouse Gas and Aerosol Concentrations
- Future Temperature Changes
- Future Precipitation and Storm Changes
- Future Sea Level Changes

**References**

- IPCC, 2007: Climate Change 2007: The Physical Science Basis.
  EXIT Disclaimer Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change [Solomon, S., D. Qin, M. Manning (eds.)].

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 24





Climate Change - Greenhouse Gas Emissions

You are here: <u>EPA Home</u>    <u>Climate Change</u>    Greenhouse Gas Emissions

# Greenhouse Gas Emissions

<u>Greenhouse Gas Emissions Overview</u> | <u>Inventories</u> |
<u>Projections</u>

**Related Links**

EPA



### 2007 Inventory of Greenhouse Gas Emissions and Sinks

*Prepared annually by EPA, the national greenhouse gas inventory report presents estimates of U.S. greenhouse gas emissions and sinks for the years 1990 through 2005. This report also discusses the methods and data used to calculate the emission estimates.*

- U.S. Greenhouse Gas Inventories
- Methane to Markets
- Personal Greenhouse Gas Emissions Calculator

Greenhouse Gas Equivalencies Calculator

IPCC's National Greenhouse Gas Inventories Programme
EXIT Disclaimer

UNFCCC

- Greenhouse Gases Database EXIT Disclaimer
- National Inventory Submissions 2006 EXIT Disclaimer

**Greenhouse Gas Overview**

Gases that trap heat in the atmosphere are often called greenhouse gases. This section of the EPA Climate Change Site provides information and data on emissions of greenhouse gases to Earth's atmosphere, and also the removal of greenhouse gases from the atmosphere. For more information on the science of climate change, please visit EPA's <u>climate change science home page</u>.

Some greenhouse gases such as carbon dioxide occur naturally and are emitted to the atmosphere through natural processes and human activities. Other greenhouse gases (e.g., fluorinated gases) are created and emitted solely through human activities. The principal greenhouse gases that enter the atmosphere because of human activities are:

- **<u>Carbon Dioxide ($CO_2$)</u>**: Carbon dioxide enters the atmosphere through the burning of fossil fuels (oil, natural gas, and coal), solid waste, trees and wood products, and also as a result of other chemical reactions (e.g., manufacture of cement). Carbon dioxide is also removed from the atmosphere (or "sequestered") when it is absorbed by plants as part of the biological carbon cycle.
- **<u>Methane ($CH_4$)</u>**: Methane is emitted during the production and transport of coal, natural gas, and oil. Methane emissions also result from livestock and other agricultural practices and by the decay of organic waste in municipal solid waste landfills.
- **<u>Nitrous Oxide ($N_2O$)</u>**: Nitrous oxide is emitted during agricultural and industrial activities, as well as during combustion of fossil fuels and solid waste.
- **<u>Fluorinated Gases</u>**: Hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride are synthetic, powerful greenhouse gases that are emitted from a variety of industrial processes. Fluorinated gases are sometimes used as substitutes for <u>ozone-depleting substances</u> (i.e., CFCs, HCFCs, and halons). These gases are typically emitted in smaller quantities, but because they are potent greenhouse gases, they are sometimes referred to as High Global Warming Potential gases ("High GWP gases").

**Greenhouse Gas Inventories**

A greenhouse gas inventory is an accounting of the amount of greenhouse gases emitted to or removed from the atmosphere over a specific period of time (e.g., one year). A greenhouse gas inventory also provides information on the activities that cause emissions and removals, as well as background on the methods used to make the calculations. Policy makers use greenhouse gas inventories to track emission trends, develop strategies and policies and assess progress. Scientists use greenhouse gas inventories as inputs to atmospheric and economic models.

To track the national trend in emissions and removals since 1990, EPA develops the official U.S. greenhouse gas inventory each year. The national greenhouse gas inventory is submitted to the United Nations in accordance with the Framework Convention on Climate Change EXIT Disclaimer.

In addition to the U.S. inventory, greenhouse gas emissions can be tracked at the global, state and local levels as well as by companies and individuals:

- Many other countries also develop national greenhouse gas inventories, which can be compiled into global inventories. EPA works with developing and transition countries to improve the accuracy and sustainability of their greenhouse gas inventories. EPA has developed Greenhouse Gas Inventory Capacity Building templates and software tools targeting key sources, emissions factors, good practices, institutional infrastructure and use of the latest IPCC guidelines on greenhouse gas inventories.
- Many states prepare greenhouse gas inventories, and EPA provides guidance and tools to assist them in their efforts.
- Corporate greenhouse gas inventories provide information on the emissions associated with the operations of a company.
- Individuals produce greenhouse gas emissions through everyday activities such as driving and using air conditioning or heating. EPA provides an online calculator for estimating personal emissions.

The Intergovernmental Panel on Climate Change (IPCC) EXIT Disclaimer publishes internationally accepted inventory methodologies that serve as a basis for all greenhouse gas inventories, ensuring that they are comparable and understandable. The 2006 IPCC Guidelines were completed and accepted by the IPCC in May 2006.

**Emission Trends & Projections**

Estimates of future emissions and removals depend in part on assumptions about changes in underlying human activities. For example, the demand for fossil fuels such as gasoline and coal is expected to increase greatly with the predicted growth of the U.S. and global economies.

The Fourth U.S. Climate Action Report concluded, in assessing current trends, that carbon dioxide emissions increased by 20 percent from 1990-2004, while methane and nitrous oxide emissions decreased by 10 percent and 2 percent, respectively. The declines in methane emissions are due to a variety of technological, policy, and agricultural changes, such as increased capture of methane from landfills for energy, reduced emissions from natural gas systems, and declining cattle populations. At least some of the decline in nitrous oxide emissions is due to improved emissions control technologies in cars, trucks, and other mobile sources. (Fourth U.S. Climate Action Report, 2007)

Many, but not all, human sources of greenhouse gas emissions are expected to rise in the future. This growth may be reduced by ongoing efforts to increase the use of newer, cleaner technologies and other measures. Additionally, our everyday choices about such things as commuting, housing, electricity use and recycling can influence the amount of greenhouse gases being emitted.

The United States government prepares projections of emissions and removals of all greenhouse gases. The following links provide more detailed information on projections:

- Greenhouse Gas Projections, Chapter 5 of the U.S. Climate Action Report: In Chapter 5 of the Climate Action Report, the U.S. forecasts future emission levels using information developed from models.
- International Non-CO2 Greenhouse Gas Emission Projections
- Methane Projections
- Nitrous Oxide Projections
- Fluorinated Gases

**References**

- Fourth U.S. Climate Action Report, 2007  EXIT Disclaimer

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 25



http://www.epa.gov/climatechange/science/stateofknowledge.html
Last updated on Thursday, December 20th, 2007.

## Climate Change - Science

You are here: <u>EPA Home</u>    <u>Climate Change</u>    <u>Science</u>    State of Knowledge

# State of Knowledge

<u>What's Known</u> | <u>What's Very Likely</u> | <u>What's Not Certain</u>

As with any field of scientific study, there are uncertainties associated with the science of climate change. This does not imply that scientists do not have confidence in many aspects of climate science. Some aspects of the science are known with virtual certainty[1], because they are based on well-known physical laws and documented trends. Current understanding of many other aspects of climate change ranges from "very likely" to "uncertain."

**Related Links**

CCSP

- Product 5.2 - Best practice approaches for characterizing, communicating, and incorporating scientific uncertainty in decisionmaking
- Vision for the Program and Highlights of the Scientific Strategic Plan

## What's Known

Scientists know with virtual certainty that:

- Human activities are changing the composition of Earth's atmosphere. Increasing levels of greenhouse gases like carbon dioxide ($CO_2$) in the atmosphere since pre-industrial times are well-documented and understood.
- The atmospheric buildup of $CO_2$ and other greenhouse gases is largely the result of human activities such as the burning of fossil fuels.
- An "unequivocal" warming trend of about 1.0 to 1.7°F occurred from 1906-2005. Warming occurred in both the Northern and Southern Hemispheres, and over the oceans (<u>IPCC, 2007</u>).
- The major greenhouse gases emitted by human activities remain in the atmosphere for periods ranging from decades to centuries. It is therefore virtually certain that atmospheric concentrations of greenhouse gases will continue to rise over the next few decades.
- Increasing greenhouse gas concentrations tend to warm the planet.

## What's Very Likely?

The Intergovernmental Panel on Climate Change (IPCC) has stated "Most of the observed increase in global average temperatures since the mid-20th century is very likely due to the observed increase in anthropogenic greenhouse gas concentrations" (<u>IPCC, 2007</u>). In short, a growing number of scientific analyses indicate, but cannot prove, that rising levels of greenhouse gases in the atmosphere are contributing to climate change (as theory predicts). In the coming decades, scientists anticipate that as atmospheric concentrations of greenhouse gases continue to rise, average global temperatures and sea levels will continue to rise as a result and precipitation patterns will change.

## What's Not Certain?

Important scientific questions remain about how much warming will occur, how fast it will occur, and how the warming will affect the rest of the climate system including precipitation

patterns and storms. Answering these questions will require advances in scientific knowledge in a number of areas:

- Improving understanding of natural climatic variations, changes in the sun's energy, land-use changes, the warming or cooling effects of pollutant aerosols, and the impacts of changing humidity and cloud cover.
- Determining the relative contribution to climate change of human activities and natural causes.
- Projecting future greenhouse emissions and how the climate system will respond within a narrow range.
- Improving understanding of the potential for rapid or abrupt climate change.

Addressing these and other areas of scientific uncertainty is a major priority of the U.S. Climate Change Science Program (CCSP). The CCSP is developing twenty-one Synthesis and Assessment products to advance scientific understanding of these uncertainty areas by the end of 2008. More information.

**References**

- IPCC, 2007: Climate Change 2007: The Physical Science Basis.
  EXIT Disclaimer Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change [Solomon, S., D. Qin, M. Manning (eds.)].

[1] Throughout the science section of this Web site, use of "virtual certainty" (or virtually certain) conveys a greater than 99% chance that a result is true. Other terms used to communicate confidence include "extremely likely" (greater than 95% chance the result is true), "very likely" (greater than 90% chance the result is true), "likely" (greater than 66% chance the result is true), "more likely than not" (greater than 50% chance the result is true), "unlikely" (less than 33% chance the result is true), "very unlikely" (less than 10% chance the result is true), and "extremely unlikely" (less than 5% chance the result is true). These judgmental estimates originate from the Intergovernmental Panel on Climate Change (IPCC, 2007).

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 26



http://www.epa.gov/climatechange/science/recentac.html
Last updated on Thursday, December 20th, 2007.

Climate Change - Science

You are here: <u>EPA Home</u>    <u>Climate Change</u>    <u>Science</u>    <u>Recent Climate Change</u>    Atmosphere Changes

- Recent Climate Change
- Atmosphere
- Temperature
- Precipitation and Storms
- Sea Levels

# Atmosphere Changes

<u>Greenhouse Gases</u> | <u>Aerosols</u> | <u>Radiative Forcing</u>

The release of greenhouse gases and aerosols resulting from human activities are changing the amount of radiation coming into and leaving the atmosphere, likely contributing to <u>changes in climate</u>.

**Greenhouse Gases**

Greenhouse gas concentrations in the atmosphere have <u>historically varied</u> as a result of many natural processes (e.g. volcanic activity, changes in temperature, etc). However, since the Industrial Revolution humans have added a <u>significant amount of greenhouse gases</u> in the atmosphere by burning fossil fuels, cutting down forests and other activities. Because greenhouse gases absorb and emit heat, increasing their concentrations in the atmosphere will tend to have a warming effect. But the <u>rate and amount of temperature increase</u> is not known with absolute certainty. Changes in the atmospheric concentration of the major greenhouse gases are described below:



*Figure 1 - Carbon Dioxide: Click on Thumbnail for full size image*

**Carbon dioxide (CO$_2$)** concentrations in the atmosphere increased from approximately 280 parts per million (ppm) in pre-industrial times to 382 ppm in 2006 according to the National Oceanic and Atmospheric Administration's (NOAA) <u>Earth Systems Research Laboratory</u>, a 36 percent increase. Almost all of the

**Related Links**

EPA

- Future Atmosphere Changes
- Greenhouse Gas Emissions
- Methane Site
- High Global Warming Potential Gases Site
- Nitrous Oxide Site

CCSP

- Methane as a Greenhouse Gas
- Product 2.3 - Aerosol properties and their impacts on climate

CDIAC: Information on primary global-change data and information analysis

NASA

- Aerosols and Climate Change
- Atmospheric Methane
- Methane's Impacts on Climate Change May Be Twice Previous Estimates
- Soot has Impact on Global Climate

NOAA

- Earth System Regional Laboratory
- Interactive Atmospheric Visualization Tool

U.S. Carbon Cycle Research Program

increase is due to human activities (IPCC, 2007). The current rate of increase in $CO_2$ concentrations is about 1.9 ppmv/year. Present $CO_2$ concentrations are higher than any time in at least the last 650,000 years (IPCC, 2007). See Figure 1 for a record of $CO_2$ concentrations from about 420,000 years ago to present. For more information on the human and natural sources of $CO_2$ emissions, see the Emissions section and for actions that can reduce these emissions, see the What You Can Do Section.



*Figure 2 - Methane: Click on Thumbnail for full size image*

**Methane (CH4)** is more abundant in the Earth's atmosphere now than at any time in at least the past 650,000 years (IPCC, 2007). Methane concentrations increased sharply during most of the 20th century and are now 148% above pre-industrial levels. In recent decades, the rate of increase has slowed considerably (see Figure 2). For more information on CH4 emissions and sources, and actions that can reduce emissions, see EPA's Methane Site.



*Figure 3 - Nitrous Oxide: Click on Thumbnail for full size image*

**Nitrous oxide (N2O)** has increased approximately 18 percent in the past 200 years and continues to increase (see Figure 3). For about 11,500 years before the industrial period, the concentration of N2O varied only slightly. It increased relatively rapidly toward the end of the 20th century (IPCC, 2007). For more information on N2O emissions and sources, see EPA's Nitrous Oxide Site .

**How are Greenhouse Gas Concentrations from Thousands of Years Ago Determined?**

Portions of the Antarctic ice sheet are several miles deep, consisting of ice that has accumulated over hundreds of thousands of years or longer. Paleoclimatologists (scientists who study the history of the Earth's climate) drill holes in this ice to extract what are called "cylindrical cores," or "ice cores."

Ice cores can provide valuable information about the Earth's past. For example, the cores contain trapped air bubbles that can be analyzed to obtain snapshots of the composition of the atmosphere at the time the ice accumulated. Through this analysis, concentrations of greenhouse gases (CO2, CH4, N2O) dating back thousands of years or longer can be obtained with a high level of confidence. See the National Aeronautics and Space Administration's (NASA) Earth Observatory feature "Paleoclimatogy: The Ice Core Method" for more information.

- **Tropospheric ozone (O3)** is created by chemical reactions from automobile, power plant and other industrial and commercial source emissions in the presence of sunlight. It is estimated that O3 has increased by about 36% since the pre-industrial era, although substantial variations exist for regions and overall trends (IPCC, 2007). Besides being a greenhouse gas, ozone can also be a harmful air pollutant at ground level, especially for people with respiratory diseases and children and adults who are active outdoors. Measures are being taken to reduce ozone emissions in the U.S. (through the Clean Air Act) and also in other countries.
- **Chlorofluorocarbons (CFCs)** and hydrochlorofluorocarbons (HCFCs) are used in coolants, foaming agents, fire extinguishers, solvents, pesticides and aerosol propellants. These compounds have steadily increased in the atmosphere since their introduction in 1928. Concentrations are slowly declining as a result of their phaseout via the Montreal Protocol on Substances that Deplete the Ozone Layer.
- **Fluorinated gases** such as hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), and sulfur hexafluoride (SF6) are frequently used as substitutes for CFCs and HCFCs and are increasing in the atmosphere. These various fluorinated gases are sometimes called "high global warming potential greenhouse gases" because, molecule for molecule, they trap more heat than CO2. For more information, visit EPA's High Global Warming Potential Gases Site.

**Aerosols**

The burning of fossil fuels and biomass (living matter such as vegetation) has resulted in aerosol emissions into the atmosphere. Aerosols absorb and emit heat, reflect light and, depending on their properties, can either cool or warm the atmosphere. NASA's Earth Observatory describes how aerosols can also affect how clouds form.

- **Sulfate aerosols** are emitted when fuel containing sulfur, such as coal and oil, is burned. Sulfate aerosols reflect solar radiation back to space and have a cooling effect. These aerosols have decreased in concentration in the past two decades resulting from efforts to reduce the coal-fired power plant emissions of sulfur dioxide in the United States and other countries.
- **Black carbon** (or soot) results from the incomplete combustion of fossil fuels and biomass burning (forest fires and land clearing) and is believed to contribute to global warming (IPCC, 2007). Though global concentrations are likely increasing, there are significant regional differences. In the United States and many other countries, efforts to reduce particulate matter (of which black carbon is a part) are lowering black carbon concentrations.

- **Other aerosols** emitted in small quantities from human activities include organic carbon and associated aerosols from biomass burning. Mineral dust aerosols (e.g., from deserts and lake beds) largely originate from natural sources, but their distribution can be affected by human activities.

## Radiative Forcing

Radiative forcing is the change in the balance between solar radiation entering the atmosphere and the Earth's radiation going out. On average, a positive radiative forcing tends to warm the surface of the Earth while negative forcing tends to cool the surface. Radiative forcing is measured in Watts per square meter, which is a measure of energy. For example, an increase in radiative forcing of +1 Watt per square meter is like shining one small holiday tree light bulb over every square meter of the Earth.

Greenhouse gases have a positive radiative forcing because they absorb and emit heat. Aerosols can have a positive or negative radiative forcing, depending on how they absorb and emit heat and/or reflect light. For example, black carbon aerosols - which have a positive forcing - more effectively absorb and emit heat than sulfates, which have a negative forcing and more effectively reflect light. The following are estimates of the change in radiative forcing in the year 2005 relative to 1750 for different components of the climate (IPCC, 2007):

- The radiative forcing contribution (since 1750) from increasing concentrations of well-mixed **greenhouse gases** (including $CO_2$, $CH_4$, $N_2O$, CFCs, HCFCs, and fluorinated gases) is estimated to be +2.64 Watts per square meter - over half due to increases in $CO_2$ (+1.66 Watts per square meter), strongly contributing to warming relative to other climate components described below.
- The radiative forcing contribution from increasing **tropospheric ozone**, an unevenly distributed greenhouse gas, is estimated to be +0.35 Watts per square meter (on average), resulting in a relatively small warming effect. This forcing varies from region to region depending on the amount of ozone in the troposphere at a particular location.
- The radiative forcing contribution from the **observed depletion of stratospheric ozone** is estimated to be -0.05 Watts per square meter, resulting in a relatively small cooling effect.
- While **aerosols** can have either positive or negative contributions to radiative forcing, the net effect of all aerosols added to the atmosphere has likely been negative. The best estimate of aerosols' direct cooling effect is -0.5 Watts per square meter; the best estimate for their indirect cooling effect (by increasing the reflectivity of clouds) is -0.7 Watts per square meter, with an uncertainty range of -1.8 to -0.3 Watts per square meter. Therefore, the net effect of changes in aerosol radiative forcing has likely resulted in a small to relatively large cooling effect.
- **Land use change** (including urbanization, deforestation, reforestation, desertification, etc) can have significant effects on radiative forcing (and the climate) at the local level by changing the reflectivity of the land surface (or albedo). For example, because farmland is more reflective than forests (which are strong absorbers of heat), replacing forests with farmland would negatively contribute to radiative forcing or have a cooling effect. Averaged over the Earth, the net radiative forcing contribution of land use changes, while uncertain, is estimated to be -0.2 Watts per square meter (IPCC, 2007), resulting in a relatively small cooling effect.
- Based on a limited, 25-year record, the effect of **changes in the sun's intensity** on radiative forcing is estimated to be relatively small, or a contribution of about +0.12 Watts per square meter, resulting in a relatively small warming effect.

NOAA's Annual Greenhouse Gas Index (AGGI), which tracks changes in radiative forcing from greenhouse gases over time, shows that radiative forcing from greenhouse gases has increased 21.5% since 1990 as of 2006. Much of the increase (63%) has resulted from the

contribution of CO2. The contribution to radiative forcing by CH4 and CFCs has been nearly constant or declining, respectively, in recent years.

---

**How Is Radiative Forcing Determined?**

For well-mixed greenhouse gases, mathematical equations are used to compute radiative forcing based on changes in their concentration relative to 1750 (or 1990 for NOAA's AGGI) and the known radiative properties of the gases. Confidence in these calculations is high due to reliable current and historic concentration data and well-established physics.

Due to limited measurements and regional variation, changes in tropospheric ozone, aerosols, land use and the sun's intensity are much more uncertain. In the case of aerosols, uncertainty is increased due to an incomplete understanding of how aerosols interact with clouds and the effects the interactions have on aerosol radiative forcing.

For more information, see Working Group I's contribution to the Intergovernmental Panel on Climate Change's Fourth Assessment Report (2007), Chapter 2, "Changes in Atmospheric Constituents and Radiative Forcing," pp. 133-134 (PDF, 8.6 MB, 106 pp.).

---

**References**

- IPCC, 2007: Climate Change 2007: The Physical Science Basis. `EXIT Disclaimer` Contribution of Working Group I to the Fourth Assessment Report of the Intergovernmental Panel on Climate Change [Solomon, S., D. Qin, M. Manning (eds.)].

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 27

# Intergovernmental Panel on Climate Change
# Fourth Assessment Report

## Climate Change 2007: Synthesis Report

# Summary for Policymakers

NOTE: Un-edited copy prepared for COP-13. The entire report is subject to final copy-edit prior to its final publication.

**Based on a draft prepared by:**
Lenny Bernstein, Peter Bosch, Osvaldo Canziani, Zhenlin Chen, Renate Christ, Ogunlade Davidson, William Hare, Saleemul Huq, David Karoly, Vladimir Kattsov, Zbigniew Kundzewicz, Jian Liu, Ulrike Lohmann, Martin Manning, Taroh Matsuno, Bettina Menne, Bert Metz, Monirul Mirza, Neville Nicholls, Leonard Nurse, Rajendra Pachauri, Jean Palutikof, Martin Parry, Dahe Qin, Nijavalli Ravindranath, Andy Reisinger, Jiawen Ren, Keywan Riahi, Cynthia Rosenzweig, Matilde Rusticucci, Stephen Schneider, Youba Sokona, Susan Solomon, Peter Stott, Ronald Stouffer, Taishi Sugiyama, Rob Swart, Dennis Tirpak, Coleen Vogel, Gary Yohe

**Table of Contents:**

| | | |
|---|---|---:|
| | Introduction | 1 |
| 1. | Observed changes in climate and their effects | 1 |
| 2. | Causes of change | 4 |
| 3. | Projected climate change and its impacts | 6 |
| 4. | Adaptation and mitigation options | 14 |
| 5. | The long-term perspective | 19 |

References in curly brackets { } in this Summary for Policymakers refer to sections, tables and figures in the longer report of this Synthesis Report.

## Introduction

This Synthesis Report is based on the assessment carried out by the three Working Groups of the IPCC. It provides an integrated view of climate change as the final part of the IPCC's Fourth Assessment Report.

A complete elaboration of the Topics covered in this summary can be found in this Synthesis Report and in the underlying reports of the three Working Groups.

## 1.   Observed changes in climate and their effects

**Warming of the climate system is unequivocal, as is now evident from observations of increases in global average air and ocean temperatures, widespread melting of snow and ice, and rising global average sea level (Figure SPM.1). {1.1}**

Eleven of the last twelve years (1995-2006) rank among the twelve warmest years in the instrumental record of global surface temperature (since 1850). The 100-year linear trend (1906-2005) of 0.74 [0.56 to 0.92]°C [1] is larger than the corresponding trend of 0.6 [0.4 to 0.8]°C (1901-2000) given in the Third Assessment Report (TAR) (Figure SPM.1). The temperature increase is widespread over the globe, and is greater at higher northern latitudes. Land regions have warmed faster than the oceans (Figures SPM.2, SPM.4). {1.1, 1.2}

Rising sea level is consistent with warming (Figure SPM.1). Global average sea level has risen since 1961 at an average rate of 1.8 [1.3 to 2.3]mm/yr and since 1993 at 3.1 [2.4 to 3.8]mm/yr, with contributions from thermal expansion, melting glaciers and ice caps, and the polar ice sheets. Whether the faster rate for 1993 to 2003 reflects decadal variation or an increase in the longer-term trend is unclear. {1.1}

Observed decreases in snow and ice extent are also consistent with warming (Figure SPM.1). Satellite data since 1978 show that annual average Arctic sea ice extent has shrunk by 2.7 [2.1 to 3.3]% per decade, with larger decreases in summer of 7.4 [5.0 to 9.8]% per decade. Mountain glaciers and snow cover on average have declined in both hemispheres. {1.1}

From 1900 to 2005, precipitation increased significantly in eastern parts of North and South America, northern Europe and northern and central Asia but declined in the Sahel, the Mediterranean, southern Africa and parts of southern Asia. Globally, the area affected by drought has *likely*[2] increased since the 1970s. {1.1}

It is *very likely* that over the past 50 years: cold days, cold nights and frosts have become less frequent over most land areas, and hot days and hot nights have become more frequent. It is *likely* that: heat waves have become more frequent over most land areas, the frequency of heavy precipitation events has increased over most areas, and since 1975 the incidence of extreme high sea level[3] has increased worldwide. {1.1}

There is observational evidence of an increase in intense tropical cyclone activity in the North Atlantic since about 1970, with limited evidence of increases elsewhere. There is no clear trend in the annual numbers of tropical cyclones. It is difficult to ascertain longer-term trends in cyclone activity, particularly prior to 1970. {1.1}

Average Northern Hemisphere temperatures during the second half of the 20th century were *very likely* higher than during any other 50-year period in the last 500 years and *likely* the highest in at least the past 1300 years. {1.1}

---

[1] Numbers in square brackets indicate a 90% uncertainty interval around a best estimate, i.e. there is an estimated 5% likelihood that the value could be above the range given in square brackets and 5% likelihood that the value could be below that range. Uncertainty intervals are not necessarily symmetric around the corresponding best estimate.

[2] Words in italics represent calibrated expressions of uncertainty and confidence. Relevant terms are explained in the Box 'Treatment of uncertainty' in the Introduction of this Synthesis Report.

[3] Excluding tsunamis, which are not due to climate change. Extreme high sea level depends on average sea level and on regional weather systems. It is defined here as the highest 1% of hourly values of observed sea level at a station for a given reference period.

**Changes in temperature, sea level and Northern Hemisphere snow cover**



**Figure SPM.1.** Observed changes in (a) global average surface temperature; (b) global average sea level from tide gauge (blue) and satellite (red) data and (c) Northern Hemisphere snow cover for March-April. All differences are relative to corresponding averages for the period 1961-1990. Smoothed curves represent decadal averaged values while circles show yearly values. The shaded areas are the uncertainty intervals estimated from a comprehensive analysis of known uncertainties (a and b) and from the time series (c). {Figure 1.1}

---

**Observational evidence[4] from all continents and most oceans shows that many natural systems are being affected by regional climate changes, particularly temperature increases. {1.2}**

Changes in snow, ice and frozen ground have with *high confidence* increased the number and size of glacial lakes, increased ground instability in mountain and other permafrost regions, and led to changes in some Arctic and Antarctic ecosystems. {1.2}

There is *high confidence* that some hydrological systems have also been affected through increased runoff and earlier spring peak discharge in many glacier- and snow-fed rivers, and effects on thermal structure and water quality of warming rivers and lakes. {1.2}

In terrestrial ecosystems, earlier timing of spring events and poleward and upward shifts in plant and animal ranges are with *very high confidence* linked to recent warming. In some marine and freshwater systems, shifts in ranges and changes in algal, plankton and fish abundance are with *high confidence* associated with rising water temperatures, as well as related changes in ice cover, salinity, oxygen levels and circulation. {1.2}

---

[4] Based largely on data sets that cover the period since 1970.

Of the more than 29,000 observational data series, from 75 studies, that show significant change in many physical and biological systems, more than 89% are consistent with the direction of change expected as a response to warming (Figure SPM.2). However, there is a notable lack of geographic balance in data and literature on observed changes, with marked scarcity in developing countries. {1.2, 1.3}

### Changes in physical and biological systems and surface temperature 1970-2004



**Figure SPM.2.** Locations of significant changes in data series of physical systems (snow, ice and frozen ground; hydrology; and coastal processes) and biological systems (terrestrial, marine, and freshwater biological systems), are shown together with surface air temperature changes over the period 1970-2004. A subset of about 29,000 data series was selected from about 80,000 data series from 577 studies. These met the following criteria: (1) ending in 1990 or later; (2) spanning a period of at least 20 years; and (3) showing a significant change in either direction, as assessed in individual studies. These data series are from about 75 studies (of which about 70 are new since the Third Assessment) and contain about 29,000 data series, of which about 28,000 are from European studies. White areas do not contain sufficient observational climate data to estimate a temperature trend. The 2 x 2 boxes show the total number of data series with significant changes (top row) and the percentage of those consistent with warming (bottom row) for (i) continental regions: North America (NAM), Latin America (LA), Europe (EUR), Africa (AFR), Asia (AS), Australia and New Zealand (ANZ), and Polar Regions (PR) and (ii) global-scale: Terrestrial (TER), Marine and Freshwater (MFW), and Global (GLO). The numbers of studies from the seven regional boxes (NAM, EUR, AFR, AS, ANZ, PR) do not add up to the global (GLO) totals because numbers from regions except Polar do not include the numbers related to Marine and Freshwater (MFW) systems. Locations of large-area marine changes are not shown on the map. {Figure 1.2}

**There is *medium confidence* that other effects of regional climate change on natural and human environments are emerging, although many are difficult to discern due to adaptation and non-climatic drivers.**

They include effects of temperature increases on: {1.2}
- agricultural and forestry management at Northern Hemisphere higher latitudes, such as earlier spring planting of crops, and alterations in disturbance regimes of forests due to fires and pests

- some aspects of human health, such as heat-related mortality in Europe, changes in infectious disease vectors in some areas, and allergenic pollen in Northern Hemisphere high and mid-latitudes
- some human activities in the Arctic (e.g. hunting and travel over snow and ice) and in lower-elevation alpine areas (such as mountain sports).

## 2. Causes of change

Changes in atmospheric concentrations of greenhouse gases (GHGs) and aerosols, land-cover and solar radiation alter the energy balance of the climate system.

**Global GHG emissions due to human activities have grown since pre-industrial times, with an increase of 70% between 1970 and 2004 (Figure SPM.3).[5] {2.1}**

Carbon dioxide ($CO_2$) is the most important anthropogenic GHG. Its annual emissions grew by about 80% between 1970 and 2004. The long-term trend of declining $CO_2$ emissions per unit of energy supplied reversed after 2000. {2.1}

### Global anthropogenic GHG emissions



**Figure SPM.3.** (a) Global annual emissions of anthropogenic GHGs from 1970 to 2004.[5] (b) Share of different anthropogenic GHGs in total emissions in 2004 in terms of $CO_2$-eq. (c) Share of different sectors in total anthropogenic GHG emissions in 2004 in terms of $CO_2$-eq. (Forestry includes deforestation). {Figure 2.1}

**Global atmospheric concentrations of $CO_2$, methane ($CH_4$) and nitrous oxide ($N_2O$) have increased markedly as a result of human activities since 1750 and now far exceed pre-industrial values determined from ice cores spanning many thousands of years. {2.2}**

Atmospheric concentrations of $CO_2$ (379ppm) and $CH_4$ (1774 ppb) in 2005 exceed by far the natural range over the last 650,000 years. Global increases in $CO_2$ concentrations are due primarily to fossil fuel use, with land-use change providing another significant but smaller contribution. It is *very likely* that the observed increase in $CH_4$ concentration is predominantly due to agriculture and fossil fuel use. Methane growth rates have declined since the early 1990s, consistent with total emissions (sum of anthropogenic and natural sources) being nearly constant during this period. The increase in $N_2O$ concentration is primarily due to agriculture. {2.2}

There is *very high confidence* that the net effect of human activities since 1750 has been one of warming.[6] {2.2}

---

[5] Includes only $CO_2$, $CH_4$, $N_2O$, HFCs, PFCs and $SF_6$ whose emissions are covered by the UNFCCC. These GHGs are weighted by their 100-year Global Warming Potentials, using values consistent with reporting under the UNFCCC.

[6] Increases in GHGs tend to warm the surface while the net effect of increases in aerosols tends to cool it. The net effect due to human activities since the pre-industrial era is one of warming (+1.6 [+0.6 to +2.4]W/m²). In comparison, changes in solar irradiance are estimated to have caused a small warming effect (+0.12 [+0.06 to +0.30]W/m²).

**Most of the observed increase in globally-averaged temperatures since the mid-20th century is *very likely* due to the observed increase in anthropogenic GHG concentrations.[7] It is *likely* there has been significant anthropogenic warming over the past 50 years averaged over each continent (except Antarctica) (Figure SPM.4). {2.4}**

During the past 50 years, the sum of solar and volcanic forcings would *likely* have produced cooling. Observed patterns of warming and their changes are simulated only by models that include anthropogenic forcings. Difficulties remain in simulating and attributing observed temperature changes at smaller than continental scales. {2.4}

---

### Global and continental temperature change



**Figure SPM.4.** Comparison of observed continental- and global-scale changes in surface temperature with results simulated by climate models using either natural or both natural and anthropogenic forcings. Decadal averages of observations are shown for the period 1906-2005 (black line) plotted against the centre of the decade and relative to the corresponding average for the period 1901-1950. Lines are dashed where spatial coverage is less than 50%. Blue shaded bands show the 5-95% range for 19 simulations from 5 climate models using only the natural forcings due to solar activity and volcanoes. Red shaded bands show the 5-95% range for 58 simulations from 14 climate models using both natural and anthropogenic forcings. {Figure 2.5}

---

[7] Consideration of remaining uncertainty is based on current methodologies.

**Advances since the TAR show that discernible human influences extend beyond average temperature to other aspects of climate. {2.4}**

Human influences have: {2.4}
- *very likely* contributed to sea level rise during the latter half of the 20th century
- *likely* contributed to changes in wind patterns, affecting extra-tropical storm tracks and temperature patterns
- *likely* increased temperatures of extreme hot nights, cold nights and cold days
- *more likely than not* increased risk of heat waves, area affected by drought since the 1970s and frequency of heavy precipitation events.

**Anthropogenic warming over the last three decades has *likely* had a discernible influence at the global scale on observed changes in many physical and biological systems. {2.4}**

Spatial agreement between regions of significant warming across the globe and locations of significant observed changes in many systems consistent with warming is *very unlikely* to be due solely to natural variability. Several modelling studies have linked some specific responses in physical and biological systems to anthropogenic warming. {2.4}

More complete attribution of observed natural system responses to anthropogenic warming is currently prevented by the short time scales of many impact studies, greater natural climate variability at regional scales, contributions of non-climate factors and limited spatial coverage of studies. {2.4}

## 3.    Projected climate change and its impacts

**There is *high agreement* and *much evidence* that with current climate change mitigation policies and related sustainable development practices, global GHG emissions will continue to grow over the next few decades. {3.1}**

The IPCC Special Report on Emission Scenarios (SRES, 2000) projects an increase of global GHG emissions by 25-90% ($CO_2$-eq) between 2000 and 2030 (Figure SPM.5), with fossil fuels maintaining their dominant position in the global energy mix to 2030 and beyond. More recent scenarios without additional emissions mitigation are comparable in range.[8, 9] {3.1}

**Continued GHG emissions at or above current rates would cause further warming and induce many changes in the global climate system during the 21st century that would *very likely* be larger than those observed during the 20th century (Table SPM.1, Figure SPM.5). {3.2.1}**

For the next two decades a warming of about 0.2°C per decade is projected for a range of SRES emission scenarios. Even if the concentrations of all GHGs and aerosols had been kept constant at year 2000 levels, a further warming of about 0.1°C per decade would be expected. Afterwards, temperature projections increasingly depend on specific emission scenarios. {3.2}

---

[8] For an explanation of SRES emission scenarios, see Box 'SRES scenarios' in Topic 3 of this Synthesis Report. These scenarios do not include additional climate policy above current ones; more recent studies differ with respect to UNFCCC and Kyoto Protocol inclusion.
[9] Emission pathways of mitigation scenarios are discussed in Section 5.

**Scenarios for GHG emissions from 2000 to 2100 (in the absence of additional climate policies) and projections of surface temperatures**



**Figure SPM.5.** Left Panel: Global GHG emissions (in $CO_2$-eq) in the absence of climate policies: six illustrative SRES marker scenarios (coloured lines) and the 80th percentile range of recent scenarios published since SRES (post-SRES) (gray shaded area). Dashed lines show the full range of post-SRES scenarios. The emissions cover $CO_2$, $CH_4$, $N_2O$, and F-gases. Right Panel: Solid lines are multi-model global averages of surface warming for scenarios A2, A1B and B1, shown as continuations of the 20th-century simulations. These projections also take into account emissions of short-lived GHGs and aerosols. The pink line is not a scenario, but is for Atmosphere-Ocean General Circulation Model (AOGCM) simulations where atmospheric concentrations are held constant at year 2000 values. The bars at the right of the figure indicate the best estimate (solid line within each bar) and the *likely* range assessed for the six SRES marker scenarios at 2090-2099. All temperatures are relative to the period 1980-1999. {Figures 3.1 and 3.2}

**Table SPM.1.** Projected global averaged surface warming and sea level rise at the end of the 21st century. {Table 3.1}

| Case | Temperature change (°C at 2090-2099 relative to 1980-1999) [a, d] | | Sea level rise (m at 2090-2099 relative to 1980-1999) |
|---|---|---|---|
| | Best estimate | *Likely range* | Model-based range excluding future rapid dynamical changes in ice flow |
| Constant year 2000 concentrations [b] | 0.6 | 0.3 − 0.9 | Not available |
| B1 scenario | 1.8 | 1.1 − 2.9 | 0.18 − 0.38 |
| A1T scenario | 2.4 | 1.4 − 3.8 | 0.20 − 0.45 |
| B2 scenario | 2.4 | 1.4 − 3.8 | 0.20 − 0.43 |
| A1B scenario | 2.8 | 1.7 − 4.4 | 0.21 − 0.48 |
| A2 scenario | 3.4 | 2.0 − 5.4 | 0.23 − 0.51 |
| A1FI scenario | 4.0 | 2.4 − 6.4 | 0.26 − 0.59 |

*Notes:*
a) *Temperatures are assessed best estimates and likely uncertainty ranges from a hierarchy of models of varying complexity as well as observational constraints.*
b) *Year 2000 constant composition is derived from Atmosphere-Ocean General Circulation Models (AOGCMs) only.*
c) *All scenarios above are six SRES marker scenarios. Approximate $CO_2$-eq concentrations corresponding to the computed radiative forcing due to anthropogenic GHGs and aerosols in 2100 (see p. 823 of the WGI TAR) for the SRES B1, AIT, B2, A1B, A2 and A1FI illustrative marker scenarios are about 600, 700, 800, 850, 1250 and 1550 ppm, respectively.*
d) *Temperature changes are expressed as the difference from the period 1980-1999. To express the change relative to the period 1850-1899 add 0.5 °C.*

The range of projections (Table SPM.1) is broadly consistent with the TAR, but uncertainties and upper ranges for temperature are larger mainly because the broader range of available models suggests stronger climate-carbon cycle feedbacks. Warming reduces terrestrial and ocean uptake of atmospheric $CO_2$, increasing the fraction of anthropogenic emissions remaining in the atmosphere. The strength of this feedback effect varies markedly among models. {2.3, 3.2.1}

Because understanding of some important effects driving sea level rise is too limited, this report does not assess the likelihood, nor provide a best estimate or an upper bound for sea level rise. Table SPM.1 shows model-based projections of global average sea level rise for 2090-2099.[10] The projections do not include uncertainties in climate-carbon cycle feedbacks nor the full effects of changes in ice sheet flow, therefore the upper values of the ranges are not to be considered upper bounds for sea level rise. They include a contribution from increased Greenland and Antarctic ice flow at the rates observed for 1993-2003, but this could increase or decrease in the future.[11] {3.2.1}

**There is now higher confidence than in the TAR in projected patterns of warming and other regional-scale features, including changes in wind patterns, precipitation, and some aspects of extremes and sea ice. {3.2.2}**

Regional-scale changes include: {3.2.2}
- warming greatest over land and at most high northern latitudes and least over Southern Ocean and parts of the North Atlantic Ocean, continuing recent observed trends (Figure SPM.6)
- contraction of snow cover area, increases in thaw depth over most permafrost regions, and decrease in sea ice extent; in some projections using SRES scenarios, Arctic late-summer sea ice disappears almost entirely by the latter part of the 21st century
- *very likely* increase in frequency of hot extremes, heat waves, and heavy precipitation
- *likely* increase in tropical cyclone intensity; less confidence in global decrease of tropical cyclone numbers
- poleward shift of extra-tropical storm tracks with consequent changes in wind, precipitation, and temperature patterns
- *very likely* precipitation increases in high latitudes and *likely* decreases in most subtropical land regions, continuing observed recent trends.

There is *high confidence* that by mid-century, annual river runoff and water availability are projected to increase at high latitudes (and in some tropical wet areas) and decrease in some dry regions in the mid-latitudes and tropics. There is also *high confidence* that many semi-arid areas (e.g. Mediterranean basin, western United States, southern Africa and northeast Brazil) will suffer a decrease in water resources due to climate change. {3.3.1; Figure 3.5}

### Geographical pattern of surface warming



0 0.5 1 1.5 2 2.5 3 3.5 4 4.5 5 5.5 6 6.5 7 7.5

(°C)

**Figure SPM. 6.** Projected surface temperature changes for the late 21st century (2090-2099). The map shows the multi-AOGCM average projection for the A1B SRES scenario. All temperatures are relative to the period 1980-1999. {Figure 3.2}

---

[10] TAR projections were made for 2100, whereas the projections for this report are for 2090-2099. The TAR would have had similar ranges to those in Table SPM.1 if it had treated uncertainties in the same way.

[11] For discussion of the longer term see material below.

**Studies since the TAR have enabled more systematic understanding of the timing and magnitude of impacts related to differing amounts and rates of climate change. {3.3.1, 3.3.2}**

Figure SPM.7 presents examples of this new information for systems and sectors. The top panel shows impacts increasing with increasing temperature change. Their estimated magnitude and timing is also affected by development pathway (lower panel). {3.3.1}

### Examples of impacts associated with global average temperature change
*(Impacts will vary by extent of adaptation, rate of temperature change, and socio-economic pathway)*



†Significant is defined here as more than 40%. ‡Based on average rate of sea level rise of 4.2 mm/year from 2000 to 2080.

### Warming by 2090-2099 relative to 1980-1999 for non-mitigation scenarios



**Figure SPM.7.** Examples of impacts associated with projected global average surface warming. Upper panel: Illustrative examples of global impacts projected for climate changes (and sea level and atmospheric CO$_2$ where relevant) associated with different amounts of increase in global average surface temperature in the 21st century. The black lines link impacts; broken-line arrows indicate impacts continuing with increasing temperature. Entries are placed so that the left hand side of text indicates the approximate level of warming that is associated with the onset of a given impact. Quantitative entries for water scarcity and flooding represent the additional impacts of climate change relative to the conditions projected across the range of SRES scenarios A1FI, A2, B1 and B2. Adaptation to climate change is not included in these estimations. Confidence levels for all statements are *high*. Lower panel: Dots and bars indicate the best estimate and *likely* ranges of warming assessed for the six SRES marker scenarios for 2090-2099 relative to 1980-1999. {Figure 3.6}

Examples of some projected impacts for different regions are given in Table SPM.2.

**Table SPM.2.** Examples of some projected regional impacts. {3.3.2}

| | |
|---|---|
| **Africa** | • By 2020, between 75 and 250 million of people are projected to be exposed to increased water stress due to climate change |
| | • By 2020, in some countries, yields from rain-fed agriculture could be reduced by up to 50%. Agricultural production, including access to food, in many African countries is projected to be severely compromised. This would further adversely affect food security and exacerbate malnutrition |
| | • Towards the end of the 21st century, projected sea-level rise will affect low-lying coastal areas with large populations. The cost of adaptation could amount to at least 5-10% of Gross Domestic Product (GDP) |
| | • By 2080, an increase of 5-8% of arid and semi-arid land in Africa is projected under a range of climate scenarios (TS) |
| **Asia** | • By the 2050s, freshwater availability in Central, South, East and South-EastAsia, particularly in large river basins, is projected to decrease |
| | • Coastal areas, especially heavily-populated megadelta regions in South, East and South-East Asia, will be at greatest risk due to increased flooding from the sea and, in some megadeltas, flooding from the rivers |
| | • Climate change is projected to compound the pressures on natural resources and the environment, associated with rapid urbanization, industrialization and economic development |
| | • Endemic morbidity and mortality due to diarrhoeal disease primarily associated with floods and droughts are expected to rise in East, South and South-East Asia due to projected changes in the hydrological cycle |
| **Australia and New Zealand** | • By 2020, significant loss of biodiversity is projected to occur in some ecologically rich sites including the Great Barrier Reef and Queensland Wet Tropics |
| | • By 2030, water security problems are projected to intensify in southern and eastern Australia and, in New Zealand, in Northland and some eastern regions |
| | • By 2030, production from agriculture and forestry is projected to decline over much of southern and eastern Australia, and over parts of eastern New Zealand, due to increased drought and fire. However, in New Zealand, initial benefits are projected in some other regions |
| | • By 2050, ongoing coastal development and population growth in some areas of Australia and New Zealand are projected to exacerbate risks from sea level rise and increases in the severity and frequency of storms and coastal flooding |
| **Europe** | • Climate change is expected to magnify regional differences in Europe's natural resources and assets. Negative impacts will include increased risk of inland flash floods, and more frequent coastal flooding and increased erosion (due to storminess and sea-level rise) |
| | • Mountainous areas will face glacier retreat, reduced snow cover and winter tourism, and extensive species losses (in some areas up to 60% under high emissions scenarios by 2080) |
| | • In Southern Europe, climate change is projected to worsen conditions (high temperatures and drought) in a region already vulnerable to climate variability, and to reduce water availability, hydropower potential, summer tourism and, in general, crop productivity |
| | • Climate change is also projected to increase the health risks due to heat-waves, and the frequency of wildfires |
| **Latin America** | • By mid century, increases in temperature and associated decreases in soil water are projected to lead to gradual replacement of tropical forest by savanna in eastern Amazonia. Semi-arid vegetation will tend to be replaced by arid-land vegetation |
| | • There is a risk of significant biodiversity loss through species extinction in many areas of tropical Latin America |
| | • Productivity of some important crops is projected to decrease and livestock productivity to decline, with adverse consequences for food security. In temperate zones soybean yields are projected to increase. Overall, the number of people at risk of hunger is projected to increase (TS; medium confidence) |
| | • Changes in precipitation patterns and the disappearance of glaciers are projected to significantly affect water availability for human consumption, agriculture and energy generation |
| **North America** | • Warming in western mountains is projected to cause decreased snowpack, more winter flooding, and reduced summer flows, exacerbating competition for over-allocated water resources |
| | • In the early decades of the century, moderate climate change is projected to increase aggregate yields of rain-fed agriculture by 5-20%, but with important variability among regions. Major challenges are projected for crops that are near the warm end of their suitable range or which depend on highly utilized water resources |
| | • During the course of this century, cities that currently experience heatwaves are expected to be further challenged by an increased number, intensity and duration of heatwaves during the course of the century, with potential for adverse health impacts |
| | • Coastal communities and habitats will be increasingly stressed by climate change impacts interacting with development and pollution |
| **Polar Regions** | • The main projected biophysical effects are reductions in thickness and extent of glaciers and ice sheets and sea ice, and changes in natural ecosystems with detrimental effects on many organisms including migratory birds, mammals and higher predators |
| | • For human communities in the Arctic, impacts, particularly those resulting from changing snow and ice conditions are projected to be mixed |
| | • Detrimental impacts would include those on infrastructure and traditional indigenous ways of life |
| | • In both polar regions, specific ecosystems and habitats are projected to be vulnerable, as climatic barriers to species invasions are lowered |

**Table SPM.2.** (cont.)

| Small Islands | • Sea-level rise is expected to exacerbate inundation, storm surge, erosion and other coastal hazards, thus threatening vital infrastructure, settlements and facilities that support the livelihood of island communities |
|---|---|
| | • Deterioration in coastal conditions, for example through erosion of beaches and coral bleaching is expected to affect local resources |
| | • By mid-century, climate change is expected to reduce water resources in many small islands, e.g. in the Caribbean and Pacific, to the point where they become insufficient to meet demand during low-rainfall periods |
| | • With higher temperatures, increased invasion by non-native species is expected to occur, particularly on mid- and high-latitude islands |

*Note: Unless stated explicitly, all entries are from WGII SPM text, and are either very high confidence or high confidence statements, reflecting different sectors (Agriculture, Ecosystems, Water, Coasts, Health, Industry and Settlements). The WGII SPM refers to the source of the statements, timelines and temperatures. The magnitude and timing of impacts that will ultimately be realized will vary with the amount and rate of climate change, emission scenarios, development pathways and adaptation.*

Some systems, sectors and regions are *likely* to be especially affected by climate change.[12] {3.3.3}

Systems and sectors: {3.3.3}
- particular ecosystems:
  - terrestrial: tundra, boreal forest and mountain regions because of sensitivity to warming; mediterranean-type ecosystems because of reduction in rainfall; and tropical rainforests where precipitation declines
  - coastal: mangroves and salt marshes, due to multiple stresses
  - marine: coral reefs due to multiple stresses; the sea ice biome because of sensitivity to warming
- water resources in some dry regions at mid-latitudes[13] and in the dry tropics, due to changes in rainfall and evapotranspiration, and in areas dependent on snow and ice melt
- agriculture in low-latitudes, due to reduced water availability
- low-lying coastal systems, due to threat of sea level rise and increased risk from extreme weather events
- human health in populations with low adaptive capacity.

Regions: {3.3.3}
- the Arctic, because of the impacts of high rates of projected warming on natural systems and human communities
- Africa, because of low adaptive capacity and projected climate change impacts
- small islands, where there is high exposure of population and infrastructure to projected climate change impacts
- Asian and African megadeltas, due to large populations and high exposure to sea level rise, storm surges and river flooding.

Within other areas, even those with high incomes, some people (such as the poor, young children, and the elderly) can be particularly at risk, and also some areas and some activities. {3.3.3}

**Ocean Acidification**

The uptake of anthropogenic carbon since 1750 has led to the ocean becoming more acidic with an average decrease in pH of 0.1 units. Increasing atmospheric $CO_2$ concentrations lead to further acidification. Projections based on SRES scenarios give a reduction in average global surface ocean pH of between 0.14 and 0.35 units over the 21st century. While the effects of observed ocean acidification on the marine biosphere are as yet undocumented, the progressive acidification of oceans is expected to have negative impacts on marine shell-forming organisms (e.g. corals) and their dependent species. {3.3.4}

---

[12] Identified on the basis of expert judgement of the assessed literature and considering the magnitude, timing and projected rate of climate change, sensitivity and adaptive capacity.

[13] Including arid and semi-arid regions.

**Altered frequencies and intensities of extreme weather, together with sea level rise, are expected to have mostly adverse effects on natural and human systems. {3.3.5}**

Examples for selected extremes and sectors are shown in Table SPM.3. {Table 3.2}

**Table SPM.3.** Examples of possible impacts of climate change due to changes in extreme weather and climate events, based on projections to the mid- to late 21st century. These do not take into account any changes or developments in adaptive capacity. The likelihood estimates in column two relate to the phenomena listed in column one. {Table 3.2}

| Phenomenon[a] and direction of trend | Likelihood of future trends based on projections for 21st century using SRES scenarios | Examples of major projected impacts by sector | | | |
|---|---|---|---|---|---|
| | | Agriculture, forestry and ecosystems | Water resources | Human health | Industry, settlement and society |
| **Over most land areas, warmer and fewer cold days and nights, warmer and more frequent hot days and nights** | *Virtually certain[b]* | Increased yields in colder environments; decreased yields in warmer environments; increased insect outbreaks | Effects on water resources relying on snowmelt; effects on some water supplies | Reduced human mortality from decreased cold exposure | Reduced energy demand for heating; increased demand for cooling; declining air quality in cities; reduced disruption to transport due to snow, ice; effects on winter tourism |
| **Warm spells/heat waves. Frequency increases over most land areas** | *Very likely* | Reduced yields in warmer regions due to heat stress; increased danger of wildfire | Increased water demand; water quality problems, e.g. algal blooms | Increased risk of heat-related mortality, especially for the elderly, chronically sick, very young and socially isolated | Reduction in quality of life for people in warm areas without appropriate housing; impacts on the elderly, very young and poor |
| **Heavy precipitation events. Frequency increases over most areas** | *Very likely* | Damage to crops; soil erosion, inability to cultivate land due to waterlogging of soils | Adverse effects on quality of surface and groundwater; contamination of water supply; water scarcity may be relieved | Increased risk of deaths, injuries and infectious, respiratory and skin diseases | Disruption of settlements, commerce, transport and societies due to flooding; pressures on urban and rural infrastructures; loss of property |
| **Area affected by drought increases** | *Likely* | Land degradation; lower yields/crop damage and failure; increased livestock deaths; increased risk of wildfire | More widespread water stress | Increased risk of food and water shortage; increased risk of malnutrition; increased risk of water-and food-borne diseases | Water shortage for settlements, industry and societies; reduced hydropower generation potentials; potential for population migration |
| **Intense tropical cyclone activity increases** | *Likely* | Damage to crops; windthrow (uprooting) of trees; damage to coral reefs | Power outages causing disruption of public water supply | Increased risk of deaths, injuries, water- and food-borne diseases; post-traumatic stress disorders | Disruption by flood and high winds; withdrawal of risk coverage in vulnerable areas by private insurers, potential for population migrations, loss of property |
| **Increased incidence of extreme high sea level (excludes tsunamis)[c]** | *Likely[d]* | Salinisation of irrigation water, estuaries and freshwater systems | Decreased freshwater availability due to saltwater intrusion | Increased risk of deaths and injuries by drowning in floods; migration-related health effects | Costs of coastal protection versus costs of land-use relocation; potential for movement of populations and infrastructure; also see tropical cyclones above |

Notes:
a)  See WGI Table 3.7 for further details regarding definitions.
b)  Warming of the most extreme days and nights each year.
c)  Extreme high sea level depends on average sea level and on regional weather systems. It is defined as the highest 1% of hourly values of observed sea level at a station for a given reference period.
d)  In all scenarios, the projected global average sea level at 2100 is higher than in the reference period. The effect of changes in regional weather systems on sea level extremes has not been assessed.

**Anthropogenic warming and sea level rise would continue for centuries due to the time scales associated with climate processes and feedbacks, even if GHG concentrations were to be stabilised. {3.2.3}**

Estimated long-term (multi-century) warming corresponding to the six AR4 WG III stabilisation categories is shown in Figure SPM.8.

**Estimated multi-century warming relative to 1980-1999 for AR4 stabilisation categories**



Global average temperature change relative to 1980-1999

**Figure SPM.8.** Estimated long-term (multi-century) warming corresponding to the six AR4 WGIII stabilisation categories (Table SPM.6). Temperature scale has been shifted by -0.5°C to account approximately for the warming between pre-industrial and 1980-1999. For most stabilisation levels global average temperature is approaching the equilibrium level over a few centuries. For GHG emission scenarios that lead to stabilisation by 2100 at levels comparable to SRES B1 and A1B (600 and 850 ppm $CO_2$-eq; category IV and V) assessed models project that about 65-70% of the estimated global equilibrium temperature increase assuming a climate sensitivity of 3°C would be realised at the time of stabilisation. For the much lower stabilisation scenarios (category I and II, Figure SPM.11), the equilibrium temperature may be reached earlier. {Figure 3.4}

Contraction of the Greenland ice sheet is projected to continue to contribute to sea level rise after 2100. Current models suggest virtually complete elimination of the Greenland ice sheet and a resulting contribution to sea level rise of about 7 m if global average warming were sustained for millennia in excess of 1.9 to 4.6°C relative to pre-industrial values. The corresponding future temperatures in Greenland are comparable to those inferred for the last interglacial period 125,000 years ago, when palaeoclimatic information suggests reductions of polar land ice extent and 4 to 6 m of sea level rise. {3.2.3}

Current global model studies project that the Antarctic ice sheet will remain too cold for widespread surface melting and gain mass due to increased snowfall. However, net loss of ice mass could occur if dynamical ice discharge dominates the ice sheet mass balance. {3.2.3}

**Anthropogenic warming could lead to some impacts that are abrupt or irreversible, depending upon the rate and magnitude of the climate change. {3.4}**

Partial loss of ice sheets on polar land could imply metres of sea level rise, major changes in coastlines and inundation of low-lying areas, with greatest effects in river deltas and low-lying islands. Such changes are projected to occur over millennial time scales, but more rapid sea level rise on century time scales cannot be excluded. {3.4}

Climate change is *likely* to lead to some irreversible impacts. There is *medium confidence* that approximately 20-30% of species assessed so far are *likely* to be at increased risk of extinction if increases in global average warming exceed 1.5-2.5°C (relative to 1980-1999). As global average temperature increase exceeds about 3.5°C, model projections suggest significant extinctions (40-70% of species assessed) around the globe. {3.4}

Based on current model simulations, the meridional overturning circulation (MOC) of the Atlantic Ocean will *very likely* slow down during the 21st century; nevertheless temperatures over the Atlantic and Europe are projected to increase. The MOC is *very unlikely* to undergo a large abrupt transition during the 21st century. Longer-term MOC changes cannot be assessed with confidence. Impacts of large-scale and persistent changes in the MOC are *likely* to include changes in marine ecosystem productivity, fisheries, ocean $CO_2$ uptake, oceanic oxygen concentrations and terrestrial vegetation. Changes in terrestrial and ocean $CO_2$ uptake may feed back on the climate system. {3.4}

## 4.    Adaptation and mitigation options[14]

**A wide array of adaptation options is available, but more extensive adaptation than is currently occurring is required to reduce vulnerability to climate change. There are barriers, limits and costs, which are not fully understood. {4.2}**

Societies have a long record of managing the impacts of weather- and climate-related events. Nevertheless, additional adaptation measures will be required to reduce the adverse impacts of projected climate change and variability, regardless of the scale of mitigation undertaken over the next two to three decades. Moreover, vulnerability to climate change can be exacerbated by other stresses. These arise from, for example, current climate hazards, poverty and unequal access to resources, food insecurity, trends in economic globalisation, conflict and incidence of diseases such as HIV/AIDS. {4.2}

Some planned adaptation to climate change is already occurring on a limited basis. Adaptation can reduce vulnerability especially when it is embedded within broader sectoral initiatives (Table SPM.4). There is *high confidence* that there are viable adaptation options that can be implemented in some sectors at low cost, and/or with high benefit-cost ratios. However, comprehensive estimates of global costs and benefits of adaptation are limited. {4.2, Table 4.1}

**Adaptive capacity is intimately connected to social and economic development but is unevenly distributed across and within societies. {4.2}**

A range of barriers limit both the implementation and effectiveness of adaptation measures. The capacity to adapt is dynamic and is influenced by a society's productive base including: natural and man-made capital assets, social networks and entitlements, human capital and institutions, governance, national income, health and technology. Even societies with high adaptive capacity remain vulnerable to climate change, variability and extremes. {4.2}

**Both bottom-up and top-down studies indicate that there is *high agreement* and *much evidence* of substantial economic potential for the mitigation of global GHG emissions over the coming decades that could offset the projected growth of global emissions or reduce emissions below current levels (Figures SPM.9, SPM.10)[15]. While top-down and bottom-up studies are in line at the global level (Figure SPM.9) there are considerable differences at the sectoral level. {4.3}**

No single technology can provide all of the mitigation potential in any sector. The economic mitigation potential, which is generally greater than the market mitigation potential, can only be achieved when adequate policies are in place and barriers removed (Table SPM.5). {4.3}

Bottom-up studies suggest that mitigation opportunities with net negative costs have the potential to reduce emissions by around 6 GtCO$_2$-eq/yr in 2030, realizing which requires dealing with implementation barriers. {4.3}

---

[14] While this section deals with adaptation and mitigation separately, these responses can be complementary. This theme is discussed in section 5.

[15] The concept of "**mitigation potential**" has been developed to assess the scale of GHG reductions that could be made, relative to emission baselines, for a given level of carbon price (expressed in cost per unit of carbon dioxide equivalent emissions avoided or reduced). Mitigation potential is further differentiated in terms of "market mitigation potential" and "economic mitigation potential".

*Market mitigation potential* is the mitigation potential based on private costs and private discount rates (reflecting the perspective of private consumers and companies), which might be expected to occur under forecast market conditions, including policies and measures currently in place, noting that barriers limit actual uptake.

*Economic mitigation potential* is the mitigation potential that takes into account social costs and benefits and social discount rates (reflecting the perspective of society; social discount rates are lower than those used by private investors), assuming that market efficiency is improved by policies and measures and barriers are removed.

Mitigation potential is estimated using different types of approaches. *Bottom-up studies* are based on assessment of mitigation options, emphasizing specific technologies and regulations. They are typically sectoral studies taking the macro-economy as unchanged. *Top-down studies* assess the economy-wide potential of mitigation options. They use globally consistent frameworks and aggregated information about mitigation options and capture macro-economic and market feedbacks.

**Table SPM.4.** Selected examples of planned adaptation by sector.

| Sector | Adaptation option/strategy | Underlying policy framework | Key constraints and opportunities to implementation (Normal font = constraints; *italics = opportunities*) |
|---|---|---|---|
| Water | Expanded rainwater harvesting; water storage and conservation techniques; water re-use; desalination; water-use and irrigation efficiency | National water policies and integrated water resources management; water-related hazards management | Financial, human resources and physical barriers; *integrated water resources management; synergies with other sectors* |
| Agriculture | Adjustment of planting dates and crop variety; crop relocation; improved land management, e.g. erosion control and soil protection through tree planting | R&D policies; institutional reform; land tenure and land reform; training; capacity building; crop insurance; financial incentives, e.g. subsidies and tax credits | Technological & financial constraints; access to new varieties; markets; *longer growing season in higher latitudes; revenues from 'new' products* |
| Infrastructure/settlement (including coastal zones) | Relocation; seawalls and storm surge barriers; dune reinforcement; land acquisition and creation of marshlands/wetlands as buffer against sea level rise and flooding; protection of existing natural barriers | Standards and regulations that integrate climate change considerations into design; land use policies; building codes; insurance | Financial and technological barriers; availability of relocation space; *integrated policies and managements; synergies with sustainable development goals* |
| Human health | Heat-health action plans; emergency medical services; improved climate-sensitive disease surveillance and control; safe water and improved sanitation | Public health policies that recognise climate risk; strengthened health services; regional and international cooperation | Limits to human tolerance (vulnerable groups); knowledge limitations; financial capacity; *upgraded health services; improved quality of life* |
| Tourism | Diversification of tourism attractions & revenues; shifting ski slopes to higher altitudes and glaciers; artificial snow-making | Integrated planning (e.g. carrying capacity; linkages with other sectors); financial incentives, e.g. subsidies and tax credits | Appeal/marketing of new attractions; financial and logistical challenges; potential adverse impact on other sectors (e.g. artificial snow-making may increase energy use); *revenues from 'new' attractions; involvement of wider group of stakeholders* |
| Transport | Realignment/relocation; design standards and planning for roads, rail, and other infrastructure to cope with warming and drainage | Integrating climate change considerations into national transport policy; investment in R&D for special situations, e.g. permafrost areas | Financial & technological barriers; availability of less vulnerable routes; *improved technologies and integration with key sectors (e.g. energy)* |
| Energy | Strengthening of overhead transmission and distribution infrastructure; underground cabling for utilities; energy efficiency; use of renewable sources; reduced dependence on single sources of energy | National energy policies, regulations, and fiscal and financial incentives to encourage use of alternative sources; incorporating climate change in design standards | Access to viable alternatives; financial and technological barriers; acceptance of new technologies; *stimulation of new technologies; use of local resources* |

*Note: Other examples from many sectors would include early warning systems.*



**Figure SPM.9.** Global economic mitigation potential in 2030 estimated from bottom-up (Panel a) and top-down (Panel b) studies, compared with the projected emission increases from SRES scenarios relative to 2000 GHG emissions of 40.8 GtCO₂-eq (Panel c). Note: GHG emissions in 2000 are exclusive of emissions of decay of above ground biomass that remains after logging and deforestation and from peat fires and drained peat soils, to ensure consistency with the SRES emission results. {Figure 4.1}

## Economic mitigation potential by sector in 2030 estimated from bottom-up studies

| Sector | total sectoral potential at <US$100/CO₂-eq in GtCO₂-eq/yr: |
|---|---|
| Energy supply | 2.4-4.7 |
| Transport | 1.6-2.5 |
| Buildings | 5.3-6.7 |
| Industry | 2.5-5.5 |
| Agriculture | 2.3-6.4 |
| Forestry | 1.3-4.2 |
| Waste | 0.4-1 |

**Figure SPM.10.** Estimated economic mitigation potential by sector in 2030 from bottom-up studies, compared to the respective baselines assumed in the sector assessments. The potentials do not include non-technical options such as lifestyle changes. {Figure 4.2}

*Notes:*

*a) The ranges for global economic potentials as assessed in each sector are shown by vertical lines. The ranges are based on end-use allocations of emissions, meaning that emissions of electricity use are counted towards the end-use sectors and not to the energy supply sector.*

*b) The estimated potentials have been constrained by the availability of studies particularly at high carbon price levels.*

*c) Sectors used different baselines. For industry the SRES B2 baseline was taken, for energy supply and transport the WEO 2004 baseline was used; the building sector is based on a baseline in between SRES B2 and A1B; for waste, SRES A1B driving forces were used to construct a waste specific baseline; agriculture and forestry used baselines that mostly used B2 driving forces.*

*d) Only global totals for transport are shown because international aviation is included.*

*e) Categories excluded are: non-CO₂ emissions in buildings and transport, part of material efficiency options, heat production and cogeneration in energy supply, heavy duty vehicles, shipping and high-occupancy passenger transport, most high-cost options for buildings, wastewater treatment, emission reduction from coal mines and gas pipelines, fluorinated gases from energy supply and transport. The underestimation of the total economic potential from these emissions is of the order of 10-15%.*

**Table SPM.5.** Selected examples of key sectoral mitigation technologies, policies and measures, constraints and opportunities. {Table 4.2}

| Sector | Key mitigation technologies and practices currently commercially available. *Key mitigation technologies and practices projected to be commercialised before 2030 shown in italics.* | Policies, measures and instruments shown to be environmentally effective | Key constraints or opportunities<br><br>(Normal font = constraints;<br>*italics = opportunities*) |
|---|---|---|---|
| Energy Supply | Improved supply and distribution efficiency; fuel switching from coal to gas; nuclear power; renewable heat and power (hydropower, solar, wind, geothermal and bioenergy); combined heat and power; early applications of Carbon Dioxide Capture and Storage (CCS) (e.g. storage of removed $CO_2$ from natural gas); *CCS for gas, biomass and coal-fired electricity generating facilities; advanced nuclear power; advanced renewable energy, including tidal and wave energy, concentrating solar, and solar photovoltaics* | Reduction of fossil fuel subsidies; Taxes or carbon charges on fossil fuels | Resistance by vested interests may make them difficult to implement |
| | | Feed-in tariffs for renewable energy technologies; Renewable energy obligations; Producer subsidies | *May be appropriate to create markets for low emissions technologies* |
| Transport | More fuel efficient vehicles; hybrid vehicles; cleaner diesel vehicles; biofuels; modal shifts from road transport to rail and public transport systems; non-motorised transport (cycling, walking); land-use and transport planning; *Second generation biofuels; higher efficiency aircraft; advanced electric and hybrid vehicles with more powerful and reliable batteries* | Mandatory fuel economy, biofuel blending and $CO_2$ standards for road transport | Partial coverage of vehicle fleet may limit effectiveness |
| | | Taxes on vehicle purchase, registration, use and motor fuels, road and parking pricing | Effectiveness may drop with higher incomes |
| | | Influence mobility needs through land use regulations, and infrastructure planning; Investment in attractive public transport facilities and non-motorised forms of transport | *Particularly appropriate for countries that are building up their transportation systems* |
| Buildings | Efficient lighting and daylighting; more efficient electrical appliances and heating and cooling devices; improved cook stoves, improved insulation; passive and active solar design for heating and cooling; alternative refrigeration fluids, recovery and recycling of fluorinated gases; *Integrated design of commercial buildings including technologies, such as intelligent meters that provide feedback and control; solar photovoltaics integrated in buildings* | Appliance standards and labelling | Periodic revision of standards needed |
| | | Building codes and certification | *Attractive for new buildings.* Enforcement can be difficult |
| | | Demand-side management programmes | Need for regulations so that utilities may profit |
| | | Public sector leadership programmes, including procurement | *Government purchasing can expand demand for energy-efficient products* |
| | | Incentives for energy service companies (ESCOs) | *Success factor: Access to third party financing* |
| Industry | More efficient end-use electrical equipment; heat and power recovery; material recycling and substitution; control of non-$CO_2$ gas emissions; and a wide array of process-specific technologies; *Advanced energy efficiency; CCS for cement, ammonia, and iron manufacture; inert electrodes for aluminium manufacture* | Provision of benchmark information; Performance standards; Subsidies, tax credits | *May be appropriate to stimulate technology uptake.* Stability of national policy important in view of international competitiveness |
| | | Tradable permits | Predictable allocation mechanisms and stable price signals important for investments |
| | | Voluntary agreements | Success factors include: clear targets, a baseline scenario, third party involvement in design and review and formal provisions of monitoring, close cooperation between government and industry |
| Agriculture | Improved crop and grazing land management to increase soil carbon storage; restoration of cultivated peaty soils and degraded lands; improved rice cultivation techniques and livestock and manure management to reduce $CH_4$ emissions; improved nitrogen fertiliser application techniques to reduce $N_2O$ emissions; dedicated energy crops to replace fossil fuel use; improved energy efficiency; *Improvements of crop yields* | Financial incentives and regulations for improved land management, maintaining soil carbon content, efficient use of fertilisers and irrigation | *May encourage synergy with sustainable development and with reducing vulnerability to climate change, thereby overcoming barriers to implementation* |

**Table SPM.5.** (cont.)

| Sector | Key mitigation technologies and practices currently commercially available. *Key mitigation technologies and practices projected to be commercialised before 2030 shown in italics.* | Policies, measures and instruments shown to be environmentally effective | Key constraints or opportunities (Normal font = constraints; *italics = opportunities*) |
|---|---|---|---|
| Forestry/ forests | Afforestation; reforestation; forest management; reduced deforestation; harvested wood product management; use of forestry products for bioenergy to replace fossil fuel use; *Tree species improvement to increase biomass productivity and carbon sequestration. Improved remote sensing technologies for analysis of vegetation/ soil carbon sequestration potential and mapping land use change* | Financial incentives (national and international) to increase forest area, to reduce deforestation, and to maintain and manage forests; land-use regulation and enforcement | Constraints include lack of investment capital and land tenure issues. *Can help poverty alleviation* |
| Waste | Landfill CH$_4$ recovery; waste incineration with energy recovery; composting of organic waste; controlled waste water treatment; recycling and waste minimisation; *biocovers and biofilters to optimise CH$_4$ oxidation* | Financial incentives for improved waste and wastewater management | *May stimulate technology diffusion* |
| | | Renewable energy incentives or obligations | Local availability of low-cost fuel |
| | | Waste management regulations | Most effectively applied at national level with enforcement strategies |

Future energy infrastructure investment decisions, expected to exceed 20 trillion US$[16] between 2005 and 2030, will have long-term impacts on GHG emissions, because of the long life-times of energy plants and other infrastructure capital stock. The widespread diffusion of low-carbon technologies may take many decades, even if early investments in these technologies are made attractive. Initial estimates show that returning global energy-related CO$_2$ emissions to 2005 levels by 2030 would require a large shift in investment patterns, although the net additional investment required ranges from negligible to 5-10%. {4.3}

**A wide variety of policies and instruments are available to governments to create the incentives for mitigation action. Their applicability depends on national circumstances and sectoral context (Table SPM.5). {4.3}**

They include integrating climate policies in wider development policies, regulations and standards, taxes and charges, tradable permits, financial incentives, voluntary agreements, information instruments, and research, development and demonstration (RD&D). {4.3}

An effective carbon-price signal could realise significant mitigation potential in all sectors. Modelling studies show global carbon prices rising to 20-80 US$/tCO$_2$-eq by 2030 are consistent with stabilisation at around 550 ppm CO$_2$-eq by 2100. For the same stabilisation level, induced technological change may lower these price ranges to 5-65 US$/tCO$_2$-eq in 2030.[17] {4.3}

There is *high agreement* and *much evidence* that mitigation actions can result in near-term co-benefits (e.g. improved health due to reduced air pollution) that may offset a substantial fraction of mitigation costs. {4.3}

There is *high agreement* and *medium evidence* that Annex I countries' actions may affect the global economy and global emissions, although the scale of carbon leakage remains uncertain.[18] {4.3}

---

[16] 20 trillion = 20,000 billion = $20 \times 10^{12}$

[17] Studies on mitigation portfolios and macro-economic costs assessed in this report are based on top-down modelling. Most models use a global least cost approach to mitigation portfolios, with universal emissions trading, assuming transparent markets, no transaction cost, and thus perfect implementation of mitigation measures throughout the 21st century. Costs are given for a specific point in time. Global modelled costs will increase if some regions, sectors (e.g. land-use), options or gases are excluded. Global modelled costs will decrease with lower baselines, use of revenues from carbon taxes and auctioned permits, and if induced technological learning is included. These models do not consider climate benefits and generally also co-benefits of mitigation measures, or equity issues. Significant progress has been achieved in applying approaches based on induced technological change to stabilisation studies; however, conceptual issues remain. In the models that consider induced technological change, projected costs for a given stabilisation level are reduced; the reductions are greater at lower stabilisation level.

[18] Further details may be found in Topic 4 of this Synthesis Report.

Fossil fuel exporting nations (in both Annex I and non-Annex I countries) may expect, as indicated in the TAR, lower demand and prices and lower GDP growth due to mitigation policies. The extent of this spill over depends strongly on assumptions related to policy decisions and oil market conditions. {4.3}

There is also *high agreement* and *medium evidence* that changes in lifestyle, behaviour patterns and management practices can contribute to climate change mitigation across all sectors. {4.3}

**Many options for reducing global GHG emissions through international cooperation exist. There is *high agreement* and *much evidence* that notable achievements of the UNFCCC and its Kyoto Protocol are the establishment of a global response to climate change, stimulation of an array of national policies, and the creation of an international carbon market and new institutional mechanisms that may provide the foundation for future mitigation efforts. Progress has also been made in addressing adaptation within the UNFCCC and additional international initiatives have been suggested. {4.5}**

Greater cooperative efforts and expansion of market mechanisms will help to reduce global costs for achieving a given level of mitigation, or will improve environmental effectiveness. Efforts can include diverse elements such as emissions targets; sectoral, local, sub-national and regional actions; RD&D programmes; adopting common policies; implementing development oriented actions; or expanding financing instruments. {4.5}

**In several sectors, climate response options can be implemented to realise synergies and avoid conflicts with other dimensions of sustainable development. Decisions about macroeconomic and other non-climate policies can significantly affect emissions, adaptive capacity and vulnerability. {4.4, 5.8}**

Making development more sustainable can enhance mitigative and adaptive capacities, reduce emissions, and reduce vulnerability, but there may be barriers to implementation. On the other hand, it is *very likely* that climate change can slow the pace of progress towards sustainable development. Over the next half-century, climate change could impede achievement of the Millennium Development Goals. {5.8}

## 5.    The long-term perspective

**Determining what constitutes "dangerous anthropogenic interference with the climate system" in relation to Article 2 of the UNFCCC involves value judgements. Science can support informed decisions on this issue, including by providing criteria for judging which vulnerabilities might be labelled "key". {Box 'Key Vulnerabilities and Article 2 of the UNFCCC', Topic 5}**

Key vulnerabilities[19] may be associated with many climate sensitive systems including food supply, infrastructure, health, water resources, coastal systems, ecosystems, global biogeochemical cycles, ice sheets, and modes of oceanic and atmospheric circulation.{Box 'Key Vulnerabilities and Article 2 of the UNFCCC', Topic 5}

**The five "reasons for concern" identified in the TAR remain a viable framework to consider key vulnerabilities. These "reasons" are assessed here to be stronger than in the TAR. Many risks are identified with higher confidence. Some risks are projected to be larger or to occur at lower increases in temperature. Understanding about the relationship between impacts (the basis for "reasons for concern" in the TAR) and vulnerability (that includes the ability to adapt to impacts) has improved. {5.2}**

This is due to more precise identification of the circumstances that make systems, sectors and regions especially vulnerable, and growing evidence of the risks of very large impacts on multiple century time scales. {5.2}

---

[19] Key Vulnerabilities can be identified based on a number of criteria in the literature, including magnitude, timing, persistence/reversibility, the potential for adaptation, distributional aspects, likelihood and 'importance' of the impacts.

- **Risks to unique and threatened systems.** There is new and stronger evidence of observed impacts of climate change on unique and vulnerable systems (such as polar and high mountain communities and ecosystems), with increasing levels of adverse impacts as temperatures increase further. An increasing risk of species extinction and coral reef damage is projected with higher confidence than in the TAR as warming proceeds. There is *medium confidence* that approximately 20-30% of plant and animal species assessed so far are *likely* to be at increased risk of extinction if increases in global average temperature exceed 1.5-2.5°C over 1980-1999 levels. Confidence has increased that a 1-2°C increase in global mean temperature above 1990 levels (about 1.5-2.5°C above pre-industrial) poses significant risks to many unique and threatened systems including many biodiversity hotspots. Corals are vulnerable to thermal stress and have low adaptive capacity. Increases in sea surface temperature of about 1-3°C are projected to result in more frequent coral bleaching events and widespread mortality, unless there is thermal adaptation or acclimatization by corals. Increasing vulnerability of indigenous communities in the Arctic and small island communities to warming is projected. {5.2}

- **Risks of extreme weather events.** Responses to some recent extreme events reveal higher levels of vulnerability than the TAR. There is now higher confidence in the projected increases in droughts, heat waves, and floods as well as their adverse impacts. {5.2}

- **Distribution of impacts and vulnerabilities.** There are sharp differences across regions and those in the weakest economic position are often the most vulnerable to climate change. There is increasing evidence of greater vulnerability of specific groups such as the poor and elderly in not only developing but also developed countries. Moreover, there is increased evidence that low-latitude and less-developed areas generally face greater risk, for example in dry areas and megadeltas. {5.2}

- **Aggregate impacts.** Compared to the TAR, initial net market-based benefits from climate change are projected to peak at a lower magnitude of warming, while damages would be higher for larger magnitudes of warming. The net costs of impacts of increased warming are projected to increase over time. {5.2}

- **Risks of large-scale singularities.** There is *high confidence* that global warming over many centuries would lead to a sea level rise contribution from thermal expansion alone which is projected to be much larger than observed over the 20th century, with loss of coastal area and associated impacts. There is better understanding than in the TAR that the risk of additional contributions to sea level rise from both the Greenland and possibly Antarctic ice sheets may be larger than projected by ice sheet models and could occur on century time scales. This is because ice dynamical processes seen in recent observations but not fully included in ice sheet models assessed in AR4 could increase the rate of ice loss. {5.2}

**There is *high confidence* that neither adaptation nor mitigation alone can avoid all climate change impacts; however, they can complement each other and together can significantly reduce the risks of climate change. {5.3}**

Adaptation is necessary in the short and longer term to address impacts resulting from the warming that would occur even for the lowest stabilisation scenarios assessed. There are barriers, limits and costs, but these are not fully understood. Unmitigated climate change would, in the long term, be *likely* to exceed the capacity of natural, managed and human systems to adapt. The time at which such limits could be reached will vary between sectors and regions. Early mitigation actions would avoid further locking in carbon intensive infrastructure and reduce climate change and associated adaptation needs. {5.2, 5.3}

**Many impacts can be reduced, delayed or avoided by mitigation. Mitigation efforts and investments over the next two to three decades will have a large impact on opportunities to achieve lower stabilisation levels. Delayed emission reductions significantly constrain the opportunities to achieve lower stabilisation levels and increase the risk of more severe climate change impacts. {5.3, 5.4, 5.7}**

In order to stabilise the concentration of GHGs in the atmosphere, emissions would need to peak and decline thereafter. The lower the stabilisation level, the more quickly this peak and decline would need to occur.[20] {5.4}

---

[20] For the lowest mitigation scenario category assessed, emissions would need to peak by 2015 and for the highest by 2090 (see Table SPM.6). Scenarios that use alternative emission pathways show substantial differences in the rate of global climate change.

NOTE: SUBJECT TO FINAL COPY-EDIT

Table SPM.6 and Figure SPM.11 summarise the required emission levels for different groups of stabilisation concentrations and the resulting equilibrium global warming and long-term sea level rise due to thermal expansion only.[21] The timing and level of mitigation to reach a given temperature stabilisation level is earlier and more stringent if climate sensitivity is high than if it is low. {5.4, 5.7}

Sea level rise under warming is inevitable. Thermal expansion would continue for many centuries after GHG concentrations have stabilised, for any of the stabilisation levels assessed, causing an eventual sea level rise much larger than projected for the 21st century. The eventual contributions from Greenland ice sheet loss could be several metres, and larger than from thermal expansion, should warming in excess of 1.9-4.6°C above pre-industrial be sustained over many centuries. The long time scales of thermal expansion and ice sheet response to warming imply that stabilisation of GHG concentrations at or above present levels would not stabilise sea level for many centuries. {5.3, 5.4}

**Table SPM.6.** Characteristics of post-TAR stabilisation scenarios and resulting long-term equilibrium global average temperature and the sea level rise component from thermal expansion only. {Table 5.1}[a]

| Category | $CO_2$ concentration at stabilisation (2005 = 379 ppm) [b] | $CO_2$-equivalent Concentration at stabilisation including GHGs and aerosols (2005 = 375 ppm) [b] | Peaking year for $CO_2$ emissions [a, c] | Change in global $CO_2$ emissions in 2050 (% of 2000 emissions) [a, c] | Global average temperature increase above pre-industrial at equilibrium, using "best estimate" climate sensitivity [d], [e] | Global average sea level rise above pre-industrial at equilibrium from thermal expansion only [f] | Number of assessed scenarios |
|---|---|---|---|---|---|---|---|
| | ppm | ppm | year | percent | °C | metres | |
| I | 350 – 400 | 445 – 490 | 2000 – 2015 | -85 to -50 | 2.0 – 2.4 | 0.4 – 1.4 | 6 |
| II | 400 – 440 | 490 – 535 | 2000 – 2020 | -60 to -30 | 2.4 – 2.8 | 0.5 – 1.7 | 18 |
| III | 440 – 485 | 535 – 590 | 2010 – 2030 | -30 to +5 | 2.8 – 3.2 | 0.6 – 1.9 | 21 |
| IV | 485 – 570 | 590 – 710 | 2020 – 2060 | +10 to +60 | 3.2 – 4.0 | 0.6 – 2.4 | 118 |
| V | 570 – 660 | 710 – 855 | 2050 – 2080 | +25 to +85 | 4.0 – 4.9 | 0.8 – 2.9 | 9 |
| VI | 660 – 790 | 855 – 1130 | 2060 – 2090 | +90 to +140 | 4.9 – 6.1 | 1.0 – 3.7 | 5 |

Notes:
a) The emission reductions to meet a particular stabilization level reported in the mitigation studies assessed here might be underestimated due to missing carbon cycle feedbacks (see also Topic 2).
b) Atmospheric $CO_2$ concentrations were 379 ppm in 2005. The best estimate of total $CO_2$-eq concentration in 2005 for all long-lived GHGs is about 455 ppm, while the corresponding value including the net effect of all anthropogenic forcing agents is 375 ppm $CO_2$-eq.
c) Ranges correspond to the 15th to 85th percentile of the post-TAR scenario distribution. $CO_2$ emissions are shown so multi-gas scenarios can be compared with $CO_2$-only scenarios (see Figure SPM.3).
d) The best estimate of climate sensitivity is 3 °C.
e) Note that global average temperature at equilibrium is different from expected global average temperature at the time of stabilization of GHG concentrations due to the inertia of the climate system. For the majority of scenarios assessed, stabilisation of GHG concentrations occurs between 2100 and 2150 (see also Footnote 21).
f) Equilibrium sea level rise is for the contribution from ocean thermal expansion only and does not reach equilibrium for at least many centuries. These values have been estimated using relatively simple climate models (one low resolution AOGCM and several EMICs based on the best estimate of 3 °C climate sensitivity) and do not include contributions from melting ice sheets, glaciers and ice caps. Long-term thermal expansion is projected to result in 0.2 to 0.6 m per degree Celsius of global average warming above pre-industrial. (AOGCM refers to Atmosphere Ocean General Circulation Models and EMICs to Earth System Models of Intermediate Complexity.)

---

[21] Estimates for the evolution of temperature over the course of this century are not available in the AR4 for the stabilisation scenarios. For most stabilisation levels global average temperature is approaching the equilibrium level over a few centuries. For the much lower stabilisation scenarios (category I and II, Figure SPM.11), the equilibrium temperature may be reached earlier.

### CO₂ emissions and equilibrium temperature increases for a range of stabilisation levels



**Figure SPM.11.** Global CO₂ emissions for 1940 to 2000 and emissions ranges for categories of stabilisation scenarios from 2000 to 2100 (left-hand panel); and the corresponding relationship between the stabilisation target and the *likely* equilibrium global average temperature increase above pre-industrial (right-hand panel). Approaching equilibrium can take several centuries, especially for scenarios with higher levels of stabilisation. Coloured shadings show stabilisation scenarios grouped according to different targets (stabilisation category I to VI). Right-hand panel shows ranges of global average temperature change above pre-industrial, using (i) "best estimate" climate sensitivity of 3°C (black line in middle of shaded area), (ii) upper bound of *likely* range of climate sensitivity of 4.5°C (red line at top of shaded area) (iii) lower bound of *likely* range of climate sensitivity of 2°C (blue line at bottom of shaded area). Black dashed lines in the left panel give the emissions range of recent baseline scenarios published since the SRES (2000). Emissions ranges of the stabilisation scenarios comprise CO₂-only and multigas scenarios and correspond to the 10th-90th percentile of the full scenario distribution. Note: CO₂ emissions in most models do not include emissions from decay of above ground biomass that remains after logging and deforestation, and from peat fires and drained peat soils. {Figure 5.1}

---

There is *high agreement* and *much evidence* that all stabilisation levels assessed can be achieved by deployment of a portfolio of technologies that are either currently available or expected to be commercialised in coming decades, assuming appropriate and effective incentives are in place for their development, acquisition, deployment and diffusion and addressing related barriers. {5.5}

All assessed stabilisation scenarios indicate that 60-80% of the reductions would come from energy supply and use, and industrial processes, with energy efficiency playing a key role in many scenarios. Including non-CO₂ and CO₂ land-use and forestry mitigation options provides greater flexibility and cost-effectiveness. Low stabilisation levels require early investments and substantially more rapid diffusion and commercialisation of advanced low-emissions technologies. {5.5}

Without substantial investment flows and effective technology transfer, it may be difficult to achieve emission reduction at a significant scale. Mobilizing financing of incremental costs of low-carbon technologies is important. {5.5}

**The macro-economic costs of mitigation generally rise with the stringency of the stabilisation target (Table SPM.7). For specific countries and sectors, costs vary considerably from the global average.[22] {5.6}**

In 2050, global average macro-economic costs for mitigation towards stabilisation between 710 and 445ppm CO₂-eq are between a 1% gain and 5.5% decrease of global GDP (Table SPM.7). This corresponds to slowing average annual global GDP growth by less than 0.12 percentage points. {5.6}

---

[22] See footnote 17 for more detail on cost estimates and model assumptions.

**Table SPM.7.** Estimated global macro-economic costs in 2030 and 2050. Costs are relative to the baseline for least-cost trajectories towards different long-term stabilisation levels. {Table 5.2}

| Stabilisation levels (ppm $CO_2$-eq) | Median GDP reduction [a] (%) | | Range of GDP reduction [b] (%) | | Reduction of average annual GDP growth rates (percentage points) [c], [e] | |
|---|---|---|---|---|---|---|
| | 2030 | 2050 | 2030 | 2050 | 2030 | 2050 |
| 445 – 535 [d] | Not available | | < 3 | < 5.5 | < 0.12 | < 0.12 |
| 535 – 590 | 0.6 | 1.3 | 0.2 to 2.5 | slightly negative to 4 | < 0.1 | < 0.1 |
| 590 – 710 | 0.2 | 0.5 | -0.6 to 1.2 | -1 to 2 | < 0.06 | < 0.05 |

Notes: Values given in this table correspond to the full literature across all baselines and mitigation scenarios that provide GDP numbers.
a)  Global GDP based on market exchange rates.
b)  The 10th and 90th percentile range of the analysed data are given where applicable.  Negative values indicate GDP gain. The first row (445-535 ppm $CO_2$-eq) gives the upper bound estimate of the literature only.
c)  The calculation of the reduction of the annual growth rate is based on the average reduction during the assessed period that would result in the indicated GDP decrease by 2030 and 2050 respectively.
d)  The number of studies is relatively small and they generally use low baselines. High emissions baselines generally lead to higher costs.
e)  The values correspond to the highest estimate for GDP reduction shown in column three.

**Responding to climate change involves an iterative risk management process that includes both adaptation and mitigation and takes into account climate change damages, co-benefits, sustainability, equity, and attitudes to risk. {5.1}**

Impacts of climate change are *very likely* to impose net annual costs which will increase over time as global temperatures increase.  Peer-reviewed estimates of the social cost of carbon[23] in 2005 average US$12 per tonne of $CO_2$, but the range from 100 estimates is large (-$3 to $95/t$CO_2$).  This is due in large part to differences in assumptions regarding climate sensitivity, response lags, the treatment of risk and equity, economic and non-economic impacts, the inclusion of potentially catastrophic losses, and discount rates. Aggregate estimates of costs mask significant differences in impacts across sectors, regions and populations and *very likely* underestimate damage costs because they cannot include many non-quantifiable impacts. {5.7}

Limited and early analytical results from integrated analyses of the costs and benefits of mitigation indicate that they are broadly comparable in magnitude, but do not as yet permit an unambiguous determination of an emissions pathway or stabilisation level where benefits exceed costs. {5.7}

Climate sensitivity is a key uncertainty for mitigation scenarios for specific temperature levels. {5.4}

Choices about the scale and timing of GHG mitigation involve balancing the economic costs of more rapid emission reductions now against the corresponding medium-term and long-term climate risks of delay. {5.7}

---

[23] Net economic costs of damages from climate change aggregated across the globe and discounted to the specified year.

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 28

# Progress on Incorporating Climate Change into Management of California's Water Resources



**July 2006**
**Technical Memorandum Report**
**California Department of Water Resources**

# 2  Potential Impacts of Climate Change on California's Water Resources

## 2.1  Introduction

The purpose of this chapter is to:

- provide a brief description of California's water resources
- summarize the anthropogenic causes of climate change
- describe the aspects of climate change that pose a potential threat to the State's water management systems

This chapter is general and statewide in scope.  It describes impacts that could occur through the end of this century.  Subsequent chapters are primarily focused on the effects of climate change on Central Valley water management systems based on selected downscaled climate model projections for mid-century.

## 2.2  Background - California's Water Resources

### 2.2.1  Distribution of Precipitation

California's water resources vary significantly throughout the State as the result of varying climates and the distribution of precipitation.  On average, more than 140 inches of precipitation falls annually in the mountains of northwestern California while fewer than four inches falls in parts of the desert in the southeast portion of the State.  Figure 2-1 depicts the distribution of average annual precipitation in the State. Statewide average annual precipitation is about 23 inches (DWR, 2003).

Variability in the distribution of precipitation in California is due in part to hemispheric-scale atmospheric circulation patterns.  Most winter storms typically move from the Pacific Ocean east across the northern part of the State.  A progressively smaller percentage of storms move across the State to the south.

Most of the State's precipitation falls in the northern Coast Range, Klamath and Cascade ranges and the western slope of the Sierra Nevada due to orographic effects.  The Mojave Desert, San Joaquin Valley floor and areas east of the Sierra Nevada receive much less precipitation, partly because they are in a rain shadow.

## 2.2.2   California's Water Management Systems

The majority of California's population of about 37 million people is concentrated in and near major urban centers.  About half of the State's population resides in Southern California where annual precipitation and runoff is much less than in Northern California.

Much of the State's agriculture also is in areas with limited precipitation, including the San Joaquin Valley and the Imperial Valley. Agriculture is critical to the State's economy and usually consumes about 40 percent of the State's total annual developed water supply (DWR, 2005a). California uses this water to produce more than 350 crops, which in 2003 were valued at $29.4 billion.  California produces more than half of the vegetables, nuts, and fruits produced in the U.S. (USDA, 2003).

An extensive network of reservoirs and aqueducts has been developed throughout much of California to provide water to major urban and agricultural areas. This network serves to store and transport runoff from where it is plentiful to where it is scarce. It also serves to store winter and early spring runoff so that it will be available when water demand is the highest in the late spring and summer. Figure 2-2 shows the location of major federal, State and local surface reservoirs and aqueducts in California.

The largest system of surface reservoirs and aqueducts in California is in the Central Valley. The historical natural average annual runoff in the Central Valley is about 33.6 million acre-feet, or about 48 percent of California's total natural runoff (DWR, 1951). About two-thirds of the runoff in the Central Valley typically originates in the Sacramento Valley.

Surface reservoirs collecting runoff in the Central Valley have a combined total capacity of about 29 million acre-feet.  The two largest water projects in the Central Valley, the State Water Project (SWP) and the federal Central Valley Project (CVP), provide a combined average total of about 10 million acre-feet of water annually for urban and agricultural uses. More than 20 million Californians rely on the SWP and the CVP for at least part of their water supply. These projects irrigate an average of nearly 3.6 million acres of farmland each year (DWR, 2005a).

Other major water storage and conveyance systems in California include the All-American Canal and the Colorado River Aqueduct, both of which divert water from the Colorado River in Southern California.  The All-American Canal supplies water to cities and agriculture in the Imperial and Coachella valleys.  The Colorado River Aqueduct supplies water to the south coast region. In the recent past, California has diverted as much as 5.3 million acre-feet of water annually from the Colorado River.  This is in excess of the State's allotment of 4.4 million acre-feet (DWR, 2005a).  Additional discussion of the Colorado River and California's diversions from the river is in Section 2.8.

**Table 2-1 Potential Effects of Climate Change on California's Water Resources and Expected Consequences**

| Potential Water Resource Impact | Expected Consequence |
|---|---|
| **Reduction of the State's average annual snowpack** | • Potential loss of 5 million acre-feet or more of average annual water storage in the State's snowpack<br>• Increased challenges for reservoir management and balancing the competing concerns of flood protection and water supply |
| **Changes in the timing, intensity, location, amount, and variability of precipitation** | • Potential increased storm intensity and increased potential for flooding<br>• Possible increased potential for droughts |
| **Long-term changes in watershed vegetation and increased incidence of wildfires** | • Changes in the intensity and timing of runoff<br>• Possible increased incidence of flooding and increased sedimentation |
| **Sea level rise** | • Inundation of coastal marshes and estuaries<br>• Increased salinity intrusion into the Sacramento-San Joaquin River Delta<br>• Increased potential for Delta levee failure<br>• Increased potential for salinity intrusion into coastal aquifers (groundwater)<br>• Increased potential for flooding near the mouths of rivers due to backwater effects |
| **Increased water temperatures** | • Possible critical effects on listed and endangered aquatic species<br>• Increased environmental water demand for temperature control<br>• Possible increased problems with foreign invasive species in aquatic ecosystems<br>• Potential adverse changes in water quality, including the reduction of dissolved oxygen levels |
| **Changes in urban and agricultural water demand** | Changes in demand patterns and evapotranspiration rates |

**Table 2-3 Possible Effects of Climate Change on Precipitation in California and Potential Consequences**

| Possible Changes in Precipitation | Potential Consequences |
|---|---|
| Amount | Increased precipitation could benefit water supplies and improve environmental conditions in some areas, especially where water supply diversions have significantly affected streamflow. Increased precipitation could also increase the incidence of flooding, depending on the timing and intensity of precipitation.<br><br>Decreased precipitation could have serious consequences for water supplies and the environment. |
| Form | Climate warming is expected to increase minimum snow elevations in California's mountains and cause more precipitation to fall in the form of rain rather than snow. This will result in reductions of annual snowpack and reduce effective water storage for maintaining spring and summer streamflow/water supply diversions. Reductions in snowpack could also negatively affect hydroelectric power generation and flood control operations. |
| Intensity, Duration, and Timing of Precipitation Events | Increased intensity or duration of precipitation events could increase the frequency and severity of flooding. Decreases could reduce flooding.<br><br>Climate change could affect the incidence of precipitation events where rain falls on accumulations of snowpack. If the incidence or severity of such events increase, it could have serious flood control and water supply implications. |
| Variability | Increased variability in annual precipitation could present significant challenges for water managers in meeting water demands and providing flood control. Increased surface storage capacity, operational changes for reservoirs and additional use of groundwater storage could be required.<br><br>Decreased variability could benefit water management. |
| Location | Shifts in the annual average distribution of precipitation in the State, due to possible changes in regional circulation patterns or other possible causes, could benefit some regions and negatively affect others. California's major water storage and conveyance systems are located and designed in accordance with the historic distribution of precipitation. Significant shifts in the distribution of precipitation could pose serious water management challenges, jeopardize the effectiveness of the State's existing water supply infrastructure and alter ecosystems. |

### 2.5.3   Trends in Snowfall and Related Runoff in California

Precipitation in California's higher mountains during the late fall and winter typically falls in the form of snow.  Significant accumulations of snow, referred to as snowpack, typically occur each year in the Sierra Nevada along the eastern flank of the Central Valley.  A significant annual snowpack also typically occurs in the Cascade Range north and northeast of the Central Valley, and in the Klamath Mountains in the northwest corner of the State.  Most of the runoff from the State's snowpack flows into the Central Valley, although snowmelt is also important for flows in rivers and streams on the east slope of the Sierra, such as the Truckee, Carson, and Owens rivers, and for the Klamath River and its tributaries.

California's annual snowpack is, on average, mostly accumulated from November though the end of March. It typically melts from April though July. Snowmelt provides significant quantities of water to streams and reservoirs for several months after the annual storm season has ended. The length and timing of each year's period of snowpack accumulation and melting can vary somewhat due to temperature and precipitation conditions.

California's snowpack is important to the State's annual water supply, because of its volume and when it typically melts. Average runoff from melting snowpack is usually about 20 percent of the State's total annual natural runoff, and probably about 35 percent of the State's total useable annual surface water supply.  The State's snowpack is estimated to contribute an average of about 15 million acre-feet of runoff each year, about 14 million acre-feet of which is estimated to occur in the Central Valley. In comparison, total reservoir capacity in the Central Valley is about 24.5 million acre-feet in watersheds with significant annual accumulations of snow (DWR, 2005c).

California's reservoir managers use snowmelt to help fill reservoirs once the threat of large winter and early spring storms and related flooding risks have passed.  Water stored in reservoirs is used to help meet downstream water demands when flows from snowmelt begin to recede and are typically not sufficient for satisfying downstream uses.

Some of the annual runoff collected in California's reservoirs is held from one year to the next. Water stored from one year to the next is typically referred to as "carryover storage". California's annual precipitation and snowpack can vary significantly from year to year in California. There may also be decadal-scale variation in precipitation over the Sierra (Freeman, 2002), and possibly other parts of California.  Carryover storage can help meet water demand in years where precipitation and runoff is low.

Rising temperatures as the result of climate change threaten California's snowpack.  An inchoative analysis of annual runoff trends in the Sacramento Valley was performed by Maurice Roos of DWR in the late 1980s (Roos, 1989).  The purpose of the analysis was to determine if changes in the timing of annual runoff in the Sacramento Valley watershed had occurred as the result of possible increasing temperatures and diminished snowpack. It was concluded that, since the beginning of the 20th century, the amount of annual runoff from April though July in the upper Sacramento River watershed had a downward trend compared to each year's total runoff. This was determined to be a possible indication of a long-term reduction in the State's snowpack due to temperature rise.

*Progress on Incorporating Climate Change into Management of California's Water Resources*

An updated evaluation of runoff trends was performed for this report. Figure 2-13 presents combined unimpaired April through July runoff for four rivers in the Sacramento Valley (Sacramento, Feather, Yuba, and American rivers) as a percent of total water year runoff from 1906 to 2005. Figure 2-14a presents total April through July unimpaired runoff volume for the same period of record and for the same four rivers. Figure 2-14b presents total unimpaired water year runoff volume for the same period and rivers.

Based on the linear trends depicted in Figure 2-13 and Figure 2-14 for the four Sacramento Valley rivers:

- ==April through July runoff, as compared to total water year runoff, has declined about 9 percent over the past 100 years==

- April through July runoff volume has decreased over the same period and total water year runoff during the same period has remained about the same



**Figure 2-13 Annual April through July Unimpaired Runoff for Four Sacramento Valley Rivers Compared to Total Unimpaired Annual Runoff[*]**

[*] Based on the flows of four rivers in the Sacramento Valley; Sacramento River at Bend Bridge (near Red Bluff), Feather River into Lake Oroville, Yuba River at Smartville, and American River below Lake Folsom.

2-23

*Progress on Incorporating Climate Change into Management of California's Water Resources*

Figure 2-15 presents combined unimpaired runoff from April through July for four rivers in the San Joaquin River watershed (Stanislaus, Tuolumne, Merced, and San Joaquin rivers) as a percentage of total water year runoff from 1901 to 2005.  Figure 2-16a presents total unimpaired April through July runoff volume for the same four rivers and for the same period of record. Figure 2-16b presents total unimpaired water year runoff volume.

The trends depicted in Figure 2-15 and Figure 2-16 for the four San Joaquin Valley rivers indicate that:

- April through July runoff, as compared to total water year runoff, has declined about 7 percent over about the past 100 years
- while total water year runoff volume decreased somewhat during the past 100 years, April through July runoff volume decreased at even a greater rate.



**Figure 2-15 Annual April through July Unimpaired Runoff for Four San Joaquin Valley Rivers Compared to Total Unimpaired Annual Runoff[*]**

[*]Based on the flows of four rivers in the San Joaquin Valley; Stanislaus River into New Melones Reservoir, Tuolumne River into Don Pedro Reservoir, Merced River into Lake McClure, and San Joaquin River into Lake Millerton.

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 29

# CLIMATE CHANGE: CHALLENGES AND SOLUTIONS FOR CALIFORNIA AGRICULTURAL LANDSCAPES

**WHITE PAPER**

*A Report From:*
**California Climate Change Center**

*Prepared By:*
**Timothy Cavagnaro, Louise Jackson, and Kate Scow (Contributing authors are listed in the relevant sections.)**

### DISCLAIMER

This report was prepared as the result of work sponsored by the California Energy Commission (Energy Commission) and the California Environmental Protection Agency (Cal/EPA). It does not necessarily represent the views of the Energy Commission, Cal/EPA, their employees, or the State of California. The Energy Commission, Cal/EPA, the State of California, their employees, contractors, and subcontractors make no warrant, express or implied, and assume no legal liability for the information in this report; nor does any party represent that the uses of this information will not infringe upon privately owned rights. This report has not been approved or disapproved by the California Energy Commission or Cal/EPA, nor has the California Energy Commission or Cal/EPA passed upon the accuracy or adequacy of the information in this report.



Arnold Schwarzenegger, *Governor*

February 2006
CEC-500-2005-189-SF

## 1.0    General Introduction and Scope of Report

Timothy Cavagnaro, Louise Jackson, Kate Scow

## 1.1.    Statement of Purpose and Scope of Report

The climate of California is predicted to change significantly during the coming century. While a changing climate will impact the state as a whole, some sectors may be affected more than others. This is especially true of agriculture. Impacts may not only alter the types and locations of commodities produced, but also the factors influencing their production, such as resource availability and biotic and abiotic stresses. The nature and interrelatedness of these factors, and the response of agro-ecosystems, need to be explored to effectively mitigate and/or adapt to the effects of climate change in a sustainable manner.

To consider the challenges facing California agriculture in a changing climate, a symposium entitled "Climate Change Symposium: Challenges and Solutions for California Agricultural Landscapes" was held at the University of California (UC) Davis by the John Muir Institute for the Environment, May 12–13, 2005 (John Muir Institute 2005). Talks were presented by 29 speakers from West Coast universities and state and federal agencies, to an audience of more than 100 participants from a range of organizations and stakeholder groups. The structure of the symposium promoted open discussion among participants from multiple disciplines. The presentations and conclusions of the symposium provide the basic structure and foundation upon which this report is written.

An important outcome of the symposium was recognition not only of future impacts of climate change on California agricultural landscapes, but of the fact that actions taken now and in the near future will play critical roles in dealing with these changes. By taking a landscape perspective, the focus was not only on commodity-specific issues and agro-ecosystem changes, but also included a wider range of factors, such as water availability and transport, and interactions with urban ecosystems. As such, there is a greater need than ever to train scientists with a broad and in-depth appreciation of the complex issues of climate change. To this end, we developed a graduate-level seminar class entitled "Climate Change and the California Agricultural Landscape" (ECL/SSC 290) UC Davis (July–September, 2005). Fourteen graduate students, from both the Ecology and the Soils and Biogeochemistry Graduate Groups, participated in the class. Student workgroups, mentored by UC Davis faculty and/or a representative from a government agency, integrated material from the symposium presentations and a review of the scientific literature to identify key impacts of climate change upon California agricultural landscapes.

Adhering, for the most part, to the organizational structure of the symposium, this report consists of an integrated analysis of potential impacts of climate change upon California agriculture. It primarily focuses on identifying impacts, options for adaptation, and identification of areas where key data are currently lacking. California agriculture also has an important role to play in climate change mitigation, both in the

1

short term and in the longer term. While not the primary focus of this report, we also identify areas and options where California agriculture may act as a net mitigator of climate change. Another outcome of this effort is a database of > 500 references relevant to assessment of climate change in California agricultural landscapes.

## 2.0    California Agricultural Landscapes and Climate Change

Todd Rosenstock, Sean Smukler, Timothy Cavagnaro

## 2.1.    California Agriculture: Production and Geography

California agriculture was valued at $31.8 billion in 2004 in cash farm receipts to agricultural producers (California Department of Food and Agriculture 2006), and it currently accounts for approximately 13% of the United States agricultural cash receipts, leading the nation as it has done every year since 1948 (University of California Agricultural Issues Center 2005). With over 250 different commodities produced, California is the most diverse agricultural producer within the United States. High value horticultural commodities (fresh fruits and vegetables, and tree nuts) account for greater than 50% of the cash receipts, and dairy is the single largest commodity in terms of income in the state. The top three agricultural commodities in 2003 (in billions of dollars) were dairy (> 4), greenhouse and nursery products (3.3), and grapes (2.6). On a national scale, California produces half of the nation's total fruits and vegetables and 19% of dairy (Figure 2.1). California is vital for domestic consumption, with 80% of production bound for national markets and 20% for export.



**Figure 2.1. California's top agricultural commodities as a percentage of the nations total production of each commodity. Figure excerpted from Legislative Analyst's Office (2002), formal permission not obtained.**

California's agricultural industry stretches well beyond the farmgate. Not only encompassing 79,631 farms, there are substantial complementary industries and rural communities in the agricultural landscape (University of California Agricultural Issues Center 2003). In California, agriculture employs approximately 1.1 million people—about 7.4% of total Californian employment. Regionally, agricultural employment is even more significant, as in the Central Valley, where it accounts for 25% of all employment. Thus, California agriculture represents a significant source of the state's income and employment, and provides a diverse range of commodities of high economic and nutritive value for the United States.

California Agriculture covers approximately 11.2 million hectares, greater than a quarter of the state's > 40 million hectares in land area (University of California Agricultural Issues Center 2005). Agriculture, including grazed grasslands, accounts for approximately one-half of the privately owned land and one-third of public lands (Figure 2.2). The diversity of topography, the latitudinal range (10 degrees), and seasonality of weather patterns, play an important role in the success of California agriculture. The California landscape is diverse, and landscape features affect climate and thus agriculture in many ways. Although a Mediterranean-type climate is present in most of California's agricultural regions, there are milder temperatures in the coastal valleys, mountain ranges which serve as rain catchments, and hotter summers and wetter winters in the Central Valley that lies between the Coast Range and the Sierra Nevada (Barbour et al. 1993). Few other states or agricultural regions exhibit climatic conditions with the confluence of availability and seasonality of water resources, along with a well-established water supply infrastructure and appropriate temperature regimes, to support a similarly diverse and productive agricultural landscape. However, the regional and climatic diversity of California also predispose the state to potentially significant impacts if large shifts in climate occur, since the commodities produced may be affected differentially. Nevertheless, with topographic diversity may come the potential for enhanced adaptive capacity in response to climate change.

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 30

# Draft California Greenhouse Gas Inventory (millions of metric tonnes of $CO_2$ equivalent) – By IPCC Category

Last Updated: Monday, November 19, 2007

**Categories Included in the Inventory.** *(CO2 equivalence based upon IPCC Second Assessement Report's Global Warming Potentials)*

| | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1 - Energy** | 386.41 | 372.06 | 373.67 | 369.39 | 380.27 | 367.36 | 364.41 | 380.88 | 395.49 | 401.11 | 399.66 | 415.82 | 407.36 | 404.88 | 420.91 |
| **1A - Fuel Combustion Activities** | 381.16 | 366.90 | 368.88 | 364.40 | 375.53 | 363.02 | 359.88 | 376.36 | 391.03 | 396.63 | 395.29 | 411.37 | 402.81 | 400.32 | 416.29 |
| **1A1 - Energy Industries** | 157.33 | 150.29 | 151.31 | 151.48 | 157.36 | 145.41 | 140.99 | 154.50 | 159.56 | 157.38 | 152.50 | 167.89 | 152.26 | 159.84 | 166.43 |
| 1A1a - Main Activity Electricity and Heat Production | 115.843 | 108.838 | 110.636 | 112.935 | 120.610 | 106.526 | 99.200 | 108.158 | 115.071 | 116.793 | 111.599 | 124.898 | 111.233 | 115.679 | 123.201 |
| *1A1ai - Electricity Generation* | 90.502 | 83.083 | 82.393 | 84.050 | 91.233 | 77.389 | 68.652 | 77.449 | 83.181 | 84.462 | 79.121 | 95.667 | 78.491 | 86.013 | 93.111 |
| Imported Electricity : Specified Imports : PNW : Boardman (OR) - Coal > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PNW : Boardman (OR) - Coal > CO2 | 0.281 | 0.605 | 0.659 | 0.654 | 0.771 | 0.323 | 0.345 | 0.271 | 0.673 | 0.711 | 0.740 | 0.671 | 0.567 | 0.671 | 0.542 |
| Imported Electricity : Specified Imports : PNW : Boardman (OR) - Coal > N2O | 0.001 | 0.003 | 0.003 | 0.003 | 0.004 | 0.002 | 0.002 | 0.001 | 0.003 | 0.003 | 0.004 | 0.003 | 0.003 | 0.003 | 0.003 |
| Imported Electricity : Specified Imports : PNW : Boardman (OR) - Distillate > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PNW : Boardman (OR) - Distillate > CO2 | 0.001 | 0.002 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.002 | 0.002 | 0.001 | 0.001 | 0.000 | 0.001 | 0.002 | 0.001 |
| Imported Electricity : Specified Imports : PNW : Boardman (OR) - Distillate > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PNW : Colstrip (MT) - Coal > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PNW : Colstrip (MT) - Coal > CO2 | 0.921 | 0.934 | 0.999 | 0.874 | 0.960 | 0.975 | 0.695 | 0.630 | 0.935 | 0.438 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PNW : Colstrip (MT) - Coal > N2O | 0.004 | 0.004 | 0.005 | 0.004 | 0.005 | 0.005 | 0.003 | 0.003 | 0.004 | 0.002 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PNW : Colstrip (MT) - Distillate > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PNW : Colstrip (MT) - Distillate > CO2 | 0.001 | 0.001 | 0.000 | 0.001 | 0.001 | 0.002 | 0.001 | 0.001 | 0.001 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PNW : Colstrip (MT) - Distillate > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PSW : Bonanza (UT) - Coal > CH4 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.000 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 |
| Imported Electricity : Specified Imports : PSW : Bonanza (UT) - Coal > CO2 | 0.620 | 0.643 | 0.645 | 0.534 | 0.488 | 0.462 | 0.453 | 0.282 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PSW : Bonanza (UT) - Coal > N2O | 0.003 | 0.003 | 0.003 | 0.003 | 0.002 | 0.002 | 0.002 | 0.001 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PSW : Bonanza (UT) - Distillate > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PSW : Bonanza (UT) - Distillate > CO2 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.001 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PSW : Bonanza (UT) - Distillate > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PSW : Four Corners (NM) - Coal > CH4 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 |
| Imported Electricity : Specified Imports : PSW : Four Corners (NM) - Coal > CO2 | 5.007 | 4.318 | 5.173 | 4.928 | 4.872 | 4.903 | 4.428 | 4.544 | 4.806 | 5.017 | 4.845 | 5.311 | 4.585 | 5.543 | 5.341 |
| Imported Electricity : Specified Imports : PSW : Four Corners (NM) - Coal > N2O | 0.024 | 0.021 | 0.025 | 0.024 | 0.023 | 0.023 | 0.021 | 0.022 | 0.023 | 0.024 | 0.023 | 0.025 | 0.022 | 0.027 | 0.026 |
| Imported Electricity : Specified Imports : PSW : Four Corners (NM) - Natural Gas > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PSW : Four Corners (NM) - Natural Gas > CO2 | 0.014 | 0.017 | 0.009 | 0.009 | 0.009 | 0.009 | 0.010 | 0.020 | 0.023 | 0.011 | 0.011 | 0.010 | 0.013 | 0.010 | 0.008 |
| Imported Electricity : Specified Imports : PSW : Four Corners (NM) - Natural Gas > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PSW : Intermountain (UT) - Coal > CH4 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.003 | 0.003 | 0.003 | 0.003 | 0.003 | 0.003 | 0.003 | 0.003 |
| Imported Electricity : Specified Imports : PSW : Intermountain (UT) - Coal > CO2 | 11.102 | 9.218 | 10.964 | 10.800 | 10.943 | 9.369 | 9.549 | 11.360 | 11.646 | 11.606 | 11.681 | 11.607 | 11.556 | 12.003 | 12.817 |
| Imported Electricity : Specified Imports : PSW : Intermountain (UT) - Coal > N2O | 0.055 | 0.046 | 0.055 | 0.054 | 0.054 | 0.047 | 0.048 | 0.057 | 0.058 | 0.058 | 0.058 | 0.058 | 0.058 | 0.060 | 0.064 |
| Imported Electricity : Specified Imports : PSW : Intermountain (UT) - Distillate > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PSW : Intermountain (UT) - Distillate > CO2 | 0.016 | 0.015 | 0.009 | 0.009 | 0.007 | 0.005 | 0.008 | 0.006 | 0.006 | 0.005 | 0.005 | 0.005 | 0.004 | 0.005 | 0.004 |
| Imported Electricity : Specified Imports : PSW : Intermountain (UT) - Distillate > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PSW : Mohave (NV) - Coal > CH4 | 0.001 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.001 | 0.001 |
| Imported Electricity : Specified Imports : PSW : Mohave (NV) - Coal > CO2 | 6.595 | 7.694 | 7.750 | 7.101 | 7.140 | 7.340 | 7.173 | 7.033 | 6.947 | 6.975 | 7.617 | 7.252 | 6.330 | 6.048 | 6.349 |
| Imported Electricity : Specified Imports : PSW : Mohave (NV) - Coal > N2O | 0.033 | 0.038 | 0.039 | 0.035 | 0.036 | 0.037 | 0.036 | 0.035 | 0.035 | 0.035 | 0.038 | 0.036 | 0.032 | 0.030 | 0.032 |
| Imported Electricity : Specified Imports : PSW : Mohave (NV) - Natural Gas > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PSW : Mohave (NV) - Natural Gas > CO2 | 0.084 | 0.082 | 0.088 | 0.101 | 0.093 | 0.073 | 0.033 | 0.024 | 0.019 | 0.025 | 0.027 | 0.012 | 0.006 | 0.009 | 0.006 |
| Imported Electricity : Specified Imports : PSW : Mohave (NV) - Natural Gas > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Imported Electricity : Specified Imports : PSW : Navajo (AZ) - Coal > CH4 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 |
| Imported Electricity : Specified Imports : PSW : Navajo (AZ) - Coal > CO2 | 3.233 | 3.313 | 3.394 | 3.241 | 3.234 | 2.455 | 2.344 | 2.745 | 3.236 | 3.342 | 3.627 | 3.511 | 3.646 | 3.338 | 3.517 |
| Imported Electricity : Specified Imports : PSW : Navajo (AZ) - Coal > N2O | 0.016 | 0.016 | 0.017 | 0.016 | 0.016 | 0.012 | 0.012 | 0.014 | 0.016 | 0.017 | 0.018 | 0.017 | 0.018 | 0.017 | 0.018 |

# Draft California Greenhouse Gas Inventory (millions of metric tonnes of CO2 equivalent) – By IPCC Category

Last Updated: Monday, November 19, 2007

| | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Manufacturing - Coal > CO2 | 0.552 | 0.458 | 0.135 | 0.157 | 0.178 | 0.199 | 0.413 | 1.077 | 1.438 | 1.654 | 1.498 | 1.392 | 1.490 | 1.514 | 1.442 |
| Manufacturing - Coal > N2O | 0.003 | 0.002 | 0.001 | 0.001 | 0.001 | 0.001 | 0.002 | 0.005 | 0.007 | 0.008 | 0.007 | 0.007 | 0.007 | 0.007 | 0.007 |
| Manufacturing - Distillate > CH4 | 0.003 | 0.003 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.004 | 0.004 | 0.002 | 0.001 | 0.002 |
| Manufacturing - Distillate > CO2 | 3.934 | 3.268 | 2.186 | 2.416 | 2.827 | 2.526 | 2.244 | 2.444 | 2.261 | 2.530 | 4.170 | 5.174 | 2.632 | 1.735 | 2.489 |
| Manufacturing - Distillate > N2O | 0.010 | 0.008 | 0.006 | 0.006 | 0.007 | 0.006 | 0.006 | 0.006 | 0.006 | 0.006 | 0.011 | 0.013 | 0.007 | 0.004 | 0.006 |
| Manufacturing - Gasoline > CH4 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 |
| Manufacturing - Gasoline > CO2 | 1.182 | 1.222 | 1.232 | 0.997 | 1.033 | 1.063 | 0.997 | 1.049 | 1.176 | 0.692 | 0.711 | 0.812 | 0.854 | 0.913 | 0.975 |
| Manufacturing - Gasoline > N2O | 0.003 | 0.003 | 0.003 | 0.003 | 0.003 | 0.003 | 0.003 | 0.003 | 0.003 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.003 |
| Manufacturing - Kerosene > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Manufacturing - Kerosene > CO2 | 0.008 | 0.011 | 0.009 | 0.010 | 0.005 | 0.006 | 0.008 | 0.008 | 0.017 | 0.043 | 0.071 | 0.065 | 0.013 | 0.010 | 0.013 |
| Manufacturing - Kerosene > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Manufacturing - LPG > CH4 | 0.000 | 0.000 | 0.001 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Manufacturing - LPG > CO2 | 1.982 | 1.255 | 1.778 | 1.211 | 1.402 | 1.125 | 0.706 | 0.481 | 0.411 | 0.889 | 0.203 | 0.284 | 0.142 | 0.000 | 0.000 |
| Manufacturing - LPG > N2O | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Manufacturing - Natural Gas > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Manufacturing - Natural Gas > CO2 | 0.038 | 0.031 | 0.031 | 0.032 | 0.035 | 0.035 | 0.036 | 0.038 | 0.009 | 0.039 | 0.004 | 0.038 | 0.071 | 0.127 | 0.124 |
| Manufacturing - Natural Gas > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Manufacturing - Natural Gas Liquids > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.001 | 0.001 | 0.000 | 0.000 | 0.000 |
| Manufacturing - Natural Gas Liquids > CO2 | 0.330 | 0.241 | 0.264 | 0.272 | 0.277 | 0.276 | 0.159 | 0.147 | 0.131 | 0.162 | 0.775 | 0.689 | 0.099 | 0.098 | 0.098 |
| Manufacturing - Natural Gas Liquids > N2O | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.000 | 0.000 | 0.000 | 0.000 | 0.002 | 0.002 | 0.000 | 0.000 | 0.000 |
| Manufacturing - Residual Fuel Oil > CH4 | 0.001 | 0.001 | 0.001 | 0.000 | 0.000 | 0.001 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Manufacturing - Residual Fuel Oil > CO2 | 0.636 | 0.636 | 0.634 | 0.612 | 0.604 | 0.707 | 0.135 | 0.043 | 0.019 | 0.325 | 0.058 | 0.011 | 0.026 | 0.018 | 0.007 |
| Manufacturing - Residual Fuel Oil > N2O | 0.002 | 0.002 | 0.001 | 0.001 | 0.001 | 0.002 | 0.000 | 0.000 | 0.000 | 0.001 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Manufacturing : Plastics & Rubber - Natural Gas > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Manufacturing : Plastics & Rubber - Natural Gas > CO2 | 0.049 | 0.050 | 0.041 | 0.043 | 0.044 | 0.042 | 0.043 | 0.044 | 0.045 | 0.045 | 0.044 | 0.037 | 0.043 | 0.043 | 0.043 |
| Manufacturing : Plastics & Rubber - Natural Gas > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Manufacturing : Plastics & Rubber : Plastics - Natural Gas > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Manufacturing : Plastics & Rubber : Plastics - Natural Gas > CO2 | 0.185 | 0.175 | 0.158 | 0.152 | 0.158 | 0.163 | 0.164 | 0.190 | 0.220 | 0.232 | 0.235 | 0.177 | 0.209 | 0.212 | 0.209 |
| Manufacturing : Plastics & Rubber : Plastics - Natural Gas > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Not Specified Industrial - Wood (Wet) > CH4 | 0.041 | 0.037 | 0.036 | 0.029 | 0.028 | 0.027 | 0.023 | 0.027 | 0.023 | 0.024 | 0.027 | 0.030 | 0.026 | 0.026 | 0.026 |
| Not Specified Industrial - Wood (Wet) > N2O | 0.081 | 0.073 | 0.071 | 0.058 | 0.055 | 0.052 | 0.046 | 0.054 | 0.045 | 0.048 | 0.052 | 0.059 | 0.052 | 0.052 | 0.052 |
| **1A3 - Transport** | **150.02** | **146.00** | **152.23** | **148.08** | **150.44** | **154.04** | **155.59** | **157.87** | **161.08** | **165.49** | **169.33** | **173.28** | **179.41** | **175.29** | **181.95** |
| Not Specified Transportation - Distillate > CH4 | 0.003 | 0.002 | 0.002 | 0.001 | 0.002 | 0.002 | 0.001 | 0.000 | 0.000 | 0.000 | 0.000 | 0.001 | 0.001 | 0.001 | 0.001 |
| Not Specified Transportation - Distillate > CO2 | 2.132 | 1.918 | 1.666 | 0.483 | 1.283 | 1.305 | 0.957 | 0.244 | 0.266 | 0.128 | 0.116 | 0.440 | 0.585 | 0.477 | 0.589 |
| Not Specified Transportation - Distillate > N2O | 0.017 | 0.015 | 0.013 | 0.004 | 0.010 | 0.010 | 0.007 | 0.002 | 0.002 | 0.001 | 0.001 | 0.003 | 0.005 | 0.004 | 0.005 |
| Not Specified Transportation - LPG > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Not Specified Transportation - LPG > CO2 | 0.208 | 0.171 | 0.147 | 0.148 | 0.228 | 0.127 | 0.108 | 0.079 | 0.151 | 0.086 | 0.357 | 0.431 | 0.221 | 0.221 | 0.221 |
| Not Specified Transportation - LPG > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Not Specified Transportation - Residual Fuel Oil > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Not Specified Transportation - Residual Fuel Oil > CO2 | 0.000 | 0.000 | 0.011 | 0.016 | 0.011 | 0.093 | 0.087 | 0.042 | 0.020 | 0.012 | 0.007 | 0.002 | 0.009 | 0.014 | 0.014 |
| Not Specified Transportation - Residual Fuel Oil > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.001 | 0.001 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| 1A3a - Civil Aviation | 5.132 | 4.688 | 4.093 | 3.671 | 3.881 | 4.013 | 4.212 | 3.915 | 3.888 | 3.748 | 3.512 | 4.183 | 3.417 | 3.055 | 3.059 |
| Aviation - Natural Gas > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Aviation - Natural Gas > CO2 | 0.018 | 0.019 | 0.014 | 0.013 | 0.013 | 0.010 | 0.010 | 0.009 | 0.011 | 0.012 | 0.012 | 0.009 | 0.042 | 0.044 | 0.043 |
| Aviation - Natural Gas > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |

# Draft California Greenhouse Gas Inventory (millions of metric tonnes of CO2 equivalent) – By IPCC Category

Last Updated: Monday, November 19, 2007

| | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *1A3aii - Domestic Aviation* | 5.113 | 4.669 | 4.079 | 3.658 | 3.868 | 4.003 | 4.202 | 3.906 | 3.877 | 3.736 | 3.500 | 4.174 | 3.374 | 3.011 | 3.016 |
| Aviation : Domestic Air transport - Aviation Gasoline > CH4 | 0.007 | 0.007 | 0.007 | 0.005 | 0.005 | 0.005 | 0.005 | 0.005 | 0.004 | 0.005 | 0.005 | 0.004 | 0.004 | 0.005 | 0.004 |
| Aviation : Domestic Air transport - Aviation Gasoline > CO2 | 0.386 | 0.381 | 0.370 | 0.286 | 0.277 | 0.282 | 0.268 | 0.292 | 0.200 | 0.288 | 0.252 | 0.229 | 0.254 | 0.254 | 0.207 |
| Aviation : Domestic Air transport - Aviation Gasoline > N2O | 0.002 | 0.002 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 |
| Aviation : Domestic Air transport : Intrastate - Jet Fuel > CH4 | 0.003 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 |
| Aviation : Domestic Air transport : Intrastate - Jet Fuel > CO2 | 4.671 | 4.236 | 3.664 | 3.332 | 3.548 | 3.678 | 3.888 | 3.571 | 3.635 | 3.406 | 3.209 | 3.900 | 3.083 | 2.724 | 2.775 |
| Aviation : Domestic Air transport : Intrastate - Jet Fuel > N2O | 0.045 | 0.041 | 0.036 | 0.032 | 0.034 | 0.036 | 0.038 | 0.035 | 0.035 | 0.033 | 0.033 | 0.031 | 0.038 | 0.030 | 0.027 |
| *1A3b - Road Transportation* | 137.992 | 134.485 | 141.765 | 139.441 | 140.467 | 143.572 | 145.061 | 148.370 | 151.314 | 155.878 | 159.336 | 162.275 | 168.990 | 165.474 | 171.506 |
| On road : Freight - Natural Gas > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| On road : Freight - Natural Gas > CO2 | 0.016 | 0.015 | 0.013 | 0.014 | 0.014 | 0.011 | 0.012 | 0.012 | 0.013 | 0.015 | 0.012 | 0.012 | 0.023 | 0.022 | 0.025 |
| On road : Freight - Natural Gas > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| On road : Passenger - Natural Gas > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| On road : Passenger - Natural Gas > CO2 | 0.010 | 0.011 | 0.012 | 0.013 | 0.015 | 0.015 | 0.022 | 0.029 | 0.030 | 0.037 | 0.040 | 0.025 | 0.036 | 0.027 | 0.015 |
| On road : Passenger - Natural Gas > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| On road : Passenger : Taxis & Buses - Natural Gas > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| On road : Passenger : Taxis & Buses - Natural Gas > CO2 | 0.010 | 0.012 | 0.008 | 0.009 | 0.014 | 0.014 | 0.024 | 0.021 | 0.024 | 0.026 | 0.026 | 0.028 | 0.025 | 0.025 | 0.025 |
| On road : Passenger : Taxis & Buses - Natural Gas > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| *1A3bi - Cars* | 63.746 | 62.351 | 65.647 | 63.580 | 62.567 | 62.954 | 62.898 | 63.232 | 63.271 | 63.877 | 65.442 | 65.249 | 67.008 | 62.037 | 63.078 |
| On road : Passenger cars - Distillate > CH4 | 0.001 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| On road : Passenger cars - Distillate > CO2 | 0.610 | 0.543 | 0.512 | 0.468 | 0.464 | 0.434 | 0.393 | 0.386 | 0.362 | 0.343 | 0.330 | 0.287 | 0.279 | 0.242 | 0.241 |
| On road : Passenger cars - Distillate > N2O | 0.006 | 0.005 | 0.005 | 0.005 | 0.005 | 0.004 | 0.004 | 0.004 | 0.004 | 0.003 | 0.003 | 0.003 | 0.003 | 0.002 | 0.002 |
| On road : Passenger cars - Gasoline > CH4 | 0.436 | 0.410 | 0.383 | 0.366 | 0.353 | 0.346 | 0.317 | 0.310 | 0.299 | 0.289 | 0.280 | 0.250 | 0.231 | 0.196 | 0.184 |
| On road : Passenger cars - Gasoline > CO2 | 59.676 | 58.528 | 61.796 | 59.943 | 59.057 | 59.531 | 59.786 | 60.184 | 60.319 | 61.005 | 62.675 | 62.721 | 64.605 | 59.955 | 61.069 |
| On road : Passenger cars - Gasoline > N2O | 3.017 | 2.863 | 2.951 | 2.798 | 2.688 | 2.638 | 2.398 | 2.349 | 2.287 | 2.236 | 2.155 | 1.988 | 1.890 | 1.642 | 1.581 |
| *1A3bii - Light-duty Trucks* | 44.754 | 44.552 | 47.692 | 48.174 | 48.906 | 50.720 | 52.007 | 53.931 | 56.265 | 58.971 | 60.558 | 63.643 | 67.973 | 68.006 | 72.117 |
| On road : Light-Duty Trucks - Distillate > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| On road : Light-Duty Trucks - Distillate > CO2 | 0.520 | 0.504 | 0.514 | 0.524 | 0.554 | 0.583 | 0.587 | 0.652 | 0.627 | 0.700 | 0.770 | 0.850 | 1.014 | 0.953 | 0.957 |
| On road : Light-Duty Trucks - Distillate > N2O | 0.005 | 0.005 | 0.005 | 0.005 | 0.006 | 0.006 | 0.006 | 0.007 | 0.006 | 0.007 | 0.008 | 0.009 | 0.010 | 0.010 | 0.010 |
| On road : Light-Duty Trucks - Gasoline > CH4 | 0.317 | 0.304 | 0.279 | 0.273 | 0.267 | 0.265 | 0.247 | 0.244 | 0.242 | 0.236 | 0.227 | 0.210 | 0.199 | 0.184 | 0.176 |
| On road : Light-Duty Trucks - Gasoline > CO2 | 41.337 | 41.197 | 44.187 | 44.693 | 45.439 | 47.226 | 48.752 | 50.630 | 52.992 | 55.647 | 57.276 | 60.433 | 64.712 | 64.986 | 69.155 |
| On road : Light-Duty Trucks - Gasoline > N2O | 2.574 | 2.541 | 2.706 | 2.678 | 2.641 | 2.641 | 2.415 | 2.398 | 2.397 | 2.380 | 2.277 | 2.141 | 2.064 | 1.873 | 1.819 |
| *1A3biii - Heavy-duty Trucks and Buses* | 29.031 | 27.125 | 28.005 | 27.295 | 28.624 | 29.529 | 29.775 | 30.895 | 31.472 | 32.715 | 33.014 | 33.000 | 33.565 | 34.832 | 35.662 |
| On road : Heavy-Duty Vehicles - Distillate > CH4 | 0.021 | 0.020 | 0.021 | 0.020 | 0.016 | 0.016 | 0.016 | 0.017 | 0.017 | 0.018 | 0.018 | 0.018 | 0.018 | 0.018 | 0.017 |
| On road : Heavy-Duty Vehicles - Distillate > CO2 | 17.401 | 16.967 | 17.732 | 17.575 | 19.173 | 20.222 | 20.517 | 22.206 | 22.773 | 23.921 | 25.623 | 25.523 | 26.137 | 26.939 | 27.639 |
| On road : Heavy-Duty Vehicles - Distillate > N2O | 0.176 | 0.171 | 0.179 | 0.177 | 0.194 | 0.205 | 0.208 | 0.225 | 0.230 | 0.242 | 0.259 | 0.259 | 0.265 | 0.273 | 0.280 |
| On road : Heavy-Duty Vehicles - Gasoline > CH4 | 0.140 | 0.117 | 0.084 | 0.076 | 0.070 | 0.065 | 0.058 | 0.051 | 0.049 | 0.048 | 0.042 | 0.040 | 0.038 | 0.036 | 0.033 |
| On road : Heavy-Duty Vehicles - Gasoline > CO2 | 10.582 | 9.229 | 9.351 | 8.843 | 8.584 | 8.451 | 8.495 | 7.949 | 7.960 | 8.044 | 6.622 | 6.737 | 6.689 | 7.164 | 7.306 |
| On road : Heavy-Duty Vehicles - Gasoline > N2O | 0.711 | 0.620 | 0.637 | 0.604 | 0.588 | 0.571 | 0.481 | 0.446 | 0.442 | 0.442 | 0.449 | 0.423 | 0.419 | 0.402 | 0.387 |
| *1A3biv - Motorcycles* | 0.426 | 0.420 | 0.388 | 0.356 | 0.328 | 0.327 | 0.323 | 0.251 | 0.238 | 0.236 | 0.243 | 0.318 | 0.361 | 0.525 | 0.584 |
| On road : Motorcycles - Gasoline > CH4 | 0.017 | 0.017 | 0.012 | 0.011 | 0.010 | 0.010 | 0.009 | 0.007 | 0.006 | 0.006 | 0.006 | 0.008 | 0.009 | 0.013 | 0.014 |
| On road : Motorcycles - Gasoline > CO2 | 0.376 | 0.371 | 0.346 | 0.317 | 0.293 | 0.292 | 0.289 | 0.225 | 0.213 | 0.212 | 0.219 | 0.286 | 0.324 | 0.473 | 0.526 |
| On road : Motorcycles - Gasoline > N2O | 0.032 | 0.032 | 0.030 | 0.028 | 0.026 | 0.025 | 0.025 | 0.019 | 0.018 | 0.018 | 0.018 | 0.024 | 0.027 | 0.039 | 0.043 |
| *1A3c - Railways* | 2.331 | 2.463 | 2.236 | 1.970 | 2.131 | 2.428 | 2.593 | 2.567 | 2.699 | 2.797 | 3.067 | 2.900 | 3.041 | 2.785 | 3.189 |
| Rail - Distillate > CH4 | 0.004 | 0.004 | 0.004 | 0.003 | 0.003 | 0.004 | 0.004 | 0.004 | 0.004 | 0.005 | 0.005 | 0.005 | 0.005 | 0.005 | 0.005 |
| Rail - Distillate > CO2 | 2.290 | 2.421 | 2.202 | 1.941 | 2.101 | 2.397 | 2.559 | 2.536 | 2.661 | 2.758 | 3.027 | 2.858 | 3.003 | 2.746 | 3.144 |

**Draft California Greenhouse Gas Inventory (millions of metric tonnes of CO2 equivalent) — By IPCC Category**

Last Updated: Monday, November 19, 2007

| | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Crop acreage burned - Almond > N2O | 0.016 | 0.016 | 0.016 | 0.016 | 0.019 | 0.019 | 0.019 | 0.019 | 0.022 | 0.023 | 0.023 | 0.023 | 0.023 | 0.024 | 0.024 |
| Crop acreage burned - Barley > CH4 | 0.001 | 0.001 | 0.001 | 0.001 | 0.002 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 |
| Crop acreage burned - Barley > N2O | 0.002 | 0.001 | 0.001 | 0.001 | 0.002 | 0.002 | 0.002 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 |
| Crop acreage burned - Corn > CH4 | 0.002 | 0.001 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 |
| Crop acreage burned - Corn > N2O | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 | 0.002 |
| Crop acreage burned - Rice > CH4 | 0.015 | 0.013 | 0.011 | 0.013 | 0.011 | 0.010 | 0.008 | 0.006 | 0.006 | 0.006 | 0.006 | 0.003 | 0.004 | 0.003 | 0.004 |
| Crop acreage burned - Rice > N2O | 0.060 | 0.054 | 0.047 | 0.052 | 0.045 | 0.041 | 0.034 | 0.025 | 0.023 | 0.024 | 0.026 | 0.014 | 0.014 | 0.014 | 0.016 |
| Crop acreage burned - Walnut > CH4 | 0.004 | 0.005 | 0.005 | 0.005 | 0.005 | 0.005 | 0.005 | 0.005 | 0.005 | 0.005 | 0.005 | 0.006 | 0.006 | 0.006 | 0.006 |
| Crop acreage burned - Walnut > N2O | 0.008 | 0.008 | 0.008 | 0.008 | 0.009 | 0.009 | 0.009 | 0.009 | 0.010 | 0.010 | 0.010 | 0.010 | 0.010 | 0.010 | 0.011 |
| Crop acreage burned - Wheat > CH4 | 0.005 | 0.003 | 0.004 | 0.004 | 0.004 | 0.004 | 0.005 | 0.004 | 0.005 | 0.004 | 0.004 | 0.004 | 0.004 | 0.006 | 0.006 |
| Crop acreage burned - Wheat > N2O | 0.004 | 0.003 | 0.003 | 0.003 | 0.004 | 0.004 | 0.004 | 0.004 | 0.004 | 0.003 | 0.003 | 0.003 | 0.003 | 0.005 | 0.004 |
| **3C2 - Liming** | **0.07** | **0.10** | **0.11** | **0.07** | **0.16** | **0.27** | **0.27** | **0.35** | **0.25** | **0.30** | **0.27** | **0.16** | **0.23** | **0.24** | **0.24** |
| Dolomite applied to soils > CO2 | 0.000 | 0.001 | 0.001 | 0.001 | 0.002 | 0.003 | 0.004 | 0.005 | 0.003 | 0.004 | 0.003 | 0.001 | 0.002 | 0.002 | 0.002 |
| Limestone applied to soils > CO2 | 0.072 | 0.098 | 0.108 | 0.073 | 0.157 | 0.271 | 0.267 | 0.348 | 0.246 | 0.294 | 0.263 | 0.161 | 0.231 | 0.236 | 0.236 |
| **3C4 - Direct N2O Emissions from Managed Soils** | **5.20** | **4.69** | **4.73** | **4.99** | **4.85** | **5.28** | **5.15** | **4.65** | **4.74** | **4.84** | **5.28** | **5.04** | **6.38** | **6.29** | **6.24** |
| Histosols cultivation > N2O | 0.181 | 0.178 | 0.175 | 0.172 | 0.169 | 0.166 | 0.163 | 0.160 | 0.157 | 0.154 | 0.151 | 0.148 | 0.145 | 0.142 | 0.139 |
| Nitrogen applied in fertilizer - Organic fertilizers > N2O | 0.012 | 0.008 | 0.012 | 0.006 | 0.017 | 0.015 | 0.013 | 0.005 | 0.004 | 0.005 | 0.035 | 0.011 | 0.017 | 0.022 | 0.009 |
| Nitrogen applied in fertilizer - Synthetic fertilizers > N2O | 2.239 | 1.814 | 1.967 | 2.335 | 2.034 | 2.662 | 2.524 | 2.027 | 2.156 | 2.176 | 2.656 | 2.445 | 3.680 | 3.639 | 3.654 |
| Nitrogen fixed by legume crops > N2O | 1.052 | 1.024 | 0.924 | 0.859 | 0.944 | 0.792 | 0.793 | 0.832 | 0.816 | 0.869 | 0.849 | 0.831 | 0.939 | 0.893 | 0.858 |
| Nitrogen in crop residues > N2O | 0.093 | 0.072 | 0.077 | 0.077 | 0.082 | 0.069 | 0.078 | 0.080 | 0.078 | 0.078 | 0.081 | 0.108 | 0.122 | 0.121 | 0.130 |
| Nitrogen in manure deposited on pasture/range > N2O | 1.549 | 1.516 | 1.494 | 1.455 | 1.517 | 1.490 | 1.488 | 1.455 | 1.434 | 1.463 | 1.404 | 1.390 | 1.368 | 1.367 | 1.336 |
| Nitrogen in manure spread daily > N2O | 0.078 | 0.079 | 0.081 | 0.083 | 0.085 | 0.086 | 0.088 | 0.090 | 0.091 | 0.095 | 0.099 | 0.103 | 0.107 | 0.110 | 0.110 |
| **3C5 - Indirect N2O Emissions from Managed Soils** | **1.44** | **1.29** | **1.33** | **1.45** | **1.37** | **1.59** | **1.54** | **1.38** | **1.42** | **1.44** | **1.66** | **1.59** | **2.01** | **2.00** | **2.00** |
| Nitrogen applied in fertilizer - Organic fertilizers > N2O | 0.003 | 0.002 | 0.003 | 0.002 | 0.004 | 0.004 | 0.003 | 0.001 | 0.001 | 0.001 | 0.009 | 0.003 | 0.004 | 0.006 | 0.002 |
| Nitrogen applied in fertilizer - Synthetic fertilizers > N2O | 0.249 | 0.202 | 0.219 | 0.259 | 0.226 | 0.296 | 0.280 | 0.225 | 0.240 | 0.242 | 0.295 | 0.272 | 0.409 | 0.404 | 0.406 |
| Nitrogen applied in fertilizer (leaching & runoff) - Organic fertilizers > N2O | 0.003 | 0.002 | 0.003 | 0.001 | 0.004 | 0.003 | 0.003 | 0.001 | 0.001 | 0.001 | 0.008 | 0.002 | 0.004 | 0.005 | 0.002 |
| Nitrogen applied in fertilizer (leaching & runoff) - Synthetic fertilizers > N2O | 0.504 | 0.408 | 0.443 | 0.525 | 0.458 | 0.599 | 0.568 | 0.456 | 0.485 | 0.490 | 0.598 | 0.550 | 0.828 | 0.819 | 0.822 |
| Nitrogen in manure (leaching & runoff) > N2O | 0.325 | 0.319 | 0.316 | 0.314 | 0.321 | 0.325 | 0.326 | 0.329 | 0.329 | 0.337 | 0.353 | 0.359 | 0.362 | 0.365 | 0.362 |
| Nitrogen volatilized from manure on soils > N2O | 0.361 | 0.354 | 0.352 | 0.349 | 0.357 | 0.361 | 0.362 | 0.366 | 0.365 | 0.374 | 0.393 | 0.399 | 0.403 | 0.406 | 0.402 |
| **3C7 - Rice Cultivations** | **0.41** | **0.36** | **0.41** | **0.45** | **0.50** | **0.48** | **0.52** | **0.54** | **0.47** | **0.52** | **0.57** | **0.49** | **0.55** | **0.53** | **0.61** |
| Harvested rice area > CH4 | 0.410 | 0.363 | 0.409 | 0.453 | 0.503 | 0.482 | 0.518 | 0.535 | 0.475 | 0.524 | 0.568 | 0.488 | 0.547 | 0.526 | 0.612 |
| **4 - Waste** | **9.42** | **9.21** | **9.47** | **9.59** | **9.67** | **9.25** | **9.19** | **9.19** | **9.40** | **9.46** | **9.31** | **9.43** | **9.36** | **9.46** | **9.44** |
| **4A - Solid Waste Disposal** | **6.26** | **5.99** | **6.21** | **6.28** | **6.30** | **5.88** | **5.77** | **5.72** | **5.91** | **5.86** | **5.64** | **5.70** | **5.62** | **5.67** | **5.62** |
| **4A1 - Managed Waste Disposal Sites** | **6.26** | **5.99** | **6.21** | **6.28** | **6.30** | **5.88** | **5.77** | **5.72** | **5.91** | **5.86** | **5.64** | **5.70** | **5.62** | **5.67** | **5.62** |
| Landfills > Landfill emissions - Landfill Gas > CH4 | 6.256 | 5.987 | 6.209 | 6.278 | 6.295 | 5.875 | 5.772 | 5.720 | 5.908 | 5.861 | 5.644 | 5.704 | 5.619 | 5.674 | 5.615 |
| Landfills > Landfill emissions - Landfill Gas > N2O | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| **4D - Wastewater Treatment and Discharge** | **3.17** | **3.23** | **3.26** | **3.31** | **3.38** | **3.37** | **3.41** | **3.47** | **3.49** | **3.60** | **3.66** | **3.72** | **3.74** | **3.79** | **3.82** |
| **4D1 - Domestic Wastewater Treatment and Discharge** | **2.83** | **2.91** | **2.96** | **2.99** | **3.03** | **3.04** | **3.07** | **3.12** | **3.17** | **3.24** | **3.28** | **3.36** | **3.33** | **3.40** | **3.43** |
| Waste water treatment : Domestic Waste Water > California Population > CH4 | 2.008 | 2.050 | 2.086 | 2.108 | 2.122 | 2.134 | 2.151 | 2.184 | 2.212 | 2.249 | 2.280 | 2.338 | 2.321 | 2.366 | 2.382 |
| Waste water treatment : Domestic Waste Water > California Population > N2O | 0.826 | 0.855 | 0.873 | 0.886 | 0.913 | 0.906 | 0.916 | 0.935 | 0.954 | 0.989 | 1.000 | 1.022 | 1.010 | 1.034 | 1.046 |
| **4D2 - Industrial Wastewater Treatment and Discharge** | **0.34** | **0.32** | **0.31** | **0.32** | **0.34** | **0.33** | **0.35** | **0.35** | **0.33** | **0.36** | **0.38** | **0.36** | **0.41** | **0.39** | **0.40** |
| Manufacturing : Wastewater Treatment : Fugitives > Fugitive emissions > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Oil & Gas Extraction : Wastewater Treatment : Fugitives > Fugitive emissions > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Petroleum Marketing : Wastewater Treatment : Fugitives > Fugitive emissions > CH4 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Petroleum Refining : Wastewater Treatment : Fugitives > Fugitive emissions > CH4 | 0.002 | 0.002 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.001 | 0.000 | 0.001 | 0.001 | 0.001 |

**Draft California Greenhouse Gas Inventory (millions of metric tonnes of CO2 equivalent) — By IPCC Category**

Last Updated: Monday, November 19, 2007

| | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Waste water treatment : Industrial Waste Water > Production Processed - Fruit and Vegetables > CH4 | 0.222 | 0.214 | 0.209 | 0.229 | 0.252 | 0.234 | 0.250 | 0.252 | 0.235 | 0.263 | 0.270 | 0.246 | 0.284 | 0.256 | 0.265 |
| Waste water treatment : Industrial Waste Water > Production Processed - Poultry > CH4 | 0.042 | 0.040 | 0.037 | 0.033 | 0.032 | 0.032 | 0.032 | 0.032 | 0.030 | 0.030 | 0.045 | 0.046 | 0.045 | 0.043 | 0.043 |
| Waste water treatment : Industrial Waste Water > Production Processed - Red Meat > CH4 | 0.069 | 0.066 | 0.058 | 0.056 | 0.059 | 0.064 | 0.065 | 0.064 | 0.064 | 0.065 | 0.066 | 0.069 | 0.083 | 0.088 | 0.088 |

**Summary of Categories Included in the Inventory.**
*(using IPCC Second Assessement Report's GWPs)*

| | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Gross California Emissions** | 433.29 | 416.94 | 418.71 | 415.42 | 427.61 | 416.97 | 414.58 | 432.89 | 449.05 | 456.50 | 457.29 | 473.49 | 468.54 | 467.42 | 484.40 |
| **Sinks from Forests and Rangelands** | -6.69 | -6.54 | -6.33 | -6.03 | -5.79 | -5.56 | -5.42 | -5.37 | -5.19 | -5.18 | -5.02 | -4.83 | -4.69 | -4.67 | -4.66 |
| **Net California Emissions** | 426.60 | 410.40 | 412.38 | 409.39 | 421.81 | 411.41 | 409.17 | 427.51 | 443.86 | 451.32 | 452.27 | 468.66 | 463.84 | 462.75 | 479.74 |

**Draft California Greenhouse Gas Inventory (millions of metric tonnes of $CO_2$ equivalent) — By IPCC Category**

Last Updated: Monday, November 19, 2007

| Categories Excluded from the Inventory. | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(CO2 equivalence based upon IPCC Second Assessement Report's Global Warming Potentials)* | | | | | | | | | | | | | | | |
| **1 - Energy** | **59.02** | **53.00** | **45.38** | **46.22** | **52.91** | **55.13** | **56.51** | **48.61** | **48.37** | **50.47** | **55.52** | **51.08** | **53.06** | **40.80** | **44.16** |
| **1A - Fuel Combustion Activities** | **59.02** | **53.00** | **45.38** | **46.22** | **52.91** | **55.13** | **56.51** | **48.61** | **48.37** | **50.47** | **55.52** | **51.08** | **53.06** | **40.80** | **44.16** |
| **1A3 - Transport** | **59.02** | **53.00** | **45.38** | **46.22** | **52.91** | **55.13** | **56.51** | **48.61** | **48.37** | **50.47** | **55.52** | **51.08** | **53.06** | **40.80** | **44.16** |
| 1A3a - Civil Aviation | 33.954 | 32.419 | 31.597 | 32.948 | 36.569 | 34.993 | 38.210 | 38.275 | 39.121 | 36.626 | 38.582 | 35.536 | 38.428 | 30.843 | 32.916 |
| *1A3ai - International Aviation (International Bunkers)* | 14.597 | 13.852 | 13.324 | 13.707 | 15.156 | 14.611 | 15.905 | 15.809 | 16.152 | 15.124 | 15.787 | 14.900 | 15.681 | 12.680 | 13.483 |
| Aviation : International Civil Aviation - Jet Fuel > CH4 (Excluded) | 0.008 | 0.008 | 0.008 | 0.008 | 0.009 | 0.008 | 0.009 | 0.009 | 0.009 | 0.009 | 0.009 | 0.009 | 0.009 | 0.007 | 0.008 |
| Aviation : International Civil Aviation - Jet Fuel > CO2 (Excluded) | 14.449 | 13.711 | 13.188 | 13.567 | 15.002 | 14.462 | 15.743 | 15.648 | 15.988 | 14.969 | 15.626 | 14.748 | 15.521 | 12.551 | 13.345 |
| Aviation : International Civil Aviation - Jet Fuel > N2O (Excluded) | 0.140 | 0.133 | 0.128 | 0.132 | 0.146 | 0.141 | 0.153 | 0.152 | 0.156 | 0.146 | 0.152 | 0.143 | 0.151 | 0.122 | 0.130 |
| *1A3aii - Domestic Aviation* | 19.357 | 18.567 | 18.274 | 19.241 | 21.413 | 20.382 | 22.305 | 22.466 | 22.968 | 21.502 | 22.795 | 20.636 | 22.748 | 18.163 | 19.433 |
| Aviation : Domestic Air transport : Interstate - Jet Fuel > CH4 (Excluded) | 0.011 | 0.010 | 0.010 | 0.011 | 0.012 | 0.012 | 0.013 | 0.013 | 0.013 | 0.012 | 0.013 | 0.012 | 0.013 | 0.010 | 0.011 |
| Aviation : Domestic Air transport : Interstate - Jet Fuel > CO2 (Excluded) | 19.160 | 18.378 | 18.088 | 19.045 | 21.194 | 20.175 | 22.078 | 22.237 | 22.734 | 21.283 | 22.563 | 20.425 | 22.516 | 17.977 | 19.235 |
| Aviation : Domestic Air transport : Interstate - Jet Fuel > N2O (Excluded) | 0.186 | 0.178 | 0.175 | 0.185 | 0.206 | 0.196 | 0.215 | 0.216 | 0.221 | 0.207 | 0.219 | 0.199 | 0.219 | 0.175 | 0.187 |
| 1A3d - Water-borne Navigation | 25.062 | 20.579 | 13.787 | 13.269 | 16.342 | 20.133 | 18.304 | 10.332 | 9.246 | 13.848 | 16.941 | 15.543 | 14.633 | 9.953 | 11.242 |
| *1A3di - International Water-borne Navigation (International Bunkers)* | 25.062 | 20.579 | 13.787 | 13.269 | 16.342 | 20.133 | 18.304 | 10.332 | 9.246 | 13.848 | 16.941 | 15.543 | 14.633 | 9.953 | 11.242 |
| Water-borne : International Marine Bunker Fuel - Distillate > CH4 (Excluded) | 0.001 | 0.001 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.001 | 0.000 | 0.000 | 0.001 | 0.000 | 0.000 | 0.000 | 0.000 |
| Water-borne : International Marine Bunker Fuel - Distillate > CO2 (Excluded) | 0.352 | 0.532 | 0.000 | 0.000 | 0.109 | 0.000 | 0.000 | 0.475 | 0.014 | 0.114 | 0.385 | 0.203 | 0.086 | 0.000 | 0.000 |
| Water-borne : International Marine Bunker Fuel - Distillate > N2O (Excluded) | 0.003 | 0.004 | 0.000 | 0.000 | 0.001 | 0.000 | 0.000 | 0.004 | 0.000 | 0.001 | 0.003 | 0.002 | 0.001 | 0.000 | 0.000 |
| Water-borne : International Marine Bunker Fuel - Residual Fuel Oil > CH4 (Excluded) | 0.036 | 0.029 | 0.020 | 0.019 | 0.024 | 0.029 | 0.027 | 0.014 | 0.013 | 0.020 | 0.024 | 0.022 | 0.021 | 0.014 | 0.016 |
| Water-borne : International Marine Bunker Fuel - Residual Fuel Oil > CO2 (Excluded) | 24.487 | 19.863 | 13.665 | 13.151 | 16.087 | 19.954 | 18.141 | 9.765 | 9.150 | 13.610 | 16.404 | 15.201 | 14.417 | 9.864 | 11.142 |
| Water-borne : International Marine Bunker Fuel - Residual Fuel Oil > N2O (Excluded) | 0.184 | 0.149 | 0.103 | 0.099 | 0.121 | 0.150 | 0.136 | 0.073 | 0.069 | 0.102 | 0.123 | 0.114 | 0.108 | 0.074 | 0.084 |

**Summary of Categories Excluded from the Inventory.**

| *(using IPCC Second Assessement Report's GWPs)* | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Gross California Emissions** | **59.02** | **53.00** | **45.38** | **46.22** | **52.91** | **55.13** | **56.51** | **48.61** | **48.37** | **50.47** | **55.52** | **51.08** | **53.06** | **40.80** | **44.16** |
| **Net California Emissions** | **59.02** | **53.00** | **45.38** | **46.22** | **52.91** | **55.13** | **56.51** | **48.61** | **48.37** | **50.47** | **55.52** | **51.08** | **53.06** | **40.80** | **44.16** |

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 31

**Executive Order 2006-13**
**Climate Change Action**


**WHEREAS,** Executive Order 2005-02 recognized that a scientific consensus has developed that increasing emissions of carbon dioxide (CO2), methane and other greenhouse gases (GHGs) released to the atmosphere are affecting the Earth's climate; and

**WHEREAS,** between 1990 and 2005 Arizona's GHG emissions increased by an estimated 56 percent; and

**WHEREAS,** GHG emissions in Arizona are projected to increase by an estimated 148 percent over 1990 levels by 2020; and

**WHEREAS,** Arizona and other Western States are experiencing the effects of a hotter, drier climate, including prolonged drought, excessive heat waves, reduced snow pack, increased snowmelt, decreased spring runoff, altered precipitation patterns, more severe forest and rangeland fires, widespread forest diseases and other serious impacts; and

**WHEREAS,** the Western Governors Association has declared that climate change could have severe economic and environmental impacts on Arizona and the West in coming decades; and

**WHEREAS,** the Western Governors Association also has declared that action to reduce GHG emissions can have significant economic and environmental benefits for Arizona and other Western States, including increased energy efficiency, improved air quality, cost savings, job growth, increased revenues, and reduced water pollution; and

**WHEREAS,** the Climate Change Advisory Group (CCAG), established by Executive Order 2005-02, has submitted a Climate Change Action Plan to the Governor that contains numerous recommendations for addressing and reducing GHG emissions in Arizona; and

**WHEREAS,** in addition to substantially reducing Arizona's GHG emissions, it is estimated that the CCAG's recommendations could result in overall net economic cost savings in Arizona of more than $5.5 billion between 2007 and 2020, with additional significant cost savings between 2020 and 2040;

**NOW THEREFORE,** I, Janet Napolitano, Governor of the State of Arizona, by virtue of the powers vested in me by the Constitution and laws of this State, do hereby order:

1. As recommended by the CCAG, it shall be the goal of the State of Arizona to reduce GHG emissions in Arizona to its 2000 emissions level by 2020 and to 50 percent below its 2000 emissions level by 2040. Furthermore, I direct the Climate Change Executive Committee to explore reaching 2000 emissions level by the Arizona Centennial, 2012.

Executive Order 2006-13
Page 2

2. The Climate Change Executive Committee is hereby established and charged with recommending strategies to the Governor for implementing recommendations in the Climate Change Action Plan in consultation with the Governor's Office.

3. The Climate Change Executive Committee shall be organized and coordinated by the Arizona Department of Environmental Quality (ADEQ) and shall be chaired by the Director of ADEQ.

4. The Climate Change Executive Committee shall be appointed by, and serve without compensation at the pleasure of, the Governor and shall consist of the following individuals or their designees:

    a. The Director of Arizona Department of Administration;
    b. The Director of the Department of Agriculture;
    c. The Director of the Department of Commerce;
    d. The Director of ADEQ;
    e. The Director of the Department of Housing;
    f. The Director of the Department of Insurance;
    g. The Director of the Department of Real Estate;
    h. The Director of Arizona Department of Transportation;
    i. The Director of the Department of Water Resources;
    j. The Director of Arizona Department of Weights and Measures;
    k. The Director of the Residential Utility Consumer Office;
    l. The Director of Arizona Game and Fish;
    m. The Commissioner of the State Land Department;
    n. The State Forester;
    o. The Director of the Arizona Department of Revenue;
    p. The Director of the Office of Strategic Planning and Budgeting;
    q. One Representative from the Arizona Corporation Commission; and
    r. Other members as the Governor may hereafter appoint.

5. State Executive Branch agencies shall endeavor to assist the State in reducing its GHG emissions, including by doing the following (notations refer to specific CCAG recommendations):

    a. The Arizona Department of Environmental Quality (ADEQ) shall develop a GHG emissions reporting mechanism (CC-2) and shall work with other Western states to establish a GHG registry to enable tracking, management, crediting and baseline protection for entities in Arizona that reduce GHG emissions (CC-3);

    b. In consultation with the Arizona Department of Transportation (ADOT), ADEQ shall adopt and implement the Clean Car Program to reduce GHG emissions from passenger vehicles (TLU-1);

Executive Order 2006-13
Page 3

   c. The Arizona Department of Weights and Measures (ADWM) and ADEQ shall develop standards for neat biodiesel (B100), biodiesel blends, and ethanol blends sold in Arizona (TLU-5);

   d. In consultation with ADEQ, ADOT shall implement a pilot program to allow designated hybrid motor vehicles to drive in high-occupancy-vehicle lanes on roadways, consistent with the provisions of A.R.S. § 28-737 and § 28-2416 (TLU-7);

   e. In compliance with requirements to be developed by the Arizona Department of Administration (ADOA) in consultation with ADEQ, beginning January 1, 2007, all state agencies, boards and commissions shall purchase only vehicles that are hybrids, meet low-GHG emissions standards, or use E-85 fuel, biofuels or other low-GHG alternative fuels (TLU-13), with the goal that by January 1, 2010, all State vehicles shall be hybrids, meet low-GHG emissions standards, or use E-85 fuel, biofuels or other low-GHG alternative fuels (TLU-13). Certain state law enforcement vehicles, including "pursuit-rated" and covert vehicles, shall be exempt from these requirements.



**IN WITNESS WHEREOF,** I have hereunto set my hand and caused to be affixed the Great Seal of the State of Arizona.

**GOVERNOR**

**DONE** at the Capitol in Phoenix on this 7th day of September in the Year Two Thousand and Six and of the Independence of the United States of America the Two Hundred and Thirty-First.

**ATTEST:**

**SECRETARY OF STATE**

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 32



# COLORADO CLIMATE ACTION PLAN

## A STRATEGY TO ADDRESS GLOBAL WARMING

GOVERNOR BILL RITTER, JR.

NOVEMBER 2007

# COLORADO CLIMATE ACTION PLAN

**A STRATEGY TO ADDRESS GLOBAL WARMING**

## A Message from Governor Bill Ritter, Jr.



Global warming is our generation's greatest environmental challenge. The scientific evidence that human activities are the principal cause of a warming planet is clear, and we will see the effects here in Colorado. But the seeds of change are also here in Colorado, in our scientific and business communities, and in each of us individually.

This Colorado Climate Action Plan is a call to action. It sets out measures that we in our state can adopt to reduce emissions of greenhouse gases by 20 percent by 2020, and makes a shared commitment with other states and nations to even deeper emissions cuts by 2050.

Why is this important?  For Colorado, global warming will mean warmer summers and less winter snowpack. The ski season will be weeks shorter. Forest fires will be more common and more intense. Water quality could decline, and the demand for both agricultural and municipal water will increase even as water supplies dwindle.

Can Coloradans really make a difference?  I believe we can, and that we have a moral obligation to try. In setting and achieving our climate action goals we will show leadership as a state, engage with neighboring states in a regional effort, and call upon the federal government to take strong actions on national initiatives.

This plan has been developed over several months, in a collaborative process, including business and community leaders, conservationists, scientists and concerned citizens.  It pushes energy efficiency measures that will reduce demand for electrical energy and lower utility bills; builds on the state's recently expanded Renewable Portfolio Standard and looks for ways to develop our renewable energy supplies even further; includes an ambitious goal for making cars and trucks run more cleanly and efficiently while saving consumers money at the pump; and provides an exciting new opportunity for rural Colorado by creating economic incentives for major utilities and industries to pay farmers and ranchers to sequester more carbon in the soil.

The plan includes a strong plea, voiced also by the bipartisan Western Governors' Association, for an accelerated round of federal investments to deploy clean coal technologies.

Its success depends on everyone doing his or her part.  We can reduce global warming and keep our economy strong and vibrant.  This is an exciting time for Colorado as we look toward an expanded New Energy Economy with new jobs, new businesses and new investments.

If we do this right, we can turn the challenge into opportunity for Colorado's workforce. Insulating homes and buildings, establishing wind farms, building solar arrays, and constructing clean coal power plants will demand thousands of trained workers. Stepping up energy conservation and developing new sources of clean, renewable energy will grow the New Energy Economy in Colorado. These benefits will radiate across the state, from coal mining areas in western Colorado to farms in eastern Colorado, and from Fort Collins to Pueblo, where urban areas have an enormous need for efficiency retrofitting in homes and buildings.

If we don't do it right, in Colorado, across America and around the globe, our children and grandchildren will inherit a much diminished world.

I urge all Colorado residents and communities to join in as we take these bold steps toward preserving a livable climate for future generations.

 Sincerely,

*Bill Ritter Jr.*

Bill Ritter, Jr.
Governor

# COLORADO CLIMATE ACTION PLAN

**A STRATEGY TO ADDRESS GLOBAL WARMING**

## TABLE OF CONTENTS



Credit: Brian Gadbury / CTO



Credit: Eric Wunrow / CTO



Executive Summary ........................................................................................... 3
Thank You ........................................................................................................ 5
This Is a Living Document ............................................................................... 5
I. Introduction ................................................................................................ 6
    A. Understanding Climate Change ............................................................ 6
    B. Impacts of Climate Change .................................................................. 7
        on Colorado, Present and Future
    C. Turning Adversity to Opportunity ....................................................... 8
II. Colorado's Emissions Profile ..................................................................... 9
III. Greenhouse Gas Emissions Reduction Goal ........................................... 10
IV. Building from a Strong Foundation ......................................................... 11
V. The Course Forward: Bridging Strategies ............................................... 12
VI. Climate Initiatives ................................................................................... 13
    A. Agricultural Offset Market .................................................................. 13
    B. Transportation .................................................................................... 14
        1. Clean Cars ..................................................................................... 14
        2. Other Measures ............................................................................. 15
    C. Electric Energy ................................................................................... 15
        1. Providing Reliable and Sustainable Energy Supplies ................... 15
        2. Efficiency ...................................................................................... 16
        3. Renewable Energy ......................................................................... 17
        4. Clean Coal ..................................................................................... 18
        5. Investor Owned Utilities ............................................................... 19
        6. Municipal Utilities and Rural Electric Coops ............................... 19
        7. New Power Plants .......................................................................... 20
        8. A Unified Effort ............................................................................ 20
    D. Natural Gas ........................................................................................ 20
    E. Solid Waste and Recycling .................................................................. 21
    F. Greenhouse Gas Emissions Reporting ................................................. 22
    G. Leading by Example ........................................................................... 22
    H. The Western Climate Initiative ........................................................... 24
    I. Climate Education and the New Energy Economy ............................... 25
VII. Adaptation .............................................................................................. 27
    A. Water .................................................................................................. 27
    B. Forests ................................................................................................ 28
VIII. Future Energy Technologies and Uncertainties ................................... 29
IX. Climate Advisory Panel .......................................................................... 30
X. A Call for Legislative Action ................................................................... 31
XI. Appendix, 2007 Legislative Achievements Related to Climate Change ___ 32

2

# COLORADO CLIMATE ACTION PLAN

**A STRATEGY TO ADDRESS GLOBAL WARMING**

## EXECUTIVE SUMMARY



Colorado's greenhouse gas emissions are steadily climbing, contributing to a worldwide climate change crisis. Our emissions in 2005 were 35 percent higher than in 1990 and under a business-as-usual scenario, are projected to grow to 81 percent above 1990 levels by the year 2020.



Our goal is to mobilize Colorado's businesses, governments and citizens in an effort to first slow and halt the increase and then reduce emissions to 20 percent below 2005 levels by 2020. We believe that goal is achievable, that it will make a material difference, and that it will put us on the path to making the even steeper emissions reductions that the world's scientists say we must achieve by the middle of this century.

These are real challenges for the State of Colorado. But by fully engaging in the New Energy Economy – by training thousands of workers to improve energy efficiency in our homes, stores and factories, and training thousands of others to build wind farms, solar facilities and geothermal plants across the state, and by aggressively pursuing new technologies for using our abundant coal resources cleanly – we can reduce our emissions, create jobs and build more sustainable communities.

**Colorado state government has three important roles to play in facing the climate change challenge:**
- Enact "bridge strategies" that immediately reduce greenhouse gas emissions while we pursue technologies to generate cleaner energy.
- Provide leadership to ensure that long-term solutions, such as renewable energy and clean coal technologies, are fully developed and broadly implemented.
- Prepare the state to adapt to those climate changes that cannot be avoided.

*Specifically, Colorado will…*

**Reduce Greenhouse Gas Emissions**
- By 2020, reduce greenhouse gas emissions by 20 percent below 2005 levels.
- By 2050, reduce greenhouse gas emissions by 80 percent below 2005 levels.

**Recognize Agriculture as Part of the Solution**
- Encourage agricultural carbon sequestration and reductions of emissions by leading the establishment of a carbon credit market.
- Provide revenues to farmers and ranchers for switching to management practices that sequester carbon in soils and reduce greenhouse gas emissions.
- Encourage the energy sector to offset its emissions by buying carbon offset credits from farmers and ranchers in Colorado and the West.



**Transportation**
- Reduce emissions from passenger vehicles by adopting greenhouse gas emissions standards.
- Expedite broadband access statewide to expand teleworking and teleconferencing options for business, education and government.
- Increase clean transportation options for state employees through the Greening of State Government program.
- Recognize community excellence in land use and transportation in the Governor's Annual Awards of Excellence in Sustainability.





3

# COLORADO CLIMATE ACTION PLAN

**A STRATEGY TO ADDRESS GLOBAL WARMING**

## VI. CLIMATE INITIATIVES (CONT.)



**3.** State government would promote a market to bring together carbon offset buyers and sellers. Existing markets, such as the Chicago Climate Exchange, may be suitable, or we may create a regional market-trading platform. The state will also work with public and private institutions to establish a regional carbon credit bank, where farmers and ranchers could deposit carbon offset credits that could be packaged into larger portfolios for purchasers.



**4.** With measurable greenhouse gas reductions in hand, farmers and ranchers could offer carbon credits for sale on this offset market. A third party verification system would be necessary to ensure that the carbon sequestration or emissions reduction is actually taking place. For example, a third party verifier would confirm that the farmers who sold credits for reducing tillage did, in fact, change their farming practices to minimize soil disturbance.

The success of our offset program will depend on the market process being transparent and verifiable. The specified changes in farm management practices must be in addition to greenhouse gas mitigation efforts that would otherwise occur. The offset measures must also be verifiable, permanent and enforceable, resulting in a solid, reliable "carbon offset currency" for buyers and sellers.

We are excited about this new offset market program because its benefits extend beyond greenhouse gas mitigation. A functioning agricultural offset market will help preserve our farms and ranches, improve soil fertility, reduce soil erosion, and improve air and water quality. Because an agricultural offset market offers a win-win solution to reducing greenhouse gases in Colorado and our region, it is a centerpiece of this Climate Action Plan.

But we also recognize there is a lot of work ahead to get this program up and running. We look forward to working with the General Assembly, our higher education research institutions such as Colorado State University, trade groups such as the Rocky Mountain

Farmers Union, farmers and ranchers themselves, and neighboring state governors to establish this market.

*Immediate action:*
*The Governor will issue an Executive Order directing the Colorado Department of Agriculture and the Colorado Department of Public Health and Environment to develop a market mechanism and accompanying carbon accounting mechanisms for the transfer of emission offsets in accordance with established timelines. To this end, we will develop partnerships with public and private entities, many of which are currently engaged in various aspects of carbon trading.*

### B. TRANSPORTATION

The transportation sector — cars, trucks, trains and construction equipment — represents 23 percent of total greenhouse gas emissions in Colorado. We cannot fight climate change if we do not address emissions in this sector. Also, the transportation sector is 90 percent dependent on oil and oil products, most of which come from foreign supplies. The rising cost of petroleum products adds to the imperative to address solutions in this sector. There are a number of initiatives that, over time, we will take in this sector, but the greenhouse gas emissions standards for cars and light trucks is the centerpiece of our plan for the transportation sector in this initial phase of our Climate Action Plan.

### 1. Clean Cars

In the absence of federal action, state governments are taking direct action to ensure that automakers reduce greenhouse gas emissions from new automobiles. To date, 16 states have adopted new regulations to require reductions in emissions of greenhouse gases from new cars and trucks. The regulations are structured in a way that allows every model to comply, so American drivers will still be able to choose from a wide range of vehicles.

# COLORADO CLIMATE ACTION PLAN

**A STRATEGY TO ADDRESS GLOBAL WARMING**

## VI. CLIMATE INITIATIVES (CONT.)





Under this new program, greenhouse gas emissions from new passenger vehicles in Colorado would significantly decrease by 2020. In addition, these new standards will also reduce emissions of the pollutants that are causing high ozone levels in Colorado's Front Range cities. It will be at least several years before these new regulations, requiring automobile manufacturers to meet the standards for vehicle sales in Colorado, take effect. When that time comes, these regulations will preserve consumers' freedom of choice when they decide to buy a new vehicle.

Colorado will join those states, which together constitute over 40 percent of the U.S. market, in adopting greenhouse gas emission standards for passenger vehicles.

The 16 states that have adopted or committed to adopt vehicle emissions standards are Arizona, California, Connecticut, Florida, Maine, Maryland, Massachusetts, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Utah, Vermont and Washington.



*Immediate Action:*
*The Governor will issue an Executive Order directing the Air Quality Control Division in the Department of Public Health and Environment to propose clean car standards to the Air Quality Control Commission within the next 12 to 24 months. The Governor will instruct the Division and the Commission to ensure that the regulations will preserve consumer choice.*

### 2. Other Transportation Measures
According to the U.S. Environmental Protection Agency, the number of vehicle miles driven by Coloradans increased by 69 percent from 1990 to 2004, reaching nearly 46 billion miles a year. This is the third fastest growth rate in the nation. While Coloradans will continue to drive their cars and trucks to work, to shop, and to enjoy the mountains, we need to find ways to reduce the emissions associated with all those vehicle miles traveled.

We will also look for ways to help Coloradans do all of those things while driving less, such as rapid implementation of FasTracks in the Denver metropolitan area.

We have begun work through the Greening of State Government initiative to reduce the percentage of state workers who drive alone to work. We will measure and report progress on this effort, demonstrating what is possible for a 50,000-person workforce. This includes providing state employees an expanded array of options, such as use of flex time, telecommuting and carpooling and vanpooling options.

We recently established the state's first Innovation Council to spur advances in Colorado's technology sector. Broadband access across the state will also help expand teleworking, teleconferencing and transportation options for workers across the state. We recognize the integral link between transportation and land use and the importance of community and neighborhood design to enable residents and workers to more easily get where they want to go without using their cars. Community excellence in land use and transportation will be recognized in the Governor's Annual Awards program.

### C. ELECTRIC ENERGY
### 1. Providing Reliable and Sustainable Energy Supplies
In 2005, total emissions from the utility sector amounted to 36 percent of $CO_2$ emissions in Colorado. Clearly, the state cannot do its part in addressing the problem of climate change unless we work with utilities large and small to reduce their $CO_2$ emissions.

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 33

# STATE OF FLORIDA
## OFFICE OF THE GOVERNOR
## EXECUTIVE ORDER NUMBER 07-127

**Establishing Immediate Actions to Reduce Greenhouse Gas Emissions within Florida**

**WHEREAS,** with nearly 1,350 miles of coastline and a majority of citizens living near that coastline, Florida is more vulnerable to rising ocean levels and violent weather than any other state; and

**WHEREAS,** global climate change is one of the most important issues facing the State of Florida this century; and

**WHEREAS,** Florida is the second fastest growing state in the union with respect to the annual increase of new greenhouse gas emissions; and

**WHEREAS,** immediate actions are available and required to reduce emissions of greenhouse gases within Florida; and

**WHEREAS,** efforts are underway at the national level to begin addressing greenhouse gas emissions; and

**WHEREAS**, Florida has committed to becoming a leader in reducing emissions of greenhouse gases which are causing changing Earth's climate; and

**WHEREAS**, Florida, together with international leaders and experts, is hosting the Serve to Conserve Climate Change Summit on July 12 and 13, 2007 in Miami, Florida;

**NOW, THEREFORE, I, CHARLIE CRIST,** as Governor of Florida, in obedience to my solemn constitutional duty to take care that the laws be faithfully executed, and pursuant to the Constitution and laws of the State of Florida, do hereby promulgate the following Executive Order, to take immediate effect:

Section 1.  I hereby establish greenhouse gas emission reduction targets for the State of Florida as follows:  by 2017, reduce greenhouse gas emissions to 2000 levels; by 2025, reduce greenhouse gas emissions to 1990 levels; by 2050, reduce greenhouse gas emissions by 80% of 1990 levels.

Section 2.  I hereby direct the following actions by members of my Administration in order to produce immediate reductions in greenhouse gas emissions within Florida;

1. The Secretary of Environmental Protection shall immediately develop rules as authorized under Chapter 403, Florida Statutes, to achieve the following:

   - Adoption of a maximum allowable emissions level of greenhouse gases for electric utilities in the State of Florida.  The standard will

require at minimum, three reduction milestones as follows:  by 2017, emissions not greater than Year 2000 utility sector emissions;  by 2025, emissions not greater than Year 1990 utility sector emissions;  by 2050, emissions not greater than 20% of Year 1990 utility sector emissions (i.e., 80% reduction of 1990 emissions by 2050);

- Adoption of the California motor vehicle emission standards in Title 13 of the California Code of Regulations, effective January 1, 2005, upon approval by the U.S. Environmental Protection Agency of the pending waiver, which includes emission standards for greenhouse gases, submitted by the California Air Resources Board; and

- Adoption of a statewide diesel engine idle reduction standard.

2.  The Secretary of Community Affairs shall immediately:

- Convene the Florida Building Commission for the purpose of revising the Florida Energy Code for Building Construction to increase the energy performance of new construction in Florida by at least 15% from the 2007 Energy Code.  The Commission should consider incorporating standards for appliances and standard lighting in the Florida Energy Code.  Target implementation date for the revised Florida Energy Code for Building Construction is January 1, 2009;

- Initiate rulemaking of the Florida Energy Conservation Standards, Chapter 9B-44, Florida Administrative Code, with an objective to increase the efficiency of applicable consumer products authorized

under s. 553.957, Florida Statutes, by 15% from current standards for
implementation by July 1, 2009.


Section 3. I hereby request the Florida Public Service Commission to take the
following actions for the electric utility sector in order to open the market to
clean, renewable energy technologies, thus avoiding future greenhouse gas
emissions:

- Not later than September 1, 2007, initiate rulemaking to require that
  utilities produce at least 20% of their electricity from renewable
  sources (Renewable Portfolio Standard) with a strong focus on solar
  and wind energy;

- Not later than September 1, 2007, initiate rulemaking to reduce the
  cost of connecting solar and other renewable energy technologies to
  Florida's power grid by adopting the Institute of Electrical and
  Electronics Engineers (IEEE) Standard 1547 for Interconnecting
  Distributed Resources with Electric Power Systems as the uniform
  statewide interconnection standard for all utilities; and

- Not later than September 1, 2007, initiate rulemaking to authorize a
  uniform, statewide method to enable residential and commercial
  customers who generate electricity from on-site renewable
  technologies of up to 1 megawatt in capacity to offset their
  consumption over a billing period by allowing their electric meters to
  turn backwards when they generate electricity (net metering).

Section 4.  All state agencies departments under the direction of the Governor are hereby directed, and all other state agencies are hereby requested, to assist those carrying out the directions in this Executive Order.

**IN TESTIMONY WHEREOF**, I have hereunto set my hand and have caused the Great Seal of the State of Florida to be affixed at Tallahassee, The Capitol, this 13th day of July, 2007



_____
GOVERNOR

ATTEST:

_____
SECRETARY OF STATE

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 34



# Iowa Plan for Energy Independence
### Charting Iowa's Course in the New Energy Economy
### December 2007

Submitted by the Iowa Office of Energy Independence

www.energy.iowa.gov

# Table of Contents

**Letter from the Governor and Lieutenant Governor**                    **3**

**Letter from the Director of the Office of Energy Independence**       **4**

**Letter from the Chair of the Power Fund Board**                       **5**

**Acknowledgements**                                                    **6**

**Executive Summary**                                                   **7**

**Introduction to Energy Independence in Iowa**                         **11**

**Vision, Mission, and Guiding Principles**                             **18**

**Energy Independence Goals and Strategies**                            **19**

**Policy Recommendations**                                              **24**

**Implementing the Iowa Plan for Energy Independence**                  **27**

**Methodology and Input for Plan Development**                          **29**

**Summary of Public Input**                                             **30**

**Appendix: Energy Information Report**                                 **36**



# OFFICE OF THE GOVERNOR

CHESTER J. CULVER
GOVERNOR

PATTY JUDGE
LT. GOVERNOR

December 14, 2007

Fellow Iowans:

It is our goal to make Iowa the national leader in energy efficiency, and sustainable energy. We want to make Iowa what we have called the Silicon Valley of the Midwest with respect to our new energy economy.  Since taking office in January 2007, we have made great strides toward this goal.

We have announced plans for the nation's first cellulosic bio-refinery, which will be able to extract ethanol from the whole corn plant, not just the kernel.

We have made renewable fuels more accessible to Iowans by opening more E85 pumps across the state, converting the state fleet to all flex-fuel vehicles, and opening distribution lines for bio-diesel.

And we have built upon our leadership in wind energy throughout the state, by recruiting and attracting new turbine manufacturers, and wind energy producers to Iowa. In doing so, we have taken steps to create and support thousands of "green collar" jobs right here in Iowa.

Now, we are undertaking another ambitious yet attainable goal – one of energy independence by the year 2025. Today, we are proud to unveil the steps we will take, with the *Iowa Plan for Energy Independence*.

Energy independence is essential for Iowa's environment and our economy. Our rich tradition of innovation has shown us that Iowa truly is a state of unlimited opportunity –  now, more than ever. With the creation of the Office of Energy Independence and the Iowa Power Fund, we have committed our state government to dedicated leadership in this effort, and to making Iowa the renewable energy capital of the country.

We challenge every Iowan to be a part of the "21st Century Renewable Energy Expedition." Together, we will create a future of energy independence for all Iowans.

Sincerely,

Chester J. Culver
Governor

Patty Judge
Lieutenant Governor





# OFFICE OF ENERGY INDEPENDENCE

CHESTER J. CULVER GOVERNOR                                        ROYA STANLEY
PATTY JUDGE LT. GOVERNOR                                              DIRECTOR

December 14, 2007


Dear Fellow Iowans:

The State of Iowa has a long and proud tradition in agriculture and manufacturing. These industries have come together in the last two decades to distinguish Iowa as a leader in renewable energy and energy efficiency. In more recent years, Iowans have been at the forefront of creating new energy industries, of performing cutting edge energy research, and key educational programs.

In May 2007, Governor Culver, Lieutenant Governor Judge, and the State Legislature created the Office of Energy Independence and the Iowa Power Fund to build upon the successes of the state. The Office and the Fund were created to help coordinate Iowa's effort for expanding renewable energy production and energy efficiency. Paired together, the Office and the Fund are extremely powerful tools for leveraging a vibrant energy economy in Iowa that thrives on new industry, research and education.

The Office of Energy Independence is tasked with marking the path to lead Iowa into a new era of energy independence by 2025. The goal is bold, and it is achievable. In Iowa, where the state's natural resources and its industrious people have always been essential to our successes, we once again call upon these core elements to develop new energy supplies while conserving energy.

Preserving our links to the land and natural resources will be fundamentally important in this new era. We need to conserve our water, air, and soil while developing our energy resources for the future. Today, we move forward and expand upon our opportunity to lead the nation in renewable energy development, energy efficiency practices, and in achieving energy independence in the 21st Century.


Sincerely,

*Roya Stanley*

Roya Stanley
Director
Office of Energy Independence

# Executive Summary

Iowa's first annual Energy Independence Plan kicks off a new era of state leadership in energy transformation. Supported by Governor Chet Culver, Lieutenant Governor Patty Judge, and the General Assembly, the Office of Energy Independence was established in 2007 to coordinate state activities for energy independence. The commitment of the state to lead by example creates opportunities for state government to move boldly to achieve its goals, track its progress, measure the results, and report the findings.

In moving to energy independence, the active engagement of every Iowan will be sought as the state works in partnership with others in achieving the goals. While leading ongoing efforts within the state, Iowa can also show the nation how to effectively address the critical, complex challenges of shifting to a secure energy future of affordable energy, cost-effective efficiency, reliance on sustainable energy, and enhanced natural resources and environment.

In accordance with House File 918, "the plan shall provide cost effective options and strategies for reducing the state's consumption of energy, dependence on foreign sources of energy, use of fossil fuels, and greenhouse gas emissions. The options and strategies developed in the plan shall provide for achieving energy independence from foreign sources of energy by the year 2025."

Energy independence is a term which means different things to different people. We use the term to mean that we are charting our own course in the emerging energy economy. Iowa can chart its own course by taking advantage of its resources: a well-educated population and an abundance of natural resources, including rich soil, abundant surface and underground water, and consistent wind patterns. Charting our own course also includes further developing our in-state industry, capturing renewable energy, and working toward improved energy efficiency. Charting our own course will allow Iowa to manage its economic destiny while protecting our environment, while creating new, "green collar" industries in every corner of Iowa.

Today Iowa is in a remarkable position to capitalize on the current situation globally and at home. Energy drives the economy and has impacts on the environment, undeniable links that are integral for energy security and independence. With the resources available within the state, the combination of significant global changes in energy and research leading to new technologies that continue to drive down the costs of sustainable energy, Iowa can take bold strides toward the goal of energy independence by 2025.

The Office of Energy Independence, with able assistance from hundreds of individuals, organizations, agencies, and advisors, presents its plan for Iowa's Energy Independence.

## Vision

Iowans creating an economically viable and environmentally sound energy future.

## Mission

To achieve a clean and sustainable energy future by
- Providing leadership through education, research, planning, and investment
- Developing policies and resources to produce market transformation

## Guiding Principles

- The state is committed to be a leader in ensuring Iowa's energy future.

- All Iowans are responsible for ensuring Iowa's energy future.

- Iowa values, economic, political, and market factors demand that Iowa is aggressive and innovative in ensuring Iowa's energy future.

- Iowa's policies and initiatives strengthen the economy, improve the environment, and ensure energy security.

## Goals and Strategies

1) Engage all Iowans in achieving the state's energy goals
   a. *Provide active state leadership in implementing energy efficient policies and practices.*
   b. *Conduct outreach, education, and promotion activities for participation in Iowa's new energy economy.*
   c. *Incent and recognize model energy communities, corporations, nonprofits, and public entities.*
   d. *Challenge Iowans to take individual responsibility to increase energy efficiency, decrease usage, and improve the environment.*
2) Achieve greater energy efficiency
   a. *Develop public policy to improve energy efficiency in the public sector.*
   b. *Develop policies, tools, resources, and financing to optimize energy efficiency for all commercial, residential, nonprofit, and public entities.*
   c. *Incent the commercial, industrial, residential, nonprofit, and public sectors to decrease energy usage.*
   d. *Adopt guidelines for state and regional planning of public transit, public trails, and the transportation of goods.*
3) Develop, encourage, and use sustainable and secure energy
   a. *Establish policies to significantly increase the proportion of sustainable energy use in Iowa.*
   b. *Provide tools, resources, and financing to support the development and growth of sustainable energy.*

**Iowa Plan for Energy Independence**

---

      c. *Create infrastructure to support distribution, transmission, and utilization of sustainable energy.*

      d. *Establish a diverse sustainable energy portfolio that ensures economic growth, energy security, and environmental integrity.*

4) Improve Iowa's natural resources and environment

      a. *Establish energy policies, tools, resources, and financing to reduce negative impacts on the environment.*

      b. *Aggressively reduce greenhouse gas emissions in cooperation with government at all levels as well as commercial, residential, and nonprofit entities.*

5) Ensure that energy is affordable

      a. *Develop policies, tools, resources, and financing to ensure affordable energy access for market transformation.*

      b. *Adopt energy policies and programs to ensure affordability for Iowa's low-income, disabled, and elderly populations.*

## Policy Recommendations

### *Iowa State Government Leading by Example*

- Require all existing state-owned buildings to have energy audits and implement energy efficiency retrofits to serve as effective energy management models for the private sector. All new state buildings will meet or exceed high energy efficiency performance standards.

- Create opportunities for state employees to reduce overall miles commuted through telecommuting, ride share, and public transit.

- In cooperation with the appropriate state agencies, map priorities for transmission, pipeline, distributed generation, road, transit, rail, trail, and other infrastructure investments needed to enhance the state's energy independence efforts.

### *Other Policy Recommendations for Iowa*

- Set numeric goals to promote and achieve all cost-effective energy efficiency measures, including attention to affordability issues.

- Direct energy providers to increase energy efficiency efforts, including education.

- Incent and require energy providers to increase the use and supply of renewable energy.

- Improve energy efficiency of existing buildings and new construction through implementation and enforcement of energy codes, and provide incentives for energy efficient construction that exceeds the required efficiencies.

**Iowa Plan for Energy Independence**

- Adopt a statewide energy efficiency building labeling system for residential, commercial, and industrial complexes.

- Inform energy decisions using a statewide integrated resource planning model.

- Set standards to reduce greenhouse gas emissions 80% by 2050 through multiple strategies.

- Include greenhouse gas emissions as a criterion for the DNR to issue air permits.

- Encourage Iowa's production of cost-effective renewably-generated electricity.

- Accelerate the infrastructure development and use of renewable fuels for all transportation in Iowa.

- Join 16 states that have adopted or are considering adopting the California emission standards for passenger vehicles.

- Establish a statewide public education, promotion, and branding initiative to create universal acceptance of the value, use, and return on investment of energy efficiency and renewable energy.

- Establish and implement a recognition program for model energy communities, corporations, non-profits, and public entities.

- Encourage construction of electric transmission for the continued development of renewable resources.

- Encourage research and commercialization of new renewable energy, renewable fuels, and energy efficiency initiatives.

## Implementation and Update

The Office of Energy Independence (OEI) will be responsible for implementing the Iowa Plan for Energy Independence. OEI will develop an implementation plan that outlines specific activities to accomplish each strategy and timeframes for completion. The activities to carry out the intent of the mission, goals, and strategies contained in the Plan will provide a clear map to begin ensuring Iowa's energy future. Activities of the Office of Energy Independence in its first year of operation will be focused on implementing the Plan and continuing to collect baseline data and complete projections that will inform planning and activities of the OEI and the Power Fund.

A key component of the implementation plan will be the identification of performance measures to track progress in achieving the strategies and, ultimately, the goals set forth for energy independence. Performance measures will provide a basis for annual review and update of the plan.

An annual review of the Plan and progress made toward achieving Iowa's energy goals will provide the Office of Energy Independence with a venue through which it can provide the Governor, Lieutenant Governor, and the General Assembly an opportunity to evaluate progress toward achieving goals.

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 35

### Friday, December 14, 2007

**Office of Energy Independence Releases Iowa's "Plan For Energy Independence"**

***Plan Details Goal for Energy Independence by 2025***

DES MOINES – Today, the Office of Energy Independence released Iowa's first-ever "Plan for Energy Independence." The plan, which was required in legislation signed by Governor Chet Culver creating the Power Fund and Iowa Office of Energy Independence, provides a path for achieving energy independence for the state of Iowa by 2025.

"It is our goal to make Iowa the national leader in energy efficiency, and sustainable energy," said Governor Culver. "Since taking office in January 2007, we have made great strides toward this goal. We have announced plans for the nation's first cellulosic bio-refinery, we have made renewable fuels more accessible to Iowans by opening more E85 pumps across the state, and we have dramatically grown the wind energy industry throughout the state, by recruiting and attracting new turbine manufacturers, and wind energy producers to Iowa. Now, we are undertaking another ambitious, yet attainable goal – one of energy independence by the year 2025.

"I want to thank Roya Stanley and her team at the Office of Energy Independence for the long hours and thoughtful work put into Iowa's first-ever 'Plan for Energy Independence.'"

In accordance with House File 918, signed into law by Governor Culver in May 2007, "the plan shall provide cost effective options and strategies for reducing the state's consumption of energy, dependence on foreign sources of energy, use of fossil fuels, and greenhouse gas emissions. The options and strategies developed in the plan shall provide for achieving energy independence from foreign sources of energy by the year 2025."

"The Office of Energy Independence is tasked with marking the path to lead Iowa into a new era of energy independence by 2025," said Office of Energy Independence Director Roya Stanley. "The goal is bold, and it is achievable. In Iowa, where the state's natural resources and its industrious people have always been essential to our successes, we once again call upon these core elements to develop new energy supplies while conserving energy."

Iowa's first annual Energy Independence Plan kicks off a new era of state leadership in energy transformation. The Office of Energy Independence was established in 2007 to coordinate state activities for energy independence. The commitment of the state to lead by example creates opportunities for state government to move boldly to achieve its goals, track its progress, measure the results, and report the findings.

According to Chairman of the Iowa Power Fund Fred Hubble, "Since our first meeting on September 26, 2007 the Board has met six times. In those meetings members established committees, developed rules and applications, as well as approved this plan. This plan is a culmination of efforts from the Iowa Office of Energy Independence, various State Agencies, the Power Fund Board, and, most importantly, from Iowans across the state."

**<u>HIGHLIGHTS OF THE "IOWA PLAN FOR ENERGY INDEPENDENCE" INCLUDE:</u>**

- Strengthen the economy, improve the environment and ensure our energy security.
- Seek to engage all Iowans in achieving our energy goals.
- Require all existing state-owned buildings to have energy audits and implement energy efficiency retrofits to serve as effective energy management models for the private sector. All new state buildings will meet or exceed high energy efficiency performance standards.
- Create opportunities for state employees to reduce overall miles commuted through telecommuting, ride share, and public transit.
- Improve energy efficiency of existing buildings and new construction through implementation and enforcement of energy codes, and provide incentives for energy efficient construction that exceeds the required efficiencies.
- Encourage Iowa's production of cost-effective, renewably-generated electricity.
- Accelerate the infrastructure development and use of renewable fuels for all transportation in Iowa.

The complete "Iowa Plan for Energy Independence" can be found at:
**http://www.energy.iowa.gov/OEI/docs/Final_Plan.pdf**

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 36





- **Health System Reform**
- **Education**
- **Environment**
- **Economic Development**

Home | Governor's News Releases | Utah Energy Efficiency Strategy Released to Governor and Utah Lawmakers

## Utah Energy Efficiency Strategy Released to Governor and Utah Lawmakers

Salt Lake City - Dianne Nielson, Governor Jon Huntsman's Energy Advisor, today accepted recommendations on the Governor's behalf for new policies and programs to increase energy efficiency that could save consumers and businesses in Utah more than $7 billion. Implementation of these recommendations statewide would reinforce the energy efficiency goal established by the Governor in April 2006, to increase energy efficiency statewide 20 percent by 2015. These and other findings are part of the Utah Energy Efficiency Strategy released today by a team of researchers under the leadership of the Southwest Energy Efficiency Project (SWEEP) and Utah Clean Energy (UCE).

"The Utah Energy Efficiency Strategy provides a blueprint for achieving enormous energy savings, substantial economic benefits and reduced pollutant emissions," Governor Huntsman said. "It demonstrates that aggressively pursuing energy efficiency is a winning strategy for Utah's citizens, businesses, government and environment. I look forward to partnering with lawmakers to help reap these savings."

The Utah Energy Efficiency Strategy consists of 23 policy options for reducing electricity, natural gas, gasoline, or diesel fuel consumption through greater energy efficiency. The options include expanding utility energy efficiency programs, upgrading building energy codes, adopting clean car standards for new cars and light trucks, and using energy pricing to encourage reduced energy demand. The Strategy covers diverse segments of Utah's economy such as construction, industry, local and state governments and the general public. Eleven of the policy options are designated highest priority.

"The Utah Energy Efficiency Strategy shows that energy efficiency is a major energy resource, even in an energy-producing state with relatively low energy prices," said Dianne Nielson, Governor Huntsman's Energy Advisor. "It makes sense to maximize energy efficiency in our homes, workplaces, and vehicles."

"Utah's aggressive energy efficiency Strategy serves as an example of how environmental protection and economic savings can go hand in hand" said Bob Meyers, principal deputy assistant administrator for EPA's Office of Air & Radiation.

"By implementing the policies in the Utah Energy Efficiency Strategy, it is possible to increase the efficiency of the main forms of energy consumed in state 20 percent by 2015 thereby achieving Gov. Huntsman's ambitious goal. Doing so would save over 3 billion gallons of water per year by 2015, reduce emissions contributing to global warming, and save consumers and businesses billions of dollars," said Howard Geller, Executive Director of SWEEP and lead author of the Strategy.

"Given the tremendous and wide-ranging benefits, we urge policymakers in Utah to make a strong commitment to increasing energy efficiency," noted Sarah Wright, Executive Director of Utah Clean Energy and co-author of the report.

The Utah Energy Efficiency Strategy was prepared by researchers from SWEEP, UCE, the American Council for an Energy-Efficient Economy (ACEEE), and the Intermountain CHP Center. Funding was provided by the Energy Foundation, Hewlett Foundation, U.S. Environmental Protection Agency, and Governor's Office.

The Utah Energy Efficiency Strategy is available on the UCE website at www.utahcleanenergy.org, the SWEEP website at www.swenergy.org/pubs/ and the Governor's Energy Policy website at www.energy.utah.gov.

About SWEEP: The Southwest Energy Efficiency Project is a public interest organization promoting greater energy efficiency in Arizona, Colorado, Nevada, New Mexico, Utah, and Wyoming. For more information, see www.swenergy.org.

About Utah Clean Energy: Utah Clean Energy works to speed the transition to a cleaner, safer, more sustainable energy future in Utah. For more information, see www.utahcleanenergy.org.


**:: Inside the Governor's Office**
- Governor Jon Huntsman, Jr.
- Lt. Governor Gary Herbert
- First Lady Mary Kaye Huntsman
- Office of Planning & Budget
- Office of Economic Development
- Executive Boards & Commissions
- Constituent Services
- Commission on Criminal and Juvenile Justice
- Staff Members
- Contact / Feedback
- Request the Governor

- Archives
- Photos
- Declarations
- Energy

**:: Appointments**

- Cabinet Members

Utah.gov Home | Utah.gov Terms of Use | Utah.gov Privacy Policy | Utah.gov Accessibility Policy

**Copyright © 2008 State of Utah - All rights reserved.**

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 37



**U.S. CENSUS BUREAU**

**American FactFinder**

### United States -- States; and Puerto Rico
**GCT-T1. Population Estimates**
Data Set: **2006 Population Estimates**

Note: For information on errors stemming from model error, sampling error, and nonsampling error, see:
http://www.census.gov/popest/topics/methodology.

| Geographic area | Population Estimates | | | | | | | Estimates Base | Census 2000 |
|---|---|---|---|---|---|---|---|---|---|
| | July 1, 2006 | July 1, 2005 | July 1, 2004 | July 1, 2003 | July 1, 2002 | July 1, 2001 | July 1, 2000 | April 1, 2000 | April 1, 2000 |
| United States | 299,398,484 | 296,507,061 | 293,638,158 | 290,796,023 | 288,125,973 | 285,226,284 | 282,216,952 | 281,424,602 | 281,421,906 |
| Alabama | 4,599,030 | 4,548,327 | 4,517,442 | 4,495,089 | 4,477,571 | 4,466,618 | 4,452,375 | 4,447,351 | 4,447,100 |
| Alaska | 670,053 | 663,253 | 656,834 | 647,747 | 640,544 | 632,241 | 627,533 | 626,931 | 626,932 |
| Arizona | 6,166,318 | 5,953,007 | 5,745,674 | 5,582,252 | 5,445,333 | 5,300,366 | 5,166,693 | 5,130,632 | 5,130,632 |
| Arkansas | 2,810,872 | 2,775,708 | 2,746,823 | 2,723,645 | 2,706,198 | 2,691,665 | 2,678,610 | 2,673,398 | 2,673,400 |
| California | 36,457,549 | 36,154,147 | 35,841,254 | 35,466,365 | 35,024,517 | 34,550,466 | 34,008,499 | 33,871,653 | 33,871,648 |
| Colorado | 4,753,377 | 4,663,295 | 4,598,507 | 4,545,957 | 4,500,122 | 4,428,562 | 4,327,409 | 4,302,015 | 4,301,261 |
| Connecticut | 3,504,809 | 3,500,701 | 3,493,893 | 3,482,326 | 3,457,927 | 3,433,201 | 3,412,539 | 3,405,602 | 3,405,565 |
| Delaware | 853,476 | 841,741 | 828,762 | 816,861 | 805,591 | 795,450 | 786,505 | 783,600 | 783,600 |
| District of Columbia | 581,530 | 582,049 | 579,720 | 577,476 | 578,907 | 577,357 | 571,042 | 572,059 | 572,059 |
| Florida | 18,089,888 | 17,768,191 | 17,366,593 | 16,981,800 | 16,682,250 | 16,354,728 | 16,050,166 | 15,982,824 | 15,982,378 |
| Georgia | 9,363,941 | 9,132,553 | 8,935,151 | 8,750,259 | 8,597,927 | 8,424,033 | 8,230,550 | 8,186,816 | 8,186,453 |
| Hawaii | 1,285,498 | 1,273,278 | 1,259,299 | 1,245,606 | 1,233,249 | 1,221,419 | 1,212,113 | 1,211,537 | 1,211,537 |
| Idaho | 1,466,465 | 1,429,367 | 1,394,524 | 1,367,428 | 1,344,266 | 1,321,446 | 1,299,811 | 1,293,956 | 1,293,953 |
| Illinois | 12,831,970 | 12,765,427 | 12,713,548 | 12,649,778 | 12,595,003 | 12,524,663 | 12,440,970 | 12,419,647 | 12,419,293 |
| Indiana | 6,313,520 | 6,266,019 | 6,223,329 | 6,191,719 | 6,154,697 | 6,126,395 | 6,092,375 | 6,080,517 | 6,080,485 |
| Iowa | 2,982,085 | 2,965,524 | 2,953,679 | 2,942,070 | 2,935,295 | 2,932,151 | 2,928,703 | 2,926,382 | 2,926,324 |
| Kansas | 2,764,075 | 2,748,172 | 2,738,356 | 2,727,042 | 2,714,792 | 2,702,446 | 2,692,947 | 2,688,824 | 2,688,418 |
| Kentucky | 4,206,074 | 4,172,608 | 4,140,427 | 4,114,489 | 4,088,977 | 4,067,643 | 4,049,260 | 4,042,285 | 4,041,769 |
| Louisiana | 4,287,768 | 4,507,331 | 4,495,706 | 4,480,925 | 4,470,543 | 4,463,421 | 4,469,529 | 4,468,958 | 4,468,976 |
| Maine | 1,321,574 | 1,318,220 | 1,313,921 | 1,307,151 | 1,296,817 | 1,286,419 | 1,277,483 | 1,274,923 | 1,274,923 |
| Maryland | 5,615,727 | 5,589,599 | 5,553,249 | 5,506,684 | 5,441,349 | 5,379,795 | 5,311,695 | 5,296,506 | 5,296,486 |
| Massachusetts | 6,437,193 | 6,433,367 | 6,435,995 | 6,439,592 | 6,431,247 | 6,406,727 | 6,362,604 | 6,349,105 | 6,349,097 |
| Michigan | 10,095,643 | 10,100,833 | 10,093,398 | 10,068,311 | 10,038,165 | 10,003,243 | 9,956,689 | 9,938,480 | 9,938,444 |
| Minnesota | 5,167,101 | 5,126,739 | 5,094,304 | 5,059,023 | 5,024,570 | 4,985,851 | 4,934,275 | 4,919,492 | 4,919,479 |
| Mississippi | 2,910,540 | 2,908,496 | 2,892,668 | 2,874,171 | 2,863,091 | 2,856,108 | 2,848,634 | 2,844,656 | 2,844,658 |
| Missouri | 5,842,713 | 5,797,703 | 5,752,861 | 5,712,355 | 5,680,259 | 5,643,232 | 5,606,532 | 5,596,683 | 5,595,211 |
| Montana | 944,632 | 934,737 | 926,345 | 917,193 | 910,357 | 906,148 | 903,531 | 902,195 | 902,195 |
| Nebraska | 1,768,331 | 1,758,163 | 1,746,980 | 1,737,017 | 1,727,040 | 1,719,315 | 1,713,426 | 1,711,265 | 1,711,263 |
| Nevada | 2,495,529 | 2,412,301 | 2,332,484 | 2,241,127 | 2,169,202 | 2,095,820 | 2,018,456 | 1,998,257 | 1,998,257 |
| New Hampshire | 1,314,895 | 1,306,819 | 1,297,961 | 1,285,918 | 1,273,970 | 1,258,408 | 1,240,664 | 1,235,786 | 1,235,786 |
| New Jersey | 8,724,560 | 8,703,150 | 8,675,879 | 8,632,553 | 8,577,514 | 8,506,516 | 8,434,216 | 8,414,347 | 8,414,350 |
| New Mexico | 1,954,599 | 1,925,985 | 1,900,620 | 1,877,598 | 1,855,353 | 1,832,783 | 1,821,656 | 1,819,046 | 1,819,046 |
| New York | 19,306,183 | 19,315,721 | 19,291,526 | 19,238,252 | 19,167,600 | 19,095,604 | 19,000,135 | 18,976,821 | 18,976,457 |
| North Carolina | 8,856,505 | 8,672,459 | 8,531,040 | 8,415,710 | 8,313,494 | 8,199,541 | 8,078,909 | 8,046,491 | 8,049,313 |
| North Dakota | 635,867 | 634,605 | 635,848 | 632,620 | 633,649 | 636,349 | 641,193 | 642,200 | 642,200 |
| Ohio | 11,478,006 | 11,470,685 | 11,461,347 | 11,437,908 | 11,414,537 | 11,392,043 | 11,364,401 | 11,353,145 | 11,353,140 |
| Oklahoma | 3,579,212 | 3,543,442 | 3,522,827 | 3,504,347 | 3,488,447 | 3,466,687 | 3,454,508 | 3,450,654 | 3,450,654 |

| Geographic area | Population Estimates | | | | | | | Estimates Base | Census 2000 |
|---|---|---|---|---|---|---|---|---|---|
| | July 1, 2006 | July 1, 2005 | July 1, 2004 | July 1, 2003 | July 1, 2002 | July 1, 2001 | July 1, 2000 | April 1, 2000 | April 1, 2000 |
| Oregon | 3,700,758 | 3,638,871 | 3,589,168 | 3,561,155 | 3,523,529 | 3,474,183 | 3,431,530 | 3,421,436 | 3,421,399 |
| Pennsylvania | 12,440,621 | 12,405,348 | 12,377,381 | 12,351,381 | 12,321,644 | 12,295,929 | 12,286,905 | 12,281,054 | 12,281,054 |
| Rhode Island | 1,067,610 | 1,073,579 | 1,078,930 | 1,074,783 | 1,068,568 | 1,058,510 | 1,050,836 | 1,048,319 | 1,048,319 |
| | | | | | | | | | |
| South Carolina | 4,321,249 | 4,246,933 | 4,194,694 | 4,142,356 | 4,101,122 | 4,060,728 | 4,023,565 | 4,011,816 | 4,012,012 |
| South Dakota | 781,919 | 774,883 | 770,188 | 763,913 | 760,291 | 758,106 | 755,793 | 754,844 | 754,844 |
| Tennessee | 6,038,803 | 5,955,745 | 5,885,597 | 5,834,358 | 5,788,333 | 5,746,477 | 5,703,299 | 5,689,262 | 5,689,283 |
| Texas | 23,507,783 | 22,928,508 | 22,517,901 | 22,134,047 | 21,762,430 | 21,357,926 | 20,951,848 | 20,851,790 | 20,851,820 |
| Utah | 2,550,063 | 2,490,334 | 2,421,500 | 2,355,785 | 2,325,921 | 2,288,374 | 2,243,490 | 2,233,198 | 2,233,169 |
| Vermont | 623,908 | 622,387 | 620,795 | 618,616 | 616,236 | 612,882 | 609,986 | 608,827 | 608,827 |
| Virginia | 7,642,884 | 7,564,327 | 7,472,448 | 7,375,863 | 7,285,707 | 7,192,701 | 7,104,587 | 7,079,030 | 7,078,515 |
| Washington | 6,395,798 | 6,291,899 | 6,205,535 | 6,130,323 | 6,070,176 | 5,995,397 | 5,912,036 | 5,894,140 | 5,894,121 |
| West Virginia | 1,818,470 | 1,814,083 | 1,810,906 | 1,808,660 | 1,804,146 | 1,801,411 | 1,807,528 | 1,808,350 | 1,808,344 |
| Wisconsin | 5,556,506 | 5,527,644 | 5,498,807 | 5,466,929 | 5,438,527 | 5,404,733 | 5,374,747 | 5,363,715 | 5,363,675 |
| Wyoming | 515,004 | 508,798 | 505,534 | 501,490 | 498,973 | 494,067 | 494,166 | 493,782 | 493,782 |
| | | | | | | | | | |
| Puerto Rico | 3,927,776 | 3,911,810 | 3,895,101 | 3,877,881 | 3,859,606 | 3,839,190 | 3,815,909 | 3,808,603 | 3,808,610 |

Source: US Census Bureau, Population Estimates Program
More Tables and Information: Population Estimates Program
Note: The April 1, 2000 estimates base reflects changes to the Census 2000 population resulting from legal boundary updates as of January 1 of the estimates year, other geographic program changes, and Count Question Resolution actions. All geographic boundaries for the July 1, 2006 population estimates series are defined as of January 1, 2006. An "(x)" in the Census 2000 field indicates a locality that was formed or incorporated after Census 2000 or was erroneously omitted from Census 2000. See Geographic Change Notes for additional information on these localities.

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 38

# State and Federal Standards for Mobile-Source Emissions

Committee on State Practices in Setting
Mobile Source Emissions Standards

Board on Environmental Studies and Toxicology

Division on Earth and Life Studies

NATIONAL RESEARCH COUNCIL
OF THE NATIONAL ACADEMIES

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
www.nap.edu

# Summary

Air pollutant emissions from mobile sources have been regulated for almost half a century. During this time, the focus has largely been on tightening emissions standards for on-road vehicles and engines, particularly passenger cars and small trucks (light-duty vehicles). Light-duty-vehicle emissions control grew out of research that implicated the increasing use of vehicles in the deterioration of air quality conditions in the 1950s in Southern California. Control of motor vehicle emissions began in the early 1960s with the introduction of positive crankcase ventilation, a simple approach consisting of a hose and valve that reduced the venting of uncombusted gases to the atmosphere. From that simple beginning, light-duty-vehicle emissions control evolved to today's complex regulation of fuel properties, exhaust emissions, and evaporative emissions, which require the use of sophisticated engine and emissions-control technologies. These strategies enabled per-mile-exhaust emissions of new, properly operating light-duty vehicles to decrease by 95-99% in 2004 compared with emissions of 1967 model-year vehicles.

The focus of mobile-source emissions control expanded to include on-road heavy-duty engines and later nonroad engines. The broadening in regulatory attention arose from the increasing fraction of mobile-source emissions that come from sources other than light-duty vehicles and the relative lack of emissions controls on these sources. On-road heavy-duty-vehicle engines were first regulated for air pollutants in the 1970s, and engines used in off-road applications were first regulated in the mid-1990s. Over the next decade, regulations already approved for new sources will substantially reduce emissions from on-road diesel vehicles, nonroad diesel engines, and gasoline-powered nonroad engines.

The federal Clean Air Act (CAA) establishes the framework for controlling mobile-source emissions in the United States. During the development of the CAA in 1967, Congress recognized that the imposition of many different state standards could result in inefficiencies in vehicle markets. Therefore, state-established emissions standards were preempted by federal emissions standards in what is now section 209 of the CAA. A special exemption to this federal preemption was made in section 209 for California because of the state's special air quality problems and pioneering efforts in the control of air pollutants. This exemption, still in existence, gives the state of California the authority to set on-road vehicle standards that differ from the federal standards as long as they are as protective in the aggregate as federal standards. Later amendments to section 209 granted California the authority to set emissions standards and regulations for some nonroad engines, and section 177 was added to allow other states to adopt California standards.

The National Research Council (NRC) convened the Committee on State Practices in Setting Mobile Source Emissions Standards in response to a request from Congress in its fiscal 2003 appropriations report for the U.S. Environmental Protection Agency (EPA) to arrange for an independent study of the practices and procedures by which states develop separate emission standards. For this report, the committee was asked to assess the scientific and technical procedures used by states to develop or adopt different emissions standards and to compare those policies and practices with those used by EPA. The committee was also asked to consider the factors that caused states to move toward more stringent emissions standards and to consider the impacts of state emissions standards on various factors, including emissions, compliance costs, energy consumption, air quality, and human health. As part of its work plan, the committee was directed to consider the effects of California's experience in setting separate emissions standards and the effects of California's standards on federal emissions standards. The full Statement of Task for the committee is provided in Chapter 1.

## CONCLUSIONS AND RECOMMENDATIONS

### Role of New Mobile-Source Emissions Standards

Despite the substantial progress made over the past few decades in reducing air pollutant emissions from many sources, including mobile

sources, some locations continue to exceed National Ambient Air Quality Standards (NAAQS).[1] Further improvements in air quality will be needed, particularly to attain the new ambient standards for fine particulate matter and ozone at concentrations averaged over 8 hours. Although many emissionscontrol programs have been developed and regions with air quality problems have implemented a variety of programs, stricter new mobile-source emissions standards are an important component of overall emissions-control plans for locations that need air quality improvements. Federal mobile-source emissions standards set by EPA ensure that all regions of the country have some emissions reductions and that the mobility of these emissions sources does not undermine other air quality initiatives. California emissions standards, which are set by the California Air Resources Board (CARB), provide additional emissions reductions for the state's most populated and worst polluted regions, including the Los Angeles area and San Joaquin Valley. In many cases, CARB has tightened mobile-source emissions standards earlier and to a greater extent than the federal government. Other states that seek mobile-source emissions reductions from new-vehicle standards beyond those provided by federal standards have adopted California standards to supply the additional benefits.

While this study was in progress, CARB adopted light-duty-vehicle emissions standards for greenhouse gases. These standards have been challenged in the courts. The committee did not develop findings and recommendations specific to these standards because of their timing, the uncertainty surrounding their standing, and the lack of comparable federal standards.

### California's Role In Mobile-Source Emissions Regulation

The CAA gives California the authority to set its own mobile-source emissions standards. Over the history of mobile-source regulation to date, California has usually led EPA in establishing emissions standards on light-duty vehicles and small nonroad gasoline engines, and

---

[1] NAAQS set maximum allowable ambient air concentrations for six so-called "criteria" pollutants; the standards are to be protective of public health (primary standards) and welfare (secondary standards). The six criteria pollutants are carbon monoxide, lead, nitrogen dioxide, ozone, particulate matter, and sulfur dioxide.

4                    *State and Federal Standards for Mobile-Source Emissions*

EPA has usually led California in establishing standards for on-road heavy-duty diesel vehicles and off-road diesel engines. This shared leadership promotes improvements in the efficiency of EPA's and CARB's regulatory efforts and allows sharing of expertise.

The mobile-source emissions standards developed by CARB, like those developed by EPA, have typically been "technology forcing."[2] In forcing technology development, California has been a laboratory for emissions-control innovations. An advantage of having a state laboratory for innovation is that the risk of failure to develop the required technologies is restricted to a limited geographic area. CARB's regulatory process is supportive of this laboratory role in that California's standards can be amended rapidly in the face of changing market and technological conditions in contrast to EPA's regulatory process.

The original reasons for which Congress authorized California to have a separate set of standards remain valid. California still has some of the worst air quality conditions in the country, and certain emission-reduction needs are greater in California than in the rest of the country. California has used its authority as Congress envisioned: to implement more aggressive measures than the rest of the country and to serve as a laboratory for technological innovation. These have resulted in successes, such as CARB's early recognition of the need to couple fuel composition with emissions control, and failures, such as the promotion of widespread use of electric vehicles under the original zero-emissions vehicle mandate.

California's authority to set its own mobile-source emissions standards inevitably imposes additional risks and costs, such as design, production, and distribution costs, although the costs and benefits are difficult to quantify. However, experience to date indicates that the California program has been beneficial overall for air quality by improving mobile-source emissions control.

**Recommendation**

California should continue its pioneering role in setting mobile-source emissions standards. The role will aid the state's efforts to achieve

---

[2] "Technology forcing" refers to the establishment by a regulatory agency of a requirement to achieve an emissions limit, within a specified time frame, that can be reached through use of unspecified technology or technologies that have not yet been developed for widespread commercial applications and have been shown to be feasible on an experimental or pilot-demonstration basis.

air quality goals and will allow it to continue to be a proving ground for new emissions-control technologies that benefit California and the rest of the nation.

## EPA and CARB Technical and
## Scientific Practices in Setting Standards

CARB and EPA have essentially the same starting point and motivation for setting new or stricter standards: attainment of the NAAQS. Each agency follows a series of procedural steps leading to a finalized regulation. These steps include identification of the need for new emissions standards, evaluation of potential control strategies, publication of proposed regulations, and solicitation of public comments on proposals before promulgating the regulations. Some differences exist in the scope of CARB and EPA regulatory assessments as a result of the different procedures that the agencies must follow.

Some important similarities in the practices of setting standards followed by the two agencies are the following:

- CARB and EPA establish emissions standards based on assessments of technological feasibility and estimated engineering costs.
- CARB and EPA periodically update their practices as emissions estimation models and procedures continue to evolve and improve over time.
- CARB and EPA study technical practices of industry and perform engineering and market cost analyses.
- CARB and EPA test new technologies in the laboratory, using their own staffs, as well as outside contractors.

Some important differences in the practices of setting standards followed by the two agencies are the following:

- EPA's rule-making practices are subject to federal requirements defined in multiple acts and executive orders. Because emissions-standard regulations are typically deemed "significant,"[1] the rule-making process is overseen by the Office of Management and Budget. CARB's emission-standard rule-making is subject to state laws and to oversight

_____

[1] "Significant rules" are defined as those that have an annual impact of $100 million or greater, raise novel regulatory issues, or have other significant impacts.

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 39



# Global Warming - Impacts

**U.S. ENVIRONMENTAL PROTECTION AGENCY**

Contact Us | Print Version    Search Area: [_____] GO

EPA Home > Global Warming > Impacts > State Impacts

Please see **EPA's Climate Change site** for current information on climate change and global warming. EPA no longer updates EPA's Global Warming Site, but is maintaining this archive for historical purposes. Thank you for visiting the archive of EPA's Global Warming Site.

**Health**

**Water Resources**

**Polar Regions**

**Mountains**

# State Impacts

**Forests**

**Rangelands**

**Deserts**

Here are links to the State Climate Change Impacts information sheets in pdf format (~70k to 100k each); these files can be viewed, downloaded, and reproduced using the Acrobat Reader, available at no charge from **Adobe Systems**. EXIT Disclaimer



**Associated Pages**

Data Sources

**Non-tidal Wetlands**

**Coastal Zones**

**Agriculture**

**Fisheries**

**Birds**

| | | | | |
|---|---|---|---|---|
| Alabama | Hawaii | Massachusetts | New Mexico | South Dakota |
| Alaska | Idaho | Michigan | New York | Tennessee |
| Arizona | Illinois | Minnesota | North Carolina | Texas |
| Arkansas | Indiana | Mississippi | North Dakota | Utah |
| California | Iowa | Missouri | Ohio | Vermont |
| Colorado | Kansas | Montana | Oklahoma | Virginia |
| Connecticut | Kentucky | Nebraska | Oregon | Washington |
| Delaware | Louisiana | Nevada | Pennsylvania | West Virginia |
| Florida | Maine | Hampshire | Rhode Island | Wisconsin |
| Geogia | Maryland | New Jersey | South Carolina | Wyoming |

**National Parks**

**State Impacts**

**International Impacts**

Data Sources for State Climate Change Impacts are available. Selected Chapters from the IPCC publication, The Regional Impacts of Climate Change - An Assessment of Vulnerability (1998), including the North America Chapter, are available on the EPA Global Warming Site.

Climate | Emissions | Impacts | Actions | News and Events | Resource Center | Where You Live | Visitor Center

About the Site | Site Map | Glossary

EPA Home | Privacy and Security Notice | Contact Us

Last Modified on Friday, January 7th, 2000
URL: yosemite.epa.gov/oar/globalwarming.nsf
/content/ImpactsStateImpacts.html

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 40

United States
Environmental Protection
Agency

Office of Policy, Planning
and Evaluation
(2111)

EPA 230-F-97-008g
September 1997

 **EPA**

# Climate Change And Connecticut

The earth's climate is predicted to change because human activities are altering the chemical composition of the atmosphere through the buildup of greenhouse gases — primarily carbon dioxide, methane, nitrous oxide, and chlorofluorocarbons. The heat-trapping property of these greenhouse gases is undisputed. Although there is uncertainty about exactly how and when the earth's climate will respond to enhanced concentrations of greenhouse gases, observations indicate that detectable changes are under way. There most likely will be increases in temperature and changes in precipitation, soil moisture, and sea level, which could have adverse effects on many ecological systems, as well as on human health and the economy.

## The Climate System

Energy from the sun drives the earth's weather and climate. Atmospheric greenhouse gases (water vapor, carbon dioxide, and other gases) trap some of the energy from the sun, creating a natural "greenhouse effect." Without this natural effect, temperatures would be much lower than they are now, and life as known today would not be possible. Instead, thanks to greenhouse gases, the earth's average temperature is a more hospitable 60°F. However, problems arise when the greenhouse effect is *enhanced* by human-generated emissions of greenhouse gases.

Global warming would do more than add a few degrees to today's average temperatures. Cold spells still would occur in winter, but heat waves would be more common. Some places would be drier, others wetter. Perhaps more important, more precipitation may come in short, intense bursts (e.g., more than 2 inches of rain in a day), which could lead to more flooding. Sea levels would be higher than they would have been without global warming, although the actual changes may vary from place to place because coastal lands are themselves sinking or rising.

### The Greenhouse Effect



Source: U.S. Department of State (1992)

## Emissions Of Greenhouse Gases

Since the beginning of the industrial revolution, human activities have been adding measurably to natural background levels of greenhouse gases. The burning of fossil fuels — coal, oil, and natural gas — for energy is the primary source of emissions. Energy burned to run cars and trucks, heat homes and businesses, and power factories is responsible for about 80% of global carbon dioxide emissions, about 25% of U.S. methane emissions, and about 20% of global nitrous oxide emissions. Increased agriculture and deforestation, landfills, and industrial production and mining also contribute a significant share of emissions. In 1994, the United States emitted about one-fifth of total global greenhouse gases.

## Concentrations Of Greenhouse Gases

Since the pre-industrial era, atmospheric concentrations of carbon dioxide have increased nearly 30%, methane concentrations have more than doubled, and nitrous oxide concentrations have risen by about 15%. These increases have enhanced the heat-trapping capability of the earth's atmosphere. Sulfate aerosols, a common air pollutant, cool the atmosphere by reflecting incoming solar radiation. However, sulfates are short-lived and vary regionally, so they do not offset greenhouse gas warming.

Although many greenhouse gases already are present in the atmosphere, oceans, and vegetation, their concentrations in the future will depend in part on present and future emissions. Estimating future emissions is difficult, because they will depend on demographic, economic, technological, policy, and institutional developments. Several emissions scenarios have been developed based on differing projections of these underlying factors. For example, by 2100, in the absence of emissions control policies, carbon dioxide concentrations are projected to be 30-150% higher than today's levels.

## Current Climatic Changes

Global mean surface temperatures have increased 0.6-1.2°F since the late 19th century. The 9 warmest years in this century all have occurred in the last 14 years. Of these, 1995 was the warmest year on record, suggesting the atmosphere has rebounded from the temporary cooling caused by the eruption of Mt. Pinatubo in the Philippines.

Several pieces of additional evidence consistent with warming, such as a decrease in Northern Hemisphere snow cover, a decrease in Arctic Sea ice, and continued melting of alpine glaciers, have been corroborated. Globally, sea levels have risen

### Global Temperature Changes (1861–1996)



Source: IPCC (1995), updated

4-10 inches over the past century, and precipitation over land has increased slightly. The frequency of extreme rainfall events also has increased throughout much of the United States.

A new international scientific assessment by the Intergovernmental Panel on Climate Change recently concluded that *"the balance of evidence suggests a discernible human influence on global climate."*

## Future Climatic Changes

For a given concentration of greenhouse gases, the resulting increase in the atmosphere's heat-trapping ability can be predicted with precision, but the resulting impact on climate is more uncertain. The climate system is complex and dynamic, with constant interaction between the atmosphere, land, ice, and oceans. Further, humans have never experienced such a rapid rise in greenhouse gases. In effect, a large and uncontrolled planet-wide experiment is being conducted.

General circulation models are complex computer simulations that describe the circulation of air and ocean currents and how energy is transported within the climate system. While uncertainties remain, these models are a powerful tool for studying climate. As a result of continuous model improvements over the last few decades, scientists are reasonably confident about the link between global greenhouse gas concentrations and temperature and about the ability of models to characterize future climate at continental scales.

Recent model calculations suggest that the global surface temperature could increase an average of 1.6-6.3°F by 2100, with significant regional variation. These temperature changes would be far greater than recent natural fluctuations, and they would occur significantly faster than any known changes in the last 10,000 years. The United States is projected to warm more than the global average, especially as fewer sulfate aerosols are produced.

The models suggest that the rate of evaporation will increase as the climate warms, which will increase average global precipitation. They also suggest increased frequency of intense rainfall as well as a marked decrease in soil moisture over some mid-continental regions during the summer. Sea level is projected to increase by 6-38 inches by 2100.

Calculations of regional climate change are much less reliable than global ones, and it is unclear whether regional climate will become more variable. The frequency and intensity of some extreme weather of critical importance to ecological systems (droughts, floods, frosts, cloudiness, the frequency of hot or cold spells, and the intensity of associated fire and pest outbreaks) could increase.

## Local Climate Changes

Over the last century, average temperatures in Storrs, Connecticut, have increased from 45.8°F (1892-1921 average) to 48.2°F (1966-1995 average), and precipitation in some locations has increased by 20%.

Over the next century, Connecticut's climate may change even more. Based on projections given by the Intergovernmental Panel on Climate Change and results from the United Kingdom Hadley Centre's climate model (HadCM2), a model that accounts for both greenhouse gases and aerosols, by 2100 temperatures in Connecticut could increase about 4°F (with a range of 2-8°F) in all seasons. Precipitation is projected to increase by 10-20% (with a range of 0-40%), with slightly less change in spring and summer and slightly more in winter.

The amount of precipitation on extreme wet (or snowy) days most likely would increase, but changes in the lengths of wet or dry spells are not clear. The frequency of extreme hot days in summer is expected to increase along with the general warming trend. It is not clear how severe storms such as hurricanes would change, although an increase in the frequency and/or intensity of winter storms is possible.

### Precipitation Trends From 1900 To Present



Source: Karl et al. (1996)

## Climate Change Impacts

Global climate change poses risks to human health and to terrestrial and aquatic ecosystems. Important economic resources such as agriculture, forestry, fisheries, and water resources also may be affected. Warmer temperatures, more severe droughts and floods, and sea level rise could have a wide range of impacts. All these stresses can add to existing stresses on resources caused by other influences such as population growth, land-use changes, and pollution.

Similar temperature changes have occurred in the past, but the previous changes took place over centuries or millennia instead of decades. The ability of some plants and animals to migrate and adapt appears to be much slower than the predicted rate of climate change.

## Human Health

Higher temperatures and increased frequency of heat waves may increase the number of heat-related deaths and the incidence of heat-related illnesses. Connecticut, with its irregular, intense heat waves, may be especially susceptible.

In Hartford, one study projects that a 2°F warming could increase heat-related deaths during a typical summer by about 20%, from close to 40 heat-related deaths per summer to near 50 (although increased air conditioning use may not have been fully accounted for). Winter-related deaths are expected to change very little if the temperature warms by 2°F. The elderly, particularly those living alone, are at greatest risk.

There is concern that climate change could increase concentrations of ground-level ozone. For example, high temperatures, strong sunlight, and stable air masses tend to increase urban ozone levels. Air pollution also is made worse by increases in natural hydrocarbons emissions during hot weather. If a warmed climate causes increased use of air conditioners, air pollutant emissions from power plants also will increase.

A 4°F warming in New York City, with no other change in weather or emissions, could increase concentrations of ozone, a major component of smog, by 4%. Similar increases could be expected in Connecticut. Currently, ground-level ozone concentrations exceed national ozone health standards throughout the state. All of Connecticut is classified as a "serious" nonattainment area for ozone. Ground-level ozone has been shown to aggravate respiratory illnesses such as asthma, reduce existing lung function, and induce respiratory inflammation. In addition, ambient ozone reduces crop yields and impairs ecosystem health.

Warming and other climate changes could expand the habitat and infectivity of disease-carrying insects, thus increasing the potential for transmission of diseases such as malaria and dengue ("break bone") fever. Mosquitos flourish in some areas around Connecticut. Some can carry malaria, while others can carry Eastern equine encephalitis, which can be lethal or cause neuro-

### Future Sea Level Rise At New London



Source: EPA (1995)

logical damage. Lyme disease, which is carried by ticks, has increased in Connecticut. If conditions become warmer and wetter and thus support larger populations of mosquitos and ticks, these diseases may be transmitted more widely.

In addition, warmer seas could contribute to the increased intensity, duration, and extent of harmful algal blooms. These blooms damage habitat and shellfish nurseries, can be toxic to humans, and can carry bacteria like those causing cholera. Brown algal tides and toxic algal blooms already are prevalent in the Atlantic. Warmer ocean waters could increase their occurrence and persistence.

## Coastal Areas

Sea level rise could lead to flooding of low-lying property, loss of coastal wetlands, erosion of beaches, saltwater contamination of drinking water, and decreased longevity of low-lying roads, causeways, and bridges. In addition, sea level rise could increase the vulnerability of coastal areas to storms and associated flooding.

Along much of Connecticut's coast, sea level already is rising 8 inches per century, and it is likely to rise another 22 inches by 2100. Connecticut's coastline contains valuable residential development and important wetlands ecosystems that would be vulnerable to flooding from sea level rise. In particular, Connecticut has extensive tidal flats and diverse nontidal freshwater marshes. Because Long Island Sound may reduce wave action, some of these wetlands may be protected with a temporary buffer from erosion. Connecticut's freshwater marshes, however, are likely to be harmed by saltwater intrusion.

Cumulative costs through 2100 to protect Connecticut's coastline from a 20-inch sea level rise could be $0.5-$3 billion.

## Water Resources

Water resources are affected by changes in precipitation as well as by temperature, humidity, wind, and sunshine. Changes in streamflow tend to magnify changes in precipitation. Water resources in drier climates tend to be more sensitive to climate changes. Because evaporation is likely to increase with warmer climate, it could result in lower river flow and lower lake levels, particularly in the summer. In addition, more intense precipitation could increase flooding. If streamflow and lake levels drop, groundwater also could be reduced.

The Connecticut River is susceptible to changes in winter snow accumulation, which would be reduced in a warmer climate. Peak spring streamflows in the Connecticut River could occur several weeks earlier if the climate were to warm about 4°F. The Housatanic and Thames rivers could see similar but smaller changes. Without increased precipitation, groundwater would decrease in a warmer climate, which would reduce Connecticut's aquifers.

## Changes In Agricultural Yield And Production



Source: Mendelsohn and Neumann (in press); McCarl (personal communication)

## Agriculture

The mix of crop and livestock production in a state is influenced by climatic conditions and water availability. As climate warms, production patterns will shift northward. Increases in climate variability could make adaptation by farmers more difficult. Warmer climates and less soil moisture due to increased evaporation may increase the need for irrigation. However, these same conditions could decrease water supplies, which also may be needed by natural ecosystems, urban populations, and other economic sectors.

Understanding, most studies have not fully accounted for changes in climate variability, water availability, and imperfect responses by farmers to changing climate. Including these factors could substantially change modeling results. Analyses based on changes in average climate and which assume farmers effectively adapt suggest that aggregate U.S. food production will not be harmed, although there may be significant regional changes.

In Connecticut, agriculture is a $500 million annual industry. About one-twentieth of 1% of total U.S. farm acres is in the state. The principal crops are silage and hay, and very little of the agricultural land is irrigated. Projections of changes in Connecticut yields are mixed; they could range from little change to decreases of almost 40%. Total acres farmed would remain about the same, but farm income could decrease by about 50%.

## Forests

Trees and forests are adapted to specific climate conditions, and as climate warms, forests will change. These changes could include changes in species, geographic extent, and health and productivity. If conditions also become drier, the current range and density of forests could be reduced and replaced by grasslands and pasture. Even a warmer and wetter climate would lead to changes; trees that are better adapted to these conditions, such as oaks and redwoods, would thrive. Under these conditions, forests could become more dense. These changes could occur during the lifetimes of today's children, particularly if they are accelerated by other stresses such as fire, pests, and diseases. Some of these stresses would themselves be worsened by a warmer and drier climate.

With changes in climate, the extent of forested areas in Connecticut could change little. However, a warmer climate could change the character of Connecticut's forests. Maple-dominated hardwood forests could give way to forests dominated by oaks and conifers, species more tolerant of higher temperatures. This change would diminish the brilliant autumn foliage as the contribution of maples declines. Across the state, as much as 30-60% of the hardwood forests could be replaced by warmer climate forests with a mix of pines and hardwoods.

*For further information about the potential impacts of climate change, contact the Climate and Policy Assessment Division (2174), U.S. EPA, 401 M Street SW, Washington, DC 20460.*

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 41

United States
Environmental Protection
Agency

Office of Policy
(2111)

EPA 236-F-98-007I
September 1998

 **Climate Change** And Maryland 

The earth's climate is predicted to change because human activities are altering the chemical composition of the atmosphere through the buildup of greenhouse gases — primarily carbon dioxide, methane, nitrous oxide, and chlorofluorocarbons. The heat-trapping property of these greenhouse gases is undisputed. Although there is uncertainty about exactly how and when the earth's climate will respond to enhanced concentrations of greenhouse gases, observations indicate that detectable changes are under way. There most likely will be increases in temperature and changes in precipitation, soil moisture, and sea level, which could have adverse effects on many ecological systems, as well as on human health and the economy.

## The Climate System

Energy from the sun drives the earth's weather and climate. Atmospheric greenhouse gases (water vapor, carbon dioxide, and other gases) trap some of the energy from the sun, creating a natural "greenhouse effect." Without this effect, temperatures would be much lower than they are now, and life as known today would not be possible. Instead, thanks to greenhouse gases, the earth's average temperature is a more hospitable 60°F. However, problems arise when the greenhouse effect is *enhanced* by human-generated emissions of greenhouse gases.

Global warming would do more than add a few degrees to today's average temperatures. Cold spells still would occur in winter, but heat waves would be more common. Some places would be drier, others wetter. Perhaps more important, more precipitation may come in short, intense bursts (e.g., more than 2 inches of rain in a day), which could lead to more flooding. Sea levels would be higher than they would have been without global warming, although the actual changes may vary from place to place because coastal lands are themselves sinking or rising.

### The Greenhouse Effect



Source: U.S. Department of State (1992)

## Emissions Of Greenhouse Gases

Since the beginning of the industrial revolution, human activities have been adding measurably to natural background levels of greenhouse gases. The burning of fossil fuels — coal, oil, and natural gas — for energy is the primary source of emissions. Energy burned to run cars and trucks, heat homes and businesses, and power factories is responsible for about 80% of global carbon dioxide emissions, about 25% of U.S. methane emissions, and about 20% of global nitrous oxide emissions. Increased agriculture and deforestation, landfills, and industrial production and mining also contribute a significant share of emissions. In 1994, the United States emitted about one-fifth of total global greenhouse gases.

## Concentrations Of Greenhouse Gases

Since the pre-industrial era, atmospheric concentrations of carbon dioxide have increased nearly 30%, methane concentrations have more than doubled, and nitrous oxide concentrations have risen by about 15%. These increases have enhanced the heat-trapping capability of the earth's atmosphere. Sulfate aerosols, a common air pollutant, cool the atmosphere by reflecting incoming solar radiation. However, sulfates are short-lived and vary regionally, so they do not offset greenhouse gas warming.

Although many greenhouse gases already are present in the atmosphere, oceans, and vegetation, their concentrations in the future will depend in part on present and future emissions. Estimating future emissions is difficult, because they will depend on demographic, economic, technological, policy, and institutional developments. Several emissions scenarios have been developed based on differing projections of these underlying factors. For example, by 2100, in the absence of emissions control policies, carbon dioxide concentrations are projected to be 30-150% higher than today's levels.

## Current Climatic Changes

Global mean surface temperatures have increased 0.6-1.2°F between 1890 and 1996. The 9 warmest years in this century all have occurred in the last 14 years. Of these, 1995 was the warmest year on record, suggesting the atmosphere has rebounded from the temporary cooling caused by the eruption of Mt. Pinatubo in the Philippines.

Several pieces of additional evidence consistent with warming, such as a decrease in Northern Hemisphere snow cover, a decrease in Arctic Sea ice, and continued melting of alpine glaciers, have been corroborated. Globally, sea levels have risen

### Global Temperature Changes (1861–1996)



Source: IPCC (1995), updated

4-10 inches over the past century, and precipitation over land has increased slightly. The frequency of extreme rainfall events also has increased throughout much of the United States.

A new international scientific assessment by the Intergovernmental Panel on Climate Change recently concluded that *"the balance of evidence suggests a discernible human influence on global climate."*

## Future Climatic Changes

For a given concentration of greenhouse gases, the resulting increase in the atmosphere's heat-trapping ability can be predicted with precision, but the resulting impact on climate is more uncertain. The climate system is complex and dynamic, with constant interaction between the atmosphere, land, ice, and oceans. Further, humans have never experienced such a rapid rise in greenhouse gases. In effect, a large and uncontrolled planet-wide experiment is being conducted.

General circulation models are complex computer simulations that describe the circulation of air and ocean currents and how energy is transported within the climate system. While uncertainties remain, these models are a powerful tool for studying climate. As a result of continuous model improvements over the last few decades, scientists are reasonably confident about the link between global greenhouse gas concentrations and temperature and about the ability of models to characterize future climate at continental scales.

Recent model calculations suggest that the global surface temperature could increase an average of 1.6-6.3°F by 2100, with significant regional variation. These temperature changes would be far greater than recent natural fluctuations, and they would occur significantly faster than any known changes in the last 10,000 years. The United States is projected to warm more than the global average, especially as fewer sulfate aerosols are produced.

The models suggest that the rate of evaporation will increase as the climate warms, which will increase average global precipitation. They also suggest increased frequency of intense rainfall as

well as a marked decrease in soil moisture over some mid-continental regions during the summer. Sea level is projected to increase by 6-38 inches by 2100.

Calculations of regional climate change are much less reliable than global ones, and it is unclear whether regional climate will become more variable. The frequency and intensity of some extreme weather of critical importance to ecological systems (droughts, floods, frosts, cloudiness, the frequency of hot or cold spells, and the intensity of associated fire and pest outbreaks) could increase.

## Local Climate Changes

Over the last century, the average temperature in College Park, Maryland, has increased 2.4°F, and precipitation has increased by up to 10% in many parts of the state. These past trends may or may not continue into the future.

Over the next century, Maryland's climate may change even more. For example, based on projections made by the Intergovernmental Panel on Climate Change and results from the United Kingdom Hadley Centre climate model (HadCM2), a model that accounts for both greenhouse gases and aerosols, by 2100 temperatures in Maryland could increase by 3°F (with a range of 1-7°F) in spring and 4°F (with a range of 2-9°F) in the other seasons. Precipitation is projected to increase by 20% (with a range of 10-40%) in all seasons, probably slightly less in spring and fall and slightly more in winter. Other climate models may show different results, especially regarding estimated changes in precipitation. The impacts described in the sections that follow take into account estimates from different models. The amount of precipitation on extreme wet or snowy days in winter is likely to increase. The frequency of extreme hot days in summer would increase because of the general warming trend. Although it is not clear how the severity of storms might be affected, an increase in the frequency and intensity of winter storms is possible.

## Human Health

Higher temperatures and increased frequency of heat waves may increase the number of heat-related deaths and the incidence of heat-related illnesses. Maryland, with its irregular, intense heat

### Precipitation Trends From 1900 To Present



Source: Karl et al. (1996)

waves, could be susceptible. One study projects that in Baltimore, a warming of 3°F could increase heat-related deaths by 50% from the current 85 to 130, and in Washington, D.C., results indicate slightly smaller increases (although increased air conditioning use may not have been fully accounted for in both estimates). This study also projects that winter-related deaths in Baltimore should remain unaffected, but could increase by a third in Washington, D.C. The exact reasons for these differences are unknown. The elderly, especially those living alone, are at greatest risk.

Climate change could increase concentrations of ground-level ozone. For example, high temperatures, strong sunlight, and stable air masses tend to increase urban ozone levels. In the eastern mid-Atlantic region, a 4°F warming, with no other change in weather or emissions, could increase concentrations of ozone, a major component of smog, by 4%. Currently, ground-level concentrations exceed the national ozone health standard throughout the state. Nearly all of Maryland is classified as a nonattainment area for ozone. Serious to severe nonattainment areas include Baltimore and the suburbs of Washington, D.C. Ground-level ozone is associated with respiratory illnesses such as asthma, reduced lung function, and respiratory inflammation.

Mosquitos carrying malaria, dengue fever, and St. Louis encephalitis are present in Maryland. Warm, wet conditions could increase mosquito populations, increase biting rates, and reduce the incubation rate of the viruses and parasites within them. The incidence of Lyme disease could also increase as warmer temperatures and increased precipitation enhance the habitat for ticks and their rodent hosts. Warmer winters, warmer temperatures, and heavy precipitation also can increase harmful algal blooms, that is, red tides; reduce water quality; and increase the potential for outbreaks of cryptosporidiosis and giardia. These impacts, however, can be minimized through existing disease prevention and control methods.

## Coastal Areas

Sea level rise could lead to flooding of low-lying property, loss of coastal wetlands, erosion of beaches, saltwater contamination of drinking water, and decreased longevity of low-lying roads, causeways, and bridges. In addition, sea level rise could increase the vulnerability of coastal areas to storms and associated flooding.

Maryland has 3,100 miles of tidally influenced shoreline. It consists of barrier islands such as Assateague Island, the highly urbanized and developed oceanfront of Ocean City, and the extensive eastern shore of Chesapeake Bay. The eastern shore of Chesapeake Bay in Maryland has an extensive array of tidally influenced freshwater and salt marshes, forested wetlands, riverine wetlands, and open water.

At Baltimore, sea level already is rising by 7 inches per century, and it is likely to rise another 19 inches by 2100. Human activities such as impounding and dredging as well as sea level rise have caused extensive losses of coastal wetlands and marshes in both the Chesapeake Bay and Assateague Island regions. With higher



**Future Sea Level Rise At Easton**

Sources: Lyles et al. (1988); EPA (1995)

sea levels, Assateague Island is likely to migrate toward the mainland as sand is eroded on the ocean side and deposited on the mainland side, and the island's native plant communities, which include some threatened species, are likely to change in distribution and diversity. The 9-mile coastline of Ocean City, which was nourished by a $30 million beach nourishment project in the late 1980s, could be threatened by a rise in sea level.

The cumulative cost of additional sand replenishment to protect Maryland's coastline from a 20-inch sea level rise by 2100 is estimated at $35-$200 million. However, sand replenishment may not be cost-effective for all coastal areas in the state and, therefore, some savings could be possible.

## Water Resources

Without increases in precipitation, higher temperatures and increased evaporation would lower streamflows, lake levels, and groundwater levels in the summer and fall. This could adversely affect the many instream uses of water in Maryland, including hydroelectric power generation, navigation, marine commerce, commercial and sport fishing, and recreation. Water supplies for the large and growing metropolitan areas surrounding Baltimore and the District of Columbia could suffer from lower summer streamflows. Drier summer conditions also could reduce groundwater levels, which could be significant for parts of Charles and Prince Georges counties in southern Maryland, which are already experiencing declines in groundwater levels. Groundwater is also the primary source of water for domestic use and irrigated agriculture on the Eastern Shore. Additionally, low flows and higher temperatures in the summer could affect water quality, further aggravating problems with nuisance algae, low dissolved-oxygen levels, and bacterial contamination in urban streams.

If, however, rainfall and runoff increase in the Maryland region, the resulting higher streamflows could alleviate water supply problems and dilute pollutants, although more flooding could occur. Higher runoff also could increase erosion and levels of pesticides and fertilizers from agricultural areas. These chemicals reduce oxygen and limit the types of species that can live in the

rivers. Increased runoff from farmlands would exacerbate this effect. It also could increase erosion and pollution from urban and strip mining areas. Although many sources of pollution into Chesapeake Bay have been controlled, runoff containing nutrients, heavy metals, and sediment remains a problem in many tidal areas. Acid mine drainage is also a concern in westernmost Maryland.

## Agriculture

The mix of crop and livestock production in a state is influenced by climatic conditions and water availability. As climate warms, production patterns could shift northward. Increases in climate variability could make adaptation by farmers more difficult. Warmer climates and less soil moisture due to increased evaporation may increase the need for irrigation. However, these same conditions could decrease water supplies, which also may be needed by natural ecosystems, urban populations, industry, and other users.

Understandably, most studies have not fully accounted for changes in climate variability, water availability, crop pests, changes in air pollution such as ozone, and adaptation by farmers to changing climate. Including these factors could change modeling results substantially. Analyses that assume changes in average climate and effective adaptation by farmers suggest that aggregate U.S. food production would not be harmed, although there may be significant regional changes.

In Maryland, production agriculture is a $1.3 billion annual industry, 60% of which comes from livestock, mainly cattle. Very few of the farmed acres are irrigated. Climate changes could reduce the farmed acres of major crops such as corn, soybeans, wheat, and hay by 24-43%, in response to changes in yields and resulting economic conditions. Projected changes in yields vary widely, depending on how climate changes and whether land is irrigated. For example, under severe conditions, corn and hay yields could fall by 32% and soybeans by 38% as temperatures rise beyond tolerance levels of the crop. Less severe changes, however, could result in increases of 4% and 24%, respectively, as soil moisture and carbon dioxide levels rise.

### Changes In Agricultural Yield And Production



Sources: Mendelsohn and Neumann (in press); McCarl (personal communication)

## Forests

Trees and forests are adapted to specific climate conditions, and as climate warms, forests will change. These changes could include changes in species composition, geographic range, and health and productivity. If conditions also become drier, the current range of forests could be reduced and replaced by grasslands and pasture. Even a warmer and wetter climate could lead to changes; trees that are better adapted to warmer conditions, such as southern pines, would prevail. Under these conditions, forests could become more dense. These changes could occur during the lifetimes of today's children, particularly if the change is accelerated by other stresses such as fire, pests, and diseases. Some of these stresses would themselves be worsened by a warmer and drier climate.

With changes in climate, the extent and density of forested areas in Maryland could change little or decline by as much as 5-10%. However, the types of trees dominating Maryland forests are likely to change. The warmer mixed forests, dominated by southern pines and oaks, would spread northward, replacing the predominantly hardwood forests currently found in the northern and western sections of the state. Maritime forests, important for their recreational and aesthetic value and for their role in coastal hydrology, could be affected adversely by changes in the frequencies of large storms associated with climate change (hurricanes in the late summer and fall, nor'easters in the winter and spring). Coastal estuaries are breeding grounds for important commercial fish and shellfish species, and changes in the hydrology of upland forests in Maryland could have profound effects on these sensitive coastal systems.

## Ecosystems

The diverse habitats of Maryland's Chesapeake Bay (including underwater grass beds, salt marshes, forested wetlands, and upland forests) provide a home for more than 2,700 species of animals and plants. The Blackwater Wildlife Refuge on the eastern shore of the bay has the largest concentration of nesting bald eagles on the east coast north of Florida, and is vital for migratory waterfowl and shorebirds. These wetlands are also important agents of flood control and water quality.

Chesapeake Bay has already begun to feel the effects of sea level rise. Rising sea level enables saltwater to penetrate farther inland and upstream, and the more than 150 streams and rivers that flow into the bay could be affected. Intruding salt water and increasing sedimentation are choking many marshes. Since 1938, the rising sea has destroyed one-third of the marsh at Blackwater. Most of the remaining marsh in this area is projected to disappear within 30 years. Inundation of lowland habitats surrounding the marshes could result in the disappearance of habitat for migratory birds and other species, for example, the endangered Delmarva fox squirrel.

*For further information about the potential impacts of climate change, contact the Climate and Policy Assessment Division (2174), U.S. EPA, 401 M Street SW, Washington, DC 20460, or visit http://www.epa.gov/globalwarming/impacts.*



U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 42

United States
Environmental Protection
Agency

Office of Policy, Planning
and Evaluation
(2111)

EPA 230-F-97-008u
September 1997

 **EPA** # Climate Change And Massachusetts

The earth's climate is predicted to change because human activities are altering the chemical composition of the atmosphere through the buildup of greenhouse gases — primarily carbon dioxide, methane, nitrous oxide, and chlorofluorocarbons. The heat-trapping property of these greenhouse gases is undisputed. Although there is uncertainty about exactly how and when the earth's climate will respond to enhanced concentrations of greenhouse gases, observations indicate that detectable changes are under way. There most likely will be increases in temperature and changes in precipitation, soil moisture, and sea level, which could have adverse effects on many ecological systems, as well as on human health and the economy.

## The Climate System

Energy from the sun drives the earth's weather and climate. Atmospheric greenhouse gases (water vapor, carbon dioxide, and other gases) trap some of the energy from the sun, creating a natural "greenhouse effect." Without this effect, temperatures would be much lower than they are now, and life as known today would not be possible. Instead, thanks to greenhouse gases, the earth's average temperature is a more hospitable 60°F. However, problems arise when the greenhouse effect is *enhanced* by human-generated emissions of greenhouse gases.

Global warming would do more than add a few degrees to today's average temperatures. Cold spells still would occur in winter, but heat waves would be more common. Some places would be drier, others wetter. Perhaps more important, more precipitation may come in short, intense bursts (e.g., more than 2 inches of rain in a day), which could lead to more flooding. Sea levels would be higher than they would have been without global warming, although the actual changes may vary from place to place because coastal lands are themselves sinking or rising.

### The Greenhouse Effect



Source: U.S. Department of State (1992)

## Emissions Of Greenhouse Gases

Since the beginning of the industrial revolution, human activities have been adding measurably to natural background levels of greenhouse gases. The burning of fossil fuels — coal, oil, and natural gas — for energy is the primary source of emissions. Energy burned to run cars and trucks, heat homes and businesses, and power factories is responsible for about 80% of global carbon dioxide emissions, about 25% of U.S. methane emissions, and about 20% of global nitrous oxide emissions. Increased agriculture and deforestation, landfills, and industrial production and mining also contribute a significant share of emissions. In 1994, the United States emitted about one-fifth of total global greenhouse gases.

## Concentrations Of Greenhouse Gases

Since the pre-industrial era, atmospheric concentrations of carbon dioxide have increased nearly 30%, methane concentrations have more than doubled, and nitrous oxide concentrations have risen by about 15%. These increases have enhanced the heat-trapping capability of the earth's atmosphere. Sulfate aerosols, common air pollutants, cool the atmosphere by reflecting incoming solar radiation. However, sulfates are short-lived and vary regionally.

Although many greenhouse gases already are present in the atmosphere, oceans, and vegetation, their concentrations in the future will depend in part on present and future emissions. Estimating future emissions is difficult, because they will depend on demographic, economic, technological, policy, and institutional developments. Several emissions scenarios have been developed based on differing projections of these underlying factors. For example, by 2100, in the absence of emissions control policies, carbon dioxide concentrations are projected to be 30-150% higher than today's levels.

## Current Climatic Changes

Global mean surface temperatures have increased 0.6-1.2°F between 1890 and 1996. The 9 warmest years in this century all have occurred in the last 14 years.

Several pieces of additional evidence consistent with warming, such as a decrease in Northern Hemisphere snow cover, a decrease in Arctic Sea ice, and continued melting of alpine glaciers, have been corroborated. Globally, sea levels have risen 4-10 inches over the past century, and precipitation over land has increased slightly. The frequency of extreme rainfall events also has increased throughout much of the United States.

### Global Temperature Changes (1861–1996)



Source: IPCC (1995), updated

A new international scientific assessment by the Intergovernmental Panel on Climate Change recently concluded that *"the balance of evidence suggests a discernible human influence on global climate."*

### Future Climatic Changes

For a given concentration of greenhouse gases, the resulting increase in the atmosphere's heat-trapping ability can be predicted with precision, but the resulting impact on climate is more uncertain. The climate system is complex and dynamic, with constant interaction between the atmosphere, land, ice, and oceans. Further, humans have never experienced such a rapid rise in greenhouse gases. In effect, a large and uncontrolled planet-wide experiment is being conducted.

General circulation models are complex computer simulations that describe the circulation of air and ocean currents and how energy is transported within the climate system. While uncertainties remain, these models are a powerful tool for studying climate. Scientists are reasonably confident about the ability of models to characterize future climate at continental scales.

Recent model calculations suggest that the global surface temperature could increase an average of 1.6-6.3°F by 2100, with significant regional variation. These temperature changes would be far greater than recent natural fluctuations, and they would occur significantly faster than any known changes in the last 10,000 years. The United States is projected to warm more than the global average, especially as fewer sulfate aerosols are produced.

The models suggest that the rate of evaporation will increase as the climate warms, which will increase average global precipitation. They also suggest increased frequency of intense rainfall as well as a marked decrease in soil moisture over some mid-continental regions during the summer. Sea level is projected to increase by 6-38 inches by 2100.

Calculations of regional climate change are much less reliable than global ones, and it is unclear whether regional climate will become more variable. The frequency and intensity of some extreme weather of critical importance to ecological systems (droughts, floods, frosts, cloudiness, the frequency of hot or cold spells, and the intensity of associated fire and pest outbreaks) could increase.

### Local Climate Changes

Over the last century, the average temperature in Amherst, Massachusetts, has increased 2°F, and precipitation has increased by up to 20% in many parts of the state.

Over the next century, climate in Massachusetts may change even more. For example, based on projections made by the Intergovernmental Panel on Climate Change and results from the United Kingdom Hadley Centre's climate model (HadCM2), a model that accounts for both greenhouse gases and aerosols, by 2100 temperatures in Massachusetts could increase by about 4°F (with a range of 1-8°F) in winter and spring and about 5°F (with a range of 2-10°F) in summer and fall. Precipitation is estimated to increase by about 10% in spring and summer, 15% in fall, and 20-60% in winter. Other climate models may show different results. The amount of precipitation on extreme wet or snowy days in winter is likely to increase. The frequency of extreme hot days in summer would increase because of the general warming trend. Although it is not clear how severe storms such as hurricanes would change, an increase in the frequency and intensity of winter storms is possible.

### Climate Change Impacts

Global climate change poses risks to human health and to terrestrial and aquatic ecosystems. Important economic resources such as agriculture, forestry, fisheries, and water resources also may be affected. Warmer temperatures, more severe droughts and floods, and sea level rise could have a wide range of impacts. All these stresses can add to existing stresses on resources caused by other influences such as population growth, land-use changes, and pollution.

Similar temperature changes have occurred in the past, but the previous changes took place over centuries or millennia instead of decades. The ability of some plants and animals to migrate and adapt appears to be much slower than the predicted rate of climate change.

### Precipitation Trends From 1900 To Present



Source: Karl et al. (1996)

## Human Health

Higher temperatures and increased frequency of heat waves may increase the number of heat-related deaths and the incidence of heat-related illnesses. Massachusetts, with its irregular, intense heat waves, could be especially susceptible.

In Boston, one study projects that by 2050 heat-related deaths during a typical summer could increase 50%, from close to 100 heat-related deaths per summer to over 150 (although increased air conditioning use may not have been fully accounted for). Winter-related deaths are expected to change very little. The elderly, particularly those living alone, are at greatest risk.

Climate change could increase concentrations of ground-level ozone. For example, high temperatures, strong sunlight, and stable air masses tend to increase urban ozone levels. Air pollution also is made worse by increases in natural hydrocarbon emissions during hot weather. If a warmer climate causes increased use of air conditioners, air pollutant emissions from power plants also will increase.

A 4°F warming in New York City, with no other change in weather or emissions, could increase concentrations of ozone, a major component of smog, by 4%. Similar increases could occur in Massachusetts. Currently, ground-level ozone concentrations exceed national ozone health standards throughout the state. All of Massachusetts is classified as a "serious" nonattainment area for ozone. Ground-level ozone has been shown to aggravate respiratory illnesses such as asthma, reduce existing lung function, and induce respiratory inflammation. In addition, ambient ozone reduces crop yields and impairs ecosystem health.

Warming and other climate changes may expand the habitat and infectivity of disease-carrying insects, thus increasing the potential for transmission of diseases such as malaria and dengue ("break bone") fever. Mosquitos flourish in some areas around Massachusetts. Some can carry malaria, while others can carry Eastern equine encephalitis, which can be lethal or cause neurological damage. Incidents of Lyme disease, which is carried by ticks, have increased in the Northeast. If conditions become warmer and wetter, mosquito and tick populations could increase, thereby increasing the risk of transmission of these diseases.

In addition, warmer seas could contribute to the increased intensity, duration, and extent of harmful algal blooms. These blooms damage habitat and shellfish nurseries, can be toxic to humans, and can carry bacteria like those causing cholera. Brown algal tides and toxic algal blooms already are prevalent in the Atlantic. Warmer ocean waters could increase their occurrence and persistence.

## Coastal Areas

Sea level rise could lead to flooding of low-lying property, loss of coastal wetlands, erosion of beaches, saltwater contamination of drinking water, and decreased longevity of low-lying roads, causeways, and bridges. In addition, sea level rise could increase the vulnerability of coastal areas to storms and associated flooding.

The coast of Massachusetts is an important resource with over 1,500 miles of shoreline. Massachusetts' coastline includes stretches of rocky shore, barrier beaches, productive estuaries, fragile salt marshes, tidal flats, and dozens of islands. Barrier beaches, salt marshes, and other wetland resource areas buffer the coast from storms, waves, and flooding.

At Boston, sea level already is rising by 11 inches per century, and it is likely to rise another 22 inches by 2100. Rising sea levels are taking a toll on Massachusetts' coastal upland. Each year, an average of 65 acres of upland is submerged by a combination of rising seas and subsiding land. Much of this loss occurs along the south-facing coast between Rhode Island and the outer shore of Cape Cod, including the islands of Nantucket and Martha's Vineyard. Coastal land that has been lost because of erosion by storm waves or wetland erosion is not included in the estimate of annual average land lost from submersion.

Possible responses to sea level rise include building walls to hold back the sea, allowing the sea to advance and adapting to it, and raising the land (e.g., by replenishing beach sand, elevating houses and infrastructure). Each of these responses will be costly, either in out-of-pocket costs or in lost land and structures. For example, the cumulative cost of sand replenishment to protect the coast of Massachusetts from a 20-inch sea level rise by 2100 is estimated at $490 million to $2.6 billion.

## Water Resources

Water resources are affected by changes in precipitation as well as by temperature, humidity, wind, and sunshine. Changes in streamflow tend to magnify changes in precipitation. Water resources in drier climates tend to be more sensitive to climate changes. Because evaporation is likely to increase with warmer climate, it could result in lower river flow and lower lake levels, particularly in the summer. If streamflow and lake levels drop, groundwater also could be reduced. In addition, more intense precipitation could increase flooding.



**Future Sea Level Rise At Woods Hole, Cape Cod**

5% Chance
50% Chance
95% Chance

Inches

2100     2200

Year

Source: EPA (1995)

3

Western Massachusetts drains to the Connecticut River, and the eastern parts of the state drain directly to the Atlantic Ocean. Relatively little of the flow of the Connecticut River originates in Massachusetts, but it is the source of much of the water supply for the Boston metropolitan area. The flow of the Connecticut is strongly affected by winter snow accumulation and runoff from Vermont and New Hampshire. A warmer climate would lead to earlier spring snowmelt, resulting in higher streamflows in winter and spring and lower streamflows in summer and fall. However, warmer summer temperatures could increase water quality problems because of increased evaporation (which concentrates pollutant levels) and more favorable conditions for algae and other water organisms. Increased rainfall could mitigate these effects, but it also could contribute to localized flooding.

## Agriculture

The mix of crop and livestock production in a state is influenced by climatic conditions and water availability. As climate warms, production patterns could shift northward. Increases in climate variability could make adaptation by farmers more difficult. Warmer climates and less soil moisture due to increased evaporation may increase the need for irrigation. However, these same conditions could decrease water supplies, which also may be needed by natural ecosystems, urban populations, industry, and other sectors.

Understandably, most studies have not fully accounted for changes in climate variability, water availability, and imperfect responses by farmers to changing climate. Including these factors could change modeling results substantially. Analyses that assume changes in average climate and effective adaptation by farmers suggest that aggregate U.S. food production would not be harmed, although there may be significant regional changes.

In Massachusetts, agriculture is a $500 million annual industry, three-fourths of which comes from crops. Very little of the crop acreage is irrigated. The major crops in the state are silage, hay, and potatoes. Climate change could change crop yields little or

cause them to fall by as much as 45%, leading to changes in acres farmed and production. For example, potato yields could decrease while production rises because of an increase in potato acres farmed.

## Forests

Trees and forests are adapted to specific climate conditions, and as climate warms, forests will change. These changes could include changes in species, geographic range, and health and productivity. If conditions also become drier, the current range of forests could be reduced and replaced by grasslands and pasture. Even a warmer and wetter climate could lead to changes; trees that are better adapted to warmer conditions, such as oaks and pines, would prevail. Under these conditions, forests could become more dense. These changes could occur during the lifetimes of today's children, particularly if change is accelerated by other stresses such as fire, pests, and diseases. Some of these stresses would themselves be worsened by a warmer and drier climate.

Although the extent of forested areas in Massachusetts could change little because of climate change, a warmer climate could change the character of those forests. Maple-dominated hardwood forests could give way to forests dominated by oaks and conifers, species more tolerant of higher temperatures. This change would diminish the brilliant autumn foliage as the number of maple trees declines. Across the state, as much as 30-60% of the hardwood forests could be replaced by warmer climate forests with a mix of pines and hardwoods.

## Ecosystems

The coastal beaches and tidal marshes of Massachusetts are especially sensitive to the effects of sea level rise and changes in river flows. Sea level rise could inundate coastal wetlands, destroying habitat for commercial and game species as well as migratory birds and other wildlife. Barrier beach island refuges such as the Monomoy National Wildlife Refuge south of Cape Cod and the Parker River National Wildlife Refuge in northeastern Massachusetts could be threatened or lost. These refuges provide important habitat for migratory birds, including the threatened piping plover and the endangered roseate tern. Harbor and gray seals, which use beaches as refuge in the winter, also could lose habitat if sea levels rise.

Forests and woodlands support much of the wildlife in the state. Climate change could result in changes in these ecosystems. Fragmented land use patterns could impede migration of some plant species, resulting in loss of some native plants and increases in non-native species. Changes in rainfall and runoff could change sediment levels in streams and wetlands, thus affecting fish and aquatic habitats.

### Changes In Agricultural Yield And Production



Source: Mendelsohn and Neumann (in press); McCarl (personal communication)

*For further information about the potential impacts of climate change, contact the Climate and Policy Assessment Division (2174), U.S. EPA, 401 M Street SW, Washington, DC 20460.*



U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 43

United States
Environmental Protection
Agency

Office of Policy, Planning
and Evaluation
(2111)

EPA 230-F-97-008dd
September 1997

 **EPA**

# Climate Change And New Jersey

The earth's climate is predicted to change because human activities are altering the chemical composition of the atmosphere through the buildup of greenhouse gases — primarily carbon dioxide, methane, nitrous oxide, and chlorofluorocarbons. The heat-trapping property of these greenhouse gases is undisputed. Although there is uncertainty about exactly how and when the earth's climate will respond to enhanced concentrations of greenhouse gases, observations indicate that detectable changes are under way. There most likely will be increases in temperature and changes in precipitation, soil moisture, and sea level, which could have adverse effects on many ecological systems, as well as on human health and the economy.

## The Climate System

Energy from the sun drives the earth's weather and climate. Atmospheric greenhouse gases (water vapor, carbon dioxide, and other gases) trap some of the energy from the sun, creating a natural "greenhouse effect." Without this effect, temperatures would be much lower than they are now, and life as known today would not be possible. Instead, thanks to greenhouse gases, the earth's average temperature is a more hospitable 60°F. However, problems arise when the greenhouse effect is *enhanced* by human-generated emissions of greenhouse gases.

Global warming would do more than add a few degrees to today's average temperatures. Cold spells still would occur in winter, but heat waves would be more common. Some places would be drier, others wetter. Perhaps more important, more precipitation may come in short, intense bursts (e.g., more than 2 inches of rain in a day), which could lead to more flooding. Sea levels would be higher than they would have been without global warming, although the actual changes may vary from place to place because coastal lands are themselves sinking or rising.

### The Greenhouse Effect



Source: U.S. Department of State (1992)

## Emissions Of Greenhouse Gases

Since the beginning of the industrial revolution, human activities have been adding measurably to natural background levels of greenhouse gases. The burning of fossil fuels — coal, oil, and natural gas — for energy is the primary source of emissions. Energy burned to run cars and trucks, heat homes and businesses, and power factories is responsible for about 80% of global carbon dioxide emissions, about 25% of U.S. methane emissions, and about 20% of global nitrous oxide emissions. Increased agriculture and deforestation, landfills, and industrial production and mining also contribute a significant share of emissions. In 1994, the United States emitted about one-fifth of total global greenhouse gases.

## Concentrations Of Greenhouse Gases

Since the pre-industrial era, atmospheric concentrations of carbon dioxide have increased nearly 30%, methane concentrations have more than doubled, and nitrous oxide concentrations have risen by about 15%. These increases have enhanced the heat-trapping capability of the earth's atmosphere. Sulfate aerosols, a common air pollutant, cool the atmosphere by reflecting incoming solar radiation. However, sulfates are short-lived and vary regionally, so they do not offset greenhouse gas warming.

Although many greenhouse gases already are present in the atmosphere, oceans, and vegetation, their concentrations in the future will depend in part on present and future emissions. Estimating future emissions is difficult, because they will depend on demographic, economic, technological, policy, and institutional developments. Several emissions scenarios have been developed based on differing projections of these underlying factors. For example, by 2100, in the absence of emissions control policies, carbon dioxide concentrations are projected to be 30-150% higher than today's levels.

## Current Climatic Changes

Global mean surface temperatures have increased 0.6-1.2°F since the late 19th century. The 9 warmest years in this century all have occurred in the last 14 years.

Several pieces of additional evidence consistent with warming, such as a decrease in Northern Hemisphere snow cover, a decrease in Arctic Sea ice, and continued melting of alpine glaciers, have been corroborated. Globally, sea levels have risen 4-10 inches over the past century, and precipitation over land has increased slightly. The frequency of extreme rainfall events also has increased throughout much of the United States.

### Global Temperature Changes (1861–1996)



Source: IPCC (1995), updated

A new international scientific assessment by the Intergovernmental Panel on Climate Change recently concluded that *"the balance of evidence suggests a discernible human influence on global climate."*

## Future Climatic Changes

For a given concentration of greenhouse gases, the resulting increase in the atmosphere's heat-trapping ability can be predicted with precision, but the resulting impact on climate is more uncertain. The climate system is complex and dynamic, with constant interaction between the atmosphere, land, ice, and oceans. Further, humans have never experienced such a rapid rise in greenhouse gases. In effect, a large and uncontrolled planet-wide experiment is being conducted.

General circulation models are complex computer simulations that describe the circulation of air and ocean currents and how energy is transported within the climate system. While uncertainties remain, these models are a powerful tool for studying climate. Scientists are reasonably confident about the ability of models to characterize future climate at continental scales.

Recent model calculations suggest that the global surface temperature could increase an average of 1.6-6.3°F by 2100, with significant regional variation. These temperature changes would be far greater than recent natural fluctuations, and they would occur significantly faster than any known changes in the last 10,000 years. The United States is projected to warm more than the global average, especially as fewer sulfate aerosols are produced.

The models suggest that the rate of evaporation will increase as the climate warms, which will increase average global precipitation. They also suggest increased frequency of intense rainfall as well as a marked decrease in soil moisture over some mid-continental regions during the summer. Sea level is projected to increase by 6-38 inches by 2100.

Calculations of regional climate change are much less reliable than global ones, and it is unclear whether regional climate will become more variable. The frequency and intensity of some extreme weather of critical importance to ecological systems (droughts, floods, frosts, cloudiness, the frequency of hot or cold spells, and the intensity of associated fire and pest outbreaks) could increase.

## Local Climate Changes

Over the last century, the average temperature in New Brunswick, New Jersey, has increased from 50.4°F (1889-1918 average) to 52.2°F (1966-1995 average), and precipitation in some locations in the state has increased by 5-10%.

Over the next century, New Jersey's climate may change even more. Based on projections given by the Intergovernmental Panel on Climate Change and results from the United Kingdom Hadley Centre's climate model (HadCM2), a model that accounts for both greenhouse gases and aerosols, by 2100 temperatures in New Jersey could increase about 4°F (with a range of 2-8°F) in winter and spring, and slightly more in summer and fall, if greenhouse-gas emissions are not controlled. Precipitation is projected to increase by 10-20% (with a range of 0-40%), with slightly less change in spring and slightly more in winter.

The amount of precipitation on extreme wet (or snowy) days most likely would increase, but changes in the lengths of wet or dry spells are not clear. The frequency of extreme hot days in summer is expected to increase along with the general warming trend. It is not clear how severe storms such as hurricanes would change.

## Climate Change Impacts

Global climate change poses risks to human health and to terrestrial and aquatic ecosystems. Important economic resources such as agriculture, forestry, fisheries, and water resources also may be affected. Warmer temperatures, more severe droughts and floods, and sea level rise could have a wide range of impacts. All these stresses can add to existing stresses on resources caused by other influences such as population growth, land-use changes, and pollution.

Similar temperature changes have occurred in the past, but the previous changes took place over centuries or millennia instead of decades. The ability of some plants and animals to migrate and adapt appears to be much slower than the predicted rate of climate change.

### Precipitation Trends From 1900 To Present



Source: Karl et al. (1996)

## Human Health

Higher temperatures and increased frequency of heat waves may increase the number of heat-related deaths and the incidence of heat-related illnesses. New Jersey, with its irregular, intense heat waves, seems very susceptible.

In Newark, one study projects that a 2-3°F warming could increase heat-related deaths during a typical summer fivefold, from about 25 today to near 125 (although increased air conditioning use may not have been fully accounted for). Decreases in winter mortality probably would be less than the summer mortality increases if the climate warms. The elderly, particularly those living alone, are at greatest risk.

There is concern that climate change could increase ozone levels. For example, high temperatures, strong sunlight, and stable air masses tend to increase urban ozone levels. Furthermore, air pollution also is made worse because natural hydrocarbons emissions increase during hot weather. If a warmed climate causes increased use of air conditioners, air pollutant emissions from power plants also will increase.

A 4°F warming in New York City, with no other change in weather or emissions, could increase concentrations of ozone, a major component of smog, by 4%. Similar increases also could occur in New Jersey. Current ozone concentrations exceed the national health standards for ozone throughout the state. Virtually all of New Jersey is classified as an "extreme and severe" nonattainment area for ozone. Ground-level ozone has been shown to aggravate existing respiratory illnesses such as asthma, reduce lung function, and induce respiratory inflammation. In addition, ambient ozone reduces agricultural crop yields and impairs ecosystem health.

Warming and other climate changes could expand the habitat and infectivity of disease-carrying insects, thus increasing the potential for transmission of diseases such as malaria and dengue ("break bone") fever. Mosquitos flourish in some areas around New Jersey. Some can carry malaria, while others can carry Eastern equine encephalitis, which can be lethal or cause neurological damage. Lyme disease, which is carried by ticks, has increased in the Northeast. If conditions become warmer and wetter, mosquito and tick populations could increase, thereby increasing the risk of transmission of these diseases.

In addition, warmer seas could contribute to the increased intensity, duration, and extent of harmful algal blooms. These blooms can damage habitat and shellfish nurseries, can be toxic to humans, and can carry bacteria like those causing cholera. Brown algal tides and toxic algal blooms already are prevalent in the Atlantic. Warmer ocean waters could increase their occurrence and persistence.

## Coastal Areas

Sea level rise could lead to flooding of low-lying property, loss of coastal wetlands, erosion of beaches, saltwater contamination of drinking water, and decreased longevity of low-lying roads,

### Future Sea Level Rise At Atlantic City



Source: EPA (1995)

causeways, and bridges. In addition, sea level rise could increase the vulnerability of coastal areas to storms and associated flooding.

Along much of New Jersey's coast, sea level already is rising by 15 inches per century, and it is likely to rise another 27 inches by 2100. A large portion of New Jersey's 130-mile coastline is vulnerable to extensive erosion and flooding from sea level rise and storms. The New Jersey coastline is made up primarily of long narrow barrier islands, low-lying salt marshes, and tidal flats. Because of this topography, sea level rise could inflict extensive damage on New Jersey's valuable, high-density coastal real estate and recreational beaches. Rising seas also would inundate many acres of New Jersey's remaining coastal salt marshes and tidal flats that provide flood protection, water quality benefits, and habitat for native species, as marsh plants die or recede to higher elevations.

Protecting New Jersey's coast would require significant resources and planning. For example, estimates of the cost of protecting Long Beach Island with seawalls and more sand from a 1-3 foot increase in sea level over the next century are $100-$500 million. These costs could begin to accrue soon and continue to be incurred throughout the next century.

## Water Resources

Water resources are affected by changes in precipitation as well as by temperature, humidity, wind, and sunshine. Changes in streamflow tend to magnify changes in precipitation. Water resources in drier climates tend to be more sensitive to climate changes. Because evaporation from streams and lakes is likely to increase with warmer climate, it could result in lower river flow and lower lake levels, particularly in the summer. In addition, more intense precipitation could increase flooding. If streamflow and lake levels drop, groundwater also could be reduced.

Ensuring the supply of high quality municipal and industrial water is the most critical water resource issue in New Jersey. About half the state's potable water comes from streams and rivers, primarily the Delaware, Raritan, and Passaic rivers, and numerous small streams. The other half comes from groundwater. Except

for that part of the Delaware River that flows from upper New York State, winter snow accumulation has only a modest effect on New Jersey streams. However, streamflow could decrease because of the increased evaporation that would accompany warmer temperatures. The mean annual flow of the Delaware River at Trenton could decrease about 15% if average temperatures warm 4.5°F and precipitation remains unchanged. Urbanization has lowered water quality and increased flooding in many small New Jersey rivers and streams, especially in the northern part of the state. Reduced flows, especially in summer, would exacerbate the decline in water quality. Many New Jersey aquifers also have been contaminated because of industrial and urban development. In the absence of increased precipitation, the amount of groundwater available to refill the aquifers could decrease.

## Agriculture

The mix of crop and livestock production in a state is influenced by climatic conditions and water availability. As climate warms, production patterns will shift northward. Increases in climate variability could make adaptation by farmers more difficult. Warmer climates and less soil moisture due to increased evaporation may increase the need for irrigation. However, these same conditions could decrease water supplies, which also may be needed by natural ecosystems, urban populations, and other economic sectors.

Understandably, most studies have not fully accounted for changes in climate variability, water availability, and imperfect responses by farmers to changing climate. Including these factors could substantially change modeling results. Analyses based on changes in average climate and which assume farmers effectively adapt suggest that aggregate U.S. food production will not be harmed, although there may be significant regional changes.

In New Jersey, agriculture is about a $0.7 billion annual industry, two-thirds of which comes from crops. About 6% of New Jersey's agricultural land is irrigated. The principal crops are hay, corn, soybeans, and some vegetables. Projections of changes in

New Jersey yield are mixed; they could range from up by 25% to down by 38%. Climate change could lower total acres farmed and production, as well as farm income.

## Forests

Trees and forests are adapted to specific climate conditions, and as climate warms, forests will change. These changes could include changes in species, geographic extent, and health and productivity. If conditions also become drier, the current range of forests could be reduced and replaced by grasslands and pasture. Even a warmer and wetter climate would lead to changes; trees that are better adapted to warmer conditions, such as southern pines, would prevail. Under these conditions, forests could become more dense. These changes could occur during the lifetimes of today's children, particularly if they are accelerated by other stresses such as fire, pests, and diseases. Some of these stresses would themselves be worsened by a warmer and drier climate.

With changes in climate, the extent and density of forested areas in New Jersey could change little or could decline by as much as 10-20%. However, wildfire frequency almost certainly would change with hotter and drier conditions. The types of trees dominating New Jersey forests are likely to change. The mixed forests, dominated by southern pines and oaks, would spread northward throughout the state. These forests would replace the predominantly hardwood forests currently found in the northern half of the state.

## Ecosystems

The most important ecosystems of New Jersey that would be vulnerable to climate change are the coastal wetlands and the forested Pine Barrens. The Pine Barrens cover approximately 1 million acres of the Outer Coastal Plain in southern and central New Jersey. The Pine Barrens provide the habitat for rare and unusual species, including the pine barrens treefrog, which is protected by the Endangered Species Act. Because there are few natural corridors that would allow migration of species, their ability to adapt and migrate in response to climate change could be limited.

Plant and animal species near the borders of their ranges are likely to be most affected by climate change. Species better adapted for cool conditions would need to migrate northward, while southern species of plants and animals (including noxious weeds such as kudzu and insect pests such as fire ants) could spread into the state.

New Jersey's coastal wetlands are among the largest and most diverse in the mid-Atlantic region. Sea level rise would alter flooding and salinity, with substantial impacts on wildlife and fisheries. Losses of tidal freshwater wetlands would be especially harmful to foraging grounds for wading birds.



**Changes In Agricultural Yield And Production**

Source: Mendelsohn and Neumann (in press); McCarl (personal communication)

*For further information about the potential impacts of climate change, contact the Climate and Policy Assessment Division (2174), U.S. EPA, 401 M Street SW, Washington, DC 20460.*

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 44

United States
Environmental Protection
Agency

Office of Policy, Planning
and Evaluation
(2111)

EPA 230-F-97-008ff
September 1997



# Climate Change And New York

The earth's climate is predicted to change because human activities are altering the chemical composition of the atmosphere through the buildup of greenhouse gases — primarily carbon dioxide, methane, nitrous oxide, and chlorofluorocarbons. The heat-trapping property of these greenhouse gases is undisputed. Although there is uncertainty about exactly how and when the earth's climate will respond to enhanced concentrations of greenhouse gases, observations indicate that detectable changes are under way. There most likely will be increases in temperature and changes in precipitation, soil moisture, and sea level, which could have adverse effects on many ecological systems, as well as on human health and the economy.

## The Climate System

Energy from the sun drives the earth's weather and climate. Atmospheric greenhouse gases (water vapor, carbon dioxide, and other gases) trap some of the energy from the sun, creating a natural "greenhouse effect." Without this natural effect, temperatures would be much lower than they are now, and life as known today would not be possible. Instead, thanks to greenhouse gases, the earth's average temperature is a more hospitable 60°F. However, problems arise when the greenhouse effect is **enhanced** by human-generated emissions of greenhouse gases.

Global warming would do more than add a few degrees to today's average temperatures. Cold spells still would occur in winter, but heat waves would be more common. Some places would be drier, others wetter. Perhaps more important, more precipitation may come in short, intense bursts (e.g., more than 2 inches of rain in a day), which could lead to more flooding. Sea levels would be higher than they would have been without global warming, although the actual changes may vary from place to place because coastal lands are themselves sinking or rising.

### The Greenhouse Effect



Source: U.S. Department of State (1992)

## Emissions Of Greenhouse Gases

Since the beginning of the industrial revolution, human activities have been adding measurably to natural background levels of greenhouse gases. The burning of fossil fuels — coal, oil, and natural gas — for energy is the primary source of emissions. Energy burned to run cars and trucks, heat homes and businesses, and power factories is responsible for about 80% of global carbon dioxide emissions, about 25% of U.S. methane emissions, and about 20% of global nitrous oxide emissions. Increased agriculture and deforestation, landfills, and industrial production and mining also contribute a significant share of emissions. In 1994, the United States emitted about one-fifth of total global greenhouse gases.

## Concentrations Of Greenhouse Gases

Since the pre-industrial era, atmospheric concentrations of carbon dioxide have increased nearly 30%, methane concentrations have more than doubled, and nitrous oxide concentrations have risen by about 15%. These increases have enhanced the heat-trapping capability of the earth's atmosphere. Sulfate aerosols, a common air pollutant, cool the atmosphere by reflecting incoming solar radiation. However, sulfates are short-lived and vary regionally, so they do not offset greenhouse gas warming.

Although many greenhouse gases already are present in the atmosphere, oceans, and vegetation, their concentrations in the future will depend in part on present and future emissions. Estimating future emissions is difficult, because they will depend on demographic, economic, technological, policy, and institutional developments. Several emissions scenarios have been developed based on differing projections of these underlying factors. For example, by 2100, in the absence of emissions control policies, carbon dioxide concentrations are projected to be 30-150% higher than today's levels.

## Current Climatic Changes

Global mean surface temperatures have increased 0.6-1.2°F since the late 19th century. The 9 warmest years in this century all have occurred in the last 14 years. Of these, 1995 was the warmest year on record, suggesting the atmosphere has rebounded from the temporary cooling caused by the eruption of Mt. Pinatubo in the Philippines.

Several pieces of additional evidence consistent with warming, such as a decrease in Northern Hemisphere snow cover, a decrease in Arctic Sea ice, and continued melting of alpine glaciers, have been corroborated. Globally, sea levels have risen

### Global Temperature Changes (1861–1996)



Source: IPCC (1995), updated

4-10 inches over the past century, and precipitation over land has increased slightly. The frequency of extreme rainfall events also has increased throughout much of the United States.

A new international scientific assessment by the Intergovernmental Panel on Climate Change recently concluded that *"the balance of evidence suggests a discernible human influence on global climate."*

## Future Climatic Changes

For a given concentration of greenhouse gases, the resulting increase in the atmosphere's heat-trapping ability can be predicted with precision, but the resulting impact on climate is more uncertain. The climate system is complex and dynamic, with constant interaction between the atmosphere, land, ice, and oceans. Further, humans have never experienced such a rapid rise in greenhouse gases. In effect, a large and uncontrolled planet-wide experiment is being conducted.

General circulation models are complex computer simulations that describe the circulation of air and ocean currents and how energy is transported within the climate system. While uncertainties remain, these models are a powerful tool for studying climate. As a result of continuous model improvements over the last few decades, scientists are reasonably confident about the link between global greenhouse gas concentrations and temperature and about the ability of models to characterize future climate at continental scales.

Recent model calculations suggest that the global surface temperature could increase an average of 1.6-6.3°F by 2100, with significant regional variation. These temperature changes would be far greater than recent natural fluctuations, and they would occur significantly faster than any known changes in the last 10,000 years. The United States is projected to warm more than the global average, especially as fewer sulfate aerosols are produced.

The models suggest that the rate of evaporation will increase as the climate warms, which will increase average global precipitation. They also suggest increased frequency of intense rainfall as well as a marked decrease in soil moisture over some mid-continental regions during the summer. Sea level is projected to increase by 6-38 inches by 2100.

Calculations of regional climate change are much less reliable than global ones, and it is unclear whether regional climate will become more variable. The frequency and intensity of some extreme weather of critical importance to ecological systems (droughts, floods, frosts, cloudiness, the frequency of hot or cold spells, and the intensity of associated fire and pest outbreaks) could increase.

## Local Climate Changes

Over the last century, temperatures in Albany, New York, have warmed by more than 1°F, and precipitation throughout the state has increased by up to 20%.

Over the next century, New York's climate may change even more. Based on projections given by the Intergovernmental Panel on Climate Change and results from the United Kingdom Hadley Centre's climate model (HadCM2), a model that has accounted for both greenhouse gases and aerosols, by 2100 temperatures in New York could increase about 4°F in winter and spring, and slightly more in summer and fall (with a range of 2-8°F). Precipitation is projected to increase by 10-20% (with a range of 0-40%), with slightly less change in spring and slightly more in winter.

The amount of precipitation on extreme wet (or snowy) days is likely to increase, but changes in the lengths of wet or dry spells are not clear. The frequency of extreme hot days in summer is expected to increase along with the general warming trend. It is not clear how severe storms such as hurricanes would change.

## Climate Change Impacts

Global climate change poses risks to human health and to terrestrial and aquatic ecosystems. Important economic resources such as agriculture, forestry, fisheries, and water resources also may be affected. Warmer temperatures, more severe droughts and floods, and sea level rise could have a wide range of impacts. All these stresses can add to existing stresses on resources caused by other influences such as population growth, land-use changes, and pollution.

### Precipitation Trends From 1900 To Present



Source: Karl et al. (1996)

Similar temperature changes have occurred in the past, but the previous changes took place over centuries or millennia instead of decades. The ability of some plants and animals to migrate and adapt appears to be much slower than the predicted rate of climate change.

## Human Health

Higher temperatures and increased frequency of heat waves may increase the number of heat-related deaths and the incidence of heat-related illnesses. New York, with its irregular, intense heat waves, could be especially susceptible.

In New York City, one study projects that a 1°F warming could more than double heat-related deaths during a typical summer, from about 300 today to over 700 (although increased air conditioning use may not have been fully accounted for). Decreases in winter mortality probably would be less than the summer mortality increases if the climate warms. The elderly, particularly those living alone, are at greatest risk.

There is concern that climate change could increase concentrations of ground-level ozone. For example, high temperatures, strong sunlight, and stable air masses tend to increase urban ozone levels. Air pollution also is made worse by increases in natural hydrocarbons emissions during hot weather. If a warmed climate causes increased use of air conditioners, air pollutant emissions from power plants also will increase.

A 4°F warming in New York City, with no other change in weather or emissions, would increase concentrations of ground-level ozone, a major component of smog, by 4%. Current ozone concentrations exceed the national health standards in many urban areas, especially New York City and Long Island. Ground-level ozone has been shown to aggravate existing respiratory illnesses such as asthma, reduce lung function, and induce respiratory inflammation. In addition, ambient ozone reduces agricultural crop yields and impairs ecosystem health.

Warming and other climate changes may expand the habitat and infectivity of disease-carrying insects, increasing the potential for transmission of diseases such as malaria and dengue ("break bone") fever. Mosquitoes flourish in some areas around New York City. Some can carry malaria, while others can carry Eastern equine encephalitis, which can be lethal or cause neurological damage. Lyme disease, which is carried by ticks, has increased in New York. If conditions become warmer and wetter, mosquito and tick populations could increase, thereby increasing the risk of transmission of these diseases.

In addition, warmer seas could contribute to the increased intensity, duration, and extent of harmful algal blooms. These blooms damage habitat and shellfish nurseries, can be toxic to humans, and can carry bacteria, like those causing cholera. Brown algal tides already are prevalent in the Atlantic. Warmer ocean waters could increase their occurrence and persistence.

### Changes In Forest Cover



Current          +10°F, +13% Precipitation

■ Conifer Forest          ▨ Savanna/Woodland
▨ Broadleaf Forest          ▫ Grassland

Source: VEMAP Participants (1995);  Neilson (1995)

## Forests

Trees and forests are adapted to specific climate conditions, and as climate warms, forests will change. This would include changes in species, geographic extent, and health and productivity. If conditions also become drier, the current range of forests might be reduced and replaced by grasslands and pasture. Even a warmer and wetter climate would lead to changes; trees that are better adapted to warmer conditions, such as southern pines, would prevail. Forests could, under these conditions, become more dense. These changes might occur during the lifetimes of today's children, particularly if they are accelerated by other stresses such as fire, pests, and diseases. Some of these stresses would themselves be worsened by a warmer and drier climate.

With changes in climate, the extent of forested areas in New York could change little or could decline by as much as 10-25%. However, the types of trees dominating New York forests are likely to change. The predominant maple, beech, and birch forests found in northern and western New York would retreat northward. The brilliant autumn foliage of the maples eventually could give way to forests dominated by oaks, ash, and pines. Across the state, as much as 50-70% of the maple forests could be lost. As a result, the character of heavily visited areas such as the Adirondacks may change.

## Coastal Areas

Along much of New York's coast, sea level already is rising 10 inches per century, and it is likely to rise another 22 inches by 2100. Sea level rise can lead to flooding of low-lying areas, loss of coastal wetlands, erosion of beaches, saltwater contamination of drinking water, and decreased longevity of low-lying roads, causeways, and bridges. In addition, sea level rise could increase the vulnerability of coastal areas to storms and associated flooding.

New York has one of the most urbanized coastlines in the United States. Over 20 million people use New York's beaches and coastal regions for recreation each year. New York has been successful at preventing major permanent losses of its beaches

and urban coastline, but sites such as Long Island continue to suffer from chronic beach erosion. Long Island's south shore, which is made up of barrier islands, barrier spits, ponds, and sand beaches, could suffer extensive damage from sea level rise and coastal storms.

Protecting New York's coast would require significant resources and planning. For example, Manhattan's 29-mile coast probably could be protected by raising existing bulkheads and sea walls at a cumulative cost of $30–$140 million for a 1–3 foot rise in sea level. The costs of raising existing bulkheads already have begun to accrue, and they could continue throughout the next century.

## Water Resources

Water resources are affected by changes in precipitation as well as by temperature, humidity, wind, and sunshine. Changes in streamflow tend to magnify changes in precipitation. Water resources in drier climates tend to be more sensitive to climate changes. Because evaporation is likely to increase with warmer climate, it could result in lower river flow and lower lake levels, particularly in the summer. In addition, more intense precipitation could increase flooding. If streamflow and lake levels drop, groundwater also could be reduced.

Scientists are unable to predict whether streamflow in New York would rise or fall on average. However, there could be higher streamflow in the winter and lower streamflow in spring and summer. Changes in the seasonality of streamflow (more in winter, less in summer) would make it difficult for the water supply systems in cities like New York to meet current demands reliably. In addition, higher temperatures and lower flow could reduce water quality in New York's rivers and streams.

Increased evaporation probably would reduce the average levels of Lakes Erie and Ontario by up to a foot. These changes would exacerbate water quality problems in those lakes, as well as in the numerous smaller lakes in the St. Lawrence River basin. Lower water levels in Lakes Erie and Ontario would reduce flood damages, but shore erosion would increase from wind and rain. The ice-free season for the St. Lawrence Seaway would be longer, with positive benefits to navigation.

## Agriculture

The mix of crop and livestock production in a state is influenced by climatic conditions and water availability. As climate warms, production patterns will shift northward. Increases in climate variability could make adaptation by farmers more difficult. Warmer climates and less soil moisture due to increased evaporation may increase the need for irrigation. However, these same conditions could decrease water supplies, which also may be needed by natural ecosystems, urban populations, and other economic sectors.

Understandably, most studies have not fully accounted for changes in climate variability, water availability, and imperfect responses by farmers to changing climate. Including these factors could substantially change modeling results. Analyses based on



**Changes In Agricultural Yield And Production**

Source: Mendelsohn and Neumann (in press); McCarl (personal communication)

changes in average climate and which assume farmers effectively adapt suggest that aggregate U.S. food production will not be harmed, although there may be significant regional changes.

In New York, agriculture is about a $3 billion a year industry, two-thirds of which comes from dairy livestock. The major crops in the state are hay, corn, and silage. Changes in New York yields could range from 0 to -40%. Climate change could lower production and farm income, but total acres farmed most likely would remain constant. Although very little land is currently irrigated, irrigated acreage probably would increase with climate change.

## Ecosystems

The ecosystems of New York are quite diverse, ranging from coastal marshes to mountain forests. These ecosystems would be affected by everything from sea level rise to changes in fires and pest outbreaks. Sea level rise could alter food availability for wading birds and other animals in the coastal areas because of loss of wetlands. In higher elevation wetlands, climate warming could reduce streamflow and lake levels, which would result in losses of vegetation such as cranberries. Brook trout habitat and fisheries, which require cold temperatures, could be lost entirely throughout New York, and most of the habitat for brown trout could be lost.

Adirondack State Park is the largest single forested area east of the Mississippi, consisting of 6 million acres, 2.6 million of which are a forest preserve. The park represents one of the most significant hardwood ecosystems in the world. A warmer climate could change the types and extent of forests. The migration of species to new locations out of the park could be impeded by economic development around the park.

*For further information about the potential impacts of climate change, contact the Climate and Policy Assessment Division (2174), U.S. EPA, 401 M Street SW, Washington, DC 20460.*

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 45

United States
Environmental Protection
Agency

Office of Policy
(2111)

EPA 236-F-98-007v
September 1998

 **EPA** **Climate Change** And Rhode Island

The earth's climate is predicted to change because human activities are altering the chemical composition of the atmosphere through the buildup of greenhouse gases — primarily carbon dioxide, methane, nitrous oxide, and chlorofluorocarbons. The heat-trapping property of these greenhouse gases is undisputed. Although there is uncertainty about exactly how and when the earth's climate will respond to enhanced concentrations of greenhouse gases, observations indicate that detectable changes are under way. There most likely will be increases in temperature and changes in precipitation, soil moisture, and sea level, which could have adverse effects on many ecological systems, as well as on human health and the economy.

## The Climate System

Energy from the sun drives the earth's weather and climate. Atmospheric greenhouse gases (water vapor, carbon dioxide, and other gases) trap some of the energy from the sun, creating a natural "greenhouse effect." Without this effect, temperatures would be much lower than they are now, and life as known today would not be possible. Instead, thanks to greenhouse gases, the earth's average temperature is a more hospitable 60°F. However, problems arise when the greenhouse effect is *enhanced* by human-generated emissions of greenhouse gases.

Global warming would do more than add a few degrees to today's average temperatures. Cold spells still would occur in winter, but heat waves would be more common. Some places would be drier, others wetter. Perhaps more important, more precipitation may come in short, intense bursts (e.g., more than 2 inches of rain in a day), which could lead to more flooding. Sea levels would be higher than they would have been without global warming, although the actual changes may vary from place to place because coastal lands are themselves sinking or rising.

### The Greenhouse Effect



Solar radiation passes through the clear atmosphere

Some solar radiation is reflected by the earth and the atmosphere

Some of the infrared radiation passes through the atmosphere, and some is absorbed and re-emitted in all directions by greenhouse gas molecules. The effect of this is to warm the earth's surface and the lower atmosphere.

Infrared radiation is emitted from the earth's surface

Most radiation is absorbed by the earth's surface and warms it

Source: U.S. Department of State (1992)

## Emissions Of Greenhouse Gases

Since the beginning of the industrial revolution, human activities have been adding measurably to natural background levels of greenhouse gases. The burning of fossil fuels — coal, oil, and natural gas — for energy is the primary source of emissions. Energy burned to run cars and trucks, heat homes and busi-nesses, and power factories is responsible for about 80% of global carbon dioxide emissions, about 25% of U.S. methane emissions, and about 20% of global nitrous oxide emissions. Increased agriculture and deforestation, landfills, and industrial production and mining also contribute a significant share of emissions. In 1994, the United States emitted about one-fifth of total global greenhouse gases.

## Concentrations Of Greenhouse Gases

Since the pre-industrial era, atmospheric concentrations of carbon dioxide have increased nearly 30%, methane concentrations have more than doubled, and nitrous oxide concentrations have risen by about 15%. These increases have enhanced the heat-trapping capability of the earth's atmosphere. Sulfate aerosols, a common air pollutant, cool the atmosphere by reflecting incoming solar radiation. However, sulfates are short-lived and vary regionally, so they do not offset greenhouse gas warming.

Although many greenhouse gases already are present in the atmosphere, oceans, and vegetation, their concentrations in the future will depend in part on present and future emissions. Estimating future emissions is difficult, because they will depend on demographic, economic, technological, policy, and institutional developments. Several emissions scenarios have been developed based on differing projections of these under-lying factors. For example, by 2100, in the absence of emissions control policies, carbon dioxide concentrations are projected to be 30-150% higher than today's levels.

## Current Climatic Changes

Global mean surface temperatures have increased 0.6-1.2°F between 1890 and 1996. The 9 warmest years in this century all have occurred in the last 14 years. Of these, 1995 was the warmest year on record, suggesting the atmosphere has rebounded from the temporary cooling caused by the eruption of Mt. Pinatubo in the Philippines.

Several pieces of additional evidence consistent with warming, such as a decrease in Northern Hemisphere snow cover, a decrease in Arctic Sea ice, and continued melting of alpine glaciers, have been corroborated. Globally, sea levels have risen

### Global Temperature Changes (1861–1996)



Source: IPCC (1995), updated

4-10 inches over the past century, and precipitation over land has increased slightly. The frequency of extreme rainfall events also has increased throughout much of the United States.

A new international scientific assessment by the Intergovernmental Panel on Climate Change recently concluded that *"the balance of evidence suggests a discernible human influence on global climate."*

## Future Climatic Changes

For a given concentration of greenhouse gases, the resulting increase in the atmosphere's heat-trapping ability can be predicted with precision, but the resulting impact on climate is more uncertain. The climate system is complex and dynamic, with constant interaction between the atmosphere, land, ice, and oceans. Further, humans have never experienced such a rapid rise in greenhouse gases. In effect, a large and uncontrolled planet-wide experiment is being conducted.

General circulation models are complex computer simulations that describe the circulation of air and ocean currents and how energy is transported within the climate system. While uncertainties remain, these models are a powerful tool for studying climate. As a result of continuous model improvements over the last few decades, scientists are reasonably confident about the link between global greenhouse gas concentrations and temperature and about the ability of models to characterize future climate at continental scales.

Recent model calculations suggest that the global surface temperature could increase an average of 1.6-6.3°F by 2100, with significant regional variation. These temperature changes would be far greater than recent natural fluctuations, and they would occur significantly faster than any known changes in the last 10,000 years. The United States is projected to warm more than the global average, especially as fewer sulfate aerosols are produced.

The models suggest that the rate of evaporation will increase as the climate warms, which will increase average global precipitation. They also suggest increased frequency of intense rainfall as

well as a marked decrease in soil moisture over some mid-continental regions during the summer. Sea level is projected to increase by 6-38 inches by 2100.

Calculations of regional climate change are much less reliable than global ones, and it is unclear whether regional climate will become more variable. The frequency and intensity of some extreme weather of critical importance to ecological systems (droughts, floods, frosts, cloudiness, the frequency of hot or cold spells, and the intensity of associated fire and pest outbreaks) could increase.

## Local Climate Changes

Over the last century, the average temperature in Providence, Rhode Island, has increased 3.3°F, and precipitation has increased by up to 20% in many parts of the state. These past trends may or may not continue into the future.

Over the next century, Rhode Island's climate may change even more. For example, based on projections made by the Intergovernmental Panel on Climate Change and results from the United Kingdom Hadley Centre climate model (HadCM2), a model that accounts for both greenhouse gases and aerosols, by 2100 temperatures in Rhode Island could increase by 4°F (with a range of 1-8°F) in winter and spring and by 5°F (with a range of 2-10°F) in summer and fall. Precipitation is projected to increase by 10% in spring and summer (with a range of 5-15%), 15% in fall (with a range of 5-30%), and 25% in winter (with a range of 10-50%). Other climate models may show different results, especially regarding estimated changes in precipitation. The impacts described in the sections that follow take into account estimates from different models. The amount of precipitation on extreme wet or snowy days in winter is likely to increase. The frequency of extreme hot days in summer would increase because of the general warming trend. Although it is not clear how the severity of storms such as hurricanes might be affected, an increase in the frequency and intensity of winter storms is possible.

### Precipitation Trends From 1900 To Present



Source: Karl et al. (1996)

2

## Human Health

Higher temperatures and increased frequency of heat waves may increase the number of heat-related deaths and the incidence of heat-related illnesses. Rhode Island, with its irregular, intense heat waves, could be susceptible. One study projects that a warming of 3-4°F could increase heat-related deaths during a typical summer in Providence by 50% from the current 50 to near 75 (although increased air conditioning use may not have been fully accounted for). This study also shows that winter-related deaths in Providence could rise by 25% given a 2°F warming. However, the exact reasons for this increase are unknown. The elderly, especially those living alone, are at greatest risk.

Climate change could increase concentrations of ground-level ozone. For example, high temperatures, strong sunlight, and stable air masses tend to increase urban ozone levels. Based on projections for New York City, a 4°F warming could increase concentrations of ozone, a major component of smog, by 4%. Currently, ground-level concentrations exceed the national ozone health standard throughout the state. All of Rhode Island is classified as a serious nonattainment area for ozone. Ground-level ozone is associated with respiratory illnesses such as asthma, reduced lung function, and respiratory inflammation. Air pollution also is made worse by increases in natural hydro-carbon emissions such as emissions of terpenes by trees and shrubs during hot weather. If a warmed climate causes increased use of air conditioners, air pollutant emissions from power plants also will increase.

Warmer temperatures could increase the incidence of Lyme disease and other tick-borne diseases in Rhode Island, because populations of ticks, and their rodent hosts, could increase under warmer temperatures and increased vegetation. Respiratory and eye allergies increase in warm, humid conditions.

Warmer winters, warmer temperatures, and heavy precipitation also can increase harmful algal blooms, that is, red tides; reduce water quality; and increase outbreaks of cryptosporidiosis and giardia. In addition, warmer seas could contribute to the intensity, duration, and extent of harmful algal blooms in the coastal waters of Rhode Island. These blooms damage habitat and shellfish nurseries and can be toxic to humans.

Developed countries such as the United States should be able to minimize the impacts of these diseases through existing disease prevention and control methods.

## Coastal Areas

Sea level rise could lead to flooding of low-lying property, loss of coastal wetlands, erosion of beaches, saltwater contamination of drinking water, and decreased longevity of low-lying roads, causeways, and bridges. In addition, sea level rise could increase the vulnerability of coastal areas to storms and associated flooding.

Rhode Island is endowed with over 400 miles of densely populated, tidally influenced shoreline, consisting of both sandy and gravel barrier beaches, and rocky cliffs. Block Island and

### Future Sea Level Rise At Watch Hill



Source: EPA (1995)

Narragansett Bay contain relatively undisturbed salt marshes, tidal flats, rocky shores, and small islands. The beaches along the Rhode Island coast are highly developed and heavily used by hundreds of thousands residents and out-of-state visitors each year. These beaches have suffered severe damage during hurricanes and storm surges. In general, erosion is most severe at the barrier beaches on the south shore of Rhode Island and bluff areas on Block Island; these areas are likely to erode most if sea level rises. The northern shore of Narragansett Bay, including Cranston, Providence, and Pawtucket, is heavily armored with seawalls and other erosion control devices.

At Watch Hill, sea level already is rising by 2 inches per century, and it is likely to rise another 12.4 inches by 2100. Possible responses to sea level rise include building walls to hold back the sea, allowing the sea to advance and adapting to it, and raising the land (e.g., by replenishing beach sand, elevating houses and infrastructure). Each of these responses will be costly, either in out-of-pocket costs or in lost land and structures. For example, the cumulative cost of sand replenishment to protect Rhode Island's coastline from a 20-inch sea level rise by 2100 is esti-mated at $90-$530 million. However, sand replenishment may not be cost-effective for all coastal areas in the state and, therefore, some savings could be possible.

## Water Resources

The principal rivers in Rhode Island are the Blackstone, the Pawtuxet, and the Pawcatuch, which drain toward Narragansett Bay and Block Island Sound. Water resources in Rhode Island are currently abundant and well developed. Most of the freshwater used in the state comes from reservoirs, lakes, and rivers. Sciture Reservoir, in southern Providence County, serves nearly one-half of the state's population. Winter snow accumulation and spring snowmelt strongly affect the state's rivers. A warmer climate would lead to an earlier snowmelt, resulting in higher streamflows in winter and spring. Without increases in precipitation, higher temperatures and increased evaporation would lower streamflows, lake levels, and groundwater levels in the

3

summer and fall. This could aggravate water supply problems, particularly in the southern part of the state, where water demand is highest. Groundwater sources, recently developed to meet growing demand in the state, also could be reduced by lower spring and summer recharge. Lower summer streamflows and warmer temperatures also could increase water quality problems by concentrating pollutant levels, particularly in parts of rivers where effluent from municipal wastewater treatment facilities and industries is dumped. Increases in rainfall could mitigate these effects. Higher rainfall, however, could contribute to localized flooding, increased levels of pesticides and fertilizers from agricultural runoff, and increased pollution from urban runoff. During periods of high flow, the water quality in northern Narragansett Bay is particularly susceptible to pollution from sewer overflows and stormwater runoff from the highly urbanized area around Providence.

## Agriculture

The mix of crop and livestock production in a state is influenced by climatic conditions and water availability. As climate warms, production patterns could shift northward. Increases in climate variability could make adaptation by farmers more difficult. Warmer climates and less soil moisture due to increased evaporation may increase the need for irrigation. However, these same conditions could decrease water supplies, which also may be needed by natural ecosystems, urban populations, industry, and other users.

Understandably, most studies have not fully accounted for changes in climate variability, water availability, crop pests, changes in air pollution such as ozone, and adaptation by farmers to changing climate. Including these factors could change modeling results substantially. Analyses that assume changes in average climate and effective adaptation by farmers suggest that aggregate U.S. food production would not be harmed, although there may be significant regional changes.

### Changes In Agricultural Yield And Production



Sources: Mendelsohn and Neumann (in press); McCarl (personal communication)

In Rhode Island, production agriculture is a $78 million annual industry, three-fourths of which comes from crops. Very few of the farmed acres are irrigated. The major crops in the state are silage, potatoes, and hay. Climate change could reduce potato yields by 30-66%. Silage, hay, and pasture yields could fall as much as 39% as temperatures rise beyond the tolerance level of the crop. Farmed acres may remain constant or could fall by as much as 14%. Estimated changes in yield vary, depending on whether land is irrigated.

## Forests

Trees and forests are adapted to specific climate conditions, and as climate warms, forests will change. These changes could include changes in species composition, geographic range, and health and productivity. If conditions also become drier, the current range and density of forests could be reduced and replaced by grasslands and pasture. Even a warmer and wetter climate could lead to changes; trees that are better adapted to these conditions, such as oaks and pines, would thrive. Under these conditions, forests could become more dense. These changes could occur during the lifetimes of today's children, particularly if the change is accelerated by other stresses such as fire, pests, and diseases. Some of these stresses would themselves be worsened by a warmer and drier climate.

Although the extent of forested areas in Rhode Island could change little because of climate change, a warmer climate could change the character of those forests. Maple-dominated hardwood forests could give way to forests dominated by oaks and conifers, species more tolerant of higher temperatures. This change would diminish the brilliant autumn foliage as the contribution of maples declines. Across the state, as much as 30-60% of the hardwood forests could be replaced by warmer-climate forests with a mix of pines and hardwoods.

## Ecosystems

The smallest state in the country, Rhode Island is almost entirely a coastal area. Its marshes, estuaries, and salt ponds are critical habitats for waterfowl and other migratory birds, as well as for many terrestrial animals. The many streams and rivers that enter Narragansett Bay provide important spawning habitat for shad, herring, and Atlantic salmon. Barrier reef islands such as Block Island in Narragansett Bay are important as refuges for a number of rare and endangered species, including the grasshopper sparrow, savannah sparrow, northern harrier hawk, and American burying beetle. These islands are also key stopover points for migratory songbirds.

The fragile coastal ecosystems of Rhode Island are particularly susceptible to destruction as sea level rises and barrier reef islands are inundated, and if the frequency and severity of storms increase. Such losses would reduce coastal habitat that supports diverse sea life and migratory waterfowl.

*For further information about the potential impacts of climate change, contact the Climate and Policy Assessment Division (2174), U.S. EPA, 401 M Street SW, Washington, DC 20460, or visit http://www.epa.gov/globalwarming/impacts.*



U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 46

United States
Environmental Protection
Agency

Office of Policy, Planning
and Evaluation
(2111)

EPA 230-F-97-008ll
September 1997

 **EPA**

# Climate Change And Pennsylvania

The earth's climate is predicted to change because human activities are altering the chemical composition of the atmosphere through the buildup of greenhouse gases — primarily carbon dioxide, methane, nitrous oxide, and chlorofluorocarbons. The heat-trapping property of these greenhouse gases is undisputed. Although there is uncertainty about exactly how and when the earth's climate will respond to enhanced concentrations of greenhouse gases, observations indicate that detectable changes are under way. There most likely will be increases in temperature and changes in precipitation, soil moisture, and sea level, which could have adverse effects on many ecological systems, as well as on human health and the economy.

## The Climate System

Energy from the sun drives the earth's weather and climate. Atmospheric greenhouse gases (water vapor, carbon dioxide, and other gases) trap some of the energy from the sun, creating a natural "greenhouse effect." Without this effect, temperatures would be much lower than they are now, and life as known today would not be possible. Instead, thanks to greenhouse gases, the earth's average temperature is a more hospitable 60°F. However, problems arise when the greenhouse effect is *enhanced* by human-generated emissions of greenhouse gases.

Global warming would do more than add a few degrees to today's average temperatures. Cold spells still would occur in winter, but heat waves would be more common. Some places would be drier, others wetter. Perhaps more important, more precipitation may come in short, intense bursts (e.g., more than 2 inches of rain in a day), which could lead to more flooding. Sea levels would be higher than they would have been without global warming, although the actual changes may vary from place to place because coastal lands are themselves sinking or rising.

### The Greenhouse Effect



Source: U.S. Department of State (1992)

## Emissions Of Greenhouse Gases

Since the beginning of the industrial revolution, human activities have been adding measurably to natural background levels of greenhouse gases. The burning of fossil fuels — coal, oil, and natural gas — for energy is the primary source of emissions. Energy burned to run cars and trucks, heat homes and businesses, and power factories is responsible for about 80% of global carbon dioxide emissions, about 25% of U.S. methane emissions, and about 20% of global nitrous oxide emissions. Increased agriculture and deforestation, landfills, and industrial production and mining also contribute a significant share of emissions. In 1994, the United States emitted about one-fifth of total global greenhouse gases.

## Concentrations Of Greenhouse Gases

Since the pre-industrial era, atmospheric concentrations of carbon dioxide have increased nearly 30%, methane concentrations have more than doubled, and nitrous oxide concentrations have risen by about 15%. These increases have enhanced the heat-trapping capability of the earth's atmosphere. Sulfate aerosols, common air pollutants, cool the atmosphere by reflecting incoming solar radiation. However, sulfates are short-lived and vary regionally.

Although many greenhouse gases already are present in the atmosphere, oceans, and vegetation, their concentrations in the future will depend in part on present and future emissions. Estimating future emissions is difficult, because they will depend on demographic, economic, technological, policy, and institutional developments. Several emissions scenarios have been developed based on differing projections of these underlying factors. For example, by 2100, in the absence of emissions control policies, carbon dioxide concentrations are projected to be 30-150% higher than today's levels.

## Current Climatic Changes

Global mean surface temperatures have increased 0.6-1.2°F between 1890 and 1996. The 9 warmest years in this century all have occurred in the last 14 years. Of these, 1995 was the warmest year on record, suggesting the atmosphere has re-bounded from the temporary cooling caused by the eruption of Mt. Pinatubo in the Philippines.

Several pieces of additional evidence consistent with warming, such as a decrease in Northern Hemisphere snow cover, a decrease in Arctic Sea ice, and continued melting of alpine glaciers, have been corroborated. Globally, sea levels have risen

### Global Temperature Changes (1861–1996)



Source: IPCC (1995), updated

4-10 inches over the past century, and precipitation over land has increased slightly. The frequency of extreme rainfall events also has increased throughout much of the United States.

A new international scientific assessment by the Intergovernmental Panel on Climate Change recently concluded that *"the balance of evidence suggests a discernible human influence on global climate."*

## Future Climatic Changes

For a given concentration of greenhouse gases, the resulting increase in the atmosphere's heat-trapping ability can be predicted with precision, but the resulting impact on climate is more uncertain. The climate system is complex and dynamic, with constant interaction between the atmosphere, land, ice, and oceans. Further, humans have never experienced such a rapid rise in greenhouse gases. In effect, a large and uncontrolled planet-wide experiment is being conducted.

General circulation models are complex computer simulations that describe the circulation of air and ocean currents and how energy is transported within the climate system. While uncertainties remain, these models are a powerful tool for studying climate. As a result of continuous model improvements over the last few decades, scientists are reasonably confident about the link between global greenhouse gas concentrations and temperature and about the ability of models to characterize future climate at continental scales.

Recent model calculations suggest that the global surface temperature could increase an average of 1.6-6.3°F by 2100, with significant regional variation. These temperature changes would be far greater than recent natural fluctuations, and they would occur significantly faster than any known changes in the last 10,000 years. The United States is projected to warm more than the global average, especially as fewer sulfate aerosols are produced.

The models suggest that the rate of evaporation will increase as the climate warms, which will increase average global precipitation. They also suggest increased frequency of intense rainfall as well as a marked decrease in soil moisture over some mid-continental regions during the summer. Sea level is projected to increase by 6-38 inches by 2100.

Calculations of regional climate change are much less reliable than global ones, and it is unclear whether regional climate will become more variable. The frequency and intensity of some extreme weather of critical importance to ecological systems (droughts, floods, frosts, cloudiness, the frequency of hot or cold spells, and the intensity of associated fire and pest outbreaks) could increase.

## Local Climate Changes

Over the last century, the average temperature in Harrisburg, Pennsylvania, has increased 1.2°F, and precipitation has increased by up to 20% in many parts of the state.

Over the next century, climate in Pennsylvania may change even more. For example, based on projections made by the Intergovernmental Panel on Climate Change and results from the United Kingdom Hadley Centre's climate model (HadCM2), a model that accounts for both greenhouse gases and aerosols, by 2100 temperatures in Pennsylvania could increase by about 4°F (with a range of 2-9°F), slightly less in summer and fall, and slightly more in winter and spring. Precipitation is estimated to increase by about 10% in spring, by about 20% in winter and summer, and by as much as 50% in fall. Other climate models may show different seasonal changes in rainfall. The amount of precipitation on extreme wet or snowy days is likely to increase. The frequency of extreme hot days in summer would increase because of the general warming trend. Although it is not clear how severe storms would change, an increase in the frequency and intensity of summer thunderstorms is possible.

## Climate Change Impacts

Global climate change poses risks to human health and to terrestrial and aquatic ecosystems. Important economic resources such as agriculture, forestry, fisheries, and water resources also

### Precipitation Trends From 1900 To Present



Source: Karl et al. (1996)

may be affected. Warmer temperatures, more severe droughts and floods, and sea level rise could have a wide range of impacts. All these stresses can add to existing stresses on resources caused by other influences such as population growth, land-use changes, and pollution.

Similar temperature changes have occurred in the past, but the previous changes took place over centuries or millennia instead of decades. The ability of some plants and animals to migrate and adapt appears to be much slower than the predicted rate of climate change.

## Human Health

Higher temperatures and increased frequency of heat waves may increase the number of heat-related deaths and the incidence of heat-related illnesses. Pennsylvania, with its irregular, intense heat waves, could be especially susceptible.

In Philadelphia, one study projects that by 2050 heat-related deaths during a typical summer could increase 90%, from close to 130 heat-related deaths per summer to over 240 (although increased air conditioning use may not have been fully accounted for). Similar but smaller increases have been projected for Pittsburgh, from about 40 heat-related deaths to 60, or a 50% increase. Winter-related deaths could drop from 85 in Philadelphia per winter to about 35 if winter temperatures warm. In Pittsburgh, winter-related deaths are expected to change very little. The elderly, particularly those living alone, are at greatest risk.

Climate change could increase concentrations of ground-level ozone. For example, high temperatures, strong sunlight, and stable air masses tend to increase urban ozone levels. Air pollution also is made worse by increases in natural hydrocarbon emissions during hot weather. If a warmed climate causes increased use of air conditioners, air pollutant emissions from power plants also will increase.

A preliminary modeling study of the Midwest, which included the area around Pittsburgh, found that a 4°F warming, with no other change in weather or emissions, could increase concentrations of ozone, a major component of smog, by as much as 8%. Currently, ground-level ozone concentrations exceed national ozone health standards in several areas throughout the state, with the Philadelphia area classified as a "severe" nonattainment area for ozone. Ground-level ozone has been shown to aggravate respiratory illnesses such as asthma, reduce existing lung function, and induce respiratory inflammation. In addition, ambient ozone reduces crop yields and impairs ecosystem health.

Warming and other climate changes may expand the habitat and infectivity of disease-carrying insects, thus increasing the potential for transmission of diseases such as malaria and dengue ("break bone") fever. Mosquitos flourish in some areas around Pennsylvania. Some can carry malaria, while others can carry encephalitis, which can be lethal or cause neurological damage. Incidents of Lyme disease, which is carried by ticks, have increased in the Northeast. If conditions become warmer

and wetter, mosquito and tick populations could increase in Pennsylvania, thereby increasing the risk of transmission of these diseases.

## Water Resources

Water resources are affected by changes in precipitation as well as by temperature, humidity, wind, and sunshine. Changes in streamflow tend to magnify changes in precipitation. Water resources in drier climates tend to be more sensitive to climate changes. Because evaporation is likely to increase with warmer climate, it could result in lower river flow and lower lake levels, particularly in the summer. If streamflow and lake levels drop, groundwater also could be reduced. In addition, more intense precipitation could increase flooding.

Pennsylvania's Susquehanna River drains much of the eastern two-thirds of the state, and the Allegheny and the upper Ohio rivers drain most of the western third. A warmer climate would lead to earlier spring snowmelt, and could result in higher streamflows in winter and spring and lower streamflows in summer and fall. However, changes in rainfall also could have significant effects on streamflow and runoff and, if summer precipitation falls, could affect adversely downstream uses such as navigation on the Ohio River. Increased precipitation in winter or summer could offset losses from increased evaporation, but also could lead to increased flood risk. Some of the most intense flooding on record in the United States has occurred in Pennsylvania.

## Agriculture

The mix of crop and livestock production in a state is influenced by climatic conditions and water availability. As climate warms, production patterns could shift northward. Increases in climate variability could make adaptation by farmers more difficult. Warmer climates and less soil moisture due to increased evaporation may increase the need for irrigation. However, these same



### Changes In Agricultural Yield And Production

Source: Mendelsohn and Neumann (in press); McCarl (personal communication)

conditions could decrease water supplies, which also may be needed by natural ecosystems, urban populations, industry, and other sectors.

Understandably, most studies have not fully accounted for changes in climate variability, water availability, and imperfect responses by farmers to changing climate. Including these factors could change modeling results substantially. Analyses that assume changes in average climate and effective adaptation by farmers suggest that aggregate U.S. food production would not be harmed, although there may be significant regional changes.

In Pennsylvania, agriculture is a $3.8 billion annual industry, two-thirds of which comes from livestock, most of which is dairy. About 6% of the crop acreage is irrigated. The major crops in the state are corn and hay. Climate change could change crop yields very little or by as much as 39%, leading to changes in acres farmed and production. For example, hay yields could rise while production falls because of a decrease in hay acres farmed.

## Forests

Trees and forests are adapted to specific climate conditions, and as climate warms, forests will change. These changes could include changes in species, geographic range, and health and productivity. If conditions also become drier, the current range of forests could be reduced and replaced by grasslands and pasture. Even a warmer and wetter climate could lead to changes; trees that are better adapted to warmer conditions, such as oaks and pines, would prevail. Under these conditions, forests could become more dense. These changes could occur during the lifetimes of today's children, particularly if change is accelerated by other stresses such as fire, pests, and diseases. Some of these stresses would themselves be worsened by a warmer and drier climate.

With changes in climate, the extent of forested areas in Pennsylvania could change little or decline by as much as 15-25%. However, the types of trees dominating Pennsylvania forests and woodlands are likely to change. The maple, beech, and birch forests found in northern Pennsylvania would retreat northward. Forest areas would become dominated by oak, ash, hickory, and pine, and the brilliant autumn foliage associated with maples would be diminished. In areas where richer soils are prevalent, southern pines could increase their range and density,

### Changes In Forest Cover



Current                    +10°F, +13% Precipitation

■ Conifer Forest
■ Broadleaf Forest
□ Savanna/Woodland

Source: VEMAP Participants (1995); Neilson (1995)

and in areas with poorer soils, which are more common in Pennsylvania's forests, scrub oaks of little commercial value (e.g., post oak and blackjack oak) could increase their range. As a result, the character of forests in Pennsylvania may change.

## Ecosystems

Ecosystems in Pennsylvania consist of forests, woodlands, wetlands, peatland, and riparian habitats. The Two Mile Run wetlands in the Pocono Mountains are the largest undisturbed peatland ecosystem in Pennsylvania. This is also the site of the largest and healthiest native spruce forest in Pennsylvania. The peatlands are an important habitat for black bears, which use them for denning and feeding. Snowshoe hare, osprey, beaver, river otter, and waterfowl also live in the Two Mile Run wetlands area. Climate change could alter the range and location of these habitats, and fragmented land use patterns could impede migration of plants and animals.

Climate change could adversely affect ecosystems such as the Erie National Wildlife Refuge and French Creek, which flows for 117 miles through northwestern Pennsylvania. This area provides habitat for approximately 70 species of fish and 25 species of freshwater mussels. Many of the aquatic species in French Creek (for example, the clubshell mussel) are already endangered. The refuge system also provides important habitat for birds, including the threatened bald eagle.

*For further information about the potential impacts of climate change, contact the Climate and Policy Assessment Division (2174), U.S. EPA, 401 M Street SW, Washington, DC 20460.*



U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 47

United States
Environmental Protection
Agency

Office of Policy
(2111)

EPA 236-F-98-007c
September 1998

 **EPA** # Climate Change And Arizona 

The earth's climate is predicted to change because human activities are altering the chemical composition of the atmosphere through the buildup of greenhouse gases — primarily carbon dioxide, methane, nitrous oxide, and chlorofluorocarbons. The heat-trapping property of these greenhouse gases is undisputed. Although there is uncertainty about exactly how and when the earth's climate will respond to enhanced concentrations of greenhouse gases, observations indicate that detectable changes are under way. There most likely will be increases in temperature and changes in precipitation, soil moisture, and sea level, which could have adverse effects on many ecological systems, as well as on human health and the economy.

## The Climate System

Energy from the sun drives the earth's weather and climate. Atmospheric greenhouse gases (water vapor, carbon dioxide, and other gases) trap some of the energy from the sun, creating a natural "greenhouse effect." Without this effect, temperatures would be much lower than they are now, and life as known today would not be possible. Instead, thanks to greenhouse gases, the earth's average temperature is a more hospitable 60°F. However, problems arise when the greenhouse effect is *enhanced* by human-generated emissions of greenhouse gases.

Global warming would do more than add a few degrees to today's average temperatures. Cold spells still would occur in winter, but heat waves would be more common. Some places would be drier, others wetter. Perhaps more important, more precipitation may come in short, intense bursts (e.g., more than 2 inches of rain in a day), which could lead to more flooding. Sea levels would be higher than they would have been without global warming, although the actual changes may vary from place to place because coastal lands are themselves sinking or rising.

### The Greenhouse Effect



Source: U.S. Department of State (1992)

## Emissions Of Greenhouse Gases

Since the beginning of the industrial revolution, human activities have been adding measurably to natural background levels of greenhouse gases. The burning of fossil fuels — coal, oil, and natural gas — for energy is the primary source of emissions. Energy burned to run cars and trucks, heat homes and businesses, and power factories is responsible for about 80% of global carbon dioxide emissions, about 25% of U.S. methane emissions, and about 20% of global nitrous oxide emissions. Increased agriculture and deforestation, landfills, and industrial production and mining also contribute a significant share of emissions. In 1994, the United States emitted about one-fifth of total global greenhouse gases.

## Concentrations Of Greenhouse Gases

Since the pre-industrial era, atmospheric concentrations of carbon dioxide have increased nearly 30%, methane concentrations have more than doubled, and nitrous oxide concentrations have risen by about 15%. These increases have enhanced the heat-trapping capability of the earth's atmosphere. Sulfate aerosols, a common air pollutant, cool the atmosphere by reflecting incoming solar radiation. However, sulfates are short-lived and vary regionally, so they do not offset greenhouse gas warming.

Although many greenhouse gases already are present in the atmosphere, oceans, and vegetation, their concentrations in the future will depend in part on present and future emissions. Estimating future emissions is difficult, because they will depend on demographic, economic, technological, policy, and institutional developments. Several emissions scenarios have been developed based on differing projections of these underlying factors. For example, by 2100, in the absence of emissions control policies, carbon dioxide concentrations are projected to be 30-150% higher than today's levels.

## Current Climatic Changes

Global mean surface temperatures have increased 0.6-1.2°F between 1890 and 1996. The 9 warmest years in this century all have occurred in the last 14 years. Of these, 1995 was the warmest year on record, suggesting the atmosphere has rebounded from the temporary cooling caused by the eruption of Mt. Pinatubo in the Philippines.

Several pieces of additional evidence consistent with warming, such as a decrease in Northern Hemisphere snow cover, a decrease in Arctic Sea ice, and continued melting of alpine glaciers, have been corroborated. Globally, sea levels have risen

### Global Temperature Changes (1861–1996)



Source: IPCC (1995), updated

4-10 inches over the past century, and precipitation over land has increased slightly. The frequency of extreme rainfall events also has increased throughout much of the United States.

A new international scientific assessment by the Intergovernmental Panel on Climate Change recently concluded that *"the balance of evidence suggests a discernible human influence on global climate."*

## Future Climatic Changes

For a given concentration of greenhouse gases, the resulting increase in the atmosphere's heat-trapping ability can be predicted with precision, but the resulting impact on climate is more uncertain. The climate system is complex and dynamic, with constant interaction between the atmosphere, land, ice, and oceans. Further, humans have never experienced such a rapid rise in greenhouse gases. In effect, a large and uncontrolled planet-wide experiment is being conducted.

General circulation models are complex computer simulations that describe the circulation of air and ocean currents and how energy is transported within the climate system. While uncertainties remain, these models are a powerful tool for studying climate. As a result of continuous model improvements over the last few decades, scientists are reasonably confident about the link between global greenhouse gas concentrations and temperature and about the ability of models to characterize future climate at continental scales.

Recent model calculations suggest that the global surface temperature could increase an average of 1.6-6.3°F by 2100, with significant regional variation. These temperature changes would be far greater than recent natural fluctuations, and they would occur significantly faster than any known changes in the last 10,000 years. The United States is projected to warm more than the global average, especially as fewer sulfate aerosols are produced.

The models suggest that the rate of evaporation will increase as the climate warms, which will increase average global precipitation. They also suggest increased frequency of intense rainfall as well as a marked decrease in soil moisture over some mid-continental regions during the summer. Sea level is projected to increase by 6-38 inches by 2100.

Calculations of regional climate change are much less reliable than global ones, and it is unclear whether regional climate will become more variable. The frequency and intensity of some extreme weather of critical importance to ecological systems (droughts, floods, frosts, cloudiness, the frequency of hot or cold spells, and the intensity of associated fire and pest outbreaks) could increase.

## Local Climate Changes

Over the last century, the average temperature in Tucson, Arizona, has increased 3.6°F, and precipitation has increased by up to 20% in many parts of the state, except in the northwest part of the state where precipitation has fallen by 20%. These past trends may or may not continue into the future.

Over the next century, climate in Arizona may change even more. For example, based on projections made by the Intergovernmental Panel on Climate Change and results from the United Kingdom Hadley Centre's climate model (HadCM2), a model that accounts for both greenhouse gases and aerosols, by 2100 temperatures in Arizona could increase by 3-4°F in spring and fall (with a range of 1-6°F), and by 5°F in winter and summer (with a range of 2-9°F). Precipitation is estimated to decrease slightly in summer (with a range of 0 to -15%), to increase by 20% in spring (with a range of 10-40%), to increase by 30% in fall (with a range of 10-50%), and to increase by 60% (with a range of 30-100%) in winter. Other climate models may show different results, especially regarding estimated changes in precipitation. The impacts described in the sections that follow take into account estimates from different models. The amount of precipitation on extreme wet or snowy days in winter is likely to increase. The frequency of extreme hot days in summer would increase because of the general warming trend. It is not clear how the severity of storms might be affected, although an increase in the frequency and intensity of winter storms is possible.

### Precipitation Trends From 1900 To Present



Source: Karl et al. (1996)

2

## Human Health

Higher temperatures and increased frequency of heat waves may increase the number of heat-related deaths and the incidence of heat-related illnesses. The elderly, particularly those living alone, are at greatest risk. These effects have been studied only for populations living in urban areas; however, even those in rural areas may be susceptible.

Climate change could increase concentrations of ground-level ozone. For example, high temperatures, strong sunlight, and stable air masses tend to increase urban ozone levels. Currently, the Phoenix metropolitan area is classified as a "moderate" nonattainment area for ozone. Increased temperatures could make attaining compliance more difficult. Ground-level ozone is associated with respiratory illnesses such as asthma, reduced lung function, and respiratory inflammation.

Infected individuals can bring malaria to places where it does not occur naturally. Also, mosquitoes in Arizona can carry malaria. If conditions become warmer and wetter, mosquito populations could increase, thus increasing the risk of transmission if this and other diseases are introduced into the area. In Arizona, water for air conditioning is stored on roofs, so a 2°F warming even without increased precipitation could increase mosquito populations. Increased runoff from heavy rainfall could increase water-borne diseases such as giardia, cryptosporidia, and viral and bacterial gastroenteritides. San Joaquin Valley fever is present in the deserts of southern California, Arizona, and Nevada. There is evidence that populations of this soil-based organism increase when extreme rainfall follows periods of drought.

In 1993, hantavirus pulmonary syndrome emerged in Arizona, and the deer mice that are the primary reservoir for hantaviruses are prevalent in Arizona. Long droughts punctuated by heavy rains can decrease the predators (owls, snakes, and coyotes) of rodents, and the heavy rains can provide the rodents with added food supplies (grasshoppers and piñon nuts).

Developed countries such as the United States should be able to minimize the impacts of these diseases through existing disease prevention and control methods.

## Water Resources

Runoff in Arizona primarily results from summer thunderstorms and winter precipitation. In the mountains, most of the winter precipitation falls as snow. A warmer climate could mean less winter snowfall, more winter rain, and a faster, earlier snowmelt. This could lead to higher winter and spring flows and the passing of flood waters that are usually stored for use later in the summer. Additionally, without large increases in rainfall (approximately 15-20%), higher temperatures and increased evaporation could lower lake levels and streamflows in the summer. Less water would be available to support important uses such as irrigation, hydro-power production, public and industrial supply, fish and wildlife habitat, and recreation. Lower streamflows would also concentrate pollutant levels and increase salinity, a critical water problem in Arizona. Although Arizona has an active groundwater management program, declining water levels are a serious problem in

parts of the state where withdrawals for irrigation and municipal uses are large. Less spring and summer recharge could result in lower groundwater levels and exacerbate this situation. The surface waters in Arizona are fully allocated through water rights agreements and legal compacts with other states and Mexico. Tribal water rights are also being resolved. Because the state's population is growing rapidly, there is concern that water demand will exceed the available supply. Changes in water availability would complicate these issues.

More rain could ease competition for water, but it also could increase flooding. Earlier, more rapid snowmelts are likely to contribute to winter and spring flooding. Flood flows on the upper Colorado River can necessitate large releases from Lakes Powell and Mead, resulting in flooding along the lower Colorado in Arizona. The Salt-Verde systems primarily store water for irrigation and have minimal flood control capacity. Severe flooding can occur in Phoenix when large volumes of water are released from the Salt River reservoirs. In a warmer climate, the intensity of summer storms could increase. Cities such as Tucson, as well as nearby smaller towns, are vulnerable to flash flooding caused by intense, summer thunderstorms.

## Agriculture

The mix of crop and livestock production in a state is influenced by climatic conditions and water availability. As climate warms, production patterns could shift northward. Increases in climate variability could make adaptation by farmers more difficult. Warmer climates and less soil moisture due to increased evaporation may increase the need for irrigation. However, these same conditions could decrease water supplies, which also may be needed by natural ecosystems, urban populations, industry, and other users.

Understandably, most studies have not fully accounted for changes in climate variability, water availability, crop pests, changes in air pollution such as ozone, and adaptation by farmers to changing climate. Including these factors could change modeling results substantially. Analyses that assume changes in



### Changes In Agricultural Yield And Production

Sources: Mendelsohn and Neumann (in press); McCarl (personal communication)

average climate and effective adaptation by farmers suggest that aggregate U.S. food production would not be harmed, although there may be significant regional changes.

In Arizona, production agriculture is a $1.9 billion annual industry, one-half of which comes from livestock, mainly poultry. Almost all of the farmed acres are irrigated. The major crops in the state are cotton, wheat, hay, and oranges. Climate change could have a significant effect on crop production by reducing cotton yields by 5-11% and wheat yields by about 70% as temperatures rise beyond the tolerance levels of the crop. On the other hand, hay and pasture yields, however, are estimated to rise by 3-12%. Farmed acres could fall by 4-20%, and the share of irrigated acres could rise. Livestock and dairy production may not be affected, unless summer temperatures rise significantly and conditions become significantly drier. Under these conditions, livestock tend to gain less weight and pasture yields decline, limiting forage.

## Forests

Trees and forests are adapted to specific climate conditions, and as climate warms, forests will change. These changes could include changes in species composition, geographic range, and health and productivity. If conditions also become drier, the current range and density of forests could be reduced and replaced by grasslands and pasture. Even a warmer and wetter climate could lead to changes; trees that are better adapted to these conditions, such as fir and spruce, would thrive. Under these conditions, forests could become more dense. These changes could occur during the lifetimes of today's children, particularly if the change is accelerated by other stresses such as fire, pests, and diseases. Some of these stresses would themselves be worsened by a warmer and drier climate.

With changes in climate, the extent of forested areas in Arizona could change little or decline by as much as 15-30%. The uncertainties depend on many factors, including whether soils become drier and, if so, how much drier. Hotter, drier weather could increase the frequency and intensity of wildfires, threatening both property and forests. Grassland, rangeland, and even

desert could expand into some of these previously forested areas. Milder winters could increase the likelihood of insect outbreaks and of subsequent wildfires in the dead fuel left after such an outbreak. These changes would significantly affect the character of Arizona forests and the activities that depend on them. However, increased rainfall could reduce the severity of these effects.

## Ecosystems

Arizona supports a rich diversity of habitats, from deserts to mountain highlands. Narrow strips of riparian vegetation are extremely important to wildlife, especially birds such as the endangered cactus ferruginous pygmy owl, southwestern willow flycatcher, masked bobwhite quail, Mexican spotted owl, and the bald eagle. Riparian habitat along the San Pedro River, for example, hosts hundreds of bird species, more than any other U.S. river. Riverine habitats running through the desert environment are critically important habitat at the southern end of winter migration routes for geese, ducks, sandhill cranes, and shorebirds such as dowitchers and sandpipers. Within the rivers and streams, 24 of Arizona's 28 native fish are threatened or endangered, including the Colorado squawfish, razorback sucker, desert pupfish, Gila topminnow, Yaqui chub, spikedace, and Apache trout. The Sonoran Desert of southern Arizona has the highest plant diversity of the southwestern desert, and is home to fan palms, saguaro cacti, palo verde, and mesquite. Endangered mammals found here include jaguar, ocelot, Mexican gray wolf, Sonoran pronghorn, and Sandborn's lesser long-nose bat. The biological communities of the isolated mountaintops within the desert have diverged remarkably over time. More than 2,000 plant species thrive in this area at the intersection of Arizona, New Mexico, and Mexico, nearly 10% of all the species found in the United States.

The decline of riparian areas threatens many species of fish and wildlife in Arizona. Here, more species are threatened with extinction than nearly any other state. For example, the Gila River is the only U.S. river basin with all 47 of its freshwater fish species either extinct, listed as threatened or endangered, or recommended as candidates of such listings. Climate change could exacerbate these existing threats. Narrow riparian habitats could be greatly influenced by decreasing water availability. This could ultimately alter the number of bird species and community composition, with the loss of many species that rely on riparian vegetation for nesting and food resources, such as the endangered southwestern willow flycatcher and Mexican spotted owl. Higher water temperatures could adversely affect habitat conditions for already endangered fish, and favor the spread of exotic species that already imperil the survival of Arizona's native fish species. In desert areas, many plants and animals already live near their tolerance limits and may be unable to survive under hotter conditions. Mountaintop island habitats are especially vulnerable to climate change.

### Changes In Forest Cover
Current     +10°F, +13% Precipitation



Conifer Forest     Shrub/Woodland
Broadleaf Forest     Grassland
Savanna/Woodland     Arid Lands

Sources: VEMAP Participants (1995); Neilson (1995)

*For further information about the potential impacts of climate change, contact the Climate and Policy Assessment Division (2174), U.S. EPA, 401 M Street SW, Washington, DC 20460, or visit http://www.epa.gov/globalwarming/impacts.*



U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 48

United States
Environmental Protection
Agency

Office of Policy
(2111)

EPA 236-F-98-007p
September 1998

 **Climate Change** And New Mexico 

The earth's climate is predicted to change because human activities are altering the chemical composition of the atmosphere through the buildup of greenhouse gases — primarily carbon dioxide, methane, nitrous oxide, and chlorofluorocarbons. The heat-trapping property of these greenhouse gases is undisputed. Although there is uncertainty about exactly how and when the earth's climate will respond to enhanced concentrations of greenhouse gases, observations indicate that detectable changes are under way. There most likely will be increases in temperature and changes in precipitation, soil moisture, and sea level, which could have adverse effects on many ecological systems, as well as on human health and the economy.

## The Climate System

Energy from the sun drives the earth's weather and climate. Atmospheric greenhouse gases (water vapor, carbon dioxide, and other gases) trap some of the energy from the sun, creating a natural "greenhouse effect." Without this effect, temperatures would be much lower than they are now, and life as known today would not be possible. Instead, thanks to greenhouse gases, the earth's average temperature is a more hospitable 60°F. However, problems arise when the greenhouse effect is *enhanced* by human-generated emissions of greenhouse gases.

Global warming would do more than add a few degrees to today's average temperatures. Cold spells still would occur in winter, but heat waves would be more common. Some places would be drier, others wetter. Perhaps more important, more precipitation may come in short, intense bursts (e.g., more than 2 inches of rain in a day), which could lead to more flooding. Sea levels would be higher than they would have been without global warming, although the actual changes may vary from place to place because coastal lands are themselves sinking or rising.

### The Greenhouse Effect



Source: U.S. Department of State (1992)

## Emissions Of Greenhouse Gases

Since the beginning of the industrial revolution, human activities have been adding measurably to natural background levels of greenhouse gases. The burning of fossil fuels — coal, oil, and natural gas — for energy is the primary source of emissions. Energy burned to run cars and trucks, heat homes and businesses, and power factories is responsible for about 80% of global carbon dioxide emissions, about 25% of U.S. methane emissions, and about 20% of global nitrous oxide emissions. Increased agriculture and deforestation, landfills, and industrial production and mining also contribute a significant share of emissions. In 1994, the United States emitted about one-fifth of total global greenhouse gases.

## Concentrations Of Greenhouse Gases

Since the pre-industrial era, atmospheric concentrations of carbon dioxide have increased nearly 30%, methane concentrations have more than doubled, and nitrous oxide concentrations have risen by about 15%. These increases have enhanced the heat-trapping capability of the earth's atmosphere. Sulfate aerosols, a common air pollutant, cool the atmosphere by reflecting incoming solar radiation. However, sulfates are short-lived and vary regionally, so they do not offset greenhouse gas warming.

Although many greenhouse gases already are present in the atmosphere, oceans, and vegetation, their concentrations in the future will depend in part on present and future emissions. Estimating future emissions is difficult, because they will depend on demographic, economic, technological, policy, and institutional developments. Several emissions scenarios have been developed based on differing projections of these underlying factors. For example, by 2100, in the absence of emissions control policies, carbon dioxide concentrations are projected to be 30-150% higher than today's levels.

## Current Climatic Changes

Global mean surface temperatures have increased 0.6-1.2°F between 1890 and 1996. The 9 warmest years in this century all have occurred in the last 14 years. Of these, 1995 was the warmest year on record, suggesting the atmosphere has rebounded from the temporary cooling caused by the eruption of Mt. Pinatubo in the Philippines.

Several pieces of additional evidence consistent with warming, such as a decrease in Northern Hemisphere snow cover, a decrease in Arctic Sea ice, and continued melting of alpine glaciers, have been corroborated. Globally, sea levels have risen

### Global Temperature Changes (1861–1996)



Source: IPCC (1995), updated

4-10 inches over the past century, and precipitation over land has increased slightly. The frequency of extreme rainfall events also has increased throughout much of the United States.

A new international scientific assessment by the Intergovernmental Panel on Climate Change recently concluded that *"the balance of evidence suggests a discernible human influence on global climate."*

## Future Climatic Changes

For a given concentration of greenhouse gases, the resulting increase in the atmosphere's heat-trapping ability can be predicted with precision, but the resulting impact on climate is more uncertain. The climate system is complex and dynamic, with constant interaction between the atmosphere, land, ice, and oceans. Further, humans have never experienced such a rapid rise in greenhouse gases. In effect, a large and uncontrolled planet-wide experiment is being conducted.

General circulation models are complex computer simulations that describe the circulation of air and ocean currents and how energy is transported within the climate system. While uncertainties remain, these models are a powerful tool for studying climate. As a result of continuous model improvements over the last few decades, scientists are reasonably confident about the link between global greenhouse gas concentrations and temperature and about the ability of models to characterize future climate at continental scales.

Recent model calculations suggest that the global surface temperature could increase an average of 1.6-6.3°F by 2100, with significant regional variation. These temperature changes would be far greater than recent natural fluctuations, and they would occur significantly faster than any known changes in the last 10,000 years. The United States is projected to warm more than the global average, especially as fewer sulfate aerosols are produced.

The models suggest that the rate of evaporation will increase as the climate warms, which will increase average global precipitation. They also suggest increased frequency of intense rainfall as

well as a marked decrease in soil moisture over some mid-continental regions during the summer. Sea level is projected to increase by 6-38 inches by 2100.

Calculations of regional climate change are much less reliable than global ones, and it is unclear whether regional climate will become more variable. The frequency and intensity of some extreme weather of critical importance to ecological systems (droughts, floods, frosts, cloudiness, the frequency of hot or cold spells, and the intensity of associated fire and pest outbreaks) could increase.

## Local Climate Changes

Over the last century, the average temperature near Albuquerque, New Mexico, has decreased 0.8°F, and precipitation has increased by up to 20% in many parts of the state. These past trends may or may not continue into the future.

Over the next century, climate in New Mexico could experience additional changes. For example, based on projections made by the Intergovernmental Panel on Climate Change and results from the United Kingdom Hadley Centre's climate model (HadCM2), a model that accounts for both greenhouse gases and aerosols, by 2100 temperatures in New Mexico could increase by 3°F in spring (with a range of 1-5°F), 4°F in fall (with a range of 2-7°F), and 5°F in winter and summer (with a range of 2-9°F). Precipitation is estimated to decrease slightly (with a range of 0 to -10%) in summer, to increase slightly in fall (with a range of 0-10%), to increase by 15% in spring (with a range of 5-25%), and to increase by 30% in winter (with a range of 15-60%). Other climate models may show different results, especially regarding estimated changes in precipitation. The impacts described in the sections that follow take into account estimates from different models. The amount of precipitation on extreme wet or snowy days in winter is likely to increase. The frequency of extreme hot days in summer would increase because of the general warming trend. It is not clear how the severity of storms might be affected, although an increase in the frequency and intensity of winter storms is possible. There also could be an increase in the frequency of summer thunderstorms associated with monsoonal moisture flow from the Gulf of Mexico.

### Precipitation Trends From 1900 To Present



Source: Karl et al. (1996)

2

## Human Health

Higher temperatures and increased frequency of heat waves may increase the number of heat-related deaths and the incidence of heat-related illnesses. The elderly, particularly those living alone, are at greatest risk. These effects have been studied only for populations living in urban areas; however, even those in rural areas may be susceptible.

Upper and lower respiratory allergies are influenced by humidity. A 2°F warming and wetter conditions could increase respiratory allergies.

Infected individuals can bring malaria to places where it does not occur naturally. Also, mosquitoes in New Mexico can carry malaria. If conditions become warmer and wetter, mosquito populations could increase, thus increasing the risk of transmission if this and other diseases are introduced into the area. Increased runoff from heavy rainfall could increase water-borne diseases such as giardia, cryptosporidia, and viral and bacterial gastroenteritis. Developed countries such as the United States should be able to minimize the impacts of these diseases through existing disease prevention and control methods.

Rodent-borne diseases are prevalent in New Mexico, and upsurges of rodent populations have been associated with extreme events and in particular the El Niño Southern Oscillation phenomenon. In 1993, hantavirus pulmonary syndrome emerged in New Mexico, and the deer mice that are the primary reservoir for hantaviruses are prevalent in New Mexico. Long droughts punctuated by heavy rains can decrease the predators (owls, snakes, and coyotes) of rodents, and the heavy rains can provide the rodents with added food supplies (grasshoppers and piñon nuts).

## Water Resources

Groundwater is the principal source of water for public, industrial, and agricultural uses in New Mexico. Irrigation, the largest user of water, relies on groundwater and surface water supplies. Except in mountainous areas, many streams run dry at some time of the year. Reservoirs on the larger perennial rivers, including the Rio Grande, Pecos, and San Juan rivers, provide storage to reduce the variation in streamflow and the severity of floods.

Much of streamflow in New Mexico results from spring and summer rainfall and snowmelt in the mountains. In nonmountainous regions, runoff results from short, intense rainstorms. A warmer climate could mean less winter snowfall, more winter rain, and a faster, earlier spring snowmelt. This could result in higher winter and spring flows and the inability to store flood waters for use later in the summer. Additionally, without large increases in rainfall, higher temperatures and increased evaporation could lower lake levels and streamflows in the summer. Less water would be available to distribute to the central and southern parts of the state, where adequate supplies for irrigation and municipal uses is a concern. In the densely populated middle Rio Grande Valley, which includes Albuquerque, the availability of adequate water to meet the needs of its growing population is a major

issue. During years of meager snowfall, many areas must supplement surface water supplies with groundwater; however, less spring and summer recharge could lower groundwater levels. This could amplify problems in the eastern and southeastern parts of the state, where groundwater levels are declining because of large irrigation withdrawals, as well as in west-central New Mexico, where groundwater development has increased to support municipal, domestic, industrial, and agricultural uses. Lower flows and higher temperatures could also impair water quality by concentrating pollutants and reducing the capacity of streams to assimilate wastes. The limited surface waters of New Mexico are almost completely allocated through legal compacts and water-rights agreements. Tribal water rights are also an important issue. Changes in water availability could complicate the complex water rights and allocation issues in New Mexico.

More rain could ease water competition, but it also could increase flooding. Earlier, more rapid snowmelts could contribute to winter and spring flooding, and more intense summer storms could increase the likelihood of flash floods. Increased rains also could increase erosion and pollution from runoff from mining areas, and exacerbate levels of pesticides and fertilizers from runoff from agricultural lands. Stream sedimentation is a major water quality problem in New Mexico, as is contaminated runoff from grazing lands, mining areas, urban areas, and irrigated fields.

## Agriculture

The mix of crop and livestock production in a state is influenced by climatic conditions and water availability. As climate warms, production patterns could shift northward. Increases in climate variability could make adaptation by farmers more difficult. Warmer climates and less soil moisture due to increased evaporation may increase the need for irrigation. However, these same conditions could decrease water supplies, which also may be needed by natural ecosystems, urban populations, industry, and other users.

Understandably, most studies have not fully accounted for changes in climate variability, water availability, crop pests, changes in air pollution such as ozone, and adaptation by farmers

### Changes In Agricultural Yield And Production



Sources: Mendelsohn and Neumann (in press); McCarl (personal communication)

to changing climate. Including these factors could change modeling results substantially. Analyses that assume changes in average climate and effective adaptation by farmers suggest that aggregate U.S. food production would not be harmed, although there may be significant regional changes.

In New Mexico, production agriculture is a $1.6 billion annual industry, two-thirds of which comes from livestock, mainly cattle. More than one-half of the farmed acres are irrigated. The major crops in the state are sorghum, wheat, and hay. Climate change could reduce wheat yields by 10-30% and sorghum yields by 7-9% as temperatures rise beyond the tolerance levels of the crop. Hay and pasture yields could fall by 4% or rise by 9%, depending on how climate changes and the extent of irrigation. Farmed acres could fall by 20-25% as a result of climate change. Livestock production may not be affected, unless summer temperatures rise significantly and conditions become significantly drier. Under these conditions, livestock tend to gain less weight and pasture yields decline, limiting forage.

## Forests

Trees and forests are adapted to specific climate conditions, and as climate warms, forests will change. These changes could include changes in species composition, geographic range, and health and productivity. If conditions also become drier, the current range and density of forests could be reduced and replaced by grasslands and pasture. Even a warmer and wetter climate could lead to changes; trees that are better adapted to these conditions, such as fir and spruce, would thrive. Under these conditions, forests could become more dense. These changes could occur during the lifetimes of today's children, particularly if the change is accelerated by other stresses such as fire, pests, and diseases. Some of these stresses would themselves be worsened by a warmer and drier climate.

With changes in climate, the extent of forested areas in New Mexico could change little or decline by as much as 15-30%. The uncertainties depend on many factors, including whether soils become drier and, if so, how much drier. Hotter, drier weather could increase the frequency and intensity of wildfires, threatening both property and forests. Drier conditions would reduce the range and health of ponderosa and piñon-juniper forests, and increase their susceptibility to fire. Grassland, rangeland, and even desert could expand into previously forested areas in the northern part of the state and those found at higher elevations. Milder winters could increase the likelihood of insect outbreaks and of subsequent wildfires in the dead fuel left after such an outbreak. These changes would significantly affect the character of New Mexico forests and the activities that depend on them. However, increased rainfall could reduce the severity of these effects.

## Ecosystems

A wide variety of ecosystems are found in New Mexico, including the Chihuahuan Desert, Great Plains grassland, Great Basin shrub-steppe, piñon-juniper woodland, bosque riparian forests and wetlands, ponderosa pine forests, mixed-conifer montane forests, and subalpine forests and meadows. Narrow strips of riparian vegetation throughout the state are extremely important to wildlife, especially the endangered cactus ferruginous pygmy owl, southwestern willow flycatcher, masked bobwhite quail, Mexican spotted owl, and southern nesting bald eagle. Bitter Lake, in the southeastern part of the state, is an oasis at the edge of the desert, providing habitat for snow geese, sandhill cranes, endangered interior least terns, and thousands of other birds. Mountaintop habitats in the Chihuahuan Desert are isolated from one another and have remarkably different species because their biotic communities have evolved in distinct ways over time. For example, more than 2,000 plant species thrive in this area at the intersection of Arizona, New Mexico, and Mexico, nearly 10% of all the species found in the United States.

The destruction of riparian areas, primarily through overwhelming pressures for water resources and overgrazing, is the single most important factor threatening and endangering many species of fish and wildlife in New Mexico. For example, the Gila River is the only U.S. river basin with all 47 of its freshwater fish species extinct, listed as threatened or endangered, or recommended as candidates of such listings. Climate change could exacerbate these existing threats. The narrow riparian habitat bands would be greatly influenced by decreased water availability. This could ultimately alter avian species number and community composition, with the loss of many species that rely on riparian vegetation for nesting and food resources, such as the endangered southwestern willow flycatcher and Mexican spotted owl. Warmer water temperatures could adversely affect habitat conditions for already endangered fish, and favor the spread of exotic species that are imperiling the survival of New Mexico's native fish species. In desert areas, many plants and animals already live near their tolerance limits and may be unable to survive under hotter conditions. Mountaintop island habitats are equally vulnerable to changing conditions. Whereas other ecosystems may have room to migrate in response to warming temperatures, those in mountain areas could have little room to move upslope.

### Changes In Forest Cover



Current    +10°F, +13% Precipitation

■ Conifer Forest    ■ Shrub/Woodland
■ Broadleaf Forest    ■ Grassland
■ Savanna/Woodland    ■ Arid Lands

Sources: VEMAP Participants (1995); Neilson (1995)

*For further information about the potential impacts of climate change, contact the Climate and Policy Assessment Division (2174), U.S. EPA, 401 M Street SW, Washington, DC 20460, or visit http://www.epa.gov/globalwarming/impacts.*



U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 49

United States
Environmental Protection
Agency

Office of Policy
(2111)

EPA 236-F-98-007u
September 1998



# **Climate Change** And Oregon



The earth's climate is predicted to change because human activities are altering the chemical composition of the atmosphere through the buildup of greenhouse gases — primarily carbon dioxide, methane, nitrous oxide, and chlorofluorocarbons. The heat-trapping property of these greenhouse gases is undisputed. Although there is uncertainty about exactly how and when the earth's climate will respond to enhanced concentrations of greenhouse gases, observations indicate that detectable changes are under way. There most likely will be increases in temperature and changes in precipitation, soil moisture, and sea level, which could have adverse effects on many ecological systems, as well as on human health and the economy.

## The Climate System

Energy from the sun drives the earth's weather and climate. Atmospheric greenhouse gases (water vapor, carbon dioxide, and other gases) trap some of the energy from the sun, creating a natural "greenhouse effect." Without this effect, temperatures would be much lower than they are now, and life as known today would not be possible. Instead, thanks to greenhouse gases, the earth's average temperature is a more hospitable 60°F. However, problems arise when the greenhouse effect is *enhanced* by human-generated emissions of greenhouse gases.

Global warming would do more than add a few degrees to today's average temperatures. Cold spells still would occur in winter, but heat waves would be more common. Some places would be drier, others wetter. Perhaps more important, more precipitation may come in short, intense bursts (e.g., more than 2 inches of rain in a day), which could lead to more flooding. Sea levels would be higher than they would have been without global warming, although the actual changes may vary from place to place because coastal lands are themselves sinking or rising.

### The Greenhouse Effect



Source: U.S. Department of State (1992)

## Emissions Of Greenhouse Gases

Since the beginning of the industrial revolution, human activities have been adding measurably to natural background levels of greenhouse gases. The burning of fossil fuels — coal, oil, and natural gas — for energy is the primary source of emissions. Energy burned to run cars and trucks, heat homes and businesses, and power factories is responsible for about 80% of global carbon dioxide emissions, about 25% of U.S. methane emissions, and about 20% of global nitrous oxide emissions. Increased agriculture and deforestation, landfills, and industrial production and mining also contribute a significant share of emissions. In 1994, the United States emitted about one-fifth of total global greenhouse gases.

## Concentrations Of Greenhouse Gases

Since the pre-industrial era, atmospheric concentrations of carbon dioxide have increased nearly 30%, methane concentrations have more than doubled, and nitrous oxide concentrations have risen by about 15%. These increases have enhanced the heat-trapping capability of the earth's atmosphere. Sulfate aerosols, a common air pollutant, cool the atmosphere by reflecting incoming solar radiation. However, sulfates are short-lived and vary regionally, so they do not offset greenhouse gas warming.

Although many greenhouse gases already are present in the atmosphere, oceans, and vegetation, their concentrations in the future will depend in part on present and future emissions. Estimating future emissions is difficult, because they will depend on demographic, economic, technological, policy, and institutional developments. Several emissions scenarios have been developed based on differing projections of these underlying factors. For example, by 2100, in the absence of emissions control policies, carbon dioxide concentrations are projected to be 30-150% higher than today's levels.

## Current Climatic Changes

Global mean surface temperatures have increased 0.6-1.2°F between 1890 and 1996. The 9 warmest years in this century all have occurred in the last 14 years. Of these, 1995 was the warmest year on record, suggesting the atmosphere has rebounded from the temporary cooling caused by the eruption of Mt. Pinatubo in the Philippines.

Several pieces of additional evidence consistent with warming, such as a decrease in Northern Hemisphere snow cover, a decrease in Arctic Sea ice, and continued melting of alpine glaciers, have been corroborated. Globally, sea levels have risen

### Global Temperature Changes (1861–1996)



Source: IPCC (1995), updated

4-10 inches over the past century, and precipitation over land has increased slightly. The frequency of extreme rainfall events also has increased throughout much of the United States.

A new international scientific assessment by the Intergovernmental Panel on Climate Change recently concluded that *"the balance of evidence suggests a discernible human influence on global climate."*

## Future Climatic Changes

For a given concentration of greenhouse gases, the resulting increase in the atmosphere's heat-trapping ability can be predicted with precision, but the resulting impact on climate is more uncertain. The climate system is complex and dynamic, with constant interaction between the atmosphere, land, ice, and oceans. Further, humans have never experienced such a rapid rise in greenhouse gases. In effect, a large and uncontrolled planet-wide experiment is being conducted.

General circulation models are complex computer simulations that describe the circulation of air and ocean currents and how energy is transported within the climate system. While uncertainties remain, these models are a powerful tool for studying climate. As a result of continuous model improvements over the last few decades, scientists are reasonably confident about the link between global greenhouse gas concentrations and temperature and about the ability of models to characterize future climate at continental scales.

Recent model calculations suggest that the global surface temperature could increase an average of 1.6-6.3°F by 2100, with significant regional variation. These temperature changes would be far greater than recent natural fluctuations, and they would occur significantly faster than any known changes in the last 10,000 years. The United States is projected to warm more than the global average, especially as fewer sulfate aerosols are produced.

The models suggest that the rate of evaporation will increase as the climate warms, which will increase average global precipitation. They also suggest increased frequency of intense rainfall as well as a marked decrease in soil moisture over some mid-continental regions during the summer. Sea level is projected to increase by 6-38 inches by 2100.

Calculations of regional climate change are much less reliable than global ones, and it is unclear whether regional climate will become more variable. The frequency and intensity of some extreme weather of critical importance to ecological systems (droughts, floods, frosts, cloudiness, the frequency of hot or cold spells, and the intensity of associated fire and pest outbreaks) could increase.

## Local Climate Changes

Over the last century, the average temperature in Corvallis, Oregon, has increased 2.5°F, and precipitation has increased by up to 20% in many parts of the state, except along the leeward side of the Cascades where precipitation has fallen by 20%. These past trends may or may not continue into the future.

Over the next century, climate in Oregon may change even more. For example, based on projections made by the Intergovernmental Panel on Climate Change and results from the United Kingdom Hadley Centre's climate model (HadCM2), a model that accounts for both greenhouse gases and aerosols, by 2100 temperatures in Oregon could increase by 5°F (with a range of 2-9°F) in winter and summer and 4°F (with a range of 2-7°F) in spring and fall. Precipitation is estimated to increase slightly in spring (with a range of 0-10%), decrease slightly in summer (with a range of 0 to -10%), and increase by 15% in fall and winter (with a range of 5-25%). Other climate models may show different results, especially regarding estimated changes in precipitation. The impacts described in the sections that follow take into account estimates from different models. The amount of precipitation on extreme wet or snowy days in winter is likely to increase. The frequency of extreme hot days in summer would increase because of the general warming trend. It is not clear how the severity of storms might be affected, although an increase in the frequency and intensity of winter storms is possible.

### Precipitation Trends From 1900 To Present



Source: Karl et al. (1996)

## Human Health

Higher temperatures and increased frequency of heat waves may increase the number of heat-related deaths and the incidence of heat-related illnesses. Oregon, with its occasional, intense heat waves, may become more susceptible if its climate changes. In Portland, heat-related deaths are estimated to increase by nearly 150% given a summer warming of 4°F (although increased air conditioning use may not have been fully accounted for). The elderly, especially those living alone, are at greatest risk. This study also projects little change in winter-related deaths in Portland if the temperature warms by 2-3°F.

Warming and other climate changes could expand the habitat and infectivity of disease-carrying insects, thus increasing the potential for transmission of diseases such as malaria and dengue ("break bone") fever. Warmer temperatures could increase the incidence of Lyme disease and other tick-borne diseases in Oregon, because populations of ticks, and their rodent hosts, could increase under warmer temperatures and increased vegetation.

St. Louis and California encephalitis are present in California, and some studies indicate that these diseases could move north under a warmer climate. Western equine encephalitis has also been found in domestic animals in Oregon. Mosquitoes can carry these diseases, which can be lethal or cause neurological damage. If conditions become warmer and wetter, mosquito populations could increase, thus increasing the risk of transmission if these diseases, as well as malaria, are introduced into the area. Increased runoff from heavy rainfall could increase water-borne diseases such as giardia and cryptosporidia.

Developed countries such as the United States should be able to minimize the impacts of these diseases through existing disease prevention and control methods.

## Coastal Areas

Sea level rise could lead to flooding of low-lying property, loss of coastal wetlands, erosion of beaches, saltwater contamination of drinking water, and decreased longevity of low-lying roads, causeways, and bridges. In addition, sea level rise could increase the vulnerability of coastal areas to storms and associated flooding.

Oregon has a 1,400-mile tidally influenced shoreline that consists mostly of steep slopes, pocket beaches, and small embayments, with a few natural coastal plains. The steep, rocky cliffs that dominate most of the coastline limit vulnerability to sea level rise. Coastal marshes in Oregon are limited to the Tillamook and Coos Bay regions. Under a sea level rise of 1-3 feet, the salt marshes along these bays and harbors could be lost (although some migration onto undeveloped lowlands could partially offset losses).

Evidence suggests that uplift may help mitigate the effects of sea level rise on the Oregon coast. Along much of the coast, land is being uplifted as a result of tectonic activity at approximately 4 inches per century. However, sea level rise could reverse that



**Future Sea Level rise At Yaquina**

Source: EPA (1995)

trend. Accounting for sea level rise from climate change, sea level on the Oregon Coast is estimated to rise 6 inches by 2100. Nonetheless, the rocky shore of Oregon may limit erosion, and help protect the coastline. The cumulative cost of sand replenishment to protect the coast of Oregon from a 20-inch sea level rise by 2100 is estimated at $60-$920 million.

## Water Resources

Runoff in Oregon is highly variable, and summer flows are often low. Reservoir storage is used throughout the state to augment summer flows with captured winter and spring runoff. Major regulated rivers include the Columbia along the northern border, the Snake along the northeast border, and the Willamette.

Some models for the Pacific Northwest project warmer, wetter winters and warmer, drier summers. In the mountains, warmer winter temperatures could mean less snowfall, more winter rain, and a faster, earlier snowmelt. More rain and greater streamflow, particularly during the winter, could benefit hydropower production and water supplies, but also could increase flooding in some areas. In the rainfall-dominated rivers in the west, projected changes result in increased winter streamflows and decreased summer streamflows. Because of limited storage capacity, there could be lower reservoir and water supplies in the summer and fall. Less water would be available to reliably support important uses such as hydropower production, fish protection, irrigation, recreation, and water supply. Oregon is a major producer of hydropower, and lower flows could affect its ability to meet energy production requirements, particularly during critical low flow periods. Provision of adequate water for fish protection is also an important issue. In rivers such as the Columbia, instream flow requirements are difficult to meet because of the limited storage available to support them. Similarly, in heavily allocated basins such as the Snake River, current irrigation demand cannot always be met. The public also demands high lake levels in the summer for recreation. Lower streamflows and lake levels would exacerbate current stresses and increase competition among water uses. Additionally, lower summer flows and higher temperatures could impair water quality by concentrating pollutants and reducing the ability of streams to assimilate wastes.

## Agriculture

The mix of crop and livestock production in a state is influenced by climatic conditions and water availability. As climate warms, production patterns could shift northward. Increases in climate variability could make adaptation by farmers more difficult. Warmer climates and less soil moisture due to increased evaporation may increase the need for irrigation. However, these same conditions could decrease water supplies, which also may be needed by natural ecosystems, urban populations, industry, and other users.

Understandably, most studies have not fully accounted for changes in climate variability, water availability, crop pests, changes in air pollution such as ozone, and adaptation by farmers to changing climate. Analyses that assume changes in average climate and effective adaptation by farmers suggest that aggregate U.S. food production would not be harmed, although there may be significant regional changes.

In Oregon, production agriculture is a $2.5 billion annual industry, three-fourths of which comes from crops. Almost one-half of the farmed acres are irrigated. The major crops in the state are wheat, hay, and potatoes. Climate change could increase wheat yields by 2-13%. Hay and pasture yields could rise by 10% or fall by 7%, depending on how climate changes and whether irrigation is used. Potato yields could fall by 17% as temperatures rise beyond the tolerance level of the crop. Farmed acres could remain fairly constant or could decrease by as much as 23%.

## Forests

Trees and forests are adapted to specific climate conditions, and as climate warms, forests will change. These changes could include changes in species composition, geographic range, and health and productivity. If conditions also become drier, the current range and density of forests could be reduced and replaced by grasslands and pasture (or in some forests lead to changes in the types of trees that flourish). Even a warmer and wetter climate could lead to changes; trees that are better adapted to these conditions, such as hemlock and sitka spruce, would thrive. Under these conditions, forests could become more dense. These changes could occur during the lifetimes of today's children, particularly if the change is accelerated by other stresses such as fire, pests, and diseases. Some of these stresses would themselves be worsened by a warmer and drier climate. Commercial timber production could also be affected by resulting changes in growth rates, plantation acreage and management, and market conditions.

With changes in climate, the extent of forested areas in Oregon could change little, or they could decline by 15-25%, primarily east of the Cascades. The uncertainties depend on many factors, including whether soils become drier and, if so, how much drier. Hotter, drier weather could increase the frequency and intensity of wildfires, threatening the important timber-producing areas of the state. In the state's highly productive conifer forests, drier conditions would favor Douglas fir, lodgepole pine, and ponderosa pine forests at the expense of the wet-loving hemlock and

### Changes In Agricultural Yield And Production



Sources: Mendelsohn and Neumann (in press); McCarl (personal communication)

sitka spruce along the coast. Warmer conditions could increase the elevation of the timberline, resulting in a reduction or the disappearance of alpine tundra and its unique (in some cases already endangered) species. These changes could affect the character of Oregon forests and the activities that depend on them.

## Ecosystems

Lower streamflow in the hot summer months would have negative consequences for fish populations in Oregon waters, which are already under pressure from dams and other human disturbances. Less summer and fall runoff could affect salmon migration and spawning. More flooding and winter runoff could alter sedimentation processes in rivers and streams, perhaps harming fish habitat and decreasing egg-smolt survival. Warmer water temperatures affect dissolved oxygen concentrations, which could decrease the survival rate, reproduction, and growth of certain fish, perhaps favoring the increased range expansion of exotic species at the expense of native species. Changing aquatic ecosystem conditions could result in a general northward shift of species distributions. Populations at the extremes of their range will be those most susceptible to change.

As low-lying coastal areas are gradually squeezed between rising sea levels and coastal development, a permanent loss of terrestrial coastal habitats is expected. Changes in offshore upwelling could cause changes in nutrient supplies, which could have adverse impacts for anadromous fish such as salmon. The rangelands of the Great Basin are already imperiled by the expansion of non-native weedy species such as European cheatgrass. Climate change could exacerbate such threats, because opportunistic non-native species are well-suited to take advantage of ecosystem disturbances caused by warming temperatures, such as increases in the frequency and severity of wildfires.

*For further information about the potential impacts of climate change, contact the Climate and Policy Assessment Division (2174), U.S. EPA, 401 M Street SW, Washington, DC 20460, or visit http://www.epa.gov/globalwarming/impacts.*



U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 50

United States
Environmental Protection
Agency

Office of Policy, Planning
and Evaluation
(2111)

EPA 230-F-97-008uu
September 1997

 **EPA**

# Climate Change And Washington

The earth's climate is predicted to change because human activities are altering the chemical composition of the atmosphere through the buildup of greenhouse gases — primarily carbon dioxide, methane, nitrous oxide, and chlorofluorocarbons. The heat-trapping property of these greenhouse gases is undisputed. Although there is uncertainty about exactly how and when the earth's climate will respond to enhanced concentrations of greenhouse gases, observations indicate that detectable changes are under way. There most likely will be increases in temperature and changes in precipitation, soil moisture, and sea level, which could have adverse effects on many ecological systems, as well as on human health and the economy.

## The Climate System

Energy from the sun drives the earth's weather and climate. Atmospheric greenhouse gases (water vapor, carbon dioxide, and other gases) trap some of the energy from the sun, creating a natural "greenhouse effect." Without this effect, temperatures would be much lower than they are now, and life as known today would not be possible. Instead, thanks to greenhouse gases, the earth's average temperature is a more hospitable 60°F. However, problems arise when the greenhouse effect is *enhanced* by human-generated emissions of greenhouse gases.

Global warming would do more than add a few degrees to today's average temperatures. Cold spells still would occur in winter, but heat waves would be more common. Some places would be drier, others wetter. Perhaps more important, more precipitation may come in short, intense bursts (e.g., more than 2 inches of rain in a day), which could lead to more flooding. Sea levels would be higher than they would have been without global warming, although the actual changes may vary from place to place because coastal lands are themselves sinking or rising.

### The Greenhouse Effect



Source: U.S. Department of State (1992)

## Emissions Of Greenhouse Gases

Since the beginning of the industrial revolution, human activities have been adding measurably to natural background levels of greenhouse gases. The burning of fossil fuels — coal, oil, and natural gas — for energy is the primary source of emissions. Energy burned to run cars and trucks, heat homes and businesses, and power factories is responsible for about 80% of global carbon dioxide emissions, about 25% of U.S. methane emissions, and about 20% of global nitrous oxide emissions. Increased agriculture and deforestation, landfills, and industrial production and mining also contribute a significant share of emissions. In 1994, the United States emitted about one-fifth of total global greenhouse gases.

## Concentrations Of Greenhouse Gases

Since the pre-industrial era, atmospheric concentrations of carbon dioxide have increased nearly 30%, methane concentrations have more than doubled, and nitrous oxide concentrations have risen by about 15%. These increases have enhanced the heat-trapping capability of the earth's atmosphere. Sulfate aerosols, a common air pollutant, cool the atmosphere by reflecting incoming solar radiation. However, sulfates are short-lived and vary regionally, so they do not offset greenhouse gas warming.

Although many greenhouse gases already are present in the atmosphere, oceans, and vegetation, their concentrations in the future will depend in part on present and future emissions. Estimating future emissions is difficult, because they will depend on demographic, economic, technological, policy, and institutional developments. Several emissions scenarios have been developed based on differing projections of these underlying factors. For example, by 2100, in the absence of emissions control policies, carbon dioxide concentrations are projected to be 30-150% higher than today's levels.

## Current Climatic Changes

Global mean surface temperatures have increased 0.6-1.2°F since the late 19th century. The 9 warmest years in this century all have occurred in the last 14 years. Of these, 1995 was the warmest year on record, suggesting the atmosphere has rebounded from the temporary cooling caused by the eruption of Mt. Pinatubo in the Philippines.

Several pieces of additional evidence consistent with warming, such as a decrease in Northern Hemisphere snow cover, a decrease in Arctic Sea ice, and continued melting of alpine glaciers, have been corroborated. Globally, sea levels have risen

### Global Temperature Changes (1861–1996)



Source: IPCC (1995), updated

4-10 inches over the past century, and precipitation over land has increased slightly. The frequency of extreme rainfall events also has increased throughout much of the United States.

A new international scientific assessment by the Intergovernmental Panel on Climate Change recently concluded that *"the balance of evidence suggests a discernible human influence on global climate."*

## Future Climatic Changes

For a given concentration of greenhouse gases, the resulting increase in the atmosphere's heat-trapping ability can be predicted with precision, but the resulting impact on climate is more uncertain. The climate system is complex and dynamic, with constant interaction between the atmosphere, land, ice, and oceans. Further, humans have never experienced such a rapid rise in greenhouse gases. In effect, a large and uncontrolled planet-wide experiment is being conducted.

General circulation models are complex computer simulations that describe the circulation of air and ocean currents and how energy is transported within the climate system. While uncertainties remain, these models are a powerful tool for studying climate. As a result of continuous model improvements over the last few decades, scientists are reasonably confident about the link between global greenhouse gas concentrations and temperature and about the ability of models to characterize future climate at continental scales.

Recent model calculations suggest that the global surface temperature could increase an average of 1.6-6.3°F by 2100, with significant regional variation. These temperature changes would be far greater than recent natural fluctuations, and they would occur significantly faster than any known changes in the last 10,000 years. The United States is projected to warm more than the global average, especially as fewer sulfate aerosols are produced.

The models suggest that the rate of evaporation will increase as the climate warms, which will increase average global precipitation. They also suggest increased frequency of intense rainfall as

well as a marked decrease in soil moisture over some mid-continental regions during the summer. Sea level is projected to increase by 6-38 inches by 2100.

Calculations of regional climate change are much less reliable than global ones, and it is unclear whether regional climate will become more variable. The frequency and intensity of some extreme weather of critical importance to ecological systems (droughts, floods, frosts, cloudiness, the frequency of hot or cold spells, and the intensity of associated fire and pest outbreaks) could increase.

## Local Climate Changes

Over the last century, the average temperature in Ellensburg, Washington, has increased from 46.2°F (1900-1929 average) to 47.2°F (1966-1995 average), and precipitation has increased by up to 20% in some areas of the state, especially in the west.

Over the next century, Washington's climate may change even more. Based on projections given by the Intergovernmental Panel on Climate Change and results from the United Kingdom Hadley Centre's climate model (HadCM2), a model that has accounted for both greenhouse gases and aerosols, by 2100 temperatures in Washington could increase by about 5°F in winter and summer, and by about 4°F in spring and fall (with a range of 2-9°F). Precipitation is projected to change little in spring, summer, and fall, and to increase by around 10% in winter.

The frequency of extreme hot days in summer is expected to increase along with the general warming trend. It is not clear how severe storms would change.

## Climate Change Impacts

Global climate change poses risks to human health and to terrestrial and aquatic ecosystems. Important economic resources such as agriculture, forestry, fisheries, and water resources also may be affected. Warmer temperatures, more severe droughts and floods, and sea level rise could have a wide range of impacts. All these stresses can add to existing stresses on resources caused by other influences such as population growth, land-use changes, and pollution.

### Precipitation Trends From 1900 To Present



Source: Karl et al. (1996)

Similar temperature changes have occurred in the past, but the previous changes took place over centuries or millennia instead of decades. The ability of some plants and animals to migrate and adapt appears to be much slower than the predicted rate of climate change.

## Human Health

Winter-related mortality in Washington could increase if such a warming occurs, because the frequency of air masses associated with inclement weather is expected to increase. One study has estimated that a 3°F warming in Seattle would increase winter-related mortality from 15 today to about 40. The elderly, particularly those living alone, are at greatest risk.

There is concern that climate change could increase concentrations of ground-level ozone. For example, high temperatures, strong sunlight, and stable air masses tend to increase urban ozone levels. Air pollution also is made worse by increases in natural hydrocarbons emissions during hot weather. If a warmed climate causes increased use of air conditioners, air pollutant emissions from power plants also will increase.

Increased emissions and accelerated atmospheric chemistry could slow progress being made in Washington to provide healthy and clean air. Currently, the Seattle-Tacoma area does not meet the national health standards for ozone and particulate matter. The particulate matter standard is also not met in Olympia, Spokane, Wallula, and Yakima. Ground-level ozone has been shown to aggravate existing respiratory illnesses such as asthma, reduce lung function, and induce respiratory inflammation. In addition, ambient ozone reduces agricultural crop yields and impairs ecosystem health.

## Coastal Areas

Sea level rise could lead to flooding of low-lying property, loss of coastal wetlands, erosion of beaches, saltwater contamination of drinking water, and decreased longevity of low-lying roads, causeways, and bridges. In addition, sea level rise could increase the vulnerability of coastal areas to storms and associated flooding.

At Seattle, Washington, sea level already is rising by 8 inches per century, and it is likely to rise another 19 inches by 2100. Washington's coastal region consists primarily of cliffs and a few low-lying tidal flats. The Puget Sound region contains tidal flats, river deltas with salt marshes, and swamps, as well as a heavily modified urban shoreline around Seattle. Many marshes in this region have been diked, drained, and converted to farmland during the last century. Sea level rise could gradually inundate the remaining tidal flats. Over half of these could be lost under a 1-3 foot rise in sea level.

Possible responses to sea level rise include building walls to hold back the sea, allowing the sea to advance and adapting to it, and raising the land (e.g., by replenishing beach sand and/or elevating houses and infrastructure). Each of these responses will be costly, either in out-of-pocket costs or in lost land and structures. For

### Changes In Forest Cover



Current        +10°F, +13% Precipitation

- 🟩 Tundra
- 🟩 Conifer Forest
- 🟩 Savanna/Woodland
- 🟦 Shrub/Woodland
- 🟦 Grasslands
- 🟦 Arid Lands

Source: VEMAP Participants (1995);  Neilson (1995)

example, the cumulative cost of sand replenishment to protect Washington's coastline from a 20-inch sea level rise by 2100 is estimated at $143 million to $2.3 billion.

## Forests

Trees and forests are adapted to specific climate conditions, and as climate warms, forests will change. These changes could include changes in species, geographic extent, and health and productivity. If conditions also become drier, the current range and density of forests could be reduced and replaced by grasslands and pasture. Even a warmer and wetter climate would lead to changes; trees that are better adapted to these conditions, such as hemlock and sitka spruce, would thrive. Under these conditions, forests could become more dense. These changes could occur during the lifetimes of today's children, particularly if they are accelerated by other stresses such as fire, pests, and diseases. Some of these stresses would themselves be worsened by a warmer and drier climate.

With changes in climate, the extent of forested areas in Washington could change little, or they could decline by 15-25%, primarily east of the Cascades. The uncertainties depend on many factors, including whether soils become drier and, if so, by how much drier. Wildfire frequency and intensity could increase and threaten the important timber producing areas of the state. In Washington's highly productive conifer forests, drier conditions would favor an expansion of Douglas fir, lodgepole pine, and ponderosa pine forests at the expense of the wet-loving hemlock and sitka spruce along the coast. These changes could affect the character of some of Washington's forests and the activities that depend on them.

## Water Resources

Water resources are affected by changes in precipitation as well as by temperature, humidity, wind, and sunshine. Changes in streamflow tend to magnify changes in precipitation. Water resources in drier climates tend to be more sensitive to climate changes. Because evaporation is likely to increase with warmer climate, it could result in lower river flow and lower lake levels,

particularly in the summer. In addition, more intense precipitation could increase flooding. If streamflow and lake levels drop, groundwater also could be reduced.

All of Washington to the east of the Cascade Mountains lies within the Columbia River drainage basin, where flow is dominated by spring snowmelt. The third of the state that lies to the west of the Cascades is drained by numerous smaller streams that flow to Puget Sound, the Pacific Ocean, or the lower Columbia. Those streams with headwaters at high elevations, especially in the Cascades and Olympics, are affected by winter snow and spring snowmelt, but lower elevation streams are dominated by winter rainfall. The seasonal pattern of flow in most streams in the eastern part of the state, and many in the west, would be highly susceptible to warmer temperatures. Runoff peaks would occur earlier in the year, which could cause problems for many of the state's reservoirs, which are small in comparison to their inflows and therefore might not be able to supply water with the same reliability as they do under current climatic conditions.

The reduced summer and fall flows that would accompany a warmer climate almost certainly would result in degraded water quality. In addition, increased snowmelt could increase winter flooding for some westside streams. Some eastside streams, which are now rarely affected by fall and winter flooding, also could become susceptible to winter snowmelt flooding. On the other hand, the susceptibility of eastside streams to spring snowmelt floods, which now account for most large floods in eastern Washington, most likely would decrease because of reduced spring snow accumulations.

## Agriculture

The mix of crop and livestock production in a state is influenced by climatic conditions and water availability. As climate warms, production patterns will shift northward. Increases in climate variability could make adaptation by farmers more difficult. Warmer climates and less soil moisture due to increased evaporation may increase the need for irrigation. However, these same conditions could decrease water supplies, which also may be needed by natural ecosystems, urban populations, and other economic sectors.

Understandably, most studies have not fully accounted for changes in climate variability, water availability, and imperfect responses by farmers to changing climate. Including these factors could substantially change modeling results. Analyses based on changes in average climate and which assume farmers effectively adapt suggest that aggregate U.S. food production will not be harmed, although there may be significant regional changes.

In Washington, agriculture is about a $4 billion annual industry, two-thirds of which is crops like wheat, barley, hay, and potatoes. About 28% of the state's farm acres is irrigated. With warmer

### Changes In Agricultural Yield And Production



Source: Mendelsohn and Neumann (in press); McCarl (personal communication)

temperatures, wheat yields could increase by up to 70-90%. Barley and hay yields could decrease by 4-14%, and potato yields could fall by 17%. Farm income could double or triple. The number of irrigated acres could increase. This could further stress water supplies, which may already be lower in the summer, and water quality could be degraded further.

## Ecosystems

The primary natural features of Washington that are vulnerable to climate change are its extensive rivers, streams, and coastal estuaries. These environments are critical for a wide diversity of wildlife, endangered species, and commercial and sport fisheries.

Reduced flows of headwater streams, or changes in their seasonal flows, could reduce the amount of suitable salmon spawning habitat. In recent years, populations of salmon and steelhead have been reduced to less than 10% of historical levels. While these past losses cannot be attributed to climate change, pink and chum salmon could lose all of their habitat with climate change. Other cold water species such as brook trout, brown trout, and mountain whitefish could lose most of their habitat. Farther downstream, increases in sea level and decreases in river flow could affect estuaries, increasing salinities and decreasing tidal marsh area. Valuable commercial shellfish communities (e.g., oysters and clams) and duck and geese populations that utilize these flats for habitat and feeding also may decline accordingly.

In addition, mountain ecosystems could shift upslope, reducing habitat for many subalpine species. At lower elevations, species now found in warmer climates may survive. For example, the climate in eastern Washington could become warm enough to support saguaro cactus.

*For further information about the potential impacts of climate change, contact the Climate and Policy Assessment Division (2174), U.S. EPA, 401 M Street SW, Washington, DC 20460.*

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 51

United States
Environmental Protection
Agency

Office of Policy
(2111)

EPA 236-F-98-007aa
September 1998



# Climate Change And Vermont



The earth's climate is predicted to change because human activities are altering the chemical composition of the atmosphere through the buildup of greenhouse gases — primarily carbon dioxide, methane, nitrous oxide, and chlorofluorocarbons. The heat-trapping property of these greenhouse gases is undisputed. Although there is uncertainty about exactly how and when the earth's climate will respond to enhanced concentrations of greenhouse gases, observations indicate that detectable changes are under way. There most likely will be increases in temperature and changes in precipitation, soil moisture, and sea level, which could have adverse effects on many ecological systems, as well as on human health and the economy.

## The Climate System

Energy from the sun drives the earth's weather and climate. Atmospheric greenhouse gases (water vapor, carbon dioxide, and other gases) trap some of the energy from the sun, creating a natural "greenhouse effect." Without this effect, temperatures would be much lower than they are now, and life as known today would not be possible. Instead, thanks to greenhouse gases, the earth's average temperature is a more hospitable 60°F. However, problems arise when the greenhouse effect is *enhanced* by human-generated emissions of greenhouse gases.

Global warming would do more than add a few degrees to today's average temperatures. Cold spells still would occur in winter, but heat waves would be more common. Some places would be drier, others wetter. Perhaps more important, more precipitation may come in short, intense bursts (e.g., more than 2 inches of rain in a day), which could lead to more flooding. Sea levels would be higher than they would have been without global warming, although the actual changes may vary from place to place because coastal lands are themselves sinking or rising.

### The Greenhouse Effect



Source: U.S. Department of State (1992)

## Emissions Of Greenhouse Gases

Since the beginning of the industrial revolution, human activities have been adding measurably to natural background levels of greenhouse gases. The burning of fossil fuels — coal, oil, and natural gas — for energy is the primary source of emissions. Energy burned to run cars and trucks, heat homes and businesses, and power factories is responsible for about 80% of global carbon dioxide emissions, about 25% of U.S. methane emissions, and about 20% of global nitrous oxide emissions. Increased agriculture and deforestation, landfills, and industrial production and mining also contribute a significant share of emissions. In 1994, the United States emitted about one-fifth of total global greenhouse gases.

## Concentrations Of Greenhouse Gases

Since the pre-industrial era, atmospheric concentrations of carbon dioxide have increased nearly 30%, methane concentrations have more than doubled, and nitrous oxide concentrations have risen by about 15%. These increases have enhanced the heat-trapping capability of the earth's atmosphere. Sulfate aerosols, a common air pollutant, cool the atmosphere by reflecting incoming solar radiation. However, sulfates are short-lived and vary regionally, so they do not offset greenhouse gas warming.

Although many greenhouse gases already are present in the atmosphere, oceans, and vegetation, their concentrations in the future will depend in part on present and future emissions. Estimating future emissions is difficult, because they will depend on demographic, economic, technological, policy, and institutional developments. Several emissions scenarios have been developed based on differing projections of these underlying factors. For example, by 2100, in the absence of emissions control policies, carbon dioxide concentrations are projected to be 30-150% higher than today's levels.

## Current Climatic Changes

Global mean surface temperatures have increased 0.6-1.2°F between 1890 and 1996. The 9 warmest years in this century all have occurred in the last 14 years. Of these, 1995 was the warmest year on record, suggesting the atmosphere has rebounded from the temporary cooling caused by the eruption of Mt. Pinatubo in the Philippines.

Several pieces of additional evidence consistent with warming, such as a decrease in Northern Hemisphere snow cover, a decrease in Arctic Sea ice, and continued melting of alpine glaciers, have been corroborated. Globally, sea levels have risen

### Global Temperature Changes (1861–1996)



Source: IPCC (1995), updated

4-10 inches over the past century, and precipitation over land has increased slightly. The frequency of extreme rainfall events also has increased throughout much of the United States.

A new international scientific assessment by the Intergovernmental Panel on Climate Change recently concluded that *"the balance of evidence suggests a discernible human influence on global climate."*

### Future Climatic Changes

For a given concentration of greenhouse gases, the resulting increase in the atmosphere's heat-trapping ability can be predicted with precision, but the resulting impact on climate is more uncertain. The climate system is complex and dynamic, with constant interaction between the atmosphere, land, ice, and oceans. Further, humans have never experienced such a rapid rise in greenhouse gases. In effect, a large and uncontrolled planetwide experiment is being conducted.

General circulation models are complex computer simulations that describe the circulation of air and ocean currents and how energy is transported within the climate system. While uncertainties remain, these models are a powerful tool for studying climate. As a result of continuous model improvements over the last few decades, scientists are reasonably confident about the link between global greenhouse gas concentrations and temperature and about the ability of models to characterize future climate at continental scales.

Recent model calculations suggest that the global surface temperature could increase an average of 1.6-6.3°F by 2100, with significant regional variation. These temperature changes would be far greater than recent natural fluctuations, and they would occur significantly faster than any known changes in the last 10,000 years. The United States is projected to warm more than the global average, especially as fewer sulfate aerosols are produced.

The models suggest that the rate of evaporation will increase as the climate warms, which will increase average global precipitation. They also suggest increased frequency of intense rainfall as well as a marked decrease in soil moisture over some mid-continental regions during the summer. Sea level is projected to increase by 6-38 inches by 2100.

Calculations of regional climate change are much less reliable than global ones, and it is unclear whether regional climate will become more variable. The frequency and intensity of some extreme weather of critical importance to ecological systems (droughts, floods, frosts, cloudiness, the frequency of hot or cold spells, and the intensity of associated fire and pest outbreaks) could increase.

### Local Climate Changes

Over the last century, the average temperature in Burlington, Vermont, has increased 0.4°F, and precipitation has increased by up to 5% in many parts of the state. These past trends may or may not continue into the future.

Over the next century, Vermont's climate may change even more. For example, based on projections made by the Intergovernmental Panel on Climate Change and results from the United Kingdom Hadley Centre climate model (HadCM2), a model that accounts for both greenhouse gases and aerosols, by 2100 temperatures in Vermont could increase by 4°F (with a range of 2-9°F) in spring and 5°F (with a range of 2-10°F) in the other seasons. Precipitation is projected to show little change in spring, to increase by about 10% in summer and fall (with a range of 5-20%), and by 30% (with a range of 10-50%) in winter. Other climate models may show different results, especially regarding estimated changes in precipitation. The impacts described in the sections that follow take into account estimates from different models. The amount of precipitation on extreme wet or snowy days in winter is likely to increase. The frequency of extreme hot days in summer would increase because of the general warming trend. Although it is not clear how the severity of storms might be affected, an increase in the frequency and intensity of winter storms is possible.

### Precipitation Trends From 1900 To Present



Source: Karl et al. (1996)

## Human Health

Higher temperatures and increased frequency of heat waves may increase the number of heat-related deaths and the incidence of heat-related illnesses. The elderly, particularly those living alone, are at greatest risk. These effects have been studied only for populations living in urban areas; however, even those in rural areas may be susceptible.

Climate change could increase concentrations of ground-level ozone. For example, high temperatures, strong sunlight, and stable air masses tend to increase urban ozone levels. In New England, a 4°F warming, with no other change in weather or emissions, could increase concentrations of ozone, a major component of smog, by 4%. Although Vermont is in compliance with current air quality standards, increased temperatures could make remaining in compliance more difficult. Ground-level ozone is associated with respiratory illnesses such as asthma, reduced lung function, and respiratory inflammation. Air pollution also is made worse by increases in natural hydrocarbon emissions such as emissions of terpenes by trees and shrubs during hot weather. If a warmed climate causes increased use of air conditioners, air pollutant emissions from power plants also will increase. Respiratory and eye allergies increase in warm, humid conditions.

Warmer temperatures could increase the incidence of Lyme disease and other tick-borne diseases in Vermont, because populations of ticks, and their rodent hosts, could increase under warmer temperatures and increased vegetation.

Warmer winters, warmer temperatures, and heavy precipitation also can increase harmful algal blooms in lakes and ponds, reduce water quality, and increase outbreaks of cryptosporidiosis and giardia.

## Water Resources

The eastern portion of Vermont is drained by the Connecticut River, which forms the border between Vermont and New Hampshire. The western half of the state is drained by tributaries that traverse the Green Mountains and flow into Lake Champlain and the Hudson River. These surface waters provide water for half of the state's population, are an important source of water for industry and hydroelectric generation, and support recreation uses. Winter snow accumulation and spring snowmelt strongly affect all the state's rivers. A warmer climate would lead to an earlier snowmelt, resulting in higher streamflows in winter and spring and lower streamflows in summer and fall. Warmer summer temperatures and longer summers could exacerbate water quality problems such as excessive growth of aquatic weeds in Lake Champlain and other lakes. Warmer water temperatures also reduce dissolved oxygen levels, adversely affecting fish habitat, and lower summer streamflows could reduce the ability of rivers to assimilate waste. Changes in the timing and accumulation of snow could affect skiing conditions in positive and negative ways, such as the timing and length of season and snow depth.

Increased rainfall could result in localized flooding and exacerbate levels of pesticides and fertilizers in runoff from agricultural lands, major causes of degraded water quality in Vermont. Less rainfall, particularly during the summer when temperatures and evaporation are high, could reduce streamflow, lake levels, and ground-water levels. This could reduce water supplies for those areas of the state experiencing the highest rates of growth, including Chittenden, Rutland, Washington, and Windsor counties. Declining aquifers would also affect small municipalities and rural populations that depend on wells.

Lower water levels in freshwater lakes such as Lake Champlain would reduce flood damage, but shorelines could be more susceptible to erosion from wind and rain.

## Agriculture

The mix of crop and livestock production in a state is influenced by climatic conditions and water availability. As climate warms, production patterns could shift northward. Increases in climate variability could make adaptation by farmers more difficult. Warmer climates and less soil moisture due to increased evaporation may increase the need for irrigation. However, these same conditions could decrease water supplies, which also may be needed by natural ecosystems, urban populations, industry, and other users.

Understandably, most studies have not fully accounted for changes in climate variability, water availability, crop pests, changes in air pollution such as ozone, and adaptation by farmers to changing climate. Including these factors could change modeling results substantially. Analyses that assume changes in average climate and effective adaptation by farmers suggest that aggregate U.S. food production would not be harmed, although there may be significant regional changes.

### Changes In Agricultural Yield And Production



Sources: Mendelsohn and Neumann (in press); McCarl (personal communication)

In Vermont, production agriculture is a $440 million annual industry, three-fourths of which comes from livestock, mainly dairy operations. Very few of the farmed acres are irrigated. The major crops in the state are silage and hay. Yields of these crops and pasture could fall by as much as 39% under severe conditions as temperatures rise beyond the tolerance levels of the crop and are combined with increased stress from decreased soil moisture. The extent of farmed acres, however, is projected to remain fairly constant. Estimated changes in yield vary, depending on whether land is irrigated. Livestock and dairy production may not be affected, unless summer temperature rises significantly and conditions become significantly drier. Under these conditions, livestock gain less weight and pasture yields decline, limiting forage.

## Forests

Trees and forests are adapted to specific climate conditions, and as climate warms, forests will change. These changes could include changes in species composition, geographic range, and health and productivity. If conditions also become drier, the current range of forests could be reduced and replaced by grasslands and pasture. Even a warmer and wetter climate could lead to changes; trees that are better adapted to warmer conditions, such as oak, hickory, and pines, would prevail. Under these conditions, forests could become more dense. These changes could occur during the lifetimes of today's children, particularly if the change is accelerated by other stresses such as fire, pests, and diseases. Some of these stresses would themselves be worsened by a warmer and drier climate.

Although the extent of forested areas in Vermont could change little because of climate change, a warmer climate could change the character of those forests. Maple-dominated hardwood forests could give way to forests with more oaks and conifers, species more tolerant of higher temperatures. This change would diminish the brilliant autumn foliage as the number of maple trees declines. The spruce-fir forests in Vermont (and other New England states) are near the southern limit of their extent. These forests are sensitive to climatic stresses and have experienced significant declines in recent decades. Across the state, as much as 30-60% of the hardwood forests could be replaced by warmer-climate forests with a mix of pines and hardwoods. The extent and density of the spruce and fir forests at higher altitudes and in the north, which support a large variety of songbirds, also could be reduced. The change in temperature also could cause maple sap to run earlier and more quickly, thus shortening the length of the season for gathering sap.

### Changes In Forest Cover



Current                    +10°F, +13% Precipitation

- ■ Conifer Forest
- ■ Broadleaf Forest
- ■ Savanna/Woodland
- □ Grassland

Sources: VEMAP Participants (1995); Neilson (1995)

## Ecosystems

Seven endangered animals and plants are found in Vermont, including the Indiana bat, the dwarf wedge mussel, and Jessup's milk vetch. These animal and plant populations could be further stressed by changes in climate and habitat. Higher-than-normal winter temperatures could boost temperatures inside cave bat roosting sites, which has been shown to cause higher mortality due to increased winter body weight loss in endangered Indiana bats (e.g., an increase of 9°F during winter hibernation has been associated with a 42% increase in the rate of body mass loss). The marshes of the Missisquoi River delta on the northeastern shore of Lake Champlain support hundreds of species of waterfowl, which depend on the water and marsh habitat. Climate change could alter the water balance and affect the health and range of the marshlands.

As forests change in both range and composition, the habitat that supports the mixture of plants and animals changes. Animal species specific to cooler conifer forests, such as spruce grouse, gray jays, moose, and marten, could experience moderate to severe range reductions. Waterfowl and other migratory birds could be especially vulnerable to climate change-induced shifts in the timing that food resources become available. If wetlands are reduced by a drier climate or increased frequency of droughts, waterfowl populations also could decline.

*For further information about the potential impacts of climate change, contact the Climate and Policy Assessment Division (2174), U.S. EPA, 401 M Street SW, Washington, DC 20460, or visit http://www.epa.gov/globalwarming/impacts.*



U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 52

United States
Environmental Protection
Agency

Office of Policy
(2111)

EPA 236-F-98-007k
September 1998

 **EPA**      # Climate Change And Maine      

The earth's climate is predicted to change because human activities are altering the chemical composition of the atmosphere through the buildup of greenhouse gases — primarily carbon dioxide, methane, nitrous oxide, and chlorofluorocarbons. The heat-trapping property of these greenhouse gases is undisputed. Although there is uncertainty about exactly how and when the earth's climate will respond to enhanced concentrations of greenhouse gases, observations indicate that detectable changes are under way. There most likely will be increases in temperature and changes in precipitation, soil moisture, and sea level, which could have adverse effects on many ecological systems, as well as on human health and the economy.

## The Climate System

Energy from the sun drives the earth's weather and climate. Atmospheric greenhouse gases (water vapor, carbon dioxide, and other gases) trap some of the energy from the sun, creating a natural "greenhouse effect." Without this effect, temperatures would be much lower than they are now, and life as known today would not be possible. Instead, thanks to greenhouse gases, the earth's average temperature is a more hospitable 60°F. However, problems arise when the greenhouse effect is *enhanced* by human-generated emissions of greenhouse gases.

Global warming would do more than add a few degrees to today's average temperatures. Cold spells still would occur in winter, but heat waves would be more common. Some places would be drier, others wetter. Perhaps more important, more precipitation may come in short, intense bursts (e.g., more than 2 inches of rain in a day), which could lead to more flooding. Sea levels would be higher than they would have been without global warming, although the actual changes may vary from place to place because coastal lands are themselves sinking or rising.

### The Greenhouse Effect



Source: U.S. Department of State (1992)

## Emissions Of Greenhouse Gases

Since the beginning of the industrial revolution, human activities have been adding measurably to natural background levels of greenhouse gases. The burning of fossil fuels — coal, oil, and natural gas — for energy is the primary source of emissions. Energy burned to run cars and trucks, heat homes and businesses, and power factories is responsible for about 80% of global carbon dioxide emissions, about 25% of U.S. methane emissions, and about 20% of global nitrous oxide emissions. Increased agriculture and deforestation, landfills, and industrial production and mining also contribute a significant share of emissions. In 1994, the United States emitted about one-fifth of total global greenhouse gases.

## Concentrations Of Greenhouse Gases

Since the pre-industrial era, atmospheric concentrations of carbon dioxide have increased nearly 30%, methane concentrations have more than doubled, and nitrous oxide concentrations have risen by about 15%. These increases have enhanced the heat-trapping capability of the earth's atmosphere. Sulfate aerosols, a common air pollutant, cool the atmosphere by reflecting incoming solar radiation. However, sulfates are short-lived and vary regionally, so they do not offset greenhouse gas warming.

Although many greenhouse gases already are present in the atmosphere, oceans, and vegetation, their concentrations in the future will depend in part on present and future emissions. Estimating future emissions is difficult, because they will depend on demographic, economic, technological, policy, and institutional developments. Several emissions scenarios have been developed based on differing projections of these underlying factors. For example, by 2100, in the absence of emissions control policies, carbon dioxide concentrations are projected to be 30-150% higher than today's levels.

## Current Climatic Changes

Global mean surface temperatures have increased 0.6-1.2°F between 1890 and 1996. The 9 warmest years in this century all have occurred in the last 14 years. Of these, 1995 was the warmest year on record, suggesting the atmosphere has rebounded from the temporary cooling caused by the eruption of Mt. Pinatubo in the Philippines.

Several pieces of additional evidence consistent with warming, such as a decrease in Northern Hemisphere snow cover, a decrease in Arctic Sea ice, and continued melting of alpine glaciers, have been corroborated. Globally, sea levels have risen

### Global Temperature Changes (1861–1996)



Source: IPCC (1995), updated

4-10 inches over the past century, and precipitation over land has increased slightly. The frequency of extreme rainfall events also has increased throughout much of the United States.

A new international scientific assessment by the Intergovernmental Panel on Climate Change recently concluded that ***"the balance of evidence suggests a discernible human influence on global climate."***

## Future Climatic Changes

For a given concentration of greenhouse gases, the resulting increase in the atmosphere's heat-trapping ability can be predicted with precision, but the resulting impact on climate is more uncertain. The climate system is complex and dynamic, with constant interaction between the atmosphere, land, ice, and oceans. Further, humans have never experienced such a rapid rise in greenhouse gases. In effect, a large and uncontrolled planet-wide experiment is being conducted.

General circulation models are complex computer simulations that describe the circulation of air and ocean currents and how energy is transported within the climate system. While uncertainties remain, these models are a powerful tool for studying climate. As a result of continuous model improvements over the last few decades, scientists are reasonably confident about the link between global greenhouse gas concentrations and temperature and about the ability of models to characterize future climate at continental scales.

Recent model calculations suggest that the global surface temperature could increase an average of 1.6-6.3°F by 2100, with significant regional variation. These temperature changes would be far greater than recent natural fluctuations, and they would occur significantly faster than any known changes in the last 10,000 years. The United States is projected to warm more than the global average, especially as fewer sulfate aerosols are produced.

The models suggest that the rate of evaporation will increase as the climate warms, which will increase average global precipitation. They also suggest increased frequency of intense rainfall as

well as a marked decrease in soil moisture over some mid-continental regions during the summer. Sea level is projected to increase by 6-38 inches by 2100.

Calculations of regional climate change are much less reliable than global ones, and it is unclear whether regional climate will become more variable. The frequency and intensity of some extreme weather of critical importance to ecological systems (droughts, floods, frosts, cloudiness, the frequency of hot or cold spells, and the intensity of associated fire and pest outbreaks) could increase.

## Local Climate Changes

Over the last century, the average temperature in Lewiston, Maine, has increased 3.4°F, and precipitation has decreased by up to 20% in many parts of the state. These past trends may or may not continue into the future.

Over the next century, Maine's climate may change even more. For example, based on projections made by the Intergovernmental Panel on Climate Change and results from the United Kingdom Hadley Centre climate model (HadCM2), a model that accounts for both greenhouse gases and aerosols, by 2100 temperatures in Maine could increase by 4°F (with a range of 2-8°F), slightly less in spring and fall and slightly more in summer and winter. Precipitation is projected to show little change in spring, increase by 10% in summer and fall (with a range of 5-15%), and increase by 30% in winter (with a range of 10-50%). Other climate models may show different results, especially regarding estimated changes in precipitation. The impacts described in the sections that follow take into account estimates from different models. The amount of precipitation on extreme wet or snowy days in winter is likely to increase. The frequency of extreme hot days in summer would increase because of the general warming trend. Although it is not clear how the severity of storms such as hurricanes might be affected, an increase in the frequency and intensity of winter storms is possible.

### Precipitation Trends From 1900 To Present



Source: Karl et al. (1996)

## Human Health

Higher temperatures and increased frequency of heat waves may increase the number of heat-related deaths and the incidence of heat-related illnesses. Maine, with its occasional heat waves, could be susceptible. In Boston, the nearest city in New England for which heat wave projections have been made, one study projects that a warming of 3°F could increase heat-related deaths during a typical summer by 50-100% (although increased air conditioning use may not have been fully accounted for). The elderly, especially those living alone, are at greatest risk. This study also shows that winter-related deaths will probably be unaffected by climate change in northern New England.

Climate change could increase concentrations of ground-level ozone. For example, high temperatures, strong sunlight, and stable air masses tend to increase urban ozone levels. In New England, a 4°F warming, with no other change in weather or emissions, could increase concentrations of ozone, a major component of smog, by 4%. Currently, ground-level concentrations exceed the national ozone health standard to a moderate extent in Portland and in southern counties along the coast. Ground-level ozone is associated with respiratory illnesses such as asthma, reduced lung function, and respiratory inflammation. Air pollution also is made worse by increases in natural hydrocarbon emissions such as emissions of terpenes by trees and shrubs during hot weather. If a warmed climate causes increased use of air conditioners, air pollutant emissions from power plants also will increase. Respiratory and eye allergies increase in warm, humid conditions.

Warmer temperatures could increase the incidence of Lyme disease and other tick-borne diseases in Maine, because populations of ticks, and their rodent hosts, could increase under warmer temperatures and increased vegetation.

Warmer winters, warmer temperatures, and heavy precipitation also can increase harmful algal blooms, that is, red tides; reduce water quality; and increase outbreaks of cryptosporidiosis and giardia. In addition, warmer seas could contribute to the intensity, duration, and extent of harmful algal blooms in the coastal waters of Maine. These blooms damage habitat and shellfish nurseries and can be toxic to humans.

## Coastal Areas

Sea level rise could lead to flooding of low-lying property, loss of coastal wetlands, erosion of beaches, saltwater contamination of drinking water, and decreased longevity of low-lying roads, causeways, and bridges. In addition, sea level rise could increase the vulnerability of coastal areas to storms and associated flooding.

Maine has almost 3,500 miles of tidally influenced shoreline, consisting of rocky peninsulas and harbors, pocket beaches, islands, and complex estuaries. Because of the steep profile that is characteristic of the Maine coastline and a lack of low-lying land to be colonized by new marshes, there is likely to be a net loss of marshes in Maine under accelerated sea level rise.

At Rockland, sea level already is rising by 3.9 inches per century, and it is likely to rise another 14 inches by 2100. The rocky substrate of Maine may slow erosion due to sea level rise, and could complement efforts to protect the coastline. Possible responses to sea level rise include building walls to hold back the sea, allowing the sea to advance and adapting to it, and raising the land (e.g., by replenishing beach sand, elevating houses and infrastructure). Each of these responses will be costly, either in out-of-pocket costs or in lost land and structures. For example, the cumulative cost of sand replenishment to protect Maine's coastline from a 20-inch sea level rise by 2100 is estimated at $200-$900 million. However, sand replenishment may not be cost-effective for all coastal areas in the state and, therefore, some savings could be possible.

## Agriculture

The mix of crop and livestock production in a state is influenced by climatic conditions and water availability. As climate warms, production patterns could shift northward. Increases in climate variability could make adaptation by farmers more difficult. Warmer climates and less soil moisture due to increased evaporation may increase the need for irrigation. However, these same conditions could decrease water supplies, which also may be needed by natural ecosystems, urban populations, industry, and other users.

Understandably, most studies have not fully accounted for changes in climate variability, water availability, crop pests, changes in air pollution such as ozone, and adaptation by farmers to changing climate. Including these factors could change modeling results substantially. Analyses that assume changes in average climate and effective adaptation by farmers suggest that aggregate U.S. food production would not be harmed, although there may be significant regional changes.

In Maine, production agriculture is a $500 million annual industry, half of which comes from crops and the other half from livestock, mainly poultry and dairy. Very few of the farmed acres are irrigated. The major crops in the state are potatoes and hay.

### Changes In Agricultural Yield And Production



Sources: Mendelsohn and Neumann (in press); McCarl (personal communication)

Climate change could reduce potato yields by 2-23%. Hay and pasture yields could fall by as much as 39% as temperatures rise beyond the tolerance level of the crop. Estimated changes in yield vary, depending on whether land is irrigated. It is possible that Maine farmers could alter their cropping practices to take advantage of longer growing seasons and thus limit income losses due to reductions in hay and potato yields.

## Water Resources

A warmer climate would lead to an earlier spring snowmelt, resulting in higher streamflows in winter and spring and lower streamflows in summer and fall. Warmer summer temperatures and longer summers could exacerbate water quality problems in rivers such as the Androscoggin, where industry is significant and pollution has traditionally been a problem. Warmer water temperatures also reduce dissolved oxygen levels, adversely affecting fish habitat, and lower summer streamflows could reduce the ability of rivers to assimilate waste.

With more intense rainfall, increased flooding is possible, particularly in steep headwater areas and along well-developed floodplains. Greater and more intense rainfall could also increase erosion in agricultural and timber-harvesting areas, resulting in deposition of sediment in lakes and streams. Less rainfall, particularly during the summer, could reduce streamflow, lake levels, and groundwater levels. Streamflow reduction and warmer temperatures would reduce habitat for cold water fish. This could reduce water supplies in areas such as southwestern coastal Maine, which is experiencing growing water demands due to population growth and increased tourism.

## Forests

Trees and forests are adapted to specific climate conditions, and as climate warms, forests will change. These changes could include changes in species composition, geographic range, and health and productivity. If conditions also become substantially drier, the current range of forests could be reduced and replaced by grasslands and pasture. Even a warmer and wetter climate could lead to changes; trees that are better adapted to warmer conditions, such as oak, hickory, and pines, would prevail. Under these conditions, forests could become more dense. These changes could occur during the lifetimes of today's children, particularly if the change is accelerated by other stresses such as fire, pests, and diseases. Some of these stresses would themselves be worsened by a warmer and drier climate.

Although the extent of forested areas in Maine could change little because of climate change, a warmer climate could change the character of those forests. Maple-dominated hardwood forests could give way to forests dominated by oaks and conifers, species more tolerant of higher temperatures, especially along the coast. This change would diminish the brilliant autumn foliage as the number of maple trees declines. The spruce-fir forests in Maine (and other New England states) are near the southern limit of their extent. These forests are sensitive to climatic stresses and have experienced significant declines in recent decades. Across the state, as much as 35-60% of the hardwood forests could be

### Changes In Forest Cover



Current          +10°F, +13% Precipitation

■ Conifer Forest
■ Broadleaf Forest
■ Savanna/Woodland

Sources: VEMAP Participants (1995); Neilson (1995)

replaced by warmer-climate forests with a mix of pines and hardwoods and, in some areas in the southeast, by grassland and pasture. The extent and density of the spruce and fir forests at higher altitudes, which support a large variety of songbirds, also could be reduced by as much as 40-50%.

## Ecosystems

The state of Maine is blanketed by northern hardwood/pine forests in the south and a mosaic of hardwood/spruce and higher elevation spruce-fir forests in the north and east. Maine's aquatic resources include the St. John River, a section of which is the longest free-flowing river segment in the northeastern United States and home to over 30 species of rare plants, including the endangered Furbish's lousewort. The state's long coastline harbors estuarine barrier islands and marshes that provide habitat for endangered species such as bald eagles, peregrine falcons, piping plovers, and roseate terns.

The conifer forests found in higher elevations in the White Mountains could be especially vulnerable to climate change. Climate change could hasten the expansion of broad-leaved forests into these pine forests, a transition that is already taking place as a result of selective and intensive logging. The ranges of spruce grouse, gray jays, boreal chickadees, snowshoe hares, marten, and moose could be affected by reduced pine forests and shifts in forest types. The already high threat of insect pest outbreaks in the northern forest could be exacerbated by warming-induced changes in the timing of spring frosts. If precipitation and runoff increase, the increased flooding of sensitive riparian areas could destroy valuable and unique aquatic and riverine habitats. Similarly, sensitive coastal ecosystems could be damaged by increased tidal floodings associated with increases in severe storms.

*For further information about the potential impacts of climate change, contact the Climate and Policy Assessment Division (2174), U.S. EPA, 401 M Street SW, Washington, DC 20460, or visit http://www.epa.gov/globalwarming/impacts.*



U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 53

PASSENGER CAR, LIGHT DUTY TRUCK, AND MEDIUM DUTY VEHICLE EXECUTIVE ORDERS - 2008

New Executive Orders added February 04, 2008

Listed below are links to the Executive Orders for Passenger Car, Light Duty Truck, and Medium Duty Vehicle for the 2008 year. To resort alphabetically or by date, please click on the header "Executive Orders" or "Modified."

| Executive Orders | Modified |
|---|---|
| tesla_pc_a3740001_0_z_e.pdf NEW! | Feb 04 2008 |
| saleen_ldt_a3240024_5d4_l2.pdf | Jan 31 2008 |
| toyota_pc_a0140615_5d0_u2.pdf | Jan 31 2008 |
| gm_pc_a0061441r1_2d2-2d4_l2.pdf | Jan 28 2008 |
| chrysler_mdev_a0090823_6d7_2d2-0d01_diesel.pdf | Jan 14 2008 |
| ford_mdev_a0101461_6d0_2d5-0d10_diesel.pdf | Jan 10 2008 |
| ford_mdev_a0101462_6d4_1d3-0d01_diesel.pdf | Jan 07 2008 |
| subaru_pc-ldt_a0020159_2d5_pz.pdf | Jan 02 2008 |
| bmw_pc_a0080228_4d0_l2.pdf | Jan 02 2008 |
| isuzu_mdev_a0200243_5d2_u1_diesel.pdf | Dec 27 2007 |
| saleen_pc_a3240023_4d6-5d0_l2.pdf | Dec 26 2007 |
| tecstar_ldt_a3730001_5d4_b4u2.pdf | Dec 26 2007 |
| nissan_pc_a0150494_1d8_u2.pdf | Dec 26 2007 |
| bmw_pc_a0080224r2_3d0_l2.pdf | Dec 21 2007 |
| bmw_pc-ldt_a0080220r1_2d5-3d0_u2.pdf | Dec 21 2007 |
| bmw_pc_a0080222_1d6_u2.pdf | Dec 21 2007 |
| bmw_pc_a0080223_1d6_u2.pdf | Dec 21 2007 |
| dcag_pc_a0030343_1d0_u2.pdf | Dec 19 2007 |
| dcco_pc-ldt_a0090786_2d4_u2.pdf | Dec 19 2007 |
| mitsubishi_pc_a0860289_2d0_l2.pdf | Dec 13 2007 |
| ford_pc_a0101411_4d6_l2.pdf | Dec 13 2007 |
| ford_pc_a0101459_4d6_l2.pdf | Dec 13 2007 |
| ford_mdev_a0101449r1_6d8_0d35-0d01.pdf | Dec 13 2007 |
| ford_mdev_a0101445r3_5d4_0d85-0d01.pdf | Dec 13 2007 |
| global_pc_a3320010_0_z_e.pdf | Nov 27 2007 |
| gm_pc_a0061483_3d6_l2.pdf | Nov 19 2007 |
| alpina_pc_a3530003_4d4_l2.pdf | Nov 19 2007 |
| nissan_pc_a0150480_3d5_l2.pdf | Nov 14 2007 |
| ford_ldt_a0101460_4d6_u2.pdf | Nov 14 2007 |
| ford_pc_a0101458_4d0_u2.pdf | Nov 14 2007 |
| lamborghini_pc_a2730032r1_6d5_l2.pdf | Nov 06 2007 |
| bmw_pc_a0080224r1_3d0_l2.pdf | Nov 06 2007 |
| ford_mdv_a0101434_4d6_b8al2_e85.pdf | Nov 05 2007 |
| gm_pc_a0061435_1d8_u2.pdf | Nov 01 2007 |
| gm_pc_a0061484_6d0_l2.pdf | Oct 30 2007 |

| | |
|---|---|
| ford_pc_a0101457_2d3_u2.pdf | Oct 30 2007 |
| gm_mdev_a0061499r2_6d6_1d3-0d01_diesel.pdf | Oct 30 2007 |
| gm_ldt_a0061476_6d0_l2.pdf | Oct 30 2007 |
| ford_mdev_a0101447r2_6d8_0d56-0d01.pdf | Oct 30 2007 |
| dcag_mdev_a0030361_3d0_1d2-0d01_diesel.pdf | Oct 30 2007 |
| workhorse_mdev_a3400040_6d0_0d8-0d01.pdf | Oct 23 2007 |
| workhorse_mdev_a3400038_4d8_0d8.pdf | Oct 23 2007 |
| shelby_pc_a3710002_4d6_l2.pdf | Oct 17 2007 |
| mitsubishi_ldt_a0860291r1_3d0_pz.pdf | Oct 17 2007 |
| mitsubishi_ldt_a0860290_2d4_l2.pdf | Oct 17 2007 |
| honda_ldt_a0230443_3d5_u2.pdf | Oct 17 2007 |
| toyota_ldt_a0140614_4d7_u2.pdf | Oct 04 2007 |
| toyota_pc_a0140612_3d5_s2_hevge.pdf | Oct 04 2007 |
| toyota_ldt_a0140613_4d0_l2.pdf | Oct 04 2007 |
| toyota_ldt_a0140611r1_5d7_u2.pdf | Oct 04 2007 |
| toyota_ldt_a0140611_5d7_u2.pdf | Oct 04 2007 |
| toyota_pc_a0140602r1_4d6_u2.pdf | Oct 04 2007 |
| subaru_pc-ldt_a0020158_3d0-3d6_l2.pdf | Oct 04 2007 |
| toyota_pc_a0140599r1_3d5_u2.pdf | Oct 04 2007 |
| nissan_pc_a0150484_4d5_l2.pdf | Oct 04 2007 |
| mazda_pc_a0160337_2d3_l2.pdf | Oct 04 2007 |
| nissan_pc_a0150481_3d5_u2.pdf | Oct 04 2007 |
| roush_pc_a3440010_5d4_b4u2.pdf | Oct 04 2007 |
| roush_pc_a3440009_4d6_u2.pdf | Oct 04 2007 |
| nissan_pc_a0150483_3d5_l2.pdf | Oct 04 2007 |
| maserati_pc_a0780038_4d2_l2.pdf | Oct 04 2007 |
| lotus_pc_a0370037_1d8_l2.pdf | Oct 04 2007 |
| hyundai_ldt_a2540162_3d3_u2.pdf | Oct 04 2007 |
| gm_ldt_a0061478r1_6d2_l2.pdf | Oct 04 2007 |
| gm_ldt_a0061447_2d4_b4u2_hevge.pdf | Oct 04 2007 |
| kia_pc_a3140096_2d4_u2.pdf | Oct 04 2007 |
| hyundai_pc_a2540161_2d0_pz.pdf | Oct 04 2007 |
| hyundai_pc_a2540160_2d0_u2.pdf | Oct 04 2007 |
| kia_pc_a3140094_2d0_pz.pdf | Oct 04 2007 |
| kia_pc_a3140095_2d0_u2.pdf | Oct 04 2007 |
| honda_pc_a0230449_1d8_pz_cng.pdf | Oct 04 2007 |
| ferrari_pc_a0400071_5d7-5d9_l2.pdf | Oct 04 2007 |
| ford_mdev_a0101445r2_5d4_0d85-0d01.pdf | Oct 04 2007 |
| ford_mdev_a0101456_6d0_2d5-0d10_diesel.pdf | Oct 04 2007 |
| ferrari_pc_a0400070_4d3_l2.pdf | Oct 04 2007 |

| | |
|---|---|
| bmw_pc_a0080221_1d6_l2.pdf | Oct 04 2007 |
| bmw_ldt_a0080216_3d0_u2.pdf | Oct 04 2007 |
| bmw_ldt_a0080218_4d8_u2.pdf | Oct 04 2007 |
| audi_pc_a0300199_3d2_l2.pdf | Oct 04 2007 |
| audi_pc_a0300196r1_4d2_l2.pdf | Oct 04 2007 |
| bentley_pc_a3510012_6d0_l2.pdf | Oct 04 2007 |
| bmw_pc_a0080225_3d0_pz.pdf | Oct 04 2007 |
| bmw_pc_a0080227_3d2_l2.pdf | Oct 04 2007 |
| bmw_pc_a0080231_6d0_l2.pdf | Oct 04 2007 |
| audi_pc_a0300194r1_4d2_l2.pdf | Oct 04 2007 |
| dcco_pc_a0090813_6d1_l2.pdf | Oct 04 2007 |
| dcco_pc_a0090787_8d4_l2.pdf | Oct 04 2007 |
| cummins_mdv_a0210453r1_6d7_u2_diesel.pdf | Oct 04 2007 |
| cummins_mdv_a0210454r1_6d7_l2_diesel.pdf | Oct 04 2007 |
| dcco_pc_a0090788_2d4_pz.pdf | Aug 24 2007 |
| nissan_ldt_a0150486_2d5_s2.pdf | Aug 23 2007 |
| astonmartin_pc_a0980033_4d3_l2.pdf | Aug 23 2007 |
| dcag_mdv_a0030354_3d5_l2.pdf | Aug 23 2007 |
| honda_pc_a0230452r1_2d0-2d4_l2.pdf | Aug 22 2007 |
| honda_pc_a0230447_1d3_pz_hevge.pdf | Aug 22 2007 |
| ford_ldt_a0101430_5d4_b4u2.pdf | Aug 22 2007 |
| dcag_mdv_a0030353_3d5_b8al2.pdf | Aug 22 2007 |
| gm_pc_a0061437_2d0_l2.pdf | Aug 22 2007 |
| gm_mdv_a0061475r1_4d8-6d0_l2.pdf | Aug 22 2007 |
| dcag_ldt_a0030355_5d0-5d5_l2.pdf | Aug 14 2007 |
| mitsubishina_pc_a2920095_3d8_l2.pdf | Aug 10 2007 |
| gm_pc_a0061440_2d0-2d3_l2.pdf | Aug 10 2007 |
| gm_pc_a0061448_2d8_l2.pdf | Aug 10 2007 |
| ford_pc_a0101409_4d6-5d4_l2.pdf | Aug 09 2007 |
| ford_pc_a0101407_4d0_u2.pdf | Aug 09 2007 |
| ford_mdv_a0101432_5d4_b8al2.pdf | Aug 09 2007 |
| ford_mdev_a0101443_6d4_1d3-0d01_diesel.pdf | Aug 09 2007 |
| ford_ldt_a0101431_5d4_u2.pdf | Aug 09 2007 |
| ford_ldt_a0101425_4d6_u2.pdf | Aug 09 2007 |
| astonmartin_pc_a0980034_5d9_l2.pdf | Aug 08 2007 |
| nissan_ldt_a0150488r1_4d0_u2.pdf | Aug 07 2007 |
| nissan_pc_a0150474_2d5_l2.pdf | Aug 07 2007 |
| nissan_ldt_a0150485_2d5_l2.pdf | Aug 07 2007 |
| nissan_ldt_a0150487_2d5_u2.pdf | Aug 07 2007 |
| kia_pc_a3140093_2d7_u2.pdf | Aug 07 2007 |

| | |
|---|---|
| kia_ldt_a3140089_2d7_l2.pdf | Aug 07 2007 |
| kia_pc_a3140090_1d6_u2.pdf | Aug 07 2007 |
| kia_pc_a3140092_2d7_u2.pdf | Aug 07 2007 |
| kia_pc_a3140091_2d4_u2.pdf | Aug 07 2007 |
| kia_ldt_a3140087_3d8_u2.pdf | Aug 07 2007 |
| hyundai_pc_a2540159_1d6_u2.pdf | Aug 07 2007 |
| kia_ldt_a3140088_2d0_u2.pdf | Aug 07 2007 |
| hyundai_pc_a2540158_3d8_u2.pdf | Aug 07 2007 |
| hyundai_pc_a2540156_2d0_u2.pdf | Aug 07 2007 |
| hyundai_ldt_a2540155_3d8_l2.pdf | Aug 07 2007 |
| hyundai_pc_a2540154_3d3_u2.pdf | Aug 07 2007 |
| hyundai_pc_a2540157_2d7_l2.pdf | Aug 07 2007 |
| toyota_pc_a0140599_3d5_u2.pdf | Aug 07 2007 |
| toyota_pc_a0140602_4d6_u2.pdf | Aug 07 2007 |
| toyota_pc_a0140600_2d5_u2.pdf | Aug 07 2007 |
| toyota_pc_a0140598_1d5_pz_hevge.pdf | Aug 07 2007 |
| porsche_pc_a0190139_3d6_l2.pdf | Aug 07 2007 |
| rollsroyce_pc_a0480054_6d7_l2.pdf | Aug 07 2007 |
| porsche_pc_a0190140_3d6-3d8_l2.pdf | Aug 07 2007 |
| porsche_pc_a0190141_3d6_l2.pdf | Aug 07 2007 |
| porsche_pc_a0190138_2d7-3d4_u2.pdf | Aug 07 2007 |
| honda_pc_a0230457_3d5_pz.pdf | Aug 07 2007 |
| honda_pc_a0230459_3d5_u2.pdf | Aug 07 2007 |
| ford_ldt_a0101428r1_5d4_b4u2.pdf | Aug 07 2007 |
| toyota_ldt_a0140605_3d3_s2_hevge.pdf | Jul 31 2007 |
| nissan_pc_a0150473_2d0_u2.pdf | Jul 31 2007 |
| nissan_ldt_a0150489_3d5_u2.pdf | Jul 31 2007 |
| landrover_ldt_a2770044_4d0_u2.pdf | Jul 31 2007 |
| jaguar_pc_a2200099_3d0_u2.pdf | Jul 31 2007 |
| ford_ldt_a0101428_5d4_b4u2.pdf | Jul 31 2007 |
| ford_mdev_a0101445r1_5d4_0d85-0d01.pdf | Jul 31 2007 |
| dcco_pc_a0090789_2d4_l2.pdf | Jul 31 2007 |
| dcag_pc_a0030347_3d0_l2_e85.pdf | Jul 25 2007 |
| dcco_pc_a0090815_5d7_b4u2.pdf | Jul 25 2007 |
| toyota_pc_a0140601_4d3_l2.pdf | Jul 24 2007 |
| toyota_ldt_a0140609_4d7_u2.pdf | Jul 24 2007 |
| toyota_ldt_a0140610_4d7_u2.pdf | Jul 24 2007 |
| toyota_ldt_a0140607_2d7_l2.pdf | Jul 24 2007 |
| toyota_ldt_a0140608_3d3_s2_hevge.pdf | Jul 24 2007 |
| toyota_ldt_a0140604_2d4_u2.pdf | Jul 24 2007 |

| | |
|---|---|
| toyota_ldt_a0140606_2d7_l2.pdf | Jul 24 2007 |
| toyota_ldt_a0140603_2d4_u2.pdf | Jul 24 2007 |
| toyota_ldt_a0140585r2_3d5_u2.pdf | Jul 24 2007 |
| nissan_pc_a0150482_3d7_u2.pdf | Jul 24 2007 |
| nissan_pc_a0150478_2d5_pz_hevge.pdf | Jul 24 2007 |
| kia_ldt_a3140085_3d8_l2.pdf | Jul 24 2007 |
| kia_pc_a3140086_3d8_u2.pdf | Jul 24 2007 |
| kia_ldt_a3140084_3d3_l2.pdf | Jul 24 2007 |
| hyundai_ldt_a2540151_2d7_u2.pdf | Jul 24 2007 |
| hyundai_ldt_a2540152_2d0_u2.pdf | Jul 24 2007 |
| hyundai_ldt_a2540153_2d7_l2.pdf | Jul 24 2007 |
| honda_pc_a0230451_2d2_l2.pdf | Jul 24 2007 |
| honda_ldt_a0230446_3d7_u2.pdf | Jul 24 2007 |
| honda_pc_a0230450_1d8_u2.pdf | Jul 24 2007 |
| ford_mdv_a0101437_4d6_u2.pdf | Jul 24 2007 |
| ford_mdv_a0101441_6d8_b8al2.pdf | Jul 24 2007 |
| ford_mdv_a0101438_5d4_u2.pdf | Jul 24 2007 |
| ford_ldt_a0101429_5d4_b5l2_e85.pdf | Jul 24 2007 |
| ford_mdev_a0101449_6d8_0d35-0d01.pdf | Jul 24 2007 |
| ford_ldt_a0101427_4d6_l2.pdf | Jul 24 2007 |
| volkswagen_pc_a0070270r1_2d5_pz.pdf | Jul 18 2007 |
| volkswagen_pc_a0070269r1_2d5_u2.pdf | Jul 18 2007 |
| nissan_pc_a0150479_3d5_u2.pdf | Jul 18 2007 |
| gm_mdev_a0061499r1_6d6_1d3-0d01_diesel.pdf | Jul 18 2007 |
| honda_ldt_a0230442_2d4_u2.pdf | Jul 18 2007 |
| honda_pc_a0230448_1d5_l2.pdf | Jul 18 2007 |
| ford_ldt_a0101426_4d2_l2.pdf | Jul 18 2007 |
| ford_mdev_a0101445_5d4_0d85-0d01.pdf | Jul 18 2007 |
| dcco_pc_a0090814_3d5_u2.pdf | Jul 18 2007 |
| dcco_pc_a0090811_2d7_l2.pdf | Jul 18 2007 |
| dcco_pc-ldt_a0090786r2_2d4_u2.pdf | Jul 18 2007 |
| honda_pc_a0230456_3d2-3d5_u2.pdf | Jul 17 2007 |
| toyota_ldt_a0140597_4d0_l2.pdf | Jul 10 2007 |
| mazda_pc_a0160342_3d0_u2.pdf | Jul 10 2007 |
| mazda_pc_a0160338_2d3_l2.pdf | Jul 10 2007 |
| mazda_pc_a0160334_1d3_l2.pdf | Jul 10 2007 |
| honda_pc_a0230455_2d4_u2.pdf | Jul 05 2007 |
| honda_pc_a0230454_2d4_pz.pdf | Jul 05 2007 |
| cummins_mdv_a0210454_6d7_l2_diesel.pdf | Jul 05 2007 |
| cummins_mdv_a0210453_6d7_u2_diesel.pdf | Jul 05 2007 |

| | |
|---|---|
| volvo_pc_a0180152_2d5_u2.pdf | Jul 05 2007 |
| volvo_pc_a0180153_3d0_u2.pdf | Jul 05 2007 |
| volvo_pc_a0180151_2d4_u2.pdf | Jul 05 2007 |
| volvo_pc-ldt_a0180154_3d2_u2.pdf | Jul 05 2007 |
| volvo_pc-ldt_a0180155_4d4_u2.pdf | Jul 05 2007 |
| volvo_pc_a0180150_2d4_l2.pdf | Jul 05 2007 |
| mitsubishi_ldt_a0860291_3d0_pz.pdf | Jul 05 2007 |
| mazda_pc_a0160340_2d3_pz.pdf | Jul 05 2007 |
| dcco_pc_a0090804_3d2_l2.pdf | Jul 05 2007 |
| dcag_pc_a0030351_3d0-3d5_u2.pdf | Jul 05 2007 |
| dcag_pc_a0030349_5d5_b4u2.pdf | Jul 05 2007 |
| dcco_mdev_a0090820_6d7_2d2-0d01_diesel.pdf | Jul 05 2007 |
| dcag_pc_a0030344_3d5_pz.pdf | Jul 05 2007 |
| dcco_ldt_a0090808_3d3_b5l2_e85.pdf | Jul 05 2007 |
| audi_pc_a0300198_6d0_l2.pdf | Jun 28 2007 |
| volvo_pc_a0180149_2d4_pz.pdf | Jun 27 2007 |
| volkswagen_pc_a0070270_2d5_pz.pdf | Jun 27 2007 |
| dcco_ldt_a0090782a_4d7_l2.pdf | Jun 25 2007 |
| dcco_ldt_a0090782b_4d7_l2.pdf | Jun 25 2007 |
| toyota_pc_a0140596_2d4_pz_hevge.pdf | Jun 25 2007 |
| toyota_pc_a0140595_3d5_u2.pdf | Jun 21 2007 |
| volkswagen_pc_a0070269_2d5_u2.pdf | Jun 21 2007 |
| toyota_pc_a0140593_2d4_u2.pdf | Jun 21 2007 |
| toyota_pc_a0140594_3d3_u2.pdf | Jun 21 2007 |
| toyota_pc_a0140591_1d5_u2.pdf | Jun 21 2007 |
| toyota_pc_a0140592_2d4_pz.pdf | Jun 21 2007 |
| honda_ldt_a0230441_2d3_u2.pdf | Jun 21 2007 |
| gm_ldt_a0061474r1_5d3-6d0_l2.pdf | Jun 20 2007 |
| gm_mdev_a0061499_6d6_1d3-0d01_diesel.pdf | Jun 20 2007 |
| ford_pc_a0101402_2d3_u2.pdf | Jun 20 2007 |
| ford_pc_a0101404_3d0_u2.pdf | Jun 20 2007 |
| ford_pc_a0101403_2d3_pz.pdf | Jun 20 2007 |
| ford_pc_a0101401_2d0_b4u2.pdf | Jun 20 2007 |
| ford_pc_a0101400_2d0_pz.pdf | Jun 20 2007 |
| ford_ldt_a0101423_3d5_u2.pdf | Jun 20 2007 |
| dcco_ldt_a0090783_4d7_u2.pdf | Jun 20 2007 |
| audi_pc_a0300197_5d2_l2.pdf | Jun 20 2007 |
| dcag_pc-ldt_a0030345_3d0-3d5_u2.pdf | Jun 20 2007 |
| audi_pc_a0300190_2d0_u2.pdf | Jun 20 2007 |
| audi_ldt_a0300191_4d2_l2.pdf | Jun 20 2007 |

| | |
|---|---|
| honda_ldt_a0230445_3d5_u2.pdf | Jun 15 2007 |
| honda_pc_a0230458_3d5_u2.pdf | Jun 15 2007 |
| gmdat_pc_a3570013_2d0_u2.pdf | Jun 12 2007 |
| ford_ldt_a0101424_4d0_b4u2.pdf | Jun 12 2007 |
| dcag_pc_a0030352_5d5-6d0_l2.pdf | Jun 12 2007 |
| dcag_pc_a0030346_3d0-3d5_b4u2.pdf | Jun 12 2007 |
| dcag_pc_a0030340_5d5_l2.pdf | Jun 12 2007 |
| mazda_pc_a0160336_2d0_u2.pdf | Jun 12 2007 |
| mazda_pc_a0160339_2d3_pz.pdf | Jun 12 2007 |
| mazda_pc_a0160335_2d0_pz.pdf | Jun 12 2007 |
| landrover_ldt_a2770046_4d4_u2.pdf | Jun 12 2007 |
| landrover_ldt_a2770045_4d2-4d4_l2.pdf | Jun 12 2007 |
| honda_pc_a0230453_2d4_l2.pdf | Jun 08 2007 |
| honda_pc_a0230452_2d4_l2.pdf | Jun 08 2007 |
| honda_ldt_a0230444_3d5_u2.pdf | Jun 08 2007 |
| dcco_pc-ldt_a0090801r2_3d5-4d0_u2.pdf | Jun 08 2007 |
| gm_mdev_a0061495_6d0_0d8-0d01.pdf | Jun 01 2007 |
| gm_mdev_a0061491_4d8_0d8.pdf | Jun 01 2007 |
| gm_pc_a0061453_3d6_l2.pdf | Jun 01 2007 |
| gm_pc_a0061452_3d6_l2.pdf | Jun 01 2007 |
| bentley_pc_a3510011_6d7_l2.pdf | Jun 01 2007 |
| audi_pc_a0300196_4d2_l2.pdf | Jun 01 2007 |
| mitsubishina_pc_a2920093_2d4_pz.pdf | May 30 2007 |
| mitsubishina_ldt_a2920094_3d8_l2.pdf | May 30 2007 |
| ford_pc_a0101408_4d6_u2.pdf | May 30 2007 |
| dcag_pc-ldt_a0030348_4d7-5d5_u2.pdf | May 30 2007 |
| toyota_pc_a0140589_1d8_l2.pdf | May 30 2007 |
| toyota_pc_a0140590_1d8_u2.pdf | May 30 2007 |
| nummi_pc_a2660041_1d8_u2.pdf | May 30 2007 |
| suzuki_ldt_a2590103_2d7_l2.pdf | May 25 2007 |
| suzuki_pc_a2590102_2d0_l2.pdf | May 25 2007 |
| mazda_pc_a0160341_2d3_u2.pdf | May 25 2007 |
| audi_pc_a0300194_4d2_l2.pdf | May 25 2007 |
| audi_pc_a0300195_3d1_l2.pdf | May 25 2007 |
| jaguar_pc_a2200102_4d2_l2.pdf | May 23 2007 |
| jaguar_pc_a2200101_4d2_u2.pdf | May 23 2007 |
| jaguar_pc_a2200100_3d0_u2.pdf | May 23 2007 |
| dcco_ldt_a0090816r1_5d7_l2.pdf | May 18 2007 |
| audi_pc_a0300193_4d2_l2.pdf | May 18 2007 |
| nissan_pc_a0150472_1d8_u2.pdf | May 18 2007 |

| | |
|---|---|
| toyota_ldt_a0140585r1_3d5_u2.pdf | May 18 2007 |
| volkswagen_pc_a0070268_3d6_l2.pdf | May 18 2007 |
| subaru_pc-ldt_a0020157r1_2d5_l2.pdf | May 18 2007 |
| toyota_pc_a0140588_5d0_s2_hevge.pdf | May 18 2007 |
| subaru_pc-ldt_a0020155r1_2d5_l2.pdf | May 18 2007 |
| mazda_ldt_a0160332_2d3_l2.pdf | May 16 2007 |
| mazda_ldt_a0160333_3d7_u2.pdf | May 16 2007 |
| gm_mdv_a0061477_4d8-6d0_l2.pdf | May 16 2007 |
| gm_pc_a0061436_2d0_l2.pdf | May 16 2007 |
| gm_ldt_a0061456r1_3d7_b4u2.pdf | May 16 2007 |
| gm_mdv_a0061475_6d0_l2.pdf | May 16 2007 |
| gmdat_pc_a3570012_1d6_u2.pdf | May 16 2007 |
| dcco_pc-ldt_a0090803_1d8_l2.pdf | May 16 2007 |
| gm_pc_a0061464_4d6_b4u2.pdf | May 04 2007 |
| gm_mdv_a0061479_6d0-6d2_b8al2.pdf | May 04 2007 |
| gm_pc-ldt_a0061465_4d4-4d6_l2.pdf | May 04 2007 |
| gm_ldt_a0061458_3d4_u2.pdf | May 04 2007 |
| gm_ldt_a0061468_5d3_b4u2.pdf | May 04 2007 |
| dcco_ldt_a0090816_5d7_l2.pdf | May 04 2007 |
| ford_ldt_a0101412_2d3_u2.pdf | May 02 2007 |
| ford_ldt_a0101422_4d0_l2.pdf | May 02 2007 |
| ford_ldt_a0101417_3d0_u2.pdf | May 02 2007 |
| ford_ldt_a0101421_3d0_u2.pdf | May 02 2007 |
| dcco_pc-ldt_a0090786r1_2d4_u2.pdf | May 02 2007 |
| dcag_pc-ldt_a0030350_6d3_l2.pdf | May 02 2007 |
| dcco_mdv_a0090818_5d7_l2.pdf | May 02 2007 |
| dcco_ldt_a0090792_6d1_l2.pdf | May 02 2007 |
| nissan_pc_a0150477_3d5_u2.pdf | Apr 27 2007 |
| nissan_pc_a0150476_2d5_pz.pdf | Apr 27 2007 |
| nissan_pc_a0150475_2d5_l2.pdf | Apr 27 2007 |
| nissan_ldt_a0150492_4d5_l2.pdf | Apr 27 2007 |
| nissan_ldt_a0150491_3d5_l2.pdf | Apr 27 2007 |
| gm_pc_a0061472_6d2_b4u2.pdf | Apr 27 2007 |
| hyundai_pc_a2540150_3d3_u2.pdf | Apr 27 2007 |
| gm_pc_a0061457_3d5-3d8_pz.pdf | Apr 27 2007 |
| hyundai_pc_2540149_2d4_u2.pdf | Apr 27 2007 |
| gm_pc_a0061441_2d4_l2.pdf | Apr 27 2007 |
| gm_ldt_a0061455_3d6_b4u2.pdf | Apr 27 2007 |
| gm_ldt_a0061463_4d3_l2.pdf | Apr 27 2007 |
| gm_ldt_a0061482_3d7_l2.pdf | Apr 27 2007 |

| | |
|---|---|
| gm_ldt_a0061456_3d7_b4u2.pdf | Apr 27 2007 |
| dcco_pc_a0090805_2d4_l2.pdf | Apr 27 2007 |
| dcco_pc-ldt_a0090812_2d0-2d4_u2.pdf | Apr 27 2007 |
| dcco_mdv_a0090819_5d7_l2.pdf | Apr 27 2007 |
| toyota_pc_a0140587_2d4_u2.pdf | Apr 20 2007 |
| volkswagen_pc_a0070267r1_3d2_l2.pdf | Apr 20 2007 |
| mitsubishifuso_mdev_a3610008_4d9_1d2-0d01_diesel.pdf | Apr 20 2007 |
| nissan_ldt_a0150488_4d0_u2.pdf | Apr 20 2007 |
| gm_ldt_a0061474_5d3-6d0_l2.pdf | Apr 20 2007 |
| gm_ldt_a0061471_5d3_l2.pdf | Apr 20 2007 |
| gm_ldt_a0061467_5d3_b5l2_e85.pdf | Apr 20 2007 |
| gm_ldt_a0061461_4d2_b4u2.pdf | Apr 20 2007 |
| gm_ldt_a0061462_4d2_b4u2.pdf | Apr 20 2007 |
| gm_ldt_a0061449_2d9_b4u2.pdf | Apr 20 2007 |
| ford_pc_a0101410_4d6_b5l2_e85.pdf | Apr 20 2007 |
| subaru_pc_a0020154_2d5_l2.pdf | Apr 20 2007 |
| subaru_pc_a0020153_2d5_l2.pdf | Apr 20 2007 |
| ford_mdev_a0101447r1_6d8_0d56-0d01.pdf | Apr 20 2007 |
| dcco_ldt_a0090809_3d7_l2.pdf | Apr 20 2007 |
| dcco_ldt_a0090821_4d0_l2.pdf | Apr 20 2007 |
| dcco_pc-ldt_a0090801r1_3d5_u2.pdf | Apr 20 2007 |
| audi_pc_a0300192_2d0_u2.pdf | Apr 20 2007 |
| dcco_ldt_a0090794_3d8_u2.pdf | Apr 20 2007 |
| dcco_ldt_a0090795_3d8_l2.pdf | Apr 20 2007 |
| bugatti_pc_a3210003_8d0_l2.pdf | Apr 20 2007 |
| volkswagen_ldt_a0070266_3d6_l2.pdf | Apr 20 2007 |
| bmw_pc-ldt_a0080220_2d5-3d0_u2.pdf | Apr 13 2007 |
| bmw_pc_a0080224_3d0_u2.pdf | Apr 13 2007 |
| nissan_ldt_a0150493_5d6_l2.pdf | Apr 06 2007 |
| ford_mdev_a0101442r2_6d4_1d3-0d01_diesel.pdf | Apr 06 2007 |
| ford_pc_a0101405_3d5_pz.pdf | Apr 04 2007 |
| dcco_ldt_a0090790_3d7_l2.pdf | Apr 04 2007 |
| bmw_pc_a0080229_4d8_u2.pdf | Apr 04 2007 |
| bmw_pc_a0080230_5d0_l2.pdf | Apr 04 2007 |
| gm_pc_a0061480_7d0_l2.pdf | Mar 30 2007 |
| gm_ldt_a0061470_5d3_b4u2_e85.pdf | Mar 30 2007 |
| gm_ldt_a0061473_6d0_b4u2.pdf | Mar 30 2007 |
| gm_ldt_a0061478_6d2_l2.pdf | Mar 30 2007 |
| gm_pc_a0061466_5d3_l2.pdf | Mar 30 2007 |
| gm_pc-ldt_a0061481_2d8-3d6_l2.pdf | Mar 30 2007 |

| | |
|---|---|
| gm_ldt_a0061469_4d8-5d3_b4u2.pdf | Mar 30 2007 |
| gm_pc_a0061438_2d2_l2.pdf | Mar 28 2007 |
| gm_pc_a0061445_2d4_l2_hevge.pdf | Mar 28 2007 |
| lamborghini_pc_a2730031_5d0_l2.pdf | Mar 28 2007 |
| lamborghini_pc_a2730032_6d5_l2.pdf | Mar 28 2007 |
| subaru_pc-ldt_a0020156_2d5_pz.pdf | Mar 28 2007 |
| subaru_pc-ldt_a0020157_2d5_l2.pdf | Mar 28 2007 |
| subaru_pc-ldt_a0020155_2d5_l2.pdf | Mar 28 2007 |
| ford_ldt_a0101420_3d0_l2.pdf | Mar 28 2007 |
| ford_ldt_a0101416_3d0_l2.pdf | Mar 28 2007 |
| ford_pc_a0101406_3d5_u2.pdf | Mar 28 2007 |
| dcco_pc_a0090798_2d4_u2.pdf | Mar 28 2007 |
| dcco_ldt_a0090791_3d7_u2.pdf | Mar 28 2007 |
| dcco_pc_a0090817_2d4_l2.pdf | Mar 28 2007 |
| gm_pc_a0061443_2d4_l2.pdf | Mar 14 2007 |
| gm_pc_a0061451_3d5-3d9_b5l2_e85.pdf | Mar 14 2007 |
| gm_pc_a0061439_2d2_pz.pdf | Mar 14 2007 |
| ford_mdev_a0101442r1_6d4_1d3-0d01_diesel.pdf | Mar 14 2007 |
| dcco_ldt_a0090810_3d7_u2.pdf | Mar 14 2007 |
| gm_pc_a0061444_2d2-2d4_u2.pdf | Mar 13 2007 |
| gm_pc_a0061442_2d4_l2.pdf | Mar 13 2007 |
| gm_ldt_a0061446_2d4_b4u2.pdf | Mar 13 2007 |
| ford_mdev_a0101442_6d4_1d3-0d01_diesel.pdf | Mar 13 2007 |
| dcco_ldt_a0090807_3d3-3d8_u2.pdf | Mar 07 2007 |
| landrover_ldt_a2770043_3d2_u2.pdf | Mar 02 2007 |
| porsche_ldt_a0190137_4d8_l2.pdf | Feb 28 2007 |
| porsche_ldt_a0190136_4d8_u2.pdf | Feb 28 2007 |
| porsche_ldt_a0190135_3d6_l2.pdf | Feb 28 2007 |
| gm_pc_a0061450_3d5_u2.pdf | Feb 28 2007 |
| gm_ldt_a0061459_3d9_b5l2_e85.pdf | Feb 28 2007 |
| gm_ldt_a0061454_3d6_l2.pdf | Feb 28 2007 |
| ford_mdv_a0101435r1_5d4_u2.pdf | Feb 09 2007 |
| volkswagen_pc_a0070267_3d2_l2.pdf | Jan 26 2007 |
| mitsubishina_pc_a2920092_3d8_l2.pdf | Jan 26 2007 |
| mitsubishina_pc_a2920091_2d4_u2.pdf | Jan 24 2007 |
| toyota_ldt_a0140585_3d5_u2.pdf | Dec 26 2006 |
| dcco_pc_a0090796_2d7_l2.pdf | Dec 26 2006 |
| dcco_pc-ldt_a0090801_3d5_u2.pdf | Dec 26 2006 |
| ford_ldt_a0101418_2d3_pz.pdf | Dec 14 2006 |
| ford_ldt_a0101414_2d3_u2.pdf | Dec 13 2006 |

| | |
|---|---|
| ford_ldt_a0101419_3d0_l2.pdf | Dec 13 2006 |
| ford_ldt_a0101415_3d0_l2.pdf | Dec 13 2006 |
| ford_ldt_a0101413_2d3_l2.pdf | Dec 13 2006 |
| ford_mdev_a0101447_6d8_0d56-0d01.pdf | Dec 08 2006 |
| ford_mdv_a0101436_5d4_u2.pdf | Dec 01 2006 |
| ford_mdv_a0101440_6d8_l2.pdf | Dec 01 2006 |
| ford_mdv_a0101435_5d4_u2.pdf | Dec 01 2006 |
| ford_mdv_a0101439_6d8_l2.pdf | Dec 01 2006 |
| ford_mdv_a0101433_5d4_u2.pdf | Dec 01 2006 |
| mitsubishi_pc_a0860288_2d0_pz.pdf | Nov 21 2006 |

On-Road New Vehicle & Engine Certification Program

The Board is one of six boards, departments, and offices under
the umbrella of the California Environmental Protection Agency.
Cal/EPA | **ARB** | CIWMB | DPR | DTSC | OEHHA | SWRCB

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 54

# U.S. COURT OF APPEALS - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | |
|---|---|---|---|---|---|---|---|---|
| **NATIONAL TOTALS** | | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 |
| OVERALL CASELOAD STATISTICS | Appeals Filed | Total | 66,618 | 68,473 | 62,762 | 60,847 | 57,555 | 57,464 |
| | | Prisoner | 16,776 | 17,034 | 16,561 | 17,691 | 18,272 | 18,343 |
| | | Other** | 21,494 | 21,666 | 21,440 | 21,200 | 21,925 | 24,540 |
| | | Criminal | 15,246 | 16,060 | 12,506 | 11,968 | 11,569 | 11,281 |
| | | Administrative | 13,102 | 13,713 | 12,255 | 9,988 | 5,789 | 3,300 |
| | % Change in Total Filings | Over Last Year | -2.7 | | | | | |
| | | Over Earlier Years | | | 6.1 | 9.5 | 15.7 | 15.9 |
| | Appeals Terminated | Total | 67,582 | 61,975 | 56,381 | 56,396 | 56,586 | 57,422 |
| | | Consolidations & Cross Appeals | 2,356 | 2,317 | 2,108 | 2,108 | 2,721 | 2,797 |
| | | Procedural | 30,646 | 29,745 | 26,835 | 27,279 | 26,107 | 25,785 |
| | | On The Merits | Total | 34,580 | 29,913 | 27,438 | 27,009 | 27,758 | 28,840 |
| | | | Prisoner | 4,277 | 4,435 | 4,520 | 5,259 | 5,341 | 5,287 |
| | | | Other | 12,881 | 12,443 | 11,402 | 11,807 | 13,065 | 14,363 |
| | | | Criminal | 10,990 | 8,614 | 7,559 | 8,078 | 7,978 | 7,873 |
| | | | Administrative | 6,432 | 4,421 | 3,957 | 1,865 | 1,374 | 1,317 |
| | | Percent by Active Judges | 77.8 | 77.4 | 78.0 | 78.0 | 77.1 | 79.0 |
| | Pending Appeals | | 56,486 | 57,724 | 51,071 | 44,600 | 40,965 | 40,303 |
| ACTIONS PER ACTIVE JUDGE* | Terminations on the Merits | | 539 | 457 | 432 | 459 | 485 | 498 |
| | Procedural Terminations | | 172 | 170 | 167 | 185 | 191 | 176 |
| | Written Decisions | Total | 183 | 154 | 144 | 154 | 165 | 168 |
| | | Signed | 64 | 52 | 47 | 51 | 51 | 54 |
| | | Unsigned | 113 | 97 | 93 | 98 | 106 | 106 |
| | | Without Comment | 6 | 5 | 4 | 5 | 8 | 8 |

\*  Includes only judges active during the entire 12 month period.

\*\*  See "Explanation of Selected Terms."

 Note: Data for petitions for rehearing per judgeship in 2003 have been revised.

Show Page Two

# U.S. COURT OF APPEALS
# JUDICIAL CASELOAD PROFILE
# PAGE 2

| NATIONAL TOTALS | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | 2006 Numerical Standing |
|---|---|---|---|---|---|---|---|---|---|
| | | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | |
| Number of Judgeships/Number of Panels | | | 167/55.7 | 167/55.7 | 167/55.7 | 167/55.7 | 167/55.7 | 167/55.7 | |
| Number of Sitting Senior Judges | | | 89 | 90 | 88 | 92 | 90 | 87 | |
| Number of Vacant Judgeship Months** | | | 178.7 | 165.6 | 188.9 | 282.7 | 355.7 | 331.0 | |
| ACTIONS PER PANEL* | Appeals Filed | Total | 1,197 | 1,230 | 1,127 | 1,093 | 1,034 | 1,032 | |
| | | Prisoner | 301 | 306 | 298 | 318 | 328 | 330 | |
| | | Other | 387 | 389 | 384 | 381 | 394 | 440 | |
| | | Criminal | 274 | 289 | 225 | 215 | 208 | 203 | |
| | | Administrative | 235 | 246 | 220 | 179 | 104 | 59 | |
| | Appeals Terminated | Total | 1,214 | 1,113 | 1,013 | 1,013 | 1,017 | 1,032 | |
| | | Consolidations & Cross Appeals | 42 | 42 | 38 | 38 | 49 | 51 | |
| | | Procedural | 551 | 534 | 482 | 490 | 469 | 463 | |
| | | On The Merits — Total | 621 | 537 | 493 | 485 | 499 | 518 | |
| | | On The Merits — Prisoner | 77 | 80 | 81 | 94 | 96 | 95 | |
| | | On The Merits — Other | 231 | 223 | 205 | 212 | 235 | 258 | |
| | | On The Merits — Criminal | 197 | 155 | 136 | 145 | 143 | 141 | |
| | | On The Merits — Administrative | 116 | 79 | 71 | 34 | 25 | 24 | |
| | Pending Appeals | | 1,015 | 1,037 | 917 | 801 | 736 | 724 | |
| Median Time | Median Time from Filing Notice of Appeal to Disposition | | 12.2 | 11.8 | 10.5 | 10.5 | 10.7 | 10.9 | |
| Other Caseload Per Judgeship | Applications for Interlocutory Appeals | | 2 | 1 | 2 | 2 | 1 | 2 | |
| | Petitions for Rehearing | | 54 | 51 | 51 | 39 | 58 | 54 | |

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 55

1   SAGASER, FRANSON & JONES
    2445 Capitol Street, 2nd Floor
2   Post Office Box 1632
    Fresno, California 93717-1632
3   Telephone: (559) 233-4800

4   Timothy Jones #119841

5   KIRKLAND & ELLIS LLP
    655 15th Street, N.W., Suite 1200
6   Washington, D.C. 20005
    Telephone: (202) 879-5000

7

    Eric B. Wolff #197147

8

    Attorneys for all plaintiffs

9

10              **UNITED STATES DISTRICT COURT**

11        **EASTERN DISTRICT OF CALIFORNIA – FRESNO**

12

13   CENTRAL VALLEY CHRYSLER-JEEP, INC.,    **Case No. 1:04-cv-06663-REC-LJO**
    KITAHARA PONTIAC GMC BUICK, INC.,
14   MADERA FORD MERCURY, INC.,
    MADERA CHEVROLET, FRONTIER    **FIRST AMENDED COMPLAINT FOR**
15   DODGE, INC., TOM FIELDS MOTORS, INC.,  **DECLARATORY AND INJUNCTIVE**
    PISTORESI CHRYSLER DODGE JEEP, BOB   **RELIEF**
16   WILLIAMS CHEVROLET, COURTESY    **[28 U.S.C. §§ 1331, 1343, 2201]**
    OLDSMOBILE CADILLAC, INC., MERLE
17   STONE CHEVROLET, INC., MERLE STONE
    PORTERVILLE, INC., STURGEON AND
18   BECK INCORPORATED, SWANSON
    FAHRNEY FORD, INC., GENERAL
19   MOTORS CORPORATION,
    DAIMLERCHRYSLER CORPORATION,
20   TULARE COUNTY FARM BUREAU, and the
    ALLIANCE OF AUTOMOBILE
21   MANUFACTURERS,

22                Plaintiffs,

23      v.

24   Catherine E. WITHERSPOON, in her official
    capacity as Executive Officer of the California
25   Air Resources Board,

26                Defendant.

27

28      Plaintiffs, Central Valley Chrysler-Jeep, Inc., Kitahara Pontiac GMC Buick, Inc., Madera

    Ford Mercury, Inc., Madera Chevrolet, Frontier Dodge, Inc., Tom Fields Motors, Inc., Pistoresi

<div align="center">1</div>

1    administrative or judicial proceedings to obtain compliance and to deter similar conduct in the

2    future.

3       99.      *In practice, it is essential for manufacturers subject to rules like the A.B. 1493*

4    regulations to obtain approval of their vehicle models well before the relevant model year begins.

5    A manufacturer whose approval status is in doubt cannot prudently undertake mass production of

6    a given vehicle model, and cannot plan for distribution or sale of its vehicles by its independent

7    franchised dealers. For their part, the dealers need to know well before a model year begins what

8    specific vehicle models will be available for them to purchase and sell to their customers. This is

9    critical to the efficient operation of their businesses in an increasingly competitive retail vehicle

10   market. Compliance with the A.B. 1493 regulations, including the initial approval of a plan for

11   compliance with the regulations by Defendant well prior to the start of model year 2009, is thus

12   essential to the economic viability of each manufacturer subject to the regulation, and to the

13   ability of their dealers to stay in business in California.

14      100.      The first model year to which Defendant's rule would apply is the 2009 model

15   year, which begins as early as January 2, 2008, under California and federal regulations. Some

16   manufacturers already have new vehicle designs for model year 2006 that they planned to sell

17   through model year 2009 and beyond without expensive design alteration, and that sales-life is

18   necessary for manufacturers to recover their investment costs and earn a profit on those newly

19   designed vehicles. Because of CARB's regulation, those product plans must be altered (to the

20   extent feasible), new vehicles must be designed, and some manufacturers will have to restrict or

21   eliminate particular vehicles they had planned to sell in California.

22      101.      According to CARB, work on the technologies needed for vehicles starting

23   production in January 2008 would only have to begin three years earlier, in early 2005. The lead

24   time estimated by others is much longer. (*See* ¶ 102.) But even taking CARB's estimates at

25   face value, immediate commitments of new resources and a redirection of their current vehicle

26   programs will be required in order for some manufacturers to comply with the A.B. 1493

27   regulation. Before seeking approval for their product plans from Defendant for model year

28

1   Constitution and other federal law, unless enjoined by this Court from doing so. Plaintiffs are

2   therefore also entitled to injunctive relief restraining and redressing these violations of federal

3   law and their rights under 42 U.S.C. §§ 1983, 1988 and other provisions of law.

4   **PRAYER FOR RELIEF**

5   WHEREFORE, Plaintiffs respectfully request that this Court enter the following

6   relief:

7   A.    A declaratory judgment, pursuant to 28 U.S.C. § 2201 and Rule 57 of the

8   Federal Rules of Civil Procedure, that the regulation adopted by CARB and Defendant on

9   September 24, 2004, in Resolution 04-28 violates federal law in the manner alleged above.

10  B.    Preliminary and permanent injunctions, pursuant to Rule 65 of the Federal

11  Rules of Civil Procedure, enjoining Defendant from implementing or enforcing the regulation

12  adopted by CARB in Resolution 04-28, or any substantially similar regulation.

13  C.    An award of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and

14  other provisions of federal law.

15  D.    Such other relief available under federal law that may be considered

16  appropriate under the circumstances, including other fees and costs of this action to the extent

17  allowed by federal law.

18

19

20  Dated: February 16, 2005.                    Respectfully submitted,

21                                               SAGASER, FRANSON & JONES

22

23

24                                               Timothy Jones
                                                 Attorneys for all Plaintiffs

25

26

27

28

47

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 56

REPORTS

3. F. H. Shu, H. Shang, A. E. Glassgold, T. Lee, Science 277, 1475 (1997).
4. B. S. Meyer, in Chondrites and the Protoplanetary Disk, A. N. Krot, E. R. D. Scott, B. Reipurth, Eds. (Astrophysical Society of the Pacific, San Francisco, CA, 2005), pp. 515–526.
5. S. Tachibana, G. R. Huss, N. T. Kita, G. Shimoda, Y. Morishita, Astrophys. J. 639, L87 (2006).
6. S. Mostefaoui, G. W. Lugmair, P. Hoppe, Astrophys. J. 625, 271 (2005).
7. A. Shukolyukov, G. W. Lugmair, Earth Planet. Sci. Lett. 119, 159 (1993).
8. M. Bizzarro, J. A. Baker, H. Haack, K. L. Lundgaard, Astrophys. J. 632, L41 (2005).
9. A. N. Halliday, T. Kleine, in Meteorites and the Early Solar System II, D. S. Lauretta, H. Y. McSween, Eds. (Univ. of Arizona Press, Tucson, AZ, 2006), pp. 775–801.
10. N. Kita et al., in Chondrites and the Protoplanetary Disk, A. N. Krot, E. R. D. Scott, B. Reipurth, Eds. (Astrophysical Society of the Pacific, San Francisco, CA, 2005), pp. 558–587.
11. Materials and methods are available as supporting material on Science Online.
12. Y. Amelin, A. N. Krot, I. D. Hutcheon, A. A. Ulyanov, Science 297, 1678 (2002).
13. J. Baker, M. Bizzarro, N. Wittig, J. Connelly, H. Haack, Nature 436, 1127 (2005).
14. Y. Amelin, Lunar Planet. Sci. XXXVIII, 1669 (abstr.) (2007).
15. J. A. Baker, M. Bizzarro, abstract 8612 presented at the Protostars and Planets V meeting, Hilton Waikoloa Village, HI, 24 to 28 October 2005.
16. A. Trinquier, J.-L. Birck, C. Allègre, Astrophys. J. 655, 1179 (2007).
17. J. H. Jones, M. J. Drake, Geochim. Cosmochim. Acta 47, 1199 (1983).
18. K. Thrane, M. Bizzarro, J. A. Baker, Astrophys. J. 646, L159 (2006).
19. A. Palacios et al., Astron. Astrophys. 429, 613 (2005).
20. M. Limongi, A. Chieffi, Astrophys. J. 647, 483 (2006).
21. M. Arnould, S. Goriely, G. Meynet, Astron. Astrophys. 453, 653 (2006).
22. G. Meynet, A. Maeder, Astron. Astrophys. 429, 581 (2005).
23. D. P. Glavin, A. Kubny, E. Jagoutz, G. W. Lugmair, Meteorit. Planet. Sci. 39, 693 (2004).
24. A. Markowski et al., Meteorit. Planet. Sci. 41, 5195 (abstr.) (2006).
25. J. J. Hester, S. J. Desch, in Chondrites and the Protoplanetary Disk, A. N. Krot, E. R. D. Scott, B. Reipurth, Eds. (Astrophysical Society of the Pacific, San Francisco, CA, 2005), pp. 107–130.
26. J. M. Rathbone et al., Mon. Not. R. Astron. Soc. 331, 85 (2002).
27. N. Ouellette, S. J. Desch, J. J. Hester, L. A. Leshin, in Chondrites and the Protoplanetary Disk, A. N. Krot, E. R. D. Scott, B. Reipurth, Eds. (Astrophysical Society of the Pacific, San Francisco, CA, 2005), pp. 527–538.
28. A. P. Boss, Meteorit. Planet. Sci. 41, 1695 (2006).
29. S. E. Woosley, Astrophys. J. 476, 801 (1997).
30. M. J. Drake, K. Righter, Nature 416, 39 (2002).
31. A. Shukolyukov, G. W. Lugmair, Lunar Planet. Sci. XXXVII, 1478 (abstr.) (2006).
32. Financial support for this project was provided by the Danish National Science Foundation, NASA's Cosmochemistry Program, and the Danish Natural Science Research Council.

**Supporting Online Material**
www.sciencemag.org/cgi/content/full/316/5828/1178/DC1
Materials and Methods
SOM Text
Tables S1 and S2
References

8 February 2007; accepted 27 March 2007
10.1126/science.1141040

Downloaded from www.sciencemag.org on May 25, 2007

# Model Projections of an Imminent Transition to a More Arid Climate in Southwestern North America

Richard Seager,[1]* Mingfang Ting,[1] Isaac Held,[2,3] Yochanan Kushnir,[1] Jian Lu,[4]
Gabriel Vecchi,[2] Huei-Ping Huang,[1] Nili Harnik,[5] Ants Leetmaa,[2] Ngar-Cheung Lau,[2,3]
Cuihua Li,[1] Jennifer Velez,[1] Naomi Naik[1]

How anthropogenic climate change will affect hydroclimate in the arid regions of southwestern North America has implications for the allocation of water resources and the course of regional development. Here we show that there is a broad consensus among climate models that this region will dry in the 21st century and that the transition to a more arid climate should already be under way. If these models are correct, the levels of aridity of the recent multiyear drought or the Dust Bowl and the 1950s droughts will become the new climatology of the American Southwest within a time frame of years to decades.

The Third Assessment Report of the Intergovernmental Panel on Climate Change (IPCC) reported that the average of all the participating models showed a general decrease in rainfall in the subtropics during the 21st century, although there was also considerable disagreement among the models (1). Subtropical drying accompanying rising $CO_2$ was also found in the models participating in the second Coupled Model Intercomparison Project (2). We examined future subtropical drying by analyzing the time history of precipitation in 19 climate models participating in the Fourth Assessment Report (AR4) of the IPCC (3). The future climate projections followed the A1B emissions scenario (4), in which $CO_2$ emissions increase until about 2050 and decrease modestly thereafter, leading to a $CO_2$ concentration of 720 parts per million in 2100. We also analyzed the simulations these models for the 1860–2000 period, in which the models were forced by the known history of trace gases and estimated changes in solar irradiance, volcanic and anthropogenic aerosols, and land use (with some variation among the models). These simulations provided initial conditions for the 21st-century climate projections. For each model, climatologies were computed for the 1950–2000 period by averaging over all the simulations available for each model. All climate changes shown here are departures from this climatology.

We define an area (shown as a box in Fig. 4A) called "the Southwest" (including all land between 125°W and 95°W and 25°N and 40°N) that incorporates the southwestern United States and parts of northern Mexico. Figure 1 shows the modeled history and future of the annual mean precipitation minus the evaporation ($P − E$), averaged over this region for the period common to all of the models (1900–2098). The median, 25th, and 75th percentiles of the modeled $P − E$ distribution and the median of $P$ and $E$ are shown. For cases in which there were multiple simulations with a single model, data from these simulations were averaged together before computing the distribution. $P − E$ equals the moisture convergence by the atmospheric flow and (over land) the amount of water that goes into runoff.

In the multimodel ensemble mean, there is a transition to a sustained drier climate that begins in the late 20th and early 21st centuries. In the ensemble mean, both $P$ and $E$ decrease, but the former decreases by a larger amount. $P − E$ is primarily reduced in winter, when $P$ decreases and $E$ is unchanged or modestly increased, whereas in summer, both $P$ and $E$ decrease. The annual mean reduction in $P$ for this region, calculated from rain gauge data within the Global Historical Climatology Network, was 0.09 mm/day between 1932 and 1939 (the Dust Bowl drought) and 0.13 mm/day between 1948 and 1957 (the 1950s Southwest drought). The ensemble median reduction in $P$ that drives the reduction in $P − E$ reaches 0.1 mm/day in midcentury, and one quarter of the models reach this amount in the early part of the current century.

The annual mean $P − E$ difference between 20-year periods in the 21st century and the 1950–2000 climatology for the 19 models are shown in Fig. 2. Almost all models have a drying trend in the American Southwest, and they consistently become drier throughout the century. Only 1 of the 19 models has a trend toward a wetter climate. Of the total of 49 individual projections conducted with the 19 models, even as early as the 2021–2040 period, only 3 projections show a shift to a wetter climate. Examples of modeled history and future precipitation for single simulations of four individual models are shown in Fig. 3 and provide an idea of potential trajectories toward the more arid climate.

[1]Lamont-Doherty Earth Observatory (LDEO), Columbia University, Palisades, NY 10964, USA. [2]National Oceanic and Atmospheric Administration (NOAA) Geophysical Fluid Dynamics Laboratory, Princeton, NJ 08540, USA. [3]Program in Atmospheric and Oceanic Sciences, Department of Geosciences, Princeton University, Princeton, NJ 08544, USA. [4]National Center for Atmospheric Research, Boulder, CO 80307, USA. [5]Tel Aviv University, Tel Aviv, Israel.

*To whom correspondence should be addressed. E-mail: seager@ldeo.columbia.edu

The contours in Fig. 4, A to C, show a map of the change in $P - E$ for the decades between 2021 and 2040 minus those in the 1950–2000 period for one of the IPCC models: the Geophysical Fluid Dynamics Laboratory (GFDL) climate model CM2.1 (5). In general, large regions of the relatively dry subtropics dry further, whereas wetter, higher-latitude regions become wetter still. In addition to the American Southwest, the southern Europe–Mediterranean–Middle East region also experiences a severe drying. This pattern of subtropical drying and moistening at higher latitudes is a robust feature of current projections with different models of future climate (6).

The change (δ) in $P - E$ (in meters per second) is balanced by a change in atmospheric moisture convergence, namely

$$\rho_w g \delta(P - E) = -\delta \left[ \int_0^{p_s} \nabla \cdot (\overline{uq}) dp + \int_0^{p_s} \nabla \cdot (\overline{u'q'}) dp \right] \quad (1)$$

Overbars indicate monthly means, primes represent departures from the monthly mean, $\rho_w$ is the density of water, $g$ indicates the acceleration due to gravity, and $\nabla$ indicates the horizontal divergence operator. The change in moisture convergence can be divided into contributions from the mean flow and from eddies. In the former, the atmospheric flow $(\overline{u})$ and the moisture $(\overline{q})$ are averaged over a month before computing the moisture transport, whereas the latter is primarily associated with the highly variable wind $(u')$ and moisture $(q')$ fields within storm systems. The moisture convergence is integrated over the pressure $(p)$ from the top of the atmosphere $(p = 0)$ to the surface $(p_s)$. The mean wind and humidity fields in Eq. 1 can be taken to be their climatological fields. (The rectification of interannual variability in the monthly mean flow and moisture fields is found to be negligible.) Changes in the mean flow contribution can, in turn, be approximated by one part associated with the climatological circulation from 1950 to 2000 $(\overline{u}_p)$, operating on the increase in climatological atmospheric humidity $(\delta \overline{q})$, a consequence of atmospheric warming, and by another part due to the change in circulation climatology $(\delta \overline{u})$, operating on the atmospheric humidity climatology from 1950 to 2000 $(\overline{q}_p)$. The nonlinear term involving changes in both the mean flow and the moisture field is found to be relatively small. Hence, Eq. 1 can be approximated by:

$$\rho_w g \delta(P - E) \sim - \int_0^{p_s} \nabla \cdot (\overline{q}_p \delta \overline{u} + \overline{u}_p \delta \overline{q}) dp$$
$$- \delta \int_0^{p_s} \nabla \cdot (\overline{u'q'}) dp \quad (2)$$

We therefore think in terms of a threefold decomposition of $P - E$, as displayed in Fig. 4 (colors) for the GFDL CM2.1 model: (i) a contribution from the change in mean circulation, (ii) a contribution from the change in mean humidity, and (iii) a contribution from eddies.

Downloaded from www.sciencemag.org on May 25, 2007



**Filtered P−E Anom, Median of 19 models (red), 25th to 75th (pink); 50th P (blue); 50th E (green)**

**Fig. 1.** Modeled changes in annual mean precipitation minus evaporation over the American Southwest (125°W to 95°W and 25°N to 40°N, land areas only), averaged over ensemble members for each of the 19 models. The historical period used known and estimated climate forcings, and the projections used the SResA1B emissions scenario. The median (red line) and 25th and 75th percentiles (pink shading) of the $P - E$ distribution among the 19 models are shown, as are the ensemble medians of $P$ (blue line) and $E$ (green line) for the period common to all models (1900–2098). Anomalies (Anom) for each model are relative to that model's climatology from 1950–2000. Results have been 6-year low-pass Butterworth-filtered to emphasize low-frequency variability that is of most consequence for water resources. The model ensemble mean $P - E$ in this region is around 0.3 mm/day.

**Precipitation – Evaporation Anomaly (25N – 40N, 95W – 125W)**



**Fig. 2.** The change in annual mean $P - E$ over the American Southwest (125°W to 95°W and 25°N to 40°N, land areas only) for 19 models (listed at left), relative to model climatologies from 1950–2000. Results are averaged over 20-year segments of the current century. The number of ensemble members for each projection is listed by the model name at left. Black dots represent ensemble members (where available), and red dots represent the ensemble mean for each model.

REPORTS

The mean flow convergence term involving only changes in humidity (Fig. 4B) causes increasing $P - E$ in regions of low-level mean mass convergence and decreasing $P - E$ in regions of low-level mean mass divergence, generally intensifying the existing pattern of $P - E$ (6). This term helps to explain much of the reduction in $P - E$ over the subtropical oceans, where there is strong evaporation, atmospheric moisture divergence, and low precipitation (6). Over land areas in general, there is no infinite surface-water source, and $P - E$ has to be positive and sustained by atmospheric moisture convergence. Over the American Southwest, in the current climate, it is the time-varying flow that sustains most of the positive $P - E$, whereas the mean flow diverges moisture away. Here, the "humidity contribution" leads to reduced $P - E$, as the moisture divergence by the mean flow increases with rising humidity. Over the Mediterranean region, there is mean moisture divergence, and rising humidity again leads to increased mean moisture divergence and reduced $P - E$.

Over the ocean, the contribution of humidity changes to changes in $P - E$ can be closely approximated by assuming that the relative humidity remains fixed at its 1950–2000 values (6). Over almost all land areas and especially over those that have reduced $P - E$, the relative humidity decreases in the early 21st century. This is be-

cause, unlike over the ocean, evaporation cannot keep pace with the rising saturation humidity of the warming atmosphere. Over land, the humidity contribution to the change in $P - E$ is distinct from that associated with fixed relative humidity.

Decreases in $P - E$ can also be sustained by changes in atmospheric circulation that alter the mean moisture convergence, even in the absence of changes in humidity (Fig. 4A). This "mean circulation contribution" leads to reduced $P - E$ at the northern edge of the subtropics (e.g., the Mediterranean, the Pacific and the Atlantic around 30°N, and parts of southwestern North America). The change in moisture convergence by the transient eddies (Fig. 4C) dries southern Europe and the subtropical Atlantic and moistens the higher-latitude Atlantic, but it does not have a coherent and large impact over North America.

A substantial portion of the mean circulation contribution, especially in winter, can be accounted for by the change in zonal mean flow alone (not shown in the figures), indicating that changes in the Hadley Cell and the extratropical mean meridional circulation are important. Increases in humidity and mean moisture divergence, changes in atmospheric circulation, and the intensification of eddy moisture divergence cause drying in the subtropics, including the area over western North America and the Med-

iterranean region. For the Southwest region, the annual mean $P - E$ decreases by 0.086 mm/day, which is largely accounted for by an increase in the mean flow moisture divergence. Changes in the circulation alone contribute 0.095 mm/day of drying, and changes in the humidity alone contribute 0.032 mm/day. These changes are modestly offset by an increased transient-eddy moisture convergence of 0.019 mm/day. (7).

Within models, the poleward edge of the Hadley Cell and the mid-latitude westerlies move poleward during the 21st century (8–10). The descending branch of the Hadley Cell causes aridity, and hence the subtropical dry zones expand poleward. In models, a poleward circulation shift can be forced by rising tropical sea surface temperatures (SSTs) in the Indo-Pacific region (11) and by uniform surface warming (12). The latter results are relevant because the spatial pattern of surface warming in the AR4 models is quite uniform away from the poles. One explanation (13, 14) is that rising tropospheric static stability, an established consequence of moist thermodynamics, stabilizes the subtropical jet streams at the poleward flank of the Hadley Cell against baroclinic instability. Consequently, the Hadley Cell extends poleward (increasing the vertical wind shear at its edge) to a new latitude where the shear successfully compensates for the suppression of baroclinic instability by rising static stability.

Although increasing stability is likely to be a substantial component of the final explanation, a fully satisfying theory for the poleward shift of the zonal mean atmospheric circulation in a warming world must account for the complex interplay between the mean circulation (Hadley Cell and the mid-latitude Ferrell Cell) and the transient eddies (13, 14) that will determine where precipitation will increase and decrease in the future. However, not all of the subtropical drying in the Southwest and Mediterranean regions can be accounted for by zonally symmetric processes, and a full explanation will require attention to moisture transport within localized storm tracks and stationary waves.

The six severe multiyear droughts that have struck western North America in the instrumental record have all been attributed (by the use of climate models) to variations in SSTs in the tropics, particularly persistent La Niña–like SSTs in the tropical Pacific Ocean (15–19). The projected future climate of intensified aridity in the Southwest is caused by different processes, because the models vary in their tropical SST response to anthropogenic forcing. Instead, it is caused by rising humidity that causes increased moisture divergence and changes in atmospheric circulation cells that include a poleward expansion of the subtropical dry zones. The drying of subtropical land areas that, according to the models, is imminent or already under way is unlike any climate state we have seen in the instrumental record. It is also distinct from the multidecadal megadroughts that afflicted the American Southwest during Medieval times (20–22), which have also been attributed to changes in tropical SSTs (18, 23). The most severe



**Fig. 3.** The change in annual mean $P - E$ over the American Southwest (125°W to 95°W and 25°N to 40°N, land areas only) for four coupled models, relative to model ensemblemean climatologies from 1950–2000. The results are from individual simulations of the 1860–2000 period, forced by known and estimated climate forcings and individual projections of future climate with the SRes A1B scenarios of climate forcings. Because the modeled anomalies have not been averaged together here, these time series provide an idea of plausible evolutions of Southwest climate toward a more arid state. The models are the National Center for Atmospheric Research Community Climate System Model (CCSM), GFDL model CM2.1, Max Planck Institut Für Meteorologie model ECHAM5, and Hadley Centre for Climate Change model HadCM3. All time series are for annual mean data, and a 6-year low-pass Butterworth filter has been applied.

Filtered Precip–Evap Anomaly (25N–40N, 95W–125W) mm/day

Downloaded from www.sciencemag.org on May 25, 2007

## Contributions to Change in Moisture Convergence
## (2021 − 2040) − (1950 − 2000)

**A**    Mean Circulation Contribution



**B**    Q Contribution to Mean



**C**    Transient Contribution



-100  -80  -60  -40  -20   0   20   40   60   80   100
colors and contours in [mm/day x 100]

**Fig. 4.** The change in annual means of $P − E$ for the 2021–2040 period minus the 1950–2000 period [contours in (A) to (C)] and contributions to the change in vertically integrated moisture convergence (colors; negative values imply increased moisture divergence) by the mean flow, due to (**A**) changes in the flow, (**B**) the specific humidity, and (**C**) the transient-eddy moisture convergence, all for the GFDL CM2.1 model. The box in (A) shows the area we defined as "the Southwest."

future droughts will still occur during persistent La Niña events, but they will be worse than any since the Medieval period, because the La Niña conditions will be perturbing a base state that is drier than any state experienced recently.

### References and Notes

1. U. Cubasch *et al.*, in *Climate Change 2000—The Scientific Basis: Contribution of Working Group I to the Third Assessment Report of the Intergovernmental Panel on Climate Change*, J. T. Houghton *et al.*, Eds. (Cambridge Univ. Press, Cambridge, 2001), pp. 525–582.
2. M. R. Allen, W. J. Ingram, *Nature* **419**, 224 (2002).
3. Details of the models analyzed can be found at www-pcmdi.llnl.gov/ipcc/model_documentation/ ipcc_model_documentation.php, and the data can be found at https://esg.llnl.gov:8443/index.jsp.
4. N. Nakicenovic, R. Swart, Eds., *Special Report on Emissions Scenarios* (Cambridge Univ. Press, New York, 2000).
5. T. L. Delworth *et al.*, *J. Clim.* **19**, 643 (2006).
6. I. M. Held, B. J. Soden, *J. Clim.* **19**, 5686 (2006).
7. The model $P − E$ is not fully accounted for by the computed moisture flow convergence that is calculated by taking the sum of the components of the mean flow and transient eddies (the imbalance is 0.022 mm/day). Calculations were performed with data collected daily on the model grid using closely matching numerics, but errors could be introduced by not using a time resolution of several hours and by neglecting moisture diffusion (potentially large over mountains), which was not archived. The data are available at http:/kage.ldeo. columbia.edu/SOURCES/.LDEO/.ClimateGroup/.GFDL.
8. J. H. Yin, *Geophys. Res. Lett.* **32**, L18701 (2005).
9. P. J. Kushner, I. M. Held, T. L. Delworth, *J. Clim.* **14**, 2238 (2001).
10. L. Bengtsson, K. I. Hodges, E. Roeckner, *J. Clim.* **19**, 3518 (2006).
11. N.-C. Lau, A. Leetmaa, M. J. Nath, *J. Clim.* **19**, 3607 (2006).
12. S. Lee, *J. Atmos. Sci.* **56**, 1353 (1999).
13. T. Schneider, *Annu. Rev. Earth Planet. Sci.* **34**, 655 (2006).
14. C. C. Walker, T. Schneider, *J. Atmos. Sci.* **63**, 3333 (2006).
15. S. D. Schubert, M. J. Suarez, P. J. Pegion, R. D. Koster, J. T. Bacmeister, *Science* **303**, 1855 (2004).
16. S. D. Schubert, M. J. Suarez, P. J. Pegion, R. D. Koster, J. T. Bacmeister, *J. Clim.* **17**, 485 (2004).
17. R. Seager, Y. Kushnir, C. Herweijer, N. Naik, J. Velez, *J. Clim.* **18**, 4065 (2005).
18. C. Herweijer, R. Seager, E. R. Cook, *Holocene* **16**, 159 (2006).
19. H.-P. Huang, R. Seager, Y. Kushnir, *Clim. Dyn.* **24**, 721 (2005).
20. S. Stine, *Nature* **369**, 546 (1994).
21. E. R. Cook, C. A. Woodhouse, C. M. Eakin, D. M. Meko, D. W. Stahle, *Science* **306**, 1015 (2004).
22. C. Herweijer, R. Seager, E. R. Cook, J. Emile-Geay, *J. Clim.* **20**, 1353 (2007).
23. E. R. Cook, R. Seager, M. A. Cane, D. W. Stahle, *Earth Sci. Rev.* **81**, 93 (2007).
24. This work was supported at LDEO by NOAA grants NA03OAR4320179 and NA06OAR4310151 and by NSF grants ATM05-01878, ATM04-34221, and ATM03-47009. We thank R. Dole, W. Robinson, and M. Wallace for useful conversations.

5 January 2007; accepted 26 March 2007
Published online 5 April 2007;
10.1126/science.1139601
Include this information when citing this paper.

Downloaded from www.sciencemag.org on May 25, 2007

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 57

# Emissions pathways, climate change, and impacts on California

Katharine Hayhoe[a,b], Daniel Cayan[c], Christopher B. Field[d], Peter C. Frumhoff[e], Edwin P. Maurer[f], Norman L. Miller[g], Susanne C. Moser[h], Stephen H. Schneider[i], Kimberly Nicholas Cahill[d], Elsa E. Cleland[d], Larry Dale[g], Ray Drapek[j], R. Michael Hanemann[k], Laurence S. Kalkstein[l], James Lenihan[j], Claire K. Lunch[d], Ronald P. Neilson[j], Scott C. Sheridan[m], and Julia H. Verville[e]

[a]ATMOS Research and Consulting, 809 West Colfax Avenue, South Bend, IN 46601; [c]Climate Research Division, The Scripps Institution of Oceanography, and Water Resources Division, U.S. Geological Survey, 9500 Gilman Drive, La Jolla, CA 92093-0224; [d]Department of Global Ecology, Carnegie Institution of Washington, 260 Panama Street, Stanford, CA 94305; [e]Union of Concerned Scientists, Two Brattle Square, Cambridge, MA 02238; [f]Civil Engineering Department, Santa Clara University, Santa Clara, CA 95053; [g]Atmosphere and Ocean Sciences Group, Earth Sciences Division, Lawrence Berkeley National Laboratory, 1 Cyclotron Road, Berkeley, CA 94720; [h]Environmental and Societal Impacts Group, National Center for Atmospheric Research, P.O. Box 3000, Boulder, CO 80307; [i]Department of Biological Sciences and Institute for International Studies, Stanford University, Stanford, CA 94305; [j]Corvallis Forestry Sciences Laboratory, U.S. Department of Agriculture Forest Service, 3200 SW Jefferson Way, Corvallis, OR 97331; [k]Department of Agricultural and Resource Economics, University of California, Berkeley, CA 94720; [l]Center for Climatic Research, Department of Geography, University of Delaware, Newark, DE 19716; and [m]Department of Geography, Kent State University, Kent, OH 44242

Contributed by Christopher B. Field, June 23, 2004

The magnitude of future climate change depends substantially on the greenhouse gas emission pathways we choose. Here we explore the implications of the highest and lowest Intergovernmental Panel on Climate Change emissions pathways for climate change and associated impacts in California. Based on climate projections from two state-of-the-art climate models with low and medium sensitivity (Parallel Climate Model and Hadley Centre Climate Model, version 3, respectively), we find that annual temperature increases nearly double from the lower B1 to the higher A1fi emissions scenario before 2100. Three of four simulations also show greater increases in summer temperatures as compared with winter. Extreme heat and the associated impacts on a range of temperature-sensitive sectors are substantially greater under the higher emissions scenario, with some interscenario differences apparent before midcentury. By the end of the century under the B1 scenario, heatwaves and extreme heat in Los Angeles quadruple in frequency while heat-related mortality increases two to three times; alpine/subalpine forests are reduced by 50–75%; and Sierra snowpack is reduced 30–70%. Under A1fi, heatwaves in Los Angeles are six to eight times more frequent, with heat-related excess mortality increasing five to seven times; alpine/subalpine forests are reduced by 75–90%; and snowpack declines 73–90%, with cascading impacts on runoff and streamflow that, combined with projected modest declines in winter precipitation, could fundamentally disrupt California's water rights system. Although interscenario differences in climate impacts and costs of adaptation emerge mainly in the second half of the century, they are strongly dependent on emissions from preceding decades.

**C**alifornia, with its diverse range of climate zones, limited water supply, and economic dependence on climate-sensitive industries such as agriculture, provides a challenging test case to evaluate impacts of regional-scale climate change under alternative emissions pathways. As characterized by the Intergovernmental Panel on Climate Change, demographic, socioeconomic, and technological assumptions underlying long-term emissions scenarios vary widely (1). Previous studies have not systematically examined the difference between projected regional-scale changes in climate and associated impacts across scenarios. Nevertheless, such information is essential to evaluate the potential for and costs of adaptation associated with alternative emissions futures and to inform mitigation policies (2).

Here, we examine a range of potential climate futures that represent uncertainties in both the physical sensitivity of current climate models and divergent greenhouse gas emissions pathways. Two global climate models, the low-sensitivity National Center for Atmospheric Research/Department of Energy Par-

allel Climate Model (PCM) (3) and the medium-sensitivity U.K. Met Office Hadley Centre Climate Model, version 3 (HadCM3), model (4, 5) are used to calculate climate change resulting from the SRES (Special Report on Emission Scenarios) B1 (lower) and A1fi (higher) emissions scenarios (1). These scenarios bracket a large part of the range of Intergovernmental Panel on Climate Change nonintervention emissions futures with atmospheric concentrations of $CO_2$ reaching $\approx 550$ ppm (B1) and $\approx 970$ ppm (A1fi) by 2100 (see *Emissions Scenarios* in *Supporting Text*, which is published as supporting information on the PNAS web site). Although the SRES scenarios do not explicitly assume any specific climate mitigation policies, they do serve as useful proxies for assessing the outcome of emissions pathways that could result from different emissions reduction policies. The scenarios at the lower end of the SRES family are comparable to emissions pathways that could be achieved by relatively aggressive emissions reduction policies, whereas those at the higher end are comparable to emissions pathways that would be more likely to occur in the absence of such policies.

## Climate Projections

**Downscaling Methods.** For hydrological and agricultural analyses, HadCM3 and PCM output was statistically downscaled to a $1/8°$ grid ($\approx 150$ km$^2$) (6) and to individual weather stations (7) for analyses of temperature and precipitation extremes and health impacts. Downscaling to the $1/8°$ grid used an empirical statistical technique that maps the probability density functions for modelled monthly precipitation and temperature for the climatological period (1961–1990) onto those of gridded historical observed data, so the mean and variability of observations are reproduced by the climate model data. The bias correction and spatial disaggregation technique was originally developed for adjusting General Circulation Model output for long-range streamflow forecasting (6), later adapted for use in studies examining the hydrologic impacts of climate change (8), and compares favorably to different statistical and dynamic downscaling techniques (9) in the context of hydrologic impact studies.

Station-level downscaling for analyses of temperature and precipitation extremes and health impacts used a deterministic method in which grid-cell values of temperatures and precipi-

---

Freely available online through the PNAS open access option.

Abbreviations: DJF, December, January, February; HadCM3, Hadley Centre Climate Model, version 3; JJA, June, July, August; PCM, Parallel Climate Model; SRES, Special Report on Emission Scenarios; SWE, snow water equivalent.

[b]To whom correspondence should be addressed. E-mail: hayhoe@atmosresearch.com.

© 2004 by The National Academy of Sciences of the USA

**Table 1. Summary of midcentury (2020–2049) and end-of-century (2070–2099) climate and impact projections for the HadCM3 and PCM B1 and A1fi scenarios**

| | | | 2020–2049 | | | | 2070–2099 | | | |
| | | | PCM | | HadCM3 | | PCM | | HadCM3 | |
| | Units | 1961–1990 | B1 | A1fi | B1 | A1fi | B1 | A1fi | B1 | A1fi |
|---|---|---|---|---|---|---|---|---|---|---|
| **Change in statewide avg temperatures** | | | | | | | | | | |
| Annual | °C | 15.0 | 1.35 | 1.5 | 1.6 | 2.0 | 2.3 | 3.8 | 3.3 | 5.8 |
| Summer (JJA) | °C | 22.8 | 1.2 | 1.4 | 2.2 | 3.1 | 2.15 | 4.1 | 4.6 | 8.3 |
| Winter (DJF) | °C | 7.6 | 1.3 | 1.2 | 1.4 | 1.45 | 2.15 | 3.0 | 2.3 | 4.0 |
| **Change in statewide avg precipitation** | | | | | | | | | | |
| Annual | mm | 544 | −37 | −51 | +6 | −70 | +38 | −91 | −117 | −157 |
| Summer (JJA) | mm | 20 | −3 | +2 | −1 | −7 | +4 | −46 | −5 | −1 |
| Winter (DJF) | mm | 269 | −45 | −55 | +4 | −44 | +13 | −13 | −79 | −92 |
| Sea level rise | cm | — | 8.7 | 9.5 | 11.6 | 12.7 | 19.2 | 28.8 | 26.8 | 40.9 |
| **Heatwave days** | | | | | | | | | | |
| Los Angeles | Days | 12 | 28 | 35 | 24 | 36 | 44 | 76 | 47 | 95 |
| Sacramento | Days | 58 | 91 | 101 | 93 | 104 | 109 | 134 | 115 | 138 |
| Fresno | Days | 92 | 113 | 120 | 111 | 116 | 126 | 147 | 126 | 149 |
| El Centro | Days | 162 | 185 | 185 | 176 | 180 | 191 | 213 | 197 | 218 |
| Length of heatwave season* | Days | 115 | 135 | 142 | 132 | 141 | 149 | 178 | 162 | 204 |
| **Excess mortality for Los Angeles†** | | | | | | | | | | |
| Without acclimatization | avg no. of deaths/yr | — | — | — | — | — | 394 | 948 | 667 | 1,429 |
| With acclimatization | avg no. of deaths/yr | 165 | — | — | — | — | 319 | 790 | 551 | 1,182 |
| **Change in April 1 snowpack SWE** | | | | | | | | | | |
| 1,000–2,000 m elevation | % | 3.6 km³ | −60 | −56 | −58 | −66 | −65 | −95 | −87 | −97 |
| 2,000–3,000 m elevation | % | 6.5 km³ | −34 | −34 | −24 | −36 | −22 | −73 | −75 | −93 |
| 3,000–4,000 m elevation | % | 2.3 km³ | −11 | −15 | 4 | −16 | 15 | −33 | −48 | −68 |
| All elevations | % | 12.4 km³ | −38 | −37 | −26 | −40 | −29 | −73 | −72 | −89 |
| **Change in annual reservoir inflow‡** | | | | | | | | | | |
| Total | % | 21.7 km³ | −18 | −22 | 5 | −10 | 12 | −29 | −24 | −30 |
| Northern Sierra | % | 15.2 km³ | −19 | −22 | 3 | −9 | 9 | −29 | −20 | −24 |
| Southern Sierra | % | 6.5 km³ | −16 | −23 | 10 | −14 | 17 | −30 | −33 | −43 |
| **Change in April–June reservoir inflow‡** | | | | | | | | | | |
| Total | % | 9.1 km³ | −20 | −24 | −11 | −19 | −1 | −46 | −41 | −54 |
| Northern Sierra | % | 5.5 km³ | −21 | −24 | −16 | −19 | −6 | −45 | −34 | −47 |
| Southern Sierra | % | 3.6 km³ | −18 | −24 | −2 | −19 | 5 | −47 | −52 | −65 |
| **Change water year flow centroid‡** | | | | | | | | | | |
| Total | Days | 03/26 | 0 | 2 | −15 | −7 | −7 | −14 | −23 | −32 |
| Northern Sierra | Days | 03/13 | 0 | 3 | −16 | −5 | −3 | −11 | −18 | −24 |
| Southern Sierra | Days | 05/01 | −10 | −7 | −19 | −12 | −22 | −34 | −34 | −43 |

avg, average; JJA, June, July, August; DJF, December, January, February; SWE, snow water equivalent.

*The number of days between the beginning of the year's first and end of the year's last heatwave.

†Reference period is 1990–1999, and projections are for the period 2090–2099.

‡Results are for inflows to seven major dams and reservoirs in the Sacramento/San Joaquin water system, including three in the Northern Sierra (Shasta, Oroville, and Folsom) and four in the Southern Sierra (New Melones, New Don Pedro, Lake McClure, and Pine Flat).

APPLIED PHYSICAL SCIENCES

ECOLOGY

tation from the reference period were rescaled by simple monthly regression relations to ensure that the overall probability distributions of the simulated daily values closely approximated the observed probability distributions at selected longterm weather stations (7). The same regression relations were then applied to future simulations, such that rescaled values share the weather statistics observed at the selected stations. At the daily scales addressed by this method, the need to extrapolate beyond the range of the historically observed parts of the probability distributions was rare even in the future simulations (typically <1% of the future days) because most of the climate changes involve more frequent warm days than actual truly warmer-than-ever-observed days (7).

Except where otherwise noted, we present projected climate anomalies and impacts averaged over 2020–2049 (with a midpoint of 2035) and 2070–2099 (here designated as end-of-century, with a midpoint of 2085), relative to a 1961–1990 reference period.

**Temperature.** All simulations show increases in annual average temperature before midcentury that are slightly greater under the higher A1fi emissions scenario (see Fig. 4, which is published as supporting information on the PNAS web site). By end-of-century, projected temperature increases under A1fi are nearly twice those under B1, with the more sensitive HadCM3 model producing larger absolute changes (Table 1). Downscaled seasonal mean temperature projections (10) show consistent spatial patterns across California, with lesser warming along the southwest coast and increasing warming to the north and northeast (Fig. 1). Statewide, the range in projected average temperature increases is higher than previously reported (11–14), particularly for summer temperature increases that are equal to or greater than increases in winter temperatures.

**Fig. 1.** Downscaled winter (DJF) and summer (JJA) temperature change (°C) for 2070–2099, relative to 1961–1990 for a 1/8° grid. Statewide, SRES B1 to A1fi winter temperature projections for the end of the century are 2.2–3°C and 2.3–4°C for PCM and HadCM3, respectively, compared with previous projections of 1.2–2.5°C and 3–3.5°C for PCM and HadCM2, respectively. End-of-century B1 to A1fi summer temperature projections are 2.2–4°C and 4.6–8.3°C for PCM and HadCM3, respectively, compared with previous projections of 1.3–3°C and 3–4°C for PCM and HadCM2, respectively (11–14).

**Precipitation.** Precipitation shows a tendency toward slight decreases in the second half of the century with no obvious interscenario differences in magnitude or frequency (see Figs. 5–10, which are published as supporting information on the PNAS web site). Three of four simulations project winter decreases of −15% to −30%, with reductions concentrated in the Central Valley and along the north Pacific Coast. Only PCM B1 projects slight increases (≈7%) by the end of the century (Table 1). These results differ from previous projections showing precipitation increases of 75–200% by 2100 (11–13), but they are consistent with recent PCM-based midrange projections (14, 15). The larger-scale pattern of rainfall over North America is more uniform across scenarios, showing an area of decreased (or lesser increase in) precipitation over California that contrasts with increases further up the coast (see Fig. 11, which is published as supporting information on the PNAS web site). Because interdecadal variability often dominates precipitation over California, projected changes in climate and impacts associated with the direct effects of temperature should be considered more robust than those determined by interactions between temperature and precipitation or precipitation alone.

**Extreme Heat and Heat-Related Mortality**

Temperature extremes increase in both frequency and magnitude under all simulations, with the most dramatic increases occurring under the A1fi scenario. Changes in local temperature extremes were evaluated based on exceedance probability analyses, by using the distribution of daily maximum temperatures downscaled to representative locations (16). Exceedance probabilities define a given temperature for which the probability

exists that X% of days throughout the year will fall below that temperature (i.e., if the 35°C exceedance probability averages 95% for the period 2070–2099, this means that an average of 95% or ≈347 days per year are likely to lie below 35°C). For the four locations examined for extreme heat occurrence (Los Angeles, Sacramento, Fresno, and Shasta Dam), mean and maximum temperatures occurring 50% and 5% of the year increase by 1.5–5°C under B1 and 3.5–9°C under A1fi by the end of the century. Extreme temperatures experienced an average of 5% of the year during the historical period are also projected to increase in frequency, accounting for 12–19% (B1) and 20–30% (A1fi) of days annually by 2070–2099 (see Fig. 12, which is published as supporting information on the PNAS web site).

The annual number of days classified as heatwave conditions (3 or more consecutive days with temperature above 32°C) increases under all simulations, with more heatwave days under A1fi before midcentury (see Fig. 13, which is published as supporting information on the PNAS web site). Among the four locations analyzed, increases and interscenario differences are proportionally greatest for Los Angeles, a location that currently experiences relatively few heatwaves. By the end of the century, the number of heatwave days in Los Angeles increases four times under B1, and six to eight times under A1fi. Statewide, the length of the heatwave season increases by 5–7 weeks under B1 and by 9–13 weeks under A1fi by the end of this century, with interscenario differences emerging by midcentury (Table 1; see also Fig. 14, which is published as supporting information on the PNAS web site).

The connection between extreme heat and summer excess mortality is well established (17). Heat-related mortality estimates for the Los Angeles metropolitan area were determined





**Fig. 2.** Average snowpack SWE for 2020–2049 and 2070–2099 expressed as a percent of the average for the reference period 1961–1990 for the Sierra Nevada region draining into the Sacramento–San Joaquin river system. Total SWE losses by the end of the century range from 29–72% for the B1 scenario to 73–89% for the A1fi scenario. Losses are greatest at elevations below 3,000 m, ranging from 37–79% for B1 to 81–94% for A1fi by the end of the century. Increases in high elevation SWE for midcentury HadCM3 B1 and end-of-century PCM B1 runs result from increased winter precipitation in these simulations.

APPLIED PHYSICAL SCIENCES

ECOLOGY

by threshold meteorological conditions beyond which mortality tends to increase. An algorithm was developed to determine the primary environmental factors (including maximum apparent temperature, number of consecutive days above the threshold apparent temperature, and time of year) that explain variability in excess mortality for all days with apparent maximum temperatures at or above the derived daily threshold apparent temperature (18) value of 34°C (see *Heat-Related Mortality* in *Supporting Text*). Estimates do not account for changes in population or demographic structure.

From a baseline of ≈165 excess deaths during the 1990s, heat-related mortality in Los Angeles is projected to increase by about two to three times under B1 and five to seven times under A1fi by the 2090s if acclimatization is taken into account (see *Heat-Related Mortality* in *Supporting Text*). Without acclimatization, these estimates are about 20–25% higher (Table 1). Actual impacts may be greater or lesser depending in part on demographic changes and societal decisions affecting preparedness, health care, and urban design. Individuals likely to be most affected include elderly, children, the economically disadvantaged, and those who are already ill (19, 20).

## Impacts on Snowpack, Runoff, and Water Supply

Rising temperatures, exacerbated in some simulations by decreasing winter precipitation, produce substantial reductions in snowpack in the Sierra Nevada Mountains, with cascading impacts on California winter recreation, streamflow, and water storage and supply. Snowpack SWE was estimated by using daily, bias-corrected and spatially downscaled temperature and precipitation to drive the Variable Infiltration Capacity distributed land surface hydrology model. The Variable Infiltration Capacity model, using the resolution and parameterization also implemented in this study, has been shown to reproduce observed

streamflows when driven by observed meteorology (10) and has been applied to simulate climate change (8) in this region. April 1 SWE decreases substantially in all simulations before midcentury (see Fig. 15, which is published as supporting information on the PNAS web site). Reductions are most pronounced at elevations below 3,000 m, where 80% of snowpack storage currently occurs (Table 1 and Fig. 2). Interscenario differences emerge before midcentury for HadCM3 and by the end of the century for both models. These changes will delay the onset of and shorten the ski season in California (see *Impact of Decreasing Snowpack on California's Ski Industry* in *Supporting Text*).

Water stored in snowpack is a major natural reservoir for California. Differences in SWE between the B1 and A1fi scenarios represent ≈1.7 km³ of water storage by midcentury and 2.1 km³ by the end of the century for HadCM3. For PCM, overall SWE losses are smaller, but the difference between the A1fi and B1 scenarios is larger by the end of the century, representing >4 km³ of storage. Reductions for all simulations except PCM under the lower B1 emission scenario are greater than previous projections of diminishing snowpack for the end of the century (8, 21). By 2020–2049 the SWE loss is comparable to that previously projected for 2060 (22).

Warmer temperatures and more precipitation falling as rain instead of snow also causes snowmelt runoff to shift earlier under all simulations (Table 1), which is consistent with earlier studies (23). The magnitude of the shift is greater in the higher-elevation Southern basins and under the higher A1fi scenario. Stream inflows to major reservoirs decline because of diminished snowpack and increased evaporation before midcentury, except where winter precipitation increases (Table 1). The greater reductions in inflows seen under A1fi are driven by both higher temperatures and lower average precipitation as compared with B1.



**Fig. 3.** Statewide change in cover of major vegetation types for 2020–2049 and 2070–2099, relative to simulated distributions for the 1961–1990 reference period. ASF, alpine/subalpine forest; ECF, evergreen conifer forest; MEF, mixed evergreen forest; MEW, mixed evergreen woodland; GRS, grassland; SHB, shrubland; DES, desert. Increasing temperatures drive the reduction in alpine/subalpine forest cover and cause mixed conifer forest to displace evergreen conifer forest in the Sierra Nevada Mountains and the North Coast. Mixed conifer forest in the South Coast expands because of increased humidity and reduced fire frequency. Because of drier conditions and increased fire frequency in inland locations, grassland displaces shrubland and woodland, particularly in the PCM simulations, whereas warmer and drier conditions under HadCM3 cause an expansion of desert cover in the southern Central Valley.

Earlier runoff may also increase the risk of winter flooding (7). Currently, state operators maintain ≈12 km³ of total vacant space in the major reservoirs to provide winter and early spring flood protection,[n] a volume approximately equal to that stored in the natural snowpack reservoir by April 1st. Capturing earlier runoff to compensate for future reductions in snowpack would take up most of the flood protection space, forcing a choice between winter flood prevention and maintaining water storage for the summer and fall dry period use. Flood risk and fresh-water supply are also affected by higher sea levels, which are projected to rise 10–40 cm under B1 and 20–65 cm under A1fi by 2100 (Table 1; see also Fig. 16, which is published as supporting information on the PNAS web site).

Declining Sierra Nevada snowpack, earlier runoff, and reduced spring and summer streamflows will likely affect surface water supplies and shift reliance to groundwater resources, already overdrafted in many agricultural areas in California (24). This could impact 85% of California's population who are agricultural and urban users in the Central Valley, San Francisco Bay Area, and the South Coast, about half of whose water is supplied by rivers of the Central Valley. Under A1fi (both models) and B1 (HadCM3), the projected length, frequency, and severity of extreme droughts in the Sacramento River system during 2070–2099 substantially exceeds what has been experienced in the 20th century. The proportion of years projected to be dry or critical increases from 32% in the historical period to 50–64% by the end of the century under all but the wetter PCM B1 scenario (see Table 2, which is published as supporting information on the PNAS web site). Changes in water availability and timing could disrupt the existing pattern of seniority in month-dependent water rights by reducing the value of rights to mid- and late-season natural streamflow and boosting the value of rights to stored water. The overall magnitude of impacts on water users depends on complex interactions between temperature-driven snowpack decreases and runoff timing, precipita-

tion, future population increases, and human decisions regarding water storage and allocation (see *Impacts on Water Supply* in *Supporting Text*).

**Impacts on Agriculture and Vegetation Distribution**

In addition to reductions in water supply, climate change could impact California agriculture by increasing demand for irrigation to meet higher evaporative demand, increasing the incidence of pests (25), and through direct temperature effects on production quality and quantity. Dairy products (milk and cream, valued at $3.8 billion annually) and grapes ($3.2 billion annually) are the two highest-value agricultural commodities of California's $30 billion agriculture sector (26). Threshold temperature impacts on dairy production and wine grape quality were calculated by using downscaled temperature projections for key counties, relative to average observed monthly temperatures.[o]

For dairy production, losses were estimated for temperatures above a 32°C threshold (27), as well as for additional losses between 25°C (28) and 32°C. For the top 10 dairy counties in the state (which account for 90% of California's milk production), rising temperatures were found to reduce production by as much as 7–10% (B1) and 11–22% (A1fi) by the end of the century (see Table 3, which is published as supporting information on the PNAS web site). Potential adaptations may become less practical with increasing temperature and humidity (29).

For wine grapes, excessively high temperatures during ripening can adversely affect quality, a major determinant of market value. Assuming ripening occurs at between 1,150 and 1,300 biologically active growing degree days (30), ripening month was determined by summing modeled growing degree days above 10°C from April to October, for both baseline and projected scenarios. Monthly average temperature at the time of ripening was used to estimate potential temperature impacts on quality. For all simulations, average ripening occurs 1–2 months earlier and at higher temperatures, leading to degraded quality and marginal/impaired conditions for all but the cool coastal region

---

[n]See the U.S. Army Corps of Engineers Flood Control Requirements for California Reservoirs, Sacramento District Water Control Data System, Sacramento, CA (www.spk-wc.usace.army.mil).

[o]See Western U.S. Climate Historical Summaries (Western Regional Climate Center) at www.wrcc.dri.edu/climsum.html.

under all scenarios by the end of the century (see Table 3, which is published as supporting information on the PNAS web site). As with other perennial crops, adaptation options to shift varieties or locations of production would require significant time and capital investment.

The distribution of California's diverse vegetation types also changes substantially over the century relative to historical simulations (Fig. 3; see also Fig. 17, which is published as supporting information on the PNAS web site). Projections of changes in vegetation distribution are those given by MC1, a dynamic general vegetation model that simulates climate-driven changes in life-form mixtures and vegetation types; ecosystem fluxes of carbon, nitrogen, and water; and fire disturbance over time (31). Vegetation shifts driven primarily by temperature, such as reductions in the extent of alpine/subalpine forest and the displacement of evergreen conifer forest by mixed evergreen forest, are consistent across models and more pronounced under A1fi by the end of the century. Changes driven by precipitation and changes in fire frequency are model-dependent and do not exhibit consistent interscenario differences. Most changes are apparent before mid-century, with the exception of changes in desert cover. The shift from evergreen conifer to mixed evergreen forest and expansion of grassland are consistent with previous impact analyses (13), whereas the extreme reduction in alpine/subalpine forest and expansion of desert had not been reported in previous impacts assessments (12, 13).

## Conclusions

Consistent and large increases in temperature and extreme heat drive significant impacts on temperature-sensitive sectors in California under both lower and higher emissions scenarios, with the most severe impacts occurring under the higher A1fi scenario. Adaptation options are limited for impacts not easily controlled by human intervention, such as the overall decline in snowpack and loss of alpine and subalpine forests. Although interscenario differences in climate impacts and costs of adaptation emerge mainly in the second half of the century, they are largely entrained by emissions from preceding decades (32). SRES scenarios do not explicitly assume climate-specific policy intervention, and thus this study does not directly address the contrast in impacts due to climate change mitigation policies. However, these findings support the conclusion that climate change and many of its impacts scale with the quantity and timing of greenhouse gas emissions (33). As such, they represent a solid starting point for assessing the outcome of changes in greenhouse gas emission trajectories driven by climate-specific policies (32, 34), and the extent to which lower emissions can reduce the likelihood that risks of "dangerous anthropogenic interference with the climate system" (35).

We thank Michael Dettinger and Mary Meyer Tyree for providing assistance with data and analysis, and Frank Davis for providing review of earlier drafts of this manuscript. PCM model results were provided by PCM personnel at the National Center for Atmospheric Research, and HadCM3 model results were provided by Dr. David Viner from the U.K. Met Office's Climate Impacts LINK Project. This work was supported in part by grants from the David and Lucile Packard Foundation, the William and Flora Hewlett Foundation, the Energy Foundation, the California Energy Commission, the National Oceanic and Atmospheric Administration Office of Global Programs, and the Department of Energy.

1. Nakićenović, N., Alcamo, J., Davis, G., de Vries, B., Fenhann, J., Gaffin, S., Gregory, K., Grübler, A., Jung, T. Y., Kram, T., *et al.* (2000) *Intergovernmental Panel on Climate Change Special Report on Emissions Scenarios* (Cambridge Univ. Press, Cambridge, U.K.).
2. Parry, M. (2002) *Global Environ. Change* **12** (3), 149–153.
3. Washington, W. M., Weatherly, J. W., Meehl, G. A., Semtner, A. J., Bettge, T. W., Craig, A. P., Strand, W. G., Arblaster, J., Wayland, V. B., James, R. & Zhang, Y. (2000) *Clim. Dyn.* **16**, 755–774.
4. Gordon, C., Cooper, C., Senior, C. A., Banks, H., Gregory, J. M., Johns, T. C., Mitchell, J. F. B. & Wood, R. A. (2000) *Clim. Dyn.* **16**, 147–168.
5. Pope, V. D., Gallani, M. L., Rowntree, P. R. & Stratton, R. A. (2000) *Clim. Dyn.* **16**, 123–146.
6. Wood, A. W., Maurer, E. P., Kumar, A. & Lettenmaier, D. P. (2002) *J. Geophys. Res.* **107**, 4429, 10.1029/2001JD000659.
7. Dettinger, M. D., Cayan, D. R., Meyer, M. K. & Jeton, A. E. (2004) *Clim. Change* **62**, 283–317.
8. VanRheenan, N. T., Wood, A. W., Palmer, R. N. & Lettenmaier, D. P. (2004) *Clim. Change* **62**, 257–281.
9. Wood, A. W., Leung, L. R., Sridhar, V. & Lettenmaier, D. P. (2004) *Clim. Change* **62**, 189–216.
10. Maurer, E. P., Wood, A. W., Adam, J. C., Lettenmaier, D. P. & Nijssen, B. (2002) *J. Clim.* **15**, 3237–3251.
11. Field, C. B., Daily, G. C., Davis, F. W., Gaines, S., Matson, P. A., Melack, J. & Miller, N. L. (1999) *Confronting Climate Change in California: Ecological Impacts on the Golden State* (Union of Concerned Scientists, Cambridge, MA, and Ecological Society of America, Washington, DC).
12. Wilkinson, R., Clarke, K., Goodchild, M., Reichman, J. & Dozier, J. (2002) *The Potential Consequences of Climate Variability and Change for California: The California Regional Assessment* (U.S. Global Change Research Program, Washington, DC).
13. Wilson, T., Williams, L., Smith, J. & Medelsohn, R. (2003) *Global Climate Change and California: Potential Implications for Ecosystems, Health, and the Economy*, Publication No. 500-03-058CF (California Energy Commission, Public Interest Energy Research Environmental Area, Sacramento).
14. Leung, L. R., Qian, Y., Bian, X., Washington, W. M., Han, J. & Roads, J. O. (2004) *Clim. Change* **62**, 75–113.
15. Snyder, M. A., Bell, J. L., Sloan, L. C., Duffy, P. B. & Govindasamy, B. (2002) *Geophys. Res. Lett.* **29**, 1514–1517.
16. Miller, N. L., Bashford, K. E. & Strem, E. (2003) *J. Am. Water Resour. Assoc.* **39**, 771–784.
17. Kalkstein, L. S. & Davis, R. E. (1989) *Ann. Assoc. Am. Geogr.* **79**, 44–64.
18. Watts, J. D. & Kalkstein, L. S. (2004) *J. Appl. Meteorol.* **43**, 503–513.
19. McGeehin, M. A. & Mirabelli, M. (2001) *Environ. Health Perspect.* **109**, 185–189.
20. Chestnut, L. G., Breffle, W. S., Smith, J. B. & Kalkstein, L. S. (1998) *Environ. Sci. Policy* **1**, 59–70.
21. Knowles, N. & Cayan, D. R. (2002) *Geophys. Res. Lett.* **29**, 1891–1895.
22. Knowles, N. & Cayan, D. R. (2004) *Clim. Change* **62**, 319–336.
23. Gleick, P. H. & Chalecki, E. L. (1999) *J. Am. Water Resour. Assoc.* **35**, 1429–1441.
24. California Department of Water Resources, Division of Planning and Local Assistance (1998) *Bulletin 160–98: California Water Plan* (California Department of Water Resources, Sacramento).
25. Harrington, R. & Stork, N. E., eds. (1995) *Insects in a Changing Environment* (Academic, London).
26. California Agricultural Statistics Service (2002) *California Agriculture Statistical Review* (California Agricultural Statistics Service, Sacramento).
27. Ahmed, M. M. M. & El Amin, A. I. (1997) *J. Arid Environ.* **35**, 737–745.
28. Mellado, M. (1995) *Veterinaria* **26**, 389–399.
29. Pittock, B., Wratt, D., Basher, R., Bates, B., Finlayson, M., Gitay, H., Woodward, A., Arthington, A., Beets, P., Biggs, B., *et al.* (2001) in *Climate Change 2001: Impacts, Adaptation, and Vulnerability* (Cambridge Univ. Press, Cambridge, U.K.).
30. Gladstones, J. (1992) *Viticulture and Environment* (Winetitles, Underdale, South Australia), 310 pp.
31. Lenihan, J., Drapek, R., Bachelet, D. & Neilson, R. (2003) *Ecol. Appl.* **13**, 1667–1681.
32. Swart, R., Mitchell, J., Morita, T. & Raper, S. (2002) *Global Environ. Change* **12**, 155–165.
33. Houghton, J. T., Ding, Y., Griggs, D. J., Noguer, M., van der Linden, P. J. & Xiaosu, D., eds. (2001) *Climate Change 2001: The Scientific Basis* (Cambridge Univ. Press, Cambridge, U.K.).
34. Arnell, N. W., Livermore, M. J. L., Kovats, S., Levy, P. E., Nicholls, R., Parry, M. L. & Gaffin, S. R. (2004) *Global Environ. Change* **14**, 3–20.
35. United Nations (1992) *United Nations Framework Convention on Climate Change* (United Nations, Rio de Janeiro, Brazil).

APPLIED PHYSICAL SCIENCES

ECOLOGY

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 58



**Translational Cancer Medicine:** *Technologies to Treatment*
**November 4-8, 2007**
Suntec International Convention and Exhibition Centre, Singapore
**Click here for program and registration details**



| Magazine | News | STKE | Careers | Multimedia | Collections |

Current Issue        Previous Issues        *Science* Express        *Science* Products        My *Science*        About the Journal

Home > *Science* Magazine > 18 August 2006 > Westerling et al. , pp. 940 - 943

Originally published in *Science* Express on 6 July 2006
*Science* 18 August 2006:
Vol. 313. no. 5789, pp. 940 - 943
DOI: 10.1126/science.1128834

ADVERTISEMENT



STAY PLUGGED IN

Easter
Island
and More

with *Science* PODCAST

ADVERTISEMENT

**RESEARCH ARTICLES**

# Warming and Earlier Spring Increase Western U.S. Forest Wildfire Activity

**A. L. Westerling,[1,2]* H. G. Hidalgo,[1] D. R. Cayan,[1,3] T. W. Swetnam[4]**

Western United States forest wildfire activity is widely thought to have increased in recent decades, yet neither the extent of recent changes nor the degree to which climate may be driving regional changes in wildfire has been systematically documented. Much of the public and scientific discussion of changes in western United States wildfire has focused instead on the effects of 19th- and 20th-century land-use history. We compiled a comprehensive database of large wildfires in western United States forests since 1970 and compared it with hydroclimatic and land-surface data. Here, we show that large wildfire activity increased suddenly and markedly in the mid-1980s, with higher large-wildfire frequency, longer wildfire durations, and longer wildfire seasons. The greatest increases occurred in mid-elevation, Northern Rockies forests, where land-use histories have relatively little effect on fire risks and are strongly associated with increased spring and summer temperatures and an earlier spring snowmelt.

[1] Scripps Institution of Oceanography, La Jolla, CA 92093, USA.
[2] University of California, Merced, CA 95344, USA.
[3] U.S. Geological Survey, La Jolla, CA 92093, USA.
[4] Laboratory of Tree-Ring Research, University of Arizona, Tucson, AZ 85721, USA.

* To whom correspondence should be addressed. E-mail: awesterling@ucmerced.edu

Wildfires have consumed increasing areas of western U.S. forests in recent years, and fire-fighting expenditures by federal land-management agencies now regularly exceed US$1 billion/year (*1*). Hundreds of homes are burned annually by wildfires, and damages to natural resources are sometimes extreme and irreversible. Media reports of recent, very large wildfires (>100,000 ha) burning in western forests have garnered widespread public attention, and a recurrent perception of crisis has galvanized legislative and administrative action (*1–3*).

Extensive discussions within the fire-management and scientific communities and the media seek to explain these phenomena, focusing on either land-use history or climate as primary causes. If increased wildfire risks are driven primarily by land-use history, then ecological restoration and fuels management are potential solutions. However, if increased risks are largely due to changes in climate during recent decades, then restoration and fuels treatments may be relatively ineffective in reversing current wildfire trends (*4*, *5*). We investigated 34 years of

western U.S. (hereafter, "western") wildfire history together with hydroclimatic data to determine where the largest increases in wildfire have occurred and to evaluate how recent climatic trends may have been important causal factors.

**Competing explanations: Climate versus management.** Land-use explanations for increased western wildfire note that extensive livestock grazing and increasingly effective fire suppression began in the late 19th and early 20th centuries, reducing the frequency of large surface fires (6–8). Forest regrowth after extensive logging beginning in the late 19th century, combined with an absence of extensive fires, promoted forest structure changes and biomass accumulation, which now reduce the effectiveness of fire suppression and increase the size of wildfires and total area burned (3, 5, 9). The effects of land-use history on forest structure and biomass accumulation are, however, highly dependent upon the "natural fire regime" for any particular forest type. For example, the effects of fire exclusion are thought to be profound in forests that previously sustained frequent, low-intensity surface fires [such as Southwestern ponderosa pine and Sierra Nevada mixed conifer (2, 3, 10, 11)], but of little or no consequence in forests that previously sustained only very infrequent, high-severity crown fires (such as Northern Rockies lodgepole pine or spruce-fir (1, 5, 12)].

In contrast, climatic explanations posit that increasing variability in moisture conditions (wet/dry oscillations promoting biomass growth, then burning), and/or a trend of increasing drought frequency, and/or warming temperatures have led to increased wildfire activity (13, 14). Documentary records and proxy reconstructions (primarily from tree rings) of fire history and climate provide evidence that western forest wildfire risks are strongly positively associated with drought concurrent with the summer fire season and (particularly in ponderosa pine–dominant forests) positively associated to a lesser extent with moist conditions in antecedent years (13–18). Variability in western climate related to the Pacific Decadal Oscillation and intense El Niño/La Niña events in recent decades along with severe droughts in 2000 and 2002 may have promoted greater forest wildfire risks in areas such as the Southwest, where precipitation anomalies are significantly influenced by patterns in Pacific sea surface temperature (19–22). Although corresponding decadal-scale variations and trends in climate and wildfire have been identified in paleo studies, there is a paucity of evidence for such associations in the 20th century.

We describe land-use history versus climate as competing explanations, but they may be complementary in some ways. In some forest types, past land uses have probably increased the sensitivity of current forest wildfire regimes to climatic variability through effects on the quantity, arrangement, and continuity of fuels. Hence, an increased incidence of large, high-severity fires may be due to a combination of extreme droughts and overabundant fuels in some forests. Climate, however, may still be the primary driver of forest wildfire risks on interannual to decadal scales. On decadal scales, climatic means and variability shape the character of the vegetation [e.g., species populations and their drought tolerance (23) and biomass (fuel) continuity (24), thus also affecting fire regime responses to shorter term climate variability]. On interannual and shorter time scales, climate variability affects the flammability of live and dead forest vegetation (13–19, 25).

High-quality time series are essential for evaluating wildfire risks, but for various reasons (26), previous works have not rigorously documented changes in large-wildfire frequency for western forests. Likewise, detailed fire-climate analyses for the region have not been conducted to evaluate what hydroclimatic variations may be associated with recent increased wildfire activity, and the spatial variations in these patterns.

We compiled a comprehensive time series of 1166 large (>400 ha) forest wildfires for 1970 to 2003 from federal land-management units containing 61% of western forested areas (and 80% above 1370 m) (26) (fig. S1). We compared these data with corresponding hydroclimatic and land surface variables (26–34) to address where and why the frequency of large forest wildfire



Visit
OpenGenomics
for the
latest
insights
into
**Chromosomal
Aberrations**

"Profiling
Intrachromosomal
Amplifications"

A presentation by
**Jon C. Strefford**, PhD,
Leukaemia Research-
Cytogenetics Group,
University of Southampton

View now

☼ Agilent Technologies

To Advertise    Find Products

ADVERTISEMENT

**FEATURED JOBS**

has changed.

**Increased forest wildfire activity.** We found that the incidence of large wildfires in western forests increased in the mid-1980s ([Fig. 1]) [hereafter, "wildfires" refers to large-fire events (>400 ha) within forested areas only (26)]. Subsequently, wildfire frequency was nearly four times the average of 1970 to 1986, and the total area burned by these fires was more than six and a half times its previous level. Interannual variability in wildfire frequency is strongly associated with regional spring and summer temperature (Spearman's correlation of 0.76, $P < 0.001$, $n = 34$). A second-order polynomial fit to the regional temperature signal alone explains 66% of the variance in the annual incidence of these fires, with many more wildfires burning in hotter than in cooler years.



**Fig. 1. (A)** Annual frequency of large (>400 ha) western U.S. forest wildfires (bars) and mean March through August temperature for the western United States (line) (26, 30). Spearman's rank correlation between the two series is 0.76 ($P < 0.001$). Wilcoxon test for change in mean large–forest fire frequency after 1987 was significant ($W = 42$; $P < 0.001$). **(B)** First principle component of center timing of stream-flow in snowmelt dominated streams (line). Low (pink shading), middle (no shading), and high (light blue shading) tercile values indicate early, mid-, and late timing of spring snowmelt, respectively. **(C)** Annual time between first and last large-fire ignition, and last large-fire control. [View Larger Version of this Image (52K GIF file)]

The length of the wildfire season also increased in the 1980s ([Fig. 1]). The average season length (the time between the reported first wildfire discovery date and the last wildfire control date) increased by 78 days (64%), comparing 1970 to 1986 with 1987 to 2003. Roughly half of that increase was due to earlier ignitions, and half to later control (48% versus 52%, respectively). Later control dates were no doubt partly due to later ignition dates, given that the date of the last reported wildfire ignition increased by 15 days, but a substantial increase in the length of time the average wildfire burned also played a role. The average time between discovery and control for a wildfire increased from 7.5 days from 1970 to 1986 to 37.1 days from 1987 to 2003. The annual length of the fire season and the average time each fire burned were also moderately correlated with the regional spring and summer temperature (Spearman's correlations of 0.61 ($P < 0.001$) and 0.55 ($P < 0.001$), respectively.

The greatest increase in wildfire frequency has been in the Northern Rockies, which account for 60% of the increase in large fires. Much of the remaining increase (18%) occurred in the Sierra Nevada, southern Cascades, and Coast Ranges of northern California and southern Oregon ("Northern California," in fig. S2). The Pacific Southwest; the Southern Rockies; the Northwest; coastal, central, and southern California; and the Black Hills each account for 11%, 5%, 5%, <1%, and <1%, respectively. Interestingly, the Northern Rockies and the Southwest show the same trend in wildfire frequency relative to their respective forested areas. However, the Southwest's absolute contribution to the western regional total is limited by its smaller forested area relative to higher latitudes.

Increased wildfire frequency since the mid-1980s has been concentrated between 1680 and 2590 m in elevation, with the greatest increase centered around 2130 m. Wildfire activity at these elevations has been episodic, coming in pulses during warm years, with relatively little activity in

Faculty Position in Systems Neuroscience
University of Wisconsin, Madison
Madison, WI

Faculty Positions in Microbiology
University of Central Florida
Orlando, FL

Senior Bioinformatics Scientist
Almac Group
Durham, NC

Associate Professor
Florida State University
Florida

ASSISTANT PROFESSOR
University of Colorado
Boulder, CO

SENIOR RESEARCH TECHNOLOGIST
Lerner Research Institute
Cleveland, OH

FACULTY POSITIONS
Rice University
Houston, TX

More jobs

cool years, and is strongly associated with changes in spring snowmelt timing, which in turn is sensitive to changes in temperature.

**Fire activity and the timing of the spring snowmelt.** As a proxy for the timing of the spring snowmelt, we used Stewart and colleagues' dates of the center of mass of annual flow (CT) for snowmelt-dominated streamflow gauge records in western North America (_32–34_). The annual wildfire frequency for the region is highly correlated (inversely) with CT at gauges across the U.S. Pacific Northwest and interior West, indicating a coherent regional signal of wildfire sensitivity to snowmelt timing (Fig. 2). The negative sign of these correlations indicates that earlier snowmelt dates correspond to increased wildfire frequency. Following Stewart _et al._, we used the first principal component (CT1) of CT at western U.S. streamflow gauges as a regional proxy for interannual variability in the arrival of the spring snowmelt (Fig. 1) (_26_, _32_). This signal had its greatest impact on wildfire frequency between elevations of 1680 and 2590 m (Fig. 2), with a nonlinear response at these elevations to variability in snowmelt timing. Overall, 56% of wildfires and 72% of area burned in wildfires occurred in early (i.e., lower tercile CT1) snowmelt years, whereas only 11% of wildfires and 4% of area burned occurred in late (i.e., upper tercile CT1) snowmelt years.



**Fig. 2.** (**A**) Pearson's rank correlation between annual western U.S. large (>400 ha) forest wildfire frequency and streamflow center timing. _x_ axis, longitude; _y_ axis, latitude. (**B**) Average frequency of western U.S. forest wildfire by elevation and early, mid-, and late snowmelt years from 1970 to 2002. See Fig. 1B for a definition of early, mid-, and late snowmelt years. [View Larger Version of this Image (28K GIF file)]

Temperature affects summer drought, and thus flammability of live and dead fuels in forests through its effect on evapotranspiration and, at higher elevations, on snow. Additionally, warm spring and summer temperatures were strongly associated with reduced winter precipitation over much of the western United States (Fig. 3). The arrival of spring snowmelt in the mountains of the western United States, represented here by CT1, is strongly associated with spring temperature (_26_). Average spring and summer temperatures throughout the entire region are significantly higher in early than in late years (Fig. 3), peaking in April. The average difference between early and late April mean monthly temperatures in forested areas was just over 2°C, and it increased with elevation.



**Fig. 3.** Average difference between early and late snowmelt years in average precipitation from October through May (**A**) and average temperature from March through August (**B**). Contours enclose regions in which a _t_ test for the difference in mean between 11 early and 11 late years was significant ($P < 0.05$). The null hypothesis that precipitation from October through May is normally distributed could not be rejected using the Shapiro-Wilk test for normality ($P > 0.05$ for more than 95% of 24,170 grid cells, $n = 49$ for precipitation; $P > 0.05$ for more than 95% of 24,170 grid cells, $n = 50$ for temperature). See Fig. 1B for a definition of early, mid-, and late snowmelt years. [View Larger

Version of this Image (76K GIF file)]

Snow carries over a substantial portion of the winter precipitation that falls in western mountains, releasing it more gradually in late spring and early summer, providing an important contribution to spring and summer soil moisture (*35*). An earlier snowmelt can lead to an earlier, longer dry season, providing greater opportunities for large fires due both to the longer period in which ignitions could potentially occur and to the greater drying of soils and vegetation. Consequently, it is not surprising that the incidence of wildfires is strongly associated with snowmelt timing.

Changes in spring and summer temperatures associated with an early spring snowmelt come in the context of a marked trend over the period of analysis. Regionally averaged spring and summer temperatures for 1987 to 2003 were 0.87°C higher than those for 1970 to 1986. Spring and summer temperatures for 1987 to 2003 were the warmest since the start of the record in 1895, with 6 years in the 90th percentile—the most for any 17-year period since the start of the record in 1895 through 2003—whereas only 1 year in the preceding 17 years ranked in the 90th percentile. Likewise, 73% of early years since 1970 occurred in 1987 to 2003 (Fig. 1).

**Spatial variability in the wildfire response to an earlier spring.** Vulnerability of western U.S. forests to more frequent wildfires due to warmer temperatures is a function of the spatial distribution of forest area and the sensitivity of the local water balance to changes in the timing of spring. We measured this sensitivity using the October-to-September moisture deficit—the cumulative difference between the potential evapotranspiration due to temperature and the actual evapotranspiration constrained by available moisture—which is an important indicator of drought stress in plants (*24*). We used the percentage difference in the moisture deficit for early versus late snowmelt years scaled by the fraction of forest cover in each grid cell to map forests' vulnerability to changes in the timing of spring (Fig. 4) (*26*). The Northern Rockies and Northern California display the greatest vulnerability by this measure—the same forests accounting for more than three-quarters of increased wildfire frequency since the mid-1980s. Although the trend in temperature over the Northern Rockies increases with elevation, vulnerability in the Northern Rockies is highest around 2130 m, where the greatest increase in fires has occurred. At lower elevations, the moisture deficit in early years is increasing from a high average value (i.e., summer drought tends to be longer and more intense at lower elevations), whereas at higher elevations the longer dry season in early years is still relatively short, and vegetation is somewhat buffered from the effects of higher temperatures by the available moisture.



**Fig. 4.** Index of forest vulnerability to changes in the timing of spring: the percentage difference in cumulative moisture deficit from October to August at each grid point in early versus late snowmelt years, scaled by the forest-type vegetation fraction at each grid point, for 1970 to 1999 (*26*). See fig. S3 for a map of forest vulnerability for 1970 to 2003 over a smaller spatial domain. See Fig. 1B for a definition of early, mid-, and late snowmelt years. [View Larger Version of this Image (45K GIF file)]

**Discussion.** Robust statistical associations between wildfire and hydroclimate in western forests

indicate that increased wildfire activity over recent decades reflects sub-regional responses to changes in climate. Historical wildfire observations exhibit an abrupt transition in the mid-1980s from a regime of infrequent large wildfires of short (average of 1 week) duration to one with much more frequent and longer burning (5 weeks) fires. This transition was marked by a shift toward unusually warm springs, longer summer dry seasons, drier vegetation (which provoked more and longer burning large wildfires), and longer fire seasons. Reduced winter precipitation and an early spring snowmelt played a role in this shift. Increases in wildfire were particularly strong in mid-elevation forests.

The greatest absolute increase in large wildfires occurred in Northern Rockies forests. This sub-region harbors a relatively large area of mesic, middle and high elevation forest types (such as lodgepole pine and spruce-fir) where fire exclusion has had little impact on natural fire regimes (1, 5), but where we found that an advance in spring produces a relatively large percentage increase in cumulative moisture deficit by midsummer. In contrast, changes in Northern California forests may involve both climate and land-use effects. In these forests, large percentage changes in moisture deficits were strongly associated with advances in the timing of spring, and this area also includes substantial forested area where fire exclusion, timber harvesting, and succession after mining activities have led to increased forest densities and fire risks (10, 11). Northern California forests have had substantially increased wildfire activity, with most wildfires occurring in early years. Southwest forests, where fire exclusion has had the greatest effect on fire risks (2, 3), have also experienced increased numbers of large wildfires, but the relatively small forest area there limits the impact on the regional total, and the trend appears to be less affected by changes in the timing of spring. Most wildfires in the Southern Rockies and Southern California have also occurred in early snowmelt years, but again forest area there is small relative to the Northern Rockies and Northern California. Thus, although land-use history is an important factor for wildfire risks in specific forest types (such as some ponderosa pine and mixed conifer forests), the broad-scale increase in wildfire frequency across the western United States has been driven primarily by sensitivity of fire regimes to recent changes in climate over a relatively large area.

The overall importance of climate in wildfire activity underscores the urgency of ecological restoration and fuels management to reduce wildfire hazards to human communities and to mitigate ecological impacts of climate change in forests that have undergone substantial alterations due to past land uses. At the same time, however, large increases in wildfire driven by increased temperatures and earlier spring snowmelts in forests where land-use history had little impact on fire risks indicates that ecological restoration and fuels management alone will not be sufficient to reverse current wildfire trends.

These results have important regional and global implications. Whether the changes observed in western hydroclimate and wildfire are the result of greenhouse gas–induced global warming or only an unusual natural fluctuation is beyond the scope of this work. Regardless of past trends, virtually all climate-model projections indicate that warmer springs and summers will occur over the region in coming decades. These trends will reinforce the tendency toward early spring snowmelt (36, 37) and longer fire seasons. This will accentuate conditions favorable to the occurrence of large wildfires, amplifying the vulnerability the region has experienced since the mid-1980s. The Intergovernmental Panel on Climate Change's consensus range of 1.5° to 5.8°C projected global surface temperature warming by the end of the 21st century is considerably larger than the recent warming of less than 0.9°C observed in spring and summer during recent decades over the western region (37).

If the average length and intensity of summer drought increases in the Northern Rockies and mountains elsewhere in the western United States, an increased frequency of large wildfires will lead to changes in forest composition and reduced tree densities, thus affecting carbon pools. Current estimates indicate that western U.S. forests are responsible for 20 to 40% of total U.S. carbon sequestration (38, 39). If wildfire trends continue, at least initially, this biomass burning

will result in carbon release, suggesting that the forests of the western United States may become a source of increased atmospheric carbon dioxide rather than a sink, even under a relatively modest temperature-increase scenario (*38*, *39*). Moreover, a recent study has shown that warmer, longer growing seasons lead to reduced $CO_2$ uptake in high-elevation forests, particularly during droughts (*40*). Hence, the projected regional warming and consequent increase in wildfire activity in the western United States is likely to magnify the threats to human communities and ecosystems, and substantially increase the management challenges in restoring forests and reducing greenhouse gas emissions.

### References and Notes

1. C. Whitlock, *Nature* **432**, 28 (2004). [CrossRef]

2. W. W. Covington, *Nature* **408**, 135 (2000). [CrossRef] [Medline]

3. C. D. Allen *et al.*, *Ecol. Appl.* **12**, 1418 (2002). [CrossRef]

4. J. L. Pierce, G. A. Meyer, A. J. T. Jull, *Nature* **432**, 87 (2004). [CrossRef]

5. T. Schoennagel, T. T. Veblen, W. H. Romme, *BioScience* **54**, 661 (2004). [CrossRef] [ISI]

6. M. Savage, T. W. Swetnam, *Ecology* **71**, 2374 (1990). [CrossRef] [ISI]

7. A. J. Belsky, D. M. Blumenthal, *Conserv. Biol.* **11**, 315 (1997). [CrossRef]

8. S. J. Pyne, P. L. Andrews, R. D. Laven, *Introduction to Wildland Fire* (Wiley, New York, 1996).

9. W. W. Covington, M. M. Moore, *J. For.* **92**, 39 (1994).

10. K. S. McKelvey *et al.*, in *Sierra Nevada Ecosystems Project: Final Report to Congress* (Univ. of California, Davis, CA, 1996), vol. 2, chap. 37.

11. G. E. Gruell, *Fire in Sierra Nevada Forests: A Photographic Interpretation of Ecological Change Since 1849* (Mountain Press, Missoula, MT, 2001).

12. T. Schoennagel, T. T. Veblen, W. H. Romme, J. S. Sibold, E. R. Cook, *Ecol. Appl.* **15**, 2000 (2005).

13. R. C. Balling, G. A. Meyer, S. G. Wells, *Agric. For. Meteorol.* **60**, 285 (1992). [CrossRef]

14. E. K. Heyerdahl, L. B. Brubaker, J. K. Agee, *Holocene* **12**, 597 (2002).

15. K. F. Kipfmueller, T. W. Swetnam, in *Wilderness Ecosystems, Threats, and Management*, D. N. Cole, S. F. McCool, W. T. Borrie, J. O'Loughlin, Eds. (U.S. Forest Service, RMRS-P-15, Fort Collins, CO, 2000), vol. 5, pp. 270–275.

16. T. W. Swetnam, J. L. Betancourt, *J. Clim.* **11**, 3128 (1998). [CrossRef]

17. T. T. Veblen, T. Kitzberger, J. Donnegan, *Ecol. Appl.* **10**, 1178 (2000). [CrossRef]

18. A. L. Westerling, T. J. Brown, A. Gershunov, D. R. Cayan, M. D. Dettinger, *Bull. Am. Meteorol. Soc.* **84**, 595 (2003). [CrossRef]

19. T. W. Swetnam, J. L. Betancourt, *Science* **249**, 1017 (1990).[Abstract/Free Full Text]

20. A. Gershunov, T. P. Barnett, *J. Clim.* **11**, 1575 (1998). [CrossRef]

21. A. Gershunov, T. P. Barnett, D. R. Cayan, *Eos* **80**, 25 (1999).

22. A. L. Westerling, T. W. Swetnam, *Eos* **84**, 545 (2003).

23. N. L. Stephenson, *Am. Nat.* **135**, 649 (1990). [CrossRef] [ISI]

24. N. L. Stephenson, *J. Biogeogr.* **25**, 855 (1998). [CrossRef]

25. T. W. Swetnam, *Science* **262**, 885 (1993).[Abstract/Free Full Text]

26. Materials and methods are available as supporting material on *Science* Online.

27. K. E. Mitchell *et al.*, *J. Geophys. Res.* **109**, D07S90 (2004). [CrossRef]

28. E. P. Maurer, A. W. Wood, J. C. Adam, D. P. Lettenmaier, B. Nijssen, *J. Clim.* **15**, 3237 (2002). [CrossRef]

29. A. F. Hamlet, D. P. Lettenmaier, *J. Hydrometeor.* **6**, 330 (2005). [CrossRef]

30. NCDC, "Time bias corrected divisional temperature-precipitation-drought index," documentation for data set TD-9640 (DBMB, NCDC, NOAA, Asheville, NC, 1994); available

online (www.ncdc.noaa.gov/oa/climate/onlineprod/drought/readme.html).

31. X. Liang, D. P. Lettenmaier, E. F. Wood, S. J. Burges, *J. Geophys. Res.* **99**, 14415 (1994). [CrossRef]

32. I. T. Stewart, D. R. Cayan, M. D. Dettinger, *J. Clim.* **18**, 1136 (2005). [CrossRef]

33. D. R. Cayan, S. A. Kammerdiener, M. D. Dettinger, J. M. Caprio, D. H. Peterson, *Bull. Am. Meteorol. Soc.* **82**, 399 (2001). [CrossRef]

34. J. R. Slack, J. M. Landwehr, *U.S. Geol. Surv. Open-File Rep. 92–129* (1992).

35. J. Sheffield, G. Goteti, F. H. Wen, E. F. Wood, *J. Geophys. Res.* **109**, D24108 (2004). [CrossRef]

36. National Assessment Synthesis Team, *Climate Change Impacts on the United States: The Potential Consequences of Climate Variability and Change* (U.S. Global Change Research Program, Washington, DC, 2000).

37. J. T. Houghton *et al.*, Eds., *IPCC Climate Change 2001: The Scientific Basis* (Cambridge Univ. Press, Cambridge and New York, 2001).

38. S. W. Pacala *et al.*, *Science* **292**, 2316 (2001).[Abstract/Free Full Text]

39. D. Schimel, B. H. Braswell, in *Global Change and Mountain Regions: An Overview of Current Knowledge*, U. M. Huber, H. K. M. Bugmann, M. A. Reasoner, Eds., vol. 23 of *Advances in Global Change Research* (Springer, Dordrecht, Netherlands, 2005), pp. 449–456. [CrossRef]

40. W. Sacks, D. Schimel, R. Monson, *Oecologia*, in press.

41. We thank M. Dettinger and D. Schimel for help. This work was supported by grants from the National Oceanographic and Atmospheric Administration's Office of Global Programs, the National Fire Plan by means of the U.S. Forest Service's Southern Research Station, and the California Energy Commission.

**Supporting Online Material**

www.sciencemag.org/cgi/content/full/1128834/DC1

Materials and Methods

Figs. S1 to S3

References

Received for publication 17 April 2006. Accepted for publication 28 June 2006.

**The editors suggest the following Related Resources on *Science* sites:**

**In *Science* Magazine**

***PERSPECTIVES***
**CLIMATE CHANGE: Is Global Warming Causing More, Larger Wildfires?**
Steven W. Running (18 August 2006)
*Science* **313** (5789), 927. [DOI: 10.1126/science.1130370]
   **Summary »   Full Text »   PDF »**

**THIS ARTICLE HAS BEEN CITED BY OTHER ARTICLES:**

**Reburn severity in managed and unmanaged vegetation in a large wildfire.**
J. R. Thompson, T. A. Spies, and L. M. Ganio (2007)
PNAS **104**, 10743-10748

**Abstract »**    **Full Text »**    **PDF »**

**Inaugural Article: Inorganic nitrogen availability after severe stand-replacing fire in the Greater Yellowstone ecosystem.**
M. G. Turner, E. A. H. Smithwick, K. L. Metzger, D. B. Tinker, and W. H. Romme (2007)
PNAS **104**, 4782-4789
    **Abstract »**    **Full Text »**    **PDF »**

**From the Cover: Contingent Pacific-Atlantic Ocean influence on multicentury wildfire synchrony over western North America.**
T. Kitzberger, P. M. Brown, E. K. Heyerdahl, T. W. Swetnam, and T. T. Veblen (2007)
PNAS **104**, 543-548
    **Abstract »**    **Full Text »**    **PDF »**

ADVERTISEMENT

**Effective Gun Training**
You can go to the range forever or you can spend four days with us.
www.FrontSight.com

**Guaranteed OnSite**
Flame Retardant Applicators Approved Certificates Provided
www.guaranteedonsite.com/

**Discount Travel**
Find great deals & compare prices. Book now and save!
LowFares.com/Ticketing

**Looking For Fire Doors?**
We Offer An Extensive Range Of Fire & Smoke Resistant Doors. Buy Today!
www.AyBPuertas.es/Fire_Doors

Ads by Google

Magazine  |  News  |  STKE  |  Careers  |  Multimedia  |  Collections  |  Help  |  Site Map

Subscribe  |  Feedback  |  Privacy / Legal  |  About Us  |  Advertise With Us  |  Contact Us

© 2006 American Association for the Advancement of Science. All Rights Reserved.
AAAS is a partner of HINARI, AGORA, PatientInform, CrossRef, and COUNTER.

U.S. DISTRICT COURT, DISTRICT OF COLUMBIA
Case No. 1:07-cv-02024-RCL

Plaintiff State of California and Plaintiff-Intervenors'
Request for Judicial Notice in Support of
Motion for Summary Judgment

# EXHIBIT 59

United States
Environmental Protection
Agency

Office of Policy, Planning
and Evaluation
(2111)

EPA 230-F-97-008e
September 1997

 **EPA**  # Climate Change And California

The earth's climate is predicted to change because human activities are altering the chemical composition of the atmosphere through the buildup of greenhouse gases — primarily carbon dioxide, methane, nitrous oxide, and chlorofluorocarbons. The heat-trapping property of these greenhouse gases is undisputed. Although there is uncertainty about exactly how and when the earth's climate will respond to enhanced concentrations of greenhouse gases, observations indicate that detectable changes are under way. There most likely will be increases in temperature and changes in precipitation, soil moisture, and sea level, which could have adverse effects on many ecological systems, as well as on human health and the economy.

## The Climate System

Energy from the sun drives the earth's weather and climate. Atmospheric greenhouse gases (water vapor, carbon dioxide, and other gases) trap some of the energy from the sun, creating a natural "greenhouse effect." Without this effect, temperatures would be much lower than they are now, and life as known today would not be possible. Instead, thanks to greenhouse gases, the earth's average temperature is a more hospitable 60°F. However, problems arise when the greenhouse effect is *enhanced* by human-generated emissions of greenhouse gases.

Global warming would do more than add a few degrees to today's average temperatures. Cold spells still would occur in winter, but heat waves would be more common. Some places would be drier, others wetter. Perhaps more important, more precipitation may come in short, intense bursts (e.g., more than 2 inches of rain in a day), which could lead to more flooding. Sea levels would be higher than they would have been without global warming, although the actual changes may vary from place to place because coastal lands are themselves sinking or rising.

### The Greenhouse Effect



Source: U.S. Department of State (1992)

## Emissions Of Greenhouse Gases

Since the beginning of the industrial revolution, human activities have been adding measurably to natural background levels of greenhouse gases. The burning of fossil fuels — coal, oil, and natural gas — for energy is the primary source of emissions. Energy burned to run cars and trucks, heat homes and businesses, and power factories is responsible for about 80% of global carbon dioxide emissions, about 25% of U.S. methane emissions, and about 20% of global nitrous oxide emissions. Increased agriculture and deforestation, landfills, and industrial production and mining also contribute a significant share of emissions. In 1994, the United States emitted about one-fifth of total global greenhouse gases.

## Concentrations Of Greenhouse Gases

Since the pre-industrial era, atmospheric concentrations of carbon dioxide have increased nearly 30%, methane concentrations have more than doubled, and nitrous oxide concentrations have risen by about 15%. These increases have enhanced the heat-trapping capability of the earth's atmosphere. Sulfate aerosols, a common air pollutant, cool the atmosphere by reflecting incoming solar radiation. However, sulfates are short-lived and vary regionally, so they do not offset greenhouse gas warming.

Although many greenhouse gases already are present in the atmosphere, oceans, and vegetation, their concentrations in the future will depend in part on present and future emissions. Estimating future emissions is difficult, because they will depend on demographic, economic, technological, policy, and institutional developments. Several emissions scenarios have been developed based on differing projections of these underlying factors. For example, by 2100, in the absence of emissions control policies, carbon dioxide concentrations are projected to be 30-150% higher than today's levels.

## Current Climatic Changes

Global mean surface temperatures have increased 0.6-1.2°F since the late 19th century. The 9 warmest years in this century all have occurred in the last 14 years.

Several pieces of additional evidence consistent with warming, such as a decrease in Northern Hemisphere snow cover, a decrease in Arctic Sea ice, and continued melting of alpine glaciers, have been corroborated. Globally, sea levels have risen 4-10 inches over the past century, and precipitation over land has increased slightly. The frequency of extreme rainfall events also has increased throughout much of the United States.

### Global Temperature Changes (1861–1996)



Source: IPCC (1995), updated

A new international scientific assessment by the Intergovernmental Panel on Climate Change recently concluded that *"the balance of evidence suggests a discernible human influence on global climate."*

## Future Climatic Changes

For a given concentration of greenhouse gases, the resulting increase in the atmosphere's heat-trapping ability can be predicted with precision, but the resulting impact on climate is more uncertain. The climate system is complex and dynamic, with constant interaction between the atmosphere, land, ice, and oceans. Further, humans have never experienced such a rapid rise in greenhouse gases. In effect, a large and uncontrolled planet-wide experiment is being conducted.

General circulation models are complex computer simulations that describe the circulation of air and ocean currents and how energy is transported within the climate system. While uncertainties remain, these models are a powerful tool for studying climate. Scientists are reasonably confident about the ability of models to characterize future climate at continental scales.

Recent model calculations suggest that the global surface temperature could increase an average of 1.6-6.3°F by 2100, with significant regional variation. These temperature changes would be far greater than recent natural fluctuations, and they would occur significantly faster than any known changes in the last 10,000 years. The United States is projected to warm more than the global average, especially as fewer sulfate aerosols are produced.

The models suggest that the rate of evaporation will increase as the climate warms, which will increase average global precipitation. They also suggest increased frequency of intense rainfall as well as a marked decrease in soil moisture over some mid-continental regions during the summer. Sea level is projected to increase by 6-38 inches by 2100.

Calculations of regional climate change are much less reliable than global ones, and it is unclear whether regional climate will become more variable. The frequency and intensity of some extreme weather of critical importance to ecological systems (droughts, floods, frosts, cloudiness, and associated fire and pest outbreaks) could increase.

## Local Climate Changes

Over the last century, the average temperature in Fresno, California, has increased from 61.9°F (1899-1928 average) to 63.3°F (1966-1995 average), and precipitation has decreased by up to 20% in many parts of the state.

Over the next century, California's climate may change even more. Based on projections given by the Intergovernmental Panel on Climate Change and results from the United Kingdom Hadley Centre's climate model (HadCM2), a model that accounts for both greenhouse gases and aerosols, by 2100 temperatures in California could increase by about 5°F (with a range of 2-9°F) in the winter and summer and slightly less in the spring and fall. Appreciable increases in precipitation are projected: 20-30% (with a range of 10-50%) in spring and fall, with somewhat larger increases in winter. Little change is projected for summer.

The amount of precipitation on extreme wet days most likely would increase, especially in the winter and fall, and there could be a decrease in the number of long dry spells and an increase in the number of long wet spells.

## Climate Change Impacts

Global climate change poses risks to human health and to terrestrial and aquatic ecosystems. Important economic resources such as agriculture, forestry, fisheries, and water resources also may be affected. Warmer temperatures, more severe droughts and floods, and sea level rise could have a wide range of impacts. All these stresses can add to existing stresses on resources caused by other influences such as population growth, land-use changes, and pollution.

Similar temperature changes have occurred in the past, but the previous changes took place over centuries or millennia instead of decades. The ability of some plants and animals to migrate and adapt appears to be much slower than the predicted rate of climate change.

### Precipitation Trends From 1900 To Present



Source: Karl et al. (1996)

2

## Human Health

Higher temperatures and increased frequency of heat waves may increase the number of heat-related deaths and the incidence of heat-related illnesses. Cities such as Los Angeles that experience occasional very hot, dry weather may be especially susceptible. One study estimates that a 3°F warming could almost double heat-related deaths in Los Angeles, from about 70 today to 125 (although increased air conditioning use may not have been fully accounted for). Little change in winter mortality is expected in Los Angeles. The elderly, particularly those living alone, are at greatest risk.

There is concern that climate change could increase concentrations of ground-level ozone. For example, high temperatures, strong sunlight, and stable air masses tend to increase urban ozone levels. Air pollution also is made worse by increases in natural hydrocarbons emissions during hot weather. If a warmed climate causes increased use of air conditioners, air pollutant emissions from power plants also will increase.

In the Bay Area and the Central Valley, with no other changes in weather or emissions, a 7.2°F warming would increase ozone concentrations by 20% and almost double the size of the area not meeting national health standards for air quality. Currently, the national standards for ozone are not attained throughout much of the state. Ground-level ozone has been shown to aggravate existing respiratory illnesses such as asthma, reduce lung function, and induce respiratory inflammation. In addition, ambient ozone reduces agricultural crop yields and impairs ecosystem health.

## Agriculture

The mix of crop and livestock production in a state is influenced by climatic conditions and water availability. As climate warms, production patterns will shift northward. Increases in climate variability could make adaptation by farmers more difficult. Warmer climates and less soil moisture due to increased evaporation may increase the need for irrigation. However, these same conditions could decrease water supplies, which also may be needed by natural ecosystems, urban populations, and other economic sectors.

Understandably, most studies have not fully accounted for changes in climate variability, water availability, and imperfect responses by farmers to changing climate. Including these factors could substantially change modeling results. Analyses based on changes in average climate and which assume farmers effectively adapt suggest that aggregate U.S. food production will not be harmed, although there may be significant regional changes.

In California, agriculture is about a $19 billion annual industry, one-third of which comes from livestock. About 3% of total U.S. farm acres is in California. The principal crops are cotton, wheat, hay, tomatoes, and oranges, as well as many other vegetables and fruits. About 87% of the acres farmed is irrigated. While climate change could decrease cotton yields by 9-17% and wheat yields by 48-66%, hay, orange, and tomato yields could increase. Total

### Changes In Agricultural Yield And Production



Source: Mendelsohn and Neumann (in press); McCarl (personal communication)

acres farmed and irrigated acres could fall slightly, and farm income could remain unchanged or increase by up to 40% because of possible price increases.

## Coastal Areas

Sea level rise could lead to flooding of low-lying property, loss of coastal wetlands, erosion of beaches, saltwater contamination of drinking water, and decreased longevity of low-lying roads, causeways, and bridges. In addition, sea level rise could increase the vulnerability of coastal areas to storms and associated flooding.

Along much of California's coast, sea level already is rising by 3-8 inches per century (3 inches at Los Angeles, 5 inches at San Francisco, and 8 inches at San Diego), and it is likely to rise by another 13-19 inches by 2100. The beaches stretching from Santa Barbara to San Diego have been replenished with sand, and undoubtedly will be replenished further or protected with structures if threatened by sea level rise. Cumulative costs for sand replenishment to protect California's coastline from a 20-inch sea level rise through 2100 could be $174 million to $3.5 billion.

San Francisco Bay contains the most extensive salt marshes on the West Coast, most of which have been modified dramatically by dredging and filling activities. A 1-3 foot increase in sea level may move the existing salt marshes in the bay to nearby lowlands and freshwater marshes, but development probably will limit the extent to which these marshes can "migrate" to new areas.

## Water Resources

Water resources are affected by changes in precipitation as well as by temperature, humidity, wind, and sunshine. Changes in streamflow tend to magnify changes in precipitation. Water resources in drier climates tend to be more sensitive to climate changes. Because evaporation is likely to increase with warmer

climate, it could result in lower river flow and lower lake levels, particularly in the summer. In addition, more intense precipitation could increase flooding. If streamflow and lake levels drop, groundwater also could be reduced.

The seasonal pattern of runoff into California's reservoirs could be susceptible to climatic warming. Winter runoff most likely would increase, while spring and summer runoff would decrease. This shift could be problematic, because the existing reservoirs are not large enough to store the increased winter flows for release in the summer. Increased winter flows to San Francisco Bay could increase the risk of flooding. The fragile environment of the bay's delta islands could be at risk from increased flooding and the upstream movement of saltwater from the bay.

Because the Colorado River, the major water source for southern California, has extensive storage capacity, the reliability of this water supply to California is not vulnerable to seasonal changes. However, it is not known if flow in the Colorado River will increase or decrease under climate change.

California's groundwater supplies are likely to be affected by climate change as well. Unless precipitation increases, the increased evaporation that would accompany warmer temperatures probably would reduce groundwater supplies.

## Forests

Trees and forests are adapted to specific climate conditions, and as climate warms, forests will change. These changes could include changes in species, geographic extent, and health and productivity. If conditions also become drier, the current range and density of forests could be reduced and replaced by grasslands and pasture. Even a warmer and wetter climate would lead to changes; trees that are better adapted to these conditions, such as oaks and redwoods, would thrive. Under these conditions, forests could become more dense. These changes could occur during the lifetimes of today's children, particularly if they are accelerated by other stresses such as fire, pests, and diseases. Some of these stresses would themselves be worsened by a warmer and drier climate.

With changes in climate, the extent of forested areas in California could change little or decline by as much as 25-50%. The uncertainties depend on many factors, including whether soils become drier and, if so, by how much drier. Hotter, drier weather could increase the frequency and intensity of wildfires, threatening both property and forests. Along the Sierras, drier conditions could reduce the range and productivity of conifer and oak forests. Farther north and along the northern coast, drier conditions could reduce growth of the Douglas fir and redwood forests. A significant increase in the extent of grasslands and chaparral throughout the state could result. These changes would affect the character of California forests and the activities that depend on them.

### Changes In Forest Cover



Current          +10°F, +13% Precipitation

- ■ Tundra
- ■ Conifer Forest
- ■ Savanna/Woodland
- ■ Shrub/Woodland
- ■ Grasslands
- ■ Arid Lands

Source: VEMAP Participants (1995); Neilson (1995)

## Ecosystems

California is an ecologically diverse state, with 134 endangered and threatened species, including the sea otter, the California condor, and the American bald eagle. California's unique ecosystems include 25,000 square miles of desert (such as the Mojave desert and the Colorado desert). California's mountain ecosystems in the Sierra Nevada, including Yosemite National Park's 1,200 square miles, contain alpine wilderness areas with large numbers of sequoia trees. The ranges of many species of plants and animals are restricted and fragmented because of both natural and human causes. Many invading species have colonized large areas and displaced native species in the wake of environmental changes in recent centuries.

Climate change could have an impact on many of California's species and ecosystems. For example, between 1992 and 1996 the range of the bay checkerspot butterfly shifted 130 miles to the north and to higher altitudes as a result of climate change. Without natural corridors to allow migration, isolated species could be limited in their ability to adapt to climate change. Plant and animal species near the borders of their ranges are likely to be most affected. Climate change could create more opportunity for the establishment and spread of weeds and pests. Increased fire from climate change could further threaten species in California.

Cold water species such as mountain whitefish and brook trout could lose all of their habitat because of climate change. Other cold water species such as cold water guild, chinook salmon, and kokanee salmon could lose most of their habitat.

*For further information about the potential impacts of climate change, contact the Climate and Policy Assessment Division (2174), U.S. EPA, 401 M Street SW, Washington, DC 20460.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STATE OF CALIFORNIA, by and through ARNOLD SCHWARZENEGGER, GOVERNOR OF THE STATE OF CALIFORNIA, and the CALIFORNIA AIR RESOURCES BOARD,**<br><br>                                             Plaintiff,<br><br>**COMMONWEALTH OF MASSACHUSETTS, et al.,**<br><br>                                   Intervenor Plaintiffs,<br><br>**WASHINGTON  ENVIRONMENTAL  COUNCIL, et al.,**<br><br>                                   Intervenor Plaintiffs,<br><br>**STATE OF DELAWARE**<br><br>                                   Intervenor Plaintiff,<br>and<br><br>**NATURAL RESOURCES DEFENSE COUNCIL, et al.,**<br><br>                                   Intervenor Plaintiffs,<br><br>v.<br><br>**THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and STEPHEN L. JOHNSON, Administrator,**<br><br>                                             Defendants. | Case No: 1:07-CV-02024-RCL<br><br>**[PROPOSED] ORDER GRANTING PLAINTIFF STATE OF CALIFORNIA AND PLAINTIFF-INTERVENORS' MOTION FOR SUMMARY JUDGMENT** |

Upon consideration of the motion of Plaintiff and Plaintiff-Intervenors for summary judgment and the responses thereto, it is hereby ORDERED that the motion is GRANTED.

Defendants United States Environmental Protection Agency and Stephen L. Johnson, Administrator, are ordered to publish decision documents regarding California's waiver request in the Federal Register no later than fifteen days from the date of this Order.

IT IS SO ORDERED.

_____
Royce C. Lamberth
United States District Judge

Date: _____

1